UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

IN RE:                                          CASE NO. 09-34791-BKC-RBR

ROTHSTEIN ROSENFELDT                    CHAPTER 11
ADLER, P.A.,

                Debtor.
_____/

## NOTICE OF FILING GOVERNMENT'S RESPONSE TO CHAPTER 11 BANKRUPTCY TRUSTEE'S MOTION FOR JOINT STATUS CONFERENCE

The United States of America ("the United States"), by and through its undersigned attorney,

Jeffrey H. Sloman, United States Attorney, and pursuant to the Court's Order [D.E. 374] directing

a response by the United States to the Chapter 11 Bankruptcy Trustee's Motion for Joint Status

Conference [D.E. 362], hereby files the Government's Response in Opposition to the Chapter 11

Bankruptcy Trustee's Motion for Joint Status Conference filed with the District Court in United

States v. Scott Rothstein, Case No. 09-60331-CR-COHN, at D.E. 95.[1]  The United States further

files herewith a copy of its Response in Opposition to Chapter 11 Bankruptcy Trustee's Motion to

Refer All Third Party Claims to the United States Bankruptcy Court [D.E. 94] as it is referenced in

its Response [D.E. 95] filed in the District Court.[2]

---

[1]The Chapter 11 Bankruptcy Trustee filed an identical Motion for Joint Status Conference in the pending criminal proceedings. See D.E. 89.

[2] The Chapter 11 Bankruptcy Trustee filed a copy of his Motion to Refer All Third Party Claims to the United States Bankruptcy Court in this case. See D.E. 363.

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the State of Florida and that I am

exempted from additional qualifications to practice in this Court pursuant to Local Rule

2090-1(B)(2)(b) pertaining to attorneys representing the United States government.

<div style="margin-left:40%">

Respectfully submitted,

JEFFREY H. SLOMAN
UNITED STATES ATTORNEY

By:     *s/ Grisel Alonso*
         GRISEL ALONSO
         Assistant United States Attorney
         Fla. Bar No. 702994
         99 NE 4th St., Suite 300
         Miami, FL 33132
         Tel. No.  (305) 961-9310
         Fax  No.  (305) 530-7139
         e-mail: grisel.alonso@usdoj.gov

COUNSEL FOR UNITED STATES

</div>

2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 10, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document has been served electronically via the Court's CM/ECF system upon the parties who are currently on the list to receive notice/service for this case.

*s/ Grisel Alonso*
GRISEL ALONSO
Assistant United States Attorney

AWL:awl

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60331-CR-COHN

UNITED STATES OF AMERICA,

v.

SCOTT W. ROTHSTEIN,

        Defendant.

_____/

### GOVERNMENT'S RESPONSE IN OPPOSITION TO
### CHAPTER 11 BANKRUPTCY TRUSTEE'S
### MOTION FOR JOINT STATUS CONFERENCE

The United States of America responds in opposition to the Chapter 11 Bankruptcy Trustee's Motion for Joint Status Conference (hereinafter "motion for conference") [DE #89]. The motion for conference should be denied because: (1) this Court has exclusive jurisdiction over the forfeitable assets and the Bankruptcy Trustee is barred from intervening at this time;[1] (2) neither a preliminary order of forfeiture nor restitution order has been entered in this case, and even if a preliminary order of forfeiture or a restitution order had been entered, the Bankruptcy Trustee fails to articulate how a joint status conference will advance the turnover of forfeitable assets to the bankruptcy estate; and (3) the United States and the Bankruptcy Trustee are engaged in discussions to see if common ground can be found.

In support of its response in opposition, the United States submits as follows:

_____

[1]Government's Response in Opposition to Chapter 11 Bankruptcy Trustee's Motion to Refer All Third Party Claims to the United States Bankruptcy Court [DE #94] (hereinafter referred to as "Government's Response to Motion for Reference") is hereby incorporated by reference.

1.    The Exclusive Jurisdiction of this Court and the Bar on Intervention Precludes A Joint Status
Conference

The Bankruptcy Trustee's motion seems to ignore two inescapable facts: a) this Court has

exclusive jurisdiction over criminal proceedings, including forfeiture and/or restitution;[2] and b) the

Bankruptcy Trustee's efforts to intervene in this criminal action are specifically barred by statute.[3]

Because this Court has exclusive jurisdiction over this criminal action and because of the statutory

bar on intervention, the Bankruptcy Trustee's Motion for Joint Status Conference must be denied.

2.    Neither a Preliminary Order of Forfeiture Nor A Restitution Order Has Been Entered

The Bankruptcy Trustee relies on *U.S. v. Dreier* for the proposition that this "procedure has

been used in other circuits [sic] when faced with similar situations." [DE #89 p.2]. As stated in

Government's Response to Motion for Reference, the Bankruptcy Trustee's reliance on *Dreier* is

misplaced. First, the coordination agreements entered in the *Dreier* case were entered post entry of

a preliminary order of forfeiture. Second, the property released by the Chapter 11 Trustee under the

coordination agreement, the 97 pieces of artwork, was property that had been seized as "substitute

assets." With regard to the three real properties referenced in the coordination agreement between

the United States and the Chapter 7 Trustee, the Government agreed to release ten percent of the

proceeds from the sale of the three real properties to the Chapter 7 bankruptcy estate in exchange

for the Bankruptcy Trustee's successful efforts to market and sell these properties. *See United States

v. Marc Dreier*, Case No. 09 Cr. 085, Memorandum Order of February 5, 2010, p.4, a copy of which

is attached hereto as Exhibit 1.

---

[2] *See*  DE #94, pp. 1-3.

[3] *See* DE #94, pp. 2-8.  *See also* DE #23, pp. 5-7 .

Thus, in *Dreier*, not only had a preliminary order of forfeiture been entered at the time the coordination agreements were crafted, but the property released to the Chapter 11 Trustee was not forfeitable. In the case before this Court, neither a preliminary order of forfeiture nor a restitution order has been entered. The differences between the instant case and *Dreier* reflect that the joint status conference "solution" urged by the Bankruptcy Trustee, is inapposite. The Bankruptcy Trustee's motion should be denied.

3.    The United States and the Bankruptcy Trustee Are Already Engaged in Discussions

To the extent that the United States can further its mission and duties while assisting the Bankruptcy Trustee in the performance of his fiduciary duties to all classes of creditors, the United States stands ready and willing to do so. The United States and the Bankruptcy Trustee have been engaged in discussions since December, 2009. To this end, not only has the United States Attorney for the Southern District of Florida and representatives of his staff met with the Bankruptcy Trustee, his counsel and Counsel for the Unsecured Creditors Committee, but there has been an exchange of written communications in an effort to see if common ground can be found.    Indeed, simultaneously with the filing of this Response, the United States is responding to the Bankruptcy Trustee's letter of February 17, 2010.

Although the United States is making every effort to see where it can find common ground with the Bankruptcy Trustee to expedite and maximize victim recovery, substantial complex legal and logistical issues must be deliberated and resolved to ensure that the United States does not compromise its mandate under The Justice for All Act of 2004, 18 U.S.C. §3771.[4] The Bankruptcy

---

[4] It would be impossible for the United States to fulfill its mandate without resolving certain threshold questions before it fully deliberates to the issue of the Bankruptcy Trustee's fees and costs and the resulting impact on creditor/victim recovery. Even if possible

Trustee fails to articulate how a joint status conference will accomplish the resolution of the substantial complex issues that must be resolved before any agreement can be reached.

WHEREFORE, based on the foregoing, the United States respectfully submits that this Court should deny the Bankruptcy Trustee's motion for joint status conference.

Respectfully submitted,

JEFFREY H. SLOMAN
UNITED STATES ATTORNEY

By: /s/ *Alison W. Lehr*
Alison W. Lehr (FL Bar No.444537)
Assistant United States Attorney
99 NE 4th Street
Miami, FL 33132-2111
Tel. (305) 961-9176
Fax. (305) 536-7599
Alison.Lehr@usdoj.gov

By: /s/ *Evelyn B. Sheehan*
Evelyn B. Sheehan (FL Bar No.944351)
Assistant United States Attorney
99 NE 4th Street
Miami, FL 33132-2111
Tel. (305) 961-9125
Fax. (305) 536-7599
Evelyn.Sheehan@usdoj.gov

coordination with the Bankruptcy Trustee yields efficiencies or results, said efficiencies will be severely undermined by multi-million dollar fees and costs that would inevitably have a direct impact on victim recovery. The United States must make certain that any potential coordination agreement justifies the proportional reduction in victim recovery.

-4-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 8, 2010, I electronically filed the foregoing

Government's Response To Chapter 11 Bankruptcy Trustee's Motion For Joint Status Conference.

