UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

www.flsb.uscourts.gov



IN RE:                                                              CASE NO.: 09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,                                   CHAPTER 11

          Debtor.

_____/

## EXPERT REPORT OF ROBERT D. MOODY, JD CISA CISM ACE
### December 2010

This report is submitted by Robert D. Moody, JD CISA CISM ACE. I have been engaged by the Court to determine, in the Court's own words "what happened," in regards to Qtask's Inc. compliance with the Court's order specific to discovery as requested by the Trustee and/or his Counsel, Berger Singerman, PA.

## Terms and Definitions

It is felt that the following terms, for purposes of this report, required explanation.  The terms and use are to be considered specifically for the context of this report.

- Qtask – will be used to reference Qtask, Inc., the software employed and is at the heart of the matter under review, Qtask's employees and/or legal Counsel.

- Trustee – will be used to reference the Trustee Stettin or his legal Counsel.

- Rothstein – will be used to reference the Law Firm of Rothstein Rosenfeldt Adler P.A., the employees or attorneys of the firm, and any of its partners.

- E-mail – will be used to reference mainstream programs, specifically Microsoft Exchange, Outlook, Lotus Notes, or Groupwise. It does not refer to the e-mail or communication component found within the Qtask software.

- Server – will be used to reference a type of computer that is used to house and process large amounts of information for several users at one time.

- Workstation – will be used to reference a type of computer that is used by a single individual to perform functions such as drafting of documents, sending e-mails, accessing programs such as Qtask as well as Servers to access its information and programs.

- Internet – will be used to reference any on-line activity of the World Wide Web using programs such as Microsoft Explorer, Safari, etc.

- Standalone – will be used to reference any computer, whether server or workstation that is not connected to a computer network.

- Network – will be used to reference computers contained within a defined space and are able to communicate with each other either with or without wires. The computers will share a common address scheme which allows the computers to recognize each other and easily share information between them.

- ESI – will be used to reference Electronically Stored Information. ESI is electronic forms of information such as documents, memos, spreadsheets, communications such as e-mails, chats, text messages, digital recordings, database records, accounting records, pictures, movies, etc.

- Metadata – is defined as information about the data. Metadata will be used to reference the specific information about how certain data or information may have been created, accessed, changed, etc.

- SQL – SQL is an abbreviation for Structured Query Language. For the purpose of this report, this is a type of container or database that offers advanced features to organize, store, sort and produce information. Additionally, It includes advanced features for relating and securing the information it contains.

- Web Browser – will be used to reference the computer software which allows the user to access the internet and the resources available on the internet including the Qtask website.

- Native Format – will be used to reference how information is stored as it is created by a specific computer program. As a point of reference, a document created in Microsoft Word would have the native format of a .doc or .docx file even though the program could provide the file in an alternative format.

- Shadow Box – will be used to reference the Qtask environment created for the Trustee by Qtask and that is housed and maintained on the Qtask server.

- Project Data or Qtask Data – will be used to reference all types of data found within the Qtask containers. This data will include any and all data viewable by any user who is a member of any

project; any data that is viewable by any user but not specific to an individual project; any data that is viewable by a user but is viewable for a specific project and only by members of that project; any other data type that might be found within the containers and subject to limitations not presently known.

- Top Down Review – will be used to describe a process of reviewing and analyzing the Qtask environment for the purpose of culling out the non-responsive users and project. This review will be performed and enough detail will be reviewed but limited so that only the identity of the users and their projects, as they exist within the Qtask "super-structure" can be determined. At no time will this initial review permit the viewing of specific content.

## Introduction and Court Order

For purposes of this report, the general background as to how the Rothstein Firm filed for Bankruptcy will be considered common knowledge and will not be discussed, unless directly relevant to a particular point.

The focus of my investigation and the substance of this report are to address issues regarding the Trustee's request for information from Qtask, the Court's order of compliance, and whether or not Qtask has complied with these requests.

