IN THE CIRCUIT COURT OF THE
17TH JUDICIAL CIRCUIT, IN AND
FOR BROWARD COUNTY, FLORIDA

CASE NO.:

11 - 3 0 8 2 1

SCOTT MORGAN, ADELE MUSSRY, JACK
MUSSRY, NASSIM MUSSRY, DANIELLE EL-
ANI, MELINA EL-ANI, LAWRENCE E.
DEKELBAUM, SHALOM STRICTLY KOSHER
MEATS, INC., , EDWARD PALEY, FLORENCE
PALEY, THE EDWARD AND FLORENCE
PALEY FOUNDATION, STEVEN PALEY,
LAURA PALEY, JANE ZARETSKY, STEVEN
ZARETSKY, as Trustee of the JANE ZARETSKY
DYNASTY TRUST, DEAN KRETSCHMAR,
ANTHONY DEGENNARO as Trustee of the
EXTRA INNING DYNASTY TRUST, LINDA
VON ALLMEN as Trustee of the VON ALLMEN
DYNASTY TRUST, DAVID VON ALLMEN, as
Trustee of the DAVID VON ALLMEN LIVING
TRUST, ANN VON ALLMEN, as Trustee of the
ANN VON ALLMEN LIVING TRUST, H&N
ASSOCS., ARETZ ASSOCS., PARK NAT'L
CAPITAL FUNDING, LLC, PARK NAT'L
MORTGAGE SERV., COOPER MGMT., SUSSCO,
INC., CONCORDE CAPITAL, INC., VICEROY
GLOBAL INVS., INC., BFMC INV., LLC,
RAZORBACK FUNDING, LLC, D3 CAPITAL
CLUB, LLC, and D&L PARTNERS, LP.



A TRUE COPY

DEC 1 3 2011

HOWARD C. FORMAN
CLERK OF CIRCUIT COURT
BROWARD COUNTY, FL

          Plaintiffs,

v.

EDWARD J. MORSE, JR., and MORSE
OPERATIONS, INC. d/b/a ED MORSE
AUTOMOTIVE GROUP

          Defendants.
_____/

## COMPLAINT

     Plaintiffs sue defendants EDWARD J. MORSE, JR. ("Ted Morse") and MORSE

OPERATIONS, INC. d/b/a ED MORSE AUTOMOTIVE GROUP ("MOI"), and state:

1

# I

## <u>INTRODUCTION</u>

1.     September 8, 2009 was a very busy day for Ted Morse.  As will be explained in detail in this Complaint, September 8th was the crescendo to a multi-million dollar fraud the he and Scott Rothstein had orchestrated since 2006.  For three years, Ted, using his own money and turning his family's car business, Morse Operations, Inc. ("MOI"), into a crime/fraud organization, knowingly invested millions of dollars into Scott Rothstein's now infamous Ponzi scheme.  Ted and MOI made millions in illegal profit -- a fact which (among others) the Morse family has kept quiet in their attempt to portray themselves to the public, the courts, and the federal government as Rothstein's "victims."

2.     Ted Morse was a charter member of Rothstein's Ponzi scheme.  Since the very beginning in 2006, Ted and MOI invested millions, and made millions, through a pattern of fictional deals having the appearance of aggressive loansharking, and by funding spurious litigation "bonds" in the Morse family's personal lawsuits, including their well-publicized lawsuit against interior decorator Jan Jones International, Inc.

3.     From February 2006 through March 2008, Ted and his wife Patti Morse had given Rothstein over $4.5 million in connection with 15 fictional deals, and by October 2009 they had made over $2 million in "interest" on them (all money stolen from investors in the scheme).  From March 2008 through March 2009, MOI had given Rothstein nearly $32 million in connection with 19 fictional deals, and had reaped more than $11 million in "interest" by October 2009.  Rothstein repaid the principal and interest on these fictional deals quickly and at criminally high rates of return (as high as 235% APR).

2

4.      By late 2008/early 2009, Rothstein was in the process of repaying MOI nearly $14 million in interest/principal payments on eight outstanding deals.  However, events unfolded which threatened to kill the money tree.  By April 2009, Rothstein had lost his hedge fund source for money for the Ponzi scheme.

5.      Rothstein has confirmed in deposition that he approached Ted at this time and explained that the Ponzi would collapse if he did not get money fast to replace Platinum and Centurion's commitment.  Ted agreed to help Rothstein because MOI had nearly $14 million on the table on outstanding deals and Rothstein agreed to pay a high return on the new investment. But, Ted needed to justify the cash infusion to MOI and some plausible deniability if the scheme went sideways and he was implicated later.

6.      So, Ted and Rothstein continued a story which they had used in 2006 and 2008 to obtain Ponzi money -- that substantial litigation bonds were needed in his father Edward J. Morse's ("Ed Sr.") and his wife Carol Morse's lawsuit against decorator Jan Jones.

7.      In the past, Ted and Rothstein obtained money they needed by claiming millions of dollars in litigation bonds were needed to Jones' bank accounts (which Rothstein claimed he had discovered).  Based on that story, Ed Sr. and Carol posted over $8 million in phony bonds for the Jones lawsuit from 2006 to 2008 (the bond money was used to repay earlier investors in the Ponzi scheme).  Now, Ted and Rothstein claimed that additional bonds were needed to secure a very favorable multi-million dollar federal court judgment, which they claimed Rothstein was on the verge of getting.  Of course, this was an absurd story given that the Morses' lawsuit against Jones was pending in state court and was worth, at best, a few million dollars.

8.      Ted and Rothstein obtained another $52 million from MOI from February 2009 to March 2009 using the revived bond story.  Once all the bond money was in place, Rothstein and

Ted manufactured a sham federal court order dated May 25, 2009, with a forged signature of United States District Judge Kenneth Marra, which contained a $23 million dollar judgment against Jan Jones in favor of Ed Sr. and Carol.

9.     It is inconceivable that this story could have fooled anyone within the Morse family. They are litigation savvy, having initiated and defended numerous lawsuits in the past. Giving Ed Sr. and Carol the benefit of the doubt that they actually believed this nonsense, part of Ted's role was to deflect any questions raised by them, like the need to post millions of dollars in bonds, or how the Morse's claim against Jones morphed into a $23 million judgment virtually overnight *and without a trial*.

10.     Unfortunately for Ted and Rothstein, Rothstein was unable to repay all the bond money plus the $23 million fake judgment quickly enough. The phony bond money obviously was not placed in trust, but was used to pay back earlier investors. The bonds and judgment would need to be repaid using money stolen from later investors, including plaintiffs.