/s/Alison W. Lehr
Alison W. Lehr
Assistant United States Attorney

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
UNITED STATES OF AMERICA,               :
                                        :
              -v-                       :
                                        :
MARC DREIER,                            :
                                        :
              Defendant.                :
------------------------------------ x
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/5/10
```

09 Cr. 085 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

        An under-appreciated evil of substantial frauds like those of

Marc Dreier is how they pit their victims against one another.

Where, as here, the funds remaining after the fraud is uncovered are

insufficient to make whole Dreier's numerous victims and creditors,

these unfortunates are left to squabble over who should get what.  In

this case, moreover, resolution of these competing claims involves

consideration of three bodies of law -- criminal law, securities law,

and bankruptcy law -- that cannot always be reconciled without some

friction.

        For some time now, it has been evident to this Court in

presiding over the criminal action against Dreier, and to the judges

presiding over the civil enforcement action brought against Dreier by

the Securities and Exchange Commission and the bankruptcy proceedings

involving the estates of Dreier and his law firm, Dreier LLP, that

these inherent tensions are best addressed through coordination and

cooperation by all concerned.  Accordingly, on April 22, 2009, the

three judges convened a joint hearing to urge such a resolution by

the affected parties.  Eventually, the Government, the Commission

(which is no longer directly affected), the bankruptcy trustees, and

various other affected parties reached a global settlement in the form of several proposed agreements and orders, to which others filed objections.  On January 12, 2010, Senior District Judge Cedarbaum, Chief Bankruptcy Judge Bernstein, and the undersigned held a joint hearing on the proposed settlement, to which all affected parties were invited to attend and following which the judges received further written submissions.  Now, subject only to certain related proposals pending before the Bankruptcy Court, this Court, confirming its Memorandum issued on January 29, 2010, hereby approves the proposed settlement agreements and reconfirms the Court's prior restitution order as well.

The first of the proposed settlement agreements is a "Coordination Agreement" between the Government and the Trustee for the Dreier LLP bankruptcy estate (the "Chapter 11 Trustee").  Under this agreement, the Government will not seek forfeiture of any recoveries generated through avoidance actions brought by the Chapter 11 Trustee, and the Government will release to the Chapter 11 Trustee ninety-seven seized artworks that the Government is presently unable to trace to the proceeds of Dreier's offenses.  In return, the Chapter 11 Trustee promises not to contest forfeiture of the properties listed in the schedule to the Court's Preliminary Order of Forfeiture entered July 13, 2009.

Additionally, under the Coordination Agreement, the Chapter 11 Trustee will not challenge the forfeiture of funds disgorged by GSO Capital Partners and its affiliates ("GSO") pursuant to a

2

proposed consent order (the "GSO Consent Order").  Under the GSO

Consent Order, GSO will forfeit to the Government $30,895,027.78 --

an amount representing payments of interest and fees received by GSO

facilities in connection with their investments in Dreier's

fictitious promissory notes.  In exchange for this payment, the

Government will forego seeking forfeiture of other GSO facility funds

presently under restraint because of their connection to Dreier's

note fraud.

In conjunction with the Coordination Agreement and the GSO

Consent Order, certain related applications are also pending before

the Bankruptcy Court.  First, the Chapter 11 Trustee seeks Bankruptcy

Court approval of the Coordination Agreement.  Second, the Chapter 11

Trustee and the Trustee for Dreier's personal bankruptcy (the

"Chapter 7 Trustee") seek Bankruptcy Court approval of agreements

with GSO whereby GSO will pay $9,250,000 to the Chapter 11 Trustee

and $250,000 to the Chapter 7 Trustee in exchange for the Trustees'

promise not to litigate any claims against GSO and the entry of a Bar

Order enjoining creditors and other parties in interest from seeking

to recover funds from GSO.  Although these applications are before

the Bankruptcy Court, not this Court, the Coordination Agreement

provides that, even if it is approved by this Court, it will not take

effect unless the Bankruptcy Court approves the settlement between

GSO and the Chapter 11 Trustee.

Also before this Court are stipulations between the

Government and the Chapter 7 Trustee (the "Chapter 7 Trustee

3

Stipulations") regarding the sale of three real properties listed in the Preliminary Order of Forfeiture (two houses in East Quogue and a Manhattan condominium). In exchange for the Chapter 7 Trustee's successful efforts to market and sell these properties, and because the Government previously agreed to release the personalty in these properties to the Chapter 7 Trustee, the Government proposes to release ten percent of the proceeds from the sale of these properties to the Chapter 7 bankruptcy estate.

Finally, before the Court is a proposed stipulation (the "Fortress Stipulation") between the Government and certain facilities managed by Fortress Investment Group LLC and its affiliates ("Fortress"). Because the Fortress facilities lost over $84 million from their investments in Dreier's fictitious notes, the Government does not intend to seek forfeiture of certain note fraud proceeds that were received by these facilities; accordingly, the proposed stipulation would vacate the restraining order that is currently freezing those funds.

While the undersigned has solicited the opinions of Judge Cedarbaum and Chief Bankruptcy Judge Bernstein as to their views of these proposals from the standpoint of securities law and bankruptcy law, this Court must address these proposals, first and foremost, from the standpoint of federal criminal law, especially the provisions of federal criminal law dealing with forfeiture and restitution. Under the restitution provisions, victims of crimes have the right to "full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). This Court "shall ensure" that these and

4

other victims' rights are vindicated, and the Government has the obligation to "make [its] best efforts" to this end. Id. § 3771(b)(1), (c)(1). Thus, while the related forfeiture provisions provide only that a defendant shall forfeit "to the United States" the fruits of his crime, 21 U.S.C. § 853(a), including so-called "substitute assets" under certain conditions, id. § 853(p), the Government has represented that, consistent with applicable laws and regulations, the assets obtained from the forfeitures in this case will be applied toward victim restitution, see Gov't Letter, 4/22/09, at 10.

In furtherance of these laws, the Court, in the aforementioned Preliminary Order of Forfeiture, ordered preliminary forfeiture to the United States of $746,690,000 in cash held in accounts controlled by Dreier, as well as preliminary forfeiture of specific properties listed in that order. As part of Dreier's sentence, he was also ordered to make an additional restitution payment to his victims in the amount of $387,675,303. Also, on September 29, 2009, the Court entered a Second Amended Restitution Order specifying that if restitution is made in partial payments, those payments are to be distributed to the victims on a pro rata basis according to their loss amounts.

The forfeiture laws further authorize the Government to compromise competing claims to forfeited assets. 21 U.S.C. § 853(i)(2); accord In re W.R. Huff Asset Mgmt. Co., 409 F.3d 555, 564 (2d Cir. 2005). Many of the objections to the settlement agreements here under consideration come down to the assertion that the

5

Government should not compromise its claims to certain artwork and
other property that, in the objectors' view, belong, indirectly, to
the victims.   Thus, Fortress and certain other hedge funds
(collectively, the "Hedge Funds"), who are by some measures the
largest victims of Dreier's frauds (but who were also arguably the
recipients of fraud proceeds) assert that the property to be turned
over to the Chapter 11 Trustee under the Coordination Agreement is
indisputably forfeitable, so its transfer would diminish the pool of
assets available for distribution to the victims.   In response to the
Government's argument that the artwork proposed to be turned over to
the Chapter 11 Trustee cannot be traced to the proceeds of Dreier's
frauds, the Hedge Funds claim that such property is nevertheless
subject to forfeiture as substitute assets.   Furthermore, according
to these victims, the "consideration" flowing to the Government under
the Coordination Agreement -- the Chapter 11 Trustee's promise not to
challenge either the forfeiture of the properties specified in the
Preliminary Order of Forfeiture or the $30.9 million payment under
the GSO Consent Order -- is illusory, as there would be no merit to
any such challenge.

        Although not without some merit, the Hedge Funds' arguments
are ultimately unpersuasive.   While the Chapter 11 Trustee's claims
to the forfeited assets might ultimately prove defective, they are
not so frivolous that their resolution would not result in
protracted, costly, internecine litigation that would, at a minimum,
have the effect of delaying and diminishing the victims' recoveries.
For example, it is unclear whether the Government's interest in

substitute assets would relate back to the date of the wrongful acts. See United States v. Parrett, 530 F.3d 422, 430 (6th Cir. 2008) (describing circuit split on this issue). Thus, to the extent that the Government's interest in such property depends on the application of this "relation back" doctrine, litigation would be far from frivolous and its outcome uncertain. Concomitantly, the Government's promise to refrain from seeking forfeiture of any avoidance recoveries does not appear to give up anything of value, as the Government has taken the position that it is not entitled to pursue such forfeiture actions, see Transcript, 1/12/10 Joint Hearing ("Tr.") 35, and the Hedge Funds have not identified any authority indicating the contrary. It follows that one effect of the agreement is to incentivize the Chapter 11 Trustee to go after recoveries the Government could not pursue. While any such recoveries will go to the creditors of the Chapter 11 estate, many of these are also victims of the fraud.