Qtask was served a subpoena on December 9, 2009 and called for the production of the requested documents on December 21, 2009 and sworn testimony on December 22, 2009.

On March 8, 2010, the Court granted the Trustee's Motion to Compel and ordered Qtask to do the following, the key points are provided below:

- Produce all responsive documents including ESI that is in its possession, custody and control to the Trustee.

- All objections are waived except attorney client privilege.

- Qtask is to produce any and all ESI so that it is useable by the Trustee.

- Qtask is to produce all ESI with its metadata intact.

- "Qtask shall produce its responsive data by providing the Trustee with access to the Qtask system for all former Rothstein Rosenfeldt Adler, P.A., ("RRA") attorneys and associated staff, and all persons associated with any of the defined RRA Entities and those entities' respective individual representatives who participated in any Qtask project related to RRA at any time ("RRA Qtask Users"). Qtask shall also provide the Trustee with access to the Qtask system for all

parties who were invited to participate in Qtask ("Invitees") by any RRA Qtask User. The term "Invitee" or "Invitees" shall include any Invitee who accessed or participated in any Qtask project which concerned the business of RRA or any RRA Qtask User at any time.  Qtask will provide this access by producing the login and password ("Access Credentials") for all RRA Qtask Users and Invitees to the Trustee. Qtask has represented to the Trustee that, because Qtask is a proprietary system, providing the Trustee with user-by-user access to the Qtask system is the most reasonable way known to Qtask to provide the Trustee with access to the data requested by the Subpoena and Notice because it provides the Trustee with access to all of the data entered by the accessible to that particular user in the format typically used by Qtask's users."

- Trustee may petition the court to order the delivery of the Qtask data in another format.

- "Qtask shall notify all Invitees that their access is being turned over to the Court by serving a written request ("Invitee Notice") to the Invitee requiring the Invitees to disclose their Access Credentials to Qtask and/or the Trustee directly, Qtask shall serve the Invitee Notice upon all Invitees within two (2) days of the entry of the Court's Order. The Invitee Notice shall state that if any Invitee fails to provide its Access Credentials to the Trustee or to Qtask within three (3) days after receipt of the Invitee Notice, Qtask shall reset that Invitee's Access Credentials and provide the reset Access Credentials for that Invitee to the Trustee."

- "Qtask allows its users to "lock" data held on the system by electing to password protect data. If the Trustee's investigation reveals locked information that it cannot access, Qtask will contact the individual who locked the data and cooperate to provide the Trustee with the information needed to access the information within the locked file."

- The Trustee stand in the shoes of Rothstein and as such no privilege is being violated.

- "Qtask shall not monitor, track or otherwise capture any activity on the Qtask system that would reveal any aspect of the Trustee's investigation conducted on the Qtask system. Further, Qtask shall not disclose the substance of the Trustee's investigation conducted on the Qtask system to anyone, including Qtask's counsel, without a court order mandating that information be disclosed."

- "In addition to Qtask's responsive electronically stored information, Qtask shall produce all other documents that are responsive to the Subpoena and Notice to the Trustee within three (3) days of the entry of this Order."

## Qtask Environment

Qtask defines itself as follows:

Qtask "is the developer of a comprehensive, secure SaaS-based collaboration and project management environment that adds accountability and improves bottom line results. Qtask provides uniquely transparent and dynamic collaboration capabilities to effectively manage all projects to successful completion reduce overhead expenses and increase productivity. Qtask, when implemented, becomes a team's or a company's virtual office accessible anytime from anywhere."

Qtask further states:

"Discussions organize your communications by thread. Discussions are embedded in other services such as Meetings, Tasks or Compliance."

In short, Qtask is a private, self-contained system which allows its users to communicate and share information in a secure manner from anywhere.