11.     By September 6, 2009, Ted and Rothstein had a major crisis on their hands. That day, Carol Morse, who had grown impatient with Rothstein, sent a stern e-mail to him questioning the bond story, demanding copies of all orders in <u>Jones</u>, and suggesting that he had acted unethically. <u>Ex.</u> "A." An attorney obviously wrote the e-mail. Ed Sr. and Carol also were demanding that Ted go to TD Bank to get a statement showing the Jan Jones escrow balance. The problem, of course, was that there were no real orders requiring bonds and Rothstein's TD Bank account had only a minimal balance. Ted and Rothstein needed to come up with something quick to avoid disaster.

12.     So, they took their fraud to an unprecedented level by: 1) drafting another sham federal court order; 2) orchestrating an impromptu meeting with United States Magistrate Barry

4

Seltzer, which Ted would later claim was a "hearing" at which he testified for purposes of the fake court order; and 3) visiting TD bank to obtain a fraudulent escrow statement for Ed Sr. and Carol. Desperate men do desperate things.

13.    **September 8, 2009**. The charade began at 10:00am on September 8, 2009, when Ted arrived at Rothstein's office to begin working on the language for the fake court order:

| | | |
|---|---|---|
| From: | Priscila A. Nascimento | Sent:   Tue 9/8/2009 10:00 AM |
| To: | Scott Rothstein | |
| Cc: | Amy N. Howard; Lisa Hirschenson | |
| Subject: | Ted Morse is here to see you | |

**Priscila Nascimento**

**Rothstein Rosenfeldt Adler**

14.    The order, which would be printed out later that day and sent to Ed Sr. and Carol, would require RRA to return all bonds, but by way of a post-dated check (which bought Rothstein and Ted additional time for repayment). This was a spurious condition for several reasons. First, no court would ever require this because banks in Florida have no duty to delay payment on post-dated checks presented to them before the date on the check. Second, this condition showed that no funds were available at the time to make the repayment (a glaring hole in Rothstein's and Ted's story that the Morse's money was safely held in "bonds" or a TD Bank trust account).

15.    At 11:00am, Rothstein e-mailed Bill Brock (Rothstein's uncle and an RRA employee and co-conspirator), who then notified TD Bank Assistant Vice President and Weston Branch Manager Rosanne Caretsky (another co-conspirator), that Rothstein and Ted were

5

coming and to have the fake escrow account statement signed and ready for them when they arrived:

> **From:** Scott Rothstein
> **Sent:** Tuesday, September 08, 2009 11:00 AM
> **To:** Bill Brock
> **Subject:** RE: What time at TD and only the 1 acct
>
>
> Letter should read, our account number 3489.....full number whatever it is.....held for the Morse matter.
>
> Letter must be signed.
>
> We will be heading out shortly

16.     Ted and Rothstein then went to the federal courthouse in downtown Fort Lauderdale and made an unannounced visit to Magistrate Barry Seltzer's chambers. The meeting lasted approximately 15 to 20 minutes. According to Magistrate Seltzer, Ted Morse said almost nothing to him. Instead, Rothstein spoke with him alone briefly in chambers. Magistrate Seltzer says that the meeting was unprecedented. In his over 23 years on the bench, he never had an attorney showed up unannounced with a client. Rothstein has confirmed that the purpose of the visit was to set up an alibi for Ted, as was their visit to the Weston branch of TD Bank that day (discussed next).

17.     After the meeting, Ted and Rothstein drove together to TD Bank in Weston to get the signed escrow statement from Caretsky. They arrived at 12:45pm. Ex. "B." Caretsky routinely provided fake escrow statements for Rothstein when he needed them. In this regard, Caretsky would request a copy of Rothstein's actual escrow statement so that TD Bank's computer records would show the request. She then allowed Uncle Bill to substitute a counterfeit statement in place of the actual one showing a different amount, in this case $57,982,110.00 (Ex. "C"):

```
ENTER Y FOR DETAIL      CURRENT BALANCE              57,982,110.00
          ( N )              TOTAL HOLDS                     .00
          ( N )              TOTAL FLOAT                     .00
          ( N )              CHECK CARD AUTHORIZATIONS       .00
          ( N )              TODAY'S ACTIVITY                .00
                             UNAVAILABLE CREDITS TODAY       .00
                             ACCRUED INTEREST                .00
          ( N )              NSF/OVERDRAFT ITEMS TODAY       .00
          ( N )              UNPOSTED ITEMS TODAY            .00
                             OVERDRAFT LIMIT                 .00
                             OD TRANSFER PROTECTION          .00
                             MAINTAIN MIN BAL TRF PROTECTION .00
                       AVAILABLE BALANCE FOR:
                             CHECK PAYMENT DECISIONS    57,982,110.00
                             CHECK CARD AUTHORIZATIONS       .00
```

These so-called "shows" were performed for innocent investors, including plaintiffs, to make them believe that their money was held in trust at TD Bank. Caretsky had participated in this charade with Rothstein and Uncle Bill many times before with innocent investors. As will be explained below, this "show" was different because Ted knew that there was no money at TD Bank.

18.     Since Rothstein had the ability to manufacture and print fake TD Bank account screen-shots from his office, there was no need to for him and Ted to go TD Bank that day except to create cover for Ted in the event his actions on September 8, 2009 were questioned later.

19.     However, the best laid plans of mice and men go awry sometimes. Apparently, Ted and Rothstein were so busy with their charade that they completely miscalculated the amount which needed to be on the TD Bank escrow statement. Between May 14, 2009 and August 4, 2009, Rothstein returned $10,300,000 of the Jan Jones "bonds" back to the Morses. The statement should have shown around $47 million in escrow. Of course, it is inconceivable that they would travel all the way to a TD Bank branch office to secure a phony bank balance that was $10 million off according to what should have been in the account and not notice the

7

discrepancy, particularly because MOI's accounting department had been involved in keeping track of the company's Ponzi investments and "bonds." All of this is nothing more than a choreographed ballet of co-conspirators and aiders and abettors.

20.    Afterwards, the two returned to RRA and at 1:51pm Rothstein instructed his assistant Pamela Dominicis to type up the fake court order. <u>Ex.</u> "D."

21.    However, before Dominicis printed the order, Ted and Rothstein tied up one more loose end for their charade. They asked Ed Sr. and Carol for permission to allow Ted to testify in court. At around 2:25pm, Ed Sr. and Carol sent an e-mail to Rothstein, copied to Ted, allowing Ted to testify in court that day for MOI (<u>Ex.</u> "E"):

| | | |
|---|---|---|
| From: | DoloresDaoust@edmorse.com | Sent:  Tue 9/8/2009 2:25 PM |
| To: | Scott Rothstein | |
| Cc: | MOI1@edmorse.com | |
| Subject: | Authorization | |

Dear Scott:

This will authorize Edward J. Morse Jr. to testify in Federal Court on behalf of Edward J. Morse and Carol A. Morse in the Jan Jones matter.