It may also be noted that the Hedge Funds do not object to either the GSO Consent Order or the Fortress Stipulation insofar as they involve the Government's stipulation that it will not seek additional forfeiture from these parties. This is, in effect, contrary to their argument that the Government should seek to maximize the amount of assets available for distribution to victims regardless of other equitable considerations. It is hence evident that the Hedge Funds' objections to the Coordination Agreement prove too much, as they are unwilling to carry such objections to their

logical conclusions when doing so might adversely affect their own
interests.

          The other objections stated by the Hedge Funds are similarly
unpersuasive.  For example, at the joint hearing on January 12, 2010,
counsel for Eton Park Capital Management, L.P., one of the Hedge
Funds, complained that the proposed settlement was reached without
adequate input from some or all of the Hedge Funds.  See Tr. 45-46.
When pressed, however, counsel was unable to make a specific
application to the Court apart from requesting that approval of the
Coordination Agreement be delayed until more "information" was
provided regarding how the victims would be treated.  Id. at 46.
Similar process-based objections were advanced by Fortress at the
joint hearing and by the Hedge Funds in written submissions.

          Although the Government is obligated to confer with the
victims before compromising claims, see 18 U.S.C. § 3771(a)(4)-
(5),"[n]othing in the [Crime Victims' Rights Act] requires the
Government to seek approval from crime victims before negotiating or
entering into a settlement agreement."  W.R. Huff Asset Mgmt. Co.,
409 F.3d at 564.  The Court accepts the Government's representation,
not directly disputed by the Hedge Funds, that opportunities to
confer were early offered to the Hedge Funds, who failed to take
advantage of the offer, Tr. 47.  Moreover, as a result of the joint
hearings in this matter, the Hedge Funds were aware at least as early
as April 22, 2009 that settlement negotiations between the Government
and the trustees were actively ongoing, and they could have sought to
be heard by the Government at any time in the process.

                                    8

The Court is driven to the conclusion that the real reason
for the Hedge Funds' objections to the settlement is their
recognition that, even though they were victims of Dreier's frauds,
they were also the seeming recipients of fraud proceeds, and hence
the bankruptcy creditors (including other victims) may have claims
against the Hedge Funds in the form of so-called avoidance actions
that, as a result of the proposed settlement, the Chapter 11 Trustee
will be free to pursue without any fear that any recoveries will
revert to the United States.  This is hardly a reason for rejecting
the settlement.  Whatever the merits of the hypothesized avoidance
actions, they will only serve to more perfectly resolve the relative
rights of victims and creditors in accordance with the laws of the
United States.

Thus, despite the foregoing objections, the Court finds that
the Coordination Agreement is reasonable and in the best interests of
the victims collectively.  As there appears to be no objection before
this Court to the GSO Consent Order, which will make $30.9 million
available for victim restitution, the Court approves that agreement
as well.[1]  As to the Chapter 7 Trustee stipulations, although the
Hedge Funds object to the payment of ten percent of real property
proceeds to the Chapter 7 Trustee, this objection strikes the Court
as yet another manifestation of their concern about funding the
bankruptcy trustees' litigation efforts, which the Court finds

---

[1] Insofar as there are objections to the Bar Order's
preclusion of victim or creditor actions against GSO, see Tr. 11,
such objections are to be addressed by the Bankruptcy Court in
the first instance.

unpersuasive for the reasons noted above. Because this amount is fair compensation for the Chapter 7 Trustee's sale of these properties and his entitlement to the personalty therein, the Court approves these stipulations. Finally, as there is no objection to the Fortress Stipulation, and because the Government's policy of eschewing forfeiture from "net losers" makes sense, the Court approves that stipulation as well.

The final matter to be resolved is the motion of an individual victim, Paul Gardi, to modify the Second Amended Restitution Order's scheme of pro rata distribution in order to provide Gardi with special priority. Gardi alleges that Dreier, who was Gardi's lawyer, forged Gardi's signature to a settlement agreement between JANA (a hedge fund) and a company controlled by Gardi, and then arranged for JANA to wire the settlement funds, in the amount of $6.3 million, into a trust account controlled by Dreier, who then used the funds for himself. Gardi claims that he is entitled to priority over other victims because he is an individual as opposed to an institutional investor, because the theft of his settlement funds is different in nature from the note fraud losses experienced by the Hedge Funds, and because the relative economic impact of Gardi's losses is more substantial than the impact on institutional victims.

Several affected parties have responded by arguing, among other things, that Gardi's motion to amend the Second Amended Restitution Order is untimely or otherwise procedurally improper; that Gardi was not the only individual victim harmed by Dreier's

10

misappropriation or other misuse of escrowed funds; that Gardi's loss should not be considered to have been suffered by an individual, since the settlement was with his company; that Gardi's financial sophistication is not unlike that of an institutional investor; that JANA, rather than Gardi, was the true victim of this particular fraud; and that there is no principled basis for treating Gardi's loss as different in kind from the losses experienced by Dreier's other victims.  The Government has taken the position that a pro rata share is appropriate because "no victim is any more or less deserving here of the restitution."  Tr. 16.  Finally, in an intermediate position, the representative of the bankruptcy estates of 360networks (USA) Inc. and its affiliates (the "360networks Representative") has submitted a response identifying the 360networks estates as similarly situated to Gardi in that they were victims of theft by Dreier in his capacity as their lawyer, and urges the Court to distinguish between "client" victims and "note fraud" victims by providing client victims with priority.

The Court will assume arguendo that the procedural objection to Gardi's submissions would ultimately not prevail and will instead proceed to the underlying merits.  There is nothing per se unfair about a pro rata distribution; the Second Circuit has endorsed this approach as particularly appropriate for frauds like Dreier's involving a Ponzi scheme or the commingling of similarly situated victims' assets.  See SEC v. Credit Bancorp Inc., 290 F.3d 80, 88-89 (2d Cir. 2002).  It is clear from the responses that Gardi is not the only "client" victim of Dreier's frauds or to whom Dreier owed

11

fiduciary duties, and each case doubtless has its own nuances. Additionally, the "note fraud" victims are only immediately the Hedge Funds; it is the investors in these funds, including individuals, charitable and educational institutions, and many others who are the ultimate "note fraud" victims. The truth is that a fraud as large and egregious as Dreier's is like an earthquake that savages its victims at random and is followed by a series of aftershocks that destroys still further assets. Any alternative to the pro rata approach would entail a costly and extensive inquiry into the circumstances of each victim's loss, which would likely devolve into a war of recriminations, to the detriment of all concerned. Accordingly, the Court denies Gardi's motion and confirms the pro rata distribution scheme set forth in the Second Amended Restitution Order.

For the foregoing reasons, the Court hereby reaffirms its Memorandum of January 29, 2010 and approves the Coordination Agreement, the GSO Consent Order, the Chapter 7 Trustee Stipulations, and the Fortress Stipulation. The Clerk of the Court is directed to close the entries numbered 102 and 106 on the docket of this case.[2]

---

[2] Still pending before the Court are three petitions filed pursuant to 21 U.S.C. § 853(n) for ancillary hearings to determine third party interests in property subject to forfeiture. Motion practice is underway with respect to the Government's motion to dismiss the petition filed by the 360networks Representative. Also, the Hedge Funds, in a series of letters submitted to the relevant Courts and the Government, set forth several arguments why the petition filed by Heathfield Capital Limited ("Heathfield") should be dismissed. While these arguments will be considered if and when the Court reaches the merits of the Heathfield petition, they provide no reason to defer approval of the settlement agreements discussed herein.

SO ORDERED.

Dated: New York, NY
       February 5, 2010

JED S. RAKOFF, U.S.D.J.

AWL:awl

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60331-CR-COHN

UNITED STATES OF AMERICA,

v.

SCOTT W. ROTHSTEIN,

Defendant.

_____/

## GOVERNMENT'S RESPONSE IN OPPOSITION TO CHAPTER 11 BANKRUPTCY TRUSTEE'S MOTION TO REFER ALL THIRD PARTY CLAIMS TO THE UNITED STATES BANKRUPTCY COURT

The United States of America responds in opposition to the Chapter 11 Bankruptcy Trustee's

Motion to Refer All Third Party Claims to the United States Bankruptcy Court (hereinafter "motion

for reference") [DE 88]. The Bankruptcy Trustee's motion for reference must be denied for the

following reasons: a) this Court has exclusive jurisdiction over criminal proceedings, including

forfeiture and/or restitution; b) the attempted intervention in and transfer of these proceedings by

the Bankruptcy Trustee is in direct contravention of 18 U.S.C. § 1963(i) and 21 U.S.C. § 853(k); and

c) the forfeiture and restitution proceedings over which this Court has exclusive jurisdiction have

well-defined statutory frameworks in which victim and third party claims are adjudicated. This

Court has both the mandate and ability to protect the victims' interest in maximizing forfeiture and