The underlying infrastructure, as reported by Qtask is an SQL database. The front end or client is accessed via a web browser.   Any authorized user can access the Qtask system via the internet and their favorite web browser. Once logged in, the user can communicate and share information via the web-page front end and have confidence that the information is being properly organized, stored and secured because of the SQL database and related security feature built into the software.
As for the ability to easily identify and extract individual e-mails, documents or other items of interest, this is possible but not very efficient.

The importance of reviewing Qtask lies in the brilliance of the software and how it can be used to identify and maintain the relationships between the e-mails, the related threads, documents, etc. In a matter such as this, potential private communication which could identify currently unknown parties, their relationship to Rothstein, the context of their communication and level of involvement can only be fully understood through the review of this data.

**Qtask's Compliance**

Qtask has claimed to be in compliance with all of the Trustee's requests and have spent hundreds of man hours developing custom solutions for the Trustee, at its own expense.

Qtask claims to have delivered the ESI data in native format as requested by the Trustee.

Qtask provided a "shadow box" which was designed to hold any and all information requested by the Trustee. The "shadow box" was created to run its own copy of the Qtask software and contain any and all projects from the users which were found to be responsive to the Trustee's requests.

Qtask has further stated that where it has not complied with the Trustee's requests, it is because they do not own the data being requested. Additionally, Qtask claims that the requests for additional data

are numerous and burdensome and the data in which Qtask would have to provide, is clearly outside of the Trustee's investigative scope and may contain sensitive governmental and personal information.

**Trustee's Issues**

The Trustee has stated that it does not believe it is receiving the cooperation or the information it has requested from Qtask and that Qtask is purposefully stalling the discovery process. The Trustee claims that its position is supported by the Court in its order of March 8, 2010.

Based upon a review of the record, the interviews conducted and other material/ software provided to me, it is clear that the Trustee has not received the information it has requested and it has not been provided the information necessary to be able to rely on the information it has received as true and correct.

Qtask has responded with two arguments here, they are:

- The Trustee fails to state any specific examples of missing data and has therefore prevented Qtask from fixing the problem.

- Qtask's arguments regarding the ownership and privacy of its client's data must be protected and the Trustee is seeking information outside of the Court's order.

I am not aware of any specific examples of missing data that has been provided by the Trustee and if specific examples do exist, they should be provided. Given the fact that the review is stalled and access to the data provided is hindered, the failure to resolve this issue appears to be as much of a problem with communication as it is with willful conduct by either side.

Specific issues raised by the Trustee include the following:

- Initial productions were useless.

  The initial productions by Qtask were CD/DVDs containing what essentially exists as the computer data version of a run on sentence. The initial production consisted of a lot of computer code and data but no format or structure for the Trustee to use.

  The second production, as reported by Qtask, did provide structure through specialized programming but, as reported by the Trustee, did not have the functionality or ease of use that the Trustee needed to work with the data set.

- Productions made to the "shadow box" have been incomplete and productions cannot be verified.

Case No.: 09-34791-RBR

The development of the "shadow box" appears to be the solution that resulted from the two production deliveries but the Trustee has identified issues involving incomplete data sets (not all of the information has been uploaded to the "shadow box.") and what has been uploaded cannot be verified or compared to their original source.

Qtask has stated that the extraction of specific user and project data is an involved process. Given that the process is somewhat complex and technical in nature, the Trustee must have a proven way to verify both the completeness and the accuracy of the extraction.

Being able to verify the data being produced is at the heart of this point. Without a proven, reliable method of insuring that all requested data is being produced and that the data produced is truly what is being requested, the Trustee will not be able to rely on any of his findings and the entire process would be a complete waste of time.

- Access to the "shadow box" has been blocked. The Trustee still does not have the passwords associated with the individual user accounts.

Access to the shadow box has not been provided. During the initial interviews, the Trustee disclosed that the passwords on the "shadow box" had not been reset and that there were users and projects that the Trustee could not access.  Shortly after this interview, this information was shared with Qtask. Qtask responded that this was the first they had heard of the problem.  As of this date, it is my understanding that this issue still remains.