Edward J. Morse
Carol A. Morse

22.    As soon as the permission-to-testify e-mail was received, Dominicis printed the fake order (<u>Ex.</u> "F"), and Seltzer's forged signature was added. The order is significant for two reasons. First, it included the same incorrect $57,982,110.00 amount as the fake TD Bank statement. <u>Ex.</u> "H," ¶ 6. Second, the order states that Ted "testified under oath" and "was questioned *at length* by this court." <u>Id.</u> at ¶ 3 (emphasis added).

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

23.    Ted and Rothstein then waited two hours before sending the order by e-mail and fax to Ed Sr. and Carol (copied to Ted) to make it appear as though the "hearing" had taken place *after* Ted had obtained permission to testify (Ex. "G"):



| From: | Scott Rothstein | Sent: | Tue 9/8/2009 4:11 PM |
|---|---|---|---|
| To: | 'DoloresDaoust@edmorse.com'; 'CAMMissy@aol.com' | | |
| Cc: | 'MOI1@edmorse.com' | | |
| Subject: | swr09082009150031391.pdf - Adobe Acrobat Professional | | |

✉ Message | 📄 swr09082009150031391.pdf

Ed and Carol,
attached please find the order from Judge Seltzer of this date. Ed, this is the order resulting from the hearing in which ted testified today. He really did a great job as a witness. I would love to take credit but without his compelling testimony i do not think that the judge would have ruled as he did. you should be proud of him.
love,
scott

Dolores, please fax a copy of this to ed right away as he wants a faxed copy immediately.
thanks
scott

24.    The fake order (Ex. "H") and several e-mails sent in connection with it to Ed Sr. and Carol -- all copied to Ted (Ex. "I") -- cite to Ted's impressive, albeit non-existent, sworn court testimony that day. Even though Ted was copied on these e-mails, he never corrected the false claim that he had testified in court. Rothstein has confirmed that Ted played along because he was fully aware that he was involved in criminal activity with Rothstein.

25.    After September 8, 2009, Rothstein repaid another $16 million of the Jan Jones bonds. Adding this to the $13,364,000 repaid before September 8, 2009, Rothstein repaid over $29 million of Jones/Mizner bond money. Rothstein also continued to make periodic payments after September 8, 2009 on outstanding Ponzi deals. The Morses were on their way to getting all of their money back, *plus* the phony $23 million judgment (spurious "interest" for the Jan Jones investment), *plus* interest on their outstanding deals, when the scheme crashed at the end of

9

October 2009. Since Rothstein stole over $200 million in the last six weeks before the crash, full repayment not only was a very real possibility, it was Ted's expectation. Yet, despite their participation in the Ponzi scheme, the Morses have an allowed claim in bankruptcy for $50 million, as well as a claim in the criminal forfeiture proceedings for $20 million, which ultimately will allow them to recoup all of their "losses."

26.      **The Morse's Spin**. As intended, Ted Morse and the Morse family have used the events surrounding September 8th as evidence of Ted's innocence in the whole fraud.

27.      For his part, Ted claims that he believed that: 1) the meeting with Magistrate Seltzer was a hearing; 2) he casually spoke with Magistrate Seltzer during that meeting; 3) this conversation is the "testimony" referred to in the September 8th order and related e-mails; 4) he believed that his so-called testimony and Scott's influence over Magistrate Seltzer resulted in the order; and 5) the order was real.

28.      The Morses' story even more troubling. For their part, the Morses claim that they sent Ted to go to court with Rothstein to get a hearing with a receptive magistrate judge, without notifying Jan Jones or Judge Marra (whose signature was on the April 24, 2009 order), so Scott could surreptitiously wield his influence and get them a favorable ruling. Put differently, the Morse's alibi is that they only thought they were engaged in corruption, defrauding the court, and that Judge Seltzer was on the take.

29.      Of course, the Morse's explanation begs the question: if they truly believe this is how the legal system works, how many other times have they sought to manipulate it? As will be explained in this Complaint, they have attempted to manipulate it many times and in many ways since the Ponzi scheme collapsed.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

30.    Ted Morse knew that Rothstein was running a fraudulent scheme and provided substantial assistance to it.    Rothstein has confirmed that Ted Morse was fully aware of Rothstein's scheme and was one of his main co-conspirators almost from the beginning.    As a result of Ted Morse's and MOI's acts of conspiring in and assisting Rothstein's massive fraud, plaintiffs have suffered hundreds of millions of dollars in damages.    If Ted Morse and MOI had not assisted Rothstein, Rothstein could not have continued to make the millions of dollars in payouts to prior investors that he needed to lure new investors and keep his Ponzi scheme going. By helping to finance Rothstein's scheme, Ted Morse and MOI helped Rothstein bilk millions of dollars from investor-victims like the plaintiffs.

## II

## BACKGROUND

31.    On June 9, 2010, Scott W. Rothstein -- the chairman and CEO of now defunct Fort Lauderdale law firm Rothstein Rosenfeldt & Adler, P.A. ("RRA") -- was sentenced to 50 years in federal prison for running a $2 billion Ponzi scheme (the largest Ponzi scheme in Florida history) from his downtown Fort Lauderdale law offices.

32.    Rothstein admitted that he ran a scam in which he falsely represented that RRA had multiple plaintiffs (the "RRA Clients") who had reached confidential settlements for large sums of money that would be paid out over varying periods of time.    Rothstein misled investor-victims like the plaintiffs into believing that the entire settlement proceeds were in prefunded escrow accounts to be paid out over time to the settling RRA Client.    Rothstein claimed that the RRA Client would agree to assign his or her rights to the full settlement amount in exchange for an immediate lump sum payment at a reduced value.

11

33.    In reality, Rothstein fabricated all of the settlements.  There were few real RRA clients and no confidential settlement agreements.  Returns to earlier investors were not made *via* payments from the settlements, but instead were made with the money obtained from later investors -- a classic Ponzi scheme.

34.    Since Rothstein's arrest in late 2009, questions surfaced as to how he was able to pull off such a massive fraud, and rumors abounded as to who else was involved.  During the several years that Rothstein was building his fraudulent financial empire he hobnobbed with the power elite of Broward County -- people who could provide Rothstein's scheme with a veneer of legitimacy, and who had the deep pockets necessary to sustain the Ponzi.  To be sure, Rothstein could not have kept a scam of this magnitude going simply with the assistance of a trusted secretary, unwitting investors, and his lust for the finer things in life.

35.    In his letter to Judge Cohn written a week before his sentencing on charges of racketeering and conspiracy, Rothstein admitted that he was assisted by "co-conspirators" who not only were aware of what was going on, but whose participation enabled him to elevate his fraud to extraordinary heights:

> I became involved with other co-conspirators who helped me take the scheme to an entirely new level.  Not against my will but rather, with my full cooperation.  We went from tens of millions to hundreds of millions almost overnight.