restitution. The unprecedented request of the Bankruptcy Trustee to turn over forfeiture and

restitution determinations along with assets[1] to the bankruptcy court, must be denied.

---

[1]This motion, unlike the Bankruptcy Trustee's previous motion for turnover of certain bank accounts [DE 17], does not request turnover of "assets." However, references are made within the body of the motion regarding the 'marshaling or turnover of assets'(*see, e.g.*, Motion for Reference at p.2 and p.13 fn.7). It therefore appears that the Bankruptcy Trustee is seeking to turnover, to the bankruptcy court, claims' determinations as well as assets.

In support of this response, the United States respectfully submits the following:

## MEMORANDUM OF LAW

I.    The District Court Has Exclusive Jurisdiction Over the Unprecedented Relief Sought by Bankruptcy Trustee

A.    The District Court Has Exclusive Jurisdiction

The Bankruptcy Trustee seeks to have all third party forfeiture claims in this criminal proceeding, including claims for restitution, referred to and resolved by the bankruptcy court. Relying on the bankruptcy court's position as a "unit of the district court" pursuant to 28 U.S.C. § 151 [DE 88, p. 4, fn. 5], the Bankruptcy Trustee asserts that "this Court may delegate the responsibility for conducting ancillary proceedings to the Bankruptcy Court." [DE 88, p.4]. Such is not the case.

While district courts may refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 ... to the bankruptcy judges for the district," 28 U.S.C. § 157(a), under §157 the district courts can only delegate the jurisdiction they have been given under 28 U.S.C. §1334. In the case of "arising under" or "related to" jurisdiction, Congress limited the authority set forth in §1334 to "civil proceedings." The proceedings at issue before this Court, including sentencing[2] and restitution, are indisputably criminal, not civil, proceedings.[3]  Title 18, United States Code, Section 3231 gives district courts "original" and

---

[2]In *Libretti v. United States*, 516 U.S. 29 (1995), the Supreme Court held that forfeiture is part of the sentencing phase of a criminal case. *See also, United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999).

[3]Compare these criminal proceedings to the civil proceedings in *SEC v. Bernard L. Madoff*, discussed *infra.*, where the type of relief requested from this Court was neither sought nor granted.

"exclusive" jurisdiction over all offenses against the laws of the United States and does not contain

a provision allowing them to delegate their criminal jurisdiction to bankruptcy courts. In this case,

the District Court is bound by the confines of federal criminal law, specifically the provisions

dealing with criminal forfeiture and restitution. 18 U.S.C. §1963, 21 U.S.C. §853 and 18 U.S.C.

§3663.[4]

B.    The Bankruptcy Trustee's Reliance on Purported Authority for the Relief
       Sought Is Misplaced

The Bankruptcy Trustee's request for this Court to enter an order of reference to the

bankruptcy court to adjudicate all third party claims, including claims for restitution, is

unprecedented, and his reliance on purported authority is misplaced.

First, the Bankruptcy Trustee cites the infamous *Bernie Madoff* case from the Southern

District of New York (*SEC v. Bernard L. Madoff*, 2009 WL 980288 (S.D.N.Y. 2009).[5]   The

Bankruptcy Trustee cites one of the *Madoff* orders for the proposition that "the Bankruptcy Court

has a critical role to play in distributing the assets of the law firm among its creditors according to

an established hierarchy of claims." [DE 88 p.11].  The Bankruptcy Trustee's reliance on this

particular order is misplaced.  In *Madoff*, a number of the alleged victims of Madoff's fraud moved

---

[4]*See also United States v. Marc Dreier*, Case No. 09 Cr. 085, Memorandum Order of
February 5, 2010 ("While the undersigned [District Court Judge] has solicited the opinions of
Judge Cederbaum [Senior District Judge] and Chief Bankruptcy Judge Bernstein as to their
views of these proposals [the Coordination Agreement between the United States and the
Chapter 11 Trustee and the Coordination Agreement between the United States and the Chapter
7 Trustee] from the standpoint of securities law and bankruptcy law, *this Court must address
these proposals, first and foremost, from the standpoint of federal criminal law dealing with
forfeiture and restitution.*") (emphasis added).  A copy of the February 5, 2010 Order is attached
hereto as Exhibit 1.

[5]The cited Order is attached hereto as Exhibit 2.

to modify the preliminary injunction entered in the *civil* SEC proceedings against Madoff. The

Court noted that "no opponent to the relief sought by the motion offers as familiar, comprehensive

and experienced a regime as does the Bankruptcy Court for staying the proliferation of individual

lawsuits against Mr.   Madoff individually, marshaling his personal assets *other than those*

*criminally forfeitable* and distributing those assets to his creditors…" *SEC v. Madoff*, 2009 WL

980288 at *1 (emphasis added).  The Court then went on to hold that:

> *For that portion of Mr. Madoff's property that is neither forfeitable criminally* nor
> subject to the liquidation of BLMIS under SIPA …movants should be able to seek
> the familiar and established relief set by Congress in the Bankruptcy Code.

*Id*.  At all times, the District Court in *Madoff* retained jurisdiction over the criminally forfeitable

assets. Thus, *Madoff* fails to provide any support for the relief sought by the Bankruptcy Trustee's

motion for reference.

The *Madoff* case is also distinguishable in that: a) an order of forfeiture was sought and

entered because the United States was not confronted with the potential consequences of the

inequitable constructive trust issue that is currently before the Eleventh Circuit; and b) the Ponzi

victims received the protections afforded to investors in failed brokerage firms by the Securities

Investor Protection Act of 1970 ("SIPA").[6]   Pursuant to SIPA, the SIPA Trustee's costs, including

legal fees and consultant fees, are fully funded by SIPC's special reserve fund. Thus, unlike the

*Madoff* case, in the case before this Court, the Bankruptcy Trustee's fees and costs will have a

_____

[6]SIPA created the Securities Investor Protection Corporation ("SIPC").  SIPC, in turn,
maintains a special reserve fund authorized by Congress to help investors at failed brokerage
firms.

significant impact on victim recoveries.[7]

Second, the Bankruptcy Trustee cites the case of *United States v. Brandau, et al.* (hereinafter, "*Brandau*") as precedent for a bankruptcy trustee to act as a receiver for purposes of liquidating and distributing property seized by the government for forfeiture and restitution [DE 88 p. 12]. While that is true, the Bankruptcy Trustee fails to note two key facts. First, the receiver was appointed by the District Court upon the request of the United States after a forfeiture order was entered. Second, the receiver was charged with maintaining, preserving and selling *certain* forfeited assets, and to assist in distributing proceeds to victims in restitution. At all times, and for all matters, the District Court retained jurisdiction, including the subset of assets that were the subject of the *Order Approving Memorandum Agreement and Appointing Receiver*, attached hereto as Exhibit 3.

Finally, the Bankruptcy Trustee cites a New York case titled *United States v. Marc Dreier* (hereinafter, "*Dreier*") as an example where competing claims to assets under the criminal and bankruptcy systems are addressed through cooperation and coordination. Like Rothstein, the *Dreier* case involved an attorney whose fraud collapsed. In *Dreier*, there was a Coordination Agreement between the United States and Trustee for the Dreier LLP bankruptcy estate (the "Chapter 11 Trustee") and the Trustee for Marc Dreier (the "Chapter 7 Trustee"). Under the Coordination Agreement with the Chapter 11 Trustee, the Government agreed to release ninety-seven pieces of artwork that the Government was unable to trace directly to the proceeds of defendant's offenses

---

[7] On March 4, 2010, fee applications requesting $2.2 million in fees covering work from November 10, 2009 to January 31, 2010, were filed. *See In re Rothstein Rosenfeldt & Adler, P.A.*, Case No. 09-34791-RBR, DE 399. The Bankruptcy Trustee's law firms requested more than $1.5 million in fees and $32,000 in expenses, while the engaged accountant seeks $611,000 in fees and $1,800 in expenses. Needless to say, such fees and expenses heavily impact creditor/victim recovery.

(*i.e.*, the assets slated to be turned over were "substitute assets"). In addition, the Government agreed not to seek forfeiture of any recoveries through avoidance actions brought by the Chapter 11 Trustee. In return, the Chapter 11 Trustee agreed not to contest forfeiture of forfeitable properties.

Under the Coordination Agreement between the United States and the Chapter 7 Trustee, in exchange for the Chapter 7 Trustee's successful efforts to market and sell three real properties, the Government proposed to release ten percent of the proceeds from the sale of the three real properties to the Chapter 7 bankruptcy estate as fair compensation for the Chapter 7 Trustee's sale of these properties. *Id.* at 4. At no time did the district court in *Dreier* cede its jurisdiction with respect to forfeitable assets, nor the related ancillary and restitution proceedings. It should also be noted that the above-referenced Coordination Agreements took a little over a year to negotiate and have approved by the District Court.[8]

The fact that the above-mentioned agreements were reached post-judgment also speaks to the methodical pace in which the *Madoff*, *Brandau* and *Dreier* agreements were reached. Defendant Rothstein was *charged* less than four months ago and entered a plea of guilty approximately one month ago in the largest Ponzi scheme South Florida has ever seen. Although the United States is making every effort to see where it can find common ground with the Bankruptcy Trustee to expedite and maximize victim recovery, substantial complex legal and logistical issues must be deliberated and resolved to ensure that the United States' mandate[9] is not compromised.[10]

---

[8]Dreier was indicted on January 29, 2009. The Memorandum Order approving the Coordination Agreement was entered on February 5, 2010.