It is my understanding that the "shadow box" is a separate copy of the Qtask environment and that it contains a separate copy of specific Users and projects as requested by the Trustee.  This "shadow box" environment has all of the functionality of the "Live Qtask Environment" but being separate, it operates without any effect on the actual "Live Qtask Environment."

Based upon the following understanding, Qtask could easily reset all of the user passwords on the "shadow box" to 12345 and then allow the Trustee the ability to assign its own password as it saw fit. Since this is a copy of the accounts and the data, the real environment would remain secure and the Trustee would have its copy to do with as it saw fit.

In their opportunity to provide feedback, Qtask states "we pointed out that Berger Singerman could have gained 100% access to all RRA employees access in Qtask, all records, and history, simply by resetting the passwords.  They never told us that they had turned RRA's email servers off as you explained to us? Why didn't they?"

Qtask also states "Had they told us, we would simply have written a one line modification to forward all RRA-Law.com emails to bergersingerman.com. They also could have asked Scott Rothstein himself for his password. Remember, we don't know anyone's passwords."

Forensic Data Services, Inc.

Qtask further states "We don't want to be the middle man on passwords (truly), but until they move this system to their own servers, we have no choice. But they never called us. And they did not opt to have this server on their own servers. No one with technical competence has talked to us other than Tom Sadaka, and he seems to have been silenced once he agreed with us."

This feedback, where it does not suggest a solution to the password problem does represent the poor communication between the parties and the fact that even though they were informed of the problem by me over two months ago, as of this day, 13 December 2010, the passwords have not been reset.

- Cannot determine the total universe of potential or responsive data.

The size of the responsive data universe can only be resolved through a review of the Qtask environment. The Trustee has stated that is requesting that Qtask only comply with its subpoena and provide access to the information which is responsive to this subpoena.

Qtask has stated that it is complying with the Court's order and producing the data within the limits set by the Court.

From my interviews and review of the information provided, the Trustee appears to be asking for a broader range of access. This need for broader access is a byproduct of the investigative process and the lack of information which has been received to date.

The unfortunate result of this quest is that Qtask has identified that they house data that is highly sensitive and which belongs to both banks and the US government.

In attempting to balance the Trustee's needs and protecting the Qtask's client's privacy concerns, the Qtask environment must be subjected to a "top down" review of its storage structure. In short, this review would allow the trustee the ability to identify all users and projects with enough particulars that the Trustee would be able to determine the user and basic information about the projects under the user without disclosing (at this particular time) the specific content associated with the user or the project.

If the Trustee identifies a particular user or project, the Court through its order has already provided a mechanism to protect the user, the user's projects and the user's specific data.

In the end, if Qtask's statements regarding its data are correct, the majority of the Qtask environment would be cleared and the specific list targets would be identified for the Trustee and his review.

Case No.: 09-34791-RBR

- Qtask is monitoring the Trustee's investigation.

  Through interviews, Qtask has acknowledged that it knows what and when the Trustee has accessed on Qtask because they are part of the same projects as the Trustee and they maintain administrative and technical control over the workspace the Trustee is conducting its investigation in.

  A review of the Qtask environment shows that this is an inherent feature of Qtask and not something that was created to monitor the Trustee. Regardless of how it came into existence, the fact is this feature does exist. Furthermore, the "shadow box" being hosted on the Qtask network does offers a significant security risk to the Trustee's investigation.

- Qtask has refused to provide data as requested but requires a single request for all data to be produced.

  The Trustee, during its investigation, has made several requests for data. The requests have taken on the form of an initial request and then a follow up request that resulted from a review of the initial disclosures.

  The Trustee and Qtask have both acknowledged that Qtask has stopped complying with these subsequent requests because Qtask feels that they are too burdensome and it should not be made to "run back to the warehouse numerous times" to meet the Trustee's demands.