At the time, Rothstein did not identify his "co-conspirators" by name.  But he has done so through extensive cooperation and information provided through his attorney.

36.    **Questions Surface**.  In late 2009, the floodgates opened as investors filed multiple suits to try to recover their investments in Rothstein's Ponzi scheme.

37.    As a result of these lawsuits, one name kept surfacing in connection with the scheme -- Ted Morse.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

38.    As noted, since Rothstein's arrest the Morse family went into damage control mode, attempting to portray themselves, MOI and Ted Morse personally as victims of Rothstein's fraud.  They made such statements to the media and under oath in their filings in restitution phase of Rothstein's criminal case, in bankruptcy court, and in the real Jan Jones state court case.  However, the evidence and information provided by Rothstein paint a very different picture of Ted Morse and his involvement.  These facts show that Ted was not Rothstein's hapless victim; rather, he was an invaluable charter member -- and one of a handful of beneficiaries -- of Rothstein's massive fraud.

39.    As will be shown here, Ted Morse allowed MOI to become a crime/fraud organization and pivotal player in the Ponzi scheme.

40.    **The Morse Auto Dynasty**.  The Morse name is well-known in South Florida. The Morse family has been in the automotive business since 1946, when Edward J. Morse ("Ed Sr.") founded Morse Motors with his father.  According to the company's Internet website, Ed Sr. and Ted "built the family owned and operated Ed Morse Automotive Group into one of the nation's most respected automotive dealer groups."  The Morses tout Morse Automotive Group as being the "best of the best in their industry."

41.    At first blush, it would seem inconceivable that a man like Ted Morse ever would get mixed up with someone like the ostentatious and street-wise Rothstein.  However, the facts uncovered belie the public image of Ted as the responsible businessman and good son.

42.    Instead, the evidence shows that Ted fancied himself as a kind of playboy who enjoyed partying and sharing Internet pornography with his friends.  Morse very much wanted to be player like Rothstein.

43.    Rothstein and Ted Morse developed a deep friendship over the years.

13

44.     Rothstein's relationship with Ted began rather fortuitously.  For many years, the Morse family had been represented by attorney Les Stracher.  In 2003, Stracher joined the Rothstein firm as a partner and brought the Morse book of business with him.

45.     The friendship between Morse and Rothstein grew steadily from 2003 through 2005.  By 2005, Ted was such good friends with Rothstein that he loaned Rothstein (through MOI) $2.73 million to buy a mansion in Fort Lauderdale.

46.     Rothstein often stated publicly and to the local media that Ted was his "best friend."  Ted was on the board of Rothstein's charity, the Rothstein Family Foundation. Rothstein listed Ted as a reference in 2007 when he applied for a seat on the Judicial Nominating Commission.  The two frequently attended parties and fundraisers together.  They even vacationed together, rode motorcycles together, dressed similarly, and had their own secret bank account at MOI -- the "Man Law" account -- which Ted kept secret from his wife.

47.     Over time, Stracher's involvement with the Morses declined and, by 2006, Rothstein bested Stracher as Ted's "go to" man at RRA.

48.     Ted's involvement in Rothstein's Ponzi scheme began in earnest in 2006.  From 2006 through 2009, Ted Morse and MOI made dozens of large cash payments to Rothstein to fund the Ponzi scheme through various artifices which including false periodic payment settlement purchases, putative third party loans, and spurious litigation bonds.  Initially, Ted Morse knew only that what Rothstein was doing was illegal.  Later, he became a knowing participant in the Rothstein's Ponzi scheme.

14

## III

## THE ROTHSTEIN PONZI SCHEME

49.      From humble beginnings in 2003, Rothstein transformed RRA into one of the fastest growing law firms in Florida.  Under Rothstein's six-year stewardship, RRA grew from seven attorneys to over seventy and amassed almost one hundred fifty in staff.  Along with its dramatic growth in size, RRA rapidly emerged as a legal, political and philanthropic powerhouse.

50.      Not surprisingly, as the firm expanded so did Rothstein's enormous portfolio of personal assets including more than twenty-four real estate properties, twenty-five cars, an eighty-seven foot yacht, and various interests in myriad businesses ranging from watches to restaurants to vodka.

51.      Rothstein lived lavishly and spent prolifically -- critical components necessary to set his scheme in motion.  Rothstein leveraged these assets as tools to induce investment into the Ponzi scheme, appeasing unwary investors with personal guaranties secured by these very same assets.

52.      With RRA's tireless marketing efforts and meteoric rise into prominence, Rothstein quickly made forays into preeminent social circles, rubbing elbows with high net-worth individuals and political luminaries, the perfect breeding grounds to attract wealthy investors.  His plot was up and running.

53.      **The Plan**.  Rothstein seized upon his new found stature to entice investors into his scheme using his purported budding employment and labor practice at RRA as the conduit.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

54.    The scheme was predicated on Rothstein's and RRA's supposed pipeline of confidential pre- and post-suit settlement agreements as the self-professed "preeminent sexual harassment and labor employment law firm in the country."

55.    RRA purported to attract a high volume of quality cases based upon RRA's own reputation, as well as from referrals and well placed "800" numbers.   Rothstein claimed to have a national network of referral lawyers, as well as lawyers in his own law firm who brought in cases.  Rothstein said that cases were sent to him because he had the ability to find investors to purchase the settlements.

56.    According to Rothstein, the cases which were being settled pre-suit were matters that had been in negotiation for some time -- either by his office or frequently by the referring attorneys who could not get the cases settled.  He said that the lack of success in settling the cases resulted primarily from distrust between the plaintiffs and the defendant.  The plaintiffs wanted lump sum settlements and did not trust the defendants to pay, while the defendants wanted to pay the settlements over time to make the plaintiff resign and go away before word would spread within the company about the case.  According to Rothstein, the men involved in these cases often were serial offenders, and there were many other women that the company was afraid would come forward if the settlement was publicized in any way.

57.    Rothstein would go on to say that frequently by the time he got the case, or after a series of long negotiations, the plaintiff and the defendant would be narrowed to some amount of money, and the plaintiff would want a lump sum.  However, the story script was that the defendants would not want to give the plaintiffs all of that money up front.  According to Rothstein, confidentiality would not be discussed during settlement negotiations (which typically is the case).  But, eventually the issue of confidentiality would arise as well as the idea of

16

periodic payments.  Rothstein would explain that he would go to the defendant and say something like, "we have been negotiating for a $1 million payment, but if you want to make payments and receive confidentiality it is going to cost you more, say $1.5 million."  The defendant reluctantly would agree.