[9]As this Court is aware, the United States must comply with its obligations under The Justice for All Act of 2004, 18 U.S.C. §3771, which requires that Department of Justice employees make their best efforts to "see that criminal victims are notified of, and accorded their rights" including the right to full and timely restitution. 18 U.S.C. §3771(c)(1) and (a)(6). *See*

In summary, none of the cases cited by the Bankruptcy Trustee support the unprecedented transfer of jurisdiction to the bankruptcy court to adjudicate third party claims, including claims for restitution, nor do they allow for the intervention (proscribed by 18 U.S.C. § 1963 and 21 U.S.C. § 853) of a bankruptcy trustee in a criminal proceeding. The Bankruptcy Trustee's motion for reference must be denied.

II.     The Bankruptcy Trustee's Motion for Reference Is Barred By 18 U.S.C. §1963(i) and 21 U.S.C. §853(k)

The Bankruptcy Trustee asserts that the time for ancillary proceedings "has now come" because defendant Rothstein plead guilty and "criminal procedure rules require that this Court enter a preliminary order of forfeiture" at this juncture [DE 88, p.3]. However, a careful reading of Federal Rule of Criminal Procedure 32.2 reveals that the Bankruptcy Trustee misreads the rule. According to Fed.R.Crim.P. 32.2(b)(2)(B), effective date December 1, 2009, "[u]nless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow

---

*also, Dreier* at pp. 4-5 ("Under the restitution provisions, victims of crimes have the right to 'full and timely restitution as provided in law.'...This Court 'shall ensure' that these and other victim's rights are vindicated, and the Government has the obligation to 'make its best efforts' to this end.")(Citing 18 U.S.C. §§3771(a)(6), (b)(1), and (c)(1)).

[10]In addition, the United States must proceed with caution with respect to any coordination with the Bankruptcy Trustee due to the aforementioned fees that are implicated. Even if possible coordination with the Bankruptcy Trustee yields efficiencies or results, said efficiencies will be severely undermined by multi-million dollar fees and costs that would inevitably have a direct impact on victim recovery. In the case of *Brandau*, for example, the receiver eventually received $442,560.30 for his role in liquidating and disbursing the assets set forth in the Order. The recent fee application in bankruptcy court speaks to the pace in which fees and costs tend to skyrocket. The accumulation of fees in excess of two million dollars in less than three months immediately signals to the United States that it must make sure that any eventual coordination agreement justifies even a fraction of that proportional reduction in victim recovery.

-7-

*parties[11]* to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4)." As set forth in the Government's Response to Court's Inquiry Regarding Preliminary Order of Forfeiture, "a preliminary order of forfeiture is not practicable at this time." [DE #79, p. 7].

In the meantime, until forfeiture ancillary proceedings are initiated, all third parties are prohibited from intervening in the case to claim an interest in forfeitable property. 18 U.S.C. § 1963(i); 21 U.S.C. § 853(k).[12]  The Bankruptcy Trustee's actions are specifically barred by statute [DE #23, pp. 5-7]. "Section 853(k) imposes an *absolute bar* on all suits claiming an interest in forfeitable property unless the action is brought within the confines of an ancillary proceeding." *In re Global Vending*, 2005 WL 2451763 at *2 (Bankr. S.D.Fla. 2005) (emphasis added) *(citing In re The American Basketball League, Inc.*, 317 B.R. 121, 129 (Bankr. N.D. Cal. 2004))(bankruptcy trustee cannot intervene to demand the turnover of forfeitable assets or, by extension, obtain referral of third party claims to the bankruptcy court). The Bankruptcy Trustee's motion for reference must be denied.

---

[11]In this context, "parties" solely refers to the parties in the criminal case (*i.e.*, the United States and Scott W. Rothstein).

[12]The statutes provide, in pertinent part, that except as otherwise allowed during ancillary forfeiture proceedings:

...no party claiming an interest in property subject to forfeiture under this section may—

(1) intervene in a trial or appeal of a criminal case involving the forfeiture of such property under this section; or
(2) commence an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.

III.    Due Process Rights Of Third Parties Are Protected Under Both The Forfeiture And Restitution Statutory Framework

The Bankruptcy Trustee's repeated assertions that the restitution framework fails to provide proper adjudication of third party claims, and that forfeiture and restitution claims can be better handled by the bankruptcy court, have no basis in law or fact.

The Bankruptcy Trustee acknowledges there is a forfeiture framework that addresses third party rights, even though he misunderstands certain principles regarding third party rights. [DE 88, pp. 5-6]. Nevertheless, the Bankruptcy Trustee submits that by not pursuing forfeiture, the United States is attempting to "circumvent the rights of third parties by proceeding directly to restitution" [DE 88 p.4]. To the contrary, the United States is carefully considering established law, as well as recent and pending developments regarding third party rights in the Eleventh Circuit, in crafting a solution that minimizes litigation[13] and advances victims' rights.

Contrary to the Bankruptcy Trustee's claim that "there is no comprehensive statutory scheme or procedural mechanism that sets forth how [restitution] should be done" [DE 88, p.5], there is a clear, streamlined, statutory framework for the issuance and enforcement of a restitution order that affords due process to third party claimants. *See* DE 90, pp. 4-6. Simply stated, third parties holding

---

[13]It bears noting that the Bankruptcy Trustee appears to use the current state of Eleventh Circuit constructive trust law as both a shield and a sword. The Bankruptcy Trustee seeks the referral of the third party claims to the bankruptcy court purportedly to "avoid the anomaly that an investor victim who is able to allege a constructive trust by tracing his funds to a specific amount or piece of property may be treated more favorably than an investor whose funds were commingled in different accounts or assets" [DE 88 p.10]. However, in the very same pleading, he announces that he intends to take advantage of this very procedural mechanism to usurp all the RRA accounts and any assets that can be traced to those accounts [DE 88 p. 7], despite the fact that bankruptcy courts also disfavor constructive trusts. *See In re Flanagan*, 503 F.3d at 182; and *In re Omegas Group, Inc.,* 16 F.3d at 1452 ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor.").

-9-

valid interests in property that the United States seeks to have distributed to victims of defendant's fraud will be entitled to judicial review of their claims.

The Bankruptcy Trustee seems to imply that the bankruptcy court enjoys a power not available to a district court regarding classifying claims and giving similar claims priority [DE 88, p. 8]. Such implication does not withstand scrutiny. First, the district court can classify victims and provide for different payment schedules. *See e.g.*, *United States v. Cabe*, 311 F.Supp.2d 501, 503 (D.S.C. 2003) (award of restitution need not treat all categories the same). Second, a bankruptcy trustee's discretion to subordinate claims is not unfettered.[14]   Further, it is of no import that the bankruptcy plan proponent can allegedly "give priority to the rights of crime victims to receive restitution as provided for under the federal criminal laws within the equitable framework of a bankruptcy case" [DE 88, p. 9], as the District Court has the exclusive jurisdiction over criminal forfeiture and restitution.

---

[14]*See Olympia & York Fla. Equity Corporate v. Bank of N.Y. (In re Holywell)*, 913 F.2d 873, 880 (11th Cir. 1990)(striking down trustee's claim subordination scheme as an abuse of discretion).

WHEREFORE, based on the foregoing, the United States respectfully submits that this Court

must maintain its exclusive and original jurisdiction and deny the Bankruptcy Trustee's motion in

its entirety.

Respectfully submitted,

JEFFREY H. SLOMAN
UNITED STATES ATTORNEY

By:     /s/ *Alison W. Lehr*
        Alison W. Lehr (FL Bar No.444537)
        Assistant United States Attorney
        99 NE 4th Street
        Miami, FL 33132-2111
        Tel. (305) 961-9176
        Fax. (305) 536-7599
        Alison.Lehr@usdoj.gov

By:     /s/ *Evelyn B. Sheehan*
        Evelyn B. Sheehan (FL Bar No.944351)
        Assistant United States Attorney
        99 NE 4th Street
        Miami, FL 33132-2111
        Tel. (305) 961-9125
        Fax. (305) 536-7599
        Evelyn.Sheehan@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 5, 2010, I electronically filed the foregoing

Government's Response In Opposition To Chapter 11 Bankruptcy Trustee's Motion To Refer All

Third Party Claims To The United States Bankruptcy Court.

/s/Alison W. Lehr
Alison W. Lehr
Assistant United States Attorney

-11-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x

UNITED STATES OF AMERICA,                    :

                -v-                          :

MARC DREIER,                                 :

                Defendant.                   :
------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/5/10

09 Cr. 085 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

      An under-appreciated evil of substantial frauds like those of Marc Dreier is how they pit their victims against one another. Where, as here, the funds remaining after the fraud is uncovered are insufficient to make whole Dreier's numerous victims and creditors, these unfortunates are left to squabble over who should get what. In this case, moreover, resolution of these competing claims involves consideration of three bodies of law -- criminal law, securities law, and bankruptcy law -- that cannot always be reconciled without some friction.

      For some time now, it has been evident to this Court in presiding over the criminal action against Dreier, and to the judges presiding over the civil enforcement action brought against Dreier by the Securities and Exchange Commission and the bankruptcy proceedings involving the estates of Dreier and his law firm, Dreier LLP, that these inherent tensions are best addressed through coordination and cooperation by all concerned. Accordingly, on April 22, 2009, the three judges convened a joint hearing to urge such a resolution by the affected parties. Eventually, the Government, the Commission (which is no longer directly affected), the bankruptcy trustees, and