  Qtask has asked for a single request so that it can limit its time and the cost associated with complying with the Trustee's requests.

  Where Qtask's concern is valid, given the nature of the investigation, the approach Qtask has requested may not be practical. The Trustee is charged with the review of a significant amount of information which has identified additional leads and as reported by the Trustee, additional sources of recovery.

  The Trustee must be able to make requests for additional information as it identifies targets of interest. The Trustee must be able to rely on the timeliness and the accuracy of the data it requests.

  In response to this section, Qtask has stated that they are not limiting production but "rather we are asking the Trustee to give us a complete set of metrics (other than using the word "all"). We are not suggesting "complete" is equal to "finished." They are welcome to make more requests should they discover something missing, and we are willing, and want to help. However they have not even given us a complete metric to work from. The court on the other hand has limited what they can request, however the Trustee continues to ask for data outside of this range. What are we meant to do?"

Forensic Data Services, Inc.

**Qtask's Issues**

During the interviews conducted of Qtask, the following issues and/or concerns were presented:

- Qtask has repeatedly claimed that the information contained within their system does not belong to them, it belongs to their client. They have stated that they are the gatekeepers and that they are not able to provide access because they do not own the information.

  Qtask's classification of the data is correct but its role in its protection is flawed.

  Qtask operates a company very similar to many other service bureaus such as America Online, Hotmail, Gmail, Yahoo, etc. Each of these companies has procedures in place to produce information that is requested.

  Qtask has an obligation to secure the information when properly requested and should follow their procedures to produce the information as required.

  Qtask should not be taking the position of questioning the Trustee as to why the information is needed or what they will be doing with the information. They are the intermediary between the housed data and the requesting party.

- Qtask has requested that they be informed as to all data the Trustee desires access to and once they have been informed of the data targets, they will determine if it is appropriate and provide access.

  Once again, Qtask is attempting to fulfill a role greater than that of the gatekeeper. As the gatekeeper, their role is to provide a process to facilitate the request and delivery of data.

  Determination as to appropriateness falls first on the Trustee and if appropriateness is questioned, it then must fall on the Court.

- Qtask has asked that the Trustee be limited to the number of requests which can be made for data and they will only go to "the vault" once, as they do not wish to make multiple trips, if it could be avoided.

  As previously stated, Qtask's request to limit the requests may be reasonable, it may not be practical. The nature of the Trustee's investigation will require a certain amount of follow up requests that cannot be avoided. One method to keep the requests to a minimum would involve the "top down" review discussed elsewhere in this report.

F o r e n s i c   D a t a   S e r v i c e s ,   I n c .

- Qtask has raised the issue that many of its clients have customer, private or highly sensitive data that cannot be viewed or accessed without appropriate clearance.

  As previously addressed, the concern of Qtask regarding their client's data must not be taken lightly. No matter the source, highly sensitive data must be protected and where possible be excluded from even a casual review, if determined that the information is not relevant to the Trustee's investigation. Based upon the March 8, 2010 order, the Trustee and the Court have made provisions for the owner of the data to be informed and to object to the production, if necessary.

## Conclusion

To conclude, I must first state the following facts. First, the Court has jurisdiction over this matter. Second, the Court appointed the Trustee. Third, the Trustee properly served a subpoena requesting information including ESI. Fourth, The Court entered an order directing Qtask's compliance to the Trustee's subpoena.

With the following being accepted, it is clear that communication between the parties has not been efficient and has been the major cause for the Trustee not obtaining meaningful discovery. This has been caused in part by the fact that the Trustee's primary communication tool is Outlook and Qtask is using its own software and there appears to be little compromise between the parties to accommodate each other.

Qtask, having both the technical and legal resources to understand both how and what it is to produce clearly chose to produce information which is arguably responsive but is clearly in a form that would cause the Trustee the most difficulty.