58.    Using this example, Rothstein would go to his plaintiff and enhance the $1 million lump sum she sought and offer her an additional $100,000 (making the lump sum $1.1 million).  With this additional $100,000, the plaintiff would consent to an investor making the $1.1 million lump sum payment to her.  In return, the plaintiff agreed to assign the settlement payment stream ($1.5 million) to the investor.  In this regard, Rothstein would stress that the discount from $1.5 million to $1.1 million in no way took advantage of the plaintiff.   Rather, this was extra money the defendant agreed to pay to get confidentiality and structure payments. He would explain that his plaintiffs were ecstatic with this arrangement, as they never wanted a stream of payments in the first place.  Rothstein said he always offered his plaintiffs the option of taking the payment stream.  But, without exception, no plaintiff would take it because of the extreme distrust between the parties (the plaintiffs believed that the defendants would find some reason to claim a breach of confidentiality and stop paying).  Rothstein explained that this was a win-win for all involved -- the plaintiffs received more money, the investors make money, Rothstein earns a higher fee, and the "bad guy" defendant pays.

59.    Accordingly, all of the alleged confidential settlements included two key provisions: 1) that the putative plaintiff would be paid the settlement over time, usually within a range of three to nine months; and 2) that the putative defendant would pre-fund the entire settlement amount, held in escrow by RRA, which could only be disbursed in accordance with the pre-determined schedule integrated into the confidential settlement.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

60.     Rothstein would explain that confidentiality and the breach of it was the most important part of each settlement. But, he would allay any investor fear of a potential default by explaining that he has done this 500 times without a breach of confidentiality. To be sure, default was a very real risk if the investments were *bona fide*. If a plaintiff breached confidentiality, the defendant obviously would stop the payment stream and the investor would lose his or her investment. So, the story script was that Rothstein advised the plaintiffs that if they breached confidentiality they could be sued for the return of the lump sum. Of course, Rothstein knew that cases alleging breach of confidentiality are exceedingly rare. So, he also would invite investors to retain lawyers to research cases nationally to see if they could find cases where a defendant sued a plaintiff for damages for breaching confidentiality. Rothstein cited statistics showing that thousands of *filed* sexual harassment cases are settled every year (a recent Forbes article indicated that 17,000 sexual harassment cases are settled every year), while many more case (like his) are settled pre-suit on a confidential basis.

61.     On some occasions, Rothstein told an investor that he had agreed to completely waive his fee to get the case settled because it was very important to one of his biggest referral sources, who had many more potential plaintiffs and defendants in the pipeline. Accordingly, that settlement was urgent and very important.

62.     All of this seemed plausible to investors like plaintiffs who innocently invested in the bogus settlements. Others, like Ted Morse, who were closer to Rothstein knew that the scheme was an elaborate fraud and that there were no settlements or any referral network.

63.     To make his scheme appear legitimate to innocent investors like plaintiffs, Rothstein would agree to provide: 1) confirmation of RRA's IOTA trust account balance at TD Bank evidencing the putative defendant's fully funded settlement proceeds being held in escrow;

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

2) a "lock letter", drafted and executed by a TD Bank executive, irrevocably assuring that the putative defendant's pre-funded settlement proceeds in RRA's IOTA trust account could only be paid directly to the investor's designated account which, in most cases, was an account at TD Bank; and 3) the opportunity for an independent third-party to authenticate the underlying settlement and assignment, and to verify that the putative defendant's funds were being held in RRA's IOTA trust account.

64.    As the final piece to induce an investment, Rothstein and RRA sometimes offered absolutely and unconditionally to guaranty the entire settlement transaction.  With some investors, the guaranty took the form of promissory notes where the payments matched the deal terms.  These notes were gratuitously included in deal packets, as though the deals were being mass produced by RRA.  This "gratuitous" guaranty, secured by Rothstein's and RRA's significant assets, was a vital inducement further securitizing the transaction and lending critical credibility to the purchase of these settlements.

65.    Notwithstanding the broad range of false assurances and material representations, Rothstein remained hyper-vigilant over access to RRA's IOTA trust and escrow accounts under the guise of confidentiality.  In fact, potential investors could only access RRA's TD Bank account information from Rothstein, a handful of his co-conspirators, or through Rothstein's express authorization directing TD Bank executives to provide the requested statements.

66.    Once an investor expressed interest and was provided the above-referenced assurances, Rothstein prepared an agreement for the putative plaintiff's assignment of the settlement and related proceeds.

19

67.    Once the terms of the deal were negotiated and finalized, the investor would receive a bank statement confirming that the funds were held in escrow in a designated RRA trust account.   Thereafter, the investor would wire funds either directly into RRA's escrow account or to their investment advisor, who would in turn wire the investor's money into an RRA escrow account.  The investor's wired money, equivalent to the agreed upon purchase price, was used to pay the putative plaintiff his or her lump sum settlement payout.  Thereafter, RRA as the putative escrow agent was obligated to make the scheduled distributions from the locked account at TD Bank to the investor's account per the pre-determined schedule in the confidential settlement agreement.

68.    As will be shown here, documents corroborate Scott Rothstein's allegations and reveal that Ted Morse participated in this Ponzi scheme, at first believing only that what Rothstein was doing was illegal loan sharking for clients, but later with full knowledge of his underlying settlement buy-out scheme.

## IV

## TED MORSE -- ROTHSTEIN'S "LITTLE MONEY DEVIL"

69.    Ted Morse -- who Rothstein affectionately called his "Little Money Devil" -- and MOI profited directly from the Ponzi scheme in two ways: 1) through a pattern of fictional deals having the appearance of aggressive loansharking;[1] and 2) since 2006, by using MOI money to fund "bonds" in Ed Sr.'s and Carol Morse's personal lawsuits, including the Jones lawsuit.

70.    Both Ted Morse and MOI were investors in Rothstein's Ponzi scheme from the very beginning in 2006.  Their known amounts invested from 2006 through 2009 are as follows:

---

[1]    The deal presentation e-mails are attached to this Complaint as Composite Ex. "J."