various other affected parties reached a global settlement in the
form of several proposed agreements and orders, to which others filed
objections.  On January 12, 2010, Senior District Judge Cedarbaum,
Chief Bankruptcy Judge Bernstein, and the undersigned held a joint
hearing on the proposed settlement, to which all affected parties
were invited to attend and following which the judges received
further written submissions.  Now, subject only to certain related
proposals pending before the Bankruptcy Court, this Court, confirming
its Memorandum issued on January 29, 2010, hereby approves the
proposed settlement agreements and reconfirms the Court's prior
restitution order as well.

        The first of the proposed settlement agreements is a
"Coordination Agreement" between the Government and the Trustee for
the Dreier LLP bankruptcy estate (the "Chapter 11 Trustee").  Under
this agreement, the Government will not seek forfeiture of any
recoveries generated through avoidance actions brought by the Chapter
11 Trustee, and the Government will release to the Chapter 11 Trustee
ninety-seven seized artworks that the Government is presently unable
to trace to the proceeds of Dreier's offenses.  In return, the
Chapter 11 Trustee promises not to contest forfeiture of the
properties listed in the schedule to the Court's Preliminary Order of
Forfeiture entered July 13, 2009.

        Additionally, under the Coordination Agreement, the Chapter
11 Trustee will not challenge the forfeiture of funds disgorged by
GSO Capital Partners and its affiliates ("GSO") pursuant to a

2

proposed consent order (the "GSO Consent Order").  Under the GSO

Consent Order, GSO will forfeit to the Government $30,895,027.78 --

an amount representing payments of interest and fees received by GSO

facilities in connection with their investments in Dreier's

fictitious promissory notes.  In exchange for this payment, the

Government will forego seeking forfeiture of other GSO facility funds

presently under restraint because of their connection to Dreier's

note fraud.

In conjunction with the Coordination Agreement and the GSO

Consent Order, certain related applications are also pending before

the Bankruptcy Court.  First, the Chapter 11 Trustee seeks Bankruptcy

Court approval of the Coordination Agreement.  Second, the Chapter 11

Trustee and the Trustee for Dreier's personal bankruptcy (the

"Chapter 7 Trustee") seek Bankruptcy Court approval of agreements

with GSO whereby GSO will pay $9,250,000 to the Chapter 11 Trustee

and $250,000 to the Chapter 7 Trustee in exchange for the Trustees'

promise not to litigate any claims against GSO and the entry of a Bar

Order enjoining creditors and other parties in interest from seeking

to recover funds from GSO.  Although these applications are before

the Bankruptcy Court, not this Court, the Coordination Agreement

provides that, even if it is approved by this Court, it will not take

effect unless the Bankruptcy Court approves the settlement between

GSO and the Chapter 11 Trustee.

Also before this Court are stipulations between the

Government and the Chapter 7 Trustee (the "Chapter 7 Trustee

Stipulations") regarding the sale of three real properties listed in
the Preliminary Order of Forfeiture (two houses in East Quogue and a
Manhattan condominium).  In exchange for the Chapter 7 Trustee's
successful efforts to market and sell these properties, and because
the Government previously agreed to release the personalty in these
properties to the Chapter 7 Trustee, the Government proposes to
release ten percent of the proceeds from the sale of these properties
to the Chapter 7 bankruptcy estate.

Finally, before the Court is a proposed stipulation (the
"Fortress Stipulation") between the Government and certain facilities
managed by Fortress Investment Group LLC and its affiliates
("Fortress").  Because the Fortress facilities lost over $84 million
from their investments in Dreier's fictitious notes, the Government
does not intend to seek forfeiture of certain note fraud proceeds
that were received by these facilities; accordingly, the proposed
stipulation would vacate the restraining order that is currently
freezing those funds.

While the undersigned has solicited the opinions of Judge
Cedarbaum and Chief Bankruptcy Judge Bernstein as to their views of
these proposals from the standpoint of securities law and bankruptcy
law, this Court must address these proposals, first and foremost,
from the standpoint of federal criminal law, especially the
provisions of federal criminal law dealing with forfeiture and
restitution.  Under the restitution provisions, victims of crimes
have the right to "full and timely restitution as provided in law."
18 U.S.C. § 3771(a)(6).  This Court "shall ensure" that these and

4

other victims' rights are vindicated, and the Government has the obligation to "make [its] best efforts" to this end. Id. § 3771(b)(1), (c)(1). Thus, while the related forfeiture provisions provide only that a defendant shall forfeit "to the United States" the fruits of his crime, 21 U.S.C. § 853(a), including so-called "substitute assets" under certain conditions, id. § 853(p), the Government has represented that, consistent with applicable laws and regulations, the assets obtained from the forfeitures in this case will be applied toward victim restitution, see Gov't Letter, 4/22/09, at 10.

In furtherance of these laws, the Court, in the aforementioned Preliminary Order of Forfeiture, ordered preliminary forfeiture to the United States of $746,690,000 in cash held in accounts controlled by Dreier, as well as preliminary forfeiture of specific properties listed in that order. As part of Dreier's sentence, he was also ordered to make an additional restitution payment to his victims in the amount of $387,675,303. Also, on September 29, 2009, the Court entered a Second Amended Restitution Order specifying that if restitution is made in partial payments, those payments are to distributed to the victims on a pro rata basis according to their loss amounts.

The forfeiture laws further authorize the Government to compromise competing claims to forfeited assets. 21 U.S.C. § 853(i)(2); accord In re W.R. Huff Asset Mgmt. Co., 409 F.3d 555, 564 (2d Cir. 2005). Many of the objections to the settlement agreements here under consideration come down to the assertion that the

5

Government should not compromise its claims to certain artwork and other property that, in the objectors' view, belong, indirectly, to the victims. Thus, Fortress and certain other hedge funds (collectively, the "Hedge Funds"), who are by some measures the largest victims of Dreier's frauds (but who were also arguably the recipients of fraud proceeds) assert that the property to be turned over to the Chapter 11 Trustee under the Coordination Agreement is indisputably forfeitable, so its transfer would diminish the pool of assets available for distribution to the victims. In response to the Government's argument that the artwork proposed to be turned over to the Chapter 11 Trustee cannot be traced to the proceeds of Dreier's frauds, the Hedge Funds claim that such property is nevertheless subject to forfeiture as substitute assets. Furthermore, according to these victims, the "consideration" flowing to the Government under the Coordination Agreement -- the Chapter 11 Trustee's promise not to challenge either the forfeiture of the properties specified in the Preliminary Order of Forfeiture or the $30.9 million payment under the GSO Consent Order -- is illusory, as there would be no merit to any such challenge.

Although not without some merit, the Hedge Funds' arguments are ultimately unpersuasive. While the Chapter 11 Trustee's claims to the forfeited assets might ultimately prove defective, they are not so frivolous that their resolution would not result in protracted, costly, internecine litigation that would, at a minimum, have the effect of delaying and diminishing the victims' recoveries. For example, it is unclear whether the Government's interest in

6

substitute assets would relate back to the date of the wrongful acts.
See United States v. Parrett, 530 F.3d 422, 430 (6th Cir. 2008)
(describing circuit split on this issue).  Thus, to the extent that
the Government's interest in such property depends on the application
of this "relation back" doctrine, litigation would be far from
frivolous and its outcome uncertain.  Concomitantly, the Government's
promise to refrain from seeking forfeiture of any avoidance
recoveries does not appear to give up anything of value, as the
Government has taken the position that it is not entitled to pursue
such forfeiture actions, see Transcript, 1/12/10 Joint Hearing
("Tr.") 35, and the Hedge Funds have not identified any authority
indicating the contrary.  It follows that one effect of the agreement
is to incentivize the Chapter 11 Trustee to go after recoveries the
Government could not pursue.  While any such recoveries will go to
the creditors of the Chapter 11 estate, many of these are also
victims of the fraud.

      It may also be noted that the Hedge Funds do not object to
either the GSO Consent Order or the Fortress Stipulation insofar as
they involve the Government's stipulation that it will not seek
additional forfeiture from these parties.  This is, in effect,
contrary to their argument that the Government should seek to
maximize the amount of assets available for distribution to victims
regardless of other equitable considerations.  It is hence evident
that the Hedge Funds' objections to the Coordination Agreement prove
too much, as they are unwilling to carry such objections to their

logical conclusions when doing so might adversely affect their own
interests.

The other objections stated by the Hedge Funds are similarly
unpersuasive. For example, at the joint hearing on January 12, 2010,
counsel for Eton Park Capital Management, L.P., one of the Hedge
Funds, complained that the proposed settlement was reached without
adequate input from some or all of the Hedge Funds. <u>See</u> Tr. 45-46.
When pressed, however, counsel was unable to make a specific
application to the Court apart from requesting that approval of the
Coordination Agreement be delayed until more "information" was
provided regarding how the victims would be treated. <u>Id.</u> at 46.
Similar process-based objections were advanced by Fortress at the
joint hearing and by the Hedge Funds in written submissions.

Although the Government is obligated to confer with the
victims before compromising claims, <u>see</u> 18 U.S.C. § 3771(a)(4)-
(5), "[n]othing in the [Crime Victims' Rights Act] requires the