Qtask's production of the "shadow box" is a move in the right direction but does not allow for the security and confidentiality the Trustee is seeking and the Court has ordered. Where the solution appears to be correct, the platform is clearly wrong.

Qtask's argument and justification for failing to produce client data, takes the form that they are the gatekeeper to the data and not the owner and cannot produce what they do not own, is flawed.

Qtask is a company that is clearly in the vein of service providers such as America Online, Yahoo, Gmail, and Hotmail, to name a few. As with all of these service providers, there is a mechanism for requesting and receiving information that they clearly house but do not own.

From the review of the record, the Trustee's requests appear to be mechanically sound but are arguably broad in scope.

Qtask has claimed that they have numerous clients which, to them, are not subject to the Trustee's investigation. Qtask has claimed that their clients include banks and the Department of Defense. Given the following, and recognizing the importance to protect both the potential existence of the bank customer's personally identifiable information and the Government's data, blanket access to the Qtask environment is problematic.

Additionally, since Qtask is the target of the Trustee's investigation, acceptance of Qtask's word as to which users and projects are responsive is equally problematic. As stated by the Trustee, "they cannot afford to get this wrong."

By way of analogy, Qtask has described itself as being the public storage facility and that it provides the individual lockers. In actuality, Qtask is more like a shared public warehouse where all customers' data is secure but it exists in the same public floor space. Qtask not only controls access to the warehouse through its security, but they are also aware of the location of every client, box, folder, file, etc. in a shared floor space. This is not to suggest that unauthorized viewing of data can or does occur. It is meant only to suggest that Qtask, as the architect and designer has a specific floor plan identifying the location of everything that exists in its warehouse.

As previously stated, It appears that the only solution is for the Trustee to conduct a "top down" inspection of Qtask's space. This would allow the Trustee to identify targets of interest without reviewing the specific contents of the Users and Projects that are clearly unrelated to the Trustee's investigation while allowing the Trustee the ability to fully review the entire Qtask digital warehouse.

As provided for in the Court's order and to resolve the privacy concerns being defended by Qtask, anyone identified through this review would then be notified by Qtask and as with the long accepted policies and procedures of similar service bureaus, the owner of the data would have an opportunity to raise their concerns.

## Recommendation

The following recommendations are respectfully made:

- It is recommended that a Special Master or Neutral Party (with a level of technical expertise) be appointed to insure compliance with the Court's order, insure proper and complete information is delivered to the Trustee, protect the information and files not subject to the Trustee's review and to facilitate meaningful communication between the parties.

- It is recommended that if the Court appoints the Special Master or Neutral party, to also serve as a Privacy Ombudsman whereby protecting the confidential nature of the information which may be subject to review or in the alternative, appoint a separate party to serve in this capacity.

- It is recommended that the Court order that all written (e-mail) communication be handled through traditional e-mail channels and not through the Qtask software.

- It is recommended that the Court order the parties to participate in a discovery conference so that the issues of discovery be worked out in accordance with the other recommendations being made.

- It is recommended that a "top down" review of Qtask's client and project structure appears to be the only way in which the Trustee can insure that any and all users and projects of interest are identified and review.

- It is recommended that any and all data sources, identified from the "top down" review as being a target of interest be produced in accordance with the procedures set forth in the Court's order and Qtask's policy.

- It is recommended that a "project plan" which identifies specific action items and a timeline of compliance be created and compliance to the information be ordered.

- It is recommended that a standalone server housing the Qtask software and the data identified by the Trustee be placed in the office of the Trustee or its Counsel and used for the Trustee's review, instead of the "shadow box" presently in use.

Please note that I reserve the right to supplement or change my report or my findings in the event additional information is presented and it warrants such a change.

Respectfully Submitted:

Robert D. Moody, JD CISA CISM ACE
Forensic Data Services, Inc.
954-727-1957 (Office)
954-727-3356 (Fax)
Rmoody@forensic-data-svc.com