20

| 2006 | Ted & Patti Morse | MOI | Litigation Bonds |
|---|---|---|---|
| 2/16/2006 | $200,000 | | |
| 3/15/2006 | $210,000 | | |
| 3/27/2006 | $172,000 | | |
| 4/19/2006 | $320,000 | | |
| 5/5/2006 | $310,000 | | |
| 6/20/2006 | $600,000 | | |
| 6/27/2006 | $150,000 | | |
| 7/10/2006 | | | $650,000 |
| 7/27/2006 | | | $600,000 |
| 11/21/2006 | | | $1,450,000 |
| 12/29/2006 | $350,000 | | |

| 2007 | Ted & Patti Morse | MOI | Litigation Bonds |
|---|---|---|---|
| 1/18/2007 | | | $282,000 |
| 4/19/2007 | $245,000 | | |
| 7/13/2007 | | $400,000 | |
| 9/24/2007 | $250,000 | | |
| 10/31/2007 | $320,000 | | |
| 12/6/2007 | $450,000 | | |

| 2008 | Ted & Patti Morse | MOI | Litigation Bonds |
|---|---|---|---|
| 1/9/2008 | $250,000 | | |
| 1/16/2008 | $300,000 | | |
| 2/12/2008 | | | $1,022,416.50 |
| 2/28/2008 | | | $1,226,415.75 |
| 3/12/2008 | | | $2,919,925.74 |
| 3/17/2008 | $450,000 | | |
| 3/18/2008 | | $1,400,000 | |
| 3/24/2008 | | $1,400,000 | |
| 4/1/2008 | | $525,000 | |
| 4/3/2008 | | $700,000 | |
| 5/5/2008 | | $460,000 | |
| 5/5/2008 | | $525,000 | |
| 5/6/2008 | | $1,200,000 | |
| 5/23/2008 | | $1,300,000 | |
| 5/29/2008 | | $863,211 | |
| 6/9/2008 | | $2,677,334 | |
| 6/25/2008 | | $3,000,000 | |
| 7/9/2008 | | $633,000 | |
| 7/24/2008 | | $1,400,000 | |
| 10/14/2008 | | $2,100,000 | |
| 10/17/2008 | | $3,600,000 | |

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

| 12/11/2008 | | $2,800,000 | |
|---|---|---|---|

| 2009 | Ted & Patti Morse | MOI | Litigation Bonds |
|---|---|---|---|
| 2/11/2009 | | | $9,250,000 |
| 2/17/2009 | | | $9,250,000 |
| 2/20/2009 | | | $10,000,000 |
| 2/23/2009 | | | $5,000,000 |
| 3/13/2009 | | | $5,000,000 |
| 3/20/2009 | | | $10,000,000 |
| 3/23/2009 | | | $5,000,000 |
| 4/24/2009 | | | $4,113,353 |

| TOTAL | $4,577,000 | $31,806,333 | $60,764,110.99 |
|---|---|---|---|

71.    Until the Ponzi scheme collapsed in October 2009, Ted Morse and MOI saw significant returns on their investments and were going to be substantial net winners had the scheme continued.  Putting aside the Jones case, Ted Morse and MOI were almost $14 million dollar net winners on "deals" by October 2009.  And Rothstein had repaid about half of the Jones "bonds" by October 2009 ($29,364,000).

72.    **Ted Morse & MOI Fictional Deals**.  Rothstein first approached Ted about putting money into his Ponzi scheme in 2006.  Rothstein's pitch was that he had opportunities for Ted to make millions of dollars.

73.    Rothstein presented the first of these opportunities to Ted in a February 16, 2006 e-mail, which is reproduced here (Ex. "J:1"):

> The deal is on............400k.....200k each.....2 points.........20% interest......return in 10 weeks guaranteed by secured funds.
> Let me know if you are in. I am going to fund tomorrow so you will have to wire today or first thing in the morning.

74.    The e-mail is characteristic of the wink-and-a handshake manner in which Rothstein and Ted Morse initiated their deals, the vague explanation of the underlying "investment," and lack of documentation -- like trust account confirmations, putative settlement

agreements and the like -- which Rothstein typically used to induce other investors' action or allay risk-related concerns.

75.    Rothstein and Ted Morse rarely, if ever, documented their fictional deals at the time of presentation and funding because Ted did not care from where his return was coming. Deals which eventually were documented tended to be those in which MOI was the investor, but only after MOI auditors or accountants questioned the large outflows from MOI to RRA and demanded documentation.    As explained below, the back dated documentation did not reflect the actual deals, but instead were phony promissory notes indicating usurious loans from MOI to RRA -- strong evidence that MOI and its agent employees and officers also were co-conspirators and/or aided and abetted the scheme.

76.    The known Ted Morse and MOI fictional deals are as follows:

|  | DOLLARS IN | RETURN | EFF APR[2] | FUNDED BY |
|---|---|---|---|---|
| 2/16/2006 | $200,000 | $40,000 | 65% | Ted & Patti Morse |
| 3/15/2006 | $210,000 | $84,000 | 57% | Ted & Patti Morse |
| 3/27/2006 | $172,000 | $143,000 | 137% | Ted & Patti Morse |
| 4/19/2006 | $320,000 | $154,000 | 48% | Ted & Patti Morse |
| 5/5/2006 | $310,000 | $37,500 | 8% | Ted & Patti Morse |
| 6/20/2006 | $600,000 | $360,000 | 30% | Ted & Patti Morse |
| 6/27/2006 | $150,000 | $126,000 | 66% | Ted & Patti Morse |
| 12/29/2006 | $350,000 | $85,000 | 102% | Ted & Patti Morse |
| 4/19/2007 | $245,000 | $110,000 | 85% | Ted & Patti Morse |
| 7/13/2007 | $400,000 | $410,000 | 267% | MOI |
| 9/24/2007 | $250,000 | $110,000 | 72% | Ted & Patti Morse |
| 10/31/2007 | $320,000 | $180,000 | 92% | Ted & Patti Morse |
| 12/06/2007 | $450,000 | $250,000 | 81% | Ted & Patti Morse |
| 1/09/2008 | $250,000 | $125,000 | 91% | Ted & Patti Morse |
| 1/16/2008 | $300,000 | $200,000 | 111% | Ted & Patti Morse |
| 3/17/2008 | $450,000 | $200,000 | 78% | Ted & Patti Morse |
| 3/18/2008 | $1.4 million | $620,000 | 213% | MOI |
| 3/24/2008 | $1.4 million | $640,000 | 235% | MOI |
| 4/1/2008 | $525,000 | $200,000 | 71% | MOI |
| 4/3/2008 | $700,000 | $300,000 | 223% | MOI |

---

[2]    The Effective APR is calculated as profit ÷ investment × 365 days ÷ actual number of days until repayment with interest.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

| | | | |
|---|---|---|---|
| 5/5/2008 | $460,000 | $120,000 | 39% | MOI |
| 5/5/2008 | $525,000 | $200,000 | 65% | MOI |
| 5/6/2008 | $1.2 million | $700,000 | 58% | MOI |
| 5/23/2008 | $1.3 million | $500,000 | 29% | MOI |
| 5/29/2008 | $863,211 | $286,433 | 28% | MOI |
| 6/2/2008 | $2,677,344 | $0 | NA | MOI (not repaid in full by crash) |
| 6/6/2008 | $1,822,788 | $73,998.90 | 36% | MOI |
| 6/25/2008 | $3 million | $550,000 | 73% | MOI |
| 7/9/2008 | $633,000 | $250,000 | 39% | MOI |
| 7/24/2008 | $1.4 million | $500,000 | 210% | MOI |
| 10/14/2008 | $2.1 million | $300,000 | 58% | MOI |
| 10/17/2008 | $3.6 million | $2.4 million | 66% | MOI |
| 12/11/2008 | $2.8 million | $856,363.60 | NA | MOI (not repaid in full by crash) |
| 3/13/2009 | $5 million | $3 million | 124% | MOI |

77.     At all times relevant, as to deals funded by MOI, Ted Morse was acting on behalf of MOI. He was, after all, the chief executive officer and MOI's owner (along with his father).