Government to seek approval from crime victims before negotiating or
entering into a settlement agreement." <u>W.R. Huff Asset Mgmt. Co.</u>,
409 F.3d at 564. The Court accepts the Government's representation,
not directly disputed by the Hedge Funds, that opportunities to
confer were early offered to the Hedge Funds, who failed to take
advantage of the offer, Tr. 47. Moreover, as a result of the joint
hearings in this matter, the Hedge Funds were aware at least as early
as April 22, 2009 that settlement negotiations between the Government
and the trustees were actively ongoing, and they could have sought to
be heard by the Government at any time in the process.

8

The Court is driven to the conclusion that the real reason
for the Hedge Funds' objections to the settlement is their
recognition that, even though they were victims of Dreier's frauds,
they were also the seeming recipients of fraud proceeds, and hence
the bankruptcy creditors (including other victims) may have claims
against the Hedge Funds in the form of so-called avoidance actions
that, as a result of the proposed settlement, the Chapter 11 Trustee
will be free to pursue without any fear that any recoveries will
revert to the United States.  This is hardly a reason for rejecting
the settlement.  Whatever the merits of the hypothesized avoidance
actions, they will only serve to more perfectly resolve the relative
rights of victims and creditors in accordance with the laws of the
United States.

Thus, despite the foregoing objections, the Court finds that
the Coordination Agreement is reasonable and in the best interests of
the victims collectively.  As there appears to be no objection before
this Court to the GSO Consent Order, which will make $30.9 million
available for victim restitution, the Court approves that agreement
as well.[1]  As to the Chapter 7 Trustee stipulations, although the
Hedge Funds object to the payment of ten percent of real property
proceeds to the Chapter 7 Trustee, this objection strikes the Court
as yet another manifestation of their concern about funding the
bankruptcy trustees' litigation efforts, which the Court finds

---

[1] Insofar as there are objections to the Bar Order's
preclusion of victim or creditor actions against GSO, see Tr. 11,
such objections are to be addressed by the Bankruptcy Court in
the first instance.

9

unpersuasive for the reasons noted above.  Because this amount is
fair compensation for the Chapter 7 Trustee's sale of these
properties and his entitlement to the personalty therein, the Court
approves these stipulations.  Finally, as there is no objection to
the Fortress Stipulation, and because the Government's policy of
eschewing forfeiture from "net losers" makes sense, the Court
approves that stipulation as well.

     The final matter to be resolved is the motion of an
individual victim, Paul Gardi, to modify the Second Amended
Restitution Order's scheme of pro rata distribution in order to
provide Gardi with special priority.  Gardi alleges that Dreier, who
was Gardi's lawyer, forged Gardi's signature to a settlement
agreement between JANA (a hedge fund) and a company controlled by
Gardi, and then arranged for JANA to wire the settlement funds, in
the amount of $6.3 million, into a trust account controlled by
Dreier, who then used the funds for himself.  Gardi claims that he is
entitled to priority over other victims because he is an individual
as opposed to an institutional investor, because the theft of his
settlement funds is different in nature from the note fraud losses
experienced by the Hedge Funds, and because the relative economic
impact of Gardi's losses is more substantial than the impact on
institutional victims.

     Several affected parties have responded by arguing, among
other things, that Gardi's motion to amend the Second Amended
Restitution Order is untimely or otherwise procedurally improper;
that Gardi was not the only individual victim harmed by Dreier's

10

misappropriation or other misuse of escrowed funds; that Gardi's loss
should not be considered to have been suffered by an individual,
since the settlement was with his company; that Gardi's financial
sophistication is not unlike that of an institutional investor; that
JANA, rather than Gardi, was the true victim of this particular
fraud; and that there is no principled basis for treating Gardi's
loss as different in kind from the losses experienced by Dreier's
other victims.  The Government has taken the position that a <u>pro rata</u>
share is appropriate because "no victim is any more or less deserving
here of the restitution."  Tr. 16.  Finally, in an intermediate
position, the representative of the bankruptcy estates of 360networks
(USA) Inc. and its affiliates (the "360networks Representative") has
submitted a response identifying the 360networks estates as similarly
situated to Gardi in that they were victims of theft by Dreier in his
capacity as their lawyer, and urges the Court to distinguish between
"client" victims and "note fraud" victims by providing client victims
with priority.

     The Court will assume <u>arguendo</u> that the procedural objection
to Gardi's submissions would ultimately not prevail and will instead
proceed to the underlying merits.  There is nothing <u>per se</u> unfair
about a <u>pro rata</u> distribution; the Second Circuit has endorsed this
approach as particularly appropriate for frauds like Dreier's
involving a Ponzi scheme or the commingling of similarly situated
victims' assets.  <u>See</u> <u>SEC v. Credit Bancorp Inc.</u>, 290 F.3d 80, 88-89
(2d Cir. 2002).  It is clear from the responses that Gardi is not the
only "client" victim of Dreier's frauds or to whom Dreier owed

                                11

fiduciary duties, and each case doubtless has its own nuances.
Additionally, the "note fraud" victims are only immediately the Hedge
Funds; it is the investors in these funds, including individuals,
charitable and educational institutions, and many others who are the
ultimate "note fraud" victims. The truth is that a fraud as large
and egregious as Dreier's is like an earthquake that savages its
victims at random and is followed by a series of aftershocks that
destroys still further assets. Any alternative to the pro rata
approach would entail a costly and extensive inquiry into the
circumstances of each victim's loss, which would likely devolve into
a war of recriminations, to the detriment of all concerned.
Accordingly, the Court denies Gardi's motion and confirms the pro
rata distribution scheme set forth in the Second Amended Restitution
Order.

   For the foregoing reasons, the Court hereby reaffirms its
Memorandum of January 29, 2010 and approves the Coordination
Agreement, the GSO Consent Order, the Chapter 7 Trustee Stipulations,
and the Fortress Stipulation. The Clerk of the Court is directed to
close the entries numbered 102 and 106 on the docket of this case.[2]

---

[2] Still pending before the Court are three petitions filed
pursuant to 21 U.S.C. § 853(n) for ancillary hearings to
determine third party interests in property subject to
forfeiture. Motion practice is underway with respect to the
Government's motion to dismiss the petition filed by the
360networks Representative. Also, the Hedge Funds, in a series
of letters submitted to the relevant Courts and the Government,
set forth several arguments why the petition filed by Heathfield
Capital Limited ("Heathfield") should be dismissed. While these
arguments will be considered if and when the Court reaches the
merits of the Heathfield petition, they provide no reason to
defer approval of the settlement agreements discussed herein.

12

SO ORDERED.

Dated: New York, NY
       February 5, 2010

JED S. RAKOFF, U.S.D.J.

Westlaw.

Page 1

Slip Copy, 2009 WL 980288 (S.D.N.Y.)
**(Cite as: 2009 WL 980288 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.
SECURITIES and EXCHANGE COMMISSION,
Plaintiff,
v.
Bernard L. MADOFF and Bernard L. Madoff Investment Securities LLC, Defendants.
**No. 08 Civ. 10791(LLS).**

April 10, 2009.

OPINION

LOUIS L. STANTON, District Judge.

**\*1** Noting that, although the individual defendant Bernard L. Madoff's assets have been frozen, they are not subject to any form of receivership, movants The Blumenthal & Associates Florida General Partnership, Marc Cherno, Judith Rock Goldman, the Horowitz Family Trust, Steven Morganstern, M.D., The Martin Rappaport Charitable Remainder Unitrust, and Martin Rappaport, alleged victims of Madoff's fraud, move to modify article V of the December 18, 2008 Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants (the "Preliminary Injunction"), incorporated in the February 9, 2009 Partial Judgment on Consent Imposing Permanent Injunction and Continuing Other Relief, to allow movants to file an involuntary bankruptcy petition against Mr. Madoff in the United States Bankruptcy Court for the Southern District of New York pursuant to section 303(b) of the Bankruptcy Code.

The relief sought by the motion is opposed by the Securities and Exchange Commission, the United

States Attorney for the Southern District of New York, and the Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* (the "SIPA Trustee"). Each of their submissions slights the utility of a Bankruptcy Court proceeding over those of Mr. Madoff's assets which are not the proceeds of his crime or forfeitable substitute property (hereinafter "proceeds"), but should be deployed to meet obligations to his creditors.

The SEC assumes, with no citation to proof, that Mr. Madoff individually has few, if any, assets that are not the proceeds of his crimes. See its Objection at 2 ("Madoff's bankruptcy estate will either be devoid of property from inception or will be divested of most, if not all, of Madoff's property interests once the forfeiture process is completed").

The SIPA Trustee, who claims to stand "alone as the entity that can deliver maximum relief to victims from the liquidation of Mr. Madoff's assets" (Apr. 8, 2009 letter of David Sheehan, Esq. to the Court at 2), disregards that distribution under SIPA goes to those who invested in BLMIS directly as its "customers" rather than the substantial number of those whose losses stemmed from investments made through intermediaries.

The United States Attorney emphasizes that the criminal forfeiture processes comprise a wholly separate and independent system of recovery and distribution of specific items of property (subject to proof that the asset substitutes for or is proceeds of a criminal offense) in which Mr. Madoff's unsecured general creditors have no standing, and which is not subject to a bankruptcy's automatic stay. See Apr. 8, 2009 letter of AUSA Sharon Frase to the Court.