78.     Several striking facts surrounding these deals show that Ted knew he was participating in illegal activity with Rothstein.

79.     **Deflection of Problematic Investigations.**   As can be seen from the list of fictional deals above, from 2006 to 2008 Ted and his wife Patti Morse funded most of them personally. However, from early 2008 until the Ponzi scheme collapsed in late 2009, MOI funded all of them. The change in the source of funding was due to Patti Morse's constant inquiries to Rothstein in 2006 and 2007 when RRA did not make payments timely, and Ted's limited financial ability to invest in the deals with his own money.

80.     One example of Patti's unwelcomed scrutiny involved the June 27, 2006 deal listed above. The original premise of that deal -- which was set forth in a June 27, 2006 e-mail from Rothstein to Ted Morse -- involved a vague investment opportunity which Rothstein and Ted could fund and which would be repaid with interest in 30 days:



| From: | Scott Rothstein | | Sent: | Mon 6/26/2006 11:30 AM |
|---|---|---|---|---|
| To: | Ted Morse | | | |
| Cc: | | | | |
| Subject: | Mo money | | | |

In addition to the thigpen deal I wrote about on fri and this morning I have a nice one for 150k each....u can do this one with patti if u like....as opposed to the man law deals.....150k each in and 175k each out in 30 days....nice fast $$$$$$$$...let me know about both...man law....love ya....mmmmmmmmmmmmmmmmmmmeeeeeeeeeeeee ;-)

Scott W. Rothstein
Chairman/CEO
Rothstein Rosenfeldt Adler

Ex. "J:8." Patti was not copied on this e-mail. Rather, Rothstein gave Ted the option to keep the deal hidden from his wife and to deposit the return into their secret "man law" account.

81.    On August 28, 2006, Patti sent an e-mail to Rothstein, copied to Ted, inquiring about various "loans" which were past due. Ex. "K." The e-mail reveals that Patti had discovered that her husband gave Rothstein $150,000 on June 27, 2006 ("Loan #7"), but did not know why. She asked Rothstein if she could get the money back because she *and Ted* had no idea what the money was for:



| From: | PattiMorse@aol.com | | Sent: | Mon 8/28/2006 10:59 PM |
|---|---|---|---|---|
| To: | Scott Rothstein; Debra Villegas; mol1@edmorse.com | | | |
| Cc: | | | | |
| Subject: | loans DUE! | | | |

DEAR SCOTT: HERE IS THE UPDATED LEDGER AS YOU REQUESTED...AS OF TODAY , AUGUST 28, 2006,  $$559,750.00 IS past due in principal and interest.

**LOAN #2.......$ 210K PRINCIPAL AND $160k & 4 MONTHS INTEREST PAST DUE**
                    **NONE OF THIS *INTEREST* HAS  BEEN RECEIVED**

LOAN #3.......$172K PRINCIPAL DUE

LOAN #4......$14K PAST INTEREST DUE ON 8/19/06 PLUS

LOAN #5......$$3,750 PAST DUE INTEREST DUE ON 8/5/06 PLUS

LOAN #7..... THIS $150K HAS BEEN HELD SINCE 6/27/2006 AND WE STILL DO NOT KNOW WHAT'S HAPPENING WITH IT.... WHAT IS THE P & I and HOW LONG IS THE LOAN FOR ???? CAN WE FIND THIS OUT OR GET IT BACK????

Thanks Bro...patti☺

82.    Rothstein did not tell her the original deal terms to which he and Ted had agreed back on June 27. Nor did Rothstein Ted tell Patti that he and Ted knew the terms of the deal.

CONRAD & SCHERER, LLP, 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

Instead, Ted and Rothstein lied to her.  Rothstein claimed in his response (below), *which was copied to Ted*:

---

LOAN #7..... **THIS $150K HAS BEEN HELD SINCE 6/27/2006 AND WE STILL DO NOT KNOW WHAT'S HAPPENING WITH IT.... WHAT IS THE P & I and HOW LONG IS THE LOAN FOR ???? CAN WE FIND THIS OUT OR GET IT BACK????** Loan is for 12 months. Interest is 3,500 per month.  According to debra, borrower asked that we hold his first three months interest check for 90 days to help him get on his feet. Thus, 90days from 6/27 you will receive a check for 10,500 and all interest checks after that will be on time.

That's it for now.....love ya,
Scott :-)

---

83.    Rothstein's response was wholly inconsistent with the original deal terms.  At that point, Rothstein had failed to repay Ted as originally promised.  Yet, Ted did not question Rothstein about the default.  Rather, Ted permitted Rothstein to lie to Patti, significantly alter the deal by enlarging the repayment period, and revise the deal terms such that the Morses would *lose* money.  Under the revised deal terms set forth in Rothstein's response to Patti's e-mail -- $10,500 per month for 12 months -- RRA would repay the Morses only $126,000, resulting in a $24,000 net loss on the alleged loan.  Ted never questioned the extension, the loss, or sought to enforce the original deal terms ($150,000 in/$175,000 out in 30 days).[3]  The reason for this is because Ted knew there was no real RRA borrower, but that his money was coming from numerous fungible illicit deals.  The purpose of Rothstein's and Ted's response was to deflect Patti's problematic inquiries, not to clarify the terms of a *bona fide* transaction.

84.    This was only one of many deals between Rothstein, Ted, and Patti where the actual repayment terms deviated substantially from the way Rothstein originally pitched the deal.

---

[3]    Eventually, Rothstein wrote a check to Ted and Patti on September 27, 2007 for $150,000 representing the repayment of principal this deal.  Accordingly, on this deal Ted and Patti made $126,000.