No opponent to the relief sought by the motion offers as familiar, comprehensive, and experienced a regime as does the Bankruptcy Code for staying the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 980288 (S.D.N.Y.)
**(Cite as: 2009 WL 980288 (S.D.N.Y.))**

proliferation of individual lawsuits against Mr. Madoff individually, marshaling his personal assets other than those criminally forfeitable, and distributing those assets among his creditors according to an established hierarchy of claims.

**\*2** A Bankruptcy Trustee has direct rights to Mr. Madoff's individual property, with the ability to maximize the size of the estate available to Mr. Madoff's creditors through his statutory authority to locate assets, avoid fraudulent transfers, and preserve or increase the value of assets through investment or sale, as well as provide notice to creditors, process claims, and make distributions in a transparent manner under the procedures and preferences established by Congress, all under the supervision of the Bankruptcy Court.

The concern that appointment of a Bankruptcy Trustee will increase administrative costs or delay recovery by victims is speculative, and outweighed by the benefits to Mr. Madoff's victims of a Bankruptcy Trustee's orderly and equitable administration of his individual estate. Indeed, the Department of Justice itself contemplates contracting with a special master, trustee, or receiver to aid it in the distribution FN1 of forfeited property. See Frase letter at fn. 5; Apr. 8, 2009 letter of Richard Weber at 1.

> FN1. The Attorney General, under his statutory authority to "take any other action to protect the rights of innocent persons which is in the interest of justice" (21 U.S.C. § 853(i)(1)), might consider saving administrative costs by delegating forfeited property to the bankruptcy estate.

Although [21 U.S.C.] § 853(n)(1) allows the Attorney General to use forfeited assets for restitution, it does not create a comprehensive means of collecting and distributing assets. Bankruptcy would have made it pellucid that [certain creditors] cannot enjoy any priority over other victims and reap a profit while [defendant's] other creditors go begging.

*United States v. Frykholm,* 362 F.3d 413, 417 (7th Cir.2004).

For that portion of Mr. Madoff's property that is neither forfeitable criminally nor subject to the liquidation of BLMIS under SIPA (with its restrictive scope of distribution), movants should be able to seek the familiar and established relief set by Congress in the Bankruptcy Code, with its automatic stay of individual suits by platoons of individual litigants.

*CONCLUSION*

The motion for relief from the Preliminary Injunction will be granted by separate order.

S.D.N.Y.,2009.
S.E.C. v. Madoff
Slip Copy, 2009 WL 980288 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 99-8125-Cr-HURLEY/Johnson(s)(s)


UNITED STATES OF AMERICA

     Plaintiff

v.

FREDERICK C. BRANDAU
GARLAND HOGAN,
MARY ANNE BILLINGHURST
FINANCIAL FEDERATED TITLE
 & TRUST, INC.,
ASSET SECURITY CORPORATION,
GARY J. PIERCE, and
CSI AG, LTD.
RAPHAEL R. LEVY,
AMERICAN BENEFITS SERVICES,
JEFFREY A. PAINE,
WANDA TIRADO,
ALAN RICHARD LEWIS,
IVAN BURGOS,
ZANE BALSAM,
JUAN ARROYO,
HARVEY BRANDAU, and
CHERYL POINDEXTER,

     Defendants.
_____/



ORDER APPROVING MEMORANDUM AGREEMENT
AND APPOINTING RECEIVER

     This matter comes before the Court pursuant to the motion

filed by the United States to approve the Memorandum of Agreement

entered into between the United States and John Kozyak, Esq., and



1

appoint John Kozyak as Receiver and as substitute custodian for the U.S. Marshals Service of the real property in this case.

The Court, upon consideration of the motion filed by the United States, finds that to protect the interests of the United States in the forfeited property under the circumstances of this case, it is necessary and appropriate for the Court pursuant to 21 U.S.C. §853(g) to appoint a Receiver who will maintain, preserve, and sell certain forfeited assets, and assist in distributing proceeds to victims in restitution.    Therefore, for good cause shown, it is hereby:

**ORDERED AND ADJUDGED:**

1.    The United States' motion is granted.

2.    The Memorandum of Agreement between the United States and John Kozyak, Esq., is approved and John Kozyak, Esq., is appointed Receiver in this case and substitute custodian for the U.S. Marshals Service of the real property which has been forfeited pursuant to the preliminary order of forfeiture dated May 31, 2000. The following personal property is excluded from the jurisdiction of the Receiver:  conveyances, bank accounts, currency, negotiable instruments or the like identified in the First Superseding Indictment.

3.    As a condition of this appointment, the Receiver will post and maintain throughout the course of the appointment an initial performance bond in the amount of $500,000.00.  At such

2

time as the account or accounts established pursuant to this order and the order appointing John Kozyak Receiver contain in aggregate more than $500,000.00, the Receiver shall immediately increase the bond to equal the amount of money being held in the receiver accounts.

4.    In carrying out his responsibilities, the Receiver shall have the following powers and duties:

a.    Manage, maintain, preserve, and protect the interest of the United States in the forfeited real estate listed in the order of forfeiture.

b.    Sell the forfeited real property consistent with the Memorandum of Agreement upon appropriate motion of the United States and entry of an order by this Court authorizing any sale. Any order of sale will require that the net proceeds of sale be deposited in one or more interest bearing accounts established by the Receiver under the jurisdiction of this Court.    The net proceeds are defined as the sales price less the actual costs incurred by the United States and/or the Receiver in the seizure, storage, maintenance, and sale of the forfeited asset authorized to be sold.

c.    Prepare and deliver a monthly written financial report to Antonia J. Barnes, Assistant U.S. Attorney.  The report will be provided to the U.S. Attorneys Office no later than 30 days after the month that the report covers.  The written report will

3

summarize the tasks performed by the Receiver and the time spent in performing these tasks. The report also will itemize with respect to each asset, any and all mortgage payments, rents and other income collected pertaining to the forfeited assets, and detail all expenses and charges incurred and aging accounts payable, including supporting documentation for all expenses and charges.

d. The Receiver shall have the authority to hire vendors to perform services and provide products in connection with the maintenance, preservation, and sale of the forfeited real estate consistent with the approved budget. The Receiver shall require all vendors, except vendors providing public utility services to the properties, to execute a non-affiliation affidavit in the form approved by Antonia J. Barnes, Assistant U.S. Attorney, as provided for in the Memorandum of Agreement prior to the service being performed or product being supplied. Where the United States, through its representative Antonia J. Barnes, Assistant U.S. Attorney and the Receiver cannot agree on a vendor or a cost or expense proposal, which is not within the amounts permitted by the approved budget or which is not for an item included in the approved budget, the Receiver shall make application to the Court for approval of the vendor or the amount and/or type of cost or expense at issue.

4. Even though the Receiver will be responsible for the maintenance, preservation and sale of only the forfeited real

4

Case 09-09-cr-60331-DTKHD   Document 14-59   Entered on FLSD Docket 03/05/2010   Page 55 of 56

property, this will not preclude using the services of the Receiver to effectuate the distribution of restitution payments from the proceeds of both the real and personal property forfeited in this case.

5.    The proposed budget is approved.

6.    No funds shall be spent except as (1) approved under the budget adopted as part of this Order, or (2) agreed to in writing between Antonia J. Barnes, Assistant U.S. Attorney, and the Receiver, or (3), in the event the United States and the Receiver cannot reach agreement, as approved by this Court.

7.    Where the United States, through its representative Antonia J. Barnes, Assistant U.S. Attorney, and the Receiver cannot agree to (1) reimbursement of maintenance expenses, which are defined in the United States' motion to include utilities and insurance premiums, for which monies were expended prior to the approval of the budget by this Court or (2) payment for legal services rendered by Kozyak Tropin & Throckmorton, P.A., related to the forfeited assets, then the Receiver shall file any application of the disputed items for approval with this Court prior to any final distribution of the proceeds from the sale of the forfeited assets.

8.    The Receiver may seek and may be paid compensation for all duties performed and services rendered related to real property and personal property covered by the Memorandum of Agreement and to

5

the distribution of the proceeds of the real property and personal property for restitution, in an amount not to exceed 3% of the net proceeds from the sale of the real property.  The application will follow the Guidelines for Fees and Disbursements for Professionals in the Southern District of Florida in Bankruptcy Cases. Any dispute regarding the amount of the fee payable to the Receiver shall be presented to the United States District Court for resolution through application for the payment of the fee by the Receiver.    The Receiver will be entitled to apply for his compensation (1) upon the resolution of all third party claims to the real property with respect to which the Receiver is authorized to act in this matter and (2) at the time that the proceeds from the sale of the forfeited property are ready for distribution.

9.    The Receiver shall file any applications for approval with this Court and the United States shall file any responses or objections to the Receiver's application in accordance with S.D. Fla. L.R. 7.1.

**DONE AND ORDERED** in Chambers in West Palm Beach, Palm Beach County, Florida, this __8th__ day of __August__, 2000.

DANIEL T.K. HURLEY
UNITED STATES DISTRICT JUDGE

cc:    Antonia J. Barnes, AUSA
       Stephen Carlton, AUSA
       Ellen Cohen, AUSA

6