CONRAD & SCHERER, LLP; 633 SOUTH FEDERAL HIGHWAY, FT. LAUDERDALE, FL 33301, TEL. (954) 462-5500

Indeed, as the below chart shows, 8 of the 15 known Ted/Patti deals (more than 50%) were botched and, as a result, Ted and Patti made $257,000 more than originally promised:

| Deal | Original Terms | Actual Repayment Terms |
|---|---|---|
| February 16, 2006 | Pay $200,000, receive $240,000 in 10 weeks. | Morse received return on investment in 16 weeks. |
| March 14, 2006 | Pay $210,000, receive $250,000 in 4 weeks and 2 days. | Morse received $294,000 ($44,000 more) in 36 weeks. |
| March 24, 2006 | Pay $172,000, receive either $210,000 in 7 weeks or $235,000 in 12 weeks. The deal was expressly presented as a settlement purchase. | Morse received $315,000 ($80,000 more) in 34 weeks. The deal was characterized as a "loan" in response to Patti's inquiries. |
| April 18, 2006 | Pay $320,000, receive $488,000 in 12 months. The deal was expressly presented as a settlement purchase. | Morse received $474,000 ($14,000 less). The deal was characterized as a "loan" in response to Patti's inquiries. |
| May 4, 2006 | Pay $310,000, receive $461,500 in 8 months. | Morse received $347,500 ($114,000 less) in 17 months. |
| June 26, 2006 | Pay $150,000, receive $175,000 in 30 days. | Morse received $276,000 ($101,000 more) in 17 months. |
| December 28, 2006 | Pay $350,000, receive $425,000 in 45 days. | Morse received $435,000 ($10,000 more) in 83 days. |
| September 18, 2006 | Pay $250,000, receive $360,000 in 220 days. | Morse received $510,000 ($150,000 more). |

85.    Surely, any legitimate investor would see that there is something wrong here, and be weary of making further investments. Why the late payments, ,particularly on putative pre-funded settlement purchases? Why the substantial under and over payments? And, how do putative settlement purchases -- like the March 24, 2006 and April 18, 2006 deals -- transform into third party loans? But, the only inquiries came from Patti. Because of Patti's pestering and Ted's desire to make ever larger investments with Rothstein, in 2008 Rothstein and Ted shifted the source of funding of their deals to MOI.

86.    While changing the source of the funding to MOI curtailed Patti Morse's inquiries, the millions of dollars in transfers from MOI to RRA raised eyebrows at MOI. In 2008 and 2009, MOI's auditors and internal accounting people demanded documentation for the millions of dollars in unsubstantiated transfers from MOI and RRA. Ted Morse and Rothstein covered up their deal with sham promissory notes. In true Ponzi scheme fashion, the sham

promissory notes -- which were executed after the fact, in batches, and after MOI's accounting people demanded documentation -- made RRA the obligor and offered no details concerning the underlying transaction.

87. The sham promissory notes included deals which purportedly involved settlement purchases. For example, in a June 25, 2008 e-mail entitled "mooooooooooo MONEY.....and I do mean MOOOOOOOOO :-)," Rothstein presented the deal to Ted Morse as follows (Ex. "J:28"):

> To:       Ted Morse[moi1@edmorse.com];
> Subject:   mooooooooooooo MONEY.....and i do mean MOOOOOOOOO :-)
> Sent:     Wed 6/25/2008 6:52:57 PM
> From:     Scott Rothstein
>
> Hey bro....this is a very simple deal.....
>
> Fund 3 million
>
> Roi is 500k
>
> Paid in 90 days in one payment
>
> If I fund today we pick up a kicker of 50k each.
>
> Let me know.....
>
> Love ya,
>
> me
>
>
> Can't be any simpler than that.
>
> Secured by funds already in house.
>
> Let me know as I want to try to fund now.
>
> Ciao ciao,
>
> Again,

**Fund 3 million**

**Roi is 500k**

**Paid in 90 days**

**Secured by funds already in house.**

88. As can be seen, Rothstein concluded the e-mail by advising Ted Morse that the deal was "*Secured by funds already in house.*" Rothstein used phrases like this when presenting deals which involved alleged pre-funded settlements. This is part of a colorful, often deliberately impoverished, lexicon ("Ponzi-Speak") which Rothstein used with his co-conspirators. This Ponzi-Speak included Rothstein referring to his co-conspirators (including Ted Morse) as "bro"

and "dawg," his phony investments as "deals" and "hot ones," RRA as the "International Bank of Wow," ending business e-mails with "love ya," and referring to himself as "hood," "pimp," "banker from the Bronx," TPOFD ("The Prince of Fucking Darkness"), and the like (as shown, in part, in the e-mails between him and Ted Morse attached to this Complaint as Ex. "J.").

89.     Rothstein and Ted Morse did not document the June 25, 2008 deal at the time of funding by MOI.  Ted Morse did not confirm RRA's trust account balance to determine if the funds were "in house."  Ted did not ask for or receive any "lock letter" or other assurance that the funds could be paid only to him.  And Ted did not ask for an independent third-party to authenticate the terms of the alleged settlement.  Rather, Rothstein and Ted Morse manufactured documentation only after MOI auditors demanded it.  However, instead of documenting the deal consistent with the premise of the June 25, 2008 e-mail -- with a putative settlement agreement, assignment, and purchase agreement -- Morse and Rothstein created an *unsecured* promissory note making Rothstein (not the third party) the obligor and which revealed nothing about the underlying transaction.  Ex. "L."

90.     If the underlying settlement was legitimate and was "secured by funds already in house" as claimed in the June 25, 2008 e-mail, why would MOI later accept an unsecured promissory note on the deal?  By accepting a promissory note with no collateral, MOI essentially released a secured debt and replaced it with an unsecured one.  Surely, someone who runs a multimillion dollar car dealership would never agree to do that, unless, of course, he knew that the underlying settlements did not exist and there were no "funds in house" to begin with.

91.     Ted Morse and Rothstein similarly covered up their March 13, 2009 deal. Rothstein presented that deal in Ponzi-Speak to Ted in the following e-mail (Ex. "J:34"):

```
Hey bro,

A little help for MOI if you want it.

Just settled a case that has a very solid ROI on the funding

Fund 5mm

Roi 3mm

Paid over 5 months
```

```
Just settled a case

Fund 5mm

Roi 3mm

Paid over 5 months
```

92.    The March 13th deal was not "papered" until 2009 when MOI auditors demanded documentation.  Just like the June 25, 2008 deal, at the time of funding Ted Morse did not confirm RRA's trust account balance, ask for or receive any "lock letter" or other assurance that the funds could be paid only to him, or ask for independent third-party authentication of the settlement terms.  When the deal was "papered" in April 2009, instead of documenting it consistent with the original premise that it involved a settlement purchase, Rothstein and Ted Morse created two sham promissory notes making RRA (not the RRA Client) liable to MOI for the return on investment.

93.    Putting aside the sham nature of these notes, which documented transactions that were not "loans," these notes are revealing in that they do not accurately reflect the dollars in/dollars out on this transaction.  The first promissory note incorrectly identified the principal as $3 million, instead of $5 million.  Ex. "M."  Then in a March 20, 2009 e-mail, Rothstein added an additional $125,000 in "interest" to Ted's $3 million return.  Id.  Rothstein asked Ted "if he needs a new note" and "new post dated checks."  Id.  In the end, Rothstein issued a corrected promissory note showing $5 million in, $8 million out, at the request of MOI's internal