# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

ROTHSTEIN ROSENFELDT ADLER P.A.,                Case No. 09-34791-BKC-RBR

      Debtor.                                                                        Chapter 11 Case

_____/

## DISCLOSURE STATEMENT IN CONNECTION WITH SECOND AMENDED JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED JOINTLY BY THE TRUSTEE AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (AS MODIFIED)

**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Paul Steven Singerman
Florida Bar No. 378860
singerman@bergersingerman.com
Jordi Guso
Florida Bar No. 0863580
jguso@bergersingerman.com
Christopher A. Jarvinen
Florida Bar No. 0021745
cjarvinen@bergersingerman.com
Isaac M. Marcushamer
Florida Bar No. 60373
imarcushamer@bergersingerman.com

*Counsel for Herbert Stettin,*
*Chapter 11 Trustee*

**AKERMAN SENTERFITT**
350 E. Las Olas Blvd., Suite 1600
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Michael I. Goldberg
Florida Bar No. 886602
michael.goldberg@akerman.com
Eyal Berger
Florida Bar No. 11069
eyal.berger@akerman.com

*Counsel for the Official*
*Committee of Unsecured Creditors*

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Miami Tower
100 S.E. Second Street, Suite 4400
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310
John H. Genovese
Florida Bar No. 280852
jgenovese@gjb-law.com
Jesus M. Suarez
Florida Bar No. 60086
jsuarez@gjb-law.com

*Special Counsel/Conflicts Counsel*
*for Herbert Stettin, Chapter 11 Trustee*

**Dated: May 29, 2013**

4969645-2

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ......................................................................................................... 1

    A.  Overview of the Plan ......................................................................................... 5

    B.  Prior Agreements Among the Trustee, the Banyon Trustee and TD Bank ......... 18

    C.  Overview of Chapter 11 ................................................................................... 20

    D.  Disclosure Statement Exhibits ........................................................................ 21

        i.  Exhibit 1:  The Plan (together with its appendices) ................................ 21

        ii.  Exhibit 2:  The Liquidation Analysis ..................................................... 21

        iii.  Exhibit 3:  List With Respect to Paragraph 3 of the Order Granting Trustee's Motion for Protective Order [ECF No. 3948] and Granting TD Bank's Motion for Protective Order  [ECF No. 3935], entered by the Bankruptcy Court on March 18, 2013 [ECF No. 4078] ............................................................................................... 21

    E.  Only Impaired Classes Vote ........................................................................... 21

    F.  Confirmation Hearing ..................................................................................... 22

    G.  Classification of Claims and Interests Under the Plan ...................................... 22

        i.  Classification ........................................................................................ 22

II.  GENERAL BACKGROUND ........................................................................................ 23

    A.  Corporate Structure ........................................................................................ 23

    B.  History of the Debtor and Its Pre-Petition Business .......................................... 23

    C.  Events Leading to Chapter 11 Filing – Scott Rothstein's Fraud ........................ 23

    D.  Litigation by Coquina Investments Against TD Bank and Rothstein.................. 25

III.  THE CHAPTER 11 CASE .......................................................................................... 27

    A.  Commencement of Case .................................................................................. 27

    B.  "First Day" Relief .......................................................................................... 27

    C.  Miscellaneous Administrative Matters ............................................................ 27

    D.  Retention of Professionals ............................................................................... 28

        i.  Bankruptcy Counsel............................................................................... 28

        ii.  Other Professionals ............................................................................... 28

    E.  Executory Contracts and Unexpired Leases ..................................................... 29

        i.  Real Property ........................................................................................ 29

        ii.  Personal Property .................................................................................. 30

    F.  Sales of Personal Property .............................................................................. 30

i

# TABLE OF CONTENTS

**Page**

G.  Claims Process and Claims Bar Dates ................................................................ 30

    i.  Claims, Notice and Ballot Agent ............................................... 30

    ii.  Filing of Schedules of Assets and Liabilities........................... 30

    iii.  General and Government Bar Dates ......................................... 31

    iv.  Administrative Expense Claims Bar Date ................................ 31

    v.  Requests for Payment of Administrative Expense Claims ..................... 31

    vi.  Objections to Claims................................................................ 31

H.  Pending Litigation................................................................................ 32

    i.  General ..................................................................................... 32

    ii.  Trustee's Adversary Proceeding ............................................. 32

I.  Constitution of the Official Committee of Unsecured Creditors ........................ 33

IV.  POTENTIAL LITIGATION ASSETS AND PRESERVATION OF SUCH LITIGATION CLAIMS ................................................................. 33

A.  Potential Bankruptcy Litigation Claims.......................................................... 33

    i.  Preference Actions ................................................................... 34

    ii.  Fraudulent Conveyances and Transfers ................................... 34

    iii.  Other Litigation....................................................................... 35

    iv.  Disallowance of Claims .......................................................... 35

B.  Applicable Insurance Policies ......................................................................... 36

C.  Transfer and Enforcement of Causes of Action................................................ 36

D.  Preservation of Rights ..................................................................................... 37

V.  CLAIMS AGAINST THE DEBTOR ......................................................................... 37

VI.  SUMMARY OF THE PLAN OF LIQUIDATION ..................................................... 38

A.  General.............................................................................................................. 38

B.  Classification and Treatment of Claims and Interests ...................................... 38

    i.  Unclassified Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Statutory Fees.......................................... 38

    ii.  Classification and Treatment of Claims and Interests ............................ 44

C.  Separate Classes and Treatment....................................................................... 62

D.  Means of Implementing the Plan ..................................................................... 62

    i.  Settlement Agreement.............................................................. 62

ii

# TABLE OF CONTENTS

**Page**

ii.      Establishment of Liquidating Trust ........................................................ 65

iii.     Continuation of Automatic Stay ............................................................ 70

iv.      Continuation of Bankruptcy Rule 2004 Rights...................................... 70

v.       Wind-Down of Debtor ........................................................................... 70

vi.      Disposition of Abandoned Assets .......................................................... 72

vii.     Closing of the Chapter 11 Case ............................................................. 72

viii.    Dissolution of Committee ...................................................................... 72

ix.      Client Files ............................................................................................ 72

x.       Immediate Binding Effect ...................................................................... 72

xi.      Additional Documents ........................................................................... 73

xii.     Collateral Source Recovery Calculations .............................................. 73

xiii.    Collateral Source Recovery Remittance ................................................ 74

xiv.     Determination of the Bar Order Will Occur at Confirmation
         Hearing................................................................................................... 75

xv.      Certain Settlement Issues ...................................................................... 75

xvi.     Binding Effect ........................................................................................ 75

E.       The TD Bank Settlement ........................................................................ 75

         i.      Settlement Terms: ....................................................................... 75

         ii.     Injunction and Bar Order in Favor of TD Bank........................ 79

         iii.    Satisfaction of Settlement Criteria ............................................. 80

F.       Settlement of Claims Between the RRA Estate and the Banyon
         Bankruptcy Estates................................................................................. 83

G.       Distributions Under the Plan.................................................................. 84

         i.      Delivery of Distributions in General.......................................... 84

         ii.     Cash Payments ........................................................................... 85

         iii.    Interest on Claims ...................................................................... 85

         iv.     No de Minimis Distributions ...................................................... 85

         v.      Face Amount .............................................................................. 85

         vi.     Unclaimed and Undeliverable Distributions.............................. 85

         vii.    Interim Distributions .................................................................. 86

         viii.   Final Distribution ....................................................................... 86

iii

# TABLE OF CONTENTS

**Page**

ix.    Disputed Claims Reserves ...................................................... 86

x.    Compliance with Tax Requirements........................................ 86

xi.    Setoff and Liquidating Trustee's Compensation ..................... 86

H.    Procedures for Resolving and Treating Disputed and Contingent Claims .......... 87

I.    Disallowance of Late Claims ............................................................ 87

J.    Recovery of Distributions on Disallowed Claims .............................. 87

K.    Equitable Defenses Not Assertable Against Liquidating Trust ........... 88

L.    Unexpired Leases and Executory Contracts ..................................... 88

i.    General Treatment: Rejected if not Previously Assumed....................... 88

ii.    Bar to Rejection Claims Arising as a Result of the Confirmation Order ....................................................... 88

iii.    Indemnification Obligations ................................................. 88

M.    Retention of Jurisdiction ................................................................. 88

i.    Jurisdiction of Court .............................................................. 88

ii.    Ongoing Bankruptcy Court Jurisdiction ................................. 89

N.    Conditions to Confirmation ............................................................ 91

O.    Conditions to Effective Date of the Plan .......................................... 92

P.    Termination of Plan for Failure to Become Effective ....................... 93

Q.    Waiver of Conditions..................................................................... 93

R.    Modifications to the Plan ............................................................... 93

S.    Exculpation, Releases and Injunction ............................................. 93

i.    Exculpation .......................................................................... 93

ii.    Injunction ............................................................................ 94

iii.    Limitation of Liability.......................................................... 95

iv.    Release of TD Bank Releasees .............................................. 95

v.    Unknown Claims ................................................................. 96

vi.    TD Bank Releasee Injunction and Bar Order ......................... 97

vii.    TD Bank Release ................................................................. 98

T.    Certain Miscellaneous Provisions ................................................... 99

i.    Revocation of the Plan .......................................................... 99

ii.    No Admissions ................................................................... 100

iv

# TABLE OF CONTENTS

**Page**

iii.    Pre-Confirmation Modification ............................................................ 100

iv.    Successors and Assigns ..................................................................... 100

v.    Exemption from Certain Transfer Taxes .............................................. 100

vi.    Exemption from Securities Laws ........................................................ 100

vii.    Preservation of Rights of Setoff ......................................................... 100

VII.    VOTING REQUIREMENTS, ACCEPTANCE AND
CONFIRMATION OF THE PLAN ................................................................ 101

A.    Parties in Interest Entitled to Vote ..................................................... 101

B.    Classes Impaired Under the Plan Entitled to Vote ............................... 101

C.    Voting Procedures and Requirements .................................................. 102

i.    Ballots ..................................................................................... 102

ii.    Completing and Returning Ballots ........................................... 102

D.    Confirmation Hearing ........................................................................ 103

E.    Confirmation .................................................................................... 103

F.    Acceptance of Plan ........................................................................... 103

G.    Confirmation Without Acceptance of All Impaired Classes ............... 103

H.    Best Interests Test ............................................................................ 105

I.    Liquidation Analysis and Alternatives to the Plan ............................. 105

J.    Feasibility ........................................................................................ 107

K.    Compliance with the Applicable Provisions of the Bankruptcy Code ............. 107

L.    Binding Effect of Confirmation of the Plan ....................................... 107

VIII.    RISK FACTORS ...................................................................................... 108

A.    Failure to Satisfy Vote Requirement .................................................. 108

B.    The Plan May Not Be Accepted or Confirmable ................................ 108

C.    Allowed Claims May Exceed Estimates .............................................. 108

D.    Non-Occurrence of the Effective Date ............................................... 109

E.    Inability to Monetize and Collect Assets ........................................... 109

F.    Reconsideration of the "Sochet Claim" .............................................. 109

G.    Risk of Delay in Achieving the Effective Date .................................. 109

H.    The Plan Proponents Have no Duty to Update ................................... 110

I.    Court Approval of the Distribution Structure ..................................... 110

# TABLE OF CONTENTS

**Page**

J.  Effectiveness of the Plan is Dependent Upon Approval of the 9019 Motion.... 110

IX.  CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ............................ 111

A.  U.S. Federal Income Tax Consequences to the Debtor ..................................... 112

    i.  Cancellation of Indebtedness Income ...................................................... 112

    ii.  Transfer of Liquidating Trust Assets to the Liquidating Trust ............. 112

B.  U.S. Federal Income Tax Consequences to the Holders of Allowed Claims .... 112

C.  U.S. Federal Income Tax Treatment of the Liquidating Trust and its
Beneficiaries ........................................................................................................ 113

    i.  U.S. Federal Income Tax Characterization of the Liquidating Trust .... 113

    ii.  Establishment and Taxation of the Liquidating Trust............................ 113

    iii.  Tax Reporting ........................................................................................... 114

    iv.  Holders of Disputed Claims and Disputed Ownership Fund
Election ...................................................................................................... 115

    v.  Qualified Settlement Fund ....................................................................... 115

D.  Information Reporting and Backup Withholding ................................................ 115

E.  Importance of Obtaining Professional Tax Assistance ...................................... 116

F.  Circular 230 Disclaimer ...................................................................................... 116

X.  RECOMMENDATION ................................................................................................... 116

XI.  CONCLUSION................................................................................................................ 117

4969645-2

## I.    INTRODUCTION

Herbert Stettin, as chapter 11 trustee (the "Trustee") for Rothstein Rosenfeldt Adler, P.A. ("Debtor" or "RRA"), and the Official Committee of Unsecured Creditors (the "Committee" and together with the Trustee, collectively, the "Plan Proponents") provide this Disclosure Statement (the "Disclosure Statement") to the holders of impaired claims against the Debtor to permit such parties entitled to vote to make an informed decision in voting to accept or reject the *Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed Jointly by the Trustee and the Official Committee of Unsecured Creditors (As Modified)* (the "Plan") dated May 29, 2013 and filed with the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "Bankruptcy Court") in connection with the above-captioned case filed pursuant to chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  A copy of the Plan is attached to this Disclosure Statement as **Exhibit 1**.  Capitalized terms used herein but not defined herein have the meanings assigned to such terms in the Plan.  Whenever the words "include," "includes" or "including" are used in this Disclosure Statement, they are deemed to be followed by the words "without limitation."

This Disclosure Statement is presented to holders of Claims against the Debtor and other parties in interest in accordance with the requirements of section 1125 of Bankruptcy Code. Section 1125 of the Bankruptcy Code requires that a disclosure statement provide information sufficient to enable a hypothetical and reasonable investor of the Debtor, to make an informed judgment whether to accept or reject the Plan.  This Disclosure Statement may not be relied upon for any purpose other than that described above.  This Disclosure Statement has not yet been approved by the Bankruptcy Court.

This Disclosure Statement is based on information publicly available, information assembled and analyzed by the Plan Proponents and their legal and financial advisors, pleadings filed with the Bankruptcy Court, and claims information provided by Trustee Services, Inc. ("TSI"), in its capacity as noticing, claims, balloting and solicitation agent of the Bankruptcy Court.

**ALL THREE MEMBERS OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (ONE OF THE PLAN PROPONENTS) STRONGLY SUPPORT CONFIRMATION OF THE PLAN AND URGE CREDITORS TO VOTE IN FAVOR OF CONFIRMING THE PLAN.**

**IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THE PLAN UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED AT THIS TIME.**

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED.  THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT,**

AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.

NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE CHAPTER 11 CASE ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO THE RESPECTIVE COUNSEL FOR EACH OF THE PLAN PROPONENTS, WHO IN THEIR DISCRETION MAY IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT OR THE OFFICE OF THE UNITED STATES TRUSTEE FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY EXHIBITS CONCERNING TRANSACTIONS INVOLVING THE DEBTOR AND THE OTHER INFORMATION CONTAINED HEREIN, HAS NOT BEEN SUBJECT TO AN AUDIT OR INDEPENDENT REVIEW EXCEPT AS EXPRESSLY SET FORTH HEREIN.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, SECTION 10.6 ("RELEASE OF TD BANK RELEASEES") OF THE PLAN PROVIDES FOR A RELEASE OF THE TD BANK RELEASEES (WHICH INCLUDE, BUT IS NOT LIMITED TO, EMESS CAPITAL, L.L.C.) FOR THE RELEASED CLAIMS.

EACH ENTITY SHOULD ASSUME WHEN EVALUATING THE PLAN, AND EACH CREDITOR SHOULD ASSUME WHEN EVALUATING AND VOTING TO ACCEPT OR REJECT THE PLAN, THAT: (I) THE TD BANK RELEASEE INJUNCTION AND BAR ORDER PURSUANT TO SECTION 10.8 OF THE PLAN APPLIES TO ALL ENTITIES, INCLUDING SUCH VOTING CREDITOR; (II) EVEN IF THE TD BANK RELEASEE INJUNCTION AND BAR ORDER PURSUANT TO SECTION 10.8 OF THE PLAN APPLIES TO SUCH VOTING CREDITOR, THE PLAN PROVIDES FOR, AND SUCH VOTING CREDITOR WILL BE ELIGIBLE TO RECEIVE, A DISTRIBUTION ON ITS ALLOWED CLAIM; AND (III) THE DETERMINATION OF THE APPLICABILITY OF THE EXCEPTION TO THE TD BANK RELEASEE INJUNCTION AND BAR ORDER CONTAINED IN SECTION 10.8(B)(5) OF THE PLAN RELATING TO A PARTICULAR CLAIM OR ACTION MAY TAKE PLACE AFTER THE PLAN'S EFFECTIVE DATE, SUBJECT TO THE TERMS OF THE PLAN.

ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE PLAN PROPONENTS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTOR, THEY HAVE NOT

INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.  THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE PLAN PROPONENTS SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THE DISCLOSURE STATEMENT.

ACCORDINGLY, ALTHOUGH AN EFFORT HAS BEEN MADE TO BE ACCURATE, THE PLAN PROPONENTS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ITS EXHIBITS IS CORRECT.  THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN.  EACH CREDITOR IS STRONGLY URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

A STATEMENT OF THE ASSETS AND LIABILITIES OF THE DEBTOR AS OF THE DATE OF THE COMMENCEMENT OF ITS CHAPTER 11 CASE IS ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT AND MAY BE INSPECTED BY INTERESTED PARTIES DURING REGULAR BUSINESS HOURS.

CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT IN ARTICLE 9 OF THE PLAN AND DESCRIBED HEREIN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT REQUIRED TO BE SATISFIED WILL BE SATISFIED OR OTHERWISE WAIVED.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

AS TO ANY CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT

4969645-2

WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR, ANY OF THE PLAN PROPONENTS, THE LIQUIDATING TRUSTEE, OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR IN THIS CHAPTER 11 CASE.  ALL SUCH PARTIES SHOULD CONSULT A QUALIFIED PROFESSIONAL ADVISOR REGARDING THE EFFECT OF THE PLAN ON SUCH PARTY.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH U.S. TREASURY CIRCULAR 230, EACH HOLDER OF A CLAIM OR INTEREST IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, BY ANY HOLDER OF A CLAIM OR INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE IRC; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE PLAN; AND (C) EACH HOLDER OF A CLAIM OR INTEREST SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULTS FOR ALL HOLDERS OF CLAIMS.  THE PLAN PROPONENTS ALSO BELIEVE THAT THE PLAN WILL ENABLE THE DEBTOR TO BE LIQUIDATED SUCCESSFULLY.  ACCORDINGLY, THE PLAN PROPONENTS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS.

THE PLAN PROPONENTS STRONGLY URGE THE CREDITORS TO VOTE TO ACCEPT THE PLAN.

On May 8, 2013, the Plan Proponents filed the Disclosure Statement and the Plan.  The Bankruptcy Court held a hearing pursuant to Bankruptcy Rule 3017, and section 1125 of the Bankruptcy Code on the adequacy of this Disclosure Statement at 9:30 a.m. on May 29, 2013, in the United States Bankruptcy Court, United States Courthouse, 299 East Broward Blvd., Courtroom 308, Fort Lauderdale, Florida 33301 (the "Disclosure Hearing") and approved the Disclosure Statement with the modifications reflected herein.

To obtain, at your cost, additional copies of this Disclosure Statement or the appendices or Exhibits hereto, including the Plan, please contact TSI at the below address, or visit the below website maintained by TSI or write to TSI at the email address below in order to obtain additional copies free of charge:

www.rra-bk.com

or

4

4969645-2

Trustee Services, Inc.,
1844 N. Nob Hill Road, #613
Plantation, FL 33322

or

info@rra-bk.com

## A.    Overview of the Plan

THE FOLLOWING IS A SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN.  THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.  CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN SECTION VI OF THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF.

THE PLAN IS ATTACHED AS EXHIBIT 1 TO THIS DISCLOSURE STATEMENT.

IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL CONTROL.

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  The fundamental purpose of a chapter 11 case is to formulate a plan to restructure a debtor's finances so as to maximize recoveries to its creditors.  With this purpose in mind, businesses often use chapter 11 as a means to conduct asset sales and other forms of liquidation.  Whether the aim is reorganization or liquidation, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and stockholders with respect to their claims against and equity interests in a debtor's bankruptcy estate.

The Plan contemplates the liquidation of the Debtor's assets and the prosecution of Litigation Claims available to the Estate.  As a part of the liquidation process, the Liquidating Trustee will make Distributions on the Allowed Claims held by Creditors from Cash on hand on the Effective Date, the proceeds of Litigation Claims, as well as the proceeds from the TD Bank Settlement (as defined herein).  As of May 2013, the Trustee holds approximately $83.1 million in Cash, which sum constitutes the proceeds of settlements of Litigation Claims to date and proceeds of sales of property previously approved by the Bankruptcy Court.

Under the Plan, substantially all of the assets of the Estate, consisting principally of Cash on hand on the Effective Date, the TD Bank Contribution, and the Litigation Claims, will be disbursed and turned over by the Trustee to the Liquidating Trust.  The holders of Allowed Claims will be the Beneficiaries of the Liquidating Trust and will receive a Distribution of Cash from the Liquidating Trust.  The Plan and Liquidating Trust also provide for interim partial Distributions of some or all of the dividend that may be payable to holders of Allowed Claims. The Liquidating Trust will be administered by the Liquidating Trustee, with the oversight of the

5

Liquidating Trust Oversight Committee. Pursuant to Section 6.2.15 of the Plan, Michael I. Goldberg was selected as the proposed, initial Liquidating Trustee, and the Confirmation Order will make his appointment effective as of the Effective Date of the Plan. Pursuant to Section 1.84 of the Plan, the Liquidating Trust Oversight Committee will be selected in accordance with Section 6.2.7 of the Plan and appointed pursuant to the Confirmation Order.

Under the Plan, certain Claims — in particular, Administrative Expense Claims, Statutory Fees, Professional Claims, Priority Non-Tax Claims and Priority Tax Claims — remain unclassified in accordance with section 1123(a)(1) of the Bankruptcy Code. The Plan also incorporates the settlement among and between the Trustee, the Banyon Trustee and TD Bank (the "TD Bank Settlement") which is incorporated into the Plan as Appendix 1.122 (as defined in the Plan the "Settlement Agreement") pursuant to which, *inter alia*, TD Bank shall contribute the TD Bank Contribution ($72,382,817.90) to the Trustee by the Third Business Day after the Confirmation Date, and, on the Effective Date, and subject to the conditions contained in the Plan, the Trustee shall, among other things, disburse and turnover all Cash on hand, including the TD Bank Contribution ($72,382,817.90), and other Assets to the Liquidating Trust in order to permit the Liquidating Trustee to make Distributions on Allowed Claims, including (i) Unclassified Claims, (ii) Allowed Secured Claims (Class 1), (iii) Single Source Recovery Allowed Unsecured Claims (Class 2), (iv) Multiple Source Recovery Allowed Unsecured Claims (Class 3), (v) Razorback Unsecured Rising Tide Claim (Class 4), (vi) Banyon Unsecured Claim (Class 5), (vii) Funds' Subordinated Unsecured Claim (Class 6), (viii) Miscellaneous Subordinated Claims (Class 7), and (ix) if the Full Amount of the Allowed Claims described in "(i)" to "(viii)" of this sentence have been paid in Cash, then the Liquidating Trustee shall make Distributions on the TD Bank Junior Subordinated Claim (Class 8) (i.e., the TD Bank Junior Subordinated Claim is subordinated to all Allowed Unclassified Claims and Claims in Classes 2-7).

The Plan Proponents estimate that the holders of Allowed Claims will receive the following treatment under the Plan: (i) the holders of Allowed Unclassified Claims will receive the Full Amount of their Allowed Claims in Cash per the treatments detailed in Sections 2.1 through 2.7 of the Plan; (ii) the holders of Allowed Claims in Classes 1-5 will receive the Full Amount of their Allowed Claims in Cash per the treatments detailed in Sections 3.2 through 3.6 of the Plan; (iii) the holder of the Allowed Claim in Class 6 will receive a potentially meaningful Distribution in Cash on its Allowed Claim per the treatment detailed in Section 3.7 of the Plan; and (iv) the holders of the Allowed Claims in Classes 7-8 will receive no Distributions per the treatments detailed in Section 3.8 and 3.9 of the Plan.

In exchange for the consideration being provided by TD Bank under the TD Bank Settlement including but not limited to TD Bank Contribution ($72,382,817.90), each TD Bank Releasee shall receive a full and general release from the Debtor, the Estate, the Trustee and the Committee. Also, TD Bank will be providing certain releases to the Estate, Trustee, the Committee (and its members, only in their capacity as members of the Committee and not in their individual capacities (e.g., as a creditor)) and any related Estate Professionals.

**IN ADDITION, UNDER THE TD BANK SETTLEMENT, EXCEPT AS OTHERWISE EXPLICITLY PROVIDED IN THE PLAN, ALL PARTIES, INCLUDING CREDITORS AND PARTIES IN INTEREST IN THIS CASE AND PARTIES THAT**

4969645-2

**HAVE ASSERTED OR FILED CLAIMS AGAINST TD BANK, WHETHER OR NOT SUCH PARTY FILED A CLAIM AGAINST THE ESTATE WILL BE FOREVER BARRED AND ENJOINED FROM ASSERTING OR PROSECUTING ANY CLAIM OR CAUSE OF ACTION AGAINST ANY TD BANK RELEASEE AS PROVIDED FOR IN ARTICLE 10 OF THE PLAN.**

As stated above, the Plan and the Settlement Agreement grant TD Bank an Allowed, junior subordinated unsecured claim in the amount of $132,450,000 (as defined in the Plan, the "TD Bank Junior Subordinated Claim" (Class 8)). TD Bank will not receive any Distribution on the TD Bank Junior Subordinated Claim until the holders of all Allowed Unclassified Claims and Claims in Classes 2-7 of the Plan receive Distributions totaling the Full Amount of their Allowed Claims. The TD Bank Contribution will be used to make Distributions under the Plan.

The following table briefly summarizes the classification and treatment of those Claims and Interests classified under the Plan:

7

| Class | Type of Claim or Interest | Treatment | Impaired / Unimpaired | Entitled to Vote | Projected Range of Claims ($) | Projected Distribution Range (%) |
|---|---|---|---|---|---|---|
| 1 | Allowed Secured Claims | -See Plan, § 3.2.<br><br>-Summary: Each holder of an Allowed Secured Claim shall receive, in the sole discretion of the Liquidating Trustee, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim: (a) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the later of (i) the Effective Date; (ii) the date that such Secured Claim becomes Allowed, and (iii) a date agreed to by the Liquidating Trustee and the holder of such Allowed Secured Claim; (b) treatment such that such Allowed Secured Claim is reinstated; (c) the property securing such Allowed Secured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee or as the Bankruptcy Court may order in the Chapter 11 Case by Final Order. | Unimpaired | No | $0<br><br>No known Claims exist in Class 1 | 100% |
| 2 | Single Source Recovery Allowed Unsecured Claims[1] | -See Plan, § 3.3.<br><br>-Summary: Subject to the payments provided for Allowed Unclassified Claims and § 3.2 of the Plan, and except as otherwise provided in § 3.3(b) of the Plan, each holder of an Allowed Class 2 Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 2 Claim, Pro Rata Distributions of Cash from the Liquidating Trust pursuant to | Impaired | Yes | $123.6 million to $132.8 million[2] | 100%[2] |

---

[1]    "Single Source Recovery Allowed Unsecured Claim" is defined in the Plan.

[2]    The projected Claim amount for Class 2 and 3 is an aggregate estimate for both Classes. As provided for in Sections 3.3 and 3.4 of Plan the distribution of Claims between Classes 2 and 3 cannot be ascertained until the Trustee receives and evaluates the Verified Collateral Source Recovery Disclosures from the Claimants as a part of the Plan solicitation process.

4969645-2

| Class | Type of Claim or Interest | Treatment | Impaired / Unimpaired | Entitled to Vote | Projected Range of Claims ($) | Projected Distribution Range (%) |
|---|---|---|---|---|---|---|
| | | the Liquidating Trust Agreement until such Allowed Class 2 Claim has been paid the Full Amount of such Allowed Claim. Allowed Class 2 Claims shall receive the same Pro Rata Distribution as the holders of Allowed Class 3 Claims, after application of Collateral Source Recoveries, which are classified and treated in Section 3.4 of the Plan. | | | | |
| 3 | Multiple Source Recovery Allowed Unsecured Claims[3] | -See Plan, § 3.4.<br>-Summary:  Subject to the payments provided for Allowed Unclassified Claims, and § 3.2 of the Plan, and except as otherwise provided in § 3.4(b) of the Plan, each holder of an Allowed Class 3 Claim, shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 3 Claim Pro Rata Distributions of Cash from the Liquidating Trust pursuant to the Liquidating Trust Agreement, after application of Collateral Source Recoveries, as applicable, until such Allowed Class 3 Claim has been paid the Full Amount of such Allowed Claim. | Impaired | Yes | $123.6 million to $132.8 million [2] | 100%[2] |
| 4 | Razorback Unsecured Rising Tide Claim | -See Plan, § 3.5.<br>-Summary:  Subject to the payments provided for Allowed Unclassified Claims and §§ 3.2 - 3.4 of the Plan, and except as otherwise provided in § 3.5(b) of the Plan, the Allowed Class 4 Claim shall not receive any Distribution under the Plan or the Liquidating Trust until such time as the holders of Allowed Class 2 and Allowed Class 3 Claims have received Pro Rata | Impaired | Yes | $494,750 | 100% |

---

[3]    "Multiple Source Recovery Allowed Unsecured Claim" is defined in the Plan.

9

| Class | Type of Claim or Interest | Treatment | Impaired / Unimpaired | Entitled to Vote | Projected Range of Claims ($) | Projected Distribution Range (%) |
|---|---|---|---|---|---|---|
| | | Distributions of Cash from the Liquidating Trust equal to 95% of the Allowed amount of such Claims after the application of Collateral Source Recoveries. Once each of the holders of Allowed Class 2 and Class 3 Claims have received a Pro Rata Distribution of Cash equal to 95% of the Allowed amount of such Class 2 and Class 3 Claims after the application of Collateral Source Recoveries, if any, the Allowed Class 4 Claim shall commence receiving Pro Rata Distributions equal to the Pro Rata Distributions provided thereafter to Allowed Class 2 and Allowed Class 3 Claims after the application of Collateral Source Recoveries. | | | | |
| 5 | Banyon Unsecured Claim | -See Plan, § 3.6.<br><br>-Summary:  On the Effective Date, the Banyon Unsecured Claim shall be Allowed in the amount of $39.7 million ($39,700,000.00) against the Estate.  Upon the transfer of the Trust Assets from the Estate to the Liquidating Trustee, the Liquidating Trustee shall establish the Banyon Unsecured Creditor Fund from the TD Bank Contribution and earmark the Banyon Unsecured Creditor Fund for payment of the Banyon Unsecured Claim.  The Banyon Bankruptcy Estates shall recover on account of the Banyon Unsecured Claim solely from the Banyon Unsecured Creditor Fund.  Within five (5) Business Days after the Effective Date, the Liquidating Trustee shall Distribute the Banyon Unsecured Creditor Fund to the Banyon Trustee for the benefit of the Banyon Bankruptcy Estates (as defined in the Plan, the "Banyon Distribution") in full satisfaction, release and | Impaired | Yes | $39.7 million | 100% |

| Class | Type of Claim or Interest | Treatment | Impaired / Unimpaired | Entitled to Vote | Projected Range of Claims ($) | Projected Distribution Range (%) |
|---|---|---|---|---|---|---|
| | | discharge of all Claims of the Banyon Bankruptcy Estates, directly or indirectly, against the Debtor or the Estate, including, without limitation, the Banyon Unsecured Claim.  The amount of the Banyon Distribution shall be allocated between the Banyon Bankruptcy Estates in accordance with the direction of the Banyon Trustee or Final Order of the Bankruptcy Court in either Banyon Bankruptcy Case.<br><br>A detailed treatment of the Banyon Unsecured Fund is found in § 3.6 of the Plan. | | | | |
| 6 | Funds' Subordinated Unsecured Claim | -See Plan, § 3.7.<br>-Summary:  Subject to the payments provided for Allowed Unclassified Claims and §§ 3.2 - 3.6 of the Plan, the Allowed Class 6 Claim is subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, and Class 5 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable. If all Allowed Class 2, Class 3, Class 4 and Class 5 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable, the Allowed Class 6 Claim shall receive Pro Rata Distributions from the Liquidating Trust pursuant to the Liquidating Trust Agreement if available until such Claims have been paid the Full Amount of such Allowed Claims in Cash in accordance with the terms of the Funds' Settlement Agreement. | Impaired | Yes | $26 million | 8%-68% |

11

| Class | Type of Claim or Interest | Treatment | Impaired / Unimpaired | Entitled to Vote | Projected Range of Claims ($) | Projected Distribution Range (%) |
|-------|---------------------------|-----------|----------------------|------------------|-------------------------------|----------------------------------|
| 7 | Miscellaneous Subordinated Claims | -See Plan, § 3.8.<br><br>-Summary:  Subject to the payments provided for Allowed Unclassified Claims, and §§ 3.2-3.7 of the Plan, Allowed Class 7 Claims are subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, Class 5, and Class 6 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable. If all Allowed Class 2, Class 3, Class 4, Class 5, and Class 6 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable, the Allowed Class 7 Claims shall receive Pro Rata Distributions from the Liquidating Trust pursuant to the Liquidating Trust Agreement if available until such Claims have been paid the Full Amount of such Allowed Claims in Cash. | Impaired | Yes | $43.2 million | 0% |
| 8 | TD Bank Junior Subordinated Claim | -See Plan, § 3.9.<br><br>-Summary:  Subject to the payments provided for Allowed Unclassified Claims and §§ 3.2-3.8 of the Plan, the Allowed Class 8 Claim is subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, Class 5, Class 6, and Class 7 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable.  If the holders of all Allowed Class 2, Class 3, Class 4, Class 5, Class 6, and Class 7 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of | Impaired | Deemed to Accept | $132.45 million | 0% |

| Class | Type of Claim or Interest | Treatment | Impaired / Unimpaired | Entitled to Vote | Projected Range of Claims ($) | Projected Distribution Range (%) |
|---|---|---|---|---|---|---|
| | | Collateral Source Recoveries, as applicable, the Allowed Class 8 Claim shall receive Distributions from the Liquidating Trust if available pursuant to the Liquidating Trust Agreement until such Claim has been paid the Full Amount of such Allowed Claim in Cash. | | | | |
| 9 | Allowed Interests in the Debtor | -See Plan, § 3.10.<br><br>-Summary:  All Interests shall be cancelled on the Effective Date. Class 9 Interests shall not receive or retain any property under the Plan. | Impaired | No | N.A. | N.A. |

The preceding summaries of the material provisions of the Plan do not purport to be complete and are qualified in their entirety by reference to all of the provisions of the Plan, including all Exhibits thereto, all documents described therein and the definitions therein of certain terms used above.  For a more detailed description of the Plan, see Article VI of this Disclosure Statement ("Summary of the Plan of Liquidation").  For detailed projected financial information, see Article VII.I of this Disclosure Statement ("Liquidation Analysis and Alternatives to the Plan") and Exhibit 2 ("Liquidation Analysis") attached to this Disclosure Statement.  To the extent of any differences in the values in above table and the Liquidation Analysis, the values in the Liquidation Analysis shall control.

On the Effective Date, except as provided in the Plan, all of the Debtor's assets shall vest in and be retained by the Liquidating Trust under the control of the Liquidating Trustee solely for the benefit of the holders of Allowed Claims (as defined in the Plan, the "Beneficiaries").  The Liquidating Trustee shall be the Estate's representative for all purposes pursuant to and in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.

Pursuant to the Settlement Agreement, the Banyon Bankruptcy Estates shall have an Allowed Claim in the amount of $39,700,000.00 (the "Class 5 Claim").  Pursuant to the Plan, the Distribution to be received by the Banyon Bankruptcy Estates with respect to the Class 5 Claim will be used to make distributions to allowed claims in the Banyon Bankruptcy Estates.  No other Claim by the Banyon Bankruptcy Estates shall be allowed in the RRA Estate.

Upon the payment of the Banyon Distribution, RRA shall have an allowed senior subordinated claim against each of the Banyon Bankruptcy Estates in the amount of $39.7 million ($39,700,000.00) (as defined in the Plan, the "RRA Banyon Senior Subordinated Claim").  The RRA Banyon Senior Subordinated Claim shall be subordinated in right to payment to the Full Amount of (i) all allowed administrative expenses in each of the Banyon Bankruptcy Cases, respectively, (ii) all allowed priority claims in each of the Banyon Bankruptcy Cases, respectively, and (iii) all allowed non-subordinated general unsecured claims in each of the

13

Banyon Bankruptcy Cases, after the application of Banyon Creditor Collateral Source Recoveries, as applicable; provided, that the Banyon Trustee shall not permit the holders of allowed claims senior to the RRA Banyon Senior Subordinated Claim to receive in excess of the Full Amount of their claims, after the application of Banyon Creditor Collateral Source Recoveries as applicable.  The RRA Banyon Senior Subordinated Claim shall be senior in right of payment to the TD Bank Banyon Junior Subordinated Claim.

No relationship exists between the RRA Estate and the Banyon Bankruptcy Estates other than (i) the claims that the Trustee and the Banyon Bankruptcy Estates have asserted in each other's estates, (ii) the joint litigation interests that have been publicly disclosed in documents filed with the Bankruptcy Court and (iii) the joint interests in having the Disclosure Statement approved, the Plan confirmed and the 9019 Motion granted in the Banyon Bankruptcy Cases, and the Plan and the Settlement Agreement effectuated.

The Trustee and the Banyon Trustee also share an interest in expeditiously and efficiently bringing their respective cases to a successful conclusion, in avoiding further delay and litigation, and in accomplishing full payment to the holders of unsubordinated general unsecured claims.

In order to achieve the results outlined in the Plan, the Plan provides for and implements the TD Bank Settlement.  The Plan Proponents believe that the TD Bank Settlement is in the best interests of the Estate as it: (i) saves significant professional fees and expenses in connection with (a) the TD Bank litigation and (b) the inter-estate claims between the RRA Estate and the Banyon Bankruptcy Estates; (ii) provides a realistic opportunity for the Distribution to Allowed Claims in Class 2 and Class 3 at the Full Amount of such Claims; (iii) allows for the Chapter 11 Case and Banyon Bankruptcy Cases to be concluded efficiently and expeditiously; and (iv) avoids any risk of an adverse outcome in respect of the RRA Estate's claims against TD Bank at trial or on appeal.  However, if the Debtor is required to litigate with TD Bank and Banyon, the result could be a significant delay in making Distributions and the risk that the RRA Estate will not achieve results that are equal or better than the terms of the TD Bank Settlement.  Indeed, as further discussed herein the Plan Proponents believe that the TD Bank Settlement far exceeds the requirements for approval for a settlement under Bankruptcy Rule 9019.

The releases, bar order and injunction in favor of TD Bank proposed in Sections 10.6-10.8 of the Plan are an integral, non-severable aspect of the global settlement with TD Bank.  Absent the bar order and releases contemplated in the Plan and Settlement Agreement, TD Bank would not have been induced into entering the Settlement Agreement.  Absent the settlement contemplated by the Settlement Agreement, the consummation of the Plan would not be possible.  If the Plan and Settlement Agreement are not approved, the Trustee will consider alternatives informed by the circumstances of such denial.  The Trustee believes that the continued prosecution of the Estate's claims against TD Bank remains an option but not the best option, in the view of the Trustee, in light of the material benefits provided to creditors under the Plan and Settlement Agreement.

Pursuant to the Plan, the Liquidating Trustee shall, at his or her discretion, pursue the Litigation Claims against various third parties including, but not limited to, those Litigation Claims arising under sections 547, 548, 549 and 550 of the Bankruptcy Code.  Such Litigation

Claims may also be a basis for disallowance of the Claims of Creditors under section 502(d) or section 553 of the Bankruptcy Code or otherwise. THE PLAN RESERVES ALL RIGHTS AND CLAIMS AGAINST PARTIES IN INTEREST, THIRD PARTIES AND CREDITORS, WHETHER OR NOT SUCH PARTIES OR CREDITORS, OR SUCH RIGHTS AND CLAIMS, ARE SPECIFICALLY NAMED IN THIS DISCLOSURE STATEMENT OR IN THE DEBTOR'S SCHEDULES. Although the Plan Proponents believe that (i) the terms of this Disclosure Statement (including, but not limited to, Article IV ("Potential Litigation Assets and Preservation of Such Litigation Claims")), and (ii) the terms of the Plan (including, but not limited to, the appendix attached to the Plan ("List of Certain Litigation Claims")), set forth the rights and claims preserved by the Estate which will be transferred to the Liquidating Trust, in an abundance of caution, the Plan Proponents have included the above reservations of rights. The Plan Proponents submit that the foregoing reservation of rights is common in plans and related disclosure statements in which there may be post-confirmation litigation.

Creditors and parties in interest should refer to Article IV of this Disclosure Statement ("Potential Litigation Assets and Preservation of Such Litigation Claims") for a more detailed discussion of such Litigation Claims and the preservation of them to the Liquidating Trust.

Except as otherwise provided in the Plan or other agreement or document entered into in connection with the Plan, each of the executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected by the Debtor on the Effective Date, unless such contract or lease (a) shall have been previously assumed or rejected by the Trustee, (b) shall have expired or terminated pursuant to its own terms or (c) shall be the subject of a pending motion to assume or assign pending on the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections as of the Effective Date. Parties to executory contracts or unexpired leases that are deemed rejected by the Confirmation Order may file a proof of claim for rejection damages as provided in Article 5 of the Plan.

Under the Plan, on the Effective Date, the Liquidating Trustee shall be appointed the sole manager, director, president and/or chief executive officer, as applicable, of the Liquidating Trust subject to oversight by the Liquidating Trust Oversight Committee as set forth in the Plan and Liquidating Trust. Upon the Effective Date and without further action by the Bankruptcy Court, the pre-Confirmation members, managers, directors and/or officers of the Debtor shall be deemed to have resigned and/or shall be deemed to have been terminated, and any employment contracts of employees of the Debtor not previously assumed or rejected shall be deemed to be rejected. As of the Effective Date, the Liquidating Trustee shall act in a fiduciary capacity for the holders of all Allowed Claims under the Plan and shall have only those rights, powers and duties conferred on him or her by the Plan and the Liquidating Trust Agreement, as well as the rights and powers of a trustee under sections 542 through 552 of the Bankruptcy Code and the duties of a trustee under the Bankruptcy Code, including but not limited to sections 704(1), (2), (5), (7) and (9) of the Bankruptcy Code. Should any dispute arise between the Liquidating Trustee and the Liquidating Trust Oversight Committee that cannot be consensually resolved or settled by mediation, the Plan provides that such dispute will be submitted to the Bankruptcy Court for resolution.

The Plan Proponents believe that the Distributions under the Plan will provide Creditors of the Debtor a greater recovery on account of Allowed Claims than would Distributions by a

chapter 7 trustee. Further, Distributions under the Plan will be made more quickly than distributions by a chapter 7 trustee and a chapter 7 trustee would be entitled to seek a fee substantially greater than the fee proposed by the Liquidating Trustee, thereby reducing the amount available for distribution to Creditors on account of Allowed Claims.

The Plan Proponents believe that the legal bases for the proposed treatment of Collateral Source Recoveries for the holders of Allowed Claims in Classes 3, 6 and 7 of the Plan include that: (i) a plan of liquidation represents a contract upon which Creditors in Classes 3, 6 and 7 and the other Impaired Classes are allowed to vote; and (ii) no prohibition exists under section 1129 of the Bankruptcy Code against the proposed treatment of Collateral Source Recoveries set forth in the Plan. The proposed treatment of Collateral Source Recoveries also promotes equality of distribution (i.e., recoveries) amongst similarly situated creditors.

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RESULTS FOR ALL HOLDERS OF CLAIMS. THE PLAN PROPONENTS ALSO BELIEVE THAT THE PLAN WILL ENABLE THE DEBTOR TO BE EFFICIENTLY AND EXPEDITIOUSLY LIQUIDATED. ACCORDINGLY THE PLAN PROPONENTS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS.**

The Plan Proponents Disagree with the Following Allegations, Assertions and Arguments by Certain Objectors to a Prior Version of the Disclosure Statement.

(a)     Certain objectors (who the Plan Proponents believe are opposed to the approval of this Disclosure Statement) have alleged that the Disclosure Statement fails to contain adequate information regarding the financial condition of TD Bank. The Plan Proponents disagree with this allegation.

(b)     In a single statement mentioned by the Trustee in an adversary proceeding initiated by the Trustee against certain of the objectors (who the Plan Proponents believe are opposed to the approval of this Disclosure Statement) which was later voluntarily and jointly dismissed by stipulation without prejudice (Adv. No. 12-1125-RBR), and which did not involve TD Bank, the Trustee testified, "We always understood TD Bank was good for any amount of judgment by any number of the creditors involved." *See* Transcript of hearing held on February 24, 2012 [Adv. ECF No. 33], pp. 176 @ 25 to 177 @ 2. The Plan Proponents submit that the foregoing sentence should be considered in the context of the entirety of the foregoing contested matter and directs parties to the full transcript of the hearing held by the Bankruptcy Court on February 24, 2012.

(c)     A group of objectors (who the Plan Proponents believe are opposed to the approval of this Disclosure Statement) allege that (i) the Settlement Agreement is in direct breach of a certain settlement agreement between the Trustee and the Razorback Plaintiffs approved by the Bankruptcy Court on October 5, 2012 [ECF No. 3362 (motion), ECF No. 3510 (order)]; (ii) the Plan vests extraordinary authority in the Liquidating Trustee; (iii) the Disclosure Statement fails to adequately disclose the Plan's distribution scheme; (iv) the Disclosure Statement and Liquidation Analysis do not contain adequate information because they contain no discussion of the "fact" that, if certain objectors' punitive claims against TD Bank are successful,

then such objectors would recover far more than they would if the Debtor's case was converted to chapter 7 (where there would be no Bar Order); (v) the parties least benefitted from the Plan are those victim groups that litigated against TD Bank and brought it to the settlement table; (vi) the Plan violates <u>Stern v. Marshall</u>, 131 S.Ct. 2594 (2011); and (vii) numerous other concessions by the RRA Estate to TD Bank would prejudice the interest of the creditor body as a whole.  The Plan Proponents disagree with the assertions of these objectors.

Based on the content of various objections to the prior version of the disclosure statement, the Plan Proponents anticipate that there will be significant opposition to the bar order proposed in the Plan.

<u>Common Interest Agreement</u>.

Per order of the Bankruptcy Court, the Trustee has a common interest arrangement with TD Bank and the Banyon Trustee in connection with confirmation of the Plan, including the approval of the TD Bank Settlement (which provides a means for executing the Plan). Specifically, the Bankruptcy Court has held that "the mediation privilege and/or the common interest doctrine apply to communications relating to the pending plan and settlement agreement between TD Bank, the [] Trustee and the Banyon Trustee…" *See Order Granting Trustee's Motion for Protective Order [ECF No. 3948] and Granting TD Bank's Motion for Protective Order [ECF No. 3935]* entered by the Bankruptcy Court on March 18, 2013 [ECF No. 4078], ¶ 3.  In addition, each of the Trustee, the Banyon Trustee, the Committee and TD Bank has acknowledged that this common interest arrangement includes the Committee due to the fact that the Committee is now one of the two Plan Proponents.

<u>Bankruptcy Court's Prior Disclosure Statement Order</u>.

After the Bankruptcy Court's *Order (I) Denying, Without Prejudice, Approval of Amended Disclosure Statement and (II) Granting Bifurcation Motion*, was entered by the Bankruptcy Court on April 22, 2013 [ECF No. 4292] (the "<u>Prior Disclosure Statement Order</u>"), the Trustee, the Committee, the Banyon Trustee and TD Bank have engaged in good faith, arms-length negotiations to amend the Plan and related documents with the goal of maximizing Distributions on the Allowed Claims while also protecting certain rights of Creditors to pursue recoveries (as detailed in Section 10.8(B)(1)-(5) of the Plan ("TD Bank Release Injunction and Bar Order")).   The Plan that this Disclosure Statement describes has resulted from such negotiations.

Under the Plan, not all of the Creditors will receive Distributions representing the Full Amount of their Allowed Claims.  The Plan Proponents estimate that holders of Allowed Unclassified Claims, as well as Allowed Claims in Classes 1, 2, 3, 4 and 5 will receive Distributions representing the Full Amount of their Allowed Claims.  The Plan Proponents also estimate that the holder of the Allowed Class 6 Claims will receive a potentially meaningful Distribution on its Allowed Claim.

On the other hand, the holders of Allowed Claims in Class 7 have agreed contractually (pursuant to various settlement agreements approved by the Bankruptcy Court) to subordinate their Allowed Claims to, among other Claims, all Allowed Unclassified Claims as well as all

Allowed Claims in Classes 1-6, and therefore, the Plan Proponents estimate that it is unlikely that the holders of Allowed Class 7 Claims will receive any Distribution.

Further, as a part of the TD Bank Settlement, TD Bank has agreed to subordinate its Class 8 Claim until the holders of the Allowed Unclassified Claims and Allowed Claims in Classes 2-7 receive Distributions representing the Full Amount of their Allowed Claims. Therefore, the Plan Proponents estimate that TD Bank will not receive a Distribution on its Allowed Class 8 Claim.

In addition to maximizing Distributions to Creditors, the Plan also will expedite such Distributions to Creditors.  The Plan and Liquidating Trust Agreement authorize the Liquidating Trustee to begin making Distributions on or soon after the Effective Date of the Plan.  Unlike the prior version of the Plan, an appeal of the Confirmation Order (so long as such Confirmation Order has not been otherwise stayed or there has not been a reversal, modification or vacation, in whole or in part, of such Confirmation Order), will not impact the occurrence of the Effective Date, and therefore, a pending appeal of the Confirmation Order is unlikely to prevent interim Distributions on Allowed Claims from taking place.

## B.      Prior Agreements Among the Trustee, the Banyon Trustee and TD Bank

On February 5, 2013, the Trustee filed the Liquidating Plan of Reorganization for Debtor [ECF no. 3809] (the "**Original Plan**") which sought approval of the Settlement Agreement and General Release (the "**Original Settlement Agreement**") dated as of February 4, 2013 among the Trustee, the Banyon Trustee and TD Bank.

On March 25, 2013, the Trustee filed the First Amended Liquidating Plan of Reorganization for Debtor] [ECF no. 4124] (the "**First Amended Plan**") which sought the approval of an amended and restated settlement agreement dated as of March 25, 2013 among the Trustee, the Banyon Trustee and TD Bank, which amended and restated the Original Settlement Agreement in its entirety (the "**First Amended Settlement Agreement**").  The Committee supported approval of the disclosure statement pertaining to the First Amended Plan.

At a hearing on April 12, 2013, the Bankruptcy Court denied, without prejudice, the approval of the disclosure statement pertaining to the First Amended Plan.

Immediately after the April 12, 2013 hearing on the disclosure statement, the Trustee, the Banyon Trustee and TD Bank engaged the Committee to collaborate in a constructive dialogue in order to address the matters raised by the Bankruptcy Court at the April 12, 2013 hearing, and, to the largest extent possible, the objections raised by various parties to the disclosure statement pertaining to the First Amended Plan, and the First Amended Settlement Agreement.

The Trustee, the Banyon Trustee, TD Bank and the Committee have each worked diligently and in good faith since April 12, 2013, to come to agreement on further modifications to the First Amended Plan and the First Amended Settlement Agreement for the benefit of the creditors of the RRA Estate and the Banyon Bankruptcy Estates.  As a result of the discussions, the Committee became a Plan Proponent seeking approval of the now pending Plan (i.e., the Second Amended Plan) and the now pending Settlement Agreement (i.e., the Second Amended Settlement Agreement).

18

The Plan and the Settlement Agreement address and resolve most, if not all, of the legitimate objections previously lodged to the prior versions of the Plan and related disclosure statements.

The treatment of creditors of the RRA Estate and the Banyon Bankruptcy Estates is significantly improved and simplified compared to the previous versions of the Plan and Settlement Agreement. The Plan and the Settlement Agreement differ significantly from the previous versions of the Plan and Settlement Agreement in that, without limitation:[4]

1.    The TD Bank Contribution for the benefit of the RRA Estate and the Banyon Bankruptcy Estates, in the approximate amount of $72.38 million, will be funded by TD Bank shortly after confirmation of the Plan (i.e., the TD Bank Contribution will not be escrowed or subject to the order confirming the Plan becoming a Final Order);

2.    On the Effective Date, the Banyon Bankruptcy Estates will receive an Allowed Claim against the RRA Estate in the amount of $39.7 million;

3.    The Banyon Bankruptcy Estates' Allowed Claim of $39.7 million will be paid in full by the RRA Estate, from the TD Bank Contribution, within 5 business days after the Effective Date;

4.    As the result of the funding of the TD Bank Contribution, the RRA Estate and the Banyon Bankruptcy Estates will make significant anticipated interim distributions as soon as possible after confirmation of the Plan;

5.    There will be no reduction to Distributions on account of anticipated Collateral Source Recoveries in the RRA Case or on account of anticipated Banyon Creditor Collateral Source Recoveries;

6.    All settlement agreements that have been previously approved by Final Order of the Bankruptcy Court in the Cases are to be expressly honored and any inconsistencies between this Plan and such settlement agreements are to be resolved in favor of the settlement agreement;

7.    The claim that TD Bank obtains against the RRA Estate under the Plan will be subordinated to the payment of all other claims against the RRA Estate;

8.    The claim that TD Bank obtains against the Banyon Bankruptcy Estates under the Settlement Agreement will be subordinated to the payment of all other claims against the Banyon Bankruptcy Estates;

9.    The RRA Estate will obtain a senior subordinated claim against the Banyon Bankruptcy Estates in the amount of $39.7 million, subordinate to all other claims against the Banyon Bankruptcy Estates, but senior to TD Bank's subordinated claim against the Banyon Bankruptcy Estates;

---

[4]    This reference to certain of the provisions of the Plan and the Settlement Agreement is a summary only, and is qualified in its entirety by the provisions of the Plan and the Settlement Agreement.

10.     Litigation proceeds obtained by the Banyon Bankruptcy Estates will be used by the Banyon Bankruptcy Estates to satisfy the claims of all creditors and will not be earmarked for the payment of TD Bank's claim against the Banyon Bankruptcy Estates;

11.     TD Bank will have no role in the post-confirmation governance activities of the RRA Estate or the Banyon Bankruptcy Estates;

12.     TD Bank will have no role in choosing the Liquidating Trustee ,the Liquidating Trust Oversight Committee or any successor thereto; and

13.     The bar order in favor of TD Bank will provide specific exclusions, and will not exceed the jurisdiction of the Bankruptcy Court, as provided in the Plan and the Settlement Agreement.

The Plan Proponents believe the provisions of the Plan and Settlement Agreement represent the best opportunity for the creditors to recover the highest distributions possible and urge the eligible creditors to vote in favor of the Plan.

## C.     Overview of Chapter 11

Chapter 11 is traditionally known as the principal business reorganization chapter of the Bankruptcy Code.  It is also a commonly used form to effectuate the liquidation of a debtor's assets for the benefit of creditors in a manner that promotes equality of treatment for similarly situated creditors and equity interest holders.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor's business may continue to operate.  Here, RRA ceased substantially all of its operations before the petitioning creditors commenced this Chapter 11 Case.   As explained below in Article II, shortly before the existence of Rothstein's fraud came to light in the general public, Stuart Rosenfeld commenced a state court receivership action against Rothstein and RRA to remove Rothstein from power.   Shortly after Stuart Rosenfeldt filed the state court receivership action, Herbert Stettin was appointed as state court receiver.  Within a few days of Herbert Stettin being appointed the state court receiver, RRA was the subject of an involuntary bankruptcy filing.

The consummation of a chapter 11 plan is the principal objective of any chapter 11 case. A plan sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any holder of a claim against or equity interest in a debtor, including those holders that voted to reject the plan.

After a plan has been filed, the holders of claims against or interests in a debtor are generally permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor to make an informed judgment about the plan.  The Plan Proponents are

submitting this Disclosure Statement to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

**D.        Disclosure Statement Exhibits**

Attached to this Disclosure Statement are the following exhibits:

      *i.*        ***Exhibit 1***:  *The Plan (together with its appendices);*

      *ii.*       ***Exhibit 2***:  *The Liquidation Analysis; and*

      *iii.*      ***Exhibit 3***:  *List With Respect to Paragraph 3 of the Order Granting Trustee's Motion for Protective Order [ECF No. 3948] and Granting TD Bank's Motion for Protective Order  [ECF No. 3935], entered by the Bankruptcy Court on March 18, 2013 [ECF No. 4078].*

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**E.        Only Impaired Classes Vote**

Pursuant to the Bankruptcy Code, only classes of claims and equity interests that are "impaired" under a plan may vote to accept or reject the plan.  Generally, a claim or equity interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan.  In addition, if the holders of claims or equity interests in an impaired class do not receive or retain any property under a plan on account of such claims or equity interests, such impaired class is deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and are deemed be Unimpaired. Class 1 is Unimpaired and, therefore, is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Under the Plan, Claims in Classes 2, 3, 4, 5, 6, 7 and 8 and Interests in Class 9 are Impaired.

Although Class 8 is Impaired under the Plan, TD Bank (the holder of the Allowed Class 8 Claim) has agreed to have such Claim deemed to have voted to accept the Plan; provided, however that the Plan Proponents shall not rely on Class 8 as an impaired accepting class for purposes of determining whether the Plan complies with Section 1129(a)(10) of the Bankruptcy Code.  Holders of Interests in RRA are classified in Class 9 and shall not receive nor retain any property under the Plan and, accordingly, such holders are deemed to reject the Plan, and their votes are not being solicited.  **ACCORDINGLY, A BALLOT FOR ACCEPTING OR**

4969645-2

**REJECTING THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 2, 3, 4, 5, 6 and 7.[5]**

**F.      Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for **July 11, 2013 at 9:30 a.m.** in the United States Bankruptcy Court, 299 East Broward Blvd., Courtroom 308, Fort Lauderdale, FL 33301 (the "Confirmation Hearing").  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before **July 2, 2013 at 5:00 p.m.** in the manner described in the Notice ("Notice of (I) Confirmation Hearing and Objection Deadline With Respect to the Liquidating Plan of Reorganization of the Debtor; (II) Solicitation and Voting Procedures; and (III) Deadline For Filing Administrative Expense Application") accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time to which the Confirmation Hearing has been adjourned.

**G.      Classification of Claims and Interests Under the Plan**

All Claims and Interests, except Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims and Statutory Fees, are classified in Classes as set forth below.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Class(es).  A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been objected to, disallowed, paid or released prior to the Effective Date.

*i.      Classification*

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Interest is placed in a particular Class for purposes of voting on the Plan, Confirmation of and receiving Distributions under the Plan only to the extent (i) the Claim or Interest is an Allowed Claim or Allowed Interest in that Class and (ii) the Claim or Interest has not been paid, released, or otherwise compromised before the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Statutory Fees are not classified under the Plan.  The Plan classifies Claims and Interests as follows:

| | |
|---|---|
| Class – 1 | Allowed Secured Claims |
| Class – 2 | Single Source Recovery Allowed Unsecured Claims |
| Class – 3 | Multiple Source Recovery Allowed Unsecured Claims |
| Class – 4 | Razorback Unsecured Rising Tide Claim |

---

[5]   "Ballot" means the form or forms approved by the Bankruptcy Court and distributed to holders of Impaired Claims on which the acceptance or rejection of the Plan is to be indicated.

4969645-2

Class – 5              Banyon Unsecured Claim
Class – 6              Funds' Subordinated Claim
Class – 7              Miscellaneous Subordinated Claims
Class – 8              TD Bank Junior Subordinated Claim
Class – 9              Allowed Interests in the Debtor

## II.    GENERAL BACKGROUND

### A.    Corporate Structure

RRA is a Florida professional services corporation, formed on February 7, 2002 by Scott W. Rothstein ("Rothstein") and Stuart A. Rosenfeldt ("Rosenfeldt"). Although Rothstein dominated the management of RRA, the law firm also maintained an Executive Committee and it had two levels of senior attorneys who were referred to in a manner that signified an ownership interest in the firm ("shareholders" and "partners"). However, based upon the Trustee's investigation of RRA, Rothstein and Rosenfeldt were the only two actual shareholders of RRA, and each owned a 50% interest in RRA.

### B.    History of the Debtor and Its Pre-Petition Business

Prior to November 2, 2009, RRA had all the trappings of a successful South Florida law firm. It employed over 70 attorneys as well as a full complement of support staff. In total, RRA employed over 150 people in offices located in New York, Venezuela, and throughout Florida. RRA's principal office and its epicenter of operations was located in Fort Lauderdale where RRA occupied over 34,000 square feet spread across four floors in a class A office building on East Las Olas Boulevard.

Although the firm's practice was initially focused on labor and employment law, it expanded to other practice areas, including commercial litigation, intellectual property, corporate law, mergers and acquisitions, real estate, criminal defense, class actions, mass torts, and personal injury claims. RRA rapidly grew from a seven-attorney law firm in 2002 to 70 attorneys and 80 support staff in 2009.

### C.    Events Leading to Chapter 11 Filing – Scott Rothstein's Fraud

Prior to 2005, Rothstein was a virtual unknown in legal, political and charitable circles. Subsequent to 2005, Rothstein and RRA became highly visible in South Florida making direct and indirect significant political, civic and charitable contributions to both gain influence and create the appearance of financial success.

On October 31, 2009, Rothstein effectively disappeared. It was later discovered that Rothstein fled to Morocco with over $16 million in cash and a stash of luxury watches and other jewelry worth millions of dollars.

On November 2, 2009, Rosenfeldt filed suit against Rothstein and RRA seeking the appointment of a receiver over RRA and to dissolve the firm. In that suit Rosenfeldt stated that Rothstein "allegedly orchestrated a substantial misappropriation of funds" from RRA accounts.

The gravamen of the wrongful acts alleged by Rosenfeldt in his complaint was that Rothstein was running a Ponzi scheme. Rosenfeldt's complaint alleged that the "investment business" was created and operated by Rothstein, with the assistance of others.

As part of his Ponzi scheme to defraud investors, Rothstein utilized the RRA offices, RRA lawyers and staff, and his position as an attorney, fifty percent owner and officer of RRA, in addition to many law firm and personal relationships with RRA's financial institutions, to effectuate the fraudulent "sale" of fake legal settlements.

Rothstein's Ponzi had many variations. Indeed, he described his fraud as having "tentacles" or "sub-Ponzi's." The most common narrative involved Rothstein claiming that he had a client who had settled a sexual harassment or whistleblower claim pre-suit. However, the settlement with the defendant required absolute confidentiality and had a structured payout over some period, usually three to six months. Rothstein would tell the target of the scheme that his client was prepared to take a substantial reduction in the settlement in return for receiving funds sooner. Accordingly, Rothstein would claim to broker a deal whereby the target would receive the funds that the defendant had allegedly deposited into an RRA account and the target would pay the client a lesser amount of money – often significantly less – in exchange for the right to the entire settlement fund in the future. In many instances the exact nature of the transaction was structured as a loan to RRA instead of a purchase.

In truth, there were no clients of this sort, no defendants, and there were no settlement funds. Instead, the scheme rested on the illusion that Rothstein was a highly successful, politically connected CEO of a thriving 70-lawyer law firm. Integral to the scheme was Rothstein's persona and "Rock Star Lifestyle."

On November 4, 2009, Broward County Circuit Judge Jeffrey E. Streitfeld appointed Herbert Stettin as receiver over RRA. While Mr. Stettin was working to familiarize himself with what a few days earlier had been a fully operating law firm with almost 70 lawyers, the United States Government raided RRA's main office in Fort Lauderdale and seized firm records, computer servers, and other documents. The United States Government also removed all of the relevant books and records of the firm – books and records that would not be shared with Mr. Stettin for several months.

On November 10, 2009, four petitioning creditors (Roger Wittenberns, Bonnie Barnett, Aran Development Inc., and Universal Legal Inc.) commenced an involuntary chapter 11 bankruptcy against RRA. [ECF No. 1]. On November 25, 2009 Trustee Stettin was appointed as the chapter 11 Trustee of RRA [ECF No. 55] and the Court subsequently on November 30, 2009, entered the *Order for Relief in Involuntary Case and Order Setting Deadline for Filing Schedules, Statements and Other Documents* [ECF No. 66].

On December 1, 2009, the United States Government charged Rothstein with running a $1.2 Billion Ponzi scheme. *See USA v. Rothstein*, 09-cr-60331-JIC (S.D. Fla. Dec. 1, 2009), Criminal Information [ECF No. 1]. On June 9, 2010, Scott W. Rothstein was sentenced to a 50-year term of imprisonment [ECF No. 290]. This case has been described in the press as "Madoff

on Crack."[6]  The Federal Bureau of Investigation called this case one of the largest fraud cases in the history of South Florida.[7]

**D.      Litigation by Coquina Investments Against TD Bank and Rothstein**

On or about May 12, 2010, Coquina Investments ("Coquina") initiated an action against TD Bank and Ponzi schemer and former attorney Scott Rothstein in the United States District Court for the Southern District of Florida (the "District Court") (Case No. 10-60786-Civ-COOKE/BANSTRA) (the "Coquina Action").  Coquina alleged that TD Bank, through its former regional vice president, Frank Spinosa, and other employees, aided and abetted Rothstein's fraud and made fraudulent representations to Coquina.  *See Omnibus Order on Motion for Sanctions*, dated 8-3-12 [ECF No. 911] (the "Motions Order"), pp. 1-2.  As part of its defense, TD Bank claimed it did not know about, and did not knowingly participate in, Rothstein's fraud, and cast Frank Spinosa and others as "rogue" employees, who acted on their own and without the knowledge of other TD Bank employees.  *See* Motions Order, p. 2.  TD Bank also maintained that its fraud monitoring procedures and systems were adequate and reasonable, and Coquina investors should have known Rothstein's investment opportunities were too good to be true.  *See* Motions Order, p. 2.

Trial in the matter began on November 8, 2011, and concluded on January 18, 2012.  *See* Motions Order, p. 2.  On January 18, 2012, the jury returned a verdict in favor of Coquina and against TD Bank on the fraudulent misrepresentation and aiding and abetting claims.  The jury awarded Coquina $16 million in compensatory damages for each claim and $17.5 million in punitive damages for each claim.  *See Omnibus Order on Post-Trial Motions*, dated 9-28-12 [ECF No. 943], p. 4.

After the trial concluded, the District Court received various filings making accusations of negligence and misconduct and other filings regarding admissions of incorrect statements to the court.  *See* Motions Order, p. 2.  For example, on March 26, 2012, Coquina filed a Fourth Motion for Sanctions ("Fourth Motion"), which relates to TD Bank's Customer Due Diligence ("CDD") form, which Coquina contends TD Bank altered with the intent to mislead the jury.  *See* Motions Order, pp. 2-3.  On April 24, 2012, Greenberg Traurig, P.A., TD Bank's then counsel in the matter ("Greenberg Traurig"), filed a Notice of Production and Withdrawal of Certain Statements made to the Court, disclosing that a document titled "Standard Investigative Protocol," which Greenberg Traurig denied existed during trial did actually exist.  *See* Motions Order, p. 3.  Also on April 24, 2012, Greenberg Traurig filed a motion for substitution of counsel, indicating it would no longer represent TD Bank; TD Bank's new counsel would be McGuireWoods LLP.   *See* Motions Order, p. 3.  On May 10, 2012, Coquina filed its Fifth Motion for Sanctions ("Fifth Motion"), which relates to TD Bank's production of fraud alerts in the Coquina Action, which Coquina contends were incomplete.  The District Court found that

---

[6]    *See* Jen Christensen, *$1.2 billion swindle 'was like Madoff on crack'*, CNN website, ww.cnn.com/2010/CRIME/02/18/florida.rothstein.ponzi.scheme/index.html    (last    visited March 1, 2010)

[7]    *See* Ashby Jones*, FBI Investments With Rothstein Could Top $1B*, Wall Street Journal Blogs, November 12, 2009.

these discovery issues came to light as a result of the ongoing production of documents in a related matter, *Emess Capital v. TD Bank*, Case No. 10-60882- JAL. *See* Motions Order, p. 3. The District Court held hearings on the Fourth Motion and Fifth Motion on May17-18, 2012 and June 12, 2012. *See* Motions Order, p. 3.

On August 3, 2012, the District Court issued its Motions Order in which the District Court granted in part and denied in part the Fourth Motion and Fifth Motion. *See* Motions Order, p. 29. In the Motions Order, the District Court determined: (i) Greenberg Traurig acted negligently in failing to comply with its discovery obligations in the case; (ii) TD Bank acted willfully in failing to comply with its discovery obligations and to assist its outside counsel to properly litigate the case; (iii) Coquina suffered prejudice as a result of the production of an incomplete CDD form; (iv) TD Bank willfully concealed relevant evidence from its trial counsel; (v) Rule 37 sanctions against Greenberg Traurig and TD Bank were warranted; and (vi) as a sanction finding with respect to the Coquina Action only, that TD Bank's monitoring and alert systems were unreasonable and that TD Bank had actual knowledge of Rothstein's fraud. *See* Motions Order, pp. 22-29. The District Court also refused to impose any sanction against any individual attorney. *See* Motions Order, pp. 29.

On October 3, 2012, TD Bank appealed the jury verdict and the Motions Order (as well as other orders entered by the District Court in the action) to the United States Court of Appeals for the Eleventh Circuit (case no. 12-11161) where the appeal is currently pending. In its Amended Brief of Defendant-Appellant TD Bank, N.A. ("Amended Brief"), filed in the appeal by TD Bank on November 26, 2012, TD Bank has asserted, in addition to challenges to liability and damages, that the record in the Coquina Action was totally devoid of evidence to sustain the District Court's finding that TD Bank willfully disregarded discovery obligations, and, therefore, District Court's foundational premise was erroneous, and the Eleventh Circuit should vacate the sanctions built upon it. *See* Amended Brief, p. 53.

As indicated on Exhibit 3, TD Bank settled the claims brought against it in the lawsuit styled *Razorback Funding, LLC, et al., v. Scott W. Rothstein, et al.*, Case No. 09-062943 (07) (17th Judicial Cir., Broward County, Fla.), and the lawsuit was dismissed. However, the Razorback Plaintiffs have filed a motion in that action seeking sanctions against TD Bank for alleged discovery misconduct which allegedly occurred prior to the settlement and dismissal of that case. TD Bank denies any liability in regard to that motion.

At a March 22, 2013 hearing on the motion, the Broward Circuit Court orally indicated that the Razorback Plaintiffs had made a sufficient preliminary factual showing in support of the motion, and ordered that further proceedings would be held to determine whether and to what extent sanctions should be entered against TD Bank and, if so, the form of such sanctions. As of this date, no order has been entered by the Broward Circuit Court.

If any monetary sanctions are ultimately imposed upon TD Bank in such action, it is uncertain whether the Razorback Plaintiffs, who are claimants in the RRA Estate, would receive any such proceeds.

## III.    THE CHAPTER 11 CASE

### A.    Commencement of Case

On the Petition Date, the petitioning creditors filed an involuntary petition for relief under chapter 11 of the Bankruptcy Code.  Shortly, thereafter the Trustee was appointed over the RRA estate.  Upon his appointment as Trustee, there was little or no unencumbered Cash, the Trustee was left with only a single choice: request that his professionals fund the case until such time as the litigation recoveries were sufficient to pay the administrative costs of the case.  The eventual goal was an organized liquidation pursuant to a chapter 11 Plan.

### B.    "First Day" Relief

On November 20, 2009, the Bankruptcy Court conducted a hearing on several motions filed by the Office of the United States Trustee ("UST" or "United States Trustee") and Stettin seeking what is commonly referred to as "first day" relief.  Because this case "crash landed" into chapter 11, the traditional type of first day relief was not possible.  Instead the focus was on getting a Trustee appointed and ensuring the most efficient transition from the short-lived state court receivership to a chapter 11 case.

The relief granted by the Bankruptcy Court at the first day hearing, including administrative-type relief granted prior to that hearing, included:

- Appointing a Trustee [ECF No. 30];

- Granting Mr. Stettin authority to make certain payments [ECF No. 32]; and

- Enforcing the automatic stay [ECF No. 33].

### C.    Miscellaneous Administrative Matters

On December 8, 2009, the UST appointed seven members to the Committee pursuant to §1102(a) [ECF No. 94].

By Order dated January 12, 2010, [ECF No. 205] the Bankruptcy Court authorized the Trustee to retain TSI to act as notice and balloting agent for the Trustee in the case.  TSI has been responsible for serving the vast number of notice parties in the case and maintaining a website at the direction of the Trustee.

By Order dated January 12, 2010 [ECF No. 206], the Bankruptcy Court authorized the Trustee to establish limited notice procedures to minimize the time and expense of serving pleadings on each and every party in interest where only one or a handful of such parties may be affected by the relief sought.  The approved notice list is consistent with that set forth in Bankruptcy Rule 2002-1(H) (formerly Bankruptcy Rule 2002-1(K)), and the Local Rules of the Bankruptcy Court. By the same order, the Bankruptcy Court also approved the form and manner of notice of the commencement of the Chapter 11 Case and the bar dates by which persons or entities were required to file proofs of claim.

27

4969645-2

### D.      Retention of Professionals

#### i.      Bankruptcy Counsel

By Order dated December 23, 2009 [ECF No. 155], the Bankruptcy Court granted the Trustee's Application to retain Berger Singerman, P.A. (now known as Berger Singerman LLP ("BSLLP" or "Berger Singerman")) as general bankruptcy counsel to the Trustee in the Chapter 11 Case. Berger Singerman received a $50,000 retainer during the interim gap period, which has been exhausted pursuant the interim fee applications filed by BSLLP.

#### ii.      Other Professionals

By Order dated December 21, 2009 [ECF No. 147], the Bankruptcy Court granted the Trustee's Application to retain Genovese, Joblove & Battista P.A. ("GJB") as special litigation and conflicts counsel. GJB received a $50,000 retainer upon approval of its appointment as special counsel to the Trustee. The retainer has been exhausted pursuant to the interim fee applications filed by GJB.

By Order dated November 25, 2009 [ECF No. 56], the Bankruptcy Court granted the Trustee's Application to retain Berkowitz Dick Pollack & Brandt ("BPB") as accountants and financial advisors to the Trustee. BPB received a $50,000 retainer upon approval of its appointment as special counsel to the Trustee. The retainer has been exhausted pursuant to the interim fee applications filed by BPB.[8]

By Order dated January 25, 2010 [ECF No. 245], the Bankruptcy Court granted the Committee's Application to retain Akerman Senterfitt as counsel to the Official Committee of Unsecured Creditors.

By Order dated March 3, 2010 [ECF No. 387], the Bankruptcy Court granted the Committee's Application to retain Kluger, Kaplan, Silverman, Katzen & Levine, P.L. ("Kluger") as special litigation counsel to the Committee solely for *Carolina Casualty Ins. Co., v. Rothstein Rosenfeldt Adler P.A.*, 09-2481-RBR (Bankr. S.D. Fla. 2009). Subsequently, the Court granted the Committee's Application to retain Kluger as special litigation counsel to the Committee solely for proposed settlement with the Funds and the Regent Parties [ECF No. 3328].

By Order dated March 11, 2010 [ECF No. 430], the Bankruptcy Court granted the Trustee's Application to retain Sprechman & Associates, P.A. as special collections counsel to the Trustee.

By Order dated April 23, 2010 [ECF No. 576], the Bankruptcy Court granted the Trustee's Application to retain Richmond Greer, P.A. as an expert witness in the case to the Trustee in the field of "attorneys' conduct" and compensation.

---

[8]    On April 23, 2012 Berkowitz Dick Pollack and Brandt was renamed as Berkowitz Pollack Brandt Advisors and Accountants.

By Order dated April 23, 2010 [ECF No. 575], the Bankruptcy Court granted the Trustee's Application to retain Ver Ploeg & Lumpkin, P.A., as Special Insurance counsel in the case to the Trustee.

By Order dated April 23, 2010 [ECF No. 574], the Bankruptcy Court granted the Trustee's Application to retain Marlow, Connell, Abrams, Adler, Newman & Lewis P.A., as workers' compensation advisors to the Trustee.

By Order dated October 5, 2010 [ECF No. 1052], the Bankruptcy Court granted the Trustee's Application to retain Joseph J. Luzinski and Development Specialist, Inc., as consultant/expert witness to the Trustee.

By Order dated June 10, 2011 [ECF No. 1761], the Bankruptcy Court granted the Trustee's Application to retain Mesirow Financial Consulting, LLC, ("Mesirow Financial") as litigation consultants to the Trustee.

By Order dated September 30, 2010 [ECF No. 1044], the Bankruptcy Court approved monthly and interim compensation and reimbursement of expense procedures for professionals retained by the Estate. The procedures, which also apply to special counsel retained under section 327(e) of the Bankruptcy Code, have provided an orderly mechanism to compensate professionals and provide reimbursement of out-of-pocket expenses on a monthly basis, comparable to those established in other complex chapter 11 cases in this and other districts. In this way, the Bankruptcy Court and parties in interest have been more effectively able to monitor the fees incurred, and the Trustee has been able to spread out their payments of professional fees, rather than suffer larger depletions to their cash on an irregular basis.

## E.      Executory Contracts and Unexpired Leases

### i.      *Real Property*

By Orders dated January 7, 2010 [ECF Nos. 195 and 196], the Bankruptcy Court authorized the Trustee to reject unexpired leases of commercial property located at the following addresses: (a) Las Olas City Centre, 401 E. Las Olas Blvd., Fort Lauderdale, Florida 33301 and (b) Las Olas City Centre, 401 E. Las Olas Blvd, Suite 2250, Fort Lauderdale, Florida 33301. These locations were vacated by agreement post-petition. The Trustee rejected these leases to minimize administrative expenses against the Estate.

By Order dated February 12, 2010 [ECF No. 326], the Bankruptcy Court authorized the Trustee to reject unexpired leases of commercial property located at the following addresses: (i) 225 N.E. Mizner Blvd, Suite 675, Boca Raton, Florida, (ii) 301 Clematis Street, Suite 3000, Office 3125, West Palm Beach, Florida, and (iii) 200 West College Ave, Suite 226, Tallahassee, Florida (collectively, the "Leased Premises"). The Leased Premises were vacated post-petition. The Trustee rejected these leases to minimize administrative expenses against the Estate.

By Order dated March 1, 2010 [ECF No. 383], the Bankruptcy Court authorized the Trustee to reject an unexpired lease of commercial property located at, 1875 K Street, N.W. Washington, D.C. 20006. The location was vacated post-petition. The Trustee rejected this lease to minimize administrative expenses against the Estate.

By Order dated July 21, 2010 [ECF No. 829], the Bankruptcy Court authorized the Trustee to reject an unexpired lease of commercial property located at, 1140 N.E. 7th Avenue, Suite 2, Fort Lauderdale, Florida 33304. The Trustee rejected this lease to minimize administrative expenses against the Estate.

The Estate currently has a lease with Matecumbe Rand, LLC, which was entered into by the Trustee post-petition. The lease is for 4,850 rentable square feet, located at 6600 N.W. 16th Street, Suite 11, Plantation, Florida. The rent is $4,041.62 per month. This lease expires on May 31, 2013.

### ii.    *Personal Property*

By Order dated February 8, 2010 [ECF No. 299], the Bankruptcy Court authorized the Trustee to reject various unexpired lease agreements between RRA and various vendors which had entered into prepetition agreements with the RRA. The Trustee rejected the various agreements to preclude the accrual of administrative expenses against Estate. The Trustee believes that no pre-petition personal property lease agreements remain.

## F.    Sales of Personal Property

On February 5, 2010 and on March 4, 2010, the Trustee conducted auctions of the tangible personal property of the Debtor. The auctions raised net proceeds of $152,415 and $121,776, respectively, for the Estate after the payment of all related expenses.

## G.    Claims Process and Claims Bar Dates

Pursuant to Bankruptcy Rule 3003(c)(2), any Creditor whose Claim was not scheduled by the Debtor or was scheduled as disputed, contingent, or unliquidated, and who failed to file a proof of claim on or before the applicable deadline may not be treated as a Creditor with respect to that Claim for purposes of voting on the Plan or receiving a Distribution thereunder.

### i.    *Claims, Notice and Ballot Agent*

As discussed in Article III. C., above, the Bankruptcy Court authorized the appointment of TSI as claims, notice and balloting agent in the Chapter 11 Case. The Court authorized TSI to, among other things, be the repository for and maintain all proofs of claim filed against the Debtor's Estate and to docket all proofs of Claim on an official claims register that includes, among other things, the name and address of each claimant, the date each Claim was received, the number assigned to the Claim and the amount and classification of the Claim.

### ii.    *Filing of Schedules of Assets and Liabilities*

On December 22, 2009, the Trustee filed Schedules and Statements of Affairs for the Debtor's Estate [ECF No. 144]. Pursuant to section 1111(a) of the Bankruptcy Code, a proof of claim is deemed filed under section 501 of the Bankruptcy Code if that Claim is included in the Debtor's Schedules filed under section 521 or 1106(a)(2) of the Bankruptcy Code, and is deemed filed in the amount listed on the Schedules, except if the Claim is scheduled as disputed, contingent or unliquidated. If a Claim is scheduled as disputed, contingent or unliquidated, a

30

Claim must have been asserted by its holder on or before the applicable Bar Date by timely filing a proof of claim. A proof of claim that is timely filed and allowed shall supersede the Debtor's Schedules. If a proof of claim was not filed in a timely manner on or before the applicable Bar Date and the asserted Claim was not scheduled or is scheduled as disputed, contingent or unliquidated, the Claim shall be deemed to be barred and/or otherwise disallowed.

### iii. General and Government Bar Dates

The Bankruptcy Court approved the form and manner of notice of the commencement of this Chapter 11 Case and the dates by which persons or entities asserting claims were required to submit Proofs of Claim to TSI. *See Order Granting Motion to (A) Approve the Form and Manner of Limited Notice and (B)the Form and Manner of Notice of Commencement* [ECF No. 206]. The Bankruptcy Court set the general claims bar date as May 12, 2010, and August 10, 2012 as the deadline by which governmental entities must file Proofs of Claim. *Id.*

### iv. Administrative Expense Claims Bar Date

The Bankruptcy Court will, in the ordinary course, set a deadline for parties to file applications seeking allowance of Administrative Expense Claims pursuant to section 503(b) of the Bankruptcy Code for expenses incurred for the period after the Petition Date.

### v. Requests for Payment of Administrative Expense Claims

To date, no requests for payment of Administrative Expense Claims other than professional fee applications have been made against the Debtor's Estate.

### vi. Objections to Claims

The Trustee has filed ten omnibus objections to various claims filed against that Debtor's Estate. The Trustee previously received Bankruptcy Court authority to deviate from Bankruptcy Rule 3007 so that he could file omnibus objections for categories of objections not listed within such rule and to object to up to 50 claims in each objection [ECF No. 1996]. This relief has allowed the Trustee to streamline the claims objection process.

The vast majority of claims objections filed have been resolved by orders sustaining such objections because claimants, despite proper notice, did not respond to the objection to claim. For those claimants that filed a response, many of those contested matters will be resolved by agreed order or will have to be litigated before the Bankruptcy Court.

The Trustee, does not currently anticipate filing additional rounds of omnibus objections; however, certain individual objections may still be filed prior to the Confirmation Hearing. In any event, the Trustee reserves the right to file any additional claim objections (omnibus or individual) prior to the Confirmation hearing. Given the large number of claims filed against the Debtor's Estate, it is possible that the Liquidating Trustee will need to file additional objections to claims after the Effective Date.

### H.    Pending Litigation

#### i.    General

Prior to the Petition Date, the Debtor was a party to litigation pending in various courts. Most of these lawsuits, are identified by case number and court location in the Debtor's Statements of Financial Affairs [Item 4(a)] (which are available free of charge at www.rra-bk.com).  Moreover any pending Litigation Claims are listed in Appendix 1.85 to the Plan.

#### ii.    Trustee's Adversary Proceeding

On July 25, 2011, the Trustee commenced an adversary proceeding against TD Bank styled "*Herbert Stettin v. TD Bank, N.A.*," case no. 11-02368-RBR (Bankr. S.D. Fla.).  In the action, the Trustee has sought to avoid and recover preferential and fraudulent transfers (the "Avoidance Counts") and separately sought damages from TD Bank for the following: breach of fiduciary duty; unjust enrichment; aiding and abetting breach of fiduciary duties; aiding and abetting conversion; negligence and wire transfer liability; and negligent retention and supervision of its employees.

In paragraph 14 of the complaint filed by the Trustee in the adversary proceeding, the Trustee alleged the following:

> *Rothstein did not act alone in committing this four year, $1.4 billion, fake settlement Ponzi scheme.  One of his co-conspirators was TD Bank, which acting through its authorized agents, enabled and allowed Rothstein to use its name, facilities and accounts to deceive investors and lenders.  Ignoring numerous "red flags," TD Bank blindly allowed RRA, through Rothstein, to open numerous accounts in RRA's name and to transfer huge sums of money between and among the accounts, which enabled Rothstein to facilitate the fraud.  Among other things, TD Bank overtly cooperated with Rothstein in issuing false "lock letters" to investors, giving them the false assurance that large sums of money designated specially for their benefit, were deposited in RRA's accounts.  TD Bank also turned a blind eye to Rothstein receiving and converting large sums of money from RRA accounts for his own benefit.  TD Bank played a central role in this massive fraud by giving Rothstein's settlement program the appearance of legitimacy.  Without TD Bank's active participation in concert with Rothstein, the Ponzi scheme would not have grown so large nor lasted so long.*

Pursuant to the allegations contained in the complaint filed by the Trustee, the Trustee asserted, among other things, that RRA had established a prepetition banking relationship with TD Bank, TD Bank allegedly afforded Rothstein and RRA special treatment, and TD Bank over time allegedly gained actual and/or constructive knowledge that the funds maintained in the RRA accounts at TD Bank were generated not by legal fees or other legitimate means.

32

As detailed in the Liquidation Analysis [Exh. 2], the complaint filed by the Trustee against TD Bank in the TD Bank Adversary (defined herein) ascribes a gross value to proceeds from the litigation totaling approximately $10.2 million arising from the claims for "Potential Fraudulent Transfers" described therein and identified in the "Composite Exhibit B" attached thereto [TD Bank Adversary; ECF No. 1].

On the other hand, the Liquidation Analysis ascribes no value to the tort claims asserted by the Trustee against TD Bank in the TD Bank Adversary because such alleged tort claims, which may be significant, are at this time unliquidated.  Accordingly, "[t]here is no requirement in case law or statute that a disclosure statement estimate the value of specific unliquidated tort claims." *See In re A.H. Robins Co., Inc.,* 880 F.2d 694,697 (4th Cir. 1989).  Further, because of the possibility that the Plan will not be confirmed as filed, the Trustee submits that it would be inappropriate and inconsistent with his fiduciary duties and the best interests of the Creditors of this Estate to disclose an "objective assessment" of his claims against TD Bank.

With respect to the net proceeds for "Potential Fraudulent Transfers," the chapter 7 Liquidation Analysis provides an estimate of the "high value" of $7.16 million representing the net amount of proceeds adjusted for litigation costs (at approximately 30% contingency).  The low value assumes that the litigation is unsuccessful and therefore is reflected at zero ($0).  The Liquidation Analysis assumes that the TD Bank Adversary would take two years to resolve through exhaustion of appeals.

I.      **Constitution of the Official Committee of Unsecured Creditors**

On December 8, 2009, the UST appointed seven members to the Committee pursuant to §1102(a) [ECF No. 94]. The Committee was originally comprised of: (i) Emess Capital LLC, (ii) Ira Sochet Trustee- Ira Sochet Inter Vivos Revocable Trust, (iii) Edward J. Morse, (iv) Razorback Funding LLC, (v) D3 Capital Club LLC, (vi) Coquina Investments, and (vii) Shimon Levy. Subsequently, Coquina Investments, Razorback Funding LLC, D3 Capital LLC and Emess Capital LLC withdrew from the Committee.

On February 27, 2013, the UST reconstituted the Committee to include (i) American Express Travel Related Services Company, Inc., (ii) Ira Sochet, Trustee-Revocable Intervivos Trust of Ira Sochet and (iii) John Mullin Esq. for Edward J. Morse (or his testamentary estate as his successor) [ECF No. 3926].

IV.      **POTENTIAL LITIGATION ASSETS AND PRESERVATION OF SUCH LITIGATION CLAIMS**

A.      **Potential Bankruptcy Litigation Claims**

The Trustee has filed and has been actively pursuing a significant number of bankruptcy causes of action.  To the extent any cause of action is unresolved as of the Effective Date it will be pursued by the Liquidating Trustee.  The proceeds thereof will be used to make Distributions under the Plan, including to holders of Allowed General Unsecured Claims.

In addition to Litigation Claims that the Debtor may have under state and other federal laws that are property of the Estate pursuant to section 541 of the Bankruptcy Code, the

Bankruptcy Code creates certain causes of action that allow a debtor to recover transfers it has made prior to its bankruptcy filing. The most common such causes of action are those to recover preferences and fraudulent transfers.

The following sections describe the nature of the litigation generally.

i.      *Preference Actions*

Under sections 547 and 550 of the Bankruptcy Code, a debtor may seek to avoid and recover certain payments made by the debtor to or for the benefit of a creditor, within the 90 days prior to the petition date, in respect of an antecedent debt if such transfer was made when the debtor was insolvent. Transfers made to a creditor that was an "insider" of the debtor are subject to these provisions if the payment was made within one year of a debtor's filing of a petition under chapter 11. Under section 547, certain defenses, in addition to the solvency of the debtor at the time of the transfer, are available to a creditor from which a preference recovery is sought. Among other defenses, a debtor may not recover a payment to the extent such creditor subsequently gave new value to the debtor for which the creditor was not paid pursuant to a payment that is not otherwise avoidable (the "New Value Defense"). A debtor may not recover a payment to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor (the "Substantially Contemporaneous Exchange Defense"). Further, a debtor may not recover a payment if such payment was made in the ordinary course of business of both the debtor and the creditor (the "Ordinary Course Defense"). The debtor has the initial burden of proof in demonstrating the existence of all the elements of a preference, although there is a rebuttable presumption that the debtor was insolvent during the 90 days prior to the commencement of its bankruptcy case. The creditor has the initial burden of proof as to the foregoing defenses.

The Trustee has already pursued many preference claims. The Trustee issued 51 preference demand letters. One putative defendant settled without the Trustee filing suit, and 23 of them required litigation. The rest were dismissed by the Trustee for a variety of reasons, including the Trustee's determination that the litigation targets were not able to satisfy a judgment if one were obtained against them. The total amount recovered from the lawsuits filed by the Trustee seeking to recover preferential transfers is $161,725.00. In these lawsuits, the Trustee also obtained reductions in claims against the Estate asserted by defendants in the amount of $5,430,757.95. To the extent any such litigation remains unresolved as of the Effective Date, pursuant to the Plan, all such unresolved claims are being reserved and assigned to the Liquidating Trust and they shall be pursued by the Liquidating Trustee.

ii.     *Fraudulent Conveyances and Transfers*

Under sections 548 and 550 of the Bankruptcy Code and under state law made applicable in bankruptcy cases by section 544(b) of the Bankruptcy Code, a debtor in possession or a trustee in bankruptcy, if a trustee is appointed or elected, may recover a transfer of property if the transfer was made while the debtor was insolvent, was unable to pay its debts as they mature, or has unreasonably small capital if, or to the extent, the debtor received less than reasonably equivalent consideration or fair value for such property and may recover a transfer made by the debtor with actual intent to hinder, delay or defraud its creditors. Such rights of the debtor or

34

trustee preclude any creditor as to whom a transfer was also fraudulent from pursuing a similar action unless the trustee declines to bring such action or to administer such claim.  Section 548 of the Bankruptcy Code applies to transfers made during the two years prior to the Petition Date. Various State laws may provide a considerably longer period of up to six years within which such action may be brought.

The Trustee filed 116 fraudulent transfer claims.  To date, the Trustee has recovered $105,299,938.13 from this litigation and the Trustee has succeeded in achieving $50,274,083.97 in reductions of claims asserted against the Estate.[9]  To the extent any such litigation remains unresolved as of the Effective Date, pursuant to the Plan, all such unresolved claims are being reserved and assigned to the Liquidating Trust and they shall be pursued by the Liquidating Trustee.  A listing of the remaining claims is attached to the Plan as Appendix 1.85.

### iii.    Other Litigation

The Trustee has also been involved in litigation other than cases involving preference or fraudulent transfers.  The largest part of this litigation has involved the claims the Trustee made in connection with the forfeiture action brought by the United States as part of Rothstein's criminal case.  That litigation resulted in most of the assets acquired with RRA funds but nominally owned by Rothstein or an entity owned by him being turned over to the government. However, the Trustee has appealed to the United States Court of Appeals for Eleventh Circuit ("Eleventh Circuit").  Oral argument of the appeal occurred on December 6, 2012, and the parties are currently awaiting a decision from the Eleventh Circuit.  If the Trustee prevails on his claims currently before the Eleventh Circuit, there is likely to be further litigation over the Estate's entitlement to certain of the assets subjected to forfeiture by the United States.

At this time, the Trustee believes that it is highly speculative as to whether there will be any proceeds distributed to the Estate from the forfeiture action.  It is not possible for the Trustee at this time to predict the ruling of the Eleventh Circuit and its impact (if any) as to whether or when the Estate will receive any proceeds from the forfeiture action.  The Trustee believes that engaging in such speculation would unduly burden the Disclosure Statement with information that is of interest only to lawyers, not the average investor.  *See In re Waterville Timeshare Group*, 67 B.R. 412, 413-414 (Bankr. D. N.H. 1986) (rejecting request for additional discovery and stating "by overburdening a proponent's disclosure statement with information significant and meaningful to lawyers alone may result ultimately in reducing the disclosure statement to an overlong, incomprehensible, ineffective collection of words to those whose interests are to be served by disclosure").

### iv.    Disallowance of Claims

In all relevant adversary proceedings the Trustee has asserted that any Claim filed by the defendant be disallowed until the requirements of section 502(d) of the Bankruptcy Code have been satisfied.  Pursuant to section 502(d) of the Bankruptcy Code, any Claim asserted by a

---

[9]    This amount does not include recoveries from fraudulent transfer targets that settled prior to the filing of a lawsuit.  These recoveries amount to $45,321,243.72 and $5,625,358.14 in Claim reductions or waivers.

Creditor shall be disallowed in its entirety if such Creditor has received a transfer, such as a preference or fraudulent transfer, that is voidable under the Bankruptcy Code and has failed to repay such transfer. Accordingly, to the extent the Estate prevails on pending litigation against Entities who received transfers subject to section 502(d) but also hold Claims against the Estate, such Claims would be disallowed in accordance with section 502(d). To the extent that an entity satisfies the requirements of section 502(d) of the Bankruptcy Code, such entity may assert against the estate the full amount of a section 502(h) claim.

## B.    Applicable Insurance Policies

RRA maintained professional liability insurance with Carolina Casualty Insurance Company ("Carolina Casualty"). Shortly after the commencement of the Chapter 11 Case, Carolina Casualty filed an action against the Estate to rescind the two professional liability policies it has issued to RRA. After the commencement of litigation by Carolina Casualty, the Trustee and Carolina Casualty reached an agreement [ECF No. 1692] whereby the Trustee would agree to the entry of a judgment by the Bankruptcy Court rescinding the policies and whereby Carolina Casualty would pay the estate $950,000, which was in excess of the pre-petition premiums paid to Carolina Casualty by RRA. After notice and hearing, the Court approved the settlement with Carolina Casualty. *See Order Granting Motion to Approve Settlement and Release Between the Chapter 11 Trustee and Carolina Casualty Insurance Company* [ECF No. 1780]. Accordingly, to the Trustee's knowledge, there do not exist any insurance policies available to cover any of the professional liability claims asserted against the Estate. The Trustee is unaware of any other insurance in the name of the Debtor.

## C.    Transfer and Enforcement of Causes of Action

Pursuant to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order, after transfer of the Assets to the Liquidating Trust pursuant to the Plan, the Litigation Claims shall vest in the Liquidating Trust and the Liquidating Trustee shall, subject to the provisions of the Plan, the Settlement Agreement, and the Liquidating Trust Agreement, have the exclusive right to enforce any and all Litigation Claims against any Entity and rights of the Debtor that arose before or after the Petition Date, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, against any Entity whatsoever and shall be entitled to all remedies available to the Trustee in the Chapter 11 Case. Notwithstanding the foregoing, in the event the Liquidating Trustee opts not to pursue a Litigation Claim, the Liquidating Trust Oversight Committee may make a written demand upon the Liquidating Trustee that the Liquidating Trustee pursue such Litigation Claim. In the event the Liquidating Trustee refuses to pursue such Litigation Claim, the Liquidating Trust Oversight Committee may File and serve a motion in the Chapter 11 Case seeking authority to pursue such Litigation Claim on behalf of the Liquidating Trust with the same rights possessed by the Liquidating Trustee. Pursuant to section 1123(b)(3) of the Bankruptcy Code, upon the occurrence of the Effective Date, the Levin Claims shall vest with TD Bank and TD Bank shall, subject to the provisions of the Plan and the Settlement Agreement, have the exclusive right to enforce any and all of the Levin Claims, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, and shall be entitled to all remedies available to the Trustee in the Chapter 11 Case.

36

**D.      Preservation of Rights**

Except to the extent that any Claim is Allowed during the Chapter 11 Case or expressly by the Plan, nothing, including, but not limited to, the failure of the Trustee to object to a Claim or Interest for any reason during the pendency of the Chapter 11 case shall affect, prejudice, diminish, or impair the rights and legal and equitable defenses of the Liquidating Trustee to contest or defend against such Claims or Interests in any lawful manner or forum, including pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, section 502(j) of the Bankruptcy Code or Bankruptcy Rules 9023 or 9024, provided, however, that subsequent to the Effective Date, only the Liquidating Trustee shall have the right to seek reconsideration of a Claim Allowed in the Chapter 11 Case by a Final Order of the Bankruptcy Court under applicable law or procedure, including, but not limited to Rule 60(b) of the Federal Rules of Civil Procedure, section 502(j) of the Bankruptcy Code and Bankruptcy Rules 9023 or 9024.

## V.      CLAIMS AGAINST THE DEBTOR

The Trustee (one of the Plan Proponents) estimates that the amount of Claims filed and scheduled against the Estate totals approximately $461,078,446.36.[10]  The Trustee continues to review Claims scheduled and filed in this Chapter 11 Case.  In connection therewith, the Trustee has filed ten omnibus objections to Claims seeking the disallowance or reduction of Claims against the Debtor's Estate pursuant to the Bankruptcy Code and applicable non-bankruptcy law. Upon the Effective Date, the Liquidating Trustee will assume the responsibility to pursue Claim objections and the settlement of such objections.

The Trustee projects that Classes 1, 2, 3, 4, and 6 will have allowed claims in the approximate aggregate amount of approximately $152 million after the claims objection and reduction process is completed.  The reduction in claims will be achieved through three primary means. First, the Trustee has aggressively sought to eliminate claims that are properly assertable against the Banyon Bankruptcy Estates. Second, the Trustee has aggressively sought to reduce or eliminate Claims that are overstated by claimants, in particular the alleged former clients of RRA.  Finally, the Trustee has aggressively sought to reduce Claims held by Entities who have recovered on account of their Claim from third parties (the "Claim Reduction Objections"). Upon the Effective Date, the Liquidating Trustee will assume the responsibility to complete the Claim objection and reduction process.

The Claim Reduction Objections are predicated on the well-settled law that a creditor is only entitled to one recovery on its claim.  Accordingly, the Claim Reduction Objections seek to reduce Claims based upon the fact that a Creditor has been completely or partially satisfied on its Claim.  *See* 11. U.S.C. § 502(b)(1); §§ 46.015, 768.041, 768.31(5), Fla. Stat.; *Blasland Bouck and Lee, Inc. v. City of North Miami*, 283 F. 3d 1286, 1295 (11th Cir. 2002); *KMS Restaurant Corp. v. Wendy's Int'l. Inc.*, 2006 WL 2271009 (11th Cir. Aug. 9, 2006); *In re Sentinel Funds*, 06-11822-JKO, Order Sustaining Objections To Claims Satisfied In Whole Or In Part Through Settlement With Bank of America (ECF No. 810) (Bankr. S.D. Fla. June 29, 2011); *In re Realty Associates Securities Corp.*, 66 F. Supp. 416 (E.D.N.Y. 1946).  Many large putative Creditors of RRA have recovered significant sums from collateral sources.  The Claim Reduction Objections

---

[10]   This number is net of any duplicate or superseded claims.

are designed to reduce the Claims held by such Creditors to ensure that all Creditors receive only a single recovery on their Claims.

The Plan Proponents anticipate that holders of Claims in (i) Classes 1, 2, 3 and 4 will receive, in the aggregate, Distributions representing the Full Amount of their Allowed Claims, (ii) Class 5 will receive a Distribution totaling $39,700,000.00 on account of their Allowed Claims, (iii) Class 6 will receive a potentially meaningful Distribution and (iv) Classes 7 and 8 will receive no Distributions.

The actual recoveries for holders of Allowed Claims in Classes 1-6 will depend on the ultimate amount of the Allowed Claims in each respective Class and the Cash ultimately available for Distribution after payment in full of expenses of the Liquidating Trustee and all Unclassified Claims.

**ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THE PROJECTED ESTIMATED RECOVERIES ARE REASONABLE, THERE IS AND CAN BE NO ASSURANCE THAT THE ACTUAL AMOUNTS OF ALLOWED CLAIMS IN EACH CLASS WILL NOT MATERIALLY EXCEED THE ESTIMATED AGGREGATE AMOUNTS DISCUSSED HEREIN.  AS A RESULT, THE ACTUAL DISTRIBUTIONS AND PERCENTAGE OF DIVIDENDS MAY BE MATERIALLY DIFFERENT FROM AMOUNTS ESTIMATED HEREIN.**

## VI.    SUMMARY OF THE PLAN OF LIQUIDATION

### A.    General

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

### B.    Classification and Treatment of Claims and  Interests

*i.    Unclassified Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Statutory Fees*

The Bankruptcy Code provides that claims other than administrative and certain priority claims are to be classified under a chapter 11 plan.  Accordingly, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claim, and Statutory Fees, if any, are not classified.

-Administrative Expense Claims

Administrative Expense Claims include any actual and necessary costs and expenses of preserving the Estate, any actual and necessary expenses of operating and liquidating the business of the Debtor after the Petition Date, and any indebtedness or obligations incurred by the Trustee in connection with the conduct of the Estate's business that fall within section 503 of the Bankruptcy Code.  Ordinary course post-petition liabilities shall be paid pursuant to their terms.  Compensation or reimbursement of expenses to Professionals retained by the Trustee and

the Committee will be paid to the extent Allowed by the Bankruptcy Court as an Administrative Expense Claim.

Subject to the allowance procedures and deadlines provided in the Plan, on the Effective Date or as soon thereafter as is practicable, the holder of an unpaid Allowed Administrative Expense Claim shall receive from the Liquidating Trustee on account of the Allowed Administrative Expense Claim and in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Expense Administrative Claim, or (b) such other treatment as to which the Plan Proponents or the Liquidating Trustee, as applicable, and the holder of such Allowed Administrative Expense Claim have agreed to writing; provided, however, that Professional Claims shall be paid in accordance with Section 2.3 of the Plan.

-Deadline for Filing Administrative Expense Claims

Any and all requests for allowance or payment of Administrative Expense Claims must be Filed and served on each of the Plan Proponents, the Liquidating Trustee, their respective counsel, and the United States Trustee no later than the applicable Administrative Expense Claim Bar Date; provided, however, that the Administrative Expense Claim Bar Date shall not apply to liabilities incurred in the ordinary course of business (other than Professional Claims). Objections to Administrative Expense Claims (other than Professional Claims) must be Filed and served on the claimant no later than thirty (30) days after the Administrative Expense Claim Bar Date; provided that objections to Administrative Expense Claims that constitute Professional Claims shall be due in accordance with the Disclosure Statement Approval Order.

Administrative Expense Claims incurred in the ordinary course of business (other than Professional Claims) shall be paid by the Liquidating Trustee or the Trustee, as applicable, in the ordinary course of business between such parties, without application to or approval of the Bankruptcy Court.

Any holder of an Administrative Expense Claim (including a holder of a Professional Claim or a Claim for federal, state or local taxes arising subsequent to the Petition Date) that is required to File, but does not File an application, motion, request or other Bankruptcy Court approved pleading by the applicable Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Expense Claim against the Debtor, the Estate, the Liquidating Trust, the Liquidating Trustee, or any of their respective Assets, and such holder shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Expense Claim.

-Trustee Compensation

On or prior to the Administrative Expense Claim Bar Date applicable to Professional Claims for the filing of final applications for compensation, the Trustee shall File with the Bankruptcy Court his final fee application seeking final approval of all fees and expenses incurred covering the period from the Petition Date through the Effective Date (including, but not limited to, fees associated with the TD Bank Contribution and the Additional Recoveries)

39

and such fee application shall be considered by the Bankruptcy Court at the Confirmation Hearing.

The Trustee's final application for compensation may seek an award of compensation in Cash based on the formula contained in section 326(a) of the Bankruptcy Code and otherwise provided for by any other provision of the Bankruptcy Code and may include a request to be paid compensation calculated on (a) the amount of all Assets disbursed, turned over or transferred by the Trustee after the Order for Relief and prior to the Effective Date, and (b) the amount of all Assets disbursed, turned over or transferred by the Trustee on the Effective Date, including the TD Bank Contribution, the Additional Recoveries, and any other Assets delivered by the Trustee to the Liquidating Trustee following execution of the Liquidating Trust Agreement; provided further, however, that for the avoidance of any doubt, the Trustee's entitlement to seek an award of compensation is without prejudice to the rights of the Committee, the United States Trustee or any other party in interest to object to the Trustee's application for fees.

Interim compensation awarded and paid to the Trustee prior to the Effective Date shall be credited against the compensation payable to the Trustee pursuant to the Plan. The amount of the Trustee's compensation shall be subject to approval by the Bankruptcy Court and shall be paid by the Estate or the Liquidating Trustee, as applicable, to the Trustee as soon as practicable after approval by the Bankruptcy Court; provided, however, that for the avoidance of any doubt, the amount of the Trustee's compensation and the payment terms will be determined by the Bankruptcy Court in the Chapter 11 Case by Final Order; provided further, however, that for purposes of calculating the amount of compensation payable to the Trustee or the Liquidating Trustee, as applicable, on account of the disbursements made on the Banyon Unsecured Claim, to the extent that any such compensation is payable to the Trustee or the Liquidating Trustee, as applicable, on account of the Banyon Unsecured Claim, only 30% of the amount Distributed on account of the Banyon Unsecured Claim may be included as a disbursement by the Trustee or the Liquidating Trustee, as applicable.

Notwithstanding anything contained herein, any party in interest, including the Office of the United States Trustee and the Committee, may object to the Trustee's final fee application, including but not limited to, in regard to which Assets disbursed, turned over or transferred by the Trustee are properly included in the formula used to calculate the Trustee's compensation.

The Committee's agreement herein that the Trustee may request compensation based on certain Assets disbursed, turned over or transferred by the Trustee shall not be construed as the Committee's agreement that the Trustee is entitled to compensation based on any such Assets disbursed, turned over or transferred by the Trustee and the Committee reserves the right to object to the Trustee's final fee application.

Notwithstanding any provision of the Plan to the contrary, the precise manner in which the Assets are disbursed, turned over or transferred to the Liquidating Trust shall not affect the rights of the Trustee to seek compensation for the amounts of Assets which ultimately are disbursed, turned over or transferred to the Liquidating Trust prior to, on, or in conjunction with the Effective Date.

The foregoing provisions regarding the Trustee's entitlement to seek fees is without prejudice to the rights of the Committee, the United States Trustee or any other party in interest to object to the Trustee's application for fees at the Confirmation Hearing or thereafter in connection with the Trustee's fee application(s) in respect of Additional Recoveries.

The United States Trustee has asserted that the statutory fees provided under 11 U.S.C. § 326 are not a guarantee but only serve as a maximum allowable amount.

The compensation for the Trustee as described in the Plan was not negotiated with TD Bank as a part of the TD Bank Settlement. The only element of the Trustee's compensation that is a part of the TD Bank Settlement has been fully disclosed in the Disclosure Statement. This element actually protects creditors because the Trustee and the Banyon Trustee have agreed to split a single 3% statutory fee on account of the Distribution from the RRA Estate related to the Banyon Unsecured Claim in order to avoid duplicative fee requests, with only 30% of the amount of such Distribution related to the Banyon Unsecured Claim to be used to calculate the 3% fee to the Trustee and the Banyon Trustee receiving a 3% fee on the remaining 70% of the amount of the Distribution related to the Banyon Unsecured Claim, all subject to Bankruptcy Court approval. See Plan, § 2.4.1 ("Trustee Compensation"); Settlement Agreement, § 2.19 ("Agreement on Certain Trustees' Commissions").

-Liquidating Trustee Compensation

Subject to Bankruptcy Court approval following application and a hearing, the Liquidating Trustee shall be entitled to receive reasonable compensation at the rate of $500.00 per hour (adjusted annually) for all time reasonably spent by the Liquidating Trustee in administering the Liquidating Trust. The initial hourly rate of $500.00 is $125.00 per hour less than the hourly rate that Mr. Goldberg is currently charging for his time in representing the Committee in the Chapter 11 case and $155.00 per hour less than the rate that Mr. Goldberg typically charges to other clients.

-Professional Claims

On or prior to the Administrative Expense Claim Bar Date applicable to Professional Claims for the filing of final applications for compensation, each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses incurred from the Petition Date to the date of the Confirmation Hearing which shall be considered by the Bankruptcy Court at the Confirmation Hearing. All such final fee applications may be supplemented in advance of the Confirmation Hearing to provide for estimates of the fees and costs to be incurred by each Professional from the date of the final applications for compensation up to the date of Confirmation Hearing (or to correct estimates in respect of such fees and costs provided for in the final applications for compensation) and supplements may include an upward or downward adjustment to prior fee and cost estimates, in accordance with the Administrative Expense Claim Bar Date applicable to Professional Claims. Professional Claims shall be paid by the Trustee or the Liquidating Trustee, as applicable, pursuant to Final Orders in the Chapter 11 Case awarding final compensation to such Professional. From and after the Confirmation Date until the Effective Date, the Trustee, in the ordinary course of business, shall pay the reasonable fees and expenses of Professionals incurred by them during such period.

41

The Trustee estimates that the amount of accrued and unpaid Allowed Administrative Expense Claims, comprised substantially of Professional Claims, as of the Confirmation Date (approximately early to mid-July, 2013) will total approximately $3,057,369.41, including the Professional Claims of: (i) Berger Singerman LLP ($1,902,408.92); (ii) Berkowitz Pollack and Brandt Advisors and Accounts ($181,883.63); (iii) Genovese Joblove Battista, P.A. ($608,329.16); (iv) Akerman Senterfitt, LLP ($210,548.01); (v) Ver Ploeg & Lumpkin, P.A. ($64,525.04); (vi) Development Specialist, Inc. ($13,326.71); (vii) Mesirow Financial ($23,625.00); (viii) Marcum LLP ($47,721.78); and (ix) Christopher & Weisberg PA ($5,001.17).[11]

The Trustee estimates that total accrued (both paid and unpaid) Professional Claims, through March 31, 2013, total approximately $35,485,334.74 ($34,160,057.80 in fees and $1,325,276.95 in expenses) including the Professional Claims of: (i) Berger Singerman LLP ($18,714,136.24 in fees and $886,318.35 in expenses); (ii) Berkowitz Pollack and Brandt Advisors and Accounts ($3,344,669.55 in fees and $13,496.96 in expenses); (iii) Genovese Joblove Battista, P.A. ($7,568,959.90 in fees and $306,788.51 in expenses); (iv) Akerman Senterfitt, LLP ($1,924,404.00 in fees and $54,021.09 in expenses); (v) Ver Ploeg & Lumpkin, P.A. ($1,158,563.00 in fees and $31,075.37 in expenses); (vi) Development Specialist, Inc. ($197,557.50 in fees and $318.45 in expenses); (vii) Mesirow Financial ($367,312.50 in fees and $5,965.86 in expenses); (viii) Marcum LLP ($369,644.50 in fees and $418.34 in expenses); (ix) Kluger, Kaplan, Silverman, Katzen & Levine, PL ($449,831.11 in fees and $22,219.19 in expenses); (x) Christopher & Weisberg PA ($16,620.00 in fees and $3,692.07); and (xi) Richman Greer, P.A. ($48,759.50 in fees and $962.76 in expenses).

From and after the Confirmation Date, the Trustee estimates that an additional amount of approximately $650,000 will be incurred in respect of Administrative Expense Claims for Professionals through the Effective Date.[12] The actual amount of Administrative Expense Claims for the Estate's Professionals may vary materially from the foregoing estimate and will be set forth with specificity in the final applications for compensation filed by the Estate's Professionals, as the same may be supplemented and revised to increase or decrease the amount of compensation sought by each of the Estate's Professionals in advance of the Confirmation Hearing.

-Statutory Fees

Statutory Fees are fees payable pursuant to 28 U.S.C. § 1930 and any fees payable to the Bankruptcy Court. Under the Plan, the Liquidating Trustee, on behalf of the Debtor, shall pay the UST the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within five (5)

---

[11]  The amounts reflected herein assume that all payments to Professionals continue to made in accordance with the already Court approved interim compensation procedures. Moreover, these estimates also assume that Confirmation occurs by July, 2013.

[12]  This amount assumes a delay of no more than 30 days from Confirmation to the Effective Date.

4969645-2

Business Days after the Effective Date for pre-Confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the Cash disbursements for the relevant period.   The Liquidating Trustee shall further pay the UST the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements of the Liquidating Trust for post-Confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), until the closing of the Chapter 11 Case by the issuance of a final decree by the Bankruptcy Court.   The Liquidating Trustee shall provide to the UST upon the payment of each post-Confirmation payment an appropriate affidavit indicating all the Cash disbursements for the relevant period.   In addition, the affidavit provided by the Liquidating Trustee to the UST shall be filed on the docket with the Bankruptcy Court and shall set forth each Distribution made to each of the Beneficiaries of the Liquidating Trust (indicating the Class, identity, applicable claim number and the amount of the Distribution).   The affidavit described in Section 2.2 of the Plan shall also indicate all Cash remaining on hand in the Liquidating Trust.

-Allowed Priority Non-Tax Claims

Priority Non-Tax Claims consist of Claims entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code. Subject to the allowance procedures and deadlines provided in the Plan, on the Effective Date or as soon thereafter as is practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, and (iii) a date agreed to by the Liquidating Trustee and the holder of such Allowed Priority Non-Tax Claim, the Liquidating Trustee shall pay each holder of an Allowed Priority Non-Tax Claim Cash equal to the amount of its Allowed Priority Non-Tax Claim in full satisfaction, release, and discharge of the Allowed Priority Non-Tax Claim.

-Allowed Priority Tax Claims

Priority Tax Claims consist of any Claims for taxes, interest and penalties against RRA, entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.   Subject to the allowance procedures and deadlines provided in the Plan, on the Effective Date or as soon thereafter as is practicable, each holder of an Allowed Priority Tax Claim shall receive at the option of the Liquidating Trustee, in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Priority Tax Claim: (a) Cash equal to the amount of such unpaid Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) a date agreed to by the Liquidating Trustee and the holder of such Allowed Priority Tax Claim; (b) equal Cash payments of a total value, as of the Effective Date, equal to the Allowed amount of such Allowed Priority Tax Claim from the Liquidating Trustee made on the last Business Day of every (3) month period following the Effective Date and terminating on February 28, 2015; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Allowed Priority Tax Claim and the Liquidating Trustee or as the Bankruptcy Court may order.   The Liquidating Trustee shall have the right, in his or her sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.

43

*ii.*     ***Classification and Treatment of Claims and  Interests***

The following are the designations for and treatment of the Classes of Claims against and Interests in the Debtor:

a.     **Class 1 — Allowed Secured Claims**

The Plan Proponents are not aware of any Secured Claims are or will be Allowed.  This is a precautionary Class.  Each holder of an Allowed Secured Claim shall receive, in the sole discretion of the Liquidating Trustee, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim: (a) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the later of (i) the Effective Date; (ii) the date that such Secured Claim becomes Allowed, and (iii) a date agreed to by the Liquidating Trustee and the holder of such Allowed Secured Claim; (b) treatment such that such Allowed Secured Claim is reinstated; (c) the property securing such Allowed Secured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee or as the Bankruptcy Court in the Chapter 11 Case may order by Final Order.

Class 1 is Unimpaired under the Plan and the holders of such Claims are not entitled to vote on the Plan.

b.     **Class 2 — Single Source Recovery Allowed Unsecured Claims**

Class 2 consists of all Single Source Recovery Allowed Unsecured Claims.  As defined in the Plan, such claim is an Allowed General Unsecured Claim on account of which the holder does not have Collateral Source Recoveries, and its sole source of recovery, as certified by the holder of such Claim on its properly completed Verified Collateral Source Recovery Disclosure, is its recovery under the Plan from the RRA Estate.

Subject to the payments provided for in Section 2.1 through 2.7, and Section 3.2 of the Plan, and except as otherwise provided in Section 3.3(b) of the Plan, each holder of an Allowed Class 2 Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 2 Claim, Pro Rata Distributions of Cash from the Liquidating Trust pursuant to the Liquidating Trust Agreement until such Allowed Class 2 Claim has been paid the Full Amount of such Allowed Claim. Allowed Class 2 Claims shall receive the same Pro Rata Distribution as the holders of Allowed Class 3 Claims, after application of Collateral Source Recoveries, which are classified and treated in Section 3.4 of the Plan.

**As a condition precedent to the receipt of a Distribution under the Plan or the Liquidating Trust, each holder of an Allowed Class 2 Claim shall deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure, in the form attached to the Plan as Appendix 1.137, by the Voting Deadline.** The Liquidating Trustee is authorized to make interim Distributions to the holders of Allowed Class 2 Claims after the Effective Date and before finalization of Collateral Source Recovery calculations; provided, however, that any such Distributions by the Liquidating Trustee will be limited in amounts that, in the Liquidating Trustee's reasonable judgment, are designed to avoid the payment of excess Distributions to the holders of Allowed Class 2 Claims.

44

If the holder of a Class 2 Claim (i) fails or refuses to timely deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure on or before the Voting Deadline, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Collateral Source Recovery Disclosure, then (a) such holder shall be deemed to irrevocably waive its rights to receive, and shall be forever barred from receiving, a Distribution from the Liquidating Trust, (b) such holder's Class 2 Claim shall be deemed Disallowed without further order of the Bankruptcy Court, and (c) such holder's Ballot shall not be counted for purposes of determining whether Class 2 has accepted or rejected the Plan.  All Entities submitting a Verified Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has changed, including, but not limited to, when such Entity actually receives a previously anticipated Verified Collateral Source Recovery.  Such obligation to correct and/or update shall terminate on the Final Distribution Date.

On or by the Effective Date, the Trustee or the Liquidating Trustee, as applicable, shall provide the Liquidating Trust Oversight Committee with copies of all Verified Collateral Source Recovery Disclosures that are timely received by the Voting Agent.

Any Holder of a Class 2 Claim that receives Distributions in excess of the amount such holder of a Class 2 Claim was entitled to receive in Distributions shall repay such amount that it received that was in excess of the Distributions such holder was entitled to receive to the Liquidating Trust within thirty (30) days after such holder has been directed by a Final Order of the Bankruptcy Court in the Chapter 11 Case to repay such excess Distributions to the Liquidating Trust.  Section 6.14 of the Plan sets forth additional obligations of holders of Class 2 Claims to remit Collateral Source Recoveries to the Liquidating Trust.

Holders of Class 2 Claims that are Disallowed subsequent to a Distribution being made to such holders shall repay any such Distribution to the Liquidating Trust within thirty (30) days after the Class 2 Claim becoming Disallowed.

If the holder of a Claim timely delivers to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure that discloses that if its Claim is Allowed, it would be a Single Source Recovery Allowed Unsecured Claim, such Claim shall be classified as a Class 2 Claim. If the holder of a Claim timely delivers to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure that discloses that if its Claim is Allowed, it would be a Multiple Source Recovery Allowed Unsecured Claim, such Claim shall be classified as a Class 3 Claim.

Class 2 is Impaired and the holders of such Claims are entitled to vote on the Plan.

c.    **Class 3 — Multiple Source Recovery Allowed Unsecured Claims**

Class 3 consists of all Multiple Source Recovery Allowed Unsecured Claims, excluding those Claims classified in Classes 4, 5, 6, 7 and 8.  As defined in the Plan, such claim is an

45

Allowed General Unsecured Claim as to which the holder has as of the date of the Confirmation Hearing received or may in the future receive one or more Collateral Source Recoveries.

Except to the extent provided in Section 3.4(b) of the Plan, the amount of a Collateral Source Recovery shall be calculated for each applicable Allowed Claim in Class 3 as shown in the following chart:

Collateral Source Recoveries equal:

**A.**    the sum of, without duplication:

1.    the gross amount of Cash and non-Cash assets received by, available to, received for the benefit of or applied to the indebtedness of the holder of an Allowed Claim (whether made directly or indirectly to such holder or any agent, attorney or third party associated with such holder), on account of or in any way related to such holder's loss directly or indirectly relating to the Debtor or Rothstein from all parties and sources, including, without limitation, any payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; and

2.    any amounts that would be required to be paid by or on behalf of the holder of an Allowed Claim to TD Bank related to the Debtor or Rothstein pursuant to any agreement between or on behalf of such holder and TD Bank including on account of the Distributions such holder would receive under the Plan.

**B.**    The amount calculated pursuant to **"A"** shall exclude, without duplication:

1.    any Distributions to be made to the holder of such Claim under the Plan;

2.    any tax benefit from a theft loss deduction taken in accordance with the IRC, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein;

3.    any amounts paid by TD Bank that result in any claims or recoveries being assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013, unless TD Bank consents to these amounts being included in the calculation of a Collateral Source Recovery; and

4.    any anticipated, but not yet received, Collateral Source Recoveries.

**C.**    The amount calculated pursuant to "**A**" and "**B**" shall include interest only if and to the extent such interest would be recoverable or allowable as an Allowed Claim or as part of the Allowed Claim of such holder.

**D.**    No deduction or reduction from the amount of a Collateral Source Recovery on account of the fees, costs and other expenses incurred or paid in connection with its pursuit of any Collateral Source Recoveries, including, without limitation, attorney's fees

46

and costs, is permissible.

Subject to the payments provided for in Sections 2.1 through 2.7, and Section 3.2 of the Plan, and except as otherwise provided in Section 3.4(b) of the Plan, each holder of an Allowed Class 3 Claim, shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 3 Claim Pro Rata Distributions of Cash from the Liquidating Trust pursuant to the Liquidating Trust Agreement until such Allowed Class 3 Claim has been paid the Full Amount of such Allowed Claim.

**As a condition precedent to the receipt of a Distribution under the Plan or the Liquidating Trust, each holder of an Allowed Class 3 Claim shall deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure, in the form attached to the Plan as Appendix 1.138, by the Voting Deadline.** Notice regarding the receipt of Collateral Source Recoveries received by the holders of the Funds' General Unsecured Claim shall be provided in accordance with the terms of the Funds' Settlement Agreement. To the extent not otherwise provided in the Plan, the Liquidating Trustee shall succeed to the rights of the Trustee under the provisions of the Funds' Settlement Agreement. Notice regarding the receipt of Collateral Source Recoveries received by the holders of Coquina Investments' General Unsecured Claim shall be provided in accordance with the terms of the Coquina Settlement Agreement. To the extent not otherwise provided in the Plan, the Liquidating Trustee shall succeed to the rights of the Trustee under the provisions of the Coquina Settlement Agreement.

If the holder of a Class 3 Claim (i) fails or refuses to timely deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure on or before the Voting Deadline, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Collateral Source Recovery Disclosure, then (a) such holder shall be deemed to irrevocably waive its rights to receive, and shall be forever barred from receiving, a Distribution from the Liquidating Trust, (b) such holder's Class 3 Claim shall be deemed Disallowed without further order of the Bankruptcy Court, and (c) such holder's Ballot shall not be counted for purposes of determining whether Class 3 has accepted or rejected the Plan. All Entities submitting a Verified Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has changed, including, but not limited to, when such Entity actually receives a previously anticipated Verified Collateral Source Recovery. Such obligation to correct and/or update shall terminate on the Final Distribution Date.

The amount of the Distributions to be made on account of each Allowed Class 3 Claim shall be reduced, on a dollar for dollar basis, by the amount of all Collateral Source Recoveries received from any source; provided, however, that the Liquidating Trustee is authorized to make interim Distributions to the holders of Allowed Class 3 Claims after the Effective Date and before finalization of Collateral Source Recovery calculations; provided further, however, that any such Distributions by the Liquidating Trustee will be limited in amounts that, in the Liquidating Trustee's reasonable judgment, are designed to avoid the payment of excess Distributions to the holders of Allowed Class 3 Claims. The amount of the reduction of the Distributions on account of each Allowed Class 3 Claim's Collateral Source Recovery shall be

47

calculated in accordance with Section 6.13 of the Plan and established in the following manner: on or before the date that is 60 days after the Effective Date (without prejudice to the Liquidating Trustee's right to request an extension of this deadline for cause from the Bankruptcy Court), the Liquidating Trustee shall, after consultation with the Liquidating Trust Oversight Committee, File and serve a notice on all affected parties which (A) provides a schedule of the aggregate Collateral Source Recoveries received from all sources by each holder of a Claim in Class 3, and (B) explicitly identifies the amount by which Distributions on account of each such holder's Class 3 Claim will be reduced on account of all of such holder's Collateral Source Recoveries, and such notice shall also provide that: (a) the Liquidating Trust Oversight Committee and the holder of a Class 3 Claim whose Distribution is sought to be reduced shall have 30 days from the Filing of such notice to object to the relief sought in such notice; (b) all objections to such notice shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee and the Liquidating Trust Oversight Committee; (c) if no timely objection to such notice is Filed and served, the Liquidating Trustee shall use the amount of the applicable Collateral Source Recovery indicated on such notice to calculate the reductions to Distributions to each such holder of a Class 3 Claim; and (d) if a timely objection to such notice is Filed and served, such objection and the amount of the applicable Collateral Source Recovery shall be resolved by the Bankruptcy Court in accordance with the provisions of Section 3.4(b) of the Plan after notice and opportunity for a hearing.

The holder of an Allowed Class 3 Claim shall not receive Distributions on account of such Class 3 Claim until the amount of such holder's Collateral Source Recoveries is less than or equal to the amount such holder would have received in Distributions on account of its Class 3 Claim if such holder did not have any Collateral Source Recoveries.

The holder of such Class 3 Claim shall receive Distributions on account of its Class 3 Claim so that such holder receives the same Pro Rata Distribution (after inclusion of such holder's Collateral Source Recoveries as if they were a Distribution) as the holders of Allowed Class 2 Claims.

On or by the Effective Date, the Trustee or the Liquidating Trustee, as applicable, shall provide the Liquidating Trust Oversight Committee with copies of all Verified Collateral Source Recovery Disclosures that are timely received by the Voting Agent.

Any holder of a Class 3 Claim that receives Distributions in excess of the amount such holder of a Class 3 Claim was entitled to receive in Distributions shall repay such amount that it received that was in excess of the Distributions such holder was entitled to receive to the Liquidating Trust within thirty (30) days after such holder has been directed by a Final Order of the Bankruptcy Court in the Chapter 11 Case to repay such excess Distributions to the Liquidating Trust.  Section 6.14 of the Plan sets forth additional obligations of holders of Class 3 Claims to remit Collateral Source Recoveries to the Liquidating Trust.

Holders of Class 3 Claims that are Disallowed subsequent to a Distribution being made to such holders shall repay any such Distribution to the Liquidating Trust within thirty (30) days after the Class 3 Claim becoming Disallowed.

If the holder of a Claim timely delivers to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure that discloses that if its Claim is Allowed, it would be a Single Source Recovery Allowed Unsecured Claim, such Claim shall be classified as a Class 2 Claim.  If the holder of a Claim timely delivers to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure that discloses that if its Claim is Allowed, it would be a Multiple Source Recovery Allowed Unsecured Claim, such Claim shall be classified as a Class 3 Claim.

Nothing in the foregoing is intended to modify or supersede, and nothing in Section 3.4 of the Plan shall modify or supersede, any settlement agreements that have been approved by Final Order of the Bankruptcy Court in the Chapter 11 Case on or before May 8, 2013.  Nothing contained in Section 3.4 of the Plan shall preclude the Liquidating Trustee from reducing Distributions pursuant to Collateral Source Recoveries as stated in Section 3.4(b) of the Plan, to the extent not inconsistent with any relevant provisions of such settlement agreements. Collateral Source Recoveries received by the holders of the Funds' General Unsecured Claim shall be calculated and treated exclusively in accordance with the Funds' Settlement Agreement and the Funds or their assignee(s) (if any) shall receive Distributions on account of such Claim as, and to the extent, provided in the Funds' Settlement Agreement and the Plan, to the extent not inconsistent with the Funds' Settlement Agreement.  Collateral Source Recoveries received by the holders of Coquina Investments' General Unsecured Claim shall be calculated and treated exclusively in accordance with the Coquina Settlement Agreement and Coquina Investments or their assignee(s) (if any) shall receive Distributions on account of such Claim as, and to the extent, provided in the Coquina Settlement Agreement and the Plan, to the extent not inconsistent with the Coquina Settlement Agreement.

Class 3 is Impaired and the holders of such Claims are entitled to vote on the Plan.

      d.     **Class 4 — Razorback Unsecured Rising Tide Claim**

Class 4 consists of the Razorback Unsecured Rising Tide Claim, as Allowed in the Razorback Settlement Agreement.

Subject to the payments provided for in Sections 2.1 through 2.7, and Sections 3.2 through 3.4 of the Plan, and except as otherwise provided in Section 3.5(b) of the Plan, the Allowed Class 4 Claim shall not receive any Distribution under the Plan or the Liquidating Trust until such time as the holders of Allowed Class 2 and Allowed Class 3 Claims have received Pro Rata Distributions of Cash from the Liquidating Trust equal to 95% of the Allowed amount of such Claims after the application of Collateral Source Recoveries.  Once each of the holders of Allowed Class 2 and Class 3 Claims have received a Pro Rata Distribution of Cash equal to 95% of the Allowed amount of such Class 2 and Class 3 Claims after the application of Collateral Source Recoveries, if any, the Allowed Class 4 Claim shall commence receiving Pro Rata Distributions equal to the Pro Rata Distributions provided thereafter to Allowed Class 2 and Allowed Class 3 Claims after the application of Collateral Source Recoveries; provided, however, that the total amount of Cash distributed pursuant the Plan and Liquidating Trust to the holder of the Allowed Class 4 Claim shall not exceed $494,750 on account of the Allowed Class 4 Claim.  The foregoing treatment shall be in full satisfaction, release and discharge of the Razorback Unsecured Rising Tide Claim.

Class 4 is Impaired under the Plan and the holders of such Claims are entitled to vote on the Plan.

        e.      **Class 5 — Banyon Unsecured Claim**

Class 5 consists of the Banyon Unsecured Claim.

     (a)     Treatment of Class 5

         1.     Upon the occurrence of the Effective Date, the Banyon Unsecured Claim shall be Allowed in the amount of $39.7 million ($39,700,000.00) against the Estate.

         2.     Upon the transfer of the Trust Assets from the Estate to the Liquidating Trustee, the Liquidating Trustee shall establish the Banyon Unsecured Creditor Fund from the TD Bank Contribution and earmark the Banyon Unsecured Creditor Fund for payment of the Banyon Unsecured Claim. The Banyon Bankruptcy Estates shall recover on account of the Banyon Unsecured Claim solely from the Banyon Unsecured Creditor Fund

         3.     Within five (5) Business Days after the Effective Date, the Liquidating Trustee shall Distribute the Banyon Unsecured Creditor Fund to the Banyon Trustee for the benefit of the Banyon Bankruptcy Estates (as defined in the Plan, the "Banyon Distribution") in full satisfaction, release and discharge of all Claims of the Banyon Bankruptcy Estates, directly or indirectly, against the Debtor or the Estate, including, without limitation, the Banyon Unsecured Claim. The amount of the Banyon Distribution shall be allocated between the Banyon Bankruptcy Estates in accordance with the direction of the Banyon Trustee or Final Order of the Bankruptcy Court in either Banyon Bankruptcy Case.

         4.     Upon the payment of the Banyon Distribution, RRA shall have an allowed senior subordinated claim against each of the Banyon Bankruptcy Estates in the amount of $39.7 million ($39,700,000.00) (as defined in the Plan, the "RRA Banyon Senior Subordinated Claim"). The RRA Banyon Senior Subordinated Claim shall be subordinated in right to payment to the Full Amount of (i) all allowed administrative expenses in each of the Banyon Bankruptcy Cases, respectively, (ii) all allowed priority claims in each of the Banyon Bankruptcy Cases, respectively, and (iii) all allowed non-subordinated general unsecured claims in each of the Banyon Bankruptcy Cases, after the application of Banyon Creditor Collateral Source Recoveries, as applicable; provided, that the Banyon Trustee shall not permit the holders of allowed claims senior to the RRA Banyon Senior Subordinated Claim to

receive in excess of the Full Amount of their claims, after the application of Banyon Creditor Collateral Source Recoveries as applicable.  The RRA Banyon Senior Subordinated Claim shall be senior in right of payment to the TD Bank Banyon Junior Subordinated Claim.

5.    (A)    (I)  Within (5) five Business Days after the Effective Date, the Banyon Trustee shall send to all holders of claims asserted or assertable against the Banyon Bankruptcy Estates a Verified Banyon Creditor Collateral Source Recovery Disclosure with instructions to return such Verified Banyon Creditor Collateral Source Recovery Disclosure to the Banyon Trustee so that (i) it is actually received by the Banyon Trustee on or before the date that is 25 days after the Effective Date and (ii) contains the information required in part (II) hereof.

(II)  **Each holder of a claim asserted or assertable against the Banyon Bankruptcy Estates must deliver to the Banyon Trustee a Verified Banyon Creditor Collateral Source Recovery Disclosure by a date that is no later than 25 days after the Effective Date.**  If the holder of a claim asserted or assertable against the Banyon Bankruptcy Estates (i) fails or refuses to timely deliver to the Banyon Trustee a completed and duly executed Verified Banyon Creditor Collateral Source Recovery Disclosure, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Banyon Creditor Collateral Source Recovery Disclosure, then (a) such holder shall be deemed to irrevocably waive its rights to receive, and shall be forever barred from receiving, a distribution from the Banyon Bankruptcy Estates, and (b) such holder's claim asserted or assertable against the Banyon Bankruptcy Estates shall be deemed disallowed without further order of the Bankruptcy Court.  All Entities submitting a Verified Banyon Creditor Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Banyon Creditor Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has materially changed, including, but not limited to, when such Entity actually receives a previously anticipated Banyon Creditor Collateral Source Recovery.  Such obligation to correct and/or update shall terminate on the Final Distribution Date.

(B)    The Banyon Trustee shall provide the Liquidating Trustee and the Liquidating Trust Oversight Committee copies of each Verified Banyon Creditor Collateral Source Recovery Disclosure submitted to him within five Business Days after the last date on

51

which such Verified Banyon Creditor Collateral Source Recovery Disclosure is required to be submitted to the Banyon Trustee

(C)    The amount of the distributions, including interim distributions, to be made by the Banyon Bankruptcy Estates on account of each claim asserted or assertable against each Banyon Bankruptcy Estate shall be reduced, on a dollar for dollar basis, by the amount of all Banyon Creditor Collateral Source Recoveries received on account of each such claim.  The amount of the reduction of the distributions, including interim distributions, on account of each such allowed claim's Banyon Creditor Collateral Source Recovery shall be calculated in accordance with Section 3.6(b)(5)(E) of the Plan and established in the following manner: on or before the date that is 45 days after the Effective Date (without prejudice to the Banyon Trustee's right to request an extension of this deadline for cause from the Bankruptcy Court), the Banyon Trustee shall, after consultation with the Liquidating Trustee and the Liquidating Trust Oversight Committee, file and serve upon all affected parties, a motion to make an interim distribution in each of the Banyon Bankruptcy Cases which (I) provides a schedule of the aggregate Banyon Creditor Collateral Source Recoveries received  by each holder of a claim asserted or assertable against each applicable Banyon Bankruptcy Estate, (II) explicitly identifies the amount by which all distributions, including interim distributions, by the Banyon Trustee on account of each such holder's claim will be reduced on account of all of such holder's Banyon Creditor Collateral Source Recoveries applicable to each such claim for all purposes, and (III) seeks authority to make an interim distribution to the creditors in each of the Banyon Bankruptcy Estates in accordance with Section 3.6(b)(8) of the Plan.  Such motion to make an interim distribution shall also provide that: (i) the Liquidating Trustee, the Liquidating Trust Oversight Committee and the holder of a claim against the Banyon Bankruptcy Estates whose distribution is sought to be reduced shall have 15 days from the filing of such motion to object to the relief sought in such motion; (ii) all objections to such motion must be filed with the Bankruptcy Court and served upon the Banyon Trustee, the Liquidating Trustee, and the Liquidating Trust Oversight Committee; (iii) if no timely objection to such motion is filed and served, the Banyon Trustee shall use the amount of the applicable Banyon Creditor Collateral Source Recovery indicated in such motion to calculate the reduction to the distributions, including interim distributions, to each such holder of each such claim asserted or assertable against each of the Banyon Bankruptcy Estates for all purposes; and (iv) if a timely objection to such motion is filed and served, such objection and the amount of the applicable Banyon Creditor Collateral Source Recovery

shall be resolved by the Bankruptcy Court in accordance with the provisions of Section 3.6(b) of the Plan after notice and opportunity for a hearing.

(D)    The holder of a claim asserted or assertable against the Banyon Bankruptcy Estates, once allowed, shall not receive a distribution on account of such a claim asserted or assertable against the Banyon Bankruptcy Estates until the amount of such holder's Banyon Creditor Collateral Source Recoveries are less than or equal to the amount such holder would have received in distributions on account of its claim asserted against the Banyon Bankruptcy Estates if such holder did not have any Banyon Creditor Collateral Source Recoveries.

(E)    Except to the extent that a settlement agreement approved by Final Order of the Bankruptcy Court in either Banyon Bankruptcy Case between the holder of an allowed claim against either of the Banyon Bankruptcy Estates and such Banyon Bankruptcy Estate provides for differing treatment of Banyon Creditor Collateral Source Recoveries, the amount of a Banyon Creditor Collateral Source Recovery shall be calculated for each applicable allowed claim against a Banyon Bankruptcy Estate as:

I.    The gross amount of Cash and non-Cash assets received by, available to, received for the benefit of or applied to the indebtedness of the holder of an allowed claim against the Banyon Bankruptcy Estates (whether made directly or indirectly to such holder or any agent, attorney or third party associated with such holder), on account of or in any way related to such holder's loss directly or indirectly relating to Banyon 1030-32, LLC, Banyon Income Fund, LP, or Rothstein from all parties and sources, including, without limitation, any payments made to the holder of such claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action.

II.    The amount calculated pursuant to Section 3.6(b)(5)(E)(I) of the Plan shall exclude, without duplication:

(i)    any distributions to be made to the holder of such claim by either of the Banyon Bankruptcy Estates;

(ii)    any tax benefit from a theft loss deduction taken in accordance with the IRC, or other tax benefits received by a holder of such claim, in either case as

53

a result of losses in connection with Banyon Bankruptcy Estates or the Ponzi scheme orchestrated or operated by Rothstein;

(iii)    any amounts paid by TD Bank that result in any claims or recoveries being assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013, unless TD Bank consents to these amounts being included in the calculation of a Banyon Creditor Collateral Source Recovery; and

(iv)    any anticipated, but not yet received, Banyon Creditor Collateral Source Recovery.

III.    The amount calculated pursuant to Section 3.6(b)(5)(E)(I) and (II) of the Plan shall include interest only if and to the extent such interest would be recoverable or allowable as an allowed claim against either Banyon Bankruptcy Estate or as part of the allowed claim of such holder against either Banyon Bankruptcy Estate.

IV.    No deduction or reduction from the amount of a Banyon Creditor Collateral Source Recovery on account of the fees, costs and other expenses incurred or paid in connection with its pursuit of any Banyon Creditor Collateral Source Recoveries, including, without limitation, attorney's fees and costs, is permissible.

(F)    In connection with the calculation of Banyon Creditor Collateral Source Recoveries, to the extent that the holder of a claim against the Banyon Bankruptcy Estates assigned or assigns any Banyon Creditor Collateral Source Recoveries to another holder of a claim against the Banyon Bankruptcy Estates, the assignor may notify the Banyon Trustee of such assignment. Subject to the Bankruptcy Court's approval, the Banyon Trustee may, in his discretion, seek to reduce the assignee's distribution, including an interim distribution, from the Banyon Bankruptcy Estates by the amount of the Banyon Creditor Collateral Source Recovery assigned to such assignee and not reduce the assignor's distribution, including an interim distribution, from the Banyon Bankruptcy Estates.

(G)    Without the need of a further order of the Bankruptcy Court and except to the extent that a settlement agreement approved in either Banyon Bankruptcy Case by Final Order of the Bankruptcy Court between either of the Banyon Bankruptcy Estates and the holder of an allowed claim against such Banyon Bankruptcy Estate

54

provides for differing treatment of Banyon Creditor Collateral Source Recoveries, the holder of an allowed claim against a Banyon Bankruptcy Estate shall be required to remit to the Banyon Trustee  an amount of Cash equal to the value of all Banyon Creditor Collateral Source Recoveries it receives that were not disclosed as having been received on such holder's Verified Banyon Creditor Collateral Source Recovery Disclosure or did not then exist, including, without limitation, any applicable payments made to the holder of such claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; provided however that in no event shall the holder of an allowed claim against either Banyon Bankruptcy Estate be required to remit Cash to the Banyon Trustee in an amount that is greater than the sum of such holder's distribution on account of such allowed claim from the applicable Banyon Bankruptcy Estate.  The holder of an allowed claim against either Banyon Bankruptcy Estate that has received or will receive a distribution from the Banyon Trustee shall fully cooperate with the Banyon Trustee and execute any documents reasonably required by the Banyon Trustee to evidence the obligation.

6.      All objections to claims in the Banyon Bankruptcy Estates shall be filed within 60 days after the Effective Date.

7.      The Banyon Trustee shall provide the Liquidating Trustee and the Liquidating Trust Oversight Committee periodic reports on (I) the status of the objections to and reconciliation of the claims asserted in the Banyon Bankruptcy Cases, (II) the status of the objections, if any, asserted to the Banyon Creditor Collateral Source Recoveries in the motion required to be filed in accordance with Section 3.6(b)(5)(C) of the Plan, and (III) the estimated administrative expenses that are projected to arise in the subsequent quarter and be allowed in the Banyon Bankruptcy Cases, each quarter commencing on the last Business Day of the month in which the 90th day after the Effective Date occurs and concluding on the date in which the Banyon Bankruptcy Cases are closed.

8.      The Banyon Trustee shall, in the motion to make an interim distribution required by Section 3.6(b)(5)(C) of the Plan, seek the authority to make an interim distribution of not less than 60% of the allowed amount of each creditor's Claim against a Banyon Estate from such Banyon Estate, and shall use his best efforts to distribute an additional 10% of the allowed amount of each creditor's Claim against a Banyon Estate from such Banyon Estate, within five (5) Business Days after the approval of such motion, subject to Bankruptcy Court approval; provided, however, that any

55

such interim distributions by the Banyon Trustee shall be limited in amounts that, in the Banyon Trustee's reasonable judgment, are designed to avoid the payment of excess distributions to a creditor of the Banyon Bankruptcy Estates; provided, further, however, that the Banyon Trustee may seek authority from the Bankruptcy Court, after notice and a hearing, to reduce the percentage of the interim distribution required by Section 3.6(b)(8) of the Plan for good cause shown.  The Banyon Trustee may rely on the amount of Banyon Creditor Collateral Source Recoveries disclosed on a Verified Banyon Creditor Collateral Source Recovery Disclosure as a Banyon Creditor Collateral Source Recovery that would reduce a creditor's distribution for the purpose of making any reserve or distribution, including any interim distribution.

9.    If the Banyon Bankruptcy Estates are not substantively consolidated, the Banyon Trustee shall allocate any Distribution received on account of the Banyon Unsecured Claim in a manner that shall result in the holders of allowed non-subordinated general unsecured claims against each of the Banyon Bankruptcy Estates receiving the same Pro Rata Distribution on account of their allowed claims after the application of the Banyon Creditor Collateral Source Recoveries.

10.    The Banyon Trustee shall file a notice that sets forth each distribution, including any interim distributions, made to a creditor of either of the Banyon Bankruptcy Estates (indicating the identity of such creditor, the applicable Banyon Bankruptcy Estate against which the creditor has asserted a claim, the applicable claim number and the amount of the distributions made to such creditor) within 30 days after the making of any such distribution to unsecured creditors in either of the Banyon Bankruptcy Cases.

Class 5 is Impaired under the Plan and the Banyon Trustee is entitled to vote the Banyon Unsecured Claim on the Plan.

f.    **Class 6 — Funds' Subordinated Unsecured Claim**

Class 6 consists of the Funds' Subordinated Unsecured Claim.

Subject to the payments provided for in Sections 2.1 through 2.7, and Sections 3.2 through 3.6 of the Plan, the Allowed Class 6 Claim is subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, and Class 5 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable.  If all Allowed Class 2, Class 3, Class 4 and Class 5 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable, the Allowed Class 6 Claim shall receive Pro Rata Distributions from the Liquidating Trust pursuant to the Liquidating Trust

56

Agreement if available until such Claims have been paid the Full Amount of such Allowed Claims in Cash in accordance with the terms of the Funds' Settlement Agreement.

Notice regarding the receipt of Collateral Source Recoveries received by the holders of the Funds' Subordinated Claim shall be provided in accordance with the terms of the Funds' Settlement Agreement.  To the extent not otherwise provided in Section 3.7 of the Plan, the Liquidating Trustee shall succeed to the rights of the Trustee under the provisions of the Funds' Settlement Agreement.

Collateral Source Recoveries received by the holders of the Funds' Subordinated Claim shall be calculated and treated exclusively in accordance with the Funds' Settlement Agreement and the Funds or their assignee(s) (if any) shall receive Distributions on account of such Claim as, and to the extent, provided in the Funds' Settlement Agreement and the Plan, to the extent not inconsistent with the Funds' Settlement Agreement.

Any holder of a Class 6 Claim that receives Distributions in excess of the amount such holder of a Class 6 Claim was entitled to receive in Distributions shall repay such amount that it received that was in excess of the Distributions such holder was entitled to receive to the Liquidating Trust within thirty (30) days after such holder has been directed by a Final Order of the Bankruptcy Court in the Chapter 11 Case to repay such excess Distributions to the Liquidating Trust.

Holders of the Class 6 Claim, if Disallowed subsequent to a Distribution being made to such holders, shall repay any such Distribution to the Liquidating Trust within thirty (30) days after the Class 6 Claim becomes Disallowed.

Except to the extent provided in Section 3.7(b) of the Plan, the amount of a Collateral Source Recovery shall be calculated for each applicable Allowed Claim in Class 6 as shown in the following chart:

| |
|---|
| Collateral Source Recoveries equal: |
| |
| **A.**     the sum of, without duplication: |
| |
|     1.     the gross amount of Cash and non-Cash assets received by, available to, received for the benefit of or applied to the indebtedness of the holder of an Allowed Claim (whether made directly or indirectly to such holder or any agent, attorney or third party associated with such holder), on account of or in any way related to such holder's loss directly or indirectly relating to the Debtor or Rothstein from all parties and sources, including, without limitation, any payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; and |
| |
|     2.     any amounts that would be required to be paid by or on behalf of the holder of an Allowed Claim to TD Bank related to the Debtor or Rothstein pursuant to any agreement between or on behalf of such holder and TD Bank including on account of the Distributions such holder would receive under the Plan. |

**B.**    The amount calculated pursuant to **"A"** shall exclude, without duplication:

    1.    any Distributions to be made to the holder of such Claim under the Plan;

    2.    any tax benefit from a theft loss deduction taken in accordance with the IRC, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein;

    3.    any amounts paid by TD Bank that result in any claims or recoveries being assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013, unless TD Bank consents to these amounts being included in the calculation of a Collateral Source Recovery;

    4.    any anticipated, but not yet received, Collateral Source Recoveries.

**C.**    The amount calculated pursuant to "**A**" and "**B**" shall include interest only if and to the extent such interest would be recoverable or allowable as an Allowed Claim or as part of the Allowed Claim of such holder.

**D.**    No deduction or reduction from the amount of a Collateral Source Recovery on account of the fees, costs and other expenses incurred or paid in connection with its pursuit of any Collateral Source Recoveries, including, without limitation, attorney's fees and costs, is permissible.

Class 6 is Impaired and the holders of such Claim is entitled to vote on the Plan.

g.    **Class 7 — Miscellaneous Subordinated Claims**

Class 7 consists of the Miscellaneous Subordinated Claims.

Subject to the payments provided for in Sections 2.1 through 2.7, and Sections 3.2 through 3.7 of the Plan, Allowed Class 7 Claims are subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, Class 5, and Class 6 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable. If all Allowed Class 2, Class 3, Class 4, Class 5, and Class 6 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable, the Allowed Class 7 Claims shall receive Pro Rata Distributions from the Liquidating Trust pursuant to the Liquidating Trust Agreement if available until such Claims have been paid the Full Amount of such Allowed Claims in Cash.

Except to the extent provided in Section 3.8(b) of the Plan, the amount of a Collateral Source Recovery shall be calculated for each applicable Allowed Claim in Class 7 as shown in the following chart:

Collateral Source Recoveries equal:

**A.** the sum of, without duplication:

1. the gross amount of Cash and non-Cash assets received by, available to, received for the benefit of or applied to the indebtedness of the holder of an Allowed Claim (whether made directly or indirectly to such holder or any agent, attorney or third party associated with such holder), on account of or in any way related to such holder's loss directly or indirectly relating to the Debtor or Rothstein from all parties and sources, including, without limitation, any payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; and

2. any amounts that would be required to be paid by or on behalf of the holder of an Allowed Claim to TD Bank related to the Debtor or Rothstein pursuant to any agreement between or on behalf of such holder and TD Bank including on account of the Distributions such holder would receive under the Plan.

**B.** The amount calculated pursuant to **"A"** shall exclude, without duplication:

1. any Distributions to be made to the holder of such Claim under the Plan;

2. any tax benefit from a theft loss deduction taken in accordance with the IRC, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein;

3. any amounts paid by TD Bank that result in any claims or recoveries being assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013, unless TD Bank consents to these amounts being included in the calculation of a Collateral Source Recovery; and

4. any anticipated, but not yet received, Collateral Source Recoveries.

**C.** The amount calculated pursuant to **"A"** and **"B"** shall include interest only if and to the extent such interest would be recoverable or allowable as an Allowed Claim or as part of the Allowed Claim of such holder.

**D.** No deduction or reduction from the amount of a Collateral Source Recovery on account of the fees, costs and other expenses incurred or paid in connection with its pursuit of any Collateral Source Recoveries, including, without limitation, attorney's fees and costs, is permissible.

**As a condition precedent to the receipt of a Distribution under the Plan or the Liquidating Trust, the holders of Class 7 Claims shall deliver to the Voting Agent completed and duly executed Verified Collateral Source Recovery Disclosures, in the form attached to the Plan as Appendix 1.138, by the Voting Deadline.**

If a holder of a Class 7 Claim (i) fails or refuses to timely deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure on or before the Voting Deadline, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Collateral Source Recovery Disclosure, then (a) the holders of the Class 7 Claim shall be deemed to irrevocably waive their rights to receive, and shall be forever barred from receiving, a Distribution from the Liquidating Trust, (b) the Class 7 Claim shall be deemed Disallowed without further order of the Bankruptcy Court, and (c) the Ballot for the Class 7 Claim shall not be counted for purposes of determining whether Class 7 has accepted or rejected the Plan. All Entities submitting a Verified Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has changed, including, but not limited to, when such Entity actually receives a previously anticipated Verified Collateral Source Recovery. Such obligation to correct and/or update shall terminate on the Final Distribution Date.

The amount of the Distributions to be made on account of each Allowed Class 7 Claim shall be reduced, on a dollar for dollar basis, by the amount of all Collateral Source Recoveries received from any source. The amount of the reduction of the Distributions on account of each Allowed Class 7 Claim's Collateral Source Recovery shall be established in the following manner: on or before the date that is 60 days after the Effective Date (without prejudice to the Liquidating Trustee's right to request an extension of this deadline for cause from the Bankruptcy Court), the Liquidating Trustee shall, after consultation with the Liquidating Trust Oversight Committee, File and serve a notice on all affected parties which (A) provides a schedule of the aggregate Collateral Source Recoveries received from all sources by each holder of a Claim in Class 7, and (B) explicitly identifies the amount by which Distributions on account of each such holder's Class 7 Claim will be reduced on account of all of such holder's Collateral Source Recoveries, and such notice shall also provide that: (a) the Liquidating Trust Oversight Committee and the holder of a Class 7 Claim whose Distribution is sought to be reduced shall have 30 days from the Filing of such notice to object to the relief sought in such notice; (b) all objections to such notice shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee and the Liquidating Trust Oversight Committee; (c) if no timely objection to such notice is Filed and served, the Liquidating Trustee shall use the amount of the applicable Collateral Source Recovery indicated on such notice to calculate the reductions to Distributions to each such holder of a Class 7 Claim; and (d) if a timely objection to such notice is Filed and served, such objection and the amount of the applicable Collateral Source Recovery shall be resolved by the Bankruptcy Court in accordance with the provisions of Section 3.8(b) of the Plan after notice and opportunity for a hearing.

Nothing in the foregoing is intended to modify or supersede, and nothing in Section 3.8 of the Plan shall modify or supersede, any settlement agreements that have been approved in the Chapter 11 Case by Final Order of the Bankruptcy Court on or before May 8, 2013, including, without limitation, the Gibraltar Settlement Agreement, the Levy Settlement Agreement, and the Razorback Settlement Agreement. Nothing contained in Section 3.8 of the Plan shall preclude the Liquidating Trustee from reducing Distributions pursuant to Collateral Source Recoveries as stated in Section 3.8(b) of the Plan, to the extent not inconsistent with any relevant provisions of such settlement agreements. For the avoidance of any doubt, Collateral Source Recoveries received by the holders of the Miscellaneous Subordinated Claims shall be calculated and

60

applied in accordance with the applicable terms of any settlement agreement with the Estate that has been approved in the Chapter 11 Case by Final Order on or before May 8, 2013 and is applicable to such Miscellaneous Subordinated Claim, including, without limitation, the Gibraltar Settlement Agreement, the Levy Settlement Agreement, and the Razorback Settlement Agreement, and such holders shall receive Distributions on account of such Miscellaneous Subordinated Claims as, and to the extent, provided in such settlement agreements and the Plan, to the extent not inconsistent with such settlement agreements.

The holder of an Allowed Class 7 Claim shall not receive a Distribution on account of such Class 7 Claim until the amount of such holder's Collateral Source Recoveries is less than the amount such holder would have received in Distributions on account of its Class 7 Claim if such holder did not have any Collateral Source Recoveries.

On or by the Effective Date, the Trustee or the Liquidating Trustee, as applicable, shall provide the Liquidating Trust Oversight Committee with copies of all Verified Collateral Source Recovery Disclosures that are timely received by the Voting Agent.

Any Holder of a Class 7 Claim that receives Distributions in excess of the amount such holder of a Class 7 Claim was entitled to receive in Distributions shall repay such amount that it received that was in excess of the Distributions such holder was entitled to receive to the Liquidating Trust within thirty (30) days after such holder has been directed by a Final Order of the Bankruptcy Court in the Chapter 11 Case to repay such excess Distributions to the Liquidating Trust.

Holders of Class 7 Claims, if Disallowed subsequent to a Distribution being made to such holders, shall repay any such Distribution to the Liquidating Trust within thirty (30) days after a Class 7 Claim becomes Disallowed

Class 7 is Impaired and the holders of such Claims are entitled to vote on the Plan.

h.    **Class 8 — TD Bank Junior Subordinated Claim**

Class 8 consists of the TD Bank Junior Subordinated Claim.

Subject to the payments provided for in Sections 2.1 through 2.7, and Sections 3.2 through 3.8 of the Plan, the Allowed Class 8 Claim is subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, Class 5, Class 6, and Class 7 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable.  If the holders of all Allowed Class 2, Class 3, Class 4, Class 5, Class 6, and Class 7 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable, the Allowed Class 8 Claim shall receive Distributions from the Liquidating Trust if available pursuant to the Liquidating Trust Agreement until such Claim has been paid the Full Amount of such Allowed Claim in Cash.

Class 8 is Impaired under the Plan, but the holder of the Allowed Class 8 Claim has agreed to have such Claim deemed to have voted to accept the Plan; provided, however that the

61

Plan Proponents shall not rely on Class 8 as an impaired accepting class for purposes of determining whether the Plan complies with section 1129(a)(10) of the Bankruptcy Code.

> i.      **Class 9 — Allowed Interests in the Debtor**

Class 9 consists of all Interests in the Debtor.

All Interests shall be cancelled on the Effective Date.  Class 9 Interests shall not receive or retain any property under the Plan

Class 9 is Impaired and will deem to have rejected the Plan.

## C.      Separate Classes and Treatment

A Claim is part of a particular Class only to the extent that the Claim qualifies within the definition of that Class and such Claim is part of a different Class to the extent that the remainder of the Claim qualifies within the description of a different Class.

## D.      Means of Implementing the Plan

> *i.*      *Settlement Agreement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan implements the Settlement Agreement which is a compromise and settlement of all issues between and among the Estate, the Banyon Bankruptcy Estates and TD Bank.  The Settlement Agreement is incorporated into the Plan in its entirety.  The Confirmation Order shall approve the Settlement Agreement in its entirety.  To the extent not otherwise provided for in the Plan, the Settlement Agreement will further be implemented under the Plan as follows:

Within three Business Days after the Confirmation Date and subject to the proviso contained in Section 9.2.12 of the Plan, TD Bank shall deliver the TD Bank Contribution to an account designated by the Trustee.

The consideration being provided to the Estate and the Banyon Bankruptcy Estates pursuant to, in accordance with, and as described in, the Plan and the Settlement Agreement by TD Bank (including, without limitation, the TD Bank Contribution, the settlement and subordination of the Claims or the portions thereof in which TD Bank has an interest that comprise in part, the TD Bank Junior Subordinated Claim pursuant to the Plan, the settlement and subordination of TD Bank's claims or interest in claims in the Banyon Case pursuant to the terms of the Settlement Agreement, the release of TD Bank's claims against the Estate pursuant to Section 10.9 of the Plan, and the release of TD Bank's claims against Banyon Bankruptcy Estates pursuant to Section 3.4 of the Settlement Agreement) is being provided by TD Bank for the consideration that the Estate and the Banyon Bankruptcy Estates are providing to TD Bank under the Settlement Agreement and the Plan (including, without limitation, the settlement of all of the Estate's claims against TD Bank (including, without limitation, the Estate's avoidance claims against TD Bank), the settlement of all of the Banyon Bankruptcy Estates' claims against TD Bank, the TD Bank Releasee injunction and bar order provided in Section 10.8 of the Plan, the bar order provided for in Section 3.3 of the Settlement Agreement, the release being granted

4969645-2

to the TD Bank Releasees provided in Section 10.6 of the Plan, the release being granted to the TD Bank Releasees provided in Section 3.1 of the Settlement Agreement, and the assignment of the Estate's and the Banyon Bankruptcy Estates' claims against the Levins).

The TD Bank Junior Subordinated Claim is Allowed and shall be classified and treated in Class 8 of the Plan.  The TD Bank Junior Subordinated Claim shall not be subject to objection, reconsideration, reduction, recharacterization, further subordination, impairment, disallowance or reduction in Distribution on account of a Collateral Source Recovery or otherwise; provided, however, that TD Bank shall not be permitted to use the TD Bank Junior Subordinated Claim in any manner adverse to the Liquidating Trust; provided further, however, that nothing in Section 6.1.3 of the Plan shall in any way impact any right that TD Bank may have to receive a Distribution on the TD Bank Junior Subordinated Claim.

The Liquidating Trustee and the Liquidating Trust Oversight Committee shall not, and shall not cause the Liquidating Trust to, permit the payment or Distribution of any Assets, Trust Assets, or the proceeds thereof on account of any Interest in the Debtor.

The Trustee, the Committee and the Liquidating Trustee, as applicable, shall (i) prosecute the Confirmation Order and the 9019 Order to Final Order and (ii) oppose and fully prosecute any appeal of the Confirmation Order or the 9019 Order that seeks relief that is adverse to any of the Parties or the Liquidating Trust.  Each of the Trustee, the Committee and the Liquidating Trustee, as applicable, shall use its best efforts to have any such appeal (i) dismissed, (ii) resolved in manner that is in form and in substance acceptable to the Parties, or (iii) fully prosecuted so that the relief requested in such appeal is denied.  Notwithstanding anything herein to the contrary, the Trustee, the Committee and the Liquidating Trustee, as applicable, shall not oppose an appeal of the Confirmation Order or the 9019 Order filed by the Trustee, the Banyon Trustee or TD Bank, so long as the relief sought by such appeal is in accordance with the terms of the Plan and the Settlement Agreement.

The TD Bank Junior Subordinated Claim shall only be junior in right of payment of Administrative Expense Claims, Priority Claims and Claims classified in Classes 1 through 7 of the Plan.

TD Bank shall have standing to prosecute and defend any appeal of the Confirmation Order or the 9019 Order.

Subject to the terms of the Settlement Agreement and Section 3.6(b)(6) of the Plan, the Trustee and the Liquidating Trustee, as applicable, and the Banyon Trustee shall have exclusive standing to object to any and all claims in the Banyon Bankruptcy Estates.

Other than those claims expressly set forth in the Settlement Agreement, the Trustee, on behalf of the Debtor and the Estate, waives all claims of the Debtor and the Estate against the Banyon Bankruptcy Estates.

The Trustee, the Liquidating Trustee and the Liquidating Trust Oversight Committee shall not and shall not permit the Debtor, the Estate, or the Liquidating Trust to support, and shall

cause the Debtor, the Estate, and the Liquidating Trust, as applicable, to object to (i) any claims under sections 503(b)(3)(A) through (E) and 503(b)(4) of the Bankruptcy Code, except the Razorback Substantial Contribution Claim, and (ii) any other non-ordinary course Administrative Expense Claims asserted against the Debtor, the Estate or the Liquidating Trust, as applicable, including any claim for a fee enhancement, unless TD Bank consents in writing to such Claims; provided that the Trustee, the Liquidating Trustee, and the Liquidating Trust Oversight Committee may support and shall not be required to object to the fees and expenses sought by the Trustee, the Liquidating Trustee, the Liquidating Trust Oversight Committee or their Professionals.  Nothing contained in Section 6.1.10 of the Plan shall in any way prohibit the Committee from objecting to the Razorback Substantial Contribution Claim.

Within three (3) Business Days after the Effective Date, the Liquidating Trustee shall, on behalf of the Trustee, Debtor and Estate, dismiss with prejudice the adversary proceeding brought by the Trustee against TD Bank that is pending in the Bankruptcy Court as adversary proceeding number 11-02368-RBR.

Within three (3) Business Days after the Effective Date, the Liquidating Trustee shall dismiss with prejudice the adversary proceeding brought by the Trustee against Emess Capital, L.L.C. that is pending in the Bankruptcy Court as adversary proceeding number 11-02768-RBR.

Any Claim which is assigned, participated or transferred or has had its recovery assigned, participated or transferred, in whole or in part, to TD Bank on or after the date the Plan is Filed shall not be subject to objection, reconsideration, reduction, recharacterization, subordination, impairment, disallowance, offset or reduction in Distribution on account of a Collateral Source Recovery, or otherwise, due to the payments made by TD Bank or because TD Bank has been assigned, participated or transferred, in whole or in part, such Claim or recovery; provided, however, that such Claim shall be subject to objection, reconsideration, reduction, recharacterization, subordination, impairment or disallowance for any other reason, subject to the other provisions of the Plan.

Upon the occurrence of the Effective Date, without execution of any further documentation, the Trustee or the Liquidating Trustee, as applicable, on behalf of the Estate shall assign, transfer, and convey the Levin Claims, and/or any proceeds thereof, to TD Bank free and clear of all liens, claims and encumbrances.

Upon the occurrence of the Effective Date, with execution of any further documentation, the Levin Claims shall unconditionally and irrevocably vest with TD Bank and TD Bank shall have the exclusive right and standing to enforce any and all of the Levin Claims, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, and shall be entitled to all remedies available to the Trustee in the Chapter 11 Case, for the sole benefit of TD Bank.

The Trustee or the Liquidating Trustee, as applicable, agrees that upon the request of TD Bank, the Trustee or the Liquidating Trustee, as applicable, shall provide or make available any and all data, records and documents regarding the Levin Claims in their actual possession, to TD Bank, subject to entry into mutually acceptable written agreements in order to preserve any

applicable attorney client privileges and protections afforded by the work product protection doctrine.

The Confirmation Order shall authorize and direct the Plan Proponents and the Banyon Trustee to take all actions, and execute and deliver all documents, necessary or desirable to implement the provisions of the Settlement Agreement and the Plan, including, without limitation, the Liquidating Trust Agreement.

### *ii.*    *Establishment of Liquidating Trust.*

Establishment of the Liquidating Trust.  On the Effective Date, the Trustee, on behalf of the Debtor and the Beneficiaries, shall execute the Liquidating Trust Agreement attached to the Plan and incorporated into the Plan as Appendix 1.82, and take all steps necessary to establish the Liquidating Trust.  In the Confirmation Order, the Bankruptcy Court shall approve the selection of the Liquidating Trustee whose appointment shall be effective on the Effective Date.

Purpose of Liquidating Trust.  The Liquidating Trust shall be established for the sole purpose of liquidating the Debtor's Assets, including prosecuting Litigation Claims and distributing the proceeds thereof solely to the Beneficiaries, as identified in and prescribed by the Plan and the Liquidating Trust Agreement.  The Liquidating Trust shall not engage in any trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Unless otherwise required by law, it is intended that all parties treat the Liquidating Trust as a liquidating trust for all federal income tax purposes.  The Liquidating Trust is intended: (i) as a trust governed and construed in all respects as a liquidating trust pursuant to Treasury Regulation § 301.7701-4(d); (ii) as a grantor trust in favor of the Beneficiaries pursuant to Treasury Regulation § 1.671-4(a); and (iii) to comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.  The Beneficiaries of the Liquidating Trust shall be treated as the grantors and deemed owners of the Liquidating Trust.

Contribution of Assets to the Liquidating Trust.  On the Effective Date and subject to the proviso contained in Section 9.2.11 of the Plan, the Trustee on behalf of the Estate shall, pursuant to the terms of the Liquidating Trust Agreement, transfer, disburse and turn over all of the Debtor's Assets, including, but not limited to, the Estate's rights under the Settlement Agreement and the Estate's rights to the Liquidating Trust; provided that the Levin Claims shall not be transferred or otherwise contributed to the Liquidating Trust and shall not be considered or become Trust Assets for any purpose.  Title to all Assets contributed to the Liquidating Trust shall vest in the Liquidating Trust on the Effective Date following the transfer.  For the avoidance of any doubt, following the contribution of Assets to the Liquidating Trust pursuant to Section 6.2.3 of the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall, subject to the terms of the Plan and the Liquidating Trust Agreement, have the exclusive standing to pursue, settle, or otherwise dispose of the Litigation Claims on behalf of the Liquidating Trust for the benefit of the Beneficiaries and shall be entitled to all remedies available to the Trustee in the Chapter 11 Case.  The Liquidating Trustee shall be substituted for the Trustee in all pending litigation without further order of the Bankruptcy Court or any other court where litigation is pending.

Certain Federal Tax Matters.  The transfer of the Assets to the Liquidating Trust will be treated for federal income tax purposes as a deemed transfer by the Debtor to the Beneficiaries followed by a deemed transfer by the Beneficiaries to the Liquidating Trust, in accordance with Revenue Procedure 94-45, 1994-2 C.B. 684.  The taxation of the deemed transfers from the Debtor to the Beneficiaries and from the Beneficiaries to the Liquidating Trust will be guided by provisions of IRC §§61(a)(12), 483, 1001, 1012 and 1274.  The taxable income or loss of the Liquidating Trust, including the taxable income attributable to the Disputed Claims Reserves, if any, will be allocated to the Beneficiaries on an annual basis pro rata in accordance with their respective entitlement to receive distributions from the Liquidating Trust if the Liquidating Trust terminated and distributed all its assets on the last day of the taxable year (taking into account all prior and concurrent distributions from the Liquidating Trust during such taxable year).  The Liquidating Trustee shall not be required to report such tax information to any Beneficiary unless such Beneficiary provides to the Liquidating Trustee a complete form W-9 or acceptable substitute signed under penalty of perjury.  In determining each Beneficiary's share of income, gain, loss, deductions and credits, the Liquidating Trustee shall not allocate such items to any Beneficiary who is the holder of a Claim which has no value until such time, if at all, as a value of the Claim arises.  For this purpose, a Claim shall have no value for any taxable year in which the Beneficiary who is the holder of the Claim would receive no distribution from the Liquidating Trust if the Liquidating Trust terminated and distributed all its assets on the last day of the taxable year.  The Beneficiaries shall be responsible to report and pay the taxes due on their proportionate share of the Liquidating Trust taxable income, whether or not amounts are actually distributed by the Liquidating Trustee to the Beneficiaries to pay the taxes.  The value of the Trust Assets transferred into the Liquidating Trust shall be the fair market value of such Assets at the time of such transfer, as reasonably determined by the Liquidating Trustee, in consultation with the Trustee and such advisors as the Liquidating Trustee deems appropriate, within a reasonable period of time after the Effective Date.  Such valuation shall be binding on all parties including, but not limited to, the Debtor, the Debtor's Estate, the Trustee, the Liquidating Trustee, and all Beneficiaries, and these valuations will be used by such parties for all federal income tax purposes.  Notwithstanding anything in the Plan to the contrary, in the event that (i) any portion of the Liquidating Trust is treated as a "qualified settlement fund" pursuant to Treasury Regulation § 1.468B-1, or (ii) the Liquidating Trustee timely elects to treat any portion of the Liquidating Trust subject to Disputed Claims as a "disputed ownership fund" pursuant to Treasury Regulation § 1.468B-9(c)(2)(ii), any federal income tax consequences shall be determined under IRC Section 468B and the Treasury Regulations thereunder.

Liquidating Trust Bond.  As a condition to serving as Liquidating Trustee, the Liquidating Trustee, and any successor trustee, shall post a bond in favor of the Liquidating Trust in an amount that is not less than the amount of Cash held by the Liquidating Trust on the Effective Date, which bond shall be in substantially the same form as is required by the United States Trustee for trustees in the Southern District of Florida.  For the avoidance of any doubt, the Liquidating Trust shall be responsible for all costs associated with the posting of the foregoing bond, including the premium associated with such bond.

Liquidating Trust Management.  Subject at all times to the consent and review rights of the Liquidating Trust Oversight Committee set forth in the Plan and/or the Liquidating Trust Agreement, the Liquidating Trustee shall (A) oversee and direct the Liquidating Trust's operations and activities, in accordance with the Liquidating Trust Agreement, including, but not

limited to, the retention of Post-Confirmation Professionals, objecting to Claims, reconciling Claims, resolving Claims, otherwise disposing of Claims, prosecution of Litigation Claims, and the settling of Litigation Claims, and (B) have the authority as set forth in Section 5.12 of the Liquidating Trust Agreement to initiate, prosecute, settle, resolve, dismiss, object to, reconcile or otherwise dispose of any Claim or Litigation Claim, all without the need of Bankruptcy Court approval absent the explicit requirement of such approval set forth in the Plan or the Liquidating Trust Agreement; provided, however, that for the avoidance of any doubt, (i) the Liquidating Trustee shall be bound by all prior settlement agreements that have been approved in the Chapter 11 Case by Final Order of the Bankruptcy Court as of May 8, 2013, subject to the Collateral Source Recovery provisions set forth in Sections 1.19, 1.36, 1.137 and 1.138, as well as Article 3, of the Plan, except to the extent such Collateral Source Recovery provisions are inconsistent with such prior settlement agreements, and (ii) TD Bank shall not have any right (a) to contest any prior settlements agreements that have been approved in the Chapter 11 Case by a Final Order of the Bankruptcy Court as of the Effective Date, or (b) to object to any Claims

Liquidating Trust Oversight Committee.  The Committee shall designate the members of the Liquidating Trust Oversight Committee.  The members of the Liquidating Trust Oversight Committee shall be identified no later than ten (10) Business Days subsequent to entry of the Disclosure Statement Approval Order.  The appointment of the Liquidating Trust Oversight Committee shall be ratified by the Confirmation Order and effective as of the Effective Date. The Liquidating Trust Oversight Committee shall review the actions of the Liquidating Trustee as provided in the Plan and as set forth in the Liquidating Trust Agreement. The Liquidating Trust Oversight Committee and its members shall have a fiduciary duty to the Beneficiaries in accordance with the Plan. The Liquidating Trust Oversight Committee may employ, pursuant to the terms of the Liquidating Trust Agreement, Post-Confirmation Professionals whose services may be reasonably necessary or advisable, to advise or assist the Liquidating Trust Oversight Committee in the discharge of its duties. Members of the Liquidating Trust Oversight Committee shall serve without compensation but shall be reimbursed for their reasonable and necessary out-of-pocket expenses incurred in performing their duties pursuant to Section 8.3(b) of the Liquidating Trust Agreement. Post-Confirmation Professionals may be retained by the Liquidating Trust Oversight Committee in the ordinary course of business and without prior approval of the Bankruptcy Court pursuant to Section 8.3(b) of the Liquidating Trust Agreement. The actual fees and expenses of such Post-Confirmation Professionals of the Liquidating Trust Oversight Committee shall be reimbursed and shall be solely paid from Trust Assets without further order of the Bankruptcy Court pursuant to the terms of the Liquidating Trust Agreement.

Litigation Approval Rights of Liquidating Trust Oversight Committee. The Liquidating Trustee shall, prior to taking any action with respect to the initiation, prosecution, settlement, resolution, dismissal, objection to, reconciliation of or other disposition of a Claim or Litigation Claim, or with respect to any action concerning the Forfeiture Action, provide the Liquidating Trust Oversight Committee with written notice of such actions that meet the criteria set forth in subparts (a), (b), and (c) to Section 5.12 of the Liquidating Trust Agreement. If any such proposed action meets the thresholds stated in subparts (b) and (c) to Section 5.12 of the Liquidating Trust Agreement, the Liquidating Trust Oversight Committee shall have ten (10) Business Days to object in writing to any such proposed action.  The Liquidating Trust Oversight Committee and the Liquidating Trustee shall confer in good faith to resolve the objection to such proposed action.  Should any dispute between the Liquidating Trustee and the Liquidating Trust

Oversight Committee remain unresolved after such conference, such dispute shall be resolved by the Bankruptcy Court.

Costs and Expenses of the Liquidating Trust. All costs and expenses incurred by the Liquidating Trust shall be the obligation of the Liquidating Trust and, subject at all times to the consent and review rights of the Liquidating Trust Oversight Committee, be payable from the Trust Assets of the Liquidating Trust in accordance with the Liquidating Trust Agreement, the Settlement Agreement and the Plan. Compensation of the Liquidating Trustee shall be paid from the Trust Assets pursuant to the terms of the Liquidating Trust Agreement and Section 2.4.2 of the Plan.

Retention and Compensation of Professionals by the Liquidating Trustee. The Liquidating Trustee may employ, without further order of the Bankruptcy Court, Post-Confirmation Professionals or other persons whose services may be reasonably necessary or advisable, subject to approval of the Liquidating Trust Oversight Committee, to advise or assist the Liquidating Trustee in the discharge of his or her duties as Liquidating Trustee, or otherwise in the exercise of any powers vested in the Liquidating Trustee, and to pay reasonable compensation solely from the Trust Assets, to such attorneys, accountants, appraisers, expert witnesses, insurance adjusters or other persons. However, the Liquidating Trustee may not retain as a Post-Confirmation Professional any member of the Liquidating Trust Oversight Committee or any firm which employs such member. On the Effective Date, in the discretion of the Liquidating Trustee and the Liquidating Trust Oversight Committee, the Voting Agent may continue in its role as noticing and claims agent with its fees and expenses being paid by the Liquidating Trustee on the same terms and conditions that were in effect on the Effective Date. Subject to the provisions of the Plan, prior representation of the Trustee or the Committee during the Chapter 11 Case shall not disqualify any professional from representing the Liquidating Trustee or the Liquidating Trust Oversight Committee. No professional that represented TD Bank during the Chapter 11 Case on matters related to the Chapter 11 Case shall be authorized to represent either the Liquidating Trustee or the Liquidating Trust Oversight Committee. Notwithstanding anything herein to the contrary, without providing notice to or obtaining the approval of any party other than the Liquidating Trust Oversight Committee, the Liquidating Trustee shall be authorized pursuant to the Liquidating Trust Agreement to pay the fees and expenses incurred after the Effective Date by the Liquidating Trustee and his or her Post-Confirmation Professionals without further order of the Bankruptcy Court.

The respective duties and obligations of the Liquidating Trustee and the Liquidating Trust Oversight Committee, were negotiated as a part of the TD Bank Settlement. Although the Plan Proponents believe that no determination has been made regarding legal representation of the Liquidating Trustee or the Liquidating Trust Oversight Committee, the Plan Proponents are unaware of any prohibition against the lawyers who represented the Trustee or the Committee during the Chapter 11 Case from being considered for representing the Liquidating Trustee and the Liquidating Trust Oversight Committee, other than in Sections 6.2.7 ("Liquidating Trust Oversight Committee") and 6.2.11 ("Retention and Compensation of Professionals by the Liquidating Trust") of the Plan.

The Trustee has inquired of his professionals and has been advised that none of them has any agreement with TD Bank or any other party regarding the continuing role of any of them in the RRA case post-confirmation.

The Trustee further discloses that notwithstanding criticism directed towards him and his professionals regarding the terms of the administration of the Liquidating Trust contemplated by the Plan, the Trustee explicitly and purposely refused to condition the settlement on his continued participation in the administration of the Trust or the involvement of his professionals. The Trustee did so to avoid allegations of self-dealing on his part or on the part of his professionals.

<u>Resignation and Removal of the Liquidating Trustee</u>.  The Liquidating Trustee may resign and be discharged from any future obligations and liabilities under the Liquidating Trust Agreement and the Plan by giving written notice thereof to the Liquidating Trust Oversight Committee.  Any resignation hereunder shall become effective on the date specified in the written notice, which shall be no less than thirty (30) days after such written notice is given.  The Liquidating Trustee may be removed at any time only by order of the Bankruptcy Court for cause.  Upon any such resignation, such Liquidating Trustee shall be entitled to any compensation, reimbursement and indemnification set forth in the Liquidating Trust Agreement or the Plan which remains due and owing to such Liquidating Trustee at the time of such resignation.  In the event the Liquidating Trustee is removed, the Liquidating Trustee shall not be entitled to any compensation or reimbursement that is due and owing to such Liquidating Trustee at the time of such removal.  If, at any time, the Liquidating Trustee shall give notice of his or her intent to resign pursuant to the Liquidating Trust Agreement, or shall become incapable of acting, counsel to the Liquidating Trustee shall provide notice thereof to the Bankruptcy Court. Upon the resignation or removal of the Liquidating Trustee, the Liquidating Trust Oversight Committee shall select a replacement Liquidating Trustee.  If the Liquidating Trustee resigns, the Liquidating Trust Oversight Committee shall name the replacement Liquidating Trustee prior to the date of the Liquidating Trustee's resignation specified in the written notice.  Any successor to the Liquidating Trustee shall be bound by the terms of the Liquidating Trust Agreement, the Settlement Agreement and the Plan.

<u>Resignation and Removal of the Liquidating Trust Oversight Committee Members</u>.  Any member of the Liquidating Trust Oversight Committee may resign and be discharged from any future obligations and liabilities hereunder by giving written notice thereof to the Bankruptcy Court with a copy to the Liquidating Trustee and the other members of the Liquidating Trust Oversight Committee.  Any resignation hereunder shall become effective on the date specified in the written notice, which shall be no less than thirty (30) days after such written notice is given. A member of the Liquidating Trust Oversight Committee may be removed at any time only by order of the Bankruptcy Court for cause.  Upon the proposed resignation or removal of a member of the Liquidating Trust Oversight Committee, the remaining members of the Liquidating Trust Oversight Committee shall select a successor who shall agree to be bound by the terms of the Plan, the Liquidating Trust Agreement, and the Settlement Agreement.  Any successor member of the Liquidating Trust Oversight Committee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall deliver counterparts thereof to the Bankruptcy Court.

Conflicts of Interest.  The Liquidating Trustee shall disclose to the Liquidating Trust Oversight Committee any connections, conflicts or potential conflicts of interest that the Liquidating Trustee and/or the firm by whom the Liquidating Trustee is employed, has with respect to the exercise of any rights, powers, duties and privileges under the Plan or the Liquidating Trust Agreement. In the event that the Liquidating Trustee cannot take any action by reason of an actual or potential conflict of interest, the Liquidating Trust Oversight Committee acting by majority shall be authorized to take any such action(s) in the Liquidating Trustee's place and stead, including without limitation the retention of Post-Confirmation Professionals (which may include Post-Confirmation Professionals retained by the Liquidating Trustee) for the purpose of taking such action.  Also, if any matter under consideration by the Liquidating Trust Oversight Committee appears to involve a conflict of interest with any member(s) serving on the Liquidating Trust Oversight Committee or any such member's professional firm or client in this matter, the member(s) with the conflicting interest shall:  (i) disclose to the Liquidating Trustee and the Liquidating Trust Oversight Committee the existence of any actual or potential conflict of which the member has knowledge; and (ii) abstain from participating in the discussion of and/or voting on the matter being considered by the Liquidating Trust Oversight Committee if a majority of the other members of the Liquidating Trust Oversight Committee determines such abstention is appropriate.

Initial Appointment of the Liquidating Trustee.  Michael I. Goldberg was selected by the Committee, after consultation with the United States Trustee, to be the Liquidating Trustee. The appointment of the Liquidating Trustee shall be ratified by the Confirmation Order and effective as of the Effective Date.

iii.     *Continuation of Automatic Stay.*

In furtherance of the implementation of the Plan, except as otherwise provided herein, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect and shall apply to the Estate, the Assets, the Liquidating Trustee, the Liquidating Trust and the Trust Assets.

iv.     *Continuation of Bankruptcy Rule 2004 Rights.*

The Liquidating Trustee shall retain the same rights under Bankruptcy Rule 2004 and Local Rule 2004-1 of the Local Rules of the Bankruptcy Court as the Trustee had prior to the Effective Date

v.     *Wind-Down of Debtor.*

On the Effective Date, the Debtor will be deemed dissolved and shall cease to exist for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith.

From and after the Effective Date, the Debtor (i) for all purposes shall be deemed to have withdrawn its business operations from any state in which it was previously conducting, or was registered or licensed to conduct, its business operations, and shall not be required to file any

document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.  The Liquidating Trustee is authorized and directed to:  (1) take any action reasonably necessary to effectuate the wind down and dissolution of the Debtor in all respects without further corporate action under applicable law, regulation, order or rule required, including any action by the Debtor or the holders of the Debtor's Interests or the board of directors, as applicable; (2) file a certificate of dissolution for the Debtor, together with all other necessary corporate and company documents, to effect the dissolution of the Debtor under applicable non-bankruptcy law without further corporate action required; (3) complete and file all of the Debtor's final or otherwise required federal, state and local tax returns, as applicable; (4) pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination for any of the Debtor, the Estate or the Liquidating Trust's unpaid tax liability regarding any tax incurred during the administration of this Chapter 11 Case, as determined under applicable law; (5) take such other actions as the Liquidating Trustee may determine to be necessary or desirable to carry out the purposes of the Plan; (6) comply with any regulatory requirements imposed on the Liquidating Trust under applicable law; (7) with the consent of the Liquidating Trust Oversight Committee, which consent will not be unreasonably withheld, cause the Liquidating Trust to abandon in any commercially reasonable manner any Trust Assets that the Liquidating  Trustee determines are of no benefit, or are of *de minimis* value, to the Liquidating Trust (as defined in the Plan, "Abandoned Assets"); (8) with the consent of the Liquidating Trust Oversight Committee and notwithstanding any applicable federal or state laws, destroy any books and records of the Debtor, including, but not limited to, personnel files of former employees and financial records; (9) preserve the Debtor's documents, as necessary, to pursue Litigation Claims and conduct the wind down of the Debtor, and to abandon or destroy documents, subject to consent by the Liquidating Trust Oversight Committee upon the Liquidating Trustee's determination that the documents are no longer necessary or beneficial to the Liquidating Trust; and (10) with the consent of the Liquidating Trust Oversight Committee, take any action he deems necessary and appropriate with respect to any employee benefit or 401(k) plan, including, but not limited to, performing any acts necessary or appropriate with respect to terminating such employee benefit or 401(k) plan.

Upon the Effective Date, the Trustee shall be required to cooperate with the Liquidating Trustee in order to implement the Settlement Agreement and the Plan, including, without limitation, providing the Liquidating Trustee prompt access to the books and records of the Estate, aiding the Liquidating Trustee in making payments required by Estate and/or the Liquidating Trust under the Plan, and aiding in the wind down of the Estate.

Except as required by Section 6.5.2 of the Plan, on or as soon as practicable after the Effective Date, the Trustee shall be discharged from his duties to the Estates, the creditors of the Estate, the Liquidating Trust, and its Beneficiaries; provided, however, the discharge of the Trustee shall not in any respect impair  his (i) entitlement to payment of the fees due to him or the enforcement of any rights he may have against  the Liquidating Trust, including his rights to indemnification or (ii) his legal rights and immunities under the Bankruptcy Code and applicable bankruptcy and non-bankruptcy law.

> *vi.*      ***Disposition of Abandoned Assets.***

The Liquidating Trustee shall have no further obligations with respect to any Abandoned Asset upon its abandonment.

> *vii.*      ***Closing of the Chapter 11 Case.***

Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Chapter 11 Case, when all Assets contributed to the Liquidating Trust have been liquidated and converted into Cash (other than the Abandoned Assets), and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Plan, and the Final Distribution made, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules. Upon the later to occur of the entry of a Final Order closing the Chapter 11 Case or the dissolution of the Liquidating Trust, the Liquidating Trustee and the Liquidating Trust Oversight Committee and its members shall be discharged from their duties to the Liquidating Trust and its Beneficiaries as applicable.

> *viii.*      ***Dissolution of Committee.***

On the Effective Date, the Committee shall be dissolved without any further order of the Bankruptcy Court. The Committee's members, Professionals, and agents shall be discharged from any further duties and responsibilities in regard to the Chapter 11 Case and the Liquidating Trust. Notwithstanding anything to the contrary in Section 6.8 of the Plan ("Dissolution of Committee"), the dissolution of the Committee shall in no way act as a waiver of the Committee's attorney-client and work product privileges, which will expressly survive the dissolution of the Committee.

> *ix.*      ***Client Files.***

Pursuant to the authority granted to the Trustee in the Client File Orders, the Trustee and the Liquidating Trustee, as applicable, shall be permitted to dispose of client files in accordance with the Client File Orders.

> *x.*      ***Immediate Binding Effect.***

Subject to Article 9 of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor and the Liquidating Trust, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are Allowed or the holders of such Claims have accepted or rejected the Plan), and all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

*xi.*    ***Additional Documents.***

On or before the Effective Date, the Debtor may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan or the Settlement Agreement. The Debtor, Trustee or Liquidating Trustee, as applicable, and all holders of Claims or Interests receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*xii.*    ***Collateral Source Recovery Calculations.***

Except to the extent provided in Section 3.4(b), 3.7(b) or 3.8(b) of the Plan, the amount of a Collateral Source Recovery shall be calculated for each applicable Allowed Claim as:

**A.**    The sum of, without duplication:

1.    the gross amount of Cash and non-Cash assets received by, available to, received for the benefit of or applied to the indebtedness of the holder of an Allowed Claim (whether made directly or indirectly to such holder or any agent, attorney or third party associated with such holder), on account of or in any way related to such holder's loss directly or indirectly relating to the Debtor or Rothstein from all parties and sources, including, without limitation, any payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; and

2.    any amounts that would be required to be paid by or on behalf of the holder of an Allowed Claim to TD Bank related to the Debtor or Rothstein pursuant to any agreement between or on behalf of such holder and TD Bank including on account of the Distributions such holder would receive under the Plan.

**B.**    The amount calculated pursuant to Section 6.13.1(A) of the Plan shall exclude, without duplication:

1.    any Distributions to be made to the holder of such Claim under the Plan;

2.    any tax benefit from a theft loss deduction taken in accordance with the IRC, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein;

3.    any amounts paid by TD Bank that result in any claims or recoveries being assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013, unless TD Bank consents to these amounts being included in the calculation of a Collateral Source Recovery; and

4.    any anticipated, but not yet received, Collateral Source Recoveries.

C. The amount calculated pursuant to Section 6.13.1(A) and (B) of the Plan shall include interest only if and to the extent such interest would be recoverable or allowable as an Allowed Claim or as part of the Allowed Claim of such holder.

D. No deduction or reduction from the amount of a Collateral Source Recovery on account of the fees, costs and other expenses incurred or paid in connection with its pursuit of any Collateral Source Recoveries, including, without limitation, attorney's fees and costs, is permissible.

The Liquidating Trustee shall not deduct or reserve from Distribution on account of any anticipated Collateral Source Recoveries.

In connection with the calculation of Collateral Source Recoveries, to the extent that the holder of a Claim assigned or assigns any Collateral Source Recoveries to another holder of a Claim, the assignor may notify the Liquidating Trustee of such assignment. Subject to the Bankruptcy Court's approval, the Liquidating Trustee may, in his or her discretion, seek to reduce the assignee's Distribution by the amount of the Collateral Source Recovery assigned to such assignee and not reduce the assignor's Distribution.

*xiii.* **Collateral Source Recovery Remittance.**

Without the need of a further order of the Bankruptcy Court or a formal assignment and except to the extent that a settlement agreement approved in the Chapter 11 Case by Final Order of the Bankruptcy Court between the Estate and the holder of an Allowed Claim provides for differing treatment of Collateral Source Recoveries, the holder of an Allowed Claim shall be required to remit to the Liquidating Trust an amount of Cash equal to the value of all Collateral Source Recoveries it receives that were not disclosed as having been received on such holder's Verified Collateral Source Recovery Disclosure or did not then exist, including, without limitation, any applicable payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; provided, however, that in no event shall the holder of an Allowed Claim be required to remit Cash to the Liquidating Trust in an amount that is greater than the sum of such holder's Distributions. The holder of an Allowed Claim that has received a Distribution under the Plan shall fully cooperate with the Liquidating Trustee and execute any documents reasonably required by the Liquidating Trustee to evidence the obligation.

As set forth in the Plan and on the Verified Banyon Creditor Collateral Source Recovery Disclosures and the Verified Collateral Source Recovery Disclosures (collectively, the "<u>Disclosures</u>"), holders of Claims who complete such Disclosures acknowledge their obligation to repay or remit to the Liquidation Trust or the Banyon Bankruptcy Estates, as applicable: (i) distributions in excess of the amount such holder of an allowed claim was entitled to receive in distributions; (ii) distributions on allowed claims that are subsequently disallowed subsequent to a distribution being made; and (iii) an amount of Cash equal to the value of all collateral source recoveries a holder of an allowed claim receives that were not disclosed as having been received on such holder's Disclosures or did not then exist, <u>provided, however</u> that in no event shall the holder of an allowed claim be required to remit Cash to the Liquidating Trust or the Banyon

Bankruptcy Estates, as applicable, in an amount that is greater than the sum of such holder's distributions.

*xiv.* **Determination of the Bar Order Will Occur at Confirmation Hearing.**

After the Bankruptcy Court's *Order (I) Denying, Without Prejudice, Approval of Amended Disclosure Statement and (II) Granting Bifurcation Motion*, was entered by the Bankruptcy Court on April 22, 2013 [ECF No. 4292] (as defined above, the "Prior Disclosure Statement Order"), the Plan Proponents filed the *Joint Motion of the Trustee and the Official Committee of Unsecured Creditors to Reconsider, in Part, the Order (I) Denying, Without Prejudice, Approval of the Amended Disclosure Statement and (II) Granting Bifurcation Motion*, dated May 6, 2013 [ECF No. 4370] (the "Reconsideration Motion").  In the Reconsideration Motion, the Plan Proponents sought the Bankruptcy Court to reconsider that portion of the Prior Disclosure Statement Order stating that "[a]ny amended disclosure statement or amended plan that proposes or incorporates a bar order shall provide for determination of the bar order prior to solicitation of acceptances or rejections, and prior to confirmation, of such plan."  Prior Disclosure Statement Order, ¶ 4.  At a hearing held by the Bankruptcy Court on May 14, 2013, the Bankruptcy Court granted the Reconsideration Motion and held that any adjudication of the bar order with respect to the Plan will take place during the Confirmation Hearing (and not before).

*xv.* **Certain Settlement Issues.**

Any settlement of (i) the Trustee's Motion to Reconsider the Order Allowing Claim of Ira Sochet Inter Vivos Revocable Trust, in addition to Objection to Claim of Ira Sochet Inter Vivos Revocable Trust [ECF No. 3603], or (ii) the Trustee's Motion to Reconsider Order Allowing Claim of Investors Risk Advantage, LP, in addition to Objection to Claim of Investors Risk Advantage, LP [ECF No. 3604], or (iii) the Sochet claims against the Estate, shall be acceptable in all respects to the Plan Proponents or the Liquidating Trustee, as applicable.

*xvi.* **Binding Effect.**

Except as otherwise provided in Section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in the Debtor and their respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

**E.    The TD Bank Settlement**

*i.    Settlement Terms:*

On July 25, 2011, the Trustee filed an adversary proceeding against TD Bank, *Stettin v. TD Bank*, 11-2368-RBR-A (Bankr. S.D. Fla.) (as defined herein, the "**TD Bank Adversary**"). Thereafter the parties engaged in a confidential mediation in an attempt to resolve the issues raised by the Trustee in the TD Bank Adversary. Mediation proved to be successful and the

4969645-2

Trustee, the Banyon Trustee and TD Bank reached the agreement reflected in the Plan and the Settlement Agreement.[13]

The following is a summary of the key terms of the TD Bank Settlement:

(A)     TD Bank shall deliver the TD Bank Contribution, in Cash in the amount of $72,382,817.90, to the Trustee by the Third Business Day after the Confirmation Date (subject to, and in accordance with, the other conditions in Section 9.2 of the Plan).  On the Effective Date, the Trustee will disburse and turn over all of the Assets of the RRA Estate, including, but not limited to the TD Bank Contribution, to the Liquidating Trustee, who, in turn, will disburse such Trust Assets solely to the Beneficiaries in accordance with the terms of the Settlement Agreement, the Plan and the Liquidating Trust Agreement.  In accordance with the provisions of the Plan, the Liquidating Trustee shall have the right and obligation to cause the payment of the Full Amount of the principal amount (excluding interest) of all Allowed Unclassified Claims and Claims in Classes 2-8 of the Plan.

(B)     TD Bank will receive an Allowed Claim against the RRA Estate in the amount of $132,450,000, classified in Class 8 of the Plan (i.e., the TD Bank RRA Junior Subordinated Claim), which Allowed Claim shall be subordinated to the payment of the Full Amount of all Allowed Claims in the RRA Estate, after application of Collateral Source Recoveries.  The TD Bank RRA Junior Subordinated Claim is on account of the TD Bank Contribution ($72,382,817.90) and on account of TD Bank's rights and interests in certain claims, or recoveries in regard thereto, that were  assigned, transferred and/or participated to TD Bank, in whole or in part, by certain Creditors on account of such Creditors' Claims against the RRA Estate (such agreements pertaining thereto, as explained below, have been fully disclosed and filed on the docket of the RRA Case).  The payments made by TD Bank to such Creditors, and the payments payable by such Creditors to TD Bank on account of such Creditors' Distributions under the Plan, constitute Collateral Source Recoveries under the Plan, and in accordance with, *inter alia*, the treatment of Class 3 of the Plan, such Collateral Source Recoveries will reduce the Distributions to be made to the holders of such Claims.  As part of the compromise embodied in the Settlement Agreement, TD Bank has agreed to the reductions of the Distributions, and TD Bank has agreed to the subordination of the TD Bank RRA Junior Subordinated Claim as provided in the Settlement Agreement and the Plan.  The TD Bank Junior Subordinated Claim is Allowed under the Plan, and shall not be subject to reconsideration, reduction, disallowance or further subordination.  The Claims of TD Bank (classified as Claims in Class 8 ("TD Bank Junior Subordinated Claim")) are the result of the global settlement negotiations that resulted in the Settlement Agreement.

TD Bank will receive an allowed claim against each of the Banyon Bankruptcy Estates in the amount of $97,450,000 (the "TD Bank Banyon Junior Subordinated Claim"), which allowed claim shall be subordinated to the payment of the Full Amount of all allowed claims in the Banyon Bankruptcy Estates, after application of Banyon Creditor Collateral

---

[13] Any term not otherwise defined in this section or the Plan shall have the meaning ascribed to it in the Settlement Agreement.

Source Recoveries. The TD Bank Banyon Junior Subordinated Claim is on account of the TD Bank Contribution ($72,382,817.90) and on account of certain of TD Bank's rights and interests in certain claims, or recoveries in regard thereto, that were assigned, transferred and/or participated to TD Bank, in whole or in part, by certain creditors on account of such creditors' claims against the Banyon Bankruptcy Estates (such agreements pertaining thereto, as explained below, have been fully disclosed and filed on the docket of the RRA Case). The payments made by TD Bank to such creditors, constitute Banyon Creditor Collateral Source Recoveries under the Settlement Agreement, and in accordance with, *inter alia*, the treatment of Class 5 in the Plan, such Banyon Creditor Collateral Source Recoveries will reduce the distributions to be made to the holders of such claims in the Banyon Bankruptcy Cases. As part of the compromise embodied in the Settlement Agreement, TD Bank has agreed to the reductions of the distributions, and TD Bank has agreed to the subordination of the TD Bank Banyon Junior Subordinated Claim as provided in the Settlement Agreement and the Plan, including the RRA Banyon Senior Subordinated Claim. The TD Bank Banyon Junior Subordinated Claim is allowed in the Banyon BankruptcyCases under the Settlement Agreement, and shall not be subject to reconsideration, reduction, disallowance or further subordination. The TD Bank Banyon Junior Subordinated Claim is the result of the global settlement negotiations that resulted in the Settlement Agreement.

Pursuant to the Order Granting TD Bank, N.A.'s *Ore Tenus* Motion To Disclose Settlement Agreements (the "***Ore Tenus* Order**") [ECF No. 4151], TD Bank delivered to the Trustee copies of the settlement agreements, with exhibits, as applicable, that TD Bank has entered into in regard to the settled matters listed on Exhibit 3 as well as a list identifying each alleged creditor of the RRA Estate contained in the settlement agreements which allows TD Bank to control or direct any creditor's right to vote such claim on any proposed plan, or to receive any right to distribution on account of such claim. In accordance with the *Ore Tenus* Order, the Trustee filed a notice on the Chapter 11 Case docket on April 2, 2013 [ECF No. 4184] with such settlement agreements attached as exhibits, thereby fully disclosing the provisions of such settlement agreements. The disclosed settlement agreements also pertain to creditors of and claims against the Banyon Bankruptcy Estates.

(C)    TD Bank shall receive a general release, as provided for in Section 10.6 of the Plan, from the RRA Estate for any and all claims, except for the obligations under the TD Bank Settlement, and causes of action against the TD Bank Releasees (as defined in the Plan). The TD Bank Adversary shall be dismissed with prejudice.

(E)    In addition, in exchange for the consideration from TD Bank under the TD Bank Settlement, as provided in Section 10.8 of the Plan, all parties, including Creditors and parties asserting claims against TD Bank who could have filed claims against the Debtor's bankruptcy estate, will be forever barred and enjoined from asserting, continuing or prosecuting any claim or cause of action against any TD Bank Releasee pertaining to Rothstein's Ponzi scheme. However, there are a number of substantial carve-outs from this bar order, including:

4969645-2

(a) any action or claim by TD Bank or its affiliates, including, but not limited to, the assertion of any claim that would otherwise be a Released Claim (as defined in the Plan) by TD Bank or its affiliates against another TD Bank Releasee;

(b) any action or claim against TD Bank filed by Coquina Investments in the matter captioned *Coquina Investments v. Rothstein, et al.*, 10-cv-60786 (S.D. Fla.), including, but not limited to, the pending appeal and cross-appeal of the decisions and orders issued in the U.S. District Court for the Southern District of Florida (Miami Division) that is currently pending in the Court of Appeals docketed at case no. 12-11161, including any subsequent related appeal, review or remand;

(c) (i) any claim by the United States Government or any of its agencies or any state and local governmental authority whatsoever against the TD Bank Releasees, or (ii) enjoin the United States Government or any of its agencies or any state and local governmental authority whatsoever from bringing any claim, suit, action or other proceedings against the TD Bank Releasees asserting any other liability, including without limitation any claim, suit or action arising under the IRC, securities laws, environmental laws or any criminal laws of the United States or any state or local jurisdiction;

(d) the prosecution of that certain *Plaintiffs' Amended Motion for Sanctions Against TD Bank, N.A.* dated as of December 10, 2012 currently pending in the Broward County Circuit Court before the Honorable Judge Jeffrey E. Streitfeld in the case captioned *Razorback Funding et al. v. Scott W. Rothstein, et al.,* Case No. 09-062943 (07); and

(e) any claim or action which is not, or was not, within the subject matter jurisdiction of the Bankruptcy Court as determined by Final Order of the Bankruptcy Court or of the District Court.

This aspect of the settlement is an integral and non-severable part of the terms of the TD Bank Settlement. Moreover, pursuant to section 1123(b)(3) of the Bankruptcy Code, and as an element of the Trustee's global settlement with TD Bank, upon the occurrence of the Effective Date, the Levin Claims shall vest with TD Bank and TD Bank shall, subject to the provisions of the Plan and the Settlement Agreement, have the exclusive right to enforce any and all of the Levin Claims, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, and shall be entitled to all remedies available to the Trustee in the Chapter 11 Case.

In addition, and as an element of the Trustee's global settlement with TD Bank, Section 1.127 of the Plan provides that Emess Capital is included as a TD Bank Indemnitee and Section 6.1.12 provides that the Liquidating Trustee will dismiss with prejudice the adversary proceeding brought by the Trustee against Emess Capital.

In the settlement agreement between TD Bank and Emess Capital, TD Bank agreed to indemnify Emess Capital in accordance with the terms thereof. *See* ECF 3959, Exh. A.

(F)     Under the TD Bank Settlement, the Banyon Bankruptcy Estates shall have a Claim against the RRA Estate (Class 5). This claim shall be funded solely from the Banyon Unsecured Creditor Fund, which shall be established as part of the TD Bank Contribution. The Banyon Unsecured Creditor Fund is set in the amount of $39.7 million ($39,700,000.00) in Cash held by the Liquidating Trust and payable solely from the TD Bank Contribution, and payable from no other source, to the Banyon Bankruptcy Estates pursuant to Section 3.6(b) of the Plan.

(G)     Upon the payment of the Banyon Distribution, RRA shall have an allowed senior subordinated claim against each of the Banyon Bankruptcy Estates in the amount of $39.7 million ($39,700,000.00) (as defined in the Plan, the "RRA Banyon Senior Subordinated Claim"). The RRA Banyon Senior Subordinated Claim shall be subordinated in right to payment to the Full Amount of (i) all allowed administrative expenses in each of the Banyon Bankruptcy Cases, respectively, (ii) all allowed priority claims in each of the Banyon Bankruptcy Cases, respectively, and (iii) all allowed non-subordinated general unsecured claims in each of the Banyon Bankruptcy Cases, after the application of Banyon Creditor Collateral Source Recoveries, as applicable; provided, that the Banyon Trustee shall not permit the holders of allowed claims senior to the RRA Banyon Senior Subordinated Claim to receive in excess of the Full Amount of their claims, after the application of Banyon Creditor Collateral Source Recoveries as applicable. The RRA Banyon Senior Subordinated Claim shall be senior in right of payment to the TD Bank Banyon Junior Subordinated Claim.

(H)     The Settlement Agreement among TD Bank, the Banyon Trustee and the Trustee settles and resolves all issues among and between these parties, on the terms provided therein. The Trustee's agreements in the Settlement Agreement pertaining to TD Bank and pertaining to the Banyon Trustee will be approved and implemented through Plan. The Banyon Trustee's agreements in the Settlement Agreement pertaining to TD Bank and pertaining to the Trustee will be approved and implemented through the Banyon Trustee's 9019 Motion. The Settlement Agreement contains a requirement, in Section 3.3, that the Bankruptcy Court enter a bar order enjoining claims against TD Bank that pertain to the Rothstein Ponzi scheme. The bar order must be entered in regard to the RRA Case (through the Plan) and in regard to the Banyon Bankruptcy Cases (through the 9019 Motion). The effectiveness of the Plan is dependent on the approval of the 9019 Motion, and the approval of the 9019 Motion is dependent on the Confirmation of the Plan.

*ii.*     ***Injunction and Bar Order in Favor of TD Bank***

The TD Bank Settlement contemplates the entry of a Bar Order and Injunction in favor of TD Bank as more particularly described below and as contained in Article 10 of the Plan.

### iii.      Satisfaction of Settlement Criteria

The United States Supreme Court requires that all court-approved settlements must be "fair and equitable" before they can be approved by the court.  *See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  To help establish whether a settlement is fair and equitable, courts in the Eleventh Circuit look to a four factor test identified in *Wallis v. Justice Oaks, II Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990), including: (i) the probability of success in litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.  *Id.*

It is not necessary for a bankruptcy court to explicitly consider all four *Justice Oaks'* factors when approving a proposed settlement.  *Chira v. Saal et al. (In re Chira)*, 567 F.3d 1307, 1313 (11th Cir. 2009) (affirming bankruptcy court's approval of settlement agreement where bankruptcy court explicitly evaluated only two of the four *Justice Oaks* factors).  In determining whether to approve a compromise, a bankruptcy court is not obligated to actually rule on the merits of the various claims, only the probability of succeeding on those claims, nor is it necessary for the bankruptcy court to  conduct a "mini trial" on the merits of the underlying cause of action.  *In re Van Diepen, P.A.,* 236 F. Appx. 498, 503 (11th Cir. 2007); *U.S. v Alaska National Bank of the North (In the Matter of Walsh Construction, Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982); *In re Soderstrom*, 477 B.R. 249, 252 (Bankr. M.D. Fla. 2012); *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).  Rather, courts consider the *Justice Oaks* factors to determine the fairness of a proposed settlement agreement.  *Chira v. Saal et al. (In re Chira)*, 567 F.3d 1307, 1312-1313 (11th Cir. 2009).

In ruling on a proposed compromise, a court should not substitute its own judgment for that of the trustee or debtor in possession. *See McMasters v. Morgan (In re Morgan)*, 2011 WL 3821102, at *1 (11th Cir. Aug. 29, 2011) (affirming bankruptcy court order approving "settlement because it was the trustee's best business judgment that the settlement be approved"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("under normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification."); *In re Purofied Down Prods. Corp*., 150 B.R. 519, 522 (S.D.N.Y. 1993) ("The reviewing court need not conduct its own investigation concerning the reasonableness of the settlement and may credit and consider the opinion of the trustee and counsel that the settlement is fair and equitable.").

Nor is the Court's task to determine whether the settlement was the best that the trustee could have obtained.  *See Cosoff v. Rodman (In re W.T. Grant)*, 699 F.2d 599, 608, 613 (2d Cir.), *cert. denied* 464 U.S. 822, 104 S. Ct. 89, 78 L. Ed.2d 97 (1983). Rather, the Court should "canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *Id*. at 608; *see also In re Bell & Beckwith*, 87 B.R. 472, 474 (N.D. Ohio 1987).

It is the business judgment of the Plan Proponents that the TD Bank Settlement falls well above the "lowest point in the range of reasonableness." *In re S&I Investments*, 421 B.R. 569, 583 (Bankr. S.D. Fla. 2009).  The TD Bank Settlement meets each of the criteria set forth by the

courts for approving settlements and compromises and represents the foundation for the Plan which will provide hundreds of victims of Rothstein's Ponzi scheme and Creditors of the RRA Estate which hold Claims that are Unclassified or classified in Classes 1-5 of the Plan and estimated to exceed in excess of approximately $164 million (after Claims objection and adjustments) with projected Distributions of the Full Amount on their Allowed Claims, and, with respect to Class 6 (only), the Disclosure Statement estimates a potentially meaningful Distribution.

TD Bank denies and disputes the allegations against it in the TD Bank Adversary, and asserts that it has significant and meritorious defenses and counterclaims to the causes of action asserted against it by the Trustee.  Among TD Bank's asserted defenses are the *in pari delicto* doctrine and that any avoidance recovery by the Trustee would likely result in section 502(h) claims in favor of TD Bank.  TD Bank steadfastly asserts that it has no liability to the RRA Estate.  TD Bank also has the resources to litigate the TD Bank Adversary vigorously and through various appellate levels, and has indicated its intention to do so in the absence of the TD Bank Settlement.

While the Trustee believes he would have potentially succeeded in litigation against TD Bank, all litigation has an element of risk and it is the Trustee's judgment that the TD Bank Settlement removes any risk to the estate and brings guaranteed economic benefit to its Creditors and an expeditious and efficient conclusion to the Chapter 11 Case.

The litigation against TD Bank is complex.  Absent the proposed TD Bank Settlement, it is unlikely that the parties would have reached a different accord.  Therefore, the trial and subsequent appeals would have been complex, expensive and lengthy.  As stated in this Disclosure Statement, on July 25, 2011, the Trustee commenced an adversary proceeding against TD Bank styled "*Herbert Stettin v. TD Bank, N.A.*", case no. 11-02368-RBR (Bankr. S.D. Fla.).  In the action, the Trustee has sought to avoid and recover preferential and fraudulent transfers and separately sought damages from TD Bank for the following: breach of fiduciary duty; unjust enrichment; aiding and abetting breach of fiduciary duties; aiding and abetting conversion; negligence and wire transfer liability; and negligent retention and supervision of its employees.

Therefore, the Trustee's efforts in pursuing and collecting on any judgment would likely be an expensive and time consuming matter because of the likely protracted litigation and appellate process, with an uncertain outcome.

After extensive discussions and negotiations, the Trustee and TD Bank have agreed to the settlement whereby (i) the RRA Estate will receive the TD Bank Contribution ($72,382,817.90) for distribution to the Debtor's creditors, (ii) the parties will resolve and avoid potential litigation related to claims asserted by the Trustee in the adversary proceeding, and (iii) the parties will resolve the claims that could have been asserted by TD Bank against the estate.  The Trustee and TD Bank have reached a comprehensive settlement which the Trustee and the Banyon Trustee believe will result in a final resolution of their disputes and significant financial benefit for the RRA Estate.

Pursuant to negotiations between the Trustee and TD Bank that resulted in the TD Bank Settlement, including TD Bank's agreement to provide Cash consideration to the Estate in an

amount of the TD Bank Contribution ($72,382,817.90) that will be used to pay, in part, the Full Amount of the Allowed Claims of the Creditors in Classes 1-5, TD Bank has agreed to subordinate its Claim (which is classified in Class 8 of the Plan) to the payment in full of the Allowed General Unsecured Claims in Classes 2-7.  The Disclosure Statement estimates that TD Bank will receive no Distribution (0%) on its Claims in Class 8.

Pursuant to separate court-approved settlement agreements, the holders of Claims in Class 7 ("Miscellaneous Subordinated Claims"), including the Razorback Subordinated Unsecured Claim [ECF no. 3510], the Gibraltar Subordinated Claim [ECF no. 3500] and the Levy Subordinated Unsecured Claims [ECF no. 3631], agreed to subordinate their Claims to the Allowed general unsecured claims.  Accordingly, the holders of contractually subordinated Claims in Class 7 are subordinate to the Allowed General Unsecured Claims in Classes 2-6 but senior in right to the Claims of TD Bank in Class 8.

The Plan Proponents believe that the parties have engaged in a good faith effort to obtain the TD Bank Contribution ($72,382,817.90) for the RRA Estate that will be used to fund Distributions to creditors under the Plan and settle outstanding claims.

Further, the Plan Proponents submit that the TD Bank Settlement is the direct result of the exercise of the Plan Proponents' sound business judgment, as the TD Bank Settlement is in the best interests of the Debtor's estate when considering the uncertainties, significant expense, inconvenience, and delay involved in resolving through litigation the issue of the claims asserted by the Trustee against TD Bank.

TD Bank has worked collaboratively and in good faith with the Plan Proponents and the Banyon Trustee to reach a reasonable and amicable resolution of all issues among them.

As a result of the TD Bank Settlement, holders of Allowed Unclassified Claims and Allowed Claims in Classes 2, 3, 4 and 5 are estimated to receive Distributions representing the Full Amount of their respective Allowed Claims. The Creditor in Class 6 is likely to receive a potentially meaningful Distribution on its Allowed Claim.  This is likely the first major Ponzi scheme case where payouts may fully compensate creditors holding unsubordinated General Unsecured Claims for their losses.

The Plan Proponents believe that the resolution of litigation issues involved in the adversary proceeding the Trustee commenced against TD Bank in the manner set forth in the TD Bank Settlement is reasonable and falls well above the lowest point on the range of reasonableness as required by Bankruptcy Rule 9019(a) and applicable case law from this district.  *Arrow Air, Inc.*, 85 B.R. at 891 (court to evaluate whether the proposed compromise falls below the "'lowest point in the range of reasonableness'") (quoting *In re Teltronics Servs., Inc.,* 762 F.2d 185, 189 (2d Cir. 1985)).

Accordingly, the Plan Proponents respectfully submit that the TD Bank Settlement satisfies the *Justice Oaks* criteria outlined above and is fair and reasonable and in the best interest of the Debtor's estate.

Based on the foregoing, the Plan Proponents respectfully request the Bankruptcy Court to authorize and approve the Settlement Agreement and the Plan on the terms and conditions contained therein at the Confirmation Hearing.

## F.  Settlement of Claims Between the RRA Estate and the Banyon Bankruptcy Estates

The RRA Estate and the Banyon Bankruptcy Estates have asserted substantial Claims against each other's Estates.  The Trustee has asserted that the RRA Estate has numerous Claims against each of the Banyon Bankruptcy Estates arising from or in connection with the Ponzi scheme orchestrated or operated by Rothstein, including, but not limited to, those claims asserted by the RRA Estate in (i) proof of claim number 1 (in the amount of $324,405,757.62 plus unliquidated amounts) asserted against the estate of Banyon 1030-32, LLC and listed on the claims register maintained for the chapter 7 estate of Banyon 1030-32, LLC and (ii) proof of claim number 1 (in the amount of $41,528,540.74 plus unliquidated amounts) asserted against the chapter 7 estate of Banyon Income Fund, LP and listed on the claims register maintained for the chapter 7 case of Banyon Income Fund, LP.  The Banyon Trustee has asserted that each of the Banyon Bankruptcy Estates has numerous Claims against the RRA Estate arising from or in connection with the Ponzi scheme orchestrated or operated by Rothstein, including, but not limited to, those Claims asserted by (i) the chapter 7 estate of Banyon 1030-32, LLC  in proof of Claim number 336 (in the amount of $6,000,000.00 plus unliquidated amounts) asserted against the RRA Estate and listed on the claims register maintained in the Chapter 11 Case and (ii) the chapter 7 estate of Banyon 1030-32, LLC in proof of Claim number 337 (in the amount of $89,098,482.97 plus unliquidated amounts) asserted against the RRA Estate and listed on the claims register maintained in the Chapter 11 Case.

Through the Settlement Agreement and the Plan, all matters between the RRA Estate on the one hand, and the Banyon Bankruptcy Estates on the other hand, are resolved and compromised.  The proofs of claim identified above shall be released except to the extent provided in the Settlement Agreement and the Plan, and upon the occurrence of the Effective Date, the Banyon Bankruptcy Estates shall be granted an Allowed Claim against the RRA Estate in Class 5 of the Plan in the amount of $39,700,000.00 (the Banyon Unsecured Claim), which shall be fully funded from the TD Bank Contribution.  Within five Business Days after the Effective Date, the Liquidating Trustee shall Distribute the $39,700,000.00 to the Banyon Trustee for the benefit of the Banyon Bankruptcy Estates.  In the business judgment of the Trustee, the resolution of the claims between the Banyon Estates and the RRA Estates in this manner is in the best interests of the RRA Estate (and the Banyon Estates).  The resolution eliminates the need for costly litigation between the RRA Estate and the Banyon Estates, while still allowing all non-subordinated creditors of the RRA Estate and the Banyon Estates to receive distributions such that the Full Amount of their Allowed Claims will likely be paid.

To ensure that the RRA Estate has not allowed the Banyon Unsecured Claim in an amount that is in excess of the amount needed by the Banyon Bankruptcy Estates to pay the Full Amount of the claims of the non-subordinated creditors in the Banyon Bankruptcy Estates, after application of Banyon Creditor Collateral Source Recoveries, the RRA Estate will granted a senior subordinated claim against the Banyon Bankruptcy Estates in the amount of $39,700,000.00 (the RRA Banyon Senior Subordinated Claim).  The RRA Banyon Senior Subordinated Claim shall be subordinated in right to payment to the Full Amount of (i) all

allowed administrative expenses in each of the Banyon Bankruptcy Cases, respectively, (ii) all allowed priority claims in each of the Banyon Bankruptcy Cases, respectively, and (iii) all allowed non-subordinated general unsecured claims in each of the Banyon Bankruptcy Cases, after the application of Banyon Creditor Collateral Source Recoveries, as applicable. Also, the Banyon Trustee shall not permit the holders of allowed claims senior to the RRA Banyon Senior Subordinated Claim to receive in excess of the Full Amount of their claims, after the application of Banyon Creditor Collateral Source Recoveries as applicable. The RRA Banyon Senior Subordinated Claim shall be senior in right of payment to the TD Bank Banyon Junior Subordinated Claim. The primary purpose of the RRA Banyon Senior Subordinated Claim is to permit the RRA Estate to recover from the assets of the Banyon Bankruptcy Estates any excess Distribution made to the Banyon Bankruptcy Estates, and such recovered excess Distributions will, in turn, be used by the Liquidating Trustee to make Distributions to the Beneficiaries of the Liquidating Trust.

Upon the Effective Date, other than the Banyon Unsecured Claim, the RRA Banyon Senior Subordinated Claim, and as otherwise provided in the Settlement Agreement, all inter-estate Claims (including, without limitation, administrative expenses, general unsecured Claims, and Claims on behalf of any trustee or his professionals) between the RRA Estate and either of the Banyon Bankruptcy Estates shall be waived and released in their entirety and, any and all proofs of claim asserted against any one of these three estates by any one of the other r estates shall be expunged.

The resolution of all matters between the RRA Estate and the Banyon Bankruptcy Estates as provided in the Settlement Agreement and the RRA Plan is a significant and necessary step forward in the resolution of each of the Chapter 11 Case and the Banyon Bankruptcy Cases. The Settlement Agreement and RRA Plan resolve complicated inter-estate claims that, absence the settlement, would delay and impede distributions to creditors in each of the RRA Case and the Banyon Cases.

**G.**      **Distributions Under the Plan**

*i.*      *Delivery of Distributions in General*

The Liquidating Trustee shall make Distributions solely to the holders of record of Allowed Claims without regard to any claim or interest asserted by any third party in such Distributions. Distributions shall be made to the holders of Allowed Claims: (a) at the addresses set forth in the proofs of Claim Filed by such holders; (b) at the addresses set forth in any written notices of address change Filed with the Bankruptcy Court or delivered to the Liquidating Trustee after the date on which any related proof of Claim was Filed; (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim or Interest if no proof of Claim has been Filed and the Liquidating Trustee has not received a written notice of a change of address; or (d) the address reflected on the timely submitted Verified Collateral Source Recovery Disclosure delivered to the Liquidating Trustee pursuant to Sections 3.4(b), 3.7(b) or 3.8(b) of the Plan. The Liquidating Trustee shall distribute at least annually to the Beneficiaries the net income of the Liquidating Trust, plus all net proceeds from the sale of assets, except that the Liquidating Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Trust Assets or to meet claims and contingent liabilities (including

84

Disputed Claims).  All full or partial payments made by the Trustee and received by the holder of a Claim before the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Liquidating Trustee pursuant to the Plan.

### ii.     Cash Payments

Except as otherwise provided in the Liquidating Trust Agreement or the Confirmation Order, Cash payments to be made pursuant to the Plan shall be made by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

### iii.     Interest on Claims

Interest shall not accrue or be paid on Claims subsequent to the Petition Date, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a Final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.  To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.

### iv.     No de Minimis Distributions

Other than in the Final Distribution, no payment of Cash in an amount of less than $100.00 shall be required to be made on account of any Allowed Claim.

### v.     Face Amount

Unless otherwise expressly set forth in the Plan with respect to a specific Claim or Class of Claims, for the purpose of the provisions of Article 8 of the Plan, the face amount of a Disputed Claim means the amount set forth on the proof of Claim, unless no proof of Claim has been timely Filed or deemed Filed, in which case the face amount shall be zero.

### vi.     Unclaimed and Undeliverable Distributions

As authorized by Local Rule 3011-1(C)(2), if the combined total of Unclaimed Property related to Allowed Claims under the Plan totals (i) $10,000 or more, the Unclaimed Property shall, subject to Section 8.4 ("No de Minimis Distributions") and other provisions of the Plan, be distributed by the Liquidating Trustee, at the time of Final Distribution Date, to the Beneficiaries in Class 2 and Class 3 until such Beneficiaries are paid in full on account of their Allowed Claims in Class 2 or Class 3 after application of Collateral Source Recoveries, if any, respectively, and, thereafter, distributed by the Liquidating Trustee to other Beneficiaries in the order of priority set forth in, and pursuant to the terms of, the Plan, or (ii) less than $10,000, the Unclaimed Property shall be donated to the Bankruptcy Bar Foundation, a not-for-profit, non-religious organization dedicated to, among other things, promoting the pro bono legal representation of the indigent; provided that, pursuant to Section 1143 of the Bankruptcy Code,

all Claims in respect of Unclaimed Property shall be deemed Disallowed, and the holder or successor to such holder of any Claim Disallowed will be forever barred, expunged, estopped and enjoined from asserting any such Disallowed Claim in any manner against the Trustee, the Estate, the Liquidating Trust, the Liquidating Trustee, Trust Assets, or their respective property, notwithstanding any federal or state escheat laws to the contrary.

vii.    **Interim Distributions**

Unless otherwise provided in the Plan and as required by Section 8.7 of the Plan, the Liquidating Trustee in his discretion may make Distributions to the Beneficiaries entitled thereto in accordance with Article 6 of the Liquidating Trust Agreement and the Plan.  The Liquidating Trustee shall make an interim Distribution of not less than 72.5% of the Allowed amount of a Beneficiary's Claim to all Beneficiaries entitled thereto within thirty (30) days after the Effective Date in accordance with Article 6 of the Liquidating Trust Agreement; provided, however, that any such interim Distributions by the Liquidating Trustee shall be limited in amounts that, in the Liquidating Trustee's reasonable judgment, are designed to avoid the payment of excess Distributions to such Beneficiary (but specifically not taking into account anticipated, but not yet actually received, Collateral Source Recoveries); provided, further, however, that the Liquidating Trustee may seek authority from the Bankruptcy Court, after notice and a hearing, to reduce the percentage of the interim Distribution required by Section 8.7 of the Plan for good cause shown. The Liquidating Trustee may rely on the amount of Collateral Source Recoveries disclosed on a Verified Collateral Source Recovery Disclosure as a Collateral Source Recovery that would reduce a creditor's Distribution for the purpose of making any reserve or Distribution, including any interim Distribution.

viii.    **Final Distribution**

The Liquidating Trustee shall make a final Distribution in accordance with Article 6 of the Liquidating Trust Agreement.

ix.    **Disputed Claims Reserves**

The Liquidating Trustee shall establish reserves for Disputed Claims in accordance with the terms of the Liquidating Trust Agreement.

x.    **Compliance with Tax Requirements**

In connection with the Plan and the Distributions made in accordance thereto, to the extent applicable, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed by any governmental unit, if any, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

xi.    **Setoff and Liquidating Trustee's Compensation**

To the extent possible and in the Liquidating Trustee's discretion, the  Liquidating Trustee will  net amounts owed  by a holder of an Allowed Claim to the Liquidating Trust

4969645-2

against Distributions owed by the Liquidating Trust to the holder of any such Allowed Claim; provided that any such netting shall not be permissible if it would be detrimental to the Liquidating Trust.

**H.        Procedures for Resolving and Treating Disputed and Contingent Claims**

Except as otherwise set forth in the Plan and the Liquidating Trust Agreement, from and after the Effective Date, the Liquidating Trustee shall have the sole authority to object to Claims pursuant to applicable procedures established by, or grounds set forth in the Bankruptcy Code, the Bankruptcy Rules, the Liquidating Trust Agreement, the Plan and the Claim Objection Procedures Order. Any compromise of any Claim objection by the Liquidating Trustee shall be subject to approval by the Liquidating Trust Oversight Committee pursuant to the Plan, the Settlement Agreement and/or the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee may seek Bankruptcy Court approval of any compromise or settlement of a Claim objection over the objection of the Liquidating Trust Oversight Committee as provided in Section 6.2.8 of the Plan and the Liquidating Trust Agreement. Any such contested matter shall be governed by Bankruptcy Rules 9014 and 9019, other applicable Bankruptcy Rules and applicable orders of the Bankruptcy Court. The deadline within which objections to Claims or Interests may be Filed shall be the first Business Day that is 360 days after the Effective Date, subject to extension by the Bankruptcy Court for cause shown; provided, however, that the Liquidating Trustee shall be authorized to seek reconsideration of any order allowing a Claim pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, section 502(j) of the Bankruptcy Code and Bankruptcy Rules 9023 or 9024, or as otherwise permitted by applicable law after such deadline. Nothing contained in Section 7.3 of the Plan or otherwise shall preclude the Liquidating Trustee from reducing Distributions to holders of Allowed Claims under Section 3.4(b), 3.7(b) or 3.8(b) of the Plan, based upon their receipt of Collateral Source Recoveries. The TD Bank Junior Subordinated Claim shall not be subject to objection, reconsideration, reduction, recharacterization, further subordination, impairment, disallowance or reduction in Distribution on account of a Collateral Source Recovery or otherwise.

**I.        Disallowance of Late Claims**

Except as provided in the Plan, any and all Claims Filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and holders of such Claims may not receive any Distributions on account of any such Claim, unless on or before the Confirmation Date, such late Claim has been deemed timely Filed by a Final Order in the Chapter 11 Case.

**J.        Recovery of Distributions on Disallowed Claims**

The Liquidating Trustee is permitted, but shall not be required, to seek the repayment or disgorgement of any and all Distributions made on account of any Claim that is or becomes Disallowed, including, but not limited to, seeking the repayment of any Distribution that is required to be repaid by the recipient of the Distribution under Sections 3.3(b), 3.4(b), 3.7(b) and 3.8(b) of the Plan.

4969645-2

**K.**     **Equitable Defenses Not Assertable Against Liquidating Trust**

No Person that is subject to a Litigation Claim or has had their Claim objected to or otherwise reconciled may assert a defense, equitable or otherwise, to such Litigation Claim based in whole or in part on TD Bank's potential recovery as a Beneficiary under the Liquidating Trust, or TD Bank's recovery on account of its Claims in the Chapter 11 Case.

**L.**     **Unexpired Leases and Executory Contracts**

*i.*     ***General Treatment: Rejected if not Previously Assumed.***

Unless a motion to assume is Filed prior to the Confirmation Hearing and an order authorizing assumption is entered on or prior to the Effective Date, all executory contracts and unexpired leases of the Debtor shall be rejected pursuant to section 365 of Bankruptcy Code as of the Effective Date. For the avoidance of any doubt, Section 5.1 of the Plan shall apply to any and all pre-petition contracts or engagements the Debtor may have with professionals, including, but not limited to, attorneys, auditors and accountants.

*ii.*     ***Bar to Rejection Claims Arising as a Result of the Confirmation Order.***

The Confirmation Order shall constitute an Order of the Bankruptcy Court approving the rejection of any executory or unexpired leases not assumed in accordance with Section 5.1 of the Plan as of the Effective Date. Any Claim for damages arising from rejection of any executory contract or unexpired leases must be Filed on the earlier of (i) the deadline established by an order of the Bankruptcy Court, or (ii) thirty (30) days after the mailing of the Notice of Effective Date (as defined in the Plan, the "Rejection Claim Bar Date"). Any Claim not Filed on or before the Rejection Claim Bar Date shall be forever barred, shall not be enforceable against the Debtor, its Estate, the Liquidating Trust, the Liquidating Trustee, or any of their respective assets and shall receive no Distribution under the Plan or otherwise on account of such Claim.

*iii.*     ***Indemnification Obligations***

All Indemnification Obligations shall be canceled, released and discharged on the Effective Date; provided that, the cancellation, release and discharge of the Indemnification Obligations shall not affect whether a Claim made on account of an Indemnification Obligation Filed by the applicable Bar Date is or may become an Allowed Claim.

**M.**     **Retention of Jurisdiction**

*i.*     ***Jurisdiction of Court.***

Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including among other things, jurisdiction over the subject matters set forth in Article 11 of the Plan.

*ii.*      ***Ongoing Bankruptcy Court Jurisdiction.***

Notwithstanding the entry of the Confirmation Order, the occurrence of the Effective Date and the disbursement, turning over and/or transfer of the Assets to the Liquidating Trust, the Bankruptcy Court shall have exclusive jurisdiction over the Chapter 11 Case after the Effective Date, including but not limited to jurisdiction to, among other things:

a.      Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of, or subordinate for any purposes pursuant to section 510 of the Bankruptcy Code, any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim, request for attorneys' fees and costs, and the resolution of any and all objections to the allowance or priority of all Claims and Interests, including the resolution of the reconsideration, recharacterization, subordination, impairment, reduction or disallowance of a Claim, or the reconsideration of the allowance of any Claim pursuant to section 502(j) of the Bankruptcy Code or Bankruptcy Rules 9023 or 9024;

b.      Hear and determine any and all causes of action and rights of the Debtor that arose before or after the Petition Date that are expressly preserved pursuant to, among other things, section 1123(b)(3) of the Bankruptcy Code, are yet to be liquidated and are preserved for prosecution by the Liquidating Trustee or other appropriate party in interest, including any designee or successor, against any Person whatsoever, on account of any and all Litigation Claims defined herein (including, but not limited to, all avoidance powers granted to the Debtor under the Bankruptcy Code and all causes of action and remedies granted pursuant to sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, and all non-avoidance actions owned by the Estate including, but not limited to, claims of tort, breach of contract and claims lying in law or in equity, whether based in common law, Florida state law, another state's law, Federal law or otherwise); provided, however, that notwithstanding anything in Section 11.1.2 or the Plan to the contrary, the Plan shall incorporate the stipulation and order relating to the insurance policy issued to Gibraltar Bank & Trust Company by National Union Fire Insurance Company of Pittsburgh, PA (Policy No. 01-232-51-05) and the insurance policy issued by Twin City Fire Insurance Company to Gibraltar Bank & Trust Company (Policy No. 00 DA 0259335-09) (together, as defined in the Plan, the "Policies"), and any actions relating to the Policies shall be filed and litigated exclusively in the District Court. The stipulation and order are attached to the Plan as Appendix 11.1.2;

c.      Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract to which the Debtor is a party or with respect to which the Debtor may be liable, including without limitation the determination of whether such contract is executory for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

d.      Enter orders as necessary to facilitate the Liquidating Trust's post-Confirmation sale or other disposition of Trust Assets;

e.      Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the Liquidating Trust Agreement;

f.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Trustee or the Bankruptcy Estate  that may be pending in the Chapter 11 Case on the Effective Date;

g.      Decide or resolve any disputes regarding the assignment, ownership of Claims and remission to the Liquidating Trust of Collateral Source Recoveries;

h.      Decide or resolve any disputes regarding a party's entitlement to a Distribution from the Liquidating Trust, including application of Collateral Source Recoveries to reduce Distributions on account of Allowed Claims;

i.      Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505 or 1146 of the Bankruptcy Code;

j.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Liquidating Trust Agreement, the Plan and the Confirmation Order;

k.      Resolve any disputes relating to objections to monthly fee invoices for submitted by the Liquidating Trustee, Liquidating Trust Oversight Committee or their Post-Confirmation Professionals;

l.      Hear and determine any matters concerning the enforcement of the provisions of Article 10 of the Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

m.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Liquidating Trust Agreement, the Plan or the Confirmation Order;

n.      Permit the Plan Proponents, to the extent authorized pursuant to section 1127 of the Bankruptcy Code and with the consent of TD Bank, to modify the Plan or any agreement or document created in connection with the Plan or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

o.      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Liquidating Trust Agreement, the Plan or the Confirmation Order and the Distributions thereunder;

90

p.      Enforce any injunctions entered in connection with or relating to the Plan or the Confirmation Order;

q.      Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Liquidating Trust Agreement or the Plan are enjoined or stayed;

r.      Determine any other matters that may arise in connection with or relating to the Plan or any settlement or compromise approved by prior order the Bankruptcy Court;

s.      Order the imposition of a bar order in favor of any Entity entering into a compromise of a Litigation Claim with the Liquidating Trustee with identical scope, breadth and reach as that provided in connection with prior settlement agreements approved in the Confirmation Order or  in the Chapter 11 Case as may be necessary;

t.      Decide or resolve any disputes regarding Distributions, including, but not limited to, any disputes between a Beneficiary and its counsel regarding the fees and costs of such counsel;

u.      Enter any orders in aid of prior orders of the Bankruptcy Court; and

v.      Enter a final decree closing the Chapter 11 Case.

## N.      <u>Conditions to Confirmation</u>

As provided for in Section 9.1 of the Plan, the following are the conditions to entry of the Confirmation Order:

a.      The Disclosure Statement shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee;

b.      The Disclosure Statement Approval Order shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee and the Disclosure Statement Approval Order shall have become a Final Order in the Chapter 11 Case;

c.      The Plan shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee;

d.      The Confirmation Order shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee;

e.      The 9019 Motion shall be in form and substance satisfactory to TD Bank, the Plan Proponents and the Banyon Trustee; and

f.      The 9019 Order shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee.

**O.      Conditions to Effective Date of the Plan**

Pursuant to Section 9.2 of the Plan, the Plan shall not become effective and the Effective Date shall not occur unless and until:

a.      The Bankruptcy Court shall have entered the Confirmation Order which, *inter alia*, confirms the Plan, ratifies the Committee's selection of the Liquidating Trustee and the Liquidating Trust Oversight Committee, and authorizes and directs the Trustee, the Committee, the Liquidating Trustee and the Estate to perform all of their obligations under the Settlement Agreement, and is in form and substance satisfactory to TD Bank, the Plan Proponents and the Banyon Trustee;

b.      The Confirmation Order shall not have been stayed and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation order;

c.      The executed and approved Settlement Agreement is in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee;

d.      The Bankruptcy Court shall have approved, in all respects, the Settlement Agreement;

e.      The Bankruptcy Court shall have entered the 9019 Order which, *inter alia*, authorizes and directs the Banyon Trustee, the Trustee, the Committee, the Liquidating Trustee, the Banyon Bankruptcy Estates and the Estate to perform all of their obligations under the Settlement Agreement, and is in form and substance satisfactory to TD Bank, the Plan Proponents and the Banyon Trustee;

f.      The 9019 Order shall not have been stayed and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such 9019 Order;

g.      The Liquidating Trust Agreement is in form and substance satisfactory to TD Bank and the Plan Proponents;

h.      The Liquidating Trust Agreement shall have been executed and delivered by the Liquidating Trustee and the Trustee;

i.      Subject to Section 6.1.14 of the Plan, the Trustee on behalf of the Estate has transferred the Assets to the Liquidating Trust; provided that the Trustee shall not have any obligation to transfer the Assets to the Liquidating Trust unless and until all other conditions to effectiveness contained in Section 9.2 of the Plan, except the condition set forth in Section 9.2.12 of the Plan, shall have been satisfied or waived in accordance with Section 9.4 of the Plan;

j.      TD Bank shall have made the TD Bank Contribution; provided that TD Bank shall not have any obligation to make the TD Bank Contribution unless and until all other conditions to effectiveness contained in Section 9.2 of the Plan shall have been satisfied or waived in accordance with Section 9.4 of the Plan; and

k.      All other documents, instruments and agreements, in form and substance satisfactory to TD Bank, the Plan Proponents, and the Banyon Trustee, provided for under the Plan or necessary to implement the Plan, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby.

**P.      Termination of Plan for Failure to Become Effective**

If the Effective Date shall not have occurred on or prior to July 31, 2013, then the Plan shall terminate and be of no further force or effect unless the provisions of Section 9.3 of the Plan are waived or extended in writing by each of the TD Bank, the Plan Proponents and the Banyon Trustee (this end date is an integral part of the TD Bank Settlement).

**Q.      Waiver of Conditions**

The Plan Proponents, the Banyon Trustee and TD Bank may collectively waive any or all of the conditions set forth in Sections 9.1 or 9.2 of the Plan. Any such waiver shall be in writing and signed by each of the Parties.

**R.      Modifications to the Plan**

The Plan provides in Section 13.1 that subject to the restrictions on Plan modifications set forth in section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend or modify the Plan before its substantial consummation; provided that, such alteration, amendment or modification to the Plan shall be acceptable to TD Bank.

**S.      Exculpation, Releases and Injunction.**

*i.      Exculpation.*

**Except as otherwise specifically provided in the Plan, neither the Trustee, the Liquidating Trustee, the Liquidating Trust Oversight Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (only in their capacity as members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)) nor any such foregoing party's employees, representatives, members, advisors, attorneys, financial advisors or agents or any of such parties' successors and assigns (as pertaining to such foregoing party in their foregoing capacities), shall have or incur, and are released from, any claim, obligation, cause of action or liability to one another or to any holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation and**

93

pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence, willful misconduct or actual fraud and in all respects shall be entitled to reasonably rely upon the advice of their respective Professionals or Post-Confirmation Professionals with respect to their duties and responsibilities (if any) under the Plan.

Except as otherwise specifically provided in the Plan, neither any holder of a Claim or Interest, regardless of whether each has Filed a proof of Claim or Interest in the Chapter 11 Case or other party in interest, nor any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Trustee, the Liquidating Trustee, the Liquidating Trust Oversight Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (only in their capacity as members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)) or any of such foregoing parties' employees, representatives, advisors, attorneys, financial advisors, or agents or such parties successors and assigns (as pertaining to such foregoing party in their foregoing capacities), for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for such persons' gross negligence, willful misconduct or actual fraud.

 *ii.*  *Injunction.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, rights, causes of action, liabilities or any Interests based upon any act or omission, transaction or other activity of any kind or nature related to the Debtor or the Chapter 11 Case that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Interest and regardless of whether such entity has voted to accept the Plan, and any successors, assigns or representatives of such entities shall be precluded and permanently enjoined on and after the Effective Date from (a) the commencement or continuation in any manner of any Claim, action or other proceeding of any kind with respect to any Claim, Interest or any other right or Claim against any assets of the Debtor which they possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any claim, interest or any other right or claim against any assets of the Debtor which such Entities possessed or may possess prior to the Effective Date, (c) the creation, perfection or enforcement of any encumbrance or Lien of any kind with respect to any Claim, Interest or any other right or Claim against the Debtor or any assets of the Debtor which they possessed or may possess prior to the Effective Date, and (d) the assertion of any Claims that will be released by the Plan.

*iii.*        *Limitation of Liability.*

**Except as expressly set forth in the Plan, following the Effective Date, neither the Trustee, the Liquidating Trustee, the Liquidating Trust Oversight Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (only in their capacity as  members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)) nor any of such foregoing parties' employees, advisors, members, attorneys, professionals or agents (as pertaining to such foregoing party in their foregoing capacities) shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan or any contract, instrument, release or other agreement or document created in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence, willful misconduct or actual fraud**.

*iv.*        *Release of TD Bank Releasees.*

**Upon the occurrence of the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in the Plan or the Settlement Agreement, the RRA Releasors shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged the TD Bank Releasees from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies and demands, of any and every kind, character or nature whatsoever (including Unknown Claims), whether liquidated or unliquidated, asserted or unasserted, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, at equity or otherwise, which the RRA Releasors, or any of them, or anyone claiming through them, on their behalf or for their benefit may have or claim to have, now or in the future, against any TD Bank Releasee that are based upon, relate to, or arise out of, in connection with or pertain to (a)(i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors; (b) any act, fact, transaction, event, occurrence, statement or omission in connection with (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors; or (c) anything alleged in any complaint asserted by an RRA Releasor against a TD Bank Releasee, including, but not limited to, those alleged in the RRA Complaint, or that could have been alleged in any such complaint or other similar proceedings, including, without limitation, the Banyon Asserted Claims and Unknown Claims (collectively, the "Released Claims"); provided, however, the release in favor of the TD Bank Releasees described herein shall not (A) effect a release of any claim by the United States Government or any of its agencies or any state and local governmental authority whatsoever against the TD Bank Releasees, or (B) enjoin the United States Government or**

95

any of its agencies or any state and local governmental authority whatsoever from bringing any claim, suit, action or other proceedings against the TD Bank Releasees asserting any other liability, including without limitation any claim, suit or action arising under the IRC, securities laws, environmental laws or any criminal laws of the United States or any state or local jurisdiction.  Notwithstanding anything contained in Section 10.6 of the Plan or elsewhere in the Plan, or in the Settlement Agreement to the contrary, the foregoing is not intended to release, nor shall it have the effect of releasing, (x) TD Bank from the performance of its obligations in accordance with the Plan or the Settlement Agreement, including, without limitation, any claim, demand or cause of action relating to the payment of the TD Bank Contribution; or (y) any Released Claim held by TD Bank or its affiliates, including, but not limited to, the release of any Claim that would otherwise be a Released Claim by TD Bank or its affiliates against another TD Bank Releasee.

     *v.*     ***Unknown Claims.***

An "Unknown Claim" is any Released Claim that any RRA Releasor does not know or suspect to exist in his, her or its favor at the time of giving the release required by Section 10.6 of the Plan and 3.1 of the Settlement Agreement that if known by him, her or it, might have affected his, her or its settlement and release.  With respect to any and all Released Claims, each RRA Releasor shall expressly waive or be deemed to have waived, and by operation of the Confirmation Order and the 9019 Order shall have waived the provisions, rights and benefits of California Civil Code § 1542 (to the extent it applies in the Plan), which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

Each RRA Releasor expressly waives, and shall be deemed to have waived, and by operation of the Confirmation Order and the 9019 Order shall have waived, any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, that is similar, comparable or equivalent in effect to California Civil Code § 1542.  The RRA Releasors may hereafter discover facts in addition to or different from those that any of them now knows or believes to be true with respect to the subject matter of the Released Claims, but each RRA Releasor shall expressly have and shall be deemed to have, and by operation of the Confirmation Order and the 9019 Order shall have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or noncontingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery of existence of such different or additional facts.  Each RRA Releasor acknowledges and shall be deemed to have acknowledged, and by operation of the Confirmation Order and the 9019

Order shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

     *vi.*     ***TD Bank Releasee Injunction and Bar Order.***

**(A) Upon the occurrence of the Effective Date, the Confirmation Order and 9019 Order shall act as an injunction against each and every Entity, including, without limitation, the plaintiffs in regard to the lawsuits enumerated on Appendix 10.8 hereof, and each and every Entity will be permanently enjoined, barred and restrained from instituting, prosecuting, continuing, pursuing or litigating in any manner:**

     **1.**     **any Released Claim; and**

     **2.**     **any action, suit or proceeding against any TD Bank Releasee (except as against Emess Capital, L.L.C.), including, without limitation (in each case, whether pre-judgment or post-judgment) enforcing, levying, employing legal process, attaching, garnishing, sequestering, bringing proceedings supplementary to execution, collecting or otherwise recovering by any means or in any manner from any TD Bank Releasee based upon any liability or responsibility, or asserted or potential liability or responsibility, directly or indirectly, of any TD Bank Releasee to or for the benefit of any Entity arising from, in any way related to, based upon, arising in connection with or pertaining to:**

     **(a)(i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors;**

     **(b) the Released Claims; and/or**

     **(c) any other claims, acts, facts, transactions, events, occurrences, statements or omissions that are, could have been or may be alleged against the TD Bank Releasees, including, without limitation, those asserted in the RRA Complaint, the Banyon Asserted Claims and the Third Party Claims or in any other complaint, action, suit or proceeding brought or that might be brought by, through, on behalf of, or for the benefit of any Entity (whether arising under federal, state or foreign law and regardless of where asserted), including, without limitation, any Unknown Claims, that is in any way related to: (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors;**

**(B) Notwithstanding the foregoing subsection (A), Section 10.8:**

4969645-2

1.      **Shall not enjoin or bar any action or claim by TD Bank or its affiliates, including, but not limited to, the assertion of any claim that would otherwise be a Released Claim by TD Bank or its affiliates against another TD Bank Releasee;**

2.      **Shall not enjoin or bar any action or claim against TD Bank filed by Coquina Investments in the matter captioned *Coquina Investments v. Rothstein, et al.*, 10-cv-60786 (S.D. Fla.), including, but not limited to, the pending appeal and cross-appeal of the decisions and orders issued in the U.S. District Court for the Southern District of Florida (Miami Division) that is currently pending in the Court of Appeals docketed at case no. 12-11161, including any subsequent related appeal, review or remand;**

3.      **Shall not (i) enjoin any claim by the United States Government or any of its agencies or any state and local governmental authority whatsoever against the TD Bank Releasees, or (ii) enjoin the United States Government or any of its agencies or any state and local governmental authority whatsoever from bringing any claim, suit, action or other proceedings against the TD Bank Releasees asserting any other liability, including without limitation any claim, suit or action arising under the IRC, securities laws, environmental laws or any criminal laws of the United States or any state or local jurisdiction;**

4.      **Shall not enjoin or bar the prosecution of that certain *Plaintiffs' Amended Motion for Sanctions Against TD Bank, N.A.* dated as of December 10, 2012 currently pending in the Broward County Circuit Court before the Honorable Judge Jeffrey E. Streitfeld in the case *Razorback Funding et al. v. Scott W. Rothstein, et al.,* Case No. 09-062943 (07); and**

5.      **Shall not bar any claim or action which is not, or was not, within the subject matter jurisdiction of the Bankruptcy Court as determined by Final Order of the Bankruptcy Court or of the District Court (which Final Order may be entered after the Effective Date), including any claim or action that is an independent claim not permitted to be barred under controlling Eleventh Circuit precedent.**

*vii.*      ***TD Bank Release.***

**Upon the occurrence of the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in the Plan or in the Settlement Agreement, TD Bank shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged the Estate, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (only in their capacity as  members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustee and any Professionals retained by the Estate by Final Order of the Bankruptcy Court on or before May 8, 2013, from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies and demands, of any and every kind, character or nature whatsoever, whether liquidated or unliquidated,**

4969645-2

asserted or unasserted, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, at equity or otherwise, which TD Bank, or anyone claiming through it, on its behalf or for its benefit, may have or claim to have, now or in the future, against the Estate, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (but only in their capacity as members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustee and any Professionals retained in the Chapter 11 Case by the Estate by Final Order of the Bankruptcy Court in the Chapter 11 Case on or before May 8, 2013 that are based upon, relate to, or arise out of, in connection with or pertain to (a) (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors, or (b) any act, fact, transaction, event, occurrence, statement or omission in connection with (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors, or (c) anything alleged in the RRA Complaint or that could have been alleged in the RRA Complaint or other similar proceedings. Notwithstanding anything contained in Section 10.9 of the Plan, elsewhere in the Plan or in the Settlement Agreement to the contrary, the foregoing is not intended to release, nor shall it have the effect of releasing, (x) the Estate, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (but only in their capacity as members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustee and any Professionals retained by the Estate, or the Liquidating Trustee from the performance of their respective obligations in accordance with the Plan or the Settlement Agreement, or (y) the Estate, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (but only in their capacity as members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustee and any Professionals retained by the Estate, or the Liquidating Trustee from making any Distribution to TD Bank on account of (A) the TD Bank Junior Subordinated Claims, or (B) on any Claim or recovery assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013.

**T.      Certain Miscellaneous Provisions.**

> *i.      Revocation of the Plan.*

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation does not occur or if the Plan does not become effective in accordance with Article 9, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor; (b) constitute an admission of any fact or legal conclusion by the Debtor or any other Entity; or (c) prejudice in any manner the rights of any of the Plan Proponents in any further proceedings involving the Estate.

*ii.*        ***No Admissions.***

If Confirmation or the Effective Date does not occur, nothing contained in the Plan or Disclosure Statement shall be deemed as an admission by any of the Plan Proponents or any other party with respect to any matter set forth therein or herein including, without limitation, liability on any Claim or the propriety of any Claims classification.

*iii.*        ***Pre-Confirmation Modification.***

If, at the Confirmation Hearing, any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Plan Proponents, the Banyon Trustee, and TD Bank, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided, however, that such provision as altered or interpreted must be acceptable in form and substance to each of the Plan Proponents, the Banyon Trustee, and TD Bank.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*iv.*        ***Successors and Assigns.***

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

*v.*        ***Exemption from Certain Transfer Taxes.***

Pursuant to section 1146(a) of Bankruptcy Code, the issuance, transfer or exchange of any security or the making or delivery of any instrument of transfer under the Plan, including the transfer of the Assets to the Liquidating Trust, may not be taxed under any law imposing a stamp tax, use tax, sales tax or similar tax.  Any sale of any Asset occurring on or after or upon the Effective Date shall be deemed to be in furtherance of the Plan.

*vi.*        ***Exemption from Securities Laws.***

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of the interests in the Liquidating Trust will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

*vii.*        ***Preservation of Rights of Setoff.***

The Liquidating Trustee may, in his or her sole discretion, but shall not be required to, set off against any Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Estate or the Liquidating Trust may have against the holder of such Claim; however, neither the failure to do so nor the allowance of any Claim hereunder shall

100

constitute a waiver or release by the Liquidating Trustee of any such claim that the Estate or the Liquidating Trust may have against such holder.

## VII.   VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan, including that (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Plan Proponents have complied with applicable provisions of the Bankruptcy Code, (iv) the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law, (v) the disclosure required by section 1125 of the Bankruptcy Code has been made, (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code) (*see* "Acceptance of Plan" and "Confirmation Without Acceptance of All Impaired Classes," herein below), (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless such liquidation or reorganization is proposed in the Plan, (viii) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to such holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### A.      Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only classes of claims and equity interests that are "Impaired" (as defined in the Plan and in section 1124 of the Bankruptcy Code), under the Plan are entitled to vote to accept or reject the Plan.  A class is impaired if the legal, equitable or contractual rights to which the claims or equity interests of that class entitled the holders of such claims or equity interests are modified, other than by curing defaults and reinstating the debt. Classes of Claims and Interests that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  Each holder of a Claim, as of the record date, in an Impaired Class other than those Classes that are deemed to reject the Plan shall be entitled to vote to accept or reject the Plan.

### B.      Classes Impaired Under the Plan Entitled to Vote

As set forth above, the following Classes of Claims and Interests are or may be Impaired and entitled to vote under the Plan:

| | |
|---|---|
| Class – 2 | Single Source Recovery Allowed Unsecured Claims |
| Class – 3 | Multiple Source Recovery Allowed Unsecured Claims |
| Class – 4 | Razorback Rising Tide Unsecured Claim |
| Class – 5 | Banyon Unsecured Claim |
| Class – 6 | Funds' Subordinated Unsecured Claim |

101

Class – 7              Miscellaneous Subordinated Claims
Class – 8              TD Bank Junior Subordinated Claim

Acceptances of the Plan are being solicited only from those holders of Claims in Impaired Classes that will or may receive a distribution under the Plan.  Accordingly, the Plan Proponents are soliciting acceptances from members of Classes **2, 3, 4, 5, 6 and 7**.  Class 8 is Impaired under the Plan, but the holder of the Allowed Class 8 Claim ("TD Bank Junior Subordinated Claim") has agreed to have such Claim deemed to have voted to accept the Plan; provided, however that the Plan Proponents shall not rely on Class 8 as an impaired accepting class for purposes of determining whether the Plan complies with Section 1129(a)(10) of the Bankruptcy Code.  Class 9 ("Allowed Interests in the Debtor") shall be deemed to have rejected the Plan and the Plan Proponents shall not solicit their vote on the Plan.  Class 1 holders are deemed to have accepted the Plan and, accordingly, the Plan Proponents shall not solicit their vote on the Plan.

**C.      Voting Procedures and Requirements**

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT.  IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT.  YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.**

*i.      Ballots.*

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  If you did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please contact the voting agent TSI at (954) 889-8405 or at info@rra-bk.com

**PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.**

*ii.      Completing and Returning Ballots.*

**YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO TSI, 8255 WEST SUNRISE BLVD., #177, PLANTATION, FL 33322, USA.  VOTES CANNOT BE TRANSMITTED ORALLY OR ELECTRONICALLY.    FACSIMILE OR EMAILED BALLOTS WILL NOT BE ACCEPTED.    TO BE COUNTED, ORIGINAL SIGNED BALLOTS MUST BE ACTUALLY RECEIVED ON OR BEFORE JULY 2, 2013 AT 5:00 P.M., PREVAILING EASTERN TIME.**

**IT IS IMPORTANT TO CAREFULLY REVIEW THE BALLOT BEFORE SIGNING AND RETURNING IT AS SET FORTH ABOVE.    SPECIFICALLY, DEPENDING ON WHICH CLASS OF CLAIMS IS APPLICABLE TO YOU, YOU WILL NEED TO EVALUATE AND DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN.**

**D.**     **Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing regarding whether the Plan and the Plan Proponents have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing will be held on **July 11, 2013 at 9:30 a.m.** and will be held before the Honorable Raymond B. Ray, United States Bankruptcy Judge, United States Bankruptcy Court, 299 East Broward Blvd., Courtroom 308, Fort Lauderdale, FL 33301.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement at the Confirmation Hearing of the date to which the Confirmation Hearing has been adjourned.

**E.**     **Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for Confirmation are that the Plan (i) is accepted by the requisite holders of Claims and Interests or, if not so accepted, is "fair and equitable" and "does not discriminate unfairly" as to the non-accepting Class of Claims or Interests, (ii) is in the "best interests" of each holder of a Claim or Interest that does not vote to accept the Plan in each impaired Class under the Plan, (iii) is feasible and (iv) complies with the applicable provisions of the Bankruptcy Code.

**F.**     **Acceptance of Plan**

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims or equity interests vote to accept the Plan, except under certain circumstances.  *See* "Confirmation Without Acceptance of All Impaired Classes" below.  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of that class vote to accept the plan.  A plan is accepted by an impaired class of equity interests if holders of at least two-thirds of the number of shares in such class vote to accept the plan.  Only those holders of Allowed Claims who actually vote count in these tabulations.  Holders of Allowed Claims who fail to vote are not counted as either accepting or rejecting a plan.  Since holders of Interests will not receive a Distribution under the Plan, these holders are deemed to vote against the Plan and will not receive a Ballot.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a Claim or interest in such class.  *See* "Best Interests Test" below.  In addition, each impaired class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below.  *See* "Confirmation Without Acceptance of All Impaired Classes" below.

**G.**     **Confirmation Without Acceptance of All Impaired Classes**

The Bankruptcy Code contains provisions for confirmation of the Plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly" and (b) is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claims or equity interests before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class, (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class may not receive any property under the plan; or, (c) with respect to a class of equity interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of equity interests receives full compensation for its allowed claims or allowed equity interests, no holder of claims or equity interests in any junior class may receive or retain any property on account of such claims or equity interests. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders either (i) retain their liens and receive deferred cash payments with a value as of the plan's effective date equal to the value of their interest in property of the estate or (ii) otherwise receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

**AS HOLDERS OF INTERESTS IN CLASS 9 ARE DEEMED TO REJECT THE PLAN, THE PLAN PROPONENTS INTEND TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS. IN ADDITION, IF HOLDERS OF CLAIMS IN ANY OF CLASSES 2, 3, 4, 5, 6, OR 7 VOTE TO REJECT THE PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF THE BANKRUPTCY CODE WITH RESPECT TO EACH AND EVERY SUCH CLASS.**

## H.        Best Interests Test

In order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each holder of a claim or interest in any such impaired class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

## I.        Liquidation Analysis and Alternatives to the Plan.

In the present case, the Trustee has been liquidating all of the Debtor's assets. The Plan contemplates a continuation of this process. All of the assets of the Debtor have been or will be liquidated to Cash. All Estate assets will be transferred to and vest in the Liquidating Trust on the Effective Date under the control of the Liquidating Trustee. All such assets transferred shall be liquidated and monetized, with the proceeds therefrom being distributed to holders of Allowed Claims in accordance with the Plan and Liquidating Trust.

As of May 2013, the Trustee possesses Cash in the approximate amount of $83.1 million. Such amount will be reduced based on the payment of Administrative Expense Claims through the Effective Date.

In addition, the Plan will be funded with, among other things, (a) cash held by the Estate; (b) payments from TD Bank to the Estate and (c) any additional recoveries through the Litigation Claims.

Pursuant to a settlement agreement between the Trustee and the Razorback Plaintiffs approved by the Court on October 5, 2012 [ECF No. 3362 (motion), ECF No. 3510 (order)], the Trustee has agreed to support a substantial contribution claim in the RRA Estate in favor of the Razorback Plaintiffs in the approximate aggregate amount of $8 million. As shown by the Liquidation Analysis, whether or not the Court approves such substantial contribution claim will have no impact on distributions to creditors holding Allowed Claims in Class 2 ("Single Source Recovery Allowed Unsecured Claims") and/or Class 3 ("Multiple Source Recovery Allowed Unsecured Claims"). *See* Liquidation Analysis.

If the Plan is not confirmed, then one alternative would be the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, which would require the appointment of a chapter 7 trustee to control the liquidation and distribution of all Estate assets. The Plan Proponents believe that the conversion of this Chapter 11 Case to a case under chapter 7 would materially and adversely affect the timing and amount of the Distributions that would ultimately be made to the holders of Allowed Claims. Specifically, the Trustee and the applicable Professionals have expended a significant amount of time and resources since the Petition Date investigating all aspects of the financial affairs of the Debtor. As a result, the Trustee, as well as the Committee (the other Plan Proponent), believe that a chapter 7 trustee, and any professionals engaged by such chapter 7 trustee, will add substantial additional and unnecessary administrative

105

expense to the Estate in attempting to recreate the substantial amount of knowledge already possessed by the Trustee and his Professionals, thereby significantly reducing and delaying the amounts that could be distributed to holders of Allowed Claims.  Moreover, based on the TD Bank Settlement, which can only be consummated through approval of the Plan, the holders of Allowed Claims in Classes 2 and 3 are projected to receive Distributions of the Full Amount of their Allowed Claims.  In addition, this Chapter 11 Case has been litigation intensive for the last three years.

The Trustee believes that the present state of the litigation in respect of the Litigation Claims is such that substantial qualitative value will be lost as a result of the substitution of a chapter 7 trustee and his or her professionals.  In connection therewith, the Plan Proponents refer all Creditors and parties in interest to the Liquidation Analysis attached hereto as Exhibit 2.  As set forth in such Liquidation Analysis, the Plan Proponents assert that there will be a significantly higher distribution to holders of Allowed Claims under the Plan than in the context of a chapter 7 liquidation.  Moreover, distributions in a chapter 7 will be substantially delayed as compared to the timing of the Distributions anticipated under the Plan.  Furthermore, a chapter 7 conversion will allow for the establishment of a new Claims bar date, causing significant confusion and uncertainty in the Claims reconciliation process.  The Plan Proponents believe that there exist three circumstances where additional claims could be filed: (i) conversion of the case to chapter 7 and the establishment of a new claims bar date; (ii) the establishment of a new bar date in the chapter 11 case after motion, hearing and entry of an order of the Bankruptcy Court granting the motion; and (iii) the allowance of Claims in settlements.

Moreover, the Plan Proponents believe that the compensation provisions for the Liquidating Trustee are significantly more favorable compared with a chapter 7 trustee because, subject to Bankruptcy Court approval following application and a hearing, the Liquidating Trustee has agreed to receive reasonable compensation at the rate of $500.00 per hour (adjusted annually) for all time reasonably spent by the Liquidating Trustee in administering the Liquidating Trust.  The initial hourly rate of $500.00 is $125.00 per hour less than the hourly rate that Mr. Goldberg is currently charging for his time in representing the Committee in the Chapter 11 case and $155.00 per hour less than the rate that Mr. Goldberg typically charges to other clients.  Not only is this compensation structure favorable from an hourly rate perspective, the Plan Proponents also believe that it is favorable because it will be less than the statutory commission that would be charged by a chapter 7 trustee.

The second alternative to the proposed Plan is the dismissal of this Chapter 11 Case. This is an untenable option for several reasons.  First, the cash accumulated to date would be subject to various competing claims and there would be no orderly method to distribute the funds.  Second, unsecured creditors of the Estate would quickly file suit or continue with their pre-petition suits against the Debtor in various courts.  The court presiding over any particular proceeding would not or might not have jurisdiction over any other proceeding, and as a consequence each Creditor would be free to undertake such collection activity, including lawsuits, as such Creditor deemed appropriate, all in what would amount to a "race to the courthouse."  Moreover, the ability of the Trustee to pursue and recover on Litigation Claims available to the Estate under the Bankruptcy Code will be substantially diminished and/or eliminated by the dismissal of this Chapter 11 Case.  These consequences are exactly the types of activities that the bankruptcy process is designed to avoid.  It is only through the bankruptcy

106

process that the Creditors can be treated in accordance with each Creditor's respective rights and the assets of the Estate maximized for the benefit of all holders of Allowed Claims.

A third alternative in the event the Plan is not confirmed is that another party in interest could attempt to formulate and propose a different plan of liquidation. The Plan Proponents do not believe that an alternate plan under chapter 11 of the Bankruptcy Code can be formulated that will provide for greater Distributions to Creditors than provided for under the Plan. Any alternate plan would likely take significant time to formulate and propose, would likely substantially increase the Administrative Expense Claims against the Estate as well as reduce Distributions ultimately payable to Creditors.

Collectively, these factors clearly evidence that the proposed Plan is superior to liquidation under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Case or the filing of an alternate plan of reorganization or liquidation. The Plan Proponents firmly believe that the Plan results in a fair balancing of all parties' rights, and again urges Creditors to vote to accept the Plan.

**J.      Feasibility**

Under section 1129(a)(11) of the Bankruptcy Code, the Plan Proponents must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan). The Plan clearly complies with this requirement because the Plan expressly contemplates the liquidation of the Debtor; therefore, there would be no successor estate that could be subject to any future reorganization or liquidation.

**K.      Compliance with the Applicable Provisions of the Bankruptcy Code**

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Plan Proponents have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

**L.      Binding Effect of Confirmation of the Plan**

Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in the Debtor and their respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

The Plan Proponents are unaware of any potential agreements that the Liquidating Trustee may revisit, but the Liquidating Trustee will have all powers available to the Liquidating Trustee under the Plan, Liquidating Trust, Bankruptcy Rules, Bankruptcy Code, Federal Rules of Civil Procedures and any other applicable law or rules.

The Trustee has no intention at this time, provided however, that the Trustee is not waiving his rights or any rights that the Liquidating Trustee may have under the Bankruptcy Code, Bankruptcy Rules or other applicable law or rules, to object to, or seek reconsideration of,

107

any previous settlements approved by the Bankruptcy Court, including, without limitation, on the following grounds: (i) fraud; (ii) partial or complete satisfaction of the Claim(s) referenced in such settlements; and (iii) failure of the non-debtor settling party(ies) to fulfill obligations under the Bankruptcy Court-approved settlement agreements.

## VIII.   RISK FACTORS

### A.      Failure to Satisfy Vote Requirement

The Plan Proponents are seeking to receive votes in number and representing Claims in amount sufficient to enable the Bankruptcy Court to confirm the Plan.  If the Plan does not receive sufficient votes for Confirmation pursuant to section 1129(a) of the Bankruptcy Code, then the Plan Proponents will nevertheless seek to employ the "cram down" procedures set forth in section 1129(b) of the Bankruptcy Code.

### B.      The Plan May Not Be Accepted or Confirmable

Although the Plan Proponents believes that the Plan satisfies all the requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes.

The Plan requires acceptance by at least one of the following Classes: 2, 3, 4, 5, 6, or 7. If at least one Class does not accept the Plan it may not be confirmed. If at least one Class accepts the Plan, the Plan Proponents may seek Confirmation pursuant to the "cramdown" provisions of the Bankruptcy Code.  Moreover, even if the Plan Proponents sought to confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, the holder of a Claim in a non-accepting Class could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code.

If the Plan is not confirmed it is unclear what, if any, Distributions would be made to the Creditors.

### C.      Allowed Claims May Exceed Estimates

The projected distributions set forth in this Disclosure Statement are based upon the Plan Proponents' good faith estimate of the amount of Plan expenses that will be incurred and total amount of Claims in each Class that will ultimately be allowed, including application of the Collateral Source Recoveries to the Distributions.  The actual amount of Plan expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving disputed Claims.  Additionally, the actual amount of Allowed Claims in any Class could be materially greater than anticipated, or aggregate amount of Collateral Source Recoveries could be materially lesser than anticipated, which will impact the distributions to be made to holders of Claims.

**D.**      **Non-Occurrence of the Effective Date**

If the conditions precedent to the Effective Date, which are discussed in detail in Article 9 of the Plan, have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order.  THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS TO EFFECTIVENESS OF THE PLAN WILL BE TIMELY SATISFIED OR WAIVED.  In the event that the conditions to effectiveness have not been timely satisfied or waived, the Plan would be deemed null and void and the Trustee may propose or solicit votes on an alternative plan that may not be as favorable to parties in interest as the Plan.

**E.**      **Inability to Monetize and Collect Assets**

If the Trustee or the Liquidating Trustee are unable to monetize and collect the Assets of the Estate or Liquidating Trust then there will be a shortfall in Cash to pay the Claims.  THERE CAN BE NO ASSURANCE THAT ALL ASSETS WILL BE MONETIZED AND COLLECTED.

**F.**      **Reconsideration of the "Sochet Claim"**

The Trustee has sought to reduce the Claim of the Ira Sochet Inter Vivos Revocable Trust and Investors Risk Advantage (collectively, the "Sochet Claim").  *See Motion to Reconsider Order Allowing Claim of Ira Sochet Inter Vivos Revocable Trust in Addition to Objection to Claim of Ira Sochet Inter Vivos Revocable Trust* [ECF No. 3603] and *Motion to Reconsider Order Allowing Claim of Investors Risk Advantage, LP, in Addition to Objection to Claim of Investors Risk Advantage, LP* [ECF No. 3604] (collectively, the "Sochet Reconsideration Motions").  The Sochet Claim is currently allowed in the amount of $68,034,178.67, subject to the outcome of the Sochet Reconsideration Motions.

If the Court does not grant the relief sought in the Sochet Reconsideration Motions and the Distribution on the Sochet Claim is not otherwise reduced as provided for in Section 3.4 of the Plan then the projected Distributions for all Classes would be materially reduced.

In the event that the Trustee is unsuccessful with respect to the Sochet Reconsideration Motions, and, subject to the provisions of the Plan, the amount of the Sochet Claim is Allowed in the amount of approximately $68 million, then the Trustee estimates that Distributions to the holders of Claims in Classes 2 and 3 would likely be less than the Full Amount of their Allowed Claims.  The Trustee considers the foregoing to be unlikely as the Trustee believes that the Sochet Entities have already received collateral source recoveries totaling $68,751,744.38, a figure representing $717,565.70 *more* *than* the amount of their alleged claims totaling $68,034,178.68, and therefore, the Sochet Entities are not entitled to any Distributions on their alleged claims.

**G.**      **Risk of Delay in Achieving the Effective Date**

Although the Plan Proponents believe that they will be able to confirm the Plan and cause it to become Effective on or prior to July 31, 2013, if that does not occur then pursuant to Section 9.3 of the Plan, the Plan shall terminate unless this deadline is waived by TD Bank, the Plan Proponents and the Banyon Trustee.

## H.        The Plan Proponents Have no Duty to Update

The statements contained in this Disclosure Statement are made by the Plan Proponents of the date hereof, unless otherwise specified in the Plan, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth in the Plan since that date.  The Plan Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

## I.        Court Approval of the Distribution Structure

The Bankruptcy Court may not approve the Distribution structure provided for in the Plan.  Under the Plan any Creditor will only begin to receive Distributions once the other Creditors in the Class have reached the same level on a Pro Rata basis taking into consideration all Collateral Source Recoveries.  Under the Plan's Class Distribution structure a Creditor with significant Collateral Source Recoveries may receive little or no Distributions from the Liquidating Trust; whereas a Creditor with very little or no Collateral Source Recoveries may receive a substantially greater Pro Rata Distribution from the Liquidating Trust.  The Plan Proponents believe that this approach is the most equitable under the circumstances of this Chapter 11 Case. However, if the Bankruptcy Court were to determine otherwise, the Distributions available to all Classes under the Plan may be significantly affected.

In particular, the Liquidation Analysis estimates the combined total General Unsecured Claims in Classes 2 to 3, taking into account adjustments for Collateral Source Recoveries, to range from approximately $123 million to $133 million (with a recovery of the Full Amount of such Allowed Claims in the Chapter 11 Case).  In the event that the Bankruptcy Court does not approve the use of Collateral Source Recoveries to adjust Distributions on Claims and the case were to become a case under chapter 7 of the Bankruptcy Code, the Liquidation Analysis shows that the range of Claims in Classes 2 to 3, in a chapter 7 liquidation, increases to approximately $302 million to $308 million (with a recovery in the range of approximately 31% to 40%).  *See* Liquidation Analysis, chart (line 17).

## J.        Effectiveness of the Plan is Dependent Upon Approval of the 9019 Motion

The Settlement Agreement among TD Bank, the Banyon Trustee and the Trustee settles and resolves all issues among and between the parties, on the terms provided therein.  The Trustee's agreements in the Settlement Agreement pertaining to TD Bank and pertaining to the Banyon Trustee will be approved and implemented through Plan.  The Banyon Trustee's agreements in the Settlement Agreement pertaining to TD Bank and pertaining to the Trustee will be approved and implemented through the Banyon Trustee's 9019 Motion.  The Settlement Agreement contains a requirement, in Section 3.3, that the Bankruptcy Court enter a bar order enjoining claims against TD Bank that pertain to the Rothstein Ponzi scheme.  The bar order must be entered in regard to the RRA Case (through the Plan) and in regard to the Banyon Cases (through the 9019 Motion).   The effectiveness of the Plan is dependent on the approval of the 9019 Motion, and the approval of the 9019 Motion is dependent on the Confirmation of the Plan. Approval of the 9019 Motion is not guaranteed, and if the 9019 Motion is not approved, then the Plan will not become effective unless this condition is waived by the Plan Proponents, the Banyon Trustee and TD Bank per the terms of § 9.4 of the Plan.  Certain alleged creditors in the

Banyon Bankruptcy Cases have sought to withdraw the reference to the District Court with respect to the 9019 Motion.

## IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

A description of certain United States ("U.S.") federal income tax consequences of the Plan is provided below.  The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plan as discussed herein.  Only the potential material U.S. federal income tax consequences of the Plan to the Debtor and to a hypothetical investor typical of the holders of Claims or Interests who are entitled to vote to confirm or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement.  No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been obtained or sought with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtor or to any particular holder of Claims or Interests.  No assurance can be given that the IRS or other tax authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated and proposed thereunder, judicial decisions, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the Debtor or to the holders of Claims or Interests.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS).  FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED, NOR ARE THE INCOME TAX CONSEQUENCES TO VICTIMS OF A PONZI SCHEME DISCUSSED HEREIN.**

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF CLAIMS OR INTERESTS. HOLDERS OF CLAIMS OR INTERESTS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

## A.    U.S. Federal Income Tax Consequences to the Debtor

### i.    *Cancellation of Indebtedness Income*

Generally, the discharge of a debt obligation owed by a debtor for an amount less than the "adjusted issue price" (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("COD") income to the debtor under IRC § 61(a)(12), subject to certain rules and exceptions. However, when the discharge of indebtedness occurs pursuant to a plan confirmed by the Bankruptcy Court in a case under Title 11 of the Bankruptcy Code (e.g., a chapter 11 case), there is a special rule under the IRC § 108 which specifically excludes from the debtor's income the amount of such discharged indebtedness (the so-called "bankruptcy exception"). Instead, certain of the debtor's tax attributes otherwise available generally must be reduced by the amount of the COD income that is excluded from the debtor's income.

It is not certain whether the Debtor will have COD income under the Plan although any such COD income should be excluded from the Debtor's income under the "bankruptcy exception" referenced above assuming that the Plan is confirmed with respect to the Debtor.

### ii.    *Transfer of Liquidating Trust Assets to the Liquidating Trust*

The transfer of the Liquidating Trust Assets to the Liquidating Trust by the Debtor, as of the Effective Date, may result in the recognition of gain or income by the Debtor, depending in part on the value of such Assets on the Effective Date and the Debtor's tax basis in those Assets as of the Effective Date. Provided that the Debtor is treated as an S corporation for U.S. federal income tax purposes, any such gain or income will not be taxable to the Debtor but rather will pass through and be taxable to its shareholders.

## B.    U.S. Federal Income Tax Consequences to the Holders of Allowed Claims

The U.S. federal income tax consequences of the Plan to the holders of Allowed Claims will depend on a number of factors, including, without limitation, the following: (i) whether the Claim constitutes a "security" for U.S. federal income tax purposes; (ii) the nature and origin of the Claim; (iii) the manner in which the holder acquired the Claim; (iv) the length of time the Claim has been held; (v) whether the Claim was acquired at a discount; (vi) whether the holder has taken a bad debt deduction or loss with respect to the Claim (or any portion thereof) in the current year or in any prior year; (vii) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (viii) the holder's method of tax accounting; (ix) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (x) the timing of any Distribution under the Plan with respect to the Claim. Holders of Allowed Claims will generally recognize gain or loss with respect to their Claims in

an amount equal to the difference between the amount realized (generally, the amount of Cash and the fair market value of any other property received) with respect to their Claims and their tax basis in the Claims.  In general, the character of any gain or loss recognized by such holder as capital or ordinary will depend on whether the Claim constitutes a capital asset in the hands of the holder.  To the extent that a debt instrument is acquired after its original issuance for less than the issue price of such instrument, it will have market discount.  A holder of an Allowed Claim with market discount must treat any gain recognized on the satisfaction of such Claim as ordinary income to the extent that it does not exceed the market discount that has already been accrued with respect to such Claim.  In addition, holders of Allowed Claims will recognize ordinary income to the extent they receive cash or other property that is allocable to accrued but unpaid interest that the holder has not yet included in its income.  There may also be state, local or foreign tax considerations applicable to particular holders of Allowed Claims, none of which are discussed herein.  **Holders of Allowed Claims should consult with their own tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.**

## C.      U.S. Federal Income Tax Treatment of the Liquidating Trust and its Beneficiaries

### *i.      U.S. Federal Income Tax Characterization of the Liquidating Trust*

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust within the meaning of § 301.7701-4(d) of the Treasury Regulations. It is being created pursuant to the Plan for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with the liquidating purpose of the Liquidating Trust. As such, the Liquidating Trust should be treated as a "grantor" trust pursuant to IRC §§ 671 through 678, except as discussed in subsections iv or v, below.  Assuming that this tax treatment is correct, and subject to the exception discussed in subsections iv and v, below, the Liquidating Trust will not be treated as a separate entity for U.S. federal income tax purposes; instead, the holders of "beneficial interests" in the Liquidating Trust (i.e., the Beneficiaries of the Liquidating Trust) will be treated as the "grantors" of the Liquidating Trust's Assets and will be treated as owning their respective pro rata shares of such Assets, subject to any liabilities of the Debtor assumed by the Liquidating Trust and any liabilities of the Liquidating Trust itself.  The Liquidating Trustee may, but is not required to, request a ruling from the IRS regarding the "grantor trust" status of the Liquidating Trust for U.S. federal income tax purposes. Accordingly, while it is anticipated that the Liquidating Trust qualifies as a liquidating trust pursuant to § 301.7701-4(d) of the Treasury Regulations and Revenue Procedure 94-45, 1994-2 C.B. 684, in the absence of such ruling, there can be no assurance that the IRS will not dispute such tax treatment of the Liquidating Trust.  **Beneficiaries of the Liquidating Trust should consult with their own tax advisors regarding the tax treatment of the Liquidating Trust for U.S. federal income tax purposes.**

### *ii.      Establishment and Taxation of the Liquidating Trust*

Except as discussed in subsections iv or v, below, the transfer of the Liquidating Trust Assets to the Liquidating Trust will be treated for U.S. federal income tax purposes (including, without, limitation, IRC §§ 61(a)(12), 483, 1001, 1012 and 1274) as a deemed transfer of the

Liquidating Trust Assets from the Debtor to the Beneficiaries of the Liquidating Trust, subject to any liabilities of the Debtor or the Liquidating Trust payable from the proceeds of such Assets, followed by such Beneficiaries' deemed transfer of such Assets (subject to such liabilities) to the Liquidating Trust in exchange for their respective "beneficial interests" in the Liquidating Trust, all as of the Effective Date.  Thus, on the Effective Date, each such Beneficiary should be treated as transferring its Claims to the Debtor in exchange for the Beneficiary's pro rata share of the applicable Liquidating Trust Assets (subject to any liabilities of the Liquidating Trust) followed by the Beneficiary's transfer of such Assets (subject to applicable liabilities) to the Liquidating Trust.  The "applicable Liquidating Trust Assets" are the Liquidating Trust Assets (or the proceeds thereof) from which a Beneficiary of the Liquidating Trust may be entitled to receive a Distribution under the Plan.  Each such Beneficiary should generally recognize gain or loss equal to the difference between the fair market value of the applicable Liquidating Trust Assets as of the Effective Date (subject to any applicable liabilities) and the Beneficiary's adjusted tax basis in its Allowed Claim.  The tax basis of the applicable Liquidating Trust Assets deemed received by the Beneficiary in the exchange will equal the amount realized by that Beneficiary and the holding period for such Assets will begin on the day following the exchange.  The value of the Liquidating Trust Assets transferred to the Liquidating Trust as of the Effective Date shall be the fair market value of such Assets as of that Effective Date of transfer.  The Assets transferred into the Liquidating Trust shall be valued consistently by all parties including, but not limited to, the Debtor, the Debtor's Estate, the Liquidating Trustee and all Beneficiaries, and these valuations will be used for all U.S. federal income tax purposes.  Each Beneficiary of the Liquidating Trust will be required to report on its U.S. federal income tax return its allocable share of any income, loss, deduction or credit recognized or incurred by the Liquidating Trust (including any interest or other investment income earned with respect to the Liquidating Trust Assets) in the manner described in the Liquidating Trust.  The obligation of a Beneficiary to report that Beneficiary's allocable share of any such income is not dependent on the Liquidating Trust distributing any cash or other proceeds to that Beneficiary.  **Beneficiaries of the Liquidating Trust should consult with their own tax advisors for information that may be relevant to their particular circumstances regarding the U.S. federal income tax consequences to them resulting from the establishment of the Liquidating Trust.**

### *iii.    Tax Reporting*

The Liquidating Trustee shall file returns (including U.S. federal income tax returns) for the Liquidating Trust as a grantor trust pursuant to § 1.671-4(a) and (b) of the Treasury Regulations.  As soon as practicable after the close of each calendar year, but in no event later than March 15th, the Liquidating Trustee shall mail to each Beneficiary of record during such year, a statement showing information sufficient for each Beneficiary to determine its share of income, gain, loss, deductions and credits for U.S. federal income tax purposes in accordance with §§ 1.671-4(a) and 1.671-4(b)(3) of the Treasury Regulations.  Notwithstanding the foregoing, in the event that (i) any portion of the Liquidating Trust is treated as a "qualified settlement fund" pursuant to § 1.468B-1 of the Treasury Regulations, or (ii) the Liquidating Trustee timely elects to treat any portion of the Liquidating Trust subject to Disputed Claims as a "disputed ownership fund" pursuant to § 1.468B-9(c)(2)(ii) of the Treasury Regulations, the federal income tax consequences (including the tax reporting) shall be determined in accordance with the rules set forth in IRC § 468B and the Treasury Regulations thereunder.

114

*iv.*        ***Holders of Disputed Claims and Disputed Ownership Fund Election***

Although not free from doubt, holders of Disputed Claims should not recognize any gain or loss on the date that the assets are transferred to the Disputed Claims Reserve, but should only be required to report their gain or loss on the cash or other property that is distributed out to the holder from the Claims Reserve free from any further restriction.  The Liquidating Trustee may elect under § 1.468B-9(c)(2)(ii) of the Treasury Regulations to treat the Liquidating Trust Assets allocable to the Disputed Claims Reserve as a "disputed ownership fund" for U.S. federal income tax purposes.  Such election, if timely made, will result in the creation of a separate taxable entity and the U.S. federal income taxation would be governed by § 1.468B-9(c) of the Treasury Regulations.  If treated as a "disputed ownership fund," the income and gain recognized with respect to the Liquidating Trust Assets allocable to the Disputed Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to such Liquidating Trust Assets allocable to the Disputed Claims Reserve, and all Distributions from such Disputed Claims Reserve (which Distributions will be net of the related expenses by such Reserve) will be treated as received by the holders of Disputed Claims in respect of their Claims. **Holders of Disputed Claims should consult with their own tax advisors regarding the U.S. federal income tax consequences to them arising from the Disputed Claims Reserve and any election to treat the Disputed Claims Reserve as a "disputed ownership fund" for U.S. federal income tax purposes.**

*v.*        ***Qualified Settlement Fund***

In the event any portion of the Liquidating Trust is treated as a "qualified settlement fund" pursuant to § 1.468B-1 of the Treasury Regulations, the U.S. federal income tax consequences shall be determined in accordance with the rules set forth in IRC § 468B and the Treasury Regulations thereunder.  The creation of a qualified settlement fund ("QSF") is generally taxed as a C corporation and income tax returns will be required to be filed by the "administrator" of the QSF.  In addition, if there is only one transferor of assets to the QSF, there is a special grantor trust tax election that the sole transferor of the property may make with the initial tax return to treat the QSF as a grantor trust (whether or not the QSF would otherwise be classified, in the absence of this election, as a grantor trust for U.S. income tax purposes). **Holders of Claims should consult with their own tax advisors for information that may be relevant to their particular circumstances regarding the U.S. federal income tax consequences to them of having a qualified settlement fund established.**

## D.        Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments are subject to backup withholding under certain circumstances.  Under the IRC's backup withholding rules, a U.S. holder may be subject to backup withholding at the applicable rate with respect to certain Distributions or payments pursuant to the Plan, unless the holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer

identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

E.      **Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING UPON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

F.      **Circular 230 Disclaimer**

**TO ENSURE COMPLIANCE WITH U.S. TREASURY CIRCULAR 230, EACH HOLDER OF A CLAIM OR INTEREST IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, BY ANY HOLDER OF A CLAIM OR INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE IRC; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE PLAN; AND (C) EACH HOLDER OF A CLAIM OR INTEREST SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## X.      RECOMMENDATION

The Plan Proponents strongly recommend that all Creditors receiving a Ballot vote in favor of the Plan. The Plan Proponents believe that the Plan is in the best interests of Creditors. The Plan as structured, among other things, allows Creditors to participate in distributions believed to be in excess of those which would otherwise be available if the Chapter 11 Case was dismissed or converted under chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to Creditors.

## XI.    CONCLUSION

**FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.  THE PLAN PROPONENTS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL BE ACTUALLY RECEIVED BY 5:00 P.M., PREVAILING EASTERN TIME, ON JULY 2, 2013.**

4969645-2

Dated: May 29, 2013.

Respectfully Submitted


_____/s/ Herbert Stettin_____
By:  Herbert Stettin, Chapter 11 Trustee of RRA


**BERGER SINGERMAN LLP**
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Telephone: 305-755-9500
Facsimile: 305-714-4340


By: __/s/ *Paul Steven Singerman*
    Paul Steven Singerman
    Florida Bar No. 378860
    singerman@bergersingerman.com
    Jordi Guso
    Florida Bar No. 0863580
    jguso@bergersingerman.com
    Christopher A. Jarvinen
    Florida Bar No. 0021745
    cjarvinen@bergersingerman.com
    Isaac M. Marcushamer
    Florida Bar No. 60373
    imarcushamer@bergersingerman.com

*Counsel for Herbert Stettin, Chapter 11 Trustee*

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Miami Tower
100 S.E. Second Street, Suite 4400
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310


By: /s/ *John H. Genovese*
    John H. Genovese
    Florida Bar No. 280852
    jgenovese@gjb-law.com
    Jesus M. Suarez
    Florida Bar No. 60086
    jsuarez@gjb-law.com


*Special Counsel/Conflicts Counsel for Herbert Stettin, Chapter 11 Trustee*

118

Dated:  May 29, 2013.

                            Respectfully Submitted

                                  /s/ John Mullin                         
                            By:  John Mullin (counsel for Edward Morse, Committee Chairperson)
                            The Official Committee of Unsecured Creditors

                                **AKERMAN SENTERFITT**
                               350 E. Las Olas Blvd., Suite 1600
                             Ft. Lauderdale, FL 33301
                             Telephone: 954-463-2700
                             Facsimile: 954-463-2224

                             By:   /s/ *Michael I. Goldberg*
                             Michael I. Goldberg
                             Florida Bar No. 886602
                             michael.goldberg@akerman.com

                               *Counsel for the Official Committee of Unsecured Creditors*

119

**EXHIBIT 1**
**The Plan**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:                                                  CASE NO.:  09-34791-BKC-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,          CHAPTER 11

     Debtor.

_____/

## SECOND AMENDED JOINT PLAN OF LIQUIDATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY
## CODE PROPOSED JOINTLY BY THE TRUSTEE AND THE
## OFFICIAL COMMITTEE OF UNSECURED CREDITORS (AS MODIFIED)

**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Paul Steven Singerman
Florida Bar No. 378860
singerman@bergersingerman.com
Jordi Guso
Florida Bar No. 0863580
jguso@bergersingerman.com
Christopher A. Jarvinen
Florida Bar No. 0021745
cjarvinen@bergersingerman.com
Isaac M. Marcushamer
Florida Bar No. 60373
imarcushamer@bergersingerman.com

*Counsel for Herbert Stettin, Chapter 11 Trustee*

**AKERMAN SENTERFITT**
350 E. Las Olas Blvd., Suite 1600
Ft. Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Michael I. Goldberg
Florida Bar No. 886602
michael.goldberg@akerman.com
Eyal Berger
Florida Bar No. 11069
eyal.berger@akerman.com

*Counsel for the Official Committee of
Unsecured Creditors*

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Miami Tower
100 S.E. Second Street, Suite 4400
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310
John H. Genovese
Florida Bar No. 280852
jgenovese@gjb-law.com
Jesus M. Suarez
Florida Bar No. 60086
jsuarez@gjb-law.com

*Special Counsel/Conflicts Counsel for Herbert
Stettin, Chapter 11 Trustee*

**Dated: May 29, 2013**

4999213-2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARTICLE 1      **DEFINITIONS, INTERPRETATION AND RULES OF
               CONSTRUCTION** ............................................................................ 2

    A.      **Scope of Definitions** ............................................................................ 2

    B.      **Definitions** ............................................................................................ 2

        1.1      9019 Motion .......................................................................... 2
        1.2      9019 Order ............................................................................ 3
        1.3      Abandoned Assets ................................................................ 3
        1.4      Additional Recoveries .......................................................... 3
        1.5      Administrative Expense Claim ............................................. 3
        1.6      Administrative Expense Claim Bar Date(s) .......................... 4
        1.7      Affiliate ................................................................................ 4
        1.8      Allowed ................................................................................ 4
        1.9      Assets ................................................................................... 6
        1.10     Available Cash ..................................................................... 6
        1.11     Ballot ................................................................................... 6
        1.12     Bankruptcy Code .................................................................. 6
        1.13     Bankruptcy Court ................................................................. 6
        1.14     Bankruptcy Rules ................................................................. 7
        1.15     Banyon Asserted Claims ...................................................... 7
        1.16     Banyon Bankruptcy Cases ................................................... 7
        1.17     Banyon Bankruptcy Estates ................................................. 7
        1.18     [Intentionally Omitted] ........................................................ 7
        1.19     Banyon Creditor Collateral Source Recoveries ................... 7
        1.20     Banyon Distribution ............................................................. 7
        1.21     Banyon Releasors ................................................................. 7
        1.22     Banyon Trustee .................................................................... 8
        1.23     Banyon Unsecured Claim ..................................................... 8
        1.24     Banyon Unsecured Creditor Fund ........................................ 8
        1.25     Bar Date ............................................................................... 8
        1.26     Bar Order Hearing ................................................................ 8
        1.27     Beneficiary or Beneficiaries ................................................ 8
        1.28     Business Day ........................................................................ 8
        1.29     Cases .................................................................................... 8
        1.30     Cash ...................................................................................... 8
        1.31     Chapter 11 Case .................................................................... 8
        1.32     Claim .................................................................................... 9
        1.33     Claim Objection Procedures Order ...................................... 9
        1.34     Class ..................................................................................... 9
        1.35     Client Files Order ................................................................. 9

# TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| 1.36 | Collateral Source Recoveries | 9 |
| 1.37 | Committee | 9 |
| 1.38 | Confirmation | 10 |
| 1.39 | Confirmation Date | 10 |
| 1.40 | Confirmation Hearing | 10 |
| 1.41 | Confirmation Order | 10 |
| 1.42 | Coquina Settlement Agreement | 10 |
| 1.43 | Court of Appeals | 10 |
| 1.44 | Creditor | 10 |
| 1.45 | Debtor | 10 |
| 1.46 | Disallowed | 11 |
| 1.47 | Disclosure Statement | 11 |
| 1.48 | Disclosure Statement Approval Order | 11 |
| 1.49 | Disputed Claim | 11 |
| 1.50 | Disputed Claims Reserve | 11 |
| 1.51 | Distribution | 12 |
| 1.52 | Distribution Record Date | 12 |
| 1.53 | District Court | 12 |
| 1.54 | Effective Date | 12 |
| 1.55 | Entity | 12 |
| 1.56 | [Intentionally Omitted] | 12 |
| 1.57 | Estate | 12 |
| 1.58 | File or Filed | 12 |
| 1.59 | Final Distribution | 12 |
| 1.60 | Final Distribution Date | 12 |
| 1.61 | Final Order | 13 |
| 1.62 | [Intentionally omitted] | 13 |
| 1.63 | Forfeiture Action | 13 |
| 1.64 | Full Amount | 13 |
| 1.65 | Funds | 14 |
| 1.66 | Funds' Settlement Agreement | 14 |
| 1.67 | Funds' Subordinated Claim | 14 |
| 1.68 | General Unsecured Claims | 14 |
| 1.69 | Gibraltar Settlement Agreement | 14 |
| 1.70 | Gibraltar Subordinated Claim | 15 |
| 1.71 | Governmental Unit | 15 |
| 1.72 | Government Unit Bar Date | 15 |
| 1.73 | Impaired | 15 |
| 1.74 | Indemnification Obligations | 15 |
| 1.75 | Interest | 15 |
| 1.76 | IRC | 15 |
| 1.77 | Levin Claims | 15 |
| 1.78 | Levy Settlement Agreement | 16 |

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 1.79 | Levy Subordinated Unsecured Claims | 16 |
| 1.80 | Lien | 16 |
| 1.81 | Liquidating Trust | 16 |
| 1.82 | Liquidating Trust Agreement | 16 |
| 1.83 | Liquidating Trustee | 17 |
| 1.84 | Liquidating Trust Oversight Committee | 17 |
| 1.85 | Litigation Claims | 18 |
| 1.86 | Miscellaneous Subordinated Claims | 19 |
| 1.87 | Multiple Source Recovery Allowed Unsecured Claim | 20 |
| 1.88 | Non-Governmental Unit Bar Date | 20 |
| 1.89 | Notice of Effective Date | 20 |
| 1.90 | October Mediation Expense | 20 |
| 1.91 | Order for Relief | 20 |
| 1.92 | Parties | 20 |
| 1.93 | Person | 20 |
| 1.94 | Petition Date | 20 |
| 1.95 | Plan | 21 |
| 1.96 | Plan Proponents | 21 |
| 1.97 | Post-Confirmation Professional | 21 |
| 1.98 | Priority Claim | 21 |
| 1.99 | Priority Non-Tax Claim | 21 |
| 1.100 | Priority Tax Claim | 21 |
| 1.101 | Professional | 21 |
| 1.102 | Professional Claim | 22 |
| 1.103 | Pro Rata | 22 |
| 1.104 | Razorback Plaintiffs | 22 |
| 1.105 | Razorback Settlement Agreement | 22 |
| 1.106 | Razorback Substantial Contribution Claim | 23 |
| 1.107 | Razorback Subordinated Unsecured Claim | 23 |
| 1.108 | Razorback Unsecured Claim | 23 |
| 1.109 | Razorback Unsecured Rising Tide Claim | 23 |
| 1.110 | Rejection Claim Bar Date | 23 |
| 1.111 | Released Claims | 23 |
| 1.112 | Reserves | 23 |
| 1.113 | Rothstein | 23 |
| 1.114 | RRA | 23 |
| 1.115 | RRA Banyon Senior Subordinated Claim | 23 |
| 1.116 | RRA Complaint | 23 |
| 1.117 | RRA Releasors | 24 |
| 1.118 | Scheduled | 24 |
| 1.119 | Schedules | 24 |
| 1.120 | Section 502(h) Bar Date | 24 |
| 1.121 | Secured Claim | 24 |

# TABLE OF CONTENTS
## (continued)

**Page**

1.122  Settlement Agreement ................................................................. 24
1.123  Single Source Recovery Allowed Unsecured Claim ............................ 25
1.124  Statutory Fees .......................................................................... 25
1.125  TD Bank .................................................................................. 25
1.126  TD Bank Contribution ................................................................ 25
1.127  TD Bank Indemnitee .................................................................. 25
1.128  TD Bank Releasees .................................................................... 25
1.129  TD Bank Junior Subordinated Claim .............................................. 26
1.130  Third Party Claims .................................................................... 26
1.131  Trustee .................................................................................... 26
1.132  Trust Assets ............................................................................. 26
1.133  Unclaimed Property ................................................................... 26
1.134  Unclassified Claims ................................................................... 27
1.135  Unimpaired .............................................................................. 27
1.136  United States Trustee ................................................................. 27
1.137  Verified Banyon Creditor Collateral Source Recovery Disclosure ......... 27
1.138  Verified Collateral Source Recovery Disclosure ............................... 28
1.139  Voting Agent ........................................................................... 28
1.140  Voting Deadline ........................................................................ 28

C.      Rules of Interpretation ...................................................... **28**

D.      Computation of Time ......................................................... **30**

**ARTICLE 2    TREATMENT OF UNCLASSIFIED CLAIMS ...................... 30**

2.1    Administrative Expense Claims ..................................................... 30
2.2    Statutory Fees ........................................................................... 30
2.3    Professional Claims .................................................................... 31
2.4    Trustee and Liquidating Trustee Compensation ................................ 32
       2.4.1   Trustee Compensation ....................................................... 32
       2.4.2   Liquidating Trustee Compensation ....................................... 34
2.5    Deadline for Filing Administrative Expense Claims ........................... 34
2.6    Allowed Priority Non-Tax Claims .................................................. 35
2.7    Allowed Priority Tax Claims ........................................................ 35

**ARTICLE 3    CLASSIFICATION AND TREATMENT OF CLASSIFIED
               CLAIMS AND INTERESTS ........................................... 36**

3.1    General .................................................................................... 36
3.2    Class 1:  Allowed Secured Claims ................................................. 37
3.3    Class 2:  Single Source Recovery Allowed Unsecured Claims ............... 37
3.4    Class 3:  Multiple Source Recovery Allowed Unsecured Claims ............ 39
3.5    Class 4:  Razorback Unsecured Rising Tide Claim ............................. 41

# TABLE OF CONTENTS
(continued)

**Page**

3.6   Class 5:  Banyon Unsecured Claim ........................................................ 42
3.7   Class 6:  Funds' Subordinated Claim..................................................... 48
3.8   Class 7:  Miscellaneous Subordinated Claims .................................... 49
3.9   Class 8:  TD Bank Junior Subordinated Claim.................................... 51
3.10  Class 9:  Allowed Interests in the Debtor ............................................ 51

**ARTICLE 4      IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS  IMPAIRED AND NOT IMPAIRED BY THE PLAN............................................................................................ 52**

4.1   Unimpaired Classes of Claims and Interests ....................................... 52
4.2   Impaired Classes of Claims and Interests ........................................... 52

**ARTICLE 5      TREATMENT OF EXECUTORY CONTRACTS................................... 52**

5.1   Rejection ................................................................................................ 52
5.2   Approval of Rejection; Rejection Damages Claims Bar Date............................. 52
5.3   Indemnification Obligations ................................................................. 53

**ARTICLE 6      MEANS FOR EXECUTION AND IMPLEMENTATION OF THIS PLAN ..................................................................................... 53**

6.1   Settlement Agreement ........................................................................... 53
6.2   The Liquidating Trust ........................................................................... 58

      6.2.1   Establishment of the Liquidating Trust................................... 58
      6.2.2   Purpose of Liquidating Trust ................................................... 58
      6.2.3   Contribution of Assets to the Liquidating Trust ..................... 59
      6.2.4   Certain Federal Tax Matters .................................................... 60
      6.2.5   Liquidating Trust Bond ............................................................ 61
      6.2.6   Liquidating Trust Management................................................. 61
      6.2.7   Liquidating Trust Oversight Committee ................................. 62
      6.2.8   Litigation Approval Rights of Liquidating Trust Oversight Committee .......................................................... 63
      6.2.9   Costs and Expenses of the Liquidating Trust ......................... 63
      6.2.10  [Intentionally Omitted] ........................................................... 64
      6.2.11  Retention and Compensation of Professionals by the Liquidating Trustee........................................................... 64
      6.2.12  Resignation and Removal of the Liquidating Trustee ............ 65
      6.2.13  Resignation and Removal of the Liquidating Trust Oversight Committee Members....................................... 66
      6.2.14  Conflicts of Interest................................................................. 67
      6.2.15  Initial Appointment of the Liquidating Trustee ..................... 67

6.3   Continuation of Automatic Stay ........................................................... 68
6.4   Continuation of Bankruptcy Rule 2004 Rights.................................... 68
6.5   Wind-Down of Debtor ........................................................................... 68
6.6   Disposition of Abandoned Assets ......................................................... 70

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 6.7 | Closing of the Chapter 11 Case | 70 |
| 6.8 | Dissolution of Committee | 71 |
| 6.9 | Client Files | 71 |
| 6.10 | Immediate Binding Effect | 71 |
| 6.11 | Additional Documents | 71 |
| 6.12 | [Intentionally Omitted] | 72 |
| 6.13 | Collateral Source Recovery Calculations | 73 |
| 6.14 | Collateral Source Recovery Remittance | 73 |
| 6.15 | Bar Order Hearing | 74 |
| 6.16 | Certain Settlement Issues | 74 |
| **ARTICLE 7** | **POST-CONFIRMATION LITIGATION** | **75** |
| 7.1 | Transfer and Enforcement of Causes of Action | 75 |
| 7.2 | Preservation of Rights | 76 |
| 7.3 | Objections to Claims | 76 |
| 7.4 | Disallowance of Late Claims | 77 |
| 7.5 | Recovery of Distributions on Disallowed Claims | 77 |
| 7.6 | Equitable Defenses Not Assertable Against Liquidating Trust | 78 |
| **ARTICLE 8** | **DISTRIBUTIONS** | **78** |
| 8.1 | Delivery of Distributions in General | 78 |
| 8.2 | Cash Payments | 79 |
| 8.3 | Interest on Claims | 79 |
| 8.4 | No de Minimis Distributions | 79 |
| 8.5 | Face Amount | 79 |
| 8.6 | Unclaimed and Undeliverable Distributions | 80 |
| 8.7 | Interim Distributions | 80 |
| 8.8 | Final Distribution | 81 |
| 8.9 | Disputed Claims Reserves | 81 |
| 8.10 | Compliance with Tax Requirements | 81 |
| 8.11 | Certain Rights of Setoff | 82 |
| **ARTICLE 9** | **CONDITIONS PRECEDENT** | **82** |
| 9.1 | Conditions to Confirmation | 82 |
| 9.2 | Conditions to the Effective Date | 82 |
| 9.3 | Termination of Plan for Failure To Become Effective | 84 |
| 9.4 | Waiver of Conditions | 85 |
| 9.5 | Notice of Effective Date | 85 |
| **ARTICLE 10** | **EFFECT OF CONFIRMATION AND RELEASES** | **85** |
| 10.1 | Jurisdiction of Court | 85 |
| 10.2 | Binding Effect | 85 |
| 10.3 | Exculpation | 86 |
| 10.4 | Injunction | 87 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 10.5 | Limitation of Liability | 88 |
| 10.6 | Release of TD Bank Releasees | 89 |
| 10.7 | Unknown Claims | 90 |
| 10.8 | TD Bank Releasee Injunction and Bar Order | 92 |
| 10.9 | TD Bank Release | 94 |

**ARTICLE 11    RETENTION OF JURISDICTION** .................................................. **97**

| | | |
|---|---|---|
| 11.1 | Ongoing Bankruptcy Court Jurisdiction | 97 |

**ARTICLE 12    ACCEPTANCE OR REJECTION OF THIS PLAN** ........................... **101**

| | | |
|---|---|---|
| 12.1 | Persons Entitled to Vote | 101 |
| 12.2 | Acceptance by Impaired Classes | 101 |
| 12.3 | Cramdown | 101 |

**ARTICLE 13    MISCELLANEOUS PROVISIONS** ...................................................... **101**

| | | |
|---|---|---|
| 13.1 | Modification of this Plan | 101 |
| 13.2 | Revocation of this Plan | 102 |
| 13.3 | Governing Law | 102 |
| 13.4 | No Admissions | 102 |
| 13.5 | Pre-Confirmation Modification | 102 |
| 13.6 | Successors and Assigns | 103 |
| 13.7 | Exemption from Certain Transfer Taxes | 103 |
| 13.8 | Exemption from Securities Laws | 103 |
| 13.9 | Preservation of Rights of Setoffs | 104 |
| 13.10 | No Injunctive Relief | 104 |
| 13.11 | Non Business Day | 104 |
| 13.12 | Entire Agreement | 104 |
| 13.13 | Notices | 104 |

**TABLE OF CONTENTS**
(continued)

**Page**

**APPENDICES**

Appendix 1.82    Liquidating Trust Agreement

Appendix 1.85    List of Certain Litigation Claims

Appendix 1.122   Settlement Agreement

Appendix 1.137   Form of Verified Banyon Creditor Collateral Source Recovery Disclosure

Appendix 1.138   Form of Verified Collateral Source Recovery Disclosure

Appendix 10.8    Litigation Pending Against TD Bank Releasees

Appendix 11.1.2  Stipulation and Order Regarding The Policies

## INTRODUCTION

Herbert Stettin, the Chapter 11 Trustee ("**Trustee**") for Rothstein Rosenfeldt Adler, P.A. (the "**Debtor**" or "**RRA**") and the Official Committee of Unsecured Creditors (the "**Committee**" and together with the Trustee, collectively, the "**Plan Proponents**") are the joint proponents of this *Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed Jointly by the Trustee and the Official Committee of Unsecured Creditors (as Modified)* (the "**Plan**") providing for the treatment, resolution and satisfaction of all Claims against and Interests in the Debtor.  All capitalized terms used herein shall have the meanings ascribed to them in Article 1 of this Plan.  Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtor's history, business, resolution of material disputes, financial projections for the liquidation and Distribution of the Debtor's remaining Assets, and a summary and analysis of this Plan and certain related matters.

This is a liquidating plan pursuant to which all of the Debtor's Assets, except for the Levin Claims, are to be transferred to the Liquidating Trust which will monetize any remaining non-Cash Assets, resolve Claims, and prosecute Litigation Claims held by the Debtor.  The Liquidating Trust shall be administered by the Liquidating Trustee.  All Available Cash will be distributed to the holders of Allowed Claims as set forth herein, whose Allowed Claims against the Debtor will be exchanged for a beneficial interest in the Liquidating Trust.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from holders of claims or interests until such time as the Disclosure Statement has been approved by the Bankruptcy Court.  The Plan Proponents urge all holders of Claims entitled to vote on the Plan to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.  The Plan Proponents are not soliciting the votes of any equity interest holders, who shall receive nothing under the Plan and whose Interests shall be extinguished on

the Effective Date.  No solicitation materials other than the Disclosure Statement and any schedules, appendices and exhibits attached thereto or referenced therein, or otherwise enclosed with the Disclosure Statement served by the Plan Proponents on interested parties, or as otherwise ordered by the Bankruptcy Court, have been authorized by the Plan Proponents or the Bankruptcy Court for use in soliciting acceptances of this Plan.  Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and Sections 13.1 and 13.2 of this Plan, the Plan Proponents expressly reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## ARTICLE 1

## DEFINITIONS, INTERPRETATION AND RULES OF CONSTRUCTION

A.    **Scope of Definitions.**  For the purposes of this Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article 1 of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, respectively. Whenever the context requires, capitalized terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

B.    **Definitions.**  In addition to such other terms as are defined in other Sections of this Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings ascribed to them in this Article 1 of this Plan.

1.1    **9019 Motion.**  The motion filed by the Banyon Trustee in the Banyon Bankruptcy Cases seeking Bankruptcy Court approval of the compromise and settlement set forth in the

Settlement Agreement, providing for the notice of such compromise and settlement to parties in interest, and authorizing and directing the consummation by the Banyon Trustee and the Banyon Bankruptcy Estates of the transactions contemplated therein by the Banyon Bankruptcy Estates, which motion must be in form and substance agreeable to TD Bank, the Committee, the Trustee and the Banyon Trustee.

   1.2 **9019 Order.** The order or orders of the Bankruptcy Court approving the 9019 Motion and implementing the terms of the Settlement Agreement, including, but not limited to, the provisions of Article 3 of the Settlement Agreement, which order or orders shall be in form and substance agreeable to TD Bank, the Committee, the Trustee and the Banyon Trustee.

   1.3 **Abandoned Assets**. Shall have the meaning set forth in Section 6.5.1 of this Plan.

   1.4 **Additional Recoveries**. The Cash portion of settlement agreements negotiated by the Trustee and approved by the Bankruptcy Court prior to the Effective Date where such Cash is anticipated to be collected by the Liquidating Trustee after the Effective Date, but excluding Cash disbursed, turned over, transferred or delivered by the Trustee to the Liquidating Trustee on the Effective Date.

   1.5 **Administrative Expense Claim.** A Claim for any cost or expense of administration (including Professional Claims) of the Chapter 11 Case asserted or arising under Sections 503, 507(a)(2), or 507(b) of the Bankruptcy Code, including any (a) actual and necessary cost or expense of preserving the Estate arising on or after the Petition Date, (b) compensation or reimbursement of expenses of Professionals arising on or after the Petition Date, to the extent allowed by the Bankruptcy Court under Section 330(a) or Section 331 of the Bankruptcy Code, (c) compensation or reimbursement for actual, necessary expenses in making

4999213-2

3

a substantial contribution in the Chapter 11 Case, and (d) fees or charges assessed against the Estate under Section 1930 of Title 28 of the United States Code.

1.6    **Administrative Expense Claim Bar Date(s).**  The date(s) established by one or more orders of the Bankruptcy Court as the deadline for the filing by any Creditor or other party in interest of an application, motion, request or other Bankruptcy Court approved pleading for allowance of any Administrative Expense Claim, including as established in the Disclosure Statement Approval Order; provided, however, that (a) unless otherwise ordered by the Bankruptcy Court, the Administrative Expense Claim Bar Date for the filing by any Professional of an application for any Administrative Expense Claim not yet Filed as of the date of this Plan shall be no later than the deadline set forth in the Disclosure Statement Approval Order, and (b) to the extent the Bankruptcy Court has entered an order establishing a different and specific deadline for a Creditor or other party in interest to file an Administrative Expense Claim, the date set forth in such order shall be deemed to be the Administrative Expense Claim Bar Date as to such Creditor or other party in interest.

1.7    **Affiliate.**  Shall have the meaning set forth in Section 101 of the Bankruptcy Code.

1.8    **Allowed.**  A Claim against or Interest in the Debtor or any portion thereof (a) that (i) has been allowed by a Final Order, (ii) for which a completed and duly executed Verified Collateral Source Recovery Disclosure, if applicable, has been timely submitted by the Voting Deadline, and (iii) is not subject to a motion under Section 502(j) of the Bankruptcy Code or Bankruptcy Rules 9023 or 9024 on or before the last date on which objections to Claims are required to be Filed pursuant to Section 7.3 of this Plan; provided, however, that the Liquidating Trustee shall not be precluded from filing motions pursuant to Section 502(j) of the Bankruptcy

4999213-2

Code or Bankruptcy Rules 9023 or 9024 after the deadline for filing objections to Claims set

forth in Section 7.3 of this Plan; or (b) as to which a completed and duly executed Verified

Collateral Source Recovery Disclosure has been timely submitted by the Voting Deadline and,

on or by the Effective Date, (i) no proof of Claim or Interest has been timely Filed with the

Bankruptcy Court and (ii) the liquidated and non-contingent amount of such Claim is Scheduled,

other than a Claim that is Scheduled at zero, in an unknown or unliquidated amount, or as

disputed, or (c) for which a proof of Claim in a liquidated amount has been timely Filed with the

Bankruptcy Court by the applicable Bar Date, a completed and duly executed Verified Collateral

Source Recovery Disclosure has been timely submitted by the Voting Deadline, and as to which

(i) no objection to its allowance has been Filed within the applicable periods of limitation fixed

by Section 7.3 of the Plan, the Bankruptcy Code, or by any order of the Bankruptcy Court,

(ii) any objection to its allowance has been settled or withdrawn, or has been overruled by a Final

Order; or (iii) the holder of such Claim has received an interim Distribution on account of such

Claim, but only to the extent of the interim Distribution received on such Claim,  or (d) that is

expressly allowed in the Plan; or (e) that is agreed in an allowed amount by written stipulation

between the holder of such Claim and the Liquidating Trustee, and subject to the consent of the

Liquidating Trust Oversight Committee; provided, however, that Claims allowed solely for the

purpose of voting to accept or reject the Plan shall not be considered Allowed Claims for any

other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be

Allowed as provided herein; provided further, however, that the possibility that a future motion

under Section 502(j) of the Bankruptcy Code or Bankruptcy Rules 9023 or 9024 may be Filed

with respect to such Claim subsequent to the date by which objections to Claims must be Filed

pursuant to Section 7.3 of this Plan, shall not cause such Claim not to be an Allowed Claim.

Unless otherwise specified under the Plan, under the Bankruptcy Code or by Final Order of the Bankruptcy Court in the Chapter 11 Case, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees or charges on such Claim from and after the Petition Date. Subsequent to the Effective Date, only the Liquidating Trustee shall be permitted to seek to reconsider a Claim previously Allowed by Final Order in the Chapter 11 Case pursuant to applicable law or procedure, including, but not limited to Section 502(j) of the Bankruptcy Code, Federal Rule of Civil Procedure 60(b) and Bankruptcy Rules 9023 or 9024.

      1.9    **Assets.**  All legal or equitable interests of the Debtor or the Estate in any and all real or personal property of any nature, tangible or intangible, including, without limitation, the Litigation Claims, rights under the Settlement Agreement, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, Cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, causes of actions, and any other general intangibles, and the proceeds, product, offspring, rents or profits thereof, whensoever and howsoever arising.

      1.10    **Available Cash.**  All Cash available for Distribution to Beneficiaries under the Liquidating Trust Agreement, less the amount of Cash deposited in the Reserves.

      1.11    **Ballot.**  The form or forms approved by the Bankruptcy Court and distributed to holders of Impaired Claims on which the acceptance or rejection of the Plan is to be indicated.

      1.12    **Bankruptcy Code.**  Title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in the Chapter 11 Case.

      1.13    **Bankruptcy Court.**  The United States Bankruptcy Court for the Southern District of Florida and, to the extent it may exercise jurisdiction in the Chapter 11 Case, the

District Court, or if either such court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct unit thereof that exercises jurisdiction over the Chapter 11 Case.

       1.14    **Bankruptcy Rules.**  The Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court and the guidelines and requirements of the United States Trustee, as in effect on the Petition Date and as thereafter amended, as applicable from time to time in the Chapter 11 Case.

       1.15    **Banyon Asserted Claims.**  Shall have the meaning set forth in the Settlement Agreement.

       1.16    **Banyon Bankruptcy Cases.**  The bankruptcy cases pending in the Bankruptcy Court for Banyon 1030-32, LLC, Case No. 10-33691-BKC-RBR and Banyon Income Fund, LP, Case No. 11-40929-BKC-RBR.

       1.17    **Banyon Bankruptcy Estates.**  The estates created by operation of Section 541 of the Bankruptcy Code following the commencement of the Banyon Bankruptcy Cases.

       1.18    **[Intentionally Omitted].**

       1.19    **Banyon Creditor Collateral Source Recoveries.**  In regard to a claim asserted against either of the Banyon Bankruptcy Estates, the amount calculated, determined and applied in accordance with Section 3.6(b) of this Plan.

       1.20    **Banyon Distribution**.  Shall have the meaning set forth in Section 3.6(b) of this Plan.

       1.21    **Banyon Releasors.**  Shall mean Banyon 1030-32, LLC, Banyon Income Fund, L.P., the Banyon Bankruptcy Estates, and the Banyon Trustee, and each of their subsidiaries and affiliates and the successors and assigns of any of them and any other Person that claims or might claim through, on behalf of or for the benefit of any of the foregoing.

4999213-2

1.22   **Banyon Trustee.**  Robert C. Furr solely in his capacity as Chapter 7 trustee for each of the Banyon Bankruptcy Estates.

1.23   **Banyon Unsecured Claim.**  An Allowed General Unsecured Claim in favor of the Banyon Bankruptcy Estates in the amount of $39.7 million ($39,700,000) classified and treated in accordance with Section 3.6 of this Plan.

1.24   **Banyon Unsecured Creditor Fund.**  $39.7 million ($39,700,000) in Cash from the TD Bank Contribution held by the Liquidating Trustee to be disbursed in accordance with Section 3.6(b) of this Plan.

1.25   **Bar Date.**  The Non-Governmental Unit Bar Date, the Governmental Unit Bar Date, the Rejection Claim Bar Date, Section 502(h) Bar Date, and the Administrative Expense Claim Bar Date.

1.26   **Bar Order Hearing.**  The hearing to consider the injunction provided in Section 10.8 of this Plan.

1.27   **Beneficiary or Beneficiaries.**  The holder(s) of an Allowed Claim as may be determined from time to time in accordance with the Plan and Liquidating Trust Agreement.

1.28   **Business Day.**  Any day other than a Saturday, Sunday, or "legal holiday" observed in Florida (as such term is defined in Bankruptcy Rule 9006(a)).

1.29   **Cases.**  The Chapter 11 Case and the Banyon Bankruptcy Cases.

1.30   **Cash.**  Legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

1.31   **Chapter 11 Case.**  This chapter 11 bankruptcy case of RRA, Case No. 09-34791-RBR-BKC.

1.32    **Claim**.  A right of a Creditor against the Debtor, whether or not asserted or allowed, of the type described in Bankruptcy Code Section 101(5), as construed by Bankruptcy Code Section 102(2).

1.33    **Claim Objection Procedures Order.**  The Final Order of the Bankruptcy Court Granting Trustee's Motion for Entry of an Order (I) Authorizing the Trustee to Add Claim Objection Categories to Anticipated Omnibus Objections; (II) Waiving the Requirements of Local Rule 3007-1(C) (Limiting Objections to Claims to Five Claims per Pleading); and (III) Establishing Uniform Procedures for the Claims Reconciliation Process dated October 11, 2011 [ECF No. 2119] entered in the Chapter 11 Case, that approves, *inter alia*, certain procedures for omnibus objections to Claims.

1.34    **Class.**  A group of Claims or Interests as classified in a particular class under the Plan pursuant to Bankruptcy Code Section 1122.

1.35    **Client Files Order.**  Any Final Order of the Bankruptcy Court in the Chapter 11 Case regarding the disposition of the files of former clients of the Debtor, including but not limited to the *Amended Agreed Order Granting Trustee's Motion for Approval of Protocol Regarding Notification to Former Clients Regarding Documents Held By Iron Mountain and Approving Abandonment* dated July 31, 2012 [ECF No. 3227] and any future Final Order entered in the Chapter 11 Case by the Bankruptcy Court regarding abandonment of client files.

1.36    **Collateral Source Recoveries.**  In regard to a Claim, the amount calculated in accordance with Section 6.13 of this Plan and determined and applied in accordance with Sections 3.4(b), 3.7(b) and 3.8(b) of this Plan.

1.37    **Committee.**  As defined in the first paragraph of this Plan, the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case as of the date on which the

Disclosure Statement Approval Order is entered.  As of the date hereof, the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case consists of the following members: (i) American Express Travel Related Services Company, Inc., (ii) Ira Sochet, Trustee-Revocable Intervivos Trust of Ira Sochet and (iii) John Mullin, Esq. for Edward J. Morse (or his testamentary estate as his successor).

   1.38 **Confirmation.**  Entry of the Confirmation Order by the Bankruptcy Court.

   1.39 **Confirmation Date.**  The date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

   1.40 **Confirmation Hearing.**  The duly noticed hearing conducted by the Bankruptcy Court to consider Confirmation of this Plan pursuant to Bankruptcy Code Section 1128, including any continuances thereof.

   1.41 **Confirmation Order.**  The order or orders of the Bankruptcy Court confirming pursuant to Section 1129 of the Bankruptcy Code and implementing the terms of this Plan, including, but not limited to, the provisions of Article 10 of this Plan, which order or orders shall be in form and substance acceptable to the Plan Proponents and TD Bank.

   1.42 **Coquina Settlement Agreement.**  That certain settlement agreement dated as of October 17, 2011 between the Trustee and Coquina Investments, and approved by the Bankruptcy Court in the Chapter 11 Case by Final Order dated October 21, 2011 [ECF No. 2138].

   1.43 **Court of Appeals.**  Shall mean the United States Court of Appeals for the Eleventh Circuit.

   1.44 **Creditor.**  Any Entity who holds a Claim against the Debtor.

   1.45 **Debtor.**  Rothstein Rosenfeldt Adler, P.A.

4999213-2

10

1.46    **Disallowed.**  A Claim, or such portion of a Claim, (a) that has been disallowed by a Final Order in the Chapter 11 Case, including, without limitation, any Claims that are disallowed by failing to comply with the applicable Bar Date for filing such Claim, (b) which were included on the Schedules as $0, unliquidated, disputed, or contingent and for which no contrary proof of Claim was timely Filed in accordance with the applicable Bar Date for filing such Claim, (c) that is not listed on the Schedules and as to which no proof of Claim has been Filed in accordance with the applicable Bar Date for filing such Claim, or (d) which has been disallowed pursuant to Section 3.4(b), 3.7(b), or 3.8(b) of this Plan.

1.47    **Disclosure Statement.**  That certain written amended disclosure statement that relates to this Plan as Filed in the Chapter 11 Case by the Plan Proponents, including the schedules and exhibits attached thereto, as any of them may be amended, modified or supplemented from time to time.

1.48    **Disclosure Statement Approval Order.**  That certain order of the Bankruptcy Court, approving, among other things, the Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, the notice and balloting procedures for this Plan, and setting various deadlines in connection with Confirmation of this Plan, including the Administrative Expense Claim Bar Date applicable to Professional Claims, which order shall be in form and substance acceptable to the Plan Proponents and TD Bank.

1.49    **Disputed Claim.**  A Claim where any portion thereof is neither an Allowed Claim nor a Disallowed Claim.

1.50    **Disputed Claims Reserve.**  Shall have the meaning set forth in Section 1.32 of the Liquidating Trust Agreement.

4999213-2

11

1.51     **Distribution**.  Any interim or subsequent payment or transfer made under the Plan or from the Liquidating Trust to a Beneficiary.

1.52     **Distribution Record Date.**  The record date for the purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be designated in the Confirmation Order.

1.53     **District Court.**  Shall mean the United States District Court for the Southern District of Florida.

1.54     **Effective Date.**  The first Business Day on which all conditions set forth in Section 9.2 of this Plan have been satisfied or, if waiveable, waived pursuant to Section 9.4 of this Plan.

1.55     **Entity.**  A Person, an estate, a trust, or the United States Trustee as defined in Section 101(15) of the Bankruptcy Code.

1.56     **[Intentionally Omitted].**

1.57     **Estate.**  The estate created pursuant to Section 541 of the Bankruptcy Code by the commencement of the Chapter 11 Case.

1.58     **File or Filed.**  To file, or to have been filed, with the Clerk of the Bankruptcy Court in the Chapter 11 Case.

1.59     **Final Distribution.**  Shall be the Distributions described in Section 8.8 of this Plan.

1.60     **Final Distribution Date.**  Shall be the date upon which the Final Distribution is made.  The Final Distribution Date shall be a date determined by the Liquidating Trustee, (a) which is after the liquidation into Cash of all Trust Assets (other than Abandoned Assets) and

collection of other sums due or otherwise remitted or returned to the Estate, and (b) on or after which the Liquidating Trust makes a Final Distribution from the Reserves.

1.61    **Final Order.**  An order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on its docket, that has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, petition for certiorari or move for reargument, rehearing or a new trial has expired and no appeal, petition for certiorari or motion for reargument, rehearing or a new trial, respectively, has been timely filed, or (b) any appeal, any petition for certiorari or any motion for reargument, rehearing or a new trial that has been or may be filed has been resolved by the highest court (or any other tribunal having final appellate jurisdiction over the order or judgment) to which the order or judgment was appealed or from which certiorari or reargument, rehearing or a new trial was sought, and the time to take any further appeal, petition for certiorari or move for reargument, rehearing or a new trial shall have expired without such actions having been taken; provided, however, the possibility that a party may file a motion for reconsideration of an order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, Section 502(j) of the Bankruptcy Code, or Bankruptcy Rules 9023 or 9024 shall not preclude an order from being a Final Order.

1.62    **[Intentionally omitted].**

1.63    **Forfeiture Action**.  Shall mean the case styled as *USA v. Scott W. Rothstein*, Case No. 0:09-cr-60331-JIC, pending in the District Court or any subsequent court of appeals with jurisdiction over such case.

1.64    **Full Amount**.  The total amount of a Claim without any interest, costs, fees or charges accruing on such Claim from and after the applicable Petition Date.

4999213-2

13

1.65    **Funds.**  Collectively, Centurion Structured Growth LLC, Platinum Partners Credit Opportunities Fund LP, Platinum Partners Value Arbitrage Fund LP and Level 3 Capital Fund LP.

1.66    **Funds' Settlement Agreement.**  That certain settlement agreement dated as of June 14, 2012 among the Trustee, the Funds, Regent Capital Partners, LLC, Mark Nordlicht, Dahlia Kalter, Murray Huberfeld, Laura Huberfeld, David Bodner, Naomi Bodner, and the Bodner Family Foundation, and approved by the Bankruptcy Court in the Chapter 11 Case by Final Order dated August 28, 2012 [ECF No. 3352].

1.67    **Funds' Subordinated Claim.**  Shall mean the Funds' unsecured claim in the maximum amount of $26,000,000 which shall be Allowed and subordinated to the extent, and as provided, in the Funds' Settlement Agreement and is treated pursuant to Section 3.7 of this Plan.

1.68    **General Unsecured Claims.**  All unsecured Claims Scheduled by, or Filed against, the Debtor, other than any unsecured Claim that is subordinated under this Plan or by Final Order of the Bankruptcy Court in the Chapter 11 Case.

1.69    **Gibraltar Settlement Agreement**.  That certain settlement agreement between Gibraltar Private Bank & Trust Company, Boston Private Financial Holdings, Inc. and Boston Private Bank and Trust Company and all of such entities' current or former directors, officers, employees, and partners (not including John Harris, Charles Sanders, Steven D. Hayworth, and Lisa Ellis), and any successors and their partners, directors, officers, and employees and the Trustee dated October 9, 2012 and approved in the Chapter 11 Case by Final Order of the Bankruptcy Court dated as of October 10, 2012 [ECF No. 3500].

4999213-2

14

1.70    **Gibraltar Subordinated Claim**.  The Allowed subordinated General Unsecured Claim of Gibraltar Private Bank & Trust Company in the amount of $7,500,000, which was allowed pursuant to the Gibraltar Settlement and is treated pursuant to Section 3.8 of this Plan.

1.71    **Governmental Unit**.  Shall have the meaning set forth in Section 101(27) of the Bankruptcy Code.

1.72    **Government Unit Bar Date.**  August 10, 2010, the date established by Section 502(a)(9) of the Bankruptcy Code as the last day for a Governmental Unit to file a proof of Claim in the Chapter 11 Case.

1.73    **Impaired.**  When used with reference to a Claim or an Interest, shall have the meaning ascribed to it in Section 1124 of the Bankruptcy Code.

1.74    **Indemnification Obligations**.  The Debtor's indemnification obligations currently in place (whether in its by-laws, certificates of incorporation, board resolutions, indemnification agreements, or employment contracts) for the current and former directors, officers, and employees of the Debtor.

1.75    **Interest.**  Shall mean the interest of any shareholder or equity holder of the Debtor.

1.76    **IRC.**  Shall mean the Internal Revenue Code of 1986, as amended from time to time.

1.77    **Levin Claims**.  Any and all rights, claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, rights to payment, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims (including, but not limited to avoidance or recovery actions available through the exercise of the powers granted by Sections 541 – 553 of the Bankruptcy

4999213-2

Code or avoidance or recovery claims recognized under any applicable state law) of the Estate, against Gayla Susan Levin, George Levin or, the bankruptcy estate of George Levin, (including, but not limited to, proofs of claim number 1-1 and 1-2 asserted against George Levin by the Estate in George Levin's chapter 11 bankruptcy case, case number 10-33696-RBR, currently pending in the Bankruptcy Court) and/or any of their Affiliates (with Gayla Susan Levin and/or George Levin considered the "debtor" for the purposes of the definition of Affiliate) or subsidiaries; provided, that the Levin Claims do not include any of the foregoing claims or rights against any Entity that is not Gayla Susan Levin, George Levin, the bankruptcy estate of George Levin and/or any of their Affiliates (with Gayla Susan Levin and/or George Levin considered the "debtor" for the purposes of the definition of Affiliate) or subsidiaries (including, but not limited to, avoidance or recovery actions through the exercise of powers granted by Sections 541-553 of the Bankruptcy Code or avoidance or recovery claims recognized under any applicable state law where such Entity was either an immediate or subsequent transferee); provided further, that the Levin Claims do not include any of the following claims, rights or actions: (a) of the Estate against the Banyon Bankruptcy Estates, and (b) asserted by the Trustee on or before May 29, 2013 through the commencement of an action against any Entity that is an Affiliate or subsidiary of either of Gayla Sue Levin or George Levin (excluding Gayla Susan Levin, George Levin, and the bankruptcy estate of George Levin).

      1.78    **Levy Settlement Agreement.**  That certain settlement agreement dated as of October 31, 2012 by and among the Trustee on the one hand and Shimon Levy, Ovadia Levy, Rachel Levy, Daniel Minkowitz, Mordechai Bar-Adon, Ben-Zion Varon, The 2009 Ovadia Levy Revocable Trust, Renato Watches, Inc. N/K/A DMOL, Inc., Sea Club Ocean Resort Hotel, Inc.,

4999213-2

16

JUBOT, LLC on the other, and approved in the Chapter 11 Case by Final Order of the

Bankruptcy Court dated as of January 23, 2013 [ECF No. 3746].

      1.79    **Levy Subordinated Unsecured Claims.**  The subordinated General Unsecured

Claim of: (a) Shimon Levy in the amount of $3,089,861.46, (b) Rachel Levy in the amount of

$250,000, (c) Daniel Minkowitz in the amount of $1,895,038.44, (d) Mordechai Bar-Adon in the

amount of $195,791.64, and (e) Ben Zion Varon in the amount of $194,791.64, each of which

was Allowed pursuant to the Levy Settlement Agreement and are treated pursuant to Section 3.8

of this Plan.

      1.80    **Lien.**  A charge against, interest in or other encumbrance upon property to secure

payment of a debt or performance of an obligation.

      1.81    **Liquidating Trust.**  The trust created on the Effective Date upon the execution

and delivery of the Liquidating Trust Agreement by the parties thereto.

      1.82    **Liquidating Trust Agreement.**  The trust agreement to be executed by the

Trustee and the Liquidating Trustee on the Effective Date, in substantially the same form that is

attached as **Appendix 1.82** and which is otherwise in form and substance agreeable to TD Bank

and the Plan Proponents.

      1.83    **Liquidating Trustee**.  Michael I. Goldberg.

      1.84    **Liquidating Trust Oversight Committee.**  The committee of three Persons

selected in accordance with Section 6.2.7 of this Plan.  The members of the Liquidating Trust

Oversight Committee shall be identified no later than ten (10) Business Days subsequent to entry

of the Disclosure Statement Approval Order.  The appointment of the Liquidating Trust

Oversight Committee shall be ratified by the Confirmation Order and effective as of the

Effective Date.

4999213-2

1.85    **Litigation Claims.**  Includes, except as provided otherwise herein, the Confirmation Order or any document, instrument, release or other agreement entered into in connection with the Plan, all claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, rights to payment, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims (including, but not limited to avoidance or recovery actions available through the exercise of the powers granted by Sections 541 - 553 of the Bankruptcy Code or avoidance or recovery claims recognized under any applicable state law) of the Estate, whether known or unknown, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively in law, equity, or otherwise, that are or may be pending on the Effective Date or instituted after the Effective Date against any Entity based on law or equity. Litigation Claims include, without limitation, those specifically enumerated on **Appendix 1.85**, and those which are:  (a) property of the bankruptcy estate under and pursuant to Section 541 of the Bankruptcy Code; (b) for subrogation and contribution; (c) for turnover; (d) to recover avoidable transfers and preferences under and pursuant to Sections 542 through 550 and 553 of the Bankruptcy Code or any applicable state law; (e) to determine the extent, validity and priority of Liens and encumbrances; (f) for surcharge under Section 506(c) of the Bankruptcy Code; (g) for subordination under Section 510 of the Bankruptcy Code; (h) related to federal or state securities laws; (i) direct or derivative claims or causes of action of any type or kind; (j) against any and all current and/or former officers, directors and equity holders of the Debtor; (k) for breach of fiduciary duty or aiding and abetting breach of fiduciary duty; (l) under and pursuant to any policies for insurance, including for bad faith, maintained by the Debtor, including, without limitation, any liability insurance policy; (m) for theft of corporate opportunity; (n) for collection

4999213-2

18

on accounts, accounts receivables, loans, notes receivables or other rights to payment; (o) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Section 505 of the Bankruptcy Code; (p) which arise under or as a result of any Section of the Bankruptcy Code; (q) for common law torts or aiding and abetting common law torts; (r) contract or quasi contract; (s) derivative based; (t) statutory claims; (u) arise out of or are related in any way to actions or claims pending as of the Effective Date, including, but not limited to, any constructive trust or equitable lien claims the Debtor has or may assert in regard to RRA; (v) for negligence including professional negligence; (w) for unjust enrichment; (x) to recover an avoidable transfer from any mediate or subsequent transferee;  (y) any claims that may be asserted against the Banyon Bankruptcy Estates for breach of  the Settlement Agreement or the 9019 Order, and claims that may be asserted in the Banyon Bankruptcy Cases for any violation of the terms of this Plan or the Confirmation Order; or (z) to seek reconsideration, reduction or disallowance of any previously Allowed Claim pursuant to Section 502(j) of the Bankruptcy Code or Bankruptcy Rules 9023 or 9024; provided that the TD Bank Junior Subordinated Claim shall not be subject to objection, reconsideration, reduction, recharacterization, further subordination, impairment, disallowance or reduction in Distribution on account of a Collateral Source Recovery or otherwise; provided further that, the Levin Claims shall not be Litigation Claims.

      1.86    **Miscellaneous Subordinated Claims.**  Any Allowed subordinated, unsecured Claim not classified and treated in Classes 6 and 8 of this Plan, including, without limitation, the Levy Subordinated Unsecured Claims, the Gibraltar Subordinated Unsecured Claim, and the Razorback Subordinated Unsecured Claims.

1.87     **Multiple Source Recovery Allowed Unsecured Claim.**  An Allowed General Unsecured Claim, including any Claim that is subordinated pursuant to Section 510 of the Bankruptcy Code, this Plan or by Final Order of the Bankruptcy Court in the Chapter 11 Case, as to which the holder has as of the date of the Confirmation Hearing received or may in the future receive one or more Collateral Source Recoveries.

1.88     **Non-Governmental Unit Bar Date.**  May 12, 2010, the deadline for filing all proofs of Claim for non-governmental entities against the Debtor as established by the Bankruptcy Court.

1.89     **Notice of Effective Date**.  Shall have the meaning set forth in Section 9.5 of this Plan.

1.90     **October Mediation Expense.**  $67,182.10, which is the Estate's and Banyon Bankruptcy Estates' allocable share of the fees and expenses incurred in regard to the October 9-10, 2012, mediation among TD Bank, the Estate and the Banyon Bankruptcy Estates, which were previously funded by TD Bank.

1.91     **Order for Relief.**  The order granting relief against the Debtor under Chapter 11 of the Bankruptcy Code dated December 18, 2009.

1.92     **Parties**.  The Plan Proponents, TD Bank and the Banyon Trustee.

1.93     **Person.**  An individual, a corporation, a limited liability company, a partnership, an association, a joint stock company, a joint venture, an unincorporated organization, or a governmental unit as defined in Section 101(41) of the Bankruptcy Code.

1.94     **Petition Date.**  November 10, 2009, the date the petitioning creditors commenced this case by filing an involuntary petition against the Debtor under Chapter 11 of the Bankruptcy Code.

4999213-2

1.95     **Plan.**  This liquidating plan, and all appendices, schedules, exhibits and supplements annexed hereto or referenced herein, as any of them may be amended, modified or supplemented from time to time in accordance with the provisions of this Plan or the Bankruptcy Code and Bankruptcy Rules.

1.96     **Plan Proponents.**  Plan Proponents shall have the meaning ascribed to such term in the introductory paragraph of this Plan.  Whenever rights are conferred upon the Plan Proponents under the Plan, such rights are conferred jointly and may not be exercised by one of the Plan Proponents without the consent of the other Plan Proponent.

1.97     **Post-Confirmation Professional**.  A professional retained by the Liquidating Trustee and/or the Liquidating Trust Oversight Committee subsequent to the Effective Date.

1.98     **Priority Claim**.  An Allowed Claim that is either a Priority Non-Tax Claim or a Priority Tax Claim.

1.99     **Priority Non-Tax Claim**.  Any Allowed unsecured Claim entitled to priority in payment as specified in Section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.100     **Priority Tax Claim**.  Any Allowed Claim, whether secured or unsecured, that is entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.101     **Professional.**  A Person, other than a Post-Confirmation Professional, (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with Sections 327 or 1102 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date pursuant to Sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

1.102   **Professional Claim.**  A Claim of a Professional (a) for compensation or reimbursement of actual and necessary costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date or (b) which seeks compensation and reimbursement pursuant to Section 503(b)(4) of the Bankruptcy Code.

1.103   **Pro Rata.**  Proportionately so that the ratio of the amount of consideration distributed on account of a particular Allowed Claim to the amount of the Allowed Claim is the same as the ratio of the amount of consideration distributed on account of all Allowed Claims of the Class in which the particular Allowed Claim is included to the amount of all Allowed Claims of that Class, but in any event the amount of consideration distributed on account of an Allowed Claim shall not exceed the Full Amount of the Allowed Claim.

1.104   **Razorback Plaintiffs.**  Collectively, Razorback Funding, LLC; D3 Capital Club, LLC; BFMC Investment, LLC; Linda Von Allmen, as Trustee of the Von Allmen Dynasty Trust; D&L Partners, LP; David Von Allmen, as Trustee of the David Von Allmen Living Trust; Ann Von Allmen, as Trustee of the Ann Von Allmen Living Trust; Dean Kretschmar; Cooper Management, LLC; Anthony Degennaro, as Trustee of the Extra Inning Dynasty Trust; Adele Mussry; Jack Mussry; Nassim Mussry; Melina El-Ani; Danielle El-Ani; H&N Associates; Aretz Associates; Park National Capital Funding, LLC; Park National Mortgage Servicing; Scott Morgan; Viceroy Global Investments, Inc.; Concord Capital, Inc.; Edward Paley; Florence Paley; the Edward and Florence Paley Foundation; Steven Paley; Laura Paley; Jane Zaretsky, The Jane Zaretsky Dynasty Trust, and Lawrence E. Dekelbaum.

1.105   **Razorback Settlement Agreement.**  The Settlement Agreement dated as of August 4, 2012 between the Trustee and the Razorback Plaintiffs and approved in the Chapter 11 Case by Final Order of the Bankruptcy Court dated October 10, 2012 [ECF No. 3510].

4999213-2

1.106 **Razorback Substantial Contribution Claim.** The substantial contribution Claim, to the extent Filed by the applicable Bar Date and to the extent such Claim is Allowed, in the maximum amount of $8 million, asserted by the Razorback Plaintiffs in the Chapter 11 Case.

1.107 **Razorback Subordinated Unsecured Claim.** The Razorback Plaintiffs' unsecured claim in the amount of $30,093,125 which is subordinated as provided in the Razorback Settlement Agreement and is treated pursuant to Section 3.8 of this Plan.

1.108 **Razorback Unsecured Claim.** The Razorback Plaintiffs' General Unsecured Claim in the amount of $250,000 which shall be treated pursuant to Section 3.4 of this Plan.

1.109 **Razorback Unsecured Rising Tide Claim.** The Razorback Plaintiffs' Unsecured Claim in the amount of $9,895,000 allowed pursuant and subject to the terms of the Razorback Settlement Agreement, as classified and treated in Section 3.5 of this Plan.

1.110 **Rejection Claim Bar Date.** Has the meaning set forth in Section 5.2 of this Plan.

1.111 **Released Claims.** Shall have the meaning set forth in Section 10.6 of this Plan.

1.112 **Reserves.** Shall have the meaning set forth in Section 1.3.6 of the Liquidating Trust Agreement.

1.113 **Rothstein.** Scott W. Rothstein.

1.114 **RRA.** Rothstein Rosenfeldt Adler, P.A.

1.115 **RRA Banyon Senior Subordinated Claim.** Shall have the meaning set forth in Section 3.6(b) of this Plan.

1.116 **RRA Complaint.** The complaint Filed by the Estate to Avoid and Recover Preferential and Fraudulent Transfers and Damages against TD Bank on July 25, 2011 (Adversary Proceeding No. 11-02368-RBR).

4999213-2

1.117   **RRA Releasors.**   The Debtor, the Estate, the Trustee, the Committee and each of their subsidiaries and affiliates and the successors and assigns of any of them and any other Person that claims or might claim through, on behalf of or for the benefit of any of the foregoing.

1.118   **Scheduled.**   Set forth on the Schedules.

1.119   **Schedules.**   The Schedules of Assets and Liabilities Filed by the Trustee on behalf of the Debtor in accordance with Bankruptcy Code Section 521 and Bankruptcy Rule 1007, as the same may be amended from time to time prior to the Effective Date in accordance with Bankruptcy Rule 1009.

1.120   **Section 502(h) Bar Date.**   The date by which a proof of Claim arising pursuant to Section 502(h) of the Bankruptcy Code is required to be submitted as set forth in a Final Order of the Bankruptcy Court in the Chapter 11 Case.

1.121   **Secured Claim**.   A Claim (a) secured by a Lien on any Assets, which Lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim as determined in accordance with Section 506(a) of the Bankruptcy Code; or (b) against the Debtor that is subject to a valid right of setoff under Section 553 of the Bankruptcy Code.

1.122   **Settlement Agreement.**   The amended and restated settlement agreement dated as of May 29,  2013 among the Banyon Trustee, the Banyon Bankruptcy Estates, the Estate, the Trustee, and TD Bank, in the form that is attached hereto as **Appendix 1.122** and which is otherwise in form and substance agreeable to TD Bank, the Committee, the Banyon Trustee, and the Trustee.

4999213-2

24

1.123  **Single Source Recovery Allowed Unsecured Claim.**  An Allowed General Unsecured Claim on account of which the holder does not have Collateral Source Recoveries, and its sole source of recovery, as certified by the holder of such Claim on its completed and duly executed Verified Collateral Source Recovery Disclosure, is the Distribution to be made from property of the Estate or the Liquidating Trust, as applicable, on account of such Allowed Claim pursuant to Section 3.3 of this Plan.

1.124  **Statutory Fees.**  The fees due the United States Trustee pursuant to 28 U.S.C. § 1930 as set forth in Section 2.2 of this Plan.

1.125  **TD Bank.**  TD Bank, N.A.

1.126  **TD Bank Contribution.**  Cash in the amount of SEVENTY TWO MILLION, THREE HUNDRED AND EIGHTY-TWO THOUSAND, EIGHT HUNDRED AND SEVENTEEN DOLLARS AND NINETY CENTS ($72,382,817.90), which is the difference between SEVENTY TWO MILLION, FOUR HUNDRED AND FIFTY THOUSAND DOLLARS ($72,450,000.00) and the October Mediation Expense ($67,182.10), to be delivered by TD Bank to the Trustee by the third Business Day after the Confirmation Date, subject to and in accordance with Section 6.1.1 of this Plan.

1.127  **TD Bank Indemnitee**.  Shall mean (i) any current or former director, officer, or employee of TD Bank to whom TD Bank has an indemnification obligation (whether in by-laws, certificates of incorporation, board resolutions, or by agreement), and (ii) Emess Capital, L.L.C.

1.128  **TD Bank Releasees.**  TD Bank, The Toronto-Dominion Bank, and each of their current and former affiliates, officers, directors, principals, shareholders, parents, subsidiaries, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, consultants, counsel, attorneys, partners, insurers, underwriters,

4999213-2

25

administrators, executors, representatives, the TD Bank Indemnitees, and the assigns of each of the foregoing.

1.129   **TD Bank Junior Subordinated Claim.**  An Allowed General Unsecured Claim in favor of TD Bank, which is subordinated pursuant to Section 510 of the Bankruptcy Code, this Plan and the Settlement Agreement, in an amount equal to $132,450,000.00. The aggregate amount of the TD Bank Junior Subordinated Claim shall be classified and treated in accordance with Section 3.9 of this Plan.

1.130   **Third Party Claims.**  Shall have the meaning set forth in the Settlement Agreement.

1.131   **Trustee.**  Herbert Stettin solely in his capacity as Chapter 11 trustee of the Debtor.

1.132   **Trust Assets.**  The Assets, including, but not limited to, the Litigation Claims, the rights of the Estate under the Settlement Agreement, the rights of the Estate under any other settlement agreements approved by the Bankruptcy Court prior to the Effective Date and the TD Bank Contribution, all of which shall be assigned, transferred and conveyed to the Liquidating Trust pursuant to this Plan on the Effective Date, plus any and all interest or other net income earned on the foregoing; provided, however that the Levin Claims shall not be a Trust Asset; provided, further, however, any distribution made by the Trustee prior to the Effective Date shall not be a Trust Asset.

1.133   **Unclaimed Property.**  Any Distribution of Cash or any other property made to the holder of an Allowed Claim pursuant to the Plan that (i) is returned to the Trustee or the Liquidating Trustee, as applicable, as undeliverable and no appropriate forwarding address is received within the later of (a) 90 days after the Effective Date and (b) 90 days after such

attempted Distribution by the Trustee or the Liquidating Trustee, as applicable, is made to such

holder, or (ii) in the case of a Distribution made in the form of a check, is not negotiated within

90 days and no request for re-issuance is made within such 90-day period, at which time, such

Distribution shall be subject of a stop payment order.  The Trustee and the Liquidating Trustee,

as applicable, are under no affirmative obligation to attempt to locate any holder of an Allowed

Claim and may rely upon the procedures set forth in Section 8.1 in the Plan ("Delivery of

Distributions in General")

      1.134  **Unclassified Claims.**  The Claims treated in Article 2 of this Plan.

      1.135  **Unimpaired.**  Has the meaning set forth in Section 1124 of the Bankruptcy Code.

      1.136  **United States Trustee.**  The United States Trustee appointed under Section

581(a)(3) of title 28 of the United States Code to serve in the Southern District of Florida.

      1.137  **Verified Banyon Creditor Collateral Source Recovery Disclosure**.  The form

disclosure required under Section 3.6(b) hereof and substantially in the form attached hereto as

**<u>Appendix 1.137</u>**, which discloses (a) the holder of a claim against one of the Banyon Bankruptcy

Estates' full legal name and complete street address and mailing address, (b) the identity and

contact information of any party that is not a Banyon Bankruptcy Estate against whom the holder

of such claim has made a demand that has given rise or may give rise to a Banyon Creditor

Collateral Source Recovery, (c) the amount of all Banyon Creditor Collateral Source Recoveries

actually received directly, indirectly, or for the benefit of the holder of such claim prior to the

date on which such Verified Banyon Creditor Collateral Source Recovery Disclosure is

submitted to the Banyon Trustee, (d) the legal basis for all Banyon Creditor Collateral Source

Recoveries received by the holder of such claim, and (e) the existence, without quantification, of

any future or anticipated Banyon Creditor Collateral Source Recovery.

4999213-2

1.138   **Verified Collateral Source Recovery Disclosure**.  The form disclosure required under Sections 3.3(b), 3.4(b), 3.7(b), and 3.8(b) hereof and substantially in the form attached hereto as **Appendix 1.138**, which discloses (a) the holder of a Class 2, Class 3, Class 6 and Class 7, as applicable, Claim's full legal name and complete street address and mailing address, (b) the identity and contact information of any non-Debtor party against whom the holder of such Claim has made a demand that has given rise or may give rise to a Collateral Source Recovery, (c) the amount of all Collateral Source Recoveries actually received directly, indirectly or for the benefit of the holder of such Claim prior to the date on which such Verified Collateral Source Recovery Disclosure is submitted to the Voting Agent, (d) the legal basis for all Collateral Source Recoveries received by the holder of such Claim, and (e) the existence, without quantification, of any future or anticipated Collateral Source Recovery.

1.139   **Voting Agent**.  Trustee Services, Inc., the entity authorized by the Bankruptcy Court to serve as the claims, noticing, and balloting agent in the Chapter 11 Case.

1.140   **Voting Deadline**.  The deadline set forth in the Disclosure Statement Approval Order by which Ballots on this Plan must have actually been received by the Voting Agent.

C.      **Rules of Interpretation.**

1.      To the extent of any inconsistency: (i) the provisions of this Plan shall control over the contents of the Disclosure Statement, the Liquidating Trust Agreement and the Settlement Agreement; and (ii) the provisions of the Confirmation Order shall control over the contents of this Plan, the Disclosure Statement, the Liquidating Trust Agreement and the Settlement Agreement.

2.      For the purposes of this Plan:

(a)      any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; provided, however, that any change to such form, terms or conditions that is material to a party to such document shall not be modified without such party's consent unless such document expressly provides otherwise, or is modified pursuant to court order; provided further, however, that notwithstanding any of the foregoing, any change to any such form, terms or conditions prior to the Effective Date or that materially affects TD Bank shall remain subject to the consent of TD Bank;

(b)      any reference in the Plan to an existing document, exhibit, appendix or schedule Filed or to be Filed means such document, exhibit, appendix or schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)      unless otherwise specified, all references in the Plan to "Sections," "Articles," and "Appendices" are references to Sections, Articles, and Appendices of or to the Plan;

(d)      the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of this Plan;

(e)      captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be part of or to affect interpretations of this Plan;

(f)      the rules of construction set forth in Bankruptcy Code Section 102 shall apply, except to the extent inconsistent with the provisions of this Article of this Plan; and

4999213-2

(g)     the word "including" means "including without limitation."

3.     Whenever a Distribution of property is required to be made on a particular date, the Distribution shall be made on such date or as soon as reasonably practicable thereafter.

**D.     Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE 2**

**TREATMENT OF UNCLASSIFIED CLAIMS**

2.1     **Administrative Expense Claims.**  Subject to the allowance procedures and deadlines provided herein, on the Effective Date or as soon thereafter as is practicable, the holder of an unpaid Allowed Administrative Expense Claim shall receive from the Liquidating Trustee on account of the Allowed Administrative Expense Claim and in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Expense  Claim, (a) Cash equal to the unpaid portion of such Allowed Expense Administrative Claim, or (b) such other treatment as to which the Plan Proponents or the Liquidating Trustee, as applicable, and the holder of such Allowed Administrative Expense Claim have agreed to writing; provided, however, that Professional Claims shall be paid in accordance with Section 2.3.

2.2     **Statutory Fees.**  The Liquidating Trustee, on behalf of the Debtor, shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within five (5) Business Days after the Effective Date for pre-Confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the Cash disbursements for the relevant period.  The Liquidating Trustee shall further pay the United States Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements of

4999213-2

the Liquidating Trust for post-Confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), until the closing of the Chapter 11 Case by the issuance of a final decree by the Bankruptcy Court.  The Liquidating Trustee shall provide to the United States Trustee upon the payment of each post-Confirmation payment an appropriate affidavit indicating all the Cash disbursements for the relevant period.  In addition, the affidavit provided by the Liquidating Trustee to the United States Trustee shall be filed on the docket with the Bankruptcy Court and shall set forth each Distribution made to each of the Beneficiaries of the Liquidating Trust (indicating the Class, identity, applicable claim number and the amount of the Distribution).  The affidavit described in this section shall also indicate all Cash remaining on hand in the Liquidating Trust.

      2.3      **Professional Claims.**  On or prior to the Administrative Expense Claim Bar Date applicable to Professional Claims for the filing of final applications for compensation, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses incurred from the Petition Date to the date of the Confirmation Hearing which shall be considered by the Bankruptcy Court at the Confirmation Hearing. All such final fee applications may be supplemented in advance of the Confirmation Hearing to provide for estimates of the fees and costs to be incurred by each Professional from the date of the final applications for compensation up to the date of Confirmation Hearing (or to correct estimates in respect of such fees and costs provided for in the final applications for compensation) and supplements may include an upward or downward adjustment to prior fee and cost estimates, in accordance with the Administrative Expense Claim Bar Date applicable to Professional Claims. Professional Claims shall be paid by the Trustee or the Liquidating Trustee, as applicable, pursuant to Final Orders in the Chapter 11 Case awarding final compensation to such

4999213-2

Professional.  From and after the Confirmation Date until the Effective Date, the Trustee, in the ordinary course of business, shall pay the reasonable fees and expenses of Professionals incurred by them during such period.

        2.4      **Trustee and Liquidating Trustee Compensation.**

        2.4.1    **Trustee Compensation.**  On or prior to the Administrative Expense Claim Bar Date applicable to Professional Claims for the filing of final applications for compensation, the Trustee shall file with the Bankruptcy Court his final fee application seeking final approval of all fees and expenses incurred covering the period from the Petition Date through the Effective Date (including, but not limited to, fees associated with the TD Bank Contribution and the Additional Recoveries) and such fee application shall be considered by the Bankruptcy Court at the Confirmation Hearing.

        The Trustee's final application for compensation may seek an award of compensation in Cash based on the formula contained in Section 326(a) of the Bankruptcy Code and otherwise provided for by any other provision of the Bankruptcy Code and may include a request to be paid compensation calculated on (a) the amount of all Assets disbursed, turned over or transferred by the Trustee after the Order for Relief and prior to the Effective Date, and (b) the amount of all Assets disbursed, turned over or transferred by the Trustee on the Effective Date, including the TD Bank Contribution, the Additional Recoveries, and any other Assets delivered by the Trustee to the Liquidating Trustee following execution of the Liquidating Trust Agreement; provided, however, that for the avoidance of any doubt, the Trustee's entitlement to seek an award of compensation is without prejudice to the rights of the Committee, the United States Trustee or any other party in interest to object to the Trustee's application for fees.

4999213-2

32

Interim compensation awarded and paid to the Trustee prior to the Effective Date shall be credited against the compensation payable to the Trustee pursuant to the Plan.  The amount of the Trustee's compensation shall be subject to approval by the Bankruptcy Court and shall be paid by the Estate or the Liquidating Trustee, as applicable, to the Trustee as soon as practicable after approval by the Bankruptcy Court; provided, however, that for the avoidance of any doubt, the amount of the Trustee's compensation and the payment terms will be determined by the Bankruptcy Court in the Chapter 11 Case by Final Order; provided, further, however  that for purposes of calculating the amount of compensation payable to the Trustee or the Liquidating Trustee, as applicable, on account of the disbursements made on the Banyon Unsecured Claim, to the extent that any such compensation is payable to the Trustee or the Liquidating Trustee, as applicable, on account of the Banyon Unsecured Claim, only 30% of the amount Distributed on account of the Banyon Unsecured Claim may be included as a disbursement by the Trustee or the Liquidating Trustee, as applicable.

Notwithstanding anything contained herein, any party in interest, including the United States Trustee and the Committee, may object to the Trustee's final fee application, including but not limited to, in regard to which Assets disbursed, turned over or transferred by the Trustee are properly included in the formula used to calculate the Trustee's compensation.

The Committee's agreement herein that the Trustee may request compensation based on certain Assets disbursed, turned over or transferred by the Trustee shall not be construed as the Committee's agreement that the Trustee is entitled to compensation based on any such Assets disbursed, turned over or transferred by the Trustee and the Committee reserves the right to object to the Trustee's final fee application.

4999213-2

33

Notwithstanding any provision of this Plan to the contrary, the precise manner in which the Assets are disbursed, turned over or transferred to the Liquidating Trust shall not affect the rights of the Trustee to seek compensation for the amounts of Assets which ultimately are disbursed, turned over or transferred to the Liquidating Trust prior to, on, or in conjunction with the Effective Date.

The foregoing provisions regarding the Trustee's entitlement to seek fees is without prejudice to the rights of the Committee, the United States Trustee or any other party in interest to object to the Trustee's application for fees at the Confirmation Hearing or thereafter in connection with the Trustee's fee application(s) in respect of Additional Recoveries.

2.4.2  **Liquidating Trustee Compensation**.  Subject to Bankruptcy Court approval following application and a hearing, the Liquidating Trustee shall be entitled to receive reasonable compensation at the rate of $500.00 per hour (adjusted annually) for all time reasonably spent by the Liquidating Trustee in administering the Liquidating Trust.

2.5  **Deadline for Filing Administrative Expense Claims**.  Any and all requests for allowance or payment of Administrative Expense Claims must be Filed and served on each of the Plan Proponents, the Liquidating Trustee, their respective counsel, and the United States Trustee no later than the applicable Administrative Expense Claim Bar Date; provided, however, that the Administrative Expense Claim Bar Date shall not apply to liabilities incurred in the ordinary course of business (other than Professional Claims).  Objections to Administrative Expense Claims (other than Professional Claims) must be Filed and served on the claimant no later than thirty (30) days after the Administrative Expense Claim Bar Date; provided that objections to Administrative Expense Claims that constitute Professional Claims shall be due in accordance with the Disclosure Statement Approval Order.

4999213-2

Administrative Expense Claims incurred in the ordinary course of business (other than Professional Claims) shall be paid by the Liquidating Trustee or the Trustee, as applicable, in the ordinary course of business between such parties, without application to or approval of the Bankruptcy Court.

Any holder of an Administrative Expense Claim (including a holder of a Professional Claim or a Claim for federal, state or local taxes arising subsequent to the Petition Date) that is required to File, but does not File an application, motion, request or other Bankruptcy Court approved pleading by the applicable Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Expense Claim against the Debtor, the Estate, the Liquidating Trust, the Liquidating Trustee, or any of their respective Assets, and such holder shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Expense Claim.

2.6     **Allowed Priority Non-Tax Claims.**  Subject to the allowance procedures and deadlines provided herein, on the Effective Date or as soon thereafter as is practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, and (iii) a date agreed to by the Liquidating Trustee and the holder of such Allowed Priority Non-Tax Claim, the Liquidating Trustee shall pay each holder of an Allowed Priority Non-Tax Claim Cash equal to the amount of its Allowed Priority Non-Tax Claim in full satisfaction, release, and discharge of the Allowed Priority Non-Tax Claim.

2.7     **Allowed Priority Tax Claims.**  Subject to the allowance procedures and deadlines provided herein, on the Effective Date or as soon thereafter as is practicable, each holder of an Allowed Priority Tax Claim shall receive at the option of the Liquidating Trustee, in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Priority Tax

4999213-2

35

Claim: (a) Cash equal to the amount of such unpaid Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) a date agreed to by the Liquidating Trustee and the holder of such Allowed Priority Tax Claim; (b) equal Cash payments of a total value, as of the Effective Date, equal to the Allowed amount of such Allowed Priority Tax Claim from the Liquidating Trustee made on the last Business Day of every (3) month period following the Effective Date and terminating on February 28, 2015; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Allowed Priority Tax Claim and the Liquidating Trustee or as the Bankruptcy Court may order.  The Liquidating Trustee shall have the right, in his sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.

## ARTICLE 3

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1    **General.**  Pursuant to Section 1122 of the Bankruptcy Code, below is a designation of the Classes of Claims against and Interests in the Debtor.  A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class.  A Claim or Interest is also placed in a particular Class for purposes of receiving a Distribution under the Plan, but only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released, or otherwise settled prior to the Effective Date.  Except as otherwise expressly set forth in this Plan, a Claim or Interest which is not an Allowed Claim or Allowed Interest shall not receive any payments, rights or Distributions under this Plan.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Claims specified in Sections 507(a)(2), 507(a)(3) or

4999213-2

36

507(a)(8) of the Bankruptcy Code have not been classified and are treated as set forth in Article

2 above.

    3.2    **Class 1:  Allowed Secured Claims.**

        (a)    Definition of Class 1

Class 1 consists of Allowed Secured Claims.  The Plan Proponents are not aware of any Secured Claims that are or will be Allowed.

        (b)    Treatment of Class l

Each holder of an Allowed Secured Claim shall receive, in the sole discretion of the Liquidating Trustee, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim: (a) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the later of (i) the Effective Date; (ii) the date that such Secured Claim becomes Allowed, and (iii) a date agreed to by the Liquidating Trustee and the holder of such Allowed Secured Claim; (b) treatment such that such Allowed Secured Claim is reinstated; (c) the property securing such Allowed Secured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Liquidating Trustee or as the Bankruptcy Court may order in the Chapter 11 Case by Final Order.

        (c)    Voting Status of Class 1

Class 1 is Unimpaired under the Plan and the holders of such Claims are not entitled to vote on the Plan.

    3.3    **Class 2:  Single Source Recovery Allowed Unsecured Claims.**

        (a)    Definition of Class 2

Class 2 consists of all Single Source Recovery Allowed Unsecured Claims.

        (b)    Treatment of Class 2

Subject to the payments provided for in Section 2.1 through 2.7, and Section 3.2 of this Plan, and except as otherwise provided in this Section 3.3(b), each holder of an Allowed Class 2 Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 2 Claim, Pro Rata Distributions of Cash from the Liquidating Trust pursuant to the Liquidating Trust Agreement until such Allowed Class 2 Claim has been paid the Full Amount of such Allowed Claim. Allowed Class 2 Claims shall receive the same Pro Rata Distribution as the holders of Allowed Class 3 Claims, after application of Collateral Source Recoveries, which are classified and treated in Section 3.4 of this Plan.

**As a condition precedent to the receipt of a Distribution under the Plan or the Liquidating Trust, each holder of an Allowed Class 2 Claim shall deliver to the Voting**

4999213-2

**Agent a completed and duly executed Verified Collateral Source Recovery Disclosure, in form attached to this Plan as Appendix 1.137, by the Voting Deadline.**  The Liquidating Trustee is authorized to make interim Distributions to the holders of Allowed Class 2 Claims after the Effective Date and before finalization of Collateral Source Recovery calculations; provided, however, that any such Distributions by the Liquidating Trustee will be limited in amounts that, in the Liquidating Trustee's reasonable judgment, are designed to avoid the payment of excess Distributions to the holders of Allowed Class 2 Claims.

If the holder of a Class 2 Claim (i) fails or refuses to timely deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure on or before the Voting Deadline, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Collateral Source Recovery Disclosure, then (a) such holder shall be deemed to irrevocably waive its rights to receive, and shall be forever barred from receiving, a Distribution from the Liquidating Trust, (b) such holder's Class 2 Claim shall be deemed Disallowed without further order of the Bankruptcy Court, and (c) such holder's Ballot shall not be counted for purposes of determining whether Class 2 has accepted or rejected this Plan. All Entities submitting a Verified Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has changed, including, but not limited to, when such Entity actually receives a previously anticipated Verified Collateral Source Recovery. Such obligation to correct and/or update shall terminate on the Final Distribution Date.

On or by the Effective Date, the Trustee or the Liquidating Trustee, as applicable, shall provide the Liquidating Trust Oversight Committee with copies of all Verified Collateral Source Recovery Disclosures that are timely received by the Voting Agent.

Any Holder of a Class 2 Claim that receives Distributions in excess of the amount such holder of a Class 2 Claim was entitled to receive in Distributions shall repay such amount that it received that was in excess of the Distributions such holder was entitled to receive to the Liquidating Trust within thirty (30) days after such holder has been directed by a Final Order of the Bankruptcy Court in the Chapter 11 Case to repay such excess Distributions to the Liquidating Trust.  Section 6.14 of this Plan sets forth additional obligations of holders of Class 2 Claims to remit Collateral Source Recoveries to the Liquidating Trust.

Holders of Class 2 Claims that are Disallowed subsequent to a Distribution being made to such holders shall repay any such Distribution to the Liquidating Trust within thirty (30) days after the Class 2 Claim becoming Disallowed.

If the holder of a Claim timely delivers to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure that discloses that if its Claim is Allowed, it would be a Single Source Recovery Allowed Unsecured Claim, such Claim shall be classified as a Class 2 Claim. If the holder of a Claim timely delivers to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure that discloses that if its Claim is Allowed, it would be a Multiple Source Recovery Allowed Unsecured Claim, such Claim shall be classified as a Class 3 Claim.

4999213-2

(c)      Voting Status of Class 2

Class 2 is Impaired under the Plan and the holders of such Claims are entitled to vote on the Plan.

3.4      **Class 3:  Multiple Source Recovery Allowed Unsecured Claims.**

(a)      Definition of Class 3

Class 3 consists of all Multiple Source Recovery Allowed Unsecured Claims, excluding those Claims classified in Classes 4, 5, 6, 7, and 8.

(b)      Treatment of Class 3

Subject to the payments provided for in Sections 2.1 through 2.7, and Section 3.2 of this Plan, and except as otherwise provided in this Section 3.4(b), each holder of an Allowed Class 3 Claim, shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 3 Claim Pro Rata Distributions of Cash from the Liquidating Trust pursuant to the Liquidating Trust Agreement until such Allowed Class 3 Claim has been paid the Full Amount of such Allowed Claim.

**As a condition precedent to the receipt of a Distribution under the Plan or the Liquidating Trust, each holder of an Allowed Class 3 Claim shall deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure, in the form attached to this Plan as Appendix 1.138, by the Voting Deadline.** Notice regarding the receipt of Collateral Source Recoveries received by the holders of the Funds' General Unsecured Claim shall be provided in accordance with the terms of the Funds' Settlement Agreement.  To the extent not otherwise provided herein, the Liquidating Trustee shall succeed to the rights of the Trustee under the provisions of the Funds' Settlement Agreement.  Notice regarding the receipt of Collateral Source Recoveries received by the holders of Coquina Investments' General Unsecured Claim shall be provided in accordance with the terms of the Coquina Settlement Agreement.  To the extent not otherwise provided herein, the Liquidating Trustee shall succeed to the rights of the Trustee under the provisions of the Coquina Settlement Agreement.

If the holder of a Class 3 Claim (i) fails or refuses to timely deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure on or before the Voting Deadline, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Collateral Source Recovery Disclosure, then (a) such holder shall be deemed to irrevocably waive its rights to receive, and shall be forever barred from receiving, a Distribution from the Liquidating Trust, (b) such holder's Class 3 Claim shall be deemed Disallowed without further order of the Bankruptcy Court, and (c) such holder's Ballot shall not be counted for purposes of determining whether Class 3 has accepted or rejected this Plan. All Entities submitting a Verified Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has changed, including, but not limited to, when such Entity actually receives a previously anticipated Verified Collateral Source

4999213-2

Recovery. Such obligation to correct and/or update shall terminate on the Final Distribution Date.

The amount of the Distributions to be made on account of each Allowed Class 3 Claim shall be reduced, on a dollar for dollar basis, by the amount of all Collateral Source Recoveries received from any source; provided, however, that the Liquidating Trustee is authorized to make interim Distributions to the holders of Allowed Class 3 Claims after the Effective Date and before finalization of Collateral Source Recovery calculations; provided further, however, that any such Distributions by the Liquidating Trustee will be limited in amounts that, in the Liquidating Trustee's reasonable judgment, are designed to avoid the payment of excess Distributions to the holders of Allowed Class 3 Claims.  The amount of the reduction of the Distributions on account of each Allowed Class 3 Claim's Collateral Source Recovery shall be calculated in accordance with Section 6.13 of this Plan and established in the following manner: on or before the date that is 60 days after the Effective Date (without prejudice to the Liquidating Trustee's right to request an extension of this deadline for cause from the Bankruptcy Court), the Liquidating Trustee shall, after consultation with the Liquidating Trust Oversight Committee, File and serve a notice on all affected parties which (A) provides a schedule of the aggregate Collateral Source Recoveries received from all sources by each holder of a Claim in Class 3, and (B) explicitly identifies the amount by which Distributions on account of each such holder's Class 3 Claim will be reduced on account of all of such holder's Collateral Source Recoveries, and such notice shall also provide that: (a) the Liquidating Trust Oversight Committee and the holder of a Class 3 Claim whose Distribution is sought to be reduced shall have 30 days from the Filing of such notice to object to the relief sought in such notice; (b) all objections to such notice shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee and the Liquidating Trust Oversight Committee; (c) if no timely objection to such notice is Filed and served, the Liquidating Trustee shall use the amount of the applicable Collateral Source Recovery indicated on such notice to calculate the reductions to Distributions to each such holder of a Class 3 Claim; and (d) if a timely objection to such notice is Filed and served, such objection and the amount of the applicable Collateral Source Recovery shall be resolved by the Bankruptcy Court in accordance with the provisions of this Section 3.4(b) after notice and opportunity for a hearing.

The holder of an Allowed Class 3 Claim shall not receive Distributions on account of such Class 3 Claim until the amount of such holder's Collateral Source Recoveries is less than or equal to the amount such holder would have received in Distributions on account of its Class 3 Claim if such holder did not have any Collateral Source Recoveries.

The holder of such Class 3 Claim shall receive Distributions on account of its Class 3 Claim so that such holder receives the same Pro Rata Distribution (after inclusion of such holder's Collateral Source Recoveries as if they were a Distribution) as the holders of Allowed Class 2 Claims.

On or by the Effective Date, the Trustee or the Liquidating Trustee, as applicable, shall provide the Liquidating Trust Oversight Committee with copies of all Verified Collateral Source Recovery Disclosures that are timely received by the Voting Agent.

4999213-2

Any holder of a Class 3 Claim that receives Distributions in excess of the amount such holder of a Class 3 Claim was entitled to receive in Distributions shall repay such amount that it received that was in excess of the Distributions such holder was entitled to receive to the Liquidating Trust within thirty (30) days after such holder has been directed by a Final Order of the Bankruptcy Court in the Chapter 11 Case to repay such excess Distributions to the Liquidating Trust.  Section 6.14 of this Plan sets forth additional obligations of holders of Class 3 Claims to remit Collateral Source Recoveries to the Liquidating Trust.

Holders of Class 3 Claims that are Disallowed subsequent to a Distribution being made to such holders shall repay any such Distribution to the Liquidating Trust within thirty (30) days after the Class 3 Claim becoming Disallowed.

If the holder of a Claim timely delivers to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure that discloses that if its Claim is Allowed, it would be a Single Source Recovery Allowed Unsecured Claim, such Claim shall be classified as a Class 2 Claim. If the holder of a Claim timely delivers to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure that discloses that if its Claim is Allowed, it would be a Multiple Source Recovery Allowed Unsecured Claim, such Claim shall be classified as a Class 3 Claim.

Nothing in the foregoing is intended to modify or supersede, and nothing herein shall modify or supersede, any settlement agreements that have been approved by Final Order of the Bankruptcy Court in the Chapter 11 Case on or before May 8, 2013.  Nothing contained herein shall preclude the Liquidating Trustee from reducing Distributions pursuant to Collateral Source Recoveries as stated in this Section 3.4(b), to the extent not inconsistent with any relevant provisions of such settlement agreements.  Collateral Source Recoveries received by the holders of the Funds' General Unsecured Claim shall be calculated and treated exclusively in accordance with the Funds' Settlement Agreement and the Funds or their assignee(s) (if any) shall receive Distributions on account of such Claim as, and to the extent, provided in the Funds' Settlement Agreement and this Plan, to the extent not inconsistent with the Funds' Settlement Agreement. Collateral Source Recoveries received by the holders of Coquina Investments' General Unsecured Claim shall be calculated and treated exclusively in accordance with the Coquina Settlement Agreement and Coquina Investments or their assignee(s) (if any) shall receive Distributions on account of such Claim as, and to the extent, provided in the Coquina Settlement Agreement and this Plan, to the extent not inconsistent with the Coquina Settlement Agreement.

        (c)      Voting Status of Class 3

Class 3 is Impaired under the Plan and the holders of such Claims are entitled to vote on the Plan.

    3.5    **Class 4:  Razorback Unsecured Rising Tide Claim.**

        (a)      Definition of Class 4

Class 4 consists of the Razorback Unsecured Rising Tide Claim, as Allowed in the Razorback Settlement Agreement.

4999213-2

(b)      Treatment of Class 4

Subject to the payments provided for in Sections 2.1 through 2.7, and Sections 3.2 through 3.4 of this Plan, and except as otherwise provided in this Section 3.5(b), the Allowed Class 4 Claim shall not receive any Distribution under this Plan or the Liquidating Trust until such time as the holders of Allowed Class 2 and Allowed Class 3 Claims have received Pro Rata Distributions of Cash from the Liquidating Trust equal to 95% of the Allowed amount of such Claims after the application of Collateral Source Recoveries. Once each of the holders of Allowed Class 2 and Class 3 Claims have received a Pro Rata Distribution of Cash equal to 95% of the Allowed amount of such Class 2 and Class 3 Claims after the application of Collateral Source Recoveries, if any, the Allowed Class 4 Claim shall commence receiving Pro Rata Distributions equal to the Pro Rata Distributions provided thereafter to Allowed Class 2 and Allowed Class 3 Claims after the application of Collateral Source Recoveries; provided, however, that the total amount of Cash distributed pursuant the Plan and Liquidating Trust to the holder of the Allowed Class 4 Claim shall not exceed $494,750 on account of the Allowed Class 4 Claim. The foregoing treatment shall be in full satisfaction, release and discharge of the Razorback Unsecured Rising Tide Claim.

(c)      Voting Status of Class 4

Class 4 is Impaired under the Plan and the holders of such Claims are entitled to vote on the Plan.

3.6    **Class 5:  Banyon Unsecured Claim.**

(a)      Definition of Class 5

Class 5 consists of the Banyon Unsecured Claim.

(b)      Treatment of Class 5

1.      Upon the occurrence of the Effective Date, the Banyon Unsecured Claim shall be Allowed in the amount of $39.7 million ($39,700,000) against the Estate.

2.      Upon the transfer of the Trust Assets from the Estate to the Liquidating Trustee, the Liquidating Trustee shall establish the Banyon Unsecured Creditor Fund from the TD Bank Contribution and earmark the Banyon Unsecured Creditor Fund for payment of the Banyon Unsecured Claim.  The Banyon Bankruptcy Estates shall recover on account of the Banyon Unsecured Claim solely from the Banyon Unsecured Creditor Fund.

3.      Within five (5) Business Days after the Effective Date, the Liquidating Trustee shall Distribute the Banyon Unsecured Creditor Fund to the Banyon Trustee for the benefit of the Banyon Bankruptcy Estates (the "**Banyon Distribution**") in full satisfaction, release and discharge of all Claims of the Banyon Bankruptcy Estates, directly or indirectly, against the Debtor or the Estate, including, without limitation, the Banyon Unsecured Claim.  The amount of the Banyon Distribution shall be allocated

between the Banyon Bankruptcy Estates in accordance with the direction of the Banyon Trustee or Final Order of the Bankruptcy Court in either Banyon Bankruptcy Case.

4.  Upon the payment of the Banyon Distribution, RRA shall have an allowed senior subordinated claim against each of the Banyon Bankruptcy Estates in the amount of $39.7 million ($39,700,000.00) (the "**RRA Banyon Senior Subordinated Claim**"). The RRA Banyon Senior Subordinated Claim shall be subordinated in right to payment to the Full Amount of (i) all allowed administrative expenses in each of the Banyon Bankruptcy Cases, respectively, (ii) all allowed priority claims in each of the Banyon Bankruptcy Cases, respectively, and (iii) all allowed non-subordinated general unsecured claims in each of the Banyon Bankruptcy Cases, after the application of Banyon Creditor Collateral Source Recoveries, as applicable; provided, that the Banyon Trustee shall not permit the holders of allowed claims senior to the RRA Banyon Senior Subordinated Claim to receive in excess of the Full Amount of their claims, after the application of Banyon Creditor Collateral Source Recoveries as applicable.  The RRA Banyon Senior Subordinated Claim shall be senior in right of payment to the TD Bank Banyon Junior Subordinated Claim.

5.     (A)     (I)  Within (5) five Business Days after the Effective Date, the Banyon Trustee shall send to all holders of claims asserted or assertable against the Banyon Bankruptcy Estates a Verified Banyon Creditor Collateral Source Recovery Disclosure with instructions to return such Verified Banyon Creditor Collateral Source Recovery Disclosure to the Banyon Trustee so that (i) it is actually received by the Banyon Trustee on or before the date that is 25 days after the Effective Date and (ii) contains the information required in part (II) hereof.

(II)  **Each holder of a claim asserted or assertable against the Banyon Bankruptcy Estates must deliver to the Banyon Trustee a Verified Banyon Creditor Collateral Source Recovery Disclosure by a date that is no later than 25 days after the Effective Date.**  If the holder of a claim asserted or assertable against the Banyon Bankruptcy Estates (i) fails or refuses to timely deliver to the Banyon Trustee a completed and duly executed Verified Banyon Creditor Collateral Source Recovery Disclosure, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Banyon Creditor Collateral Source Recovery Disclosure, then (a) such holder shall be deemed to irrevocably waive its rights to receive, and shall be forever barred from receiving, a distribution from the Banyon Bankruptcy Estates, and (b) such holder's claim asserted or assertable against the Banyon Bankruptcy Estates shall be deemed disallowed without further order of the Bankruptcy Court.  All Entities submitting a Verified Banyon Creditor Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Banyon Creditor Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has materially changed, including, but not limited to, when such Entity actually receives a previously anticipated Banyon Creditor Collateral Source Recovery. Such obligation to correct and/or update shall terminate on the Final Distribution Date.

(B)     The Banyon Trustee shall provide the Liquidating Trustee and the Liquidating Trust Oversight Committee copies of each Verified Banyon

4999213-2

43

Creditor Collateral Source Recovery Disclosure submitted to him within five Business Days after the last date on which such Verified Banyon Creditor Collateral Source Recovery Disclosure is required to be submitted to the Banyon Trustee.

(C)     The amount of the distributions, including interim distributions, to be made by the Banyon Bankruptcy Estates on account of each claim asserted or assertable against each Banyon Bankruptcy Estate shall be reduced, on a dollar for dollar basis, by the amount of all Banyon Creditor Collateral Source Recoveries received on account of each such claim.  The amount of the reduction of the distributions, including interim distributions, on account of each such allowed claim's Banyon Creditor Collateral Source Recovery shall be calculated in accordance with Section 3.6(b)(5)(E) of this Plan and established in the following manner: on or before the date that is 45 days after the Effective Date (without prejudice to the Banyon Trustee's right to request an extension of this deadline for cause from the Bankruptcy Court), the Banyon Trustee shall, after consultation with the Liquidating Trustee and the Liquidating Trust Oversight Committee, file and serve upon all affected parties, a motion to make an interim distribution in each of the Banyon Bankruptcy Cases which (I) provides a schedule of the aggregate Banyon Creditor Collateral Source Recoveries received  by each holder of a claim asserted or assertable against each applicable Banyon Bankruptcy Estate, (II) explicitly identifies the amount by which all distributions, including interim distributions, by the Banyon Trustee on account of each such holder's claim will be reduced on account of all of such holder's Banyon Creditor Collateral Source Recoveries applicable to each such claim for all purposes, and (III) seeks authority to make an interim distribution to the creditors in each of the Banyon Bankruptcy Estates in accordance with Section 3.6(b)(8) of this Plan.  Such motion to make an interim distribution shall also provide that: (i) the Liquidating Trustee, the Liquidating Trust Oversight Committee and the holder of a claim against the Banyon Bankruptcy Estates whose distribution is sought to be reduced shall have 15 days from the filing of such motion to object to the relief sought in such motion; (ii) all objections to such motion must be filed with the Bankruptcy Court and served upon the Banyon Trustee, the Liquidating Trustee, and the Liquidating Trust Oversight Committee; (iii) if no timely objection to such motion is filed and served, the Banyon Trustee shall use the amount of the applicable Banyon Creditor Collateral Source Recovery indicated in such motion to calculate the reduction to the distributions, including interim distributions, to each such holder of each such claim asserted or assertable against each of the Banyon Bankruptcy Estates for all purposes; and (iv) if a timely objection to such motion is filed and served, such objection and the amount of the applicable Banyon Creditor Collateral Source Recovery shall be resolved by the Bankruptcy Court in accordance with the provisions of this Section 3.6(b) of the Plan after notice and opportunity for a hearing.

(D)     The holder of a claim asserted or assertable against the Banyon Bankruptcy Estates, once allowed, shall not receive a distribution on account of such a claim asserted or assertable against the Banyon Bankruptcy Estates until the amount of such holder's Banyon Creditor Collateral Source Recoveries are less than or equal to the amount such holder would have received in distributions on account of its

4999213-2

claim asserted against the Banyon Bankruptcy Estates if such holder did not have any Banyon Creditor Collateral Source Recoveries.

(E)    Except to the extent that a settlement agreement approved by Final Order of the Bankruptcy Court in either Banyon Bankruptcy Case between the holder of an allowed claim against either of the Banyon Bankruptcy Estates and such Banyon Bankruptcy Estate provides for differing treatment of Banyon Creditor Collateral Source Recoveries, the amount of a Banyon Creditor Collateral Source Recovery shall be calculated for each applicable allowed claim against a Banyon Bankruptcy Estate as:

I.    The gross amount of Cash and non-Cash assets received by, available to, received for the benefit of or applied to the indebtedness of the holder of an allowed claim against the Banyon Bankruptcy Estates (whether made directly or indirectly to such holder or any agent, attorney or third party associated with such holder), on account of or in any way related to such holder's loss directly or indirectly relating to Banyon 1030-32, LLC, Banyon Income Fund, LP, or Rothstein from all parties and sources, including, without limitation, any payments made to the holder of such claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action.

II.    The amount calculated pursuant to Section 3.6(b)(5)(E)(I) of this Plan shall exclude, without duplication:

(i)    any distributions to be made to the holder of such claim by either of the Banyon Bankruptcy Estates;

(ii)    any tax benefit from a theft loss deduction taken in accordance with the IRC, or other tax benefits received by a holder of such claim, in either case as a result of losses in connection with Banyon Bankruptcy Estates or the Ponzi scheme orchestrated or operated by Rothstein;

(iii)    any amounts paid by TD Bank that result in any claims or recoveries being assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013, unless TD Bank consents to these amounts being included in the calculation of a Banyon Creditor Collateral Source Recovery;

(iv)    any anticipated, but not yet received, Banyon Creditor Collateral Source Recovery.

III.    The amount calculated pursuant to Section 3.6(b)(5)(E)(I) and (II) of this Plan shall include interest only if and to the extent such interest would be recoverable or allowable as an allowed claim against either Banyon

Bankruptcy Estate or as part of the allowed claim of such holder against either Banyon Bankruptcy Estate.

IV.    No deduction or reduction from the amount of a Banyon Creditor Collateral Source Recovery on account of the fees, costs and other expenses incurred or paid in connection with its pursuit of any Banyon Creditor Collateral Source Recoveries, including, without limitation, attorney's fees and costs, is permissible.

(F)    In connection with the calculation of Banyon Creditor Collateral Source Recoveries, to the extent that the holder of a claim against the Banyon Bankruptcy Estates assigned or assigns any Banyon Creditor Collateral Source Recoveries to another holder of a claim against the Banyon Bankruptcy Estates, the assignor may notify the Banyon Trustee of such assignment.  Subject to the Bankruptcy Court's approval, the Banyon Trustee may, in his discretion, seek to reduce the assignee's distribution, including an interim distribution, from the Banyon Bankruptcy Estates by the amount of the Banyon Creditor Collateral Source Recovery assigned to such assignee and not reduce the assignor's distribution, including an interim distribution, from the Banyon Bankruptcy Estates.

(G)    Without the need of a further order of the Bankruptcy Court and except to the extent that a settlement agreement approved in either Banyon Bankruptcy Case by Final Order of the Bankruptcy Court between either of the Banyon Bankruptcy Estates and the holder of an allowed claim against such Banyon Bankruptcy Estate provides for differing treatment of Banyon Creditor Collateral Source Recoveries, the holder of an allowed claim against a Banyon Bankruptcy Estate shall be required to remit to the Banyon Trustee  an amount of Cash equal to the value of all Banyon Creditor Collateral Source Recoveries it receives that were not disclosed as having been received on such holder's Verified Banyon Creditor Collateral Source Recovery Disclosure or did not then exist, including, without limitation, any applicable payments made to the holder of such claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; provided, however that in no event shall the holder of an allowed claim against either Banyon Bankruptcy Estate be required to remit Cash to the Banyon Trustee in an amount that is greater than the sum of such holder's distribution on account of such allowed claim from the applicable Banyon Bankruptcy Estate.  The holder of an allowed claim against either Banyon Bankruptcy Estate that has received or will receive a distribution from the Banyon Trustee shall fully cooperate with the Banyon Trustee and execute any documents reasonably required by the Banyon Trustee to evidence the obligation.

6.    All objections to claims in the Banyon Bankruptcy Estates shall be filed within 60 days after the Effective Date.

7.    The Banyon Trustee shall provide the Liquidating Trustee and the Liquidating Trust Oversight Committee periodic reports on (I) the status of the objections to and reconciliation of the claims asserted in the Banyon Bankruptcy Cases, (II) the status of the objections, if any, asserted to the Banyon Creditor Collateral Source

Recoveries in the motion required to be filed in accordance with Section 3.6(b)(5)(C) of this Plan, and (III) the estimated administrative expenses that are projected to arise in the subsequent quarter and be allowed in the Banyon Bankruptcy Cases, each quarter commencing on the last Business Day of the month in which the 90th day after the Effective Date occurs and concluding on the date in which the Banyon Bankruptcy Cases are closed.

8.      The Banyon Trustee shall, in the motion to make an interim distribution required by Section 3.6(b)(5)(C) of this Plan, seek the authority to make an interim distribution of not less than 60% of the allowed amount of each creditor's Claim against a Banyon Estate from such Banyon Estate, and shall use his best efforts to distribute an additional 10% of the allowed amount of each creditor's Claim against a Banyon Estate from such Banyon Estate, within five (5) Business Days after the approval of such motion, subject to Bankruptcy Court approval; provided, however, that any such interim distributions by the Banyon Trustee shall be limited in amounts that, in the Banyon Trustee's reasonable judgment, are designed to avoid the payment of excess distributions to a creditor of the Banyon Bankruptcy Estates; provided, further, however, that the Banyon Trustee may seek authority from the Bankruptcy Court, after notice and a hearing, to reduce the percentage of the interim distribution required by this Section 3.6(b)(8) for good cause shown.  The Banyon Trustee may rely on the amount of Banyon Creditor Collateral Source Recoveries disclosed on a Verified Banyon Creditor Collateral Source Recovery Disclosure as a Banyon Creditor Collateral Source Recovery that would reduce a creditor's distribution for the purpose of making any reserve or distribution, including any interim distribution.

9.      If the Banyon Bankruptcy Estates are not substantively consolidated, the Banyon Trustee shall allocate any Distribution received on account of the Banyon Unsecured Claim in a manner that shall result in the holders of allowed non-subordinated general unsecured claims against each of the Banyon Bankruptcy Estates receiving the same Pro Rata Distribution on account of their allowed claims after the application of the Banyon Creditor Collateral Source Recoveries.

10.      The Banyon Trustee shall file a notice that sets forth each distribution, including any interim distributions, made to a creditor of either of the Banyon Bankruptcy Estates (indicating the identity of such creditor, the applicable Banyon Bankruptcy Estate against which the creditor has asserted a claim, the applicable claim number and the amount of the distributions made to such creditor) within 30 days after the making of any such distribution to unsecured creditors in either of the Banyon Bankruptcy Cases.

(c)      Voting Status of Class 5

Class 5 is Impaired under the Plan and the Banyon Trustee is entitled to vote the Banyon Unsecured Claim on the Plan.

3.7    **Class 6:  Funds' Subordinated Claim.**

(a)    Definition of Class 6

Class 6 consists of the Funds' Subordinated Claim.

(b)    Treatment of Class 6

Subject to the payments provided for in Sections 2.1 through 2.7, and Sections 3.2 through 3.6 of this Plan, the Allowed Class 6 Claim is subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, and Class 5 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable. If all Allowed Class 2, Class 3, Class 4 and Class 5 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable, the Allowed Class 6 Claim shall receive Pro Rata Distributions from the Liquidating Trust pursuant to the Liquidating Trust Agreement if available until such Claims have been paid the Full Amount of such Allowed Claims in Cash in accordance with the terms of the Funds' Settlement Agreement.

Notice regarding the receipt of Collateral Source Recoveries received by the holders of the Funds' Subordinated Claim shall be provided in accordance with the terms of the Funds' Settlement Agreement.  To the extent not otherwise provided herein, the Liquidating Trustee shall succeed to the rights of the Trustee under the provisions of the Funds' Settlement Agreement.

Collateral Source Recoveries received by the holders of the Funds' Subordinated Claim shall be calculated and treated exclusively in accordance with the Funds' Settlement Agreement and the Funds or their assignee(s) (if any) shall receive Distributions on account of such Claim as, and to the extent, provided in the Funds' Settlement Agreement and this Plan, to the extent not inconsistent with the Funds' Settlement Agreement.

Any holder of a Class 6 Claim that receives Distributions in excess of the amount such holder of a Class 6 Claim was entitled to receive in Distributions shall repay such amount that it received that was in excess of the Distributions such holder was entitled to receive to the Liquidating Trust within thirty (30) days after such holder has been directed by a Final Order of the Bankruptcy Court in the Chapter 11 Case to repay such excess Distributions to the Liquidating Trust.

Holders of the Class 6 Claim, if Disallowed subsequent to a Distribution being made to such holders, shall repay any such Distribution to the Liquidating Trust within thirty (30) days after the Class 6 Claim becomes Disallowed.

(c)    Voting Status of Class 6

Class 6 is Impaired under the Plan and the holders of such Claim are entitled to vote on the Plan.

4999213-2

48

3.8    **Class 7:  Miscellaneous Subordinated Claims.**

(a)    Definition of Class 7

Class 7 consists of the Miscellaneous Subordinated Claims.

(b)    Treatment of Class 7

Subject to the payments provided for in Sections 2.1 through 2.7, and Sections 3.2 through 3.7 of this Plan, Allowed Class 7 Claims are subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, Class 5, and Class 6 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable. If all Allowed Class 2, Class 3, Class 4, Class 5, and Class 6 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable, the Allowed Class 7 Claims shall receive Pro Rata Distributions from the Liquidating Trust pursuant to the Liquidating Trust Agreement if available until such Claims have been paid the Full Amount of such Allowed Claims in Cash.

**As a condition precedent to the receipt of a Distribution under the Plan or the Liquidating Trust, the holders of Class 7 Claims shall deliver to the Voting Agent completed and duly executed Verified Collateral Source Recovery Disclosures, in the form attached to this Plan as Appendix 1.138, by the Voting Deadline.**

If a holder of a Class 7 Claim (i) fails or refuses to timely deliver to the Voting Agent a completed and duly executed Verified Collateral Source Recovery Disclosure on or before the Voting Deadline, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Collateral Source Recovery Disclosure, then (a) the holders of the Class 7 Claim shall be deemed to irrevocably waive their rights to receive, and shall be forever barred from receiving, a Distribution from the Liquidating Trust, (b) the Class 7 Claim shall be deemed Disallowed without further order of the Bankruptcy Court, and (c) the Ballot for the Class 7 Claim shall not be counted for purposes of determining whether Class 7 has accepted or rejected this Plan. All Entities submitting a Verified Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has changed, including, but not limited to, when such Entity actually receives a previously anticipated Verified Collateral Source Recovery. Such obligation to correct and/or update shall terminate on the Final Distribution Date.

The amount of the Distributions to be made on account of each Allowed Class 7 Claim shall be reduced, on a dollar for dollar basis, by the amount of all Collateral Source Recoveries received from any source.  The amount of the reduction of the Distributions on account of each Allowed Class 7 Claim's Collateral Source Recovery shall be established in the following manner: on or before the date that is 60 days after the Effective Date (without prejudice to the Liquidating Trustee's right to request an extension of this deadline for cause from the Bankruptcy Court), the Liquidating Trustee shall, after consultation with the Liquidating Trust Oversight Committee, File and serve a notice on all affected parties which (A) provides a

4999213-2

schedule of the aggregate Collateral Source Recoveries received from all sources by each holder of a Claim in Class 7, and (B) explicitly identifies the amount by which Distributions on account of each such holder's Class 7 Claim will be reduced on account of all of such holder's Collateral Source Recoveries, and such notice shall also provide that: (a) the Liquidating Trust Oversight Committee and the holder of a Class 7 Claim whose Distribution is sought to be reduced shall have 30 days from the Filing of such notice to object to the relief sought in such notice; (b) all objections to such notice shall be Filed with the Bankruptcy Court and served upon the Liquidating Trustee and the Liquidating Trust Oversight Committee; (c) if no timely objection to such notice is Filed and served, the Liquidating Trustee shall use the amount of the applicable Collateral Source Recovery indicated on such notice to calculate the reductions to Distributions to each such holder of a Class 7 Claim; and (d) if a timely objection to such notice is Filed and served, such objection and the amount of the applicable Collateral Source Recovery shall be resolved by the Bankruptcy Court in accordance with the provisions of this Section 3.8(b) after notice and opportunity for a hearing.

Nothing in the foregoing is intended to modify or supersede, and nothing herein shall modify or supersede, any settlement agreements that have been approved in the Chapter 11 Case by Final Order of the Bankruptcy Court on or before May 8, 2013, including, without limitation, the Gibraltar Settlement Agreement, the Levy Settlement Agreement, and the Razorback Settlement Agreement. Nothing contained herein shall preclude the Liquidating Trustee from reducing Distributions pursuant to Collateral Source Recoveries as stated in this Section 3.8(b), to the extent not inconsistent with any relevant provisions of such settlement agreements. For the avoidance of any doubt, Collateral Source Recoveries received by the holders of the Miscellaneous Subordinated Claims shall be calculated and applied in accordance with the applicable terms of any settlement agreement with the Estate that has been approved in the Chapter 11 Case by Final Order on or before May 8, 2013 and is applicable to such Miscellaneous Subordinated Claim, including, without limitation, the Gibraltar Settlement Agreement, the Levy Settlement Agreement, and the Razorback Settlement Agreement, and such holders shall receive Distributions on account of such Miscellaneous Subordinated Claims as, and to the extent, provided in such settlement agreements and this Plan, to the extent not inconsistent with such settlement agreements.

The holder of an Allowed Class 7 Claim shall not receive a Distribution on account of such Class 7 Claim until the amount of such holder's Collateral Source Recoveries is less than or equal to the amount such holder would have received in Distributions on account of its Class 7 Claim if such holder did not have any Collateral Source Recoveries.

On or by the Effective Date, the Trustee or the Liquidating Trustee, as applicable, shall provide the Liquidating Trust Oversight Committee with copies of all Verified Collateral Source Recovery Disclosures that are timely received by the Voting Agent.

Any Holder of a Class 7 Claim that receives Distributions in excess of the amount such holder of a Class 7 Claim was entitled to receive in Distributions shall repay such amount that it received that was in excess of the Distributions such holder was entitled to receive to the Liquidating Trust within thirty (30) days after such holder has been directed by a Final Order of the Bankruptcy Court in the Chapter 11 Case to repay such excess Distributions to the Liquidating Trust.

4999213-2

50

Holders of Class 7 Claims, if Disallowed subsequent to a Distribution being made to such holders, shall repay any such Distribution to the Liquidating Trust within thirty (30) days after a Class 7 Claim becomes Disallowed.

   (c)  Voting Status of Class 7

Class 7 is Impaired under the Plan and the holders of such Claim are entitled to vote on the Plan.

  3.9 **Class 8:  TD Bank Junior Subordinated Claim.**

   (a)  Definition of Class 8

Class 8 consists of the TD Bank Junior Subordinated Claim.

   (b)  Treatment of Class 8

Subject to the payments provided for in Sections 2.1 through 2.7, and Sections 3.2 through 3.8 of this Plan, the Allowed Class 8 Claim is subordinate in right of payment to all Allowed Class 2, Class 3, Class 4, Class 5, Class 6, and Class 7 Claims, and will be paid, if at all, after all Allowed Claims in such senior classes are paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable.  If the holders of all Allowed Class 2, Class 3, Class 4, Class 5, Class 6, and Class 7 Claims have been paid the Full Amount of such Allowed Claims in Cash after application of Collateral Source Recoveries, as applicable, the Allowed Class 8 Claim shall receive Distributions from the Liquidating Trust if available pursuant to the Liquidating Trust Agreement until such Claim has been paid the Full Amount of such Allowed Claim in Cash.

   (c)  Voting Status of Class 8

Class 8 is Impaired under the Plan, but the holder of the Allowed Class 8 Claim has agreed to have such Claim deemed to have voted to accept the Plan; <u>provided, however</u> that the Plan Proponents shall not rely on Class 8 as an impaired accepting class for purposes of determining whether the Plan complies with Section 1129(a)(10) of the Bankruptcy Code.

  3.10 **Class 9:  Allowed Interests in the Debtor.**

   (a)  Definition of Class 9

Class 9 consists of all Interests in the Debtor.

   (b)  Treatment of Class 9

All Interests shall be cancelled on the Effective Date.  Class 9 Interests shall not receive or retain any property under this Plan**.**

4999213-2

(c)     Voting Status of Class 9

Class 9 is Impaired under the Plan and will be deemed to have rejected the Plan.

## ARTICLE 4

### IDENTIFICATION OF CLASSES OF CLAIMS AND INTERESTS IMPAIRED AND NOT IMPAIRED BY THE PLAN

4.1     **Unimpaired Classes of Claims and Interests**.  Class 1 Allowed Secured Claims is Unimpaired under the Plan.

4.2     **Impaired Classes of Claims and Interests**.  Classes 2, 3, 4, 5, 6, 7, 8, and 9 are Impaired.  The Plan Proponents shall solicit votes from the holders of Claims in Classes 2, 3, 4, 5, 6, and 7.

## ARTICLE 5

### TREATMENT OF EXECUTORY CONTRACTS

5.1     **Rejection.**  Unless a motion to assume is Filed prior to the Confirmation Hearing and an order authorizing assumption is entered on or prior to the Effective Date, all executory contracts and unexpired leases of the Debtor shall be rejected pursuant to Section 365 of Bankruptcy Code as of the Effective Date.  For the avoidance of any doubt, this Section 5.1 shall apply to any and all pre-petition contracts or engagements the Debtor may have with professionals, including, but not limited to, attorneys, auditors and accountants.

5.2     **Approval of Rejection; Rejection Damages Claims Bar Date.**  The Confirmation Order shall constitute an Order of the Bankruptcy Court approving the rejection of any executory or unexpired leases not assumed in accordance with Section 5.1 of this Plan as of the Effective Date.  Any Claim for damages arising from rejection of any executory contract or unexpired leases must be Filed on the earlier of (i) the deadline established by an order of the Bankruptcy Court, or (ii) thirty (30) days after the mailing of the Notice of Effective Date (the

4999213-2

52

"**Rejection Claim Bar Date**").  Any Claim not Filed on or before the Rejection Claim Bar Date shall be forever barred, shall not be enforceable against the Debtor, its Estate, the Liquidating Trust, the Liquidating Trustee, or any of their respective assets and shall receive no Distribution under the Plan or otherwise on account of such Claim.

       5.3     **Indemnification Obligations**.  All Indemnification Obligations shall be canceled, released and discharged on the Effective Date; provided, however, that the cancellation, release and discharge of the Indemnification Obligations shall not affect whether a Claim made on account of an Indemnification Obligation Filed by the applicable Bar Date is or may become an Allowed Claim.

**ARTICLE 6**

**MEANS FOR EXECUTION AND IMPLEMENTATION OF THIS PLAN**

       6.1     **Settlement Agreement**.  Pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan implements the Settlement Agreement which is a compromise and settlement of all issues between and among the Estate, the Banyon Bankruptcy Estates and TD Bank.  The Settlement Agreement is hereby incorporated into the Plan in its entirety.  The Confirmation Order shall approve the Settlement Agreement in its entirety.  To the extent not otherwise provided for in the Plan, the Settlement Agreement will further be implemented under the Plan as follows:

       6.1.1    Within three Business Days after the Confirmation Date, and subject to the proviso contained in Section 9.2.12 of this Plan, TD Bank shall deliver the TD Bank Contribution to an account designated by the Trustee.

       6.1.2    The consideration being provided to the Estate and the Banyon Bankruptcy Estates pursuant to, in accordance with, and as described in, the Plan and the

4999213-2

Settlement Agreement by TD Bank, (including, without limitation, the TD Bank Contribution, the settlement and subordination of the Claims or the portions thereof in which TD Bank has an interest that comprise in part, the TD Bank Junior Subordinated Claim pursuant to this Plan, the settlement and subordination of TD Bank's claims or interest in claims in the Banyon Case pursuant to the terms of the Settlement Agreement, the release of TD Bank's claims against the Estate pursuant to Section 10.9 of this Plan, and the release of TD Bank's claims against Banyon Bankruptcy Estates pursuant to Section 3.4 of the Settlement Agreement) is being provided by TD Bank for the consideration that the Estate and the Banyon Bankruptcy Estates are providing to TD Bank under the Settlement Agreement and this Plan (including, without limitation, the settlement of all of the Estate's claims against TD Bank (including, without limitation, the Estate's avoidance claims against TD Bank), the settlement of all of the Banyon Bankruptcy Estates' claims against TD Bank, the TD Bank Releasee injunction and bar order provided in Section 10.8 of this Plan, the bar order provided for in Section 3.3 of the Settlement Agreement, the release being granted to the TD Bank Releasees provided in Section 10.6 of this Plan, the release being granted to the TD Bank Releasees provided in Section 3.1 of the Settlement Agreement, and the assignment of the Estate's and the Banyon Bankruptcy Estates' claims against the Levins).

6.1.3   The TD Bank Junior Subordinated Claim is Allowed and shall be classified and treated in Class 8 of this Plan.  The TD Bank Junior Subordinated Claim shall not be subject to objection, reconsideration, reduction, recharacterization, further subordination, impairment, disallowance or reduction in Distribution on account of a Collateral Source Recovery or otherwise; provided, however, that TD Bank shall not be permitted to use the TD Bank Junior Subordinated Claim in any manner adverse to the Liquidating Trust; provided

<u>further</u>, <u>however</u>, that nothing in this Section 6.1.3 of the Plan shall in any way impact any right that TD Bank may have to receive a Distribution on the TD Bank Junior Subordinated Claim.

        6.1.4    The Liquidating Trustee and the Liquidating Trust Oversight Committee shall not, and shall not cause the Liquidating Trust to, permit the payment or Distribution of any Assets, Trust Assets, or the proceeds thereof on account of any Interest in the Debtor.

        6.1.5    The Trustee, the Committee and the Liquidating Trustee, as applicable, shall (i) prosecute the Confirmation Order and the 9019 Order to Final Order and (ii) oppose and fully prosecute any appeal of the Confirmation Order or the 9019 Order that seeks relief that is adverse to any of the Parties or the Liquidating Trust.  Each of the Trustee, the Committee and the Liquidating Trustee, as applicable, shall use its best efforts to have any such appeal (i) dismissed, (ii) resolved in manner that is in form and in substance acceptable to the Parties, or (iii) fully prosecuted so that the relief requested in such appeal is denied.  Notwithstanding anything herein to the contrary, the Trustee, the Committee and the Liquidating Trustee, as applicable, shall not oppose an appeal of the Confirmation Order or the 9019 Order filed by the Trustee, the Banyon Trustee or TD Bank, so long as the relief sought by such appeal is in accordance with the terms of this Plan and the Settlement Agreement.

        6.1.6    The TD Bank Junior Subordinated Claim shall only be junior in right of payment of Administrative Expense Claims, Priority Claims and Claims classified in Classes 1 through 7 of this Plan.

        6.1.7    TD Bank shall have standing to prosecute and defend any appeal of the Confirmation Order or the 9019 Order.

6.1.8    Subject to the terms of the Settlement Agreement and Section 3.6(b)(6) of the Plan, the Trustee and the Liquidating Trustee, as applicable, and the Banyon Trustee shall have exclusive standing to object to any and all claims in the Banyon Bankruptcy Estates.

6.1.9    Other than those claims expressly set forth in the Settlement Agreement, the Trustee, on behalf of the Debtor and the Estate, hereby waives all claims of the Debtor and the Estate against the Banyon Bankruptcy Estates.

6.1.10  The Trustee, the Liquidating Trustee and the Liquidating Trust Oversight Committee shall not and shall not permit the Debtor, the Estate, or the Liquidating Trust to support, and shall cause the Debtor, the Estate, and the Liquidating Trust, as applicable, to object to (i) any claims under Sections 503(b)(3)(A) through (E) and 503(b)(4) of the Bankruptcy Code, except the Razorback Substantial Contribution Claim, and (ii) any other non-ordinary course Administrative Expense Claims asserted against the Debtor, the Estate or the Liquidating Trust, as applicable, including any claim for a fee enhancement, unless TD Bank consents in writing to such Claims; provided that the Trustee, the Liquidating Trustee, and the Liquidating Trust Oversight Committee may support and shall not be required to object to the fees and expenses sought by the Trustee, the Liquidating Trustee, the Liquidating Trust Oversight Committee or their Professionals.  Nothing contained in this Section 6.1.10 shall in any way prohibit the Committee from objecting to the Razorback Substantial Contribution Claim.

6.1.11  Within three (3) Business Days after the Effective Date, the Liquidating Trustee shall, on behalf of the Trustee, Debtor and Estate, dismiss with prejudice the adversary proceeding brought by the Trustee against TD Bank that is pending in the Bankruptcy Court as adversary proceeding number 11-02368-RBR.

4999213-2

6.1.12  Within three (3) Business Days after the Effective Date, the Liquidating Trustee shall dismiss with prejudice the adversary proceeding brought by the Trustee against Emess Capital, L.L.C. that is pending in the Bankruptcy Court as adversary proceeding number 11-02768-RBR.

6.1.13  Any Claim which is assigned, participated or transferred or has had its recovery assigned, participated or transferred, in whole or in part, to TD Bank on or after the date this Plan is Filed shall not be subject to objection, reconsideration, reduction, recharacterization, subordination, impairment, disallowance, offset or reduction in Distribution on account of a Collateral Source Recovery, or otherwise, due to the payments made by TD Bank or because TD Bank has been assigned, participated or transferred, in whole or in part, such Claim or recovery; provided, however, that such Claim shall be subject to objection, reconsideration, reduction, recharacterization, subordination, impairment or disallowance for any other reason, subject to the other provisions of this Plan.

6.1.14  Upon the occurrence of the Effective Date, without execution of any further documentation, the Trustee or the Liquidating Trustee, as applicable, on behalf of the Estate shall assign, transfer, and convey the Levin Claims, and/or any proceeds thereof, to TD Bank free and clear of all liens, claims and encumbrances.

6.1.15  Upon the occurrence of the Effective Date, without execution of any further documentation, the Levin Claims shall unconditionally and irrevocably vest with TD Bank and TD Bank shall have the exclusive right and standing to enforce any and all of the Levin Claims, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, and shall be entitled to all remedies available to the Trustee in the Chapter 11 Case, for the sole benefit of TD Bank.

4999213-2

6.1.16  The Trustee or the Liquidating Trustee, as applicable, hereby agrees that upon the request of TD Bank, the Trustee or the Liquidating Trustee, as applicable, shall provide or make available any and all data, records and documents regarding the Levin Claims in their actual possession, to TD Bank, subject to entry into mutually acceptable written agreements in order to preserve any applicable attorney client privileges and protections afforded by the work product protection doctrine.

6.1.17  The Confirmation Order shall authorize and direct the Plan Proponents and the Banyon Trustee to take all actions, and execute and deliver all documents, necessary or desirable to implement the provisions of the Settlement Agreement and the Plan, including, without limitation, the Liquidating Trust Agreement.

6.2     **The Liquidating Trust.**

6.2.1   **Establishment of the Liquidating Trust.**  On the Effective Date, the Trustee, on behalf of the Debtor and the Beneficiaries, shall execute the Liquidating Trust Agreement attached hereto and incorporated herein as Appendix 1.82, and take all steps necessary to establish the Liquidating Trust.  In the Confirmation Order, the Bankruptcy Court shall approve the selection of the Liquidating Trustee whose appointment shall be effective on the Effective Date.

6.2.2   **Purpose of Liquidating Trust.**  The Liquidating Trust shall be established for the sole purpose of liquidating the Debtor's Assets, including prosecuting Litigation Claims and distributing the proceeds thereof solely to the Beneficiaries, as identified in and prescribed by this Plan and the Liquidating Trust Agreement.  The Liquidating Trust shall not engage in any trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Unless otherwise required by law, it is

4999213-2

58

intended that all parties treat the Liquidating Trust as a liquidating trust for all federal income tax purposes. The Liquidating Trust is intended: (i) as a trust governed and construed in all respects as a liquidating trust pursuant to Treasury Regulation § 301.7701-4(d); (ii) as a grantor trust in favor of the Beneficiaries pursuant to Treasury Regulation § 1.671-4(a); and (iii) to comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.  The Beneficiaries of the Liquidating Trust shall be treated as the grantors and deemed owners of the Liquidating Trust.

      6.2.3    **Contribution of Assets to the Liquidating Trust.**  On the Effective Date and subject to the proviso contained in Section 9.2.11 of this Plan, the Trustee on behalf of the Estate shall, pursuant to the terms of the Liquidating Trust Agreement, transfer, disburse and turn over all of the Debtor's Assets, including, but not limited to, the Estate's rights under the Settlement Agreement and the Estate's rights to the Liquidating Trust; provided that the Levin Claims shall not be transferred or otherwise contributed to the Liquidating Trust and shall not be considered or become Trust Assets for any purpose.  Title to all Assets contributed to the Liquidating Trust shall vest in the Liquidating Trust on the Effective Date following the transfer.  For the avoidance of any doubt, following the contribution of Assets to the Liquidating Trust pursuant to this Section 6.2.3 and the Liquidating Trust Agreement, the Liquidating Trustee shall, subject to the terms of this Plan and the Liquidating Trust Agreement, have the exclusive standing to pursue, settle, or otherwise dispose of the Litigation Claims on behalf of the Liquidating Trust for the benefit of the Beneficiaries and shall be entitled to all remedies available to the Trustee in the Chapter 11 Case.  The Liquidating Trustee shall be substituted for the Trustee in all pending litigation without further order of the Bankruptcy Court or any other court where litigation is pending.

4999213-2

59

6.2.4   **Certain Federal Tax Matters.**  The transfer of the Assets to the Liquidating Trust will be treated for federal income tax purposes as a deemed transfer by the Debtor to the Beneficiaries followed by a deemed transfer by the Beneficiaries to the Liquidating Trust, in accordance with Revenue Procedure 94-45, 1994-2 C.B. 684.  The taxation of the deemed transfers from the Debtor to the Beneficiaries and from the Beneficiaries to the Liquidating Trust will be guided by provisions of IRC §§61(a)(12), 483, 1001, 1012 and 1274.  The taxable income or loss of the Liquidating Trust, including the taxable income attributable to the Disputed Claims Reserves, if any, will be allocated to the Beneficiaries on an annual basis pro rata in accordance with their respective entitlement to receive distributions from the Liquidating Trust if the Liquidating Trust terminated and distributed all its assets on the last day of the taxable year (taking into account all prior and concurrent distributions from the Liquidating Trust during such taxable year).  The Liquidating Trustee shall not be required to report such tax information to any Beneficiary unless such Beneficiary provides to the Liquidating Trustee a complete form W-9 or acceptable substitute signed under penalty of perjury.  In determining each Beneficiary's share of income, gain, loss, deductions and credits, the Liquidating Trustee shall not allocate such items to any Beneficiary who is the holder of a Claim which has no value until such time, if at all, as a value of the Claim arises.  For this purpose, a Claim shall have no value for any taxable year in which the Beneficiary who is the holder of the Claim would receive no distribution from the Liquidating Trust if the Liquidating Trust terminated and distributed all its assets on the last day of the taxable year.  The Beneficiaries shall be responsible to report and pay the taxes due on their proportionate share of the Liquidating Trust taxable income, whether or not amounts are actually distributed by the Liquidating Trustee to the Beneficiaries to pay the taxes.  The value of the Trust Assets

4999213-2

transferred into the Liquidating Trust shall be the fair market value of such Assets at the time of such transfer, as reasonably determined by the Liquidating Trustee, in consultation with the Trustee and such advisors as the Liquidating Trustee deems appropriate, within a reasonable period of time after the Effective Date.  Such valuation shall be binding on all parties including, but not limited to, the Debtor, the Debtor's Estate, the Trustee, the Liquidating Trustee, and all Beneficiaries, and these valuations will be used by such parties for all federal income tax purposes.  Notwithstanding anything in this Plan to the contrary, in the event that (i) any portion of the Liquidating Trust is treated as a "qualified settlement fund" pursuant to Treasury Regulation § 1.468B-1, or (ii) the Liquidating Trustee timely elects to treat any portion of the Liquidating Trust subject to Disputed Claims as a "disputed ownership fund" pursuant to Treasury Regulation § 1.468B-9(c)(2)(ii), any federal income tax consequences shall be determined under IRC Section 468B and the Treasury Regulations thereunder.

      6.2.5  **Liquidating Trust Bond.**  As a condition to serving as Liquidating Trustee, the Liquidating Trustee, and any successor trustee, shall post a bond in favor of the Liquidating Trust in an amount that is not less than the amount of Cash held by the Liquidating Trust on the Effective Date, which bond shall be in substantially the same form as is required by the United States Trustee for trustees in the Southern District of Florida.  For the avoidance of any doubt, the Liquidating Trust shall be responsible for all costs associated with the posting of the foregoing bond, including the premium associated with such bond.

      6.2.6  **Liquidating Trust Management.**  Subject at all times to the consent and review rights of the Liquidating Trust Oversight Committee set forth in this Plan and/or the Liquidating Trust Agreement, the Liquidating Trustee shall (A) oversee and direct the Liquidating Trust's operations and activities, in accordance with the Liquidating Trust

Agreement, including, but not limited to, the retention of Post-Confirmation Professionals, objecting to Claims, reconciling Claims, resolving Claims, otherwise disposing of Claims, prosecution of Litigation Claims, and the settling of Litigation Claims, and (B) have the authority as set forth in Section 5.12 of the Liquidating Trust Agreement to initiate, prosecute, settle, resolve, dismiss, object to, reconcile or otherwise dispose of any Claim or Litigation Claim, all without the need of Bankruptcy Court approval absent the explicit requirement of such approval set forth in this Plan or the Liquidating Trust Agreement; provided, however, that for the avoidance of any doubt, (i) the Liquidating Trustee shall be bound by all prior settlement agreements that have been approved in the Chapter 11 Case by Final Order of the Bankruptcy Court as of May 8, 2013, subject to the Collateral Source Recovery provisions set forth in Sections 1.19, 1.36, 1.137 and 1.138, as well as Article 3, of this Plan, except to the extent such Collateral Source Recovery provisions are inconsistent with such prior settlement agreements, and (ii) TD Bank shall not have any right (a) to contest any prior settlements agreements that have been approved in the Chapter 11 Case by a Final Order of the Bankruptcy Court as of the Effective Date, or (b) to object to any Claims.

      6.2.7   **Liquidating Trust Oversight Committee.**  The Committee shall designate the members of the Liquidating Trust Oversight Committee.  The members of the Liquidating Trust Oversight Committee shall be identified no later than ten (10) Business Days subsequent to entry of the Disclosure Statement Approval Order.  The appointment of the Liquidating Trust Oversight Committee shall be ratified by the Confirmation Order and effective as of the Effective Date.  The Liquidating Trust Oversight Committee shall review the actions of the Liquidating Trustee as provided in this Plan and as set forth in the Liquidating Trust Agreement. The Liquidating Trust Oversight Committee and its members shall have a fiduciary

4999213-2

duty to the Beneficiaries in accordance with this Plan. The Liquidating Trust Oversight Committee may employ, pursuant to the terms of the Liquidating Trust Agreement, Post-Confirmation Professionals whose services may be reasonably necessary or advisable, to advise or assist the Liquidating Trust Oversight Committee in the discharge of its duties. Members of the Liquidating Trust Oversight Committee shall serve without compensation but shall be reimbursed for their reasonable and necessary out-of-pocket expenses incurred in performing their duties pursuant to Section 8.3(b) of the Liquidating Trust Agreement. Post-Confirmation Professionals may be retained by the Liquidating Trust Oversight Committee in the ordinary course of business and without prior approval of the Bankruptcy Court pursuant to Section 8.3(b) of the Liquidating Trust Agreement.  The actual fees and expenses of such Post-Confirmation Professionals of the Liquidating Trust Oversight Committee shall be reimbursed and shall be solely paid from Trust Assets without further order of the Bankruptcy Court pursuant to the terms of the Liquidating Trust Agreement.

6.2.8    **Litigation Approval Rights of Liquidating Trust Oversight Committee.**  The Liquidating Trustee shall, prior to taking any action with respect to the initiation, prosecution, settlement, resolution, dismissal, objection to, reconciliation of or other disposition of a Claim or Litigation Claim, or with respect to any action concerning the Forfeiture Action, provide the Liquidating Trust Oversight Committee with written notice of such actions that meet the criteria set forth in subparts (a), (b), and (c) to Section 5.12 of the Liquidating Trust Agreement. If any such proposed action meets the thresholds stated in subparts (b) and (c) to Section 5.12 of the Liquidating Trust Agreement, the Liquidating Trust Oversight Committee shall have ten (10) Business Days to object in writing to any such proposed action. The Liquidating Trust Oversight Committee and the Liquidating Trustee shall confer in good

faith to resolve the objection to such proposed action.  Should any dispute between the

Liquidating Trustee and the Liquidating Trust Oversight Committee remain unresolved after

such conference, such dispute shall be resolved by the Bankruptcy Court.

      6.2.9    **Costs and Expenses of the Liquidating Trust.**  All costs and expenses

incurred by the Liquidating Trust shall be the obligation of the Liquidating Trust and, subject at

all times to the consent and review rights of the Liquidating Trust Oversight Committee, be

payable from the Trust Assets of the Liquidating Trust in accordance with the Liquidating Trust

Agreement, the Settlement Agreement and this Plan.  Compensation of the Liquidating Trustee

shall be paid from the Trust Assets pursuant to the terms of the Liquidating Trust Agreement and

Section 2.4.2 of this Plan.

      6.2.10  **[Intentionally Omitted].**

      6.2.11  **Retention and Compensation of Professionals by the Liquidating**

**Trustee.**  The Liquidating Trustee may employ, without further order of the Bankruptcy Court,

Post-Confirmation Professionals or other persons whose services may be reasonably necessary or

advisable, subject to approval of the Liquidating Trust Oversight Committee, to advise or assist

the Liquidating Trustee in the discharge of his duties as Liquidating Trustee, or otherwise in the

exercise of any powers vested in the Liquidating Trustee, and to pay reasonable compensation

solely from the Trust Assets, to such attorneys, accountants, appraisers, expert witnesses,

insurance adjusters or other persons. However, the Liquidating Trustee may not retain as a Post-

Confirmation Professional any member of the Liquidating Trust Oversight Committee or any

firm which employs such member.  On the Effective Date, in the discretion of the Liquidating

Trustee and the Liquidating Trust Oversight Committee, the Voting Agent may continue in its

role as noticing and claims agent with its fees and expenses being paid by the Liquidating

Trustee on the same terms and conditions that were in effect on the Effective Date.  Subject to

the provisions of this Plan, prior representation of the Trustee or the Committee during the

Chapter 11 Case shall not disqualify any professional from representing the Liquidating Trustee

or the Liquidating Trust Oversight Committee.  No professional that represented TD Bank during

the Chapter 11 Case on matters related to the Chapter 11 Case shall be authorized to represent

either the Liquidating Trustee or the Liquidating Trust Oversight Committee.  Notwithstanding

anything herein to the contrary, without providing notice to or obtaining the approval of any

party other than the Liquidating Trust Oversight Committee, the Liquidating Trustee shall be

authorized pursuant to the Liquidating Trust Agreement to pay the fees and expenses incurred

after the Effective Date by his Post-Confirmation Professionals without further order of the

Bankruptcy Court.

          6.2.12  **Resignation and Removal of the Liquidating Trustee.**  The Liquidating

Trustee may resign and be discharged from any future obligations and liabilities under the

Liquidating Trust Agreement and this Plan by giving written notice thereof to the Liquidating

Trust Oversight Committee.  Any resignation hereunder shall become effective on the date

specified in the written notice, which shall be no less than thirty (30) days after such written

notice is given.  The Liquidating Trustee may be removed at any time only by order of the

Bankruptcy Court for cause.  Upon any such resignation, such Liquidating Trustee shall be

entitled to any compensation, reimbursement and indemnification set forth in the Liquidating

Trust Agreement or this Plan which remains due and owing to such Liquidating Trustee at the

time of such resignation.  In the event the Liquidating Trustee is removed, the Liquidating

Trustee shall not be entitled to any compensation or reimbursement that is due and owing to such

Liquidating Trustee at the time of such removal.  If, at any time, the Liquidating Trustee shall

4999213-2

give notice of his intent to resign pursuant to the Liquidating Trust Agreement, or shall become incapable of acting, counsel to the Liquidating Trustee shall provide notice thereof to the Bankruptcy Court.  Upon the resignation or removal of the Liquidating Trustee, the Liquidating Trust Oversight Committee shall select a replacement Liquidating Trustee.  If the Liquidating Trustee resigns, the Liquidating Trust Oversight Committee shall name the replacement Liquidating Trustee prior to the date of the Liquidating Trustee's resignation specified in the written notice.  Any successor to the Liquidating Trustee shall be bound by the terms of the Liquidating Trust Agreement, the Settlement Agreement and this Plan.

6.2.13  **Resignation and Removal of the Liquidating Trust Oversight Committee Members.**  Any member of the Liquidating Trust Oversight Committee may resign and be discharged from any future obligations and liabilities hereunder by giving written notice thereof to the Bankruptcy Court with a copy to the Liquidating Trustee and the other members of the Liquidating Trust Oversight Committee.  Any resignation hereunder shall become effective on the date specified in the written notice, which shall be no less than thirty (30) days after such written notice is given.  A member of the Liquidating Trust Oversight Committee may be removed at any time only by order of the Bankruptcy Court for cause.  Upon the proposed resignation or removal of a member of the Liquidating Trust Oversight Committee, the remaining members of the Liquidating Trust Oversight Committee shall select a successor who shall agree to be bound by the terms of this Plan, the Liquidating Trust Agreement, and the Settlement Agreement.  Any successor member of the Liquidating Trust Oversight Committee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall deliver counterparts thereof to the Bankruptcy Court.

6.2.14  **Conflicts of Interest.**  The Liquidating Trustee shall disclose to the Liquidating Trust Oversight Committee any connections, conflicts or potential conflicts of interest that the Liquidating Trustee and/or the firm by whom the Liquidating Trustee is employed, has with respect to the exercise of any rights, powers, duties and privileges under this Plan or the Liquidating Trust Agreement. In the event that the Liquidating Trustee cannot take any action by reason of an actual or potential conflict of interest, the Liquidating Trust Oversight Committee acting by majority shall be authorized to take any such action(s) in the Liquidating Trustee's place and stead, including without limitation the retention of Post-Confirmation Professionals (which may include Post-Confirmation Professionals retained by the Liquidating Trustee) for the purpose of taking such action.  Also, if any matter under consideration by the Liquidating Trust Oversight Committee appears to involve a conflict of interest with any member(s) serving on the Liquidating Trust Oversight Committee or any such member's professional firm or client in this matter, the member(s) with the conflicting interest shall:  (i) disclose to the Liquidating Trustee and the Liquidating Trust Oversight Committee the existence of any actual or potential conflict of which the member has knowledge; and (ii) abstain from participating in the discussion of and/or voting on the matter being considered by the Liquidating Trust Oversight Committee if a majority of the other members of the Liquidating Trust Oversight Committee determines such abstention is appropriate.

6.2.15  **Initial Appointment of the Liquidating Trustee.**  Michael I. Goldberg was selected by the Committee, after consultation with the United States Trustee, to be the Liquidating Trustee. The appointment of the Liquidating Trustee shall be ratified by the Confirmation Order and effective as of the Effective Date.

4999213-2

6.3     **Continuation of Automatic Stay.**  In furtherance of the implementation of this Plan, except as otherwise provided herein, all injunctions or stays provided for in the Chapter 11 Case pursuant to Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect and shall apply to the Estate, the Assets, the Liquidating Trustee, the Liquidating Trust and the Trust Assets.

6.4     **Continuation of Bankruptcy Rule 2004 Rights.**  The Liquidating Trustee shall retain the same rights under Bankruptcy Rule 2004 and Local Rule 2004-1 of the Local Rules of the Bankruptcy Court as the Trustee had prior to the Effective Date.

6.5     **Wind-Down of Debtor.**  On the Effective Date, the Debtor will be deemed dissolved and shall cease to exist for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith.

6.5.1     From and after the Effective Date, the Debtor (i) for all purposes shall be deemed to have withdrawn its business operations from any state in which it was previously conducting, or was registered or licensed to conduct, its business operations, and shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.  The Liquidating Trustee is authorized and directed to:  (1) take any action reasonably necessary to effectuate the wind down and dissolution of the Debtor in all respects without further corporate action under applicable law, regulation, order or rule required, including any action by the Debtor or the holders of the Debtor's Interests or the board of directors, as applicable; (2) file a certificate of dissolution for the Debtor, together with all other necessary corporate and company documents,

4999213-2

68

to effect the dissolution of the Debtor under applicable non-bankruptcy law without further corporate action required; (3) complete and file all of the Debtor's final or otherwise required federal, state and local tax returns, as applicable; (4) pursuant to Section 505(b) of the Bankruptcy Code, request an expedited determination for any of the Debtor, the Estate or the Liquidating Trust's unpaid tax liability regarding any tax incurred during the administration of this Chapter 11 Case, as determined under applicable law; (5) take such other actions as the Liquidating Trustee may determine to be necessary or desirable to carry out the purposes of this Plan; (6) comply with any regulatory requirements imposed on the Liquidating Trust under applicable law; (7) with the consent of the Liquidating Trust Oversight Committee, which consent will not be unreasonably withheld, cause the Liquidating Trust to abandon in any commercially reasonable manner any Trust Assets that the Liquidating Trustee determines are of no benefit, or are of *de minimis* value, to the Liquidating Trust ("**Abandoned Assets**"); (8) with the consent of the Liquidating Trust Oversight Committee and notwithstanding any applicable federal or state laws, destroy any books and records of the Debtor, including, but not limited to, personnel files of former employees and financial records; (9) preserve the Debtor's documents, as necessary, to pursue Litigation Claims and conduct the wind down of the Debtor, and to abandon or destroy documents, subject to consent by the Liquidating Trust Oversight Committee upon the Liquidating Trustee's determination that the documents are no longer necessary or beneficial to the Liquidating Trust; and (10) with the consent of the Liquidating Trust Oversight Committee, take any action he deems necessary and appropriate with respect to any employee benefit or 401(k) plan, including, but not limited to, performing any acts necessary or appropriate with respect to terminating such employee benefit or 401(k) plan.

6.5.2    Upon the Effective Date, the Trustee shall be required to cooperate with the Liquidating Trustee in order to implement the Settlement Agreement and this Plan, including, without limitation, providing the Liquidating Trustee prompt access to the books and records of the Estate, aiding the Liquidating Trustee in making payments required by Estate and/or the Liquidating Trust under the Plan, and aiding in the wind down of the Estate.

6.5.3    Except as required by Section 6.5.2 of this Plan, on or as soon as practicable after the Effective Date, the Trustee shall be discharged from his duties to the Estates, the creditors of the Estate, the Liquidating Trust, and its Beneficiaries; provided, however, the discharge of the Trustee shall not in any respect impair  his (i) entitlement to payment of the fees due to him or the enforcement of any rights he may have against  the Liquidating Trust, including his rights to indemnification or (ii) his legal rights and immunities under the Bankruptcy Code and applicable bankruptcy and non-bankruptcy law.

6.6    **Disposition of Abandoned Assets.**  The Liquidating Trustee shall have no further obligations with respect to any Abandoned Asset upon its abandonment.

6.7    **Closing of the Chapter 11 Case.**  Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Chapter 11 Case, when all Assets contributed to the Liquidating Trust have been liquidated and converted into Cash (other than the Abandoned Assets), and such Cash has been distributed in accordance with the Liquidating Trust Agreement and this Plan, and the Final Distribution made, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  Upon the later to occur of the entry of a Final Order closing the Chapter 11 Case or the dissolution of the Liquidating Trust, the Liquidating

4999213-2

Trustee and the Liquidating Trust Oversight Committee and its members shall be discharged from their duties to the Liquidating Trust and its Beneficiaries as applicable.

6.8     **Dissolution of Committee.**  On the Effective Date, the Committee shall be dissolved without any further order of the Bankruptcy Court.  The Committee's members, Professionals, and agents shall be discharged from any further duties and responsibilities in regard to the Chapter 11 Case and the Liquidating Trust.  Notwithstanding anything to the contrary herein, the dissolution of the Committee shall in no way act as a waiver of the Committee's attorney-client and work product privileges, which will expressly survive the dissolution of the Committee.

6.9     **Client Files**.  Pursuant to the authority granted to the Trustee in the Client File Orders, the Trustee and the Liquidating Trustee, as applicable, shall be permitted to dispose of client files in accordance with the Client File Orders.

6.10     **Immediate Binding Effect.**  Subject to Article 9 hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtor and the Liquidating Trust, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are Allowed or the holders of such Claims have accepted or rejected the Plan), and all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan.  All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

6.11     **Additional Documents.**  On or before the Effective Date, the Debtor may File with the Court such agreements and other documents as may be necessary or appropriate to

4999213-2

71

effectuate and further evidence the terms and conditions of the Plan or the Settlement

Agreement.  The Debtor, Trustee or Liquidating Trustee, as applicable, and all holders of Claims

or Interests receiving Distributions pursuant to the Plan and all other parties in interest shall,

from time to time, prepare, execute, and deliver any agreements or documents and take any other

actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

6.12    **[Intentionally Omitted].**

6.13    **Collateral Source Recovery Calculations.**

6.13.1  Except to the extent provided in Section 3.4(b), 3.7(b) or 3.8(b) of this

Plan, the amount of a Collateral Source Recovery shall be calculated for each applicable

Allowed Claim as:

**A.**    the sum of, without duplication:

1.    the gross amount of Cash and non-Cash assets received by, available to, received for the benefit of or applied to the indebtedness of the holder of an Allowed Claim (whether made directly or indirectly to such holder or any agent, attorney or third party associated with such holder), on account of or in any way related to such holder's loss directly or indirectly relating to the Debtor or Rothstein from all parties and sources, including, without limitation, any payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; and

2.    any amounts that would be required to be paid by or on behalf of the holder of an Allowed Claim to TD Bank related to the Debtor or Rothstein pursuant to any agreement between or on behalf of such holder and TD Bank including on account of the Distributions such holder would receive under this Plan.

**B.**    The amount calculated pursuant to Section 6.13.1(A) of this Plan shall exclude, without duplication:

1.    any Distributions to be made to the holder of such Claim under this Plan;

2.    any tax benefit from a theft loss deduction taken in accordance with the IRC, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein;

3.    any amounts paid by TD Bank that result in any claims or recoveries being assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8,

4999213-2

72

2013, unless TD Bank consents to these amounts being included in the calculation of a Collateral Source Recovery; and

        4.      any anticipated, but not yet received, Collateral Source Recoveries.

    **C.**    The amount calculated pursuant to Section 6.13.1(A) and (B) of this Plan shall include interest only if and to the extent such interest would be recoverable or allowable as an Allowed Claim or as part of the Allowed Claim of such holder.

    **D.**    No deduction or reduction from the amount of a Collateral Source Recovery on account of the fees, costs and other expenses incurred or paid in connection with its pursuit of any Collateral Source Recoveries, including, without limitation, attorney's fees and costs, is permissible.

        6.13.2  The Liquidating Trustee shall not deduct or reserve from Distributions on account of any anticipated Collateral Source Recoveries.

        6.13.3  In connection with the calculation of Collateral Source Recoveries, to the extent that the holder of a Claim assigned or assigns any Collateral Source Recoveries to another holder of a Claim, the assignor may notify the Liquidating Trustee of such assignment.  Subject to the Bankruptcy Court's approval, the Liquidating Trustee may, in his discretion, seek to reduce the assignee's Distribution by the amount of the Collateral Source Recovery assigned to such assignee and not reduce the assignor's Distribution.

    6.14   **Collateral Source Recovery Remittance.**  Without the need of a further order of the Bankruptcy Court or a formal assignment and except to the extent that a settlement agreement approved in the Chapter 11 Case by Final Order of the Bankruptcy Court between the Estate and the holder of an Allowed Claim provides for differing treatment of Collateral Source Recoveries, the holder of an Allowed Claim shall be required to remit to the Liquidating Trust an amount of Cash equal to the value of all Collateral Source Recoveries it receives that were not disclosed as having been received on such holder's Verified Collateral Source Recovery Disclosure or did not then exist, including, without limitation, any applicable payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld

4999213-2

Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; provided, however that in no event shall the holder of an Allowed Claim be required to remit Cash to the Liquidating Trust in an amount that is greater than the sum of such holder's Distributions.  The holder of an Allowed Claim that has received a Distribution under the Plan shall fully cooperate with the Liquidating Trustee and execute any documents reasonably required by the Liquidating Trustee to evidence the obligation.

6.15    **Bar Order Hearing.**  Absent reconsideration of or relief from the Order (I) Denying, Without Prejudice, Approval of Amended Disclosure Statement and (II) Granting Bifurcation Motion [ECF No. 4292], the Bankruptcy Court shall hold the Bar Order Hearing after the approval of the Disclosure Statement, but prior to solicitation of acceptances or rejections of this Plan.  Should reconsideration of or relief from the Order (I) Denying, Without Prejudice, Approval of Amended Disclosure Statement and (II) Granting Bifurcation Motion [ECF No. 4292] be granted, the Bar Order Hearing shall be held in accordance with the relief granted with respect thereto.

6.16    **Certain Settlement Issues.**  Any settlement of (i) the Trustee's Motion to Reconsider the Order Allowing Claim of Ira Sochet Inter Vivos Revocable Trust, in addition to Objection to Claim of Ira Sochet Inter Vivos Revocable Trust [ECF No. 3603], or (ii) the Trustee's Motion to Reconsider Order Allowing Claim of Investors Risk Advantage, LP, in addition to Objection to Claim of Investors Risk Advantage, LP [ECF No. 3604], or (iii) the Sochet claims against the Estate, shall be acceptable in all respects to the Plan Proponents or the Liquidating Trustee, as applicable.

4999213-2

# ARTICLE 7

# POST-CONFIRMATION LITIGATION

7.1     **Transfer and Enforcement of Causes of Action**.  Pursuant to Section

1123(b)(3) of the Bankruptcy Code, except as otherwise provided in this Plan or the

Confirmation Order, after transfer of the Assets to the Liquidating Trust pursuant to the Plan, the

Litigation Claims shall vest in the Liquidating Trust and the Liquidating Trustee shall, subject to

the provisions of this Plan, the Settlement Agreement, and the Liquidating Trust Agreement,

have the exclusive right to enforce any and all Litigation Claims against any Entity and rights of

the Debtor that arose before or after the Petition Date, including, but not limited to, the rights and

powers of a trustee and debtor-in-possession, against any Entity whatsoever and shall be entitled

to all remedies available to the Trustee in the Chapter 11 Case.  Notwithstanding the foregoing,

in the event the Liquidating Trustee opts not to pursue a Litigation Claim, the Liquidating Trust

Oversight Committee may make a written demand upon the Liquidating Trustee that the

Liquidating Trustee pursue such Litigation Claim.  In the event the Liquidating Trustee refuses

to pursue such Litigation Claim, the Liquidating Trust Oversight Committee may File and serve

a motion in the Chapter 11 Case seeking authority to pursue such Litigation Claim on behalf of

the Liquidating Trust with the same rights possessed by the Liquidating Trustee.  On the

Effective Date, the Levin Claims shall unconditionally vest with TD Bank and TD Bank shall

have the exclusive right and standing to enforce any and all of the Levin Claims, including, but

not limited to, the rights and powers of a trustee and debtor-in-possession, and shall be entitled to

all remedies available to the Trustee in the Chapter 11 Case. Neither the Liquidating Trustee nor

the Liquidating Trust Oversight Committee shall have the power or authority to seek or consent

to allowance of a Claim in favor of any entity that is not, as of the Effective Date, either the

holder of an Allowed Claim or a Disputed Claim, except as expressly authorized by Section 502(h) of the Bankruptcy Code.

7.2     **Preservation of Rights.**  Except to the extent that any Claim is Allowed during the Chapter 11 Case or expressly by this Plan, nothing, including, but not limited to, the failure of the Trustee to object to a Claim or Interest for any reason during the pendency of the Chapter 11 case shall affect, prejudice, diminish, or impair the rights and legal and equitable defenses of the Liquidating Trustee to contest or defend against such Claims or Interests in any lawful manner or forum, including pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, Section 502(j) of the Bankruptcy Code or Bankruptcy Rules 9023 or 9024, provided, however, that subsequent to the Effective Date, only the Liquidating Trustee shall have the right to seek reconsideration of a Claim Allowed in the Chapter 11 Case by a Final Order of the Bankruptcy Court under applicable law or procedure, including, but not limited to Rule 60(b) of the Federal Rules of Civil Procedure, Section 502(j) of the Bankruptcy Code and Bankruptcy Rules 9023 or 9024.

7.3     **Objections to Claims**.  Except as otherwise set forth in this Plan and the Liquidating Trust Agreement, from and after the Effective Date, the Liquidating Trustee shall have the sole authority to object to Claims pursuant to applicable procedures established by, or grounds set forth in the Bankruptcy Code, the Bankruptcy Rules, the Liquidating Trust Agreement, this Plan and the Claim Objection Procedures Order.  Any compromise of any Claim objection by the Liquidating Trustee shall be subject to approval by the Liquidating Trust Oversight Committee pursuant to this Plan, the Settlement Agreement and/or the Liquidating Trust Agreement; provided, however, that the Liquidating Trustee may seek Bankruptcy Court approval of any compromise or settlement of a Claim objection over the objection of the

Liquidating Trust Oversight Committee as provided in Section 6.2.8 of this Plan and the Liquidating Trust Agreement.  Any such contested matter shall be governed by Bankruptcy Rules 9014 and 9019, other applicable Bankruptcy Rules and applicable orders of the Bankruptcy Court.  The deadline within which objections to Claims or Interests may be Filed shall be the first Business Day that is 360 days after the Effective Date, subject to extension by the Bankruptcy Court for cause shown; provided, however, that the Liquidating Trustee shall be authorized to seek reconsideration of any order allowing a Claim pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, Section 502(j) of the Bankruptcy Code and Bankruptcy Rules 9023 or 9024, or as otherwise permitted by applicable law after such deadline.  Nothing contained herein shall preclude the Liquidating Trustee from reducing Distributions to holders of Allowed Claims under Section 3.4(b), 3.7(b) or 3.8(b), based upon their receipt of Collateral Source Recoveries.  The TD Bank Junior Subordinated Claim shall not be subject to objection, reconsideration, reduction, recharacterization, further subordination, impairment, disallowance or reduction in Distribution on account of a Collateral Source Recovery or otherwise.

7.4     **Disallowance of Late Claims**.  Except as provided herein, any and all Claims submitted after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and holders of such Claims may not receive any Distributions on account of any such Claim, unless on or before the Effective Date, such late Claim has been deemed timely submitted by a Final Order in the Chapter 11 Case.

7.5     **Recovery of Distributions on Disallowed Claims.**  The Liquidating Trustee is permitted, but shall not be required, to seek the repayment or disgorgement of any and all Distributions made on account of any Claim that is or becomes Disallowed, including, but not

limited to, seeking the repayment of any Distribution that is required to be repaid by the recipient of the Distribution under Sections 3.3(b), 3.4(b), 3.7(b), and 3.8(b) of this Plan.

7.6    **Equitable Defenses Not Assertable Against Liquidating Trust.**  No Person that is subject to a Litigation Claim or has had their Claim objected to or otherwise reconciled may assert a defense, equitable or otherwise, to such Litigation Claim based in whole or in part on TD Bank's potential recovery as a Beneficiary under the Liquidating Trust, or TD Bank's recovery on account of its Claims in the Chapter 11 Case.

## ARTICLE 8

## DISTRIBUTIONS

8.1    **Delivery of Distributions in General.**  The Liquidating Trustee shall make Distributions solely to the holders of record of Allowed Claims without regard to any claim or interest asserted by any third party in such Distributions.  Distributions shall be made to the holders of Allowed Claims:  (a) at the addresses set forth in the proofs of Claim Filed by such holders; (b) at the addresses set forth in any written notices of address change Filed with the Bankruptcy Court or delivered to the Liquidating Trustee after the date on which any related proof of Claim was Filed; (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim or Interest if no proof of Claim has been Filed and the Liquidating Trustee has not received a written notice of a change of address; or (d) the address reflected on the timely submitted Verified Collateral Source Recovery Disclosure delivered to the Liquidating Trustee pursuant to Sections 3.4(b), 3.7(b) or 3.8(b) of this Plan.  The Liquidating Trustee shall distribute at least annually to the Beneficiaries the net income of the Liquidating Trust, plus all net proceeds from the sale of assets, except that the Liquidating Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Trust Assets or to meet

claims and contingent liabilities (including Disputed Claims).  All full or partial payments made by the Trustee and received by the holder of a Claim before the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Liquidating Trustee pursuant to the Plan.

8.2    **Cash Payments.**  Except as otherwise provided in the Liquidating Trust Agreement or the Confirmation Order, Cash payments to be made pursuant to the Plan shall be made by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Liquidating Trustee.

8.3    **Interest on Claims.**  Interest shall not accrue or be paid on Claims subsequent to the Petition Date, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a Final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.  To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.

8.4    **No *de Minimis* Distributions.**  Other than in the Final Distribution, no payment of Cash in an amount of less than $100.00 shall be required to be made on account of any Allowed Claim.

8.5    **Face Amount.**  Unless otherwise expressly set forth herein with respect to a specific Claim or Class of Claims, for the purpose of the provisions of this Article, the face

4999213-2

amount of a Disputed Claim means the amount set forth on the proof of Claim, unless no proof of Claim has been timely Filed or deemed Filed, in which case the face amount shall be zero.

      8.6    **Unclaimed and Undeliverable Distributions.**  As authorized by Local Rule 3011-1(C)(2), if the combined total of Unclaimed Property related to Allowed Claims under the Plan totals (i) $10,000 or more, the Unclaimed Property shall, subject to Section 8.4 ("No de Minimis Distributions") and other provisions of the Plan, be distributed by the Liquidating Trustee, at the time of Final Distribution Date, to the Beneficiaries in Class 2 and Class 3 until such Beneficiaries are paid in full on account of their Allowed Claims in Class 2 or Class 3 after application of Collateral Source Recoveries, if any, respectively, and, thereafter, distributed by the Liquidating Trustee to other Beneficiaries in the order of priority set forth in, and pursuant to the terms of, the Plan, or (ii) less than $10,000, the Unclaimed Property shall be donated to the Bankruptcy Bar Foundation, a not-for-profit, non-religious organization dedicated to, among other things, promoting the pro bono legal representation of the indigent; provided that, pursuant to Section 1143 of the Bankruptcy Code, all Claims in respect of Unclaimed Property shall be deemed Disallowed, and the holder or successor to such holder of any Claim Disallowed will be forever barred, expunged, estopped and enjoined from asserting any such Disallowed Claim in any manner against the Trustee, the Estate, the Liquidating Trust, the Liquidating Trustee, Trust Assets, or their respective property, notwithstanding any federal or state escheat laws to the contrary.

      8.7    **Interim Distributions.**  Unless otherwise provided in this Plan and as required by this Section 8.7, the Liquidating Trustee in his discretion may make Distributions to the Beneficiaries entitled thereto in accordance with Article 6 of the Liquidating Trust Agreement and this Plan.  The Liquidating Trustee shall make an interim Distribution of not less than 72.5%

4999213-2

of the Allowed amount of a Beneficiary's Claim to all Beneficiaries entitled thereto within thirty (30) days after the Effective Date in accordance with Article 6 of the Liquidating Trust Agreement; provided, however, that any such interim Distributions by the Liquidating Trustee shall be limited in amounts that, in the Liquidating Trustee's reasonable judgment, are designed to avoid the payment of excess Distributions to such Beneficiary; provided, further, however, that the Liquidating Trustee may seek authority from the Bankruptcy Court, after notice and a hearing, to reduce the percentage of the interim Distribution required by this Section 8.7 for good cause shown. The Liquidating Trustee may rely on the amount of Collateral Source Recoveries disclosed on a Verified Collateral Source Recovery Disclosure as a Collateral Source Recovery that would reduce a creditor's Distribution for the purpose of making any reserve or Distribution, including any interim Distribution.

8.8     **Final Distribution.** The Liquidating Trustee shall make a final Distribution in accordance with Article 6 of the Liquidating Trust Agreement.

8.9     **Disputed Claims Reserves.** The Liquidating Trustee shall establish reserves for Disputed Claims in accordance with the terms of the Liquidating Trust Agreement.

8.10    **Compliance with Tax Requirements.** In connection with the Plan and the Distributions made in accordance thereto, to the extent applicable, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed by any governmental unit, if any, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

4999213-2

8.11    **Certain Rights of Setoff.**  To the extent possible and in the Liquidating Trustee's discretion, the Liquidating Trustee will net amounts owed by a holder of an Allowed Claim to the Liquidating Trust against Distributions owed by the Liquidating Trust to the holder of any such Allowed Claim; <u>provided that</u> any such netting shall not be permissible if it would be detrimental to the Liquidating Trust.

**ARTICLE 9**

<u>**CONDITIONS PRECEDENT**</u>

9.1    **Conditions to Confirmation.**  As a condition to entry of the Confirmation Order:

9.1.1    The Disclosure Statement shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee;

9.1.2    The Disclosure Statement Approval Order shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee and the Disclosure Statement Approval Order shall have become a Final Order in the Chapter 11 Case;

9.1.3    The Plan shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee;

9.1.4    The Confirmation Order shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee;

9.1.5    The 9019 Motion shall be in form and substance satisfactory to TD Bank, the Plan Proponents and the Banyon Trustee; and

9.1.6    The 9019 Order shall be in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee.

9.2    **Conditions to the Effective Date.**  The Plan shall not become effective and the Effective Date shall not occur unless and until:

4999213-2

9.2.1    The Bankruptcy Court shall have entered the Confirmation Order which, *inter alia*, confirms this Plan, ratifies the Committee's selection of the Liquidating Trustee and the Liquidating Trust Oversight Committee, and authorizes and directs the Trustee, the Committee, the Liquidating Trustee and the Estate to perform all of their obligations under the Settlement Agreement, and is in form and substance satisfactory to TD Bank, the Plan Proponents and the Banyon Trustee;

9.2.2    The Confirmation Order shall not have been stayed and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation Order;

9.2.3    The executed and approved Settlement Agreement is in form and substance agreeable to TD Bank, the Plan Proponents and the Banyon Trustee;

9.2.4    The Bankruptcy Court shall have approved, in all respects, the Settlement Agreement;

9.2.5    The Bankruptcy Court shall have entered the 9019 Order which, *inter alia*, authorizes and directs the Banyon Trustee, the Trustee, the Committee, the Liquidating Trustee, the Banyon Bankruptcy Estates and the Estate to perform all of their obligations under the Settlement Agreement, and is in form and substance satisfactory to TD Bank, the Plan Proponents and the Banyon Trustee;

9.2.6    The 9019 Order shall not have been stayed and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such 9019 Order;

9.2.7    [Intentionally Omitted];

9.2.8    [Intentionally Omitted];

4999213-2

83

9.2.9   The Liquidating Trust Agreement is in form and substance satisfactory to TD Bank and the Plan Proponents;

9.2.10  The Liquidating Trust Agreement shall have been executed and delivered by the Liquidating Trustee and the Trustee;

9.2.11  Subject to Section 6.1.14 of this Plan, the Trustee on behalf of the Estate has transferred the Assets to the Liquidating Trust; **provided that** the Trustee shall not have any obligation to transfer the Assets to the Liquidating Trust unless and until all other conditions to effectiveness contained in this Section 9.2, except the condition set forth in Section 9.2.12 of this Plan, shall have been satisfied or waived in accordance with Section 9.4 of the Plan; and

9.2.12  TD Bank shall have made the TD Bank Contribution; **provided that** TD Bank shall not have any obligation to make the TD Bank Contribution unless and until all other conditions to effectiveness contained in this Section 9.2 shall have been satisfied or waived in accordance with Section 9.4 of the Plan.

9.2.13  All other documents, instruments and agreements, in form and substance satisfactory to TD Bank, the Plan Proponents, and the Banyon Trustee, provided for under this Plan or necessary to implement this Plan, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby.

9.3   **Termination of Plan for Failure To Become Effective.**  If the Effective Date shall not have occurred on or prior to July 31, 2013, then this Plan shall terminate and be of no further force or effect unless the provisions of this Section are waived or extended in writing by each of TD Bank, the Plan Proponents and the Banyon Trustee.

9.4    **Waiver of Conditions.**  The Plan Proponents, the Banyon Trustee and TD Bank may collectively waive any or all of the conditions set forth in Sections 9.1 or 9.2 of this Plan. Any such waiver shall be in writing and signed by each of the Parties.

9.5    **Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date**,** the Liquidating Trustee shall File with the Bankruptcy Court a "**Notice of Effective Date**" in a form reasonably acceptable to the Liquidating Trustee and TD Bank, which notice shall constitute appropriate and adequate notice that this Plan has become effective.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Time, on the Effective Date specified in such filing.  A courtesy copy of the Notice of Effective Date may, but is not required to, be sent by first class mail, postage prepaid (or at the Liquidating Trustee's option, by courier or facsimile) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

## ARTICLE 10

## EFFECT OF CONFIRMATION AND RELEASES

10.1    **Jurisdiction of Court.**  Pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including among other things, jurisdiction over the subject matters set forth in Article 11 of this Plan.

10.2    **Binding Effect.**  Except as otherwise provided in Section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of this Plan shall bind any holder of a Claim against or Interest in the Debtor and their respective successors and assigns,

whether or not the Claim or Interest of such holder is Impaired under this Plan and whether or not such holder has accepted the Plan.

10.3 **Exculpation.  Except as otherwise specifically provided in the Plan, neither the Trustee, the Liquidating Trustee, the Liquidating Trust Oversight Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (only in their capacity as  members of the Official Committee of Unsecured Creditors  and not in their individual capacities (e.g., as a creditor)) nor any of each such foregoing party's employees, representatives, members, advisors, attorneys, financial advisors or agents or any of such parties' successors and assigns (as pertaining to such foregoing party in their foregoing capacities), shall have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation and pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under the Plan, except for their gross negligence, willful misconduct or actual fraud and in all respects shall be entitled to reasonably rely upon the advice of their respective Professionals or Post-Confirmation Professionals with respect to their duties and responsibilities (if any) under the Plan.**

**Except as otherwise specifically provided in the Plan, neither any holder of a Claim or Interest, regardless of whether each has Filed a proof of Claim or Interest in the**

4999213-2

Chapter 11 Case or other party in interest, nor any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Trustee, the Liquidating Trustee, the Liquidating Trust Oversight Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (only in their capacity as members of the Official Committee of Unsecured Creditors  and not in their individual capacities (e.g., as a creditor)) or any of such foregoing parties' employees, representatives, advisors, attorneys, financial advisors, or agents or such parties successors and assigns (as pertaining to such foregoing party in their foregoing capacities), for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation and pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under the Plan, except for such persons' gross negligence, willful misconduct, or actual fraud.

   10.4 **Injunction.  Except as otherwise specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, rights, causes of action, liabilities or any Interests based upon any act or omission, transaction or other activity of any kind or nature related to the Debtor or the Chapter 11 Case that occurred prior to the Effective Date, other than as expressly provided in this Plan or the Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Interest and regardless of whether such entity has voted to accept the Plan, and any successors, assigns or representatives of such entities shall be precluded and permanently enjoined on and after the Effective Date from (a) the commencement or**

4999213-2

continuation in any manner of any Claim, action or other proceeding of any kind with respect to any Claim, Interest or any other right or Claim against any assets of the Debtor which they possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any claim, interest or any other right or claim against any assets of the Debtor which such Entities possessed or may possess prior to the Effective Date, (c) the creation, perfection or enforcement of any encumbrance or Lien of any kind with respect to any Claim, Interest or any other right or Claim against the Debtor or any assets of the Debtor which they possessed or may possess prior to the Effective Date, and (d) the assertion of any Claims that are released hereby.

       10.5    **Limitation of Liability.** Except as expressly set forth in the Plan, following the Effective Date, neither the Trustee, the Liquidating Trustee, the Liquidating Trust Oversight Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (only in their capacity as members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)) nor any of such foregoing parties' employees, advisors, members, attorneys, professionals or agents (as pertaining to such foregoing party in their foregoing capacities), shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the negotiation and pursuit of confirmation of this Plan, the consummation of this Plan or any contract, instrument, release or other agreement or document created in connection with the Plan, or the administration of this Plan or the property to be distributed under the Plan, except for gross negligence, willful misconduct or actual fraud.

4999213-2

10.6    **Release of TD Bank Releasees.  Upon the occurrence of the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in this Plan or the Settlement Agreement, the RRA Releasors shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged the TD Bank Releasees from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies and demands, of any and every kind, character or nature whatsoever (including Unknown Claims), whether liquidated or unliquidated, asserted or unasserted, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, at equity or otherwise, which the RRA Releasors, or any of them, or anyone claiming through them, on their behalf or for their benefit may have or claim to have, now or in the future, against any TD Bank Releasee that are based upon, relate to, or arise out of, in connection with or pertain to (a)(i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors; (b) any act, fact, transaction, event, occurrence, statement or omission in connection with (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors; or (c) anything alleged in any complaint asserted by an RRA Releasor against a TD Bank Releasee, including, but not limited to, those alleged in**

the RRA Complaint, or that could have been alleged in any such complaint or other similar proceedings, including, without limitation, the Banyon Asserted Claims and Unknown Claims (collectively, the "Released Claims"); provided, however, the release in favor of the TD Bank Releasees described herein shall not (A) effect a release of any claim by the United States Government or any of its agencies or any state and local governmental authority whatsoever against the TD Bank Releasees, or (B) enjoin the United States Government or any of its agencies or any state and local governmental authority whatsoever from bringing any claim, suit, action or other proceedings against the TD Bank Releasees asserting any other liability, including without limitation any claim, suit or action arising under the IRC, securities laws, environmental laws or any criminal laws of the United States or any state or local jurisdiction.  Notwithstanding anything contained in this Section 10.6 or elsewhere in this Plan, or in the Settlement Agreement to the contrary, the foregoing is not intended to release, nor shall it have the effect of releasing, (x) TD Bank from the performance of its obligations in accordance with this Plan or the Settlement Agreement, including, without limitation, any claim, demand or cause of action relating to the payment of the TD Bank Contribution; or (y) any Released Claim held by TD Bank or its affiliates, including, but not limited to, the release of any Claim that would otherwise be a Released Claim by TD Bank or its affiliates against another TD Bank Releasee.

10.7    Unknown Claims.  An "Unknown Claim" is any Released Claim that any RRA Releasor does not know or suspect to exist in his, her or its favor at the time of giving the release required by Section 10.6 of this Plan and 3.1 of the Settlement Agreement that if known by him, her or it, might have affected his, her or its settlement and release.  With respect to any and all Released Claims, each RRA Releasor shall expressly waive or be

4999213-2

90

deemed to have waived, and by operation of the Confirmation Order and the 9019 Order

shall have waived the provisions, rights and benefits of California Civil Code § 1542 (to the

extent it applies herein), which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

Each RRA Releasor expressly waives, and shall be deemed to have waived, and by

operation of the Confirmation Order and the 9019 Order shall have waived, any and all

provisions, rights and benefits conferred by any law of any state or territory of the United

States, or principle of common law or foreign law, that is similar, comparable or equivalent

in effect to California Civil Code § 1542.  The RRA Releasors may hereafter discover facts

in addition to or different from those that any of them now knows or believes to be true

with respect to the subject matter of the Released Claims, but each RRA Releasor shall

expressly have and shall be deemed to have, and by operation of the Confirmation Order

and the 9019 Order shall have fully, finally and forever settled and released any and all

Released Claims, known or unknown, suspected or unsuspected, contingent or

noncontingent, whether or not concealed or hidden, that now exist or heretofore have

existed, upon any theory of law or equity now existing or coming into existence in the

future, including conduct that is negligent, reckless, intentional, with or without malice, or

a breach of any duty, law or rule, without regard to the subsequent discovery of existence

of such different or additional facts.  Each RRA Releasor acknowledges and shall be

deemed to have acknowledged, and by operation of the Confirmation Order and the 9019

4999213-2

Order shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

      10.8    **TD Bank Releasee Injunction and Bar Order.  (A) Upon the occurrence of the Effective Date, the Confirmation Order and 9019 Order shall act as an injunction against each and every Entity, including, without limitation, the plaintiffs in regard to the lawsuits enumerated on Appendix 10.8 hereof, and each and every Entity is hereby permanently enjoined, barred and restrained from instituting, prosecuting, continuing, pursuing or litigating in any manner:**

    **1.    any Released Claim; and**

    **2.    any action, suit or proceeding against any TD Bank Releasee (except as against Emess Capital, L.L.C.), including, without limitation (in each case, whether pre-judgment or post-judgment) enforcing, levying, employing legal process, attaching, garnishing, sequestering, bringing proceedings supplementary to execution, collecting or otherwise recovering by any means or in any manner from any TD Bank Releasee based upon any liability or responsibility, or asserted or potential liability or responsibility, directly or indirectly, of any TD Bank Releasee to or for the benefit of any Entity arising from, in any way related to, based upon, arising in connection with or pertaining to:**

        **(a)(i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors;**

4999213-2

(b) the Released Claims; and/or

(c) any other claims, acts, facts, transactions, events, occurrences, statements or omissions that are, could have been or may be alleged against the TD Bank Releasees, including, without limitation, those asserted in the RRA Complaint, the Banyon Asserted Claims and the Third Party Claims or in any other complaint, action, suit or proceeding brought or that might be brought by, through, on behalf of, or for the benefit of any Entity (whether arising under federal, state or foreign law and regardless of where asserted), including, without limitation, any Unknown Claims, that is in any way related to: (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors;

(B) Notwithstanding the foregoing subsection (A), Section 10.8:

    1.    Shall not enjoin or bar any action or claim by TD Bank or its affiliates, including, but not limited to, the assertion of any claim that would otherwise be a Released Claim by TD Bank or its affiliates against another TD Bank Releasee;

    2.    Shall not enjoin or bar any action or claim against TD Bank filed by Coquina Investments in the matter captioned *Coquina Investments v. Rothstein, et al.*, 10-cv-60786 (S.D. Fla.), including, but not limited to, the pending appeal and cross-appeal of the decisions and orders issued in the U.S. District Court for the Southern District of

4999213-2

Florida (Miami Division) that is currently pending in the Court of Appeals docketed at case no. 12-11161, including any subsequent related appeal, review or remand;

3.    Shall not (i) enjoin any claim by the United States Government or any of its agencies or any state and local governmental authority whatsoever against the TD Bank Releasees, or (ii) enjoin the United States Government or any of its agencies or any state and local governmental authority whatsoever from bringing any claim, suit, action or other proceedings against the TD Bank Releasees asserting any other liability, including without limitation any claim, suit or action arising under the IRC, securities laws, environmental laws or any criminal laws of the United States or any state or local jurisdiction;

4.    Shall not enjoin or bar the prosecution of that certain *Plaintiffs' Amended Motion for Sanctions Against TD Bank, N.A.* dated as of December 10, 2012 currently pending in the Broward County Circuit Court before the Honorable Judge Jeffrey E. Streitfeld in the case captioned *Razorback Funding et al. v. Scott W. Rothstein, et al.,* Case No. 09-062943 (07); and

5.    Shall not bar any claim or action which is not, or was not, within the subject matter jurisdiction of the Bankruptcy Court as determined by Final Order of the Bankruptcy Court or of the District Court (which Final Order may be entered after the Effective Date), including any claim or action that is an independent claim not permitted to be barred under controlling Eleventh Circuit precedent.

10.9    **TD Bank Release.**  Upon the occurrence of the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in this Plan or in

4999213-2

94

the Settlement Agreement, TD Bank shall be deemed to have irrevocably and
unconditionally, fully, finally and forever waived, released, acquitted and discharged the
Estate, the Committee, the members of the Official Committee of Unsecured Creditors
appointed in the Chapter 11 Case as of the Confirmation Date (only in their capacity as
members of the Official Committee of Unsecured Creditors and not in their individual
capacities (e.g., as a creditor)), the Trustee and any Professionals retained by the Estate by
Final Order of the Bankruptcy Court in the Chapter 11 Case on or before May 8, 2013,
from any and all claims, actions, causes of action, liabilities, obligations, rights, suits,
accounts, covenants, contracts, agreements, promises, damages, judgments, debts,
encumbrances, liens, remedies and demands, of any and every kind, character or nature
whatsoever, whether liquidated or unliquidated, asserted or unasserted, fixed or
contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now
existing or hereafter arising, in law, at equity or otherwise, which TD Bank, or anyone
claiming through it, on its behalf or for its benefit, may have or claim to have, now or in the
future, against the Estate, the Committee, the members of the Official Committee of
Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (but
only in their capacity as  members of the Official Committee of Unsecured Creditors and
not in their individual capacities (e.g., as a creditor)), the Trustee and any Professionals
retained in the Chapter 11 Case by the Estate by Final Order of the Bankruptcy Court on
or before May 8, 2013 that are based upon, relate to, or arise out of, in connection with or
pertain to (a) (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii)
Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v)
the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the

4999213-2

95

Banyon Releasors, or (b) any act, fact, transaction, event, occurrence, statement or omission in connection with (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors, or (c) anything alleged in the RRA Complaint or that could have been alleged in the RRA Complaint or other similar proceedings.

Notwithstanding anything contained in this Section 10.9, elsewhere in this Plan or in the Settlement Agreement to the contrary, the foregoing is not intended to release, nor shall it have the effect of releasing, (x) the Estate, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (but only in their capacity as members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustee and any Professionals retained by the Estate, or the Liquidating Trustee from the performance of their respective obligations in accordance with this Plan or the Settlement Agreement, or (y) the Estate, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case as of the Confirmation Date (but only in their capacity as members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustee and any Professionals retained by the Estate, or the Liquidating Trustee from making any Distribution to TD Bank on account of (A) the TD Bank Junior Subordinated Claims, or (B) on any Claim or recovery assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013.

## ARTICLE 11

## RETENTION OF JURISDICTION

11.1    **Ongoing Bankruptcy Court Jurisdiction.**  Notwithstanding the entry of the Confirmation Order, the occurrence of the Effective Date and the disbursement, turning over and/or transfer of the Assets to the Liquidating Trust, the Bankruptcy Court shall have exclusive jurisdiction over the Chapter 11 Case after the Effective Date, including but not limited to jurisdiction to, among other things:

11.1.1  Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of, or subordinate for any purposes pursuant to Section 510 of the Bankruptcy Code, any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim, request for attorneys' fees and costs, and the resolution of any and all objections to the allowance or priority of all Claims and Interests, including the resolution of the reconsideration, recharacterization, subordination, impairment, reduction or disallowance of a Claim, or the reconsideration of the allowance of any Claim pursuant to Section 502(j) of the Bankruptcy Code or Bankruptcy Rules 9023 or 9024;

11.1.2  Hear and determine any and all causes of action and rights of the Debtor that arose before or after the Petition Date that are expressly preserved pursuant to, among other things, Section 1123(b)(3) of the Bankruptcy Code, are yet to be liquidated and are preserved for prosecution by the Liquidating Trustee or other appropriate party in interest, including any designee or successor, against any Person whatsoever, on account of any and all Litigation Claims defined herein (including, but not limited to, all avoidance powers granted to the Debtor under the Bankruptcy Code and all causes of action and remedies granted pursuant to Sections 502, 506, 510, 541, 542, 543, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, and

4999213-2

97

all non-avoidance actions owned by the Estate including, but not limited to, claims of tort, breach of contract and claims lying in law or in equity, whether based in common law, Florida state law, another state's law, Federal law or otherwise); provided, however, that notwithstanding anything in this Section 11.1.2 or the Plan to the contrary, the Plan shall incorporate the stipulation and order relating to the insurance policy issued to Gibraltar Bank & Trust Company by National Union Fire Insurance Company of Pittsburgh, PA (Policy No. 01-232-51-05) and the insurance policy issued by Twin City Fire Insurance Company to Gibraltar Bank & Trust Company (Policy No. 00 DA 0259335-09) (together, the "**Policies**"), and any actions relating to the Policies shall be filed and litigated exclusively in the District Court. The stipulation and order are attached to this Plan as Appendix 11.1.2;

       11.1.3  Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract to which the Debtor is a party or with respect to which the Debtor may be liable, including without limitation the determination of whether such contract is executory for the purposes of Section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

       11.1.4  Enter orders as necessary to facilitate the Liquidating Trust's post-Confirmation sale or other disposition of Trust Assets;

       11.1.5  Ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and the Liquidating Trust Agreement;

       11.1.6  Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Trustee or the Bankruptcy Estate  that may be pending in the Chapter 11 Case on the Effective Date;

4999213-2

11.1.7  Decide or resolve any disputes regarding the assignment, ownership of Claims, and remission to the Liquidating Trust of Collateral Source Recoveries;

11.1.8  Decide or resolve any disputes regarding a party's entitlement to a Distribution from the Liquidating Trust, including application of Collateral Source Recoveries to reduce Distributions on account of Allowed Claims;

11.1.9  Hear and determine matters concerning state, local or federal taxes in accordance with Sections 346, 505 or 1146 of the Bankruptcy Code;

11.1.10  Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Liquidating Trust Agreement, the Plan and the Confirmation Order;

11.1.11  Resolve any disputes relating to objections to monthly fee invoices for submitted by the Liquidating Trustee, Liquidating Trust Oversight Committee or their Post-Confirmation Professionals;

11.1.12  Hear and determine any matters concerning the enforcement of the provisions of Article 10 of this Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

11.1.13   Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Liquidating Trust Agreement, the Plan or the Confirmation Order;

11.1.14  Permit the Plan Proponents, to the extent authorized pursuant to Section 1127 of the Bankruptcy Code and with the consent of TD Bank, to modify the Plan or any agreement or document created in connection with the Plan or remedy any defect or omission or

reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

11.1.15  Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Liquidating Trust Agreement, the Plan or the Confirmation Order and the Distributions thereunder;

11.1.16  Enforce any injunctions entered in connection with or relating to the Plan or the Confirmation Order;

11.1.17  Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or Distributions pursuant to the Liquidating Trust Agreement or the Plan are enjoined or stayed;

11.1.18  Determine any other matters that may arise in connection with or relating to the Plan or any settlement or compromise approved by prior order the Bankruptcy Court;

11.1.19  Order the imposition of a bar order in favor of any Entity entering into a compromise of a Litigation Claim with the Liquidating Trustee with identical scope, breadth and reach as that provided in connection with prior settlement agreements approved in the Confirmation Order or  in the Chapter 11 Case as may be necessary;

11.1.20  Decide or resolve any disputes regarding Distributions, including, but not limited to, any disputes between a Beneficiary and its counsel regarding the fees and costs of such counsel;

11.1.21  Enter any orders in aid of prior orders of the Bankruptcy Court; and

11.1.22  Enter a final decree closing the Chapter 11 Case.

4999213-2

100

## ARTICLE 12

## ACCEPTANCE OR REJECTION OF THIS PLAN

12.1     **Persons Entitled to Vote.**  Classes 2, 3, 4, 5, 6, 7, 8, and 9 are Impaired.  The Plan Proponents shall solicit votes from the holders of Claims in Classes 2, 3, 4, 5, 6, and 7. Class 1 and Class 8 are deemed to accept the Plan.  Class 9, Interest holders, shall be deemed to have rejected the Plan and the Plan Proponents shall not solicit their vote on the Plan.

12.2     **Acceptance by Impaired Classes.**  An Impaired Class of Claims shall have accepted the Plan if (i) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

12.3     **Cramdown.**  If any impaired Class of Claims or Interests shall fail to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, then the Plan Proponents reserve the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

13.1     **Modification of this Plan.**  Subject to the restrictions on Plan modifications set forth in Section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend or modify the Plan before its substantial consummation; provided that, such alteration, amendment or modification to the Plan shall be acceptable to TD Bank.

13.2    **Revocation of this Plan.**  The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Plan Proponents revoke or withdraw the Plan, or if Confirmation does not occur or if the Plan does not become effective in accordance with Article 9, then this Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor; (b) constitute an admission of any fact or legal conclusion by the Debtor or any other Entity; or (c) prejudice in any manner the rights of any of the Plan Proponents in any further proceedings involving the Estate.

13.3    **Governing Law.**  Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

13.4    **No Admissions.**  If Confirmation or the Effective Date does not occur, nothing contained in the Plan or Disclosure Statement shall be deemed as an admission by any of the Plan Proponents or any other party with respect to any matter set forth therein or herein including, without limitation, liability on any Claim or the propriety of any Claims classification.

13.5    **Pre-Confirmation Modification.**  If, at the Confirmation Hearing, any term or provision of this Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Plan Proponents, the Banyon Trustee, and TD Bank, the Bankruptcy Court shall have the power to alter and interpret

4999213-2

such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided, however, that such provision as altered or interpreted must be acceptable in form and substance to each of the Plan Proponents, the Banyon Trustee, and TD Bank. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.6    **Successors and Assigns.**  The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

13.7    **Exemption from Certain Transfer Taxes.**  Pursuant to Section 1146(a) of Bankruptcy Code, the issuance, transfer or exchange of any security or the making or delivery of any instrument of transfer under this Plan, including the transfer of the Assets to the Liquidating Trust, may not be taxed under any law imposing a stamp tax, use tax, sales tax or similar tax. Any sale of any Asset occurring on or after or upon the Effective Date shall be deemed to be in furtherance of this Plan.

13.8    **Exemption from Securities Laws**.  To the maximum extent provided by Section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of the interests in the Liquidating Trust will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

4999213-2

13.9   **Preservation of Rights of Setoffs.**  The Liquidating Trustee may, in his sole discretion, but shall not be required to, set off against any Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Estate or the Liquidating Trust may have against the holder of such Claim; however, neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trustee of any such claim that the Estate or the Liquidating Trust may have against such holder.

13.10   **No Injunctive Relief.**  Except as otherwise provided in the Plan or Confirmation Order, no Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable, or other prospective relief.

13.11   **Non Business Day.**  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.12   **Entire Agreement.**  This Plan, the Settlement Agreement, and their exhibits and appendices (together with the Liquidating Trust Agreement, and the exhibits and schedules thereto) set forth the entire agreement and undertaking relating to the subject matter hereof and supersedes all prior discussions and documents, as modified by the Confirmation Order.  The Estate shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein.

13.13   **Notices.**  Any notice required or permitted to be provided under this Plan shall be in writing and served by electronic mail and either (a) certified mail, return receipt requested,

4999213-2

postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, freight prepaid, to

be addressed as follows:

If to the Trustee, to:

Herbert Stettin
4000 Ponce de Leon Boulevard
Suite 570
Coral Gables, FL  33146
Tel: (305) 374-3353
Fax: (305) 374-7632
Email c/o:  singerman@bergersingerman.com

and

Herbert Stettin
5401 Hammock Drive
Coral Gables, FL  33156

with a copy to:

Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Attn: Paul Steven Singerman
Telephone: (305) 714-4343
Facsimile: (305) 714-4340
Email: singerman@bergersingerman.com

and

John H. Genovese
Genovese Joblove & Battista, P.A.
100 SE 2nd Street, 44th Floor
Miami, FL 33131
Telephone: (305) 372-2462
Facsimile: (305) 428-8802
Email: jgenovese@gjb-law.com

If to the Committee, to:

Michael I. Goldberg
Akerman Senterfitt
350 E. Las Olas Blvd., Suite 1600

Ft. Lauderdale, FL 33301
Telephone: 954-463-2700
Facsimile: 954-463-2224
michael.goldberg@akerman.com

If to the Banyon Trustee, to:

Robert C. Furr, Trustee
Furr and Cohen, P.A.
2255 Glades Rd. Suite 337w
Boca Raton, FL  33431
Telephone: (561) 395-0500
Facsimile:  561-338-7532
Email: rfurr@furrcohen.com

with copy to:

Russell Blain
Stichter, Riedel, Blain & Prosser, P.A.
110 East Madison Street
Suite 200
Tampa, FL 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Email:  rblain@srbp.com

If to TD Bank, to:

TD Bank, N.A.
Legal Department
1701 Route 70 East
Cherry Hill, NJ 08034
Attn: Craig Baldauf
Telephone: (856) 874-2455
Facsimile:  (856) 874-2423
E-mail: craig.baldauf@td.com

with a copy to:

Dion W. Hayes
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219
Telephone: (804) 775-1144
Facsimile:  (804) 698-2078

4999213-2

106

Email:  dhayes@mcguirewoods.com

If to the Liquidating Trustee, to the address and e-mail address identified on the notice identifying the Liquidating Trustee or his successor, filed with the Bankruptcy Court.

If to the members of the Liquidating Trust Oversight Committee, to the addresses and e-mail addresses identified on the notice identifying the members of the Liquidating Trust Oversight Committee or a member's successor, filed with the Bankruptcy Court.

[Signatures to Follow]

4999213-2

107

Dated:  May 29, 2013

Respectfully Submitted

/s/ Herbert Stettin
By:  Herbert Stettin, Chapter 11 Trustee of RRA

**BERGER SINGERMAN LLP**
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:   /s/ Paul Steven Singerman
    Paul Steven Singerman
    Florida Bar No. 378860
    singerman@bergersingerman.com
    Jordi Guso
    Florida Bar No. 0863580
    jguso@bergersingerman.com
    Christopher A. Jarvinen
    Florida Bar No. 0021745
    cjarvinen@bergersingerman.com
    Isaac M. Marcushamer
    Florida Bar No. 60373
    imarcushamer@bergersingerman.com

*Counsel for Herbert Stettin, Chapter 11 Trustee*

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Miami Tower
100 S.E. Second Street, Suite 4400
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By: /s/ John H. Genovese
    John H. Genovese
    Florida Bar No. 280852
    jgenovese@gjb-law.com
    Jesus M. Suarez
    Florida Bar No. 60086
    jsuarez@gjb-law.com

*Special Counsel/Conflicts Counsel for Herbert Stettin, Chapter 11 Trustee*

4999213-2

108

Dated:  May 29, 2013

Respectfully Submitted

/s/ John Mullin
By: John Mullin (counsel for Edward Morse, Committee Chairman)
The Official Committee of Unsecured Creditors

**AKERMAN SENTERFITT**
350 E. Las Olas Blvd., Suite 1600
Ft. Lauderdale, FL 33301
Telephone: 954-463-2700
Facsimile: 954-463-2224

By: */s/ Michael I. Goldberg*
Michael I. Goldberg
Florida Bar No. 886602
michael.goldberg@akerman.com

***Counsel for the Official Committee of Unsecured Creditors***

Appendix 1.82

<u>Liquidating Trust Agreement</u>

## ROTHSTEIN ROSENFELDT ADLER, P.A.
## LIQUIDATING TRUST AGREEMENT

THIS LIQUIDATING TRUST AGREEMENT dated as of this ____ day of _____ 2013, is entered into by and among Herbert Stettin, as chapter 11 trustee (the "Trustee") for the estate of Rothstein Rosenfeldt Adler, P.A. ("RRA" or "Debtor") in the Chapter 11 bankruptcy case, assigned Case No. 09-34791-BKC-RBR (the "Chapter 11 Case"), in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), and Michael I. Goldberg, the liquidating trustee (the "Liquidating Trustee") appointed under and pursuant to the Plan (as defined herein).

## W I T N E S S E T H:

WHEREAS, by order dated _____, 2013 (the "Confirmation Order"), the Bankruptcy Court confirmed the Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code Proposed Jointly by the Trustee and the Official Committee of Unsecured Creditors (the "Plan")[1] proposed pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); and

WHEREAS, the Plan provides for the incorporation of that certain settlement agreement between the Debtor, the Trustee, the Banyon Trustee,the Banyon Bankruptcy Estates, and TD Bank, N.A., dated as of _____ __, 2013 (the "Settlement Agreement"); and

WHEREAS, the Plan and Settlement Agreement provide for the creation of an irrevocable trust for the benefit of the Beneficiaries (as defined herein) under and pursuant to the terms of the Plan; and

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed such term in the Plan.

**WHEREAS**, the Plan and Settlement Agreement further provide for the creation of the Banyon Unsecured Creditor Fund in the amount calculated pursuant to the provisions of the Plan; and

**WHEREAS**, this Liquidating Trust Agreement is executed by the parties hereto in order to establish a trust, which trust is to be known as "The RRA Liquidating Trust" (the "Liquidating Trust") in accordance with Treasury Regulation ("Treas. Reg") § 301.7701-4(d), whose sole purpose is to facilitate the implementation of the Plan and the Settlement Agreement and not to otherwise engage in the conduct of an active trade or business; and

**WHEREAS**, the corpus of the Liquidating Trust and all income earned thereon remaining after the satisfaction of all expenses and liabilities of the Liquidating Trust shall be used solely for the purpose of discharging the legal obligations of the Debtor and the Liquidating Trust pursuant to the Plan and the Settlement Agreement; and

**WHEREAS**, the parties to this Liquidating Trust Agreement desire that the Liquidating Trust created pursuant to this Liquidating Trust Agreement qualify as a liquidating trust in accordance with Treas. Reg. § 301.7701-4(d), and that on qualification, the Liquidating Trust shall be taxed as a grantor trust in favor of the Beneficiaries under and in accordance with the relevant provisions of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code" or "IRC") and the Treasury Regulations pertaining thereto.

**NOW, THEREFORE**, in consideration of the premises and for such other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of this Liquidating Trust Agreement, the Settlement Agreement and the Plan, the Trustee and the Liquidating Trustee have executed this Liquidating Trust Agreement for the sole benefit of the Beneficiaries and no other party as follows:

## ARTICLE 1
## GRANT, ACCEPTANCE, NAME AND DEFINITIONS

1.1    **Grant.**

(i)    The Trustee, on behalf of the Debtor and the Debtor's Estate, hereby grants, assigns, transfers, disburses, turns over, conveys, delivers, delegates and sets over unto the Liquidating Trustee the Trust Assets (as defined herein) in trust for the benefit of the Beneficiaries and subject to the terms and provisions set out below, in the Plan and the Settlement Agreement.   Additionally, subject to the terms hereof, the Plan and Settlement Agreement, the Trustee hereby irrevocably (a) grants, assigns, transfers, disburses, turns over, conveys, delivers, delegates and sets over unto the Liquidating Trustee all of the authority, rights, powers and duties previously vested in the Debtor under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the power to contest, defend or settle all claims, charges and litigation to which the Debtor, the Trustee or the Liquidating Trustee is or hereafter may become subject, and (b) designates the Liquidating Trust as the representative of the Debtor's Estate for all purposes under Section 1123(b)(3)(B) of the Bankruptcy Code.   To the extent that any law, regulation or contractual provision prohibits the transfer of ownership of any of the Trust Assets from the Debtor, the Debtor's Estate or the Trustee to the Liquidating Trust or the Liquidating Trustee, or if for any reason the Trustee shall retain or receive at any point any property which is included in or intended under the Plan, the Settlement Agreement and this Trust Agreement to be included in the definition of Trust Assets, then the Trustee shall and is hereby deemed to hold such property (and any proceeds or products thereof) in trust for the Beneficiaries of the Liquidating Trust and shall promptly notify the Liquidating Trustee of the existence of such property and shall promptly take such actions with respect to such property as the Liquidating Trustee shall direct in writing.   It is intended that the Trust Assets transferred

pursuant to this paragraph shall provide the Beneficiaries with distributions on account of their Allowed Claims pursuant to and in accordance with the Plan and the Settlement Agreement.

(ii)     This transfer will be treated for federal income tax purposes as a deemed transfer by the Debtor to the Beneficiaries followed by a deemed transfer by the Beneficiaries to the Trust, in accordance with Revenue Procedure 94-45, 1994-2 C.B. 684.  The taxation of the deemed transfers from the Debtor to the Beneficiaries and from the Beneficiaries to the Liquidating Trust will be guided by provisions of IRC §§61(a)(12), 483, 1001, 1012 and 1274.

(iii)     The Liquidating Trustee hereby accepts the Trust Assets and the Liquidating Trust created hereunder, subject to the terms and provisions set out below, in the Plan and in the Settlement Agreement, on behalf of and for the benefit of the Beneficiaries.

1.2     **Name.**  The trust created pursuant to the terms hereof shall be known as "The RRA Liquidating Trust" and shall be referred to herein as the "Liquidating Trust."

1.3     **Certain Terms Defined.**     For all purposes of this Trust Agreement, the capitalized terms used herein shall have the following meanings:

1.3.1     "Beneficiaries" shall mean the holders of Allowed Claims as defined in and provided for in the Plan.

1.3.2     "Disputed Claim Reserve" shall mean Cash in an amount determined by the Liquidating Trustee in his reasonable discretion as sufficient to pay any Disputed Claims that are Administrative Expense Claims, Priority Non-Tax Claims, Priority Tax Claims, and Claims in Classes 2 – 5 of the Plan.  To the extent that there are adequate Trust Assets remaining after paying the Full Amount of all Allowed Claims in Classes 2-5 and establishing the Disputed Claims Reserve sufficient to pay the Full Amount of all Disputed Claims in Classes 2 – 5, in Cash, as deemed sufficient by the Liquidating Trustee after consultation with the Liquidating

Trust Oversight Committee, the Liquidating Trustee shall establish a Disputed Claims Reserve for the Class 6 Claim under the Plan.  To the extent that there are adequate Trust Assets remaining after paying the Full Amount of the Claim in Class 6 (or reservation sufficient to pay the Full Amount of such Claim), the Liquidating Trustee shall use any additional Trust Assets to establish a Disputed Claims Reserve for the Class 7 Claims under the Plan and fund such Disputed Claims Reserve with any Trust Assets in excess of those used or reserved to pay the Full Amount of the Class 6 Claim.  Upon the payment of the Full Amount of the Claims in Class 7 (or reservation sufficient to pay the Full Amount of such Claim), the Liquidating Trustee shall use any additional Trust Assets to establish a Disputed Claims Reserve for the Class 8 Claim under the Plan and fund such Disputed Claims Reserve with any Trust Assets in excess of those used or reserved to pay the Full Amount of all Class 7 Claims.  Any amounts reserved for Disputed Claims that are not ultimately paid on account of such Disputed Claims shall be used by the Liquidating Trust for distribution to Beneficiaries or to fund Disputed Claims Reserves in accordance with the Plan.

      1.3.3    "Liquidating Trust" shall have the meaning set forth in Section 1.2 hereof.

      1.3.4    "Liquidating Trustee" shall mean Michael I. Goldberg.

      1.3.5    "Post-Confirmation Administrative Reserve" shall mean Cash in an amount estimated by the Liquidating Trustee to be sufficient as an adequate reserve for the projected fees and expenses of the Liquidating Trustee necessary to carry out the provisions of the Plan and the Settlement Agreement, including, without limitation, the payment of post-confirmation fees due the United States Trustee, fees and expenses of the Post-Confirmation Professionals retained by the Liquidating Trust and the Liquidating Trust Oversight Committee, and costs and expenses incurred by the Liquidating Trustee in connection with the prosecution of

(a) objections to the allowance of any Claims, and (b) Litigation Claims.

   1.3.6 "Reserves" shall mean the Disputed Claim Reserves and the Post-Confirmation Administrative Reserve, collectively.

   1.3.7 "Trustee's Certificate" shall mean the certificate filed by the Liquidating Trustee with the Bankruptcy Court on the Effective Date, or as soon thereafter as is practicable, identifying the initial corpus of the Trust.

   1.3.8 "Trust Agreement" shall mean this Liquidating Trust Agreement as originally executed or as it may from time to time be amended pursuant to the terms hereof.

   1.3.9 "Trust Assets" shall mean all of the Debtor's and the Debtor's Estate's rights, title and interest in and to Assets including, without limitation, all Litigation Claims, the rights of the Estate under the Settlement Agreement, the rights of the Estate under any other settlement agreements approved by the Bankruptcy Court prior to the Effective Date, and the TD Bank Contribution, plus any and all interest or other net income earned on the foregoing.  The Trust Assets shall not include any Assets paid out, distributed or otherwise disposed of by the Liquidating Trustee in accordance with this Trust Agreement and the Plan after the date of any such payment, distribution or disposition except as provided in the Plan; provided that the Levin Claims shall not be Trust Assets; provided further, however, any Distribution made by the Trustee prior to the Effective Date shall not be a Trust Asset.

**ARTICLE 2**
**NATURE OF TRANSFER**

  2.1 **Purpose of Liquidating Trust.** The Liquidating Trust is created solely to implement the terms of the Plan and the Settlement Agreement.  The purposes of the Liquidating Trust are to manage, conserve and protect the value of the Trust Assets for the benefit of the Beneficiaries, including, but not limited to collecting and liquidating the Trust Assets, filing

objections to Claims asserted against the Debtor or the Debtor's Estates and otherwise bring appropriate proceedings to resolve the same through compromise or litigation, pursuing those claims and causes of actions vested in the Trust, and distributing to the Beneficiaries all proceeds from the liquidation of the Trust Assets pursuant to the terms of the Plan, including, without limitation, in accordance with the priority of payment established pursuant to the Plan, and the Settlement Agreement.  Under no circumstances shall the Liquidating Trustee have any power to engage in any trade or business or any other activity except as specifically provided herein, in the Plan, in the Settlement Agreement or otherwise reasonably necessary and advisable for the orderly liquidation and distribution of the Trust Assets.

2.2    **Grantor Trust.**    The Liquidating Trust created by this Trust Agreement is intended:  (i) as a trust governed and construed in all respects as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d) of the United States Treasury Regulations; (ii) as a grantor trust in favor of the Beneficiaries pursuant to Treas. Reg. § 1.671-4(a), and (iii) to comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.

2.3    **Liabilities of the Debtor.**    The Liquidating Trustee, solely for and on behalf of the Liquidating Trust, shall utilize all or such part of the Trust Assets as may be necessary to, and shall pay any and all Allowed Claims in accordance with and pursuant to the terms of the Plan and the Settlement Agreement.

2.4    **Representative of the Debtor.**    The Liquidating Trustee, in accordance with the Plan, for the purpose of exercising or carrying out his duties herein, shall be deemed to be a "representative" of the Debtor's Estate within the meaning of 11 U.S.C. § 1123(b)(3).

2.5    **Court Approval Not Required.**    The Liquidating Trustee shall, subject to the

terms of this Trust Agreement, the Plan and the Settlement Agreement, be empowered to exercise all rights and powers granted to the Liquidating Trustee in this Trust Agreement without need of further Bankruptcy Court approval.

## ARTICLE 3
## BENEFICIARIES

3.1      **Rights of Beneficiaries.**  Each Beneficiary shall be entitled to participate in the rights and benefits due to a Beneficiary hereunder.  The interest of each Beneficiary in the Liquidating Trust is hereby declared and shall be in all respects personal property of such Beneficiary and upon the death of an individual Beneficiary his or her interest shall pass to his or her legal representative and such death shall not terminate the Liquidating Trust or otherwise affect the validity of this Trust Agreement.  Each Beneficiary shall have the rights with respect to the Liquidating Trust as are provided by this Trust Agreement, the Plan and the Settlement Agreement.  No widower, widow, heir, or devisee of any person who may be a Beneficiary shall have any right of power, homestead, inheritance, or of partition, or any other right, statutory or otherwise, in any property whatever forming a part of the Trust Assets, but the whole title to all the Trust Assets shall be vested in the Liquidating Trustee and the sole interest of the Beneficiaries shall be the rights and benefits given to such persons under the Plan, the Settlement Agreement and this Trust Agreement.

3.2      **Transfer of Interests of Beneficiaries.**  No interest of a Beneficiary may be transferred either by the Beneficiary or by a duly authorized agent or attorney, or by the properly appointed legal representatives of the Beneficiary except as otherwise provided for by the Plan and in accordance with Bankruptcy Rule 3001.  In the event of any such transfer, the transferee shall take and hold such interest subject to the terms and provisions of this Trust Agreement and shall give prompt written notice of such transfer to the Liquidating Trustee.   The Liquidating

Trustee shall not be liable to any transferee of an interest of a Beneficiary for any distributions provided for hereunder unless such transfer is valid under the terms of the Plan and in accordance with Bankruptcy Rule 3001 and until the Liquidating Trustee receives written notice of such transfer together with appropriate assignment and transfer documents signed by the applicable Beneficiary.

3.3    **Beneficiary Information.**  The Liquidating Trustee may rely upon information relating to each Beneficiary as it appears in records of the Bankruptcy Court.  Upon receipt by the Liquidating Trustee of appropriate assignment or transfer documents signed by a Beneficiary or his or her duly appointed representative and duly filed with the Bankruptcy Court pursuant to Bankruptcy Rule 3001, the Liquidating Trustee shall record such assignment or transfer on the books and records of the Liquidating Trust and shall treat such transferee as a Beneficiary for all purposes hereunder in accordance with such assignment or transfer from and after the date the Liquidating Trustee receives such notice.  Thereafter, the Liquidating Trustee shall have no further liability or obligations to the transferor Beneficiary hereunder.

3.4    **Certification of Interests**.  The Liquidating Trustee shall not be required to issue certificates or other instruments representing or evidencing the interests of the Beneficiaries in the Liquidating Trust, but nothing contained herein shall prohibit him from doing so.

## ARTICLE 4
## DURATION OF TRUST ESTATE

4.1    **Duration.**  The Liquidating Trust shall remain in existence and continue in full force and effect until all of the following shall have occurred:  (a) the entirety of the Trust Assets has been reduced to Cash or the Liquidating Trustee has determined that it is impractical or not in the best interests of the Beneficiaries of the Liquidating Trust to do so; (b) all costs, expenses and obligations incurred in administering the Liquidating Trust have been paid and discharged;

(c) the Trust Assets have been distributed to the Beneficiaries in accordance with the Plan; and

(d) a Final Report has been filed with the Bankruptcy Court and a final decree closing the Chapter 11 Case has been entered; provided, however, subject to the provisions in the immediately succeeding sentence, the Liquidating Trust shall not remain in existence more than five years after the date of this Trust Agreement.  If warranted by the facts and circumstances provided for in the Plan or the Settlement Agreement, and subject to the approval of the Bankruptcy Court, upon a finding that an extension is necessary to fulfill the purpose of this Liquidating Trust, the term of the Liquidating Trust may be extended for a finite term based on the particular circumstances.  Each extension must be approved by the Bankruptcy Court within six months prior to the beginning of the extended term after notice and opportunity for hearing to all Beneficiaries.

## ARTICLE 5
## ADMINISTRATION OF LIQUIDATING TRUST ESTATE

5.1    **Rights and Powers.**  The Liquidating Trustee shall have all rights and powers of a trustee under sections 1106 and 704 of the Bankruptcy Code and, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, shall be designated and serve as the sole representative of the Debtor's Estate.

5.2    **Sale of Trust Asset.**  The Liquidating Trustee may, subject to the terms of this Trust Agreement, the Plan, the Settlement Agreement, and the Confirmation Order, at such times and in such manner as he may deem appropriate, transfer, assign, or otherwise dispose of all or any part of the Trust Assets (collectively, "Asset Dispositions") without seeking Bankruptcy Court approval; provided, however, that any such Asset Disposition that exceeds $1,000,000 with respect to Trust Assets shall be subject to the consent of the Liquidating Trust Oversight Committee or the approval by the Bankruptcy Court, upon notice to the Beneficiaries or to such

lesser list of parties ordered by the Bankruptcy Court.

5.3     **Payment of Interest to Beneficiaries.**  The Liquidating Trustee shall hold the Trust Assets without provision for, or the payment of, interest, costs, fees or charges to any Beneficiary.

5.4     **Payment of Claims, Expenses and Liabilities and the Reserve Amounts.**  The Liquidating Trustee shall pay from the Trust Assets all claims, expenses, charges, liabilities, and obligations of the Trust Assets, whether civil or otherwise, and all liabilities and obligations which the Liquidating Trustee, on behalf of the Liquidating Trust, has specifically assumed and agreed to pay pursuant to Article 2 of this Trust Agreement, together with such transferee liabilities which the Liquidating Trust may be obligated to pay as transferee of the Trust Assets, including among the foregoing, and without limiting the generality of the foregoing, interest, taxes, assessments, and public charges of every kind and nature and the costs, charges, and expenses connected with or growing out of the execution or administration of the Liquidating Trust, including, without limitation, the expenses of the Liquidating Trust Oversight Committee, the fees and expenses of its Post-Confirmation Professionals, and such other payments and disbursements as are provided in this Trust Agreement or which may be determined to be a proper charge against the Trust Assets by the Liquidating Trustee or by any court of competent jurisdiction.  In addition, the Liquidating Trustee may, pursuant to the terms of the Plan, the Settlement Agreement, and this Trust Agreement, make provision out of the Trust Assets for the Disputed Claim Reserve and Post-Confirmation Administrative Reserve, amounts to meet present or future claims, expenses and liabilities of the Trust, whether fixed or contingent, known or unknown.

5.5     **Reports to Beneficiaries.**  As soon as practicable (and in no event more than 60

days) after the end of each calendar quarter after the Effective Date, and within 120 days after termination of the Liquidating Trust, the Liquidating Trustee shall file a written report with the Bankruptcy Court containing the information described below. Such report shall be in addition to the Trustee's Certificate as well as any other report required by the Plan or Settlement Agreement, and shall list the assets and liabilities of the Liquidating Trust, including the Reserves and the amounts contained therein at the end of such calendar quarter or upon termination of the Liquidating Trust, and the receipts and disbursements of the Liquidating Trustee for such period. Such reports shall (if deemed appropriate by the Liquidating Trustee) be audited or reviewed by the independent public accountants for the Liquidating Trust.

5.6 **Federal Income Tax Information.** As soon as practicable after the close of each calendar year, but in no event later than March 15th, the Liquidating Trustee shall mail to each Beneficiary of record during such year, a statement showing information sufficient for each Beneficiary to determine its share of income, gain, loss, deductions and credits for federal income tax purposes in accordance with §§1.671-4(a) and 1.671-4(b)(3) of the United States Treasury Regulations. The Liquidating Trustee shall not be required to report such tax information to any Beneficiary unless such Beneficiary provides to the Liquidating Trustee a complete form W-9 or acceptable substitute signed under penalty of perjury. In determining each Beneficiary's share of income, gain, loss, deductions and credits, the Liquidating Trustee shall not allocate such items to any Beneficiary who is the holder of a Claim which has no value until such time, if at all, as a value of the Claim arises. For this purpose, a Claim shall have no value for any taxable year in which the Beneficiary who is the holder of the Claim would receive no distribution from the Liquidating Trust if the Liquidating Trust terminated and distributed all of its assets on the last day of the taxable year.

5.7     **Required Filing.**  The Liquidating Trustee shall prepare and file with appropriate state and federal agencies and authorities, all such documents, forms, reports and returns (including, but not limited to, state and federal income tax returns and Forms 1099) as the Liquidating Trustee shall, with the advice and assistance of his Post-Confirmation Professionals, including but not limited to legal counsel and accountants, deem necessary, required or appropriate in connection with the creation, existence, operation or termination of the Trust.  The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treas. Reg. §§ 1.671-4(a) and 1.671-4(b)(3)(ii).

5.8     **Tax Attributes and Tax Characteristics of the Trust.**     The Beneficiaries of the Liquidating Trust shall be treated as its grantors and deemed owners.  The Liquidating Trustee shall file or cause to be filed tax returns for the Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a), or (b), as appropriate.  Accordingly, the taxable income or loss of the Liquidating Trust, including taxable income attributable to the Reserves, if any, will be allocated to the Beneficiaries on an annual basis, pro rata in accordance with their respective entitlement to receive distributions from the Liquidating Trust if the Liquidating Trust terminated and distributed all its assets on the last day of the taxable year (taking into account all prior and concurrent distributions from the Liquidating Trust during such taxable year), subject to Section 5.6 hereof, and the Beneficiaries shall be responsible to report and pay the taxes due on their proportionate share of the Liquidating Trust taxable income, whether or not any amounts are actually distributed by the Liquidating Trustee to the Beneficiaries.  The value of the Trust Assets transferred into the Liquidating Trust shall be the fair market value of such Assets at the time of such transfer, as reasonably determined by the Liquidating Trustee, in consultation with the Trustee and such advisors as the Liquidating Trustee deems appropriate, within a reasonable

period of time after the Effective Date.  Such valuation shall be binding on all parties including, but not limited to, the Debtor, the Debtor's Estate, the Trustee, the Liquidating Trustee, and all Beneficiaries, and these valuations will be used by such parties for all federal income tax purposes.

5.9    **Revenue Ruling Requests.**  The Liquidating Trustee on behalf of Beneficiaries may, but shall not be required to, file a ruling request (in accordance with the procedures set forth in Revenue Procedure 94-45, 1994-2 C.B. 684) with the Internal Revenue Service to have the Liquidating Trust classified as a liquidating trust as described in Treas. Reg. §301.7701-4(d).

5.10    **Necessary Documents.**  On the Effective Date, the Trustee shall execute and deliver all documents reasonably required by the Liquidating Trustee including the endorsement of any instruments, all business records of the Debtor, and authorizations to permit the Liquidating Trustee to access all bank records, tax returns, and other files and records of the Debtor, including files held by the Trustee's professionals, the Debtor's Estate or the Trustee as necessary for the administration of the Liquidating Trust.  The Trustee's professionals shall provide the Liquidating Trustee any and all documents or information reasonably requested by Liquidating Trustee for the administration of the Liquidating Trust.

5.11    **Privileges Transferred to Liquidating Trustee.**  The Liquidating Trustee, after the Effective Date, shall control all applicable legal privileges of the Debtor, its Estate, the Trustee, and the Committee, including control over all work product and attorney-client privilege for matters arising from or relating to transactions or activity occurring, in whole or in part, prior to the Effective Date.

5.12    **Disposition of Claims and Litigation Claims**.  Subject to the terms of this section, the Liquidating Trustee shall have the authority to initiate, prosecute, settle, resolve,

dismiss, object to, reconcile or otherwise dispose of any Claim, including an Administrative Expense Claim, or Litigation Claims (collectively, the "Claims/Litigation Claims Resolution"). With respect to any Claims/Litigation Claims Resolution that (a) exceeds $1,000,000 with respect to Trust Assets or (b) involves a Trust Asset that has an alleged claim amount exceeding $1,000,000; or (c) involves a Professional Claim, the Liquidating Trustee shall, prior to taking any such action, provide the Liquidating Trust Oversight Committee with written notice of such action. The Liquidating Trust Oversight Committee shall have ten (10) Business Days to object in writing to any such proposed action. The Liquidating Trust Oversight Committee and the Liquidating Trustee shall confer in good faith to resolve the objection to such proposed action. Should any disputes between them remain unresolved after such conference, such dispute shall be resolved by the Bankruptcy Court, upon notice to the Beneficiaries or to such lesser list of parties ordered by the Bankruptcy Court. All settlements shall be guided by the principles of the settlement standards set forth by Bankruptcy Rule 9019 and the legal standards for settlement set forth in the Eleventh Circuit for such settlements, including *In Re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990), cert den., 498 U.S. 959, 1126 L.Ed. 398, 111 S.Ct. 389 (1990), or such other prevailing, binding law.

5.13    **Standing.** Subject to Sections 5.12 and 5.15 of this Trust Agreement and Section 2.4 of the Plan, and in accordance with the procedures set forth in Section 7.3 of the Plan, the Liquidating Trustee shall have the sole standing and authority to file objections to Administrative Expense Claims, Claims and Interests, or Litigation Claims, and to defend against any and all counterclaims asserted in connection therewith.

5.14    **Qualified Settlement Fund; Disputed Ownership Fund.** Notwithstanding anything in this Trust Agreement to the contrary, in the event that (i) any portion of the

Liquidating Trust is treated as a "qualified settlement fund" pursuant to Treas. Reg. § 1.468B-1, or (ii) the Liquidating Trustee timely elects to treat any portion of the Liquidating Trust subject to Disputed Claims as a "disputed ownership fund" pursuant to Treas. Reg. § 1.468B-9(c)(2)(ii), any federal income tax consequences shall be determined under IRC § 468B and the Treasury Regulations thereunder.

     5.15   **Trustee and Liquidating Trustee Compensation.**

     (a)     Trustee Compensation.  On or prior to the Administrative Expense Claim Bar Date applicable to Professional Claims for the filing of final applications for compensation, the Trustee shall file with the Bankruptcy Court his final fee application seeking final approval of all fees and expenses incurred covering the period from the Petition Date through the Effective Date (including, but not limited to, fees associated with the TD Bank Contribution and the Additional Recoveries) and such fee application shall be considered by the Bankruptcy Court at the Confirmation Hearing.

     The Trustee's final application for compensation may seek an award of compensation in Cash based on the formula contained in Section 326(a) of the Bankruptcy Code and otherwise provided for by any other provision of the Bankruptcy Code and may include a request to be paid compensation calculated on (a) the amount of all Assets disbursed, turned over or transferred by the Trustee after the Order for Relief and prior to the Effective Date, and (b) the amount of all Assets disbursed, turned over or transferred by the Trustee on the Effective Date, including the TD Bank Contribution, the Additional Recoveries, and any other Assets delivered by the Trustee to the Liquidating Trustee following execution of this Trust Agreement; provided, however, that for the avoidance of any doubt, the Trustee's entitlement to seek an award of compensation is

without prejudice to the rights of the Committee, the United States Trustee or any other party in interest to object to the Trustee's application for fees.

Interim compensation awarded and paid to the Trustee prior to the Effective Date shall be credited against the compensation payable to the Trustee pursuant to the Plan.  The amount of the Trustee's compensation shall be subject to approval by the Bankruptcy Court and shall be paid by the Estate or the Liquidating Trustee, as applicable, to the Trustee as soon as practicable after approval by the Bankruptcy Court; provided, however, that for the avoidance of any doubt, the amount of the Trustee's compensation and the payment terms will be determined by the Bankruptcy Court in the Chapter 11 Case by Final Order; provided, further, however  that for purposes of calculating the amount of compensation payable to the Trustee or the Liquidating Trustee, as applicable, on account of the disbursements made on the Banyon Unsecured Claim, to the extent that any such compensation is payable to the Trustee or the Liquidating Trustee, as applicable, on account of the Banyon Unsecured Claim, only 30% of the amount Distributed on account of the Banyon Unsecured Claim may be included as a disbursement by the Trustee or the Liquidating Trustee, as applicable.

Notwithstanding anything contained herein, any party in interest, including the United States Trustee and the Committee, may object to the Trustee's final fee application, including but not limited to, in regard to which Assets disbursed, turned over or transferred by the Trustee are properly included in the formula used to calculate the Trustee's compensation.

The Committee's agreement that the Trustee may request compensation based on certain Assets disbursed, turned over or transferred by the Trustee shall not be construed as the Committee's agreement that the Trustee is entitled to compensation based on any such Assets

disbursed, turned over or transferred by the Trustee and the Committee reserves the right to object to the Trustee's final fee application.

Notwithstanding any provision of the Plan to the contrary, the precise manner in which the Assets are disbursed, turned over or transferred to the Liquidating Trust shall not affect the rights of the Trustee to seek compensation for the amounts of Assets which ultimately are disbursed, turned over or transferred to the Liquidating Trust prior to, on, or in conjunction with the Effective Date.

The foregoing provisions regarding the Trustee's entitlement to seek fees is without prejudice to the rights of the Committee, the United States Trustee or any other party in interest to object to the Trustee's application for fees at the Confirmation Hearing or thereafter in connection with the Trustee's fee application(s) in respect of Additional Recoveries.

(b)     Liquidating Trustee Compensation.   Subject to Bankruptcy Court approval following application and a hearing, the Liquidating Trustee shall be entitled to receive reasonable compensation at the rate of $500.00 per hour (adjusted annually) for all time reasonably spent by the Liquidating Trustee in administering the Liquidating Trust.

## ARTICLE 6
## DISTRIBUTIONS TO BENEFICIARIES

6.1     **Allowed Claims.**  Following the establishment of Reserves in such amounts as determined in accordance with Section 1.3.2 of this Trust Agreement, the Liquidating Trustee shall be authorized to make distributions to the Beneficiaries pursuant to and in accordance with the Plan and Settlement Agreement on the later of: (a) as soon as practicable after the Effective Date; or (b) the first date on which Distributions are made after the Claim becomes Allowed pursuant to the Plan; provided, however, that the Liquidating Trustee shall distribute at least annually to such Beneficiaries, in accordance with their allocable share, the net income of the

Liquidating Trust, plus all net proceeds from the sale of Trust Assets, except that the Liquidating Trustee may retain an amount of net proceeds or net income reasonably necessary to maintain the value of the Trust Assets or to meet claims and contingent liabilities (including Disputed Claims). All full or partial payments made by the Trustee and received by the holder of a Claim before the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Liquidating Trustee pursuant to the Plan.

6.2    **Distributions.**

(a)    All Distributions under this Trust Agreement to any Beneficiary shall be made at the address of such Beneficiary as set forth in the official register of Claims, and/or at such other address as such Beneficiary shall have specified for payment purposes in a written notice to the Liquidating Trustee at least fifteen (15) days prior to such distribution date. Nothing contained in this Trust Agreement or the Plan shall require the Trustee or the Liquidating Trustee to attempt to locate any Beneficiary other than by reviewing the proofs of Claim and information contained in any Verified Multiple Source Recovery Disclosure delivered to the Liquidating Trustee pursuant to the Plan.

(b)    As authorized by Local Bankruptcy Rule 3011-1(C)(2), if the combined total of Unclaimed Property related to Allowed Claims under the Plan totals (i) $10,000 or more, the Unclaimed Property shall, subject to Section 8.4 ("No de Minimis Distributions") and other provisions of the Plan, be distributed by the Liquidating Trustee, at the time of Final Distribution Date, to the Beneficiaries in Class 2 and Class 3 until such Beneficiaries are paid in full on account of their Allowed Claims in Class 2 or Class 3 after application of Collateral Source Recoveries, if any, respectively, and, thereafter, distributed by the Liquidating Trustee to other Beneficiaries in the order of priority set forth in, and pursuant to the terms of, the Plan, or (ii)

less than $10,000, the Unclaimed Property shall be donated to the Bankruptcy Bar Foundation, a not-for-profit, non-religious organization dedicated to, among other things, promoting the pro bono legal representation of the indigent; provided that, pursuant to Section 1143 of the Bankruptcy Code, all Claims in respect of Unclaimed Property shall be deemed Disallowed, and the holder or successor to such holder of any Claim Disallowed will be forever barred, expunged, estopped and enjoined from asserting any such Disallowed Claim in any manner against the Trustee, the Estate, the Liquidating Trust, the Liquidating Trustee, Trust Assets, or their respective property, notwithstanding any federal or state escheat laws to the contrary.

6.3    **Limitation on Distribution Rights**.  If a claimant holds more than one Claim in any one Class, all Claims of the claimant in that Class may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

6.4    **De Minimis Amount.**  The Liquidating Trustee shall not be obligated to make disbursements in the event any distribution to any Beneficiary is less than $100.  Under such circumstances, the Liquidating Trustee shall not be obligated to disburse such funds until such time as the total distribution to a Beneficiary on any date a Distribution is made is not less than $100.

6.5    **Fractional Dollars**.  Notwithstanding any other provision of the Plan, the Liquidating Trustee shall not be required to make Cash distributions of fractions of dollars; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made may reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as an unclaimed Distribution pursuant to Section 6.2 herein.

6.6    **Tax Identification Numbers.**    The Liquidating Trustee may require any Beneficiary to provide to the Liquidating Trustee such Beneficiary's employer or tax identification number as assigned by the Internal Revenue Service, and the Liquidating Trustee may condition any distribution to a Beneficiary upon receipt of such identification number and any other information required for the Liquidating Trustee to comply with Internal Revenue Service requirements.

**ARTICLE 7**
**POWERS OF AND LIMITATIONS ON THE LIQUIDATING TRUSTEE**
**AND THE LIQUIDATING TRUST OVERSIGHT COMMITTEE**

7.1    **Limitations on Liquidating Trustee.**    The Liquidating Trustee shall not do any act or undertake any activity unless he determines, in good faith, that such act or activity is desirable, necessary or appropriate for the management, conservation, and protection of the Trust Assets and is in compliance with this Trust Agreement, the Plan and the Settlement Agreement. The investment powers of the Liquidating Trustee are limited to the powers to invest temporarily cash portions of the Estate in demand and time deposits in banks or savings institutions, temporary investment such as short-term certificates of deposit, investments in United States Treasuries, or money market funds.  The Liquidating Trustee shall be restricted to the holding, liquidation, and collection of Trust Assets and the payment and distribution thereof for the purposes set forth in the Plan and Settlement Agreement, and to the conservation and protection of the Liquidating Trust and the Trust Assets, and administration thereof in accordance with the provisions of this Trust Agreement, the Plan and the Settlement Agreement.

7.2    **Specific Powers of Liquidating Trustee.**    Subject to the provisions of the preceding paragraph, the Plan and the Settlement Agreement, the Liquidating Trustee shall have the following specific powers in addition to any powers granted by 11 U.S.C. §§ 1106 and 704 or

conferred upon him by any other provision of this Trust Agreement, the Plan and the Settlement Agreement; **provided, however**, that enumeration of the following powers shall not be considered in any way to limit or control the power of the Liquidating Trustee to act as specifically authorized by any other provisions of this Trust Agreement, the Plan or the Settlement Agreement, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate to discharge all obligations of or assumed by the Liquidating Trustee or provided herein, in the Plan or in the Settlement Agreement and to conserve and protect the Liquidating Trust and the Trust Assets or to confer on the Beneficiaries the benefits intended to be conferred upon them by this Trust Agreement, the Plan and the Settlement Agreement, at all times subject to the terms of this Trust Agreement, the Plan and the Settlement Agreement:

(a)    To determine when or on what terms Trust Assets should be sold, liquidated or otherwise disposed of;

(b)    To collect and receive any and all money and other Assets of whatsoever kind or nature due to or owing or belonging to the Liquidating Trust;

(c)    Pending sale or other disposition or distribution, to retain all or any Trust Assets regardless of whether or not such Trust Assets are, or may become, unproductive or a wasting asset.  The Liquidating Trustee shall not be under any duty to reinvest such part of the Liquidating Trust as may be in Cash, or as may be converted into Cash; nor shall the Liquidating Trustee be chargeable with interest thereon except to the extent that interest may be paid to the Liquidating Trust on such Cash amounts;

(d)    To retain and set aside such funds out of the Trust Assets as the Liquidating Trustee shall deem necessary or expedient to pay, or provide for the payment of (i) Allowed Claims pursuant to the Plan and the Settlement Agreement; and (ii) any Reserve

amounts;

(e)     Subject to section 5.12 of this Trust Agreement, to do and perform any acts or things necessary or appropriate for the management, conservation and protection of the Liquidating Trust, including acts or things necessary or appropriate to maintain Trust Assets pending sale or other disposition thereof or distribution thereof to the Beneficiaries, and in connection therewith to employ such agents, including Post-Confirmation Professionals as provided for in this Trust Agreement, the Plan or the Settlement Agreement, and to confer upon them such authority as the Liquidating Trustee may deem expedient, and to pay fees and expenses therefor;

(f)     To cause any investment of the Liquidating Trust to be registered and held in the name of the Liquidating Trustee or in the names of a nominee or nominees, or in the names of a nominee or nominees of another entity, without increase or decrease of liability with respect thereto;

(g)     Subject to section 5.12 of this Trust Agreement, to prepare, file, assert, commence and prosecute, or continue to prosecute in the case of existing actions, any and all Litigation Claims, as the Liquidating Trustee may determine to be of value and benefit to the Liquidating Trust and the Creditors;

(h)     Subject to section 5.12 of this Trust Agreement, to institute or defend actions or declaratory judgments, to substitute the Liquidating Trustee for the Debtor, the Trustee,  the Debtor's Estate or the Committee as the real party in interest in pending litigation, and to take such other action, in the name of the Liquidating Trust if required, as the Liquidating Trustee may deem necessary or desirable to enforce any instruments, contracts, agreements, or causes of action relating to or forming a part of the Liquidating Trust;

(i)      Subject to section 5.12 of this Trust Agreement, to cancel, terminate, or amend any instruments, contracts or agreements relating to or forming a part of the Liquidating Trust to the full extent permitted by such instruments, contracts or agreements and to execute new instruments, contracts, or agreements;

(j)      To perform any act authorized, permitted, or required under any instrument, contract, agreement, or cause of action relating to or forming a part of the Liquidating Trust whether in the nature of an approval, consent, demand, or notice thereunder or otherwise;

(k)      Subject to section 5.12 of this Trust Agreement, to deal in and with all accounts receivable, promissory notes and contracts which form a part of the Trust Assets with full authority to compromise, settle and otherwise deal in and with such Trust Assets as the Liquidating Trustee shall deem appropriate, in his sole discretion and without further order of the Bankruptcy Court;

(l)      To take all actions for and on behalf of the Debtor and the Debtor's Estate, including but not limited to, the preparation, execution and filing of documents, as the Liquidating Trustee shall deem necessary, desirable or appropriate in order to complete, conclude and finalize any filing, reporting or other obligations which the Debtor, the Trustee, the Debtor's Estate, the Liquidating Trustee, or the Liquidating Trust may have to any state or federal governmental authority, including the Liquidating Trustee's required completion and filing of all of the Debtor's final or otherwise required federal, state and local tax returns, which shall be done by the Liquidating Trustee;

(m)      Subject to section 5.12 of this Trust Agreement, to enter into such consulting or employment arrangements or otherwise retain such accountants, agents, attorneys,

consultants or independent contractors as the Liquidating Trustee shall deem necessary, desirable and appropriate to enable the Liquidating Trustee to accomplish the purposes enumerated in this Trust Agreement, the Settlement Agreement and the Plan;

(n)     To make the distributions provided for in this Trust Agreement, the Plan or the Settlement Agreement;

(o)     Subject to the terms of this Trust Agreement, to have control and management of the Liquidating Trust;

(p)     To make the election described in Treas. Reg. § 1.468B-9(c)(2)(ii) to treat any portion of the Liquidating Trust subject to Disputed Claims as a "disputed ownership fund" for federal income tax purposes.

(q)     To establish one or more "qualified settlement funds" within the meaning of IRC § 468B and the Treasury Regulations thereunder for any claims for which a "qualified settlement fund" is required or permitted by law;

(r)     To request any appropriate tax determination, including, without limitation, a determination pursuant to Section 505 of the Bankruptcy Code;

(s)     To destroy any records of the Debtor as authorized by the Bankruptcy Court (including, without limitation, the Client File Orders) and to request authority to destroy any records of the Debtor not previously authorized by the Bankruptcy Court; and

(t)     To take any action reasonably necessary to effectuate the wind down and dissolution of the Debtor in all respects without further corporate action under applicable law, regulation, order or rule required, including any action by the Debtor or the holders of the Debtor's Interests or the board of directors, as applicable.

7.3     **Preservation, Prosecution, and Defense of Causes of Action**.     Subject to

Section 5.12 of this Trust Agreement, the Liquidating Trustee shall have the right to pursue any and all Litigation Claims of the Debtor, the Trustee, the Committee, or the Debtor's Estate, whether or not such causes of action had been commenced as of the Effective Date, and shall be substituted as a real party in interest in any actions commenced by or against the Debtor, the Trustee, the Committee or the Debtor's Estate.   Also subject to Section 5.12 of this Trust Agreement, the Liquidating Trustee shall be authorized at any point in any litigation (a) without Bankruptcy Court approval, to enter such settlements as the Liquidating Trustee deems to be in the best interest of the Beneficiaries, or (b) to abandon, dismiss, and/or decide not to prosecute any such litigation if the Liquidating Trustee deems such action to be in the best interest of creditors provided, however, that any such proposed settlement or other action described in subparts "(a)" and "(b)" of this Section 7.3 that (i) exceeds $1,000,000 with respect to Trust Assets; (ii) involves a Trust Asset that has an alleged claim amount exceeding $1,000,000; or (iii) involves a Professional Claim shall be subject to the approval of the Liquidating Trust Oversight Committee or subject to approval by the Bankruptcy Court, upon notice and opportunity for hearing in accordance with Bankruptcy Rule 9019.

7.4    **Liquidating Trust Oversight Committee**.  The Committee shall designate the members of the Liquidating Trust Oversight Committee.  The members of the Liquidating Trust Oversight Committee shall be identified no later than ten (10) Business Days subsequent to entry of the Disclosure Statement Approval Order.   The appointment of the Liquidating Trust Oversight Committee shall be ratified by the Confirmation Order and effective as of the Effective Date.   The Liquidating Trust Oversight Committee shall review the actions of the Liquidating Trustee as provided in the Plan and as set forth in this Trust Agreement. The Liquidating Trust Oversight Committee and its members shall have a fiduciary duty to the

Beneficiaries in accordance with the Plan.

      7.5     **Indemnification of Liquidating Trustee and Liquidating Trust Oversight Committee**. The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee, the Liquidating Trust Oversight Committee, their respective employers and their respective actuaries, agents, attorneys, consultants, designees, directors, employees, financial advisors, investment bankers, managers, members, officers, professionals, partners, shareholders, and members of the Liquidating Trust Oversight Committee (but only in their capacity as members and not in their individual capacities) (collectively, all of the above are the "Liquidating Trust Protected Parties") from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses, which such Liquidating Trust Protected Parties may incur or to which such Liquidating Trust Protected Parties may become subject to in connection with any action, suit, proceeding, demand, claim, or investigation brought by or threatened against such Liquidating Trust Protected Parties arising out of or due to their acts or omissions or any consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust, the Plan, the Settlement Agreement or the discharge of their duties hereunder or otherwise related to the Liquidating Trust, the Liquidating Trustee or the Liquidating Trust Oversight Committee ("Related Matters"); **provided, however**, that no such indemnification will be provided to any such Liquidating Trust Protected Party for actions or omissions finally and judicially determined to have arisen solely and directly from such Liquidating Trust Protected Party's willful misconduct, gross negligence, or actual fraud. In the sole discretion of the Liquidating Trustee, the Liquidating Trustee may authorize available Cash of the Trust Assets to be advanced to satisfy any documented out-of-pocket costs and expenses (including attorneys' fees and other costs of defense) incurred by any Liquidating Trust Protected Party who is

threatened to be named or made a defendant or a respondent, or is served with formal or informal discovery, in connection with any proceeding, claim, investigation, or demand, concerning the administration, business, and affairs of the Liquidating Trust; **provided, however**, that all such payments are subject to disgorgement in the event the expenses relate solely to an underlying claim against the Liquidating Trust Protected Party which has been finally and judicially determined to have resulted solely and directly from the Liquidating Trust Protected Party's own willful misconduct, gross negligence, or actual fraud.  In the event that, at any time whether before or after termination of this Trust Agreement, as a result of or in connection with this Trust Agreement, any Liquidating Trust Protected Party is required to produce any of its personnel (including former employees) for examination, deposition or other written, recorded or oral presentation, or any Liquidating Trust Protected Party is required to produce or otherwise review, compile, submit, duplicate, search for, organize or report on any material within such Liquidating Trust Protected Party's possession or control pursuant to a subpoena or other legal (including administrative) process, the Liquidating Trust Protected Party shall be reimbursed by the Liquidating Trust for its out of pocket expenses, including the fees and expenses of its counsel, and will be compensated by the Liquidating Trust for the time expended by its personnel based on such personnel's then current standard hourly rate.

      7.6    **Liability of Liquidating Trust Protected Parties.**  No Liquidating Trust Protected Party shall have any liability to any party for any Related Matters, unless it shall be proven that such liability arose solely and directly from the gross negligence, willful misconduct or actual fraud of such Liquidating Trust Protected Party.  None of the Liquidating Trust Protected Parties shall be deemed to make any representations or warranties as to the value or condition of the Trust Assets or any part thereof, or as to the validity, execution, enforceability,

legality, or sufficiency of this Trust Agreement or the Plan, and none of the Liquidating Trust Protected Parties shall incur any liability or responsibility to any party in respect of such matters.

## ARTICLE 8
## CONCERNING THE LIQUIDATING TRUSTEE AND
## LIQUIDATING TRUST OVERSIGHT COMMITTEE

8.1    **Generally.**    The Liquidating Trustee accepts and undertakes to discharge the Liquidating Trust upon the terms and conditions hereof.  In performing his duties hereunder, the Liquidating Trustee may rely on information reasonably believed by him to be accurate and reliable.

8.2    **Reliance by Liquidating Trustee.**    The Liquidating Trustee may rely and shall be fully protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by him to be genuine and to have been signed or presented by the proper party or parties.

8.3    **Counsel and Advisors for Liquidating Trustee and Liquidating Trust Oversight Committee**.

(a)    The Liquidating Trustee may, subject to the consent of the Liquidating Trust Oversight Committee but without further order of the Bankruptcy Court, consult with and retain Post-Confirmation Professionals or other persons whose services may be reasonably necessary or advisable to be selected by him, and the Liquidating Trustee shall not be liable for any actions taken or suffered by him in accordance with the advice of such Post-Confirmation Professionals, and may also, subject to consent of the Liquidating Trust Oversight Committee, consult with and retain current and former accountants, consultants or other professionals of the Debtor, the Debtor's Estate, the Committee, the Trustee, present and former officers and directors of the Debtor, the Debtor's Estate and each of their respective affiliates or subsidiaries.  However, the

Liquidating Trustee may not retain as a Post-Confirmation Professional any member of the Liquidating Trust Oversight Committee or firm which employs such member.  The actual fees and expenses of Post-Confirmation Professionals retained by the Liquidating Trustee shall be paid from the Trust Assets and in accordance with the Plan, the Settlement Agreement, and the Confirmation Order.

(b)      Members of the Liquidating Trust Oversight Committee shall serve without compensation but shall be reimbursed for their reasonable and necessary out-of-pocket expenses incurred in performing their duties solely from Trust Assets.  The Liquidating Trust Oversight Committee may employ, without further order of the Bankruptcy Court, Post-Confirmation Professionals whose services may be reasonably necessary or advisable, to advise or assist the Liquidating Trust Oversight Committee in the discharge of its duties.  The Liquidating Trust Oversight Committee may consult with and retain current and former accountants, consultants or other professionals of the Debtor, the Debtor's Estate, the Committee, the Trustee, present and former officers and directors of the Debtor, the Debtor's Estate and each of their respective affiliates or subsidiaries, and the Liquidating Trust Oversight Committee shall not be liable for any actions taken in accordance with the advice of such counsel or other professionals.  The actual fees and expenses of the Post-Confirmation Professionals of the Liquidating Trust Oversight Committee shall be reimbursed and shall be solely paid from Trust Assets without further order of the Bankruptcy Court pursuant to the terms of this Trust Agreement.

(c)      Post-Confirmation Professionals retained by the Liquidating Trustee or the Liquidating Trust Oversight Committee need not be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, the Liquidating Trustee's firm (should the Liquidating Trustee be a part of a professional services firm (the "LT Firm")) and its affiliates, as

well as counsel, employees, interim management, financial advisors, independent contractors or agents of the Trustee, the Committee, the Liquidating Trust Oversight Committee or the LT Firm.  The Liquidating Trustee is hereby expressly authorized to utilize the services of the LT Firm, its affiliates and personnel as Post-Confirmation Professionals (rather than utilizing other similarly situated or available personnel or professional services firms) notwithstanding that (a) the Liquidating Trustee may benefit (directly or indirectly) from the compensation paid to the LT Firm,  and (b) other persons or entities may be available to provide the same or similar work at similar or more competitive prices.  In no event shall the Liquidating Trustee, the LT Firm or their affiliates be subject to a claim of a conflict of interest or breach of fiduciary duty or any other claim arising as a result of the appointment of any such person in accordance with this provision.  No professional that represented TD Bank during the Chapter 11 Case on matters related to the Chapter 11 Case shall be authorized to represent either the Liquidating Trustee or the Liquidating Trust Oversight Committee.

       8.4    **Liquidating Trust's Funds**. No provision of this Trust Agreement, the Plan or the Settlement Agreement shall require the Liquidating Trustee to expend or risk his own funds or otherwise incur any financial liability in the performance of any of his duties as Liquidating Trustee hereunder, under the Plan, under the Settlement Agreement, or in the exercise of any of its rights or powers, if the Liquidating Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity or security satisfactory to him against such risk or liability is not reasonably assured to him.  For the avoidance of doubt, the Liquidating Trustee shall not be required to rely on the security, reimbursement or indemnity of the LT Firm, its affiliates or their respective insurers in determining whether the assurances described in the preceding sentence are available.

8.5    **Conflicts of Interest**.  The Liquidating Trustee shall disclose to the Liquidating Trust Oversight Committee any connections, conflicts or potential conflicts of interest that the Liquidating Trustee and/or the LT Firm has with respect to the exercise of any rights, powers, duties and privileges under the Plan or this Trust Agreement. In the event that the Liquidating Trustee cannot take any action by reason of an actual or potential conflict of interest, the Liquidating Trust Oversight Committee acting by majority shall be authorized to take any such action(s) in the Liquidating Trustee's place and stead, including without limitation the retention of Post-Confirmation Professionals (which may include Post-Confirmation Professionals retained by the Liquidating Trustee) for the purpose of taking such action.  Also, if any matter under consideration by the Liquidating Trust Oversight Committee appears to involve a conflict of interest with any member(s) serving on the Liquidating Trust Oversight Committee or any such member's professional firm or client in this matter, the member(s) with the conflicting interest shall:  (i) disclose to the Liquidating Trustee and the Liquidating Trust Oversight Committee the existence of any actual or potential conflict of which the member has knowledge to the Liquidating Trustee and the Liquidating Trust Oversight Committee; and (ii) abstain from participating in the discussion of and/or voting on the matter being considered by the Liquidating Trust Oversight Committee if a majority of the other members of the Liquidating Trust Oversight Committee determines such abstention is appropriate.

## ARTICLE 9
### PERSONS DEALING WITH THE LIQUIDATING TRUSTEE

9.1    **Liquidating Trustee Not Personally Liable.**    Persons dealing with the Liquidating Trust shall look only to the Trust Assets to satisfy any liability incurred by the Liquidating Trust, or the Liquidating Trustee, to such person, in carrying out the terms of this Trust Agreement, the Plan, or the Settlement Agreement.  Neither the Liquidating Trust nor the

Liquidating Trustee shall have any personal or individual obligation to satisfy any such liability, unless it is proven that the Liquidating Trustee breached his fiduciary duty, was grossly negligent, acted with willful misconduct or fraud in ascertaining the pertinent facts or in performing any of the rights, powers or duties herein, in the Plan or in the Settlement Agreement.

9.2     **Authority of Liquidating Trustee**.  Any person dealing with the Liquidating Trustee shall be fully protected in relying upon the Trustee's Certificate signed by the Liquidating Trustee that such Liquidating Trustee has authority to take any action under this Trust Agreement.

**ARTICLE 10**
**COMPENSATION**

10.1     **Compensation for Liquidating Trustee**.  The Liquidating Trustee shall be paid the aggregate sum of (i) his fees on a per hour basis, plus (ii) actual out-of-pocket expenses, to be paid monthly from Trust Assets of the Liquidating Trust without the filing of any fee applications or Bankruptcy Court approval.

10.2     **Payment of Costs/Expenses**.  All costs and expenses incurred by the Liquidating Trust shall be the obligation of the Liquidating Trust and, subject at all times to the consent and review rights of the Liquidating Trust Oversight Committee, be payable from the Trust Assets of the Liquidating Trust in accordance with this Trust Agreement, the Settlement Agreement and the Plan.  Compensation of the Liquidating Trustee shall be paid from the Trust Assets pursuant to the terms of this Trust Agreement.  Notwithstanding anything herein to the contrary, without providing notice to or obtaining the approval of any party other than the Liquidating Trust Oversight Committee, the Liquidating Trustee shall be authorized pursuant to this Trust Agreement to pay the fees and expenses incurred after the Effective Date by the Liquidating Trustee and his Post-Confirmation Professionals, as well as to the actual expenses incurred after

the Effective Date by the members of the Liquidating Trust Oversight Committee and the actual fees and expenses of the Post-Confirmation Professionals of the Liquidating Trust Oversight Committee incurred after the Effective Date, in each case from Trust Assets without further order of the Bankruptcy Court.  The Liquidating Trustee shall be authorized pursuant to the terms of the Plan, the Confirmation Order, the Liquidating Trust and any other order of a court of competent jurisdiction to pay the compensation due to the Trustee.

10.3  **Bond/Insurance**.  As a condition to serving as Liquidating Trustee, the Liquidating Trustee, and any successor trustee, shall post a bond in favor of the Liquidating Trust in an amount that is not less than the amount of Cash held by the Liquidating Trust on the Effective Date, which bond shall be in substantially the same form as is required by the United States Trustee for trustees in the Southern District of Florida. For the avoidance of doubt, the Liquidating Trust shall be responsible for all costs associated with the posting of the foregoing bond, including the premium associated with such bond. In addition, the Liquidating Trustee is hereby authorized, out of funds available from the Liquidating Trust, to obtain all reasonably necessary insurance coverage for himself and the Liquidating Trust, its agents, representatives, employees or independent contractors whether as a named insured on the Trustee's policies or otherwise, including, but not limited to, coverage with respect to (a) appropriate directors and officers/trustee liability insurance, (b) any property that is or may in the future become the property of the Liquidating Trust and (c) the liabilities, duties, and obligations of the Liquidating Trustee and the Liquidating Trust Protected Parties.

**ARTICLE 11**
**SUCCESSION**

11.1  **Resignation and Removal of the Liquidating Trustee.**  The Liquidating Trustee may resign and be discharged from any future obligations and liabilities under this Trust

Agreement and the Plan by giving written notice thereof to the Liquidating Trust Oversight Committee. Any resignation hereunder shall become effective on the date specified in the written notice, which shall be no less than thirty (30) days after such written notice is given. The Liquidating Trustee may be removed at any time only by order of the Bankruptcy Court for cause. Upon any such resignation or removal, such Liquidating Trustee shall be entitled to any compensation, reimbursement and indemnification set forth in this Trust Agreement or the Plan which remains due and owing to such Liquidating Trustee at the time of such resignation. In the event the Liquidating Trustee is removed, the Liquidating Trustee shall not be entitled to any compensation or reimbursement that is due and owing to such Liquidating Trustee at the time of such removal. If, at any time, the Liquidating Trustee shall give notice of his intent to resign pursuant to this Trust Agreement, or shall become incapable of acting, counsel to the Liquidating Trustee shall provide notice thereof to the Bankruptcy Court. Upon the resignation or removal of the Liquidating Trustee, the Liquidating Trust Oversight Committee shall select a replacement Liquidating Trustee. If the Liquidating Trustee resigns, the Liquidating Trust Oversight Committee shall name the replacement Liquidating Trustee prior to the date of the Liquidating Trustee's resignation specified in the notice. Any successor to the Liquidating Trustee shall be bound by the terms of this Trust Agreement, the Plan, and the Settlement Agreement.

11.2    **Resignation and Removal of the Liquidating Trust Oversight Committee Members.** Any member of the Liquidating Trust Oversight Committee may resign and be discharged from any future obligations and liabilities hereunder by giving written notice thereof to the Bankruptcy Court with a copy to the Liquidating Trustee and the other members of the Liquidating Trust Oversight Committee. Any resignation hereunder shall become effective on the date specified in the written notice, which shall be no less than thirty (30) days after such

written notice is given upon the appointment of a successor. A member of the Liquidating Trust Oversight Committee may be removed at any time only by order of the Bankruptcy Court for cause. Upon the proposed resignation or removal of a member of the Liquidating Trust Oversight Committee the remaining members of the Liquidating Trust Oversight Committee shall select a successor, who shall agree to be bound by the terms of the Confirmation Order, the Plan, this Trust Agreement, and the Settlement Agreement. Any successor member of the Liquidating Trust Oversight Committee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall deliver counterparts thereof to the Bankruptcy Court.

11.3 **Acceptance of Appointment by Liquidating Trustee**. Each successor Liquidating Trustee appointed hereunder shall execute an instrument accepting such appointment. Thereupon such successor Liquidating Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trust, and duties of his, her, or its predecessor in the Liquidating Trust hereunder with like effect as if originally named therein; but the retiring Liquidating Trustee shall nevertheless, when requested in writing by the successor Liquidating Trustee, execute and deliver any instrument or instruments conveying and transferring to such successor Liquidating Trustee upon the Liquidating Trust herein expressed, all the estates, properties, rights, powers, and trusts of such retiring Liquidating Trustee, and shall duly assign, transfer, and deliver to such successor Liquidating Trustee all property and money held by him hereunder. Notwithstanding the appointment of a successor Liquidating Trustee, the resigning Liquidating Trustee and Liquidating Trust Oversight Committee shall, without limitation, continue to be entitled to the indemnity and other protections provided in Sections 7.4 and 7.5 hereof.

### ARTICLE 12
### CONCERNING THE BENEFICIARIES

12.1    **Limitation on Suits by Beneficiaries**.  No Beneficiaries shall have any right by virtue of any provision of this Trust Agreement, the Plan, or the Settlement Agreement, to institute any action or proceeding at law or in equity against any party upon, under, or with respect to the Liquidating Trust or the Trust Assets.

12.2    **Expenses in Connection with Litigation.**  In connection with any lawsuit or action by or against the Liquidating Trustee regarding any rights, actions, and/or omissions under this Trust Agreement, the Plan, or the Settlement Agreement, the Liquidating Trustee may request any court to require, and any court may in its discretion require, that a party to such action other than the Liquidating Trustee pay all costs and fees associated with such action.

### ARTICLE 13
### AMENDMENTS

13.1    **Amendments.**  The Liquidating Trustee may, with the consent of the Liquidating Trust Oversight Committee,  make and execute such declarations amending this Trust Agreement for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Trust Agreement or amendments hereto; provided, however, that no such amendment shall permit the Liquidating Trustee to act in any manner which is inconsistent with the Plan or the Settlement Agreement, or engage in any activity prohibited by this Trust Agreement or affect the Beneficiaries' rights to receive their share of any Distributions under this Trust Agreement, the Plan or the Settlement Agreement.

13.2    **Notice and Effect of Amendment.**  Promptly after the execution by the Liquidating Trustee of any declaration of amendment permitted by and pursuant to Section 13.1 hereof, the Liquidating Trustee shall give notice of the substance of such amendment to (i) TD

Bank, (ii) all parties who requested copies of pleadings in the Chapter 11 Case, and (iii) all Beneficiaries.  Upon the execution of any such declaration of amendment by the Liquidating Trustee, this Trust Agreement shall be deemed to be modified and amended in accordance therewith and the respective rights, limitations of rights, obligations, duties and immunities of the Liquidating Trustee and the Beneficiaries under this Trust Agreement shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modification and amendment, and all the terms and conditions of this Trust Agreement for any and all purposes.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

14.1     **Further Assurances.**  The Trustee and the Liquidating Trustee shall promptly execute and deliver such further instruments and do such further acts as may be necessary or proper to effectively transfer to the Liquidating Trustee any portion of the Trust Assets intended to be conveyed pursuant to the Plan, the Settlement Agreement and this Trust Agreement or to otherwise carry out the intentions of this Trust Agreement, the Settlement Agreement and the Plan.

14.2     **Retention of Jurisdiction**.  The Bankruptcy Court shall retain exclusive jurisdiction over this Trust Agreement and the Liquidating Trust established hereby as set forth in the Plan, including, without limitation, the enforcement, modification and interpretation of its provisions, for the purpose of determining all amendments, applications, claims or disputes with respect to this Trust Agreement, the substitution of the Liquidating Trustee or the Liquidating Trust Oversight Committee, and all applications, claims and disputes related thereto or otherwise brought against the Liquidating Trustee or the Liquidating Trust Oversight Committee.

14.3     **Filing Documents**.  This Trust Agreement shall be filed or recorded in such office or offices as the Liquidating Trustee may determine to be necessary or desirable.  A copy

of this Trust Agreement and all amendments thereof shall be maintained in the office of the Liquidating Trustee and shall be available during regular business hours for inspection by any Beneficiary or his duly authorized representative.  The Liquidating Trustee shall file or record any amendment of this Trust Agreement in the same places where the original Trust Agreement is filed or recorded.  The Liquidating Trustee shall file or record any instrument which relates to any change in the office of the Liquidating Trustee in the same places where the original Trust Agreement is filed or recorded.

14.4   **Intention of Parties to Establish Trust.**  This Trust Agreement is not intended to create, and shall not be interpreted as creating, an association, partnership, or joint venture of any kind.

14.5   **Laws as to Construction.**   This Trust Agreement shall be governed and construed in accordance with the internal laws of the State of Florida, without giving effect to the principles of conflicts of law prevailing in Florida.

14.6   **Severability.**   In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

14.7   **No Assignment**.  Except as otherwise provided herein, the obligations, duties or rights of the Liquidating Trustee under this Trust Agreement shall not be assignable, voluntarily, involuntarily or by operation of law, and any such attempted assignment shall be void.

14.8   **Calendar Year**.  The Trust will utilize the calendar year for tax and financial

accounting purposes.

14.9    **Inconsistency with Plan or Settlement Agreement**.    To the extent of any inconsistency: (i) the provisions of the Liquidating Trust Agreement shall control over the provisions of the Disclosure Statement; (ii) the provisions of the Settlement Agreement shall control over the contents of the Liquidating Trust Agreement and the Disclosure Statement; (iii) the provisions of the Plan shall control over the contents of the Settlement Agreement, the Liquidating Trust Agreement, and the Disclosure Statement; and (iv) the provisions of the Confirmation Order shall control over the contents of the Plan, the Settlement Agreement, the Liquidating Trust Agreement, and the Disclosure Statement.

14.10    **Effectiveness**.    This Trust Agreement shall become effective on the Effective Date.

14.11    **Fiscal Year**.    The fiscal year of the Liquidating Trust will begin on the first day of January and end on the last day of December of each year.

14.12    **Confidentiality**.    The Liquidating Trustee, every member of the Liquidating Trust Oversight Committee, and any respective successor for either entity (each a "Covered Person") shall, during the period that they serve in such capacity under this Trust Agreement and following either the termination of this Trust Agreement or such individual's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, nonpublic information of or pertaining to any entity to which any of the assets of the Liquidating Trust relates or of which it has become aware in its capacity (the "Information"), except to the extent disclosure is required by applicable law, order, regulation or legal process. In the event that any Covered Person is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation, demand or similar legal

process) to disclose any Information, such Covered Person will furnish only that portion of the Information, which the Covered Person, advised by counsel, is legally required and exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.

14.13  **Notices.**  Any notice or other communication hereunder shall be in writing and shall be mailed United States First Class Mail, postage prepaid, delivered by courier service, transmitted by telecopy, or transmitted electronically, effective upon receipt:

(a)  to any Beneficiary at the most current address as shown on the records of the Liquidating Trustee;

(b)  to the Liquidating Trustee at:

> Michael I. Goldberg
> Akerman Senterfitt
> 350 E. Las Olas Blvd., Suite 1600
> Ft. Lauderdale, FL 33301
> Tel: (954) 463-2700
> Fax: (954) 463-2224
> Email: Michael.goldberg@akerman.com

(c)  to the Liquidating Trust Oversight Committee at

_____, with a copy to the Liquidating Trust Oversight Committee's counsel at _____;

(d)  to the Trustee at:

> Herbert Stettin
> 4000 Ponce de Leon Boulevard
> Suite 570
> Coral Gables, FL  33146
> Tel: (305) 374-3353
> Fax: (305) 374-7632
> Email c/o:  singerman@bergersingerman.com
>
> and

Herbert Stettin
5401 Hammock Drive
Coral Gables, FL  33156

with a copy to the Trustee's counsel at:

Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Attn: Paul Steven Singerman
Telephone: (305) 714-4343
Facsimile: (305) 714-4340
Email: singerman@bergersingerman.com

and

John H. Genovese
Genovese Joblove & Battista, P.A.
100 SE 2nd Street, 44th Floor
Miami, FL 33131
Telephone: (305) 372-2462
Facsimile: (305) 428-8802
Email: jenovese@gjb-law.com

    14.14  **Counterparts.**    This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have caused this Trust Agreement to be signed

and acknowledged as of the date set forth in the opening paragraph hereof.

**HERBERT STETTIN, NOT INDIVIDUALLY, BUT**
**AS CHAPTER 11 TRUSTEE FOR ROTHSTEIN**
**ROSENFELDT ADLER, P.A.**


_____


**LIQUIDATING TRUSTEE**


_____

<u>Appendix 1.85</u>

<u>List of Certain Litigation Claims</u>

| LIST OF CERTAIN LITIGATION CLAIMS |
|---|
| **Adversary Name and Case No.** |
| 10-03552-RBR Stettin v. Caro Group, L.L.C. |
| 10-03553-RBR Stettin v. Exito Investment Group, L.L.C. |
| 10-03554-RBR Stettin v. Marmarser Investment, L.L,C. |
| 10-03556-RBR Stettin v. New Miami Group, L.L,C, |
| 10-03557-RBR Stettin v. Pirulin Group, L.L.C. |
| 10-03558-RBR Stettin v. OPMonies 2, L.L.C. et al |
| 10-03602-RBR Stettin v. Network Resources Investment Group, L.L.C |
| 10-03710-RBR Stettin v. RL Pearson and Associates, Inc. |
| 10-03775-RBR Stettin v. Alu |
| 10-03823-RBR Thirteen Aqua Holdings Ltd v. Stettin |
| 11-02770-RBR Stettin v. FDS Investments USA, L.L.C. |
| 11-02771-RBR Stettin v. BWS Investments USA, L.L.C. |
| 11-02772-RBR Stettin v. GGTW Investments USA, LLC |
| 11-02773-RBR Stettin v. Viceroy Global Investments, Inc. |
| 11-02779-RBR Stettin v. Casa Casuarina, LLC et al |
| 11-02790-RBR Stettin v. Aran Development, Inc. |
| 12-01836-RBR Stettin v. Qtask |
| 11-02590-RBR Lexington Insurance Company et al v. Stettin et al |
| 11-02604-RBR Stettin v. Maple Leaf Drilling Partners, et, al. |
| 11-02734-RBR Stettin v. Boden |
| 11-02893-RBR Stettin v. Lifshitz |
| 11-02895-RBR Stettin v. Setvest, LLC |
| 11-02897-RBR Stettin v. Weiss |
| 11-02898-RBR Stettin v. Morgan |
| 11-02899-RBR Stettin v. Utica Advisors, LLC |
| 11-02902-RBR Stettin v. Wolinetz |
| 11-02903-RBR Stettin v. Mussry, et, al |
| 11-02906-RBR Stettin v. Pinewski |
| 11-02907-RBR Stettin v. Schreiber |
| 11-02908-RBR Stettin v. Kopelman |
| 11-02909-RBR Stettin v. Schraga |
| 11-02910-RBR Stettin v. Sussco, Inc. |
| 11-02911-RBR Stettin v. Sturm, et, al. |
| 11-02912-RBR Stettin v. Szafranski, et, al. |
| 11-02914-RBR Stettin v. Goldstein |
| 11-02915-RBR Stettin v. Adelsberg |
| 11-02916-RBR Stettin v. Eisenberg Family Foundation |

| |
|---|
| 11-02917-RBR Stettin v. Lifshitz Irrevocable Trust |
| 11-02918-RBR Stettin v. DC Capital Connections |
| 11-02919-RBR Stettin v. Concentrix Capital, LLC |
| 11-02920-RBR Stettin v. Diamond Street Equities |
| 11-02921-RBR Stettin v. Ber Group, LLC |
| 11-02922-RBR Stettin v. Kavana, et, al. |
| 11-02924-RBR Stettin v. Godin |
| 11-02926-RBR Stettin v. El Equities, LLC |
| 11-02927-RBR Stettin v. Krivoposk |
| 11-02928-RBR Stettin v. HN Associates |
| 11-02929-RBR Stettin v. Ballamor Capital Management, Inc, et, al. |
| 11-03014-RBR Stettin v. Preve, et, al. |
| 11-03018-RBR Stettin v. Leon |
| 11-03036-RBr Stettin v. Banyon Funding, LLC, et, al. |
| 11-03040-RBR Stettin v. Daniel Courtney, P.A. |
| 11-03034-RBR Stettin v. Banyon Capital, LLC |
| 11-03040-RBR Stettin v. Daniel Courtney, P.A. |
| 11-02900-RBR Stettin v. Neiss |
| 11-02908-RBR Stettin v. Paul, et, al. |
| 11-3013-RBR Stettin v. Intracoastal |
| 11-03021-RBR Stettin v. Harris, et, al. |
| 11-02896-RBR Stettin v. Menchel |
| All property and assets, as listed in the Preliminary Order of Forfeiture [ECF No. 134] and any other subsequent order, In *United States v. Rothstein*, 09-cr-60331-JIC (S.D. Fla) |
| All Forfeiture and Restitution related claims in *United States v. Kim Rothstein,* 12-cr-60204 (S.D. Fla) |
| All claims against Marc Nurik |
| All claims and rights relating to the appeal styled as *Stettin v. United States*, 11-10676 (11th Cir. 2011) and any litigation that may result from or after any ruling in respect of the appeal. |
| Any and all assigned claims against AON Risk Services Central, Inc., National Union Fire Insurance Company of Pittsburgh, Pa. and The Hartford arising from Settlement with Gibraltar Private Bank & Trust Co. and certain current and former officers and directors. |
| Any and all rights and remedies, including but not limited to specific performance or default remedies under existing but not fully consummated settlement agreements. |
| Any and all rights and Litigation Claims, known or unknown, which are property of the Estate. |
| Any and all claims known or unknown, filed or unfiled relating to *In re Rothstein Rosenfeldt Adler, P.A.*, 09-34791-RBR (Bankr. S.D. Fla) |
| Any and all rights under any settlement agreement between the Trustee and any third party ("Parties") filed or reached in *In re Rothstein Rosenfeldt Adler, P.A.*, 09-34791-RBR (Bankr. S.D. Fla) |

| |
|---|
| Any and all appellate remedies regarding the foregoing. |
| Any and all collection and/or enforcement proceedings relating to the foregoing. |

Appendix 1.122

<u>Settlement Agreement</u>

## SECOND AMENDED AND RESTATED SETTLEMENT AGREEMENT AND GENERAL RELEASE (AS MODIFIED)

THIS SECOND AMENDED AND RESTATED SETTLEMENT AGREEMENT AND GENERAL RELEASE (AS MODIFIED) (the "***Agreement***"), dated May 29, 2013, is by and among Herbert Stettin, as the Chapter 11 trustee (including any successor, the "***RRA Trustee***") of the bankruptcy estate of Rothstein Rosenfeldt Adler, P.A. (the "***RRA Estate***"), Robert C. Furr, as the Chapter 7 trustee (including any successor, the "***Banyon Trustee***" and with the RRA Trustee, the "***Trustees***") of the bankruptcy estates of Banyon 1030-32, LLC (the "***Banyon 1030-32 Estate***") and Banyon Income Fund, L.P. (the "***BIF Estate***", together with Banyon 1030-32 Estate, the "***Banyon Estates***"; the RRA Estate and the Banyon Estates are collectively referred to as the "***Estates***"), and TD Bank, N.A. ("***TD Bank***"). The RRA Estate, the RRA Trustee, each of the Banyon Estates, the Banyon Trustee and TD Bank are referred to hereinafter collectively as the "***Parties***" or individually as a "***Party***".  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article I below.

## RECITALS

A.    In 2005, Scott W. Rothstein ("***Rothstein***"), the 50% shareholder of RRA, began perpetrating a Ponzi scheme through the sale of fictitious structured settlements with non-existent clients of RRA.

B.    Each of Banyon 1030-32, LLC ("***Banyon 1030-32***") and Banyon Income Fund, L.P. ("***BIF***" and with Banyon 1030-32, the "***Banyon Funds***") acted as an investment fund that placed investments in the Ponzi scheme orchestrated or operated by Rothstein.

C.    RRA began to use TD Bank's predecessor in interest, Commerce Bank, for certain of its banking activities in 2007.

D.    On November 10, 2009 (the "***RRA Petition Date***"), certain creditors of RRA filed an involuntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "***Bankruptcy Code***"), with the Bankruptcy Court against RRA, which created the RRA Estate.  The RRA Estate's bankruptcy case was assigned case number 09-34791-RBR (the "***RRA Case***").

E.    On November 20, 2009, the Office of the United States Trustee selected the RRA Trustee as the chapter 11 trustee for the RRA Estate.

F.    On November 30, 2009, the Bankruptcy Court entered an order for relief in the RRA Case.

G.    On August 12, 2010 (the "***Banyon 1030-32 Petition Date***"), certain creditors of Banyon 1030-32 filed an involuntary petition against Banyon 1030-32 in the Bankruptcy Court, which created the Banyon 1030-32 Estate.  The bankruptcy case of Banyon 1030-32 was assigned case number 10-33691-RBR (the "***Banyon 1030-32 Case***").

H.     The RRA Estate filed a Complaint to Avoid and Recover Preferential and Fraudulent Transfers and for Damages against TD Bank (Adversary Proceeding No. 11-02368-RBR) (the "**RRA Complaint**") on July 25, 2011.

I.     On November 4, 2011(the "**BIF Petition Date**", and collectively with the RRA Petition Date and the Banyon 1030-32 Petition Date the "**Petition Dates**"), certain creditors of BIF filed an involuntary petition against BIF in the Bankruptcy Court, which created the BIF Estate.  The bankruptcy case of BIF (the "**BIF Case**" and together with the RRA Case and the Banyon 1030-32 Case, collectively the "**Cases**") was assigned case number 11-40929-RBR.

J.     On November 29, 2011, the Bankruptcy Court entered an order for relief in the Banyon 1030-32 Case, and the Office of the United States Trustee appointed the Banyon Trustee as the chapter 7 trustee in the Banyon 1030-32 Case.

K.     On January 31, 2012, the Bankruptcy Court entered an order for relief in the BIF Case.

L.     On February 6, 2012, the Office of the United States Trustee appointed the Banyon Trustee as the chapter 7 trustee in the BIF Case.

M.     On April 10, 2012, the Bankruptcy Court authorized the joint administration of the BIF Case and the Banyon 1030-32 Case under case number 10-33691-RBR (the "**Banyon Cases**").

N.     The Banyon Trustee has informally asserted that TD Bank is liable for damages the Banyon Estates incurred in regard to the Ponzi scheme orchestrated or operated by Rothstein because of TD Bank's alleged actions or failure to act in connection with the Ponzi scheme orchestrated or operated by Rothstein (the "**Banyon Asserted Claims**").

O.     Certain third parties have claimed that TD Bank is liable for damages caused to such third parties by the Ponzi scheme orchestrated or operated by Rothstein because of TD Bank's alleged actions or failures to act in connection with the Ponzi scheme orchestrated or operated by Rothstein (the "**Third Party Claims**").

P.      TD Bank has settled certain of the Third Party Claims.  As part of those settlements, certain holders of Third Party Claims have assigned, participated or transferred, in whole or in part, certain of the recoveries such parties will receive from the Estates and other sources to TD Bank (the "**TD Bank Controlled Claims**").   Each of the Trustees has asserted that he has various objections to the TD Bank Controlled Claims.

Q.     The RRA Complaint, the Banyon Asserted Claims and the objections to the TD Bank Controlled Claims, and the objections, defenses and counterclaims that TD Bank could assert thereto, raise complex legal and factual issues for TD Bank and the Estates.

R.     Each Estate has asserted substantial Claims against each other Estate.  The RRA Trustee has asserted that the RRA Estate has numerous Claims against each of the Banyon Estates  arising from or in connection with the Ponzi scheme orchestrated or operated by Rothstein, including, but not limited to, those Claims asserted by the RRA Estate in (i) proof of

2

Claim number 1 asserted against the Banyon 1030-32 Estate and listed on the claims register maintained for the Banyon 1030-32 Case and (ii) proof of Claim number 1 asserted against the BIF Estate and listed on the claims register maintained for the BIF Case. The Banyon Trustee has asserted that each of the Banyon Estates has numerous Claims against the RRA Estate arising from or in connection with the Ponzi scheme orchestrated or operated by Rothstein, including, but not limited to, those Claims asserted by (i) the Banyon 1030-32 Estate in proof of Claim number 336 asserted against the RRA Estate and listed on the claims register maintained in the RRA Case and (ii) the BIF Estate in proof of Claim number 337 asserted against the RRA Estate and listed on the claims register maintained in the RRA Case.

S.    Each Trustee asserts that he has objections, defenses and counterclaims to each such Claim asserted against each such Estate.

T.    The Trustees and the Estates have concluded that, because of the substantial expense of litigating the issues associated with the RRA Complaint, the Banyon Asserted Claims, the TD Bank Controlled Claims, TD Bank's objections, defenses and counterclaims thereto, and the Claims of each Estate against each other Estate, the length of time necessary to resolve the issues presented therein, and the uncertainty as to the result of any such litigation, the compromise and settlement provided herein is fair and reasonable, and in the best interests of the Estates, their creditors and the holders of Third Party Claims.

U.    The Trustees and the Estates have concluded that permitting the Third Party Claims to proceed against TD Bank will further protract the Estates' litigation against TD Bank, will disrupt the efforts of the RRA Trustee to confirm a plan of liquidation in the RRA Case and the efforts of the Trustees to provide distributions in the RRA Case and the Banyon Cases, and will further complicate the determination of the amounts that creditors will be able to recover from the Estates.

V.    TD Bank has denied, and continues to deny, each and all of the Claims and allegations of wrongdoing made by the Trustees, including those asserted in the RRA Complaint and the Banyon Asserted Claims, and maintains that it has meritorious defenses and counterclaims against the Estates. TD Bank has expressly denied, and continues to deny, all charges of wrongdoing or liability against it arising out of any of the conduct, statements, acts or omissions alleged or that could have been alleged in the RRA Complaint, the Banyon Asserted Claims and the Third Party Claims, and TD Bank vigorously contends that many of the factual allegations of the RRA Complaint, the Banyon Asserted Claims and the Third Party Claims relating to it are materially inaccurate. TD Bank also has denied and continues to deny, *inter alia*, the allegations that the Trustees and their Estates or their creditors were harmed by TD Bank's conduct as alleged in the RRA Complaint, the Banyon Asserted Claims, the Third Party Claims or otherwise.

W.    TD Bank has concluded that further litigation of the RRA Complaint, the Banyon Asserted Claims, the TD Bank Controlled Claims, and the Third Party Claims would be protracted and expensive, and that it is desirable and beneficial to it that the allegations made in the RRA Complaint, the Banyon Asserted Claims, the TD Bank Controlled Claims, and the Third Party Claims be fully and finally settled in the manner and upon the terms and conditions set forth in this Agreement.

3

X.      The Parties acknowledge that TD Bank has required, *inter alia*, the bar order and releases to be provided in accordance with Article III hereof as the central consideration for inducing TD Bank to enter into the settlement contemplated by this Agreement.  Absent the bar order and releases contemplated by Article III, TD Bank would not have been induced into entering this Agreement.  Absent the settlement contemplated by this Agreement, the consummation of the RRA Plan would not be possible.

Y.      On February 4, 2013, the Parties entered into the original Settlement Agreement and General Release dated February 4, 2013 (the "***Original Agreement***").

Z.      On March 25, 2013, the Parties entered into the Amended and Restated Settlement Agreement and General Release dated March 25, 2013 that amended and restated the Original Agreement in its entirety (the "***First Amended Agreement***").

AA.      On May 8, 2013, the Parties entered into the Second Amended and Restated Settlement Agreement and General Release dated May 8, 2013 that amended and restated the First Amended Agreement (the "***Initial Second Amended Agreement***").

NOW, THEREFORE, IT IS HEREBY AGREED, by and among the undersigned that the Original Agreement, the First Amended Agreement and the Initial Second Amended Agreement are hereby amended and restated in their entireties as follows:

## ARTICLE I
### DEFINITIONS

Section 1.1      Recitals.  The recitals set forth above are an integral part of this Agreement and are incorporated herein by reference and are explicitly made a part of this Agreement.

Section 1.2      Definitions.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"***9019 Motion***" shall mean the motion filed by the Banyon Trustee in the Banyon Cases seeking Bankruptcy Court approval of the compromise and settlement set forth in this Agreement, providing for the notice of such compromise and settlement to parties in interest, and authorizing and directing the consummation by the Banyon Trustee and the Banyon Estates of the transactions contemplated herein by the Banyon Estates, which motion must be in form and substance satisfactory to the Parties and the Committee.

"***9019 Order***" shall mean the order or orders of the Bankruptcy Court approving the 9019 Motion and implementing the terms of this Agreement, including, but not limited to, the provisions of Article 3 of this Agreement, which order or orders, shall be in form and substance satisfactory to the Parties and the Committee.

"***Affiliate***" shall have the meaning set forth in Section 101 of the Bankruptcy Code.

"***Allowed Banyon TD Bank Claim***" shall have the meaning set forth in Section 2.7.

4

"*Allowed Claim*" shall (A) in regard to the RRA Estate, mean a Claim (as defined in the RRA Plan) that has been Allowed (as defined in the RRA Plan), or (B) in regard to the Banyon Estates, mean a Claim for which a completed and duly executed Verified Banyon Creditor Collateral Source Recovery Disclosure has been timely submitted and (i) a timely proof of Claim has been filed and such Claim is not disputed, (ii) the Bankruptcy Court has allowed such Claim in a Final Order in the applicable Banyon Case, or (iii) the holder of such Claim has received an interim distribution on account of such Claim, but only to the extent of the interim distribution received on such Claim.

"*Allowed RRA TD Bank Claim*" shall have the meaning set forth in Section 2.3.

 "*Bankruptcy Code*" shall have the meaning set forth in Recital D.

"*Bankruptcy Court*" shall mean The United States Bankruptcy Court for the Southern District of Florida and, to the extent it may exercise jurisdiction in any of the Cases, the District Court, or if either such court ceases to exercise jurisdiction over the any of the Cases, such court or adjunct unit thereof that exercises jurisdiction over such Cases.

"*Banyon 1030-32 Case*" shall have the meaning set forth in Recital G.

"*Banyon 1030-32 Petition Date*" shall have the meaning set forth in Recital G.

"*Banyon Asserted Claims*" shall have the meaning set forth in Recital N.

"*Banyon Cases*" shall have the meaning set forth in Recital M.

 "*Banyon Creditor Collateral Source Recoveries*" shall mean in regard to a Claim asserted against either of the Banyon Estates, the amount calculated, determined and applied in accordance Section 3.6(b) of the RRA Plan and Section 2.13 of this Agreement.

"*Banyon Distribution*" shall have the meaning set forth in section 2.13 of this Agreement.

"*Banyon Funds*" shall have the meaning set forth in Recital B.

"*Banyon Levin Claims*" shall mean any and all rights, Claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, rights to payment, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party Claims, counterclaims and cross Claims (including, but not limited to avoidance or recovery actions available through the exercise of the powers granted by Sections 541 – 553 of the Bankruptcy Code or avoidance or recovery Claims recognized under any applicable state law) of each of the Banyon Estates against Gayla Susan Levin, George Levin, the bankruptcy estate of George Levin (including, but not limited to, proofs of Claim number 60 and 61 asserted against George Levin by the applicable Banyon Estate in George Levin's chapter 11 bankruptcy case, case number 10-33696-RBR, currently pending in the Bankruptcy Court) and/or any of their Affiliates (with  Gayla Susan Levin and/or George Levin considered the "debtor" for the purposes of the definition of Affiliate) or subsidiaries; provided, that Banyon Levin Claims do not include any of the foregoing Claims or rights against any Entity that is not Gayla Susan

5

Levin, George Levin, the bankruptcy estate of George Levin and/or any of their Affiliates (with Gayla Susan Levin and/or George Levin considered the "debtor" for the purposes of the definition of Affiliate) or subsidiaries (including, but not limited to, avoidance or recovery actions through the exercise of powers granted by Sections 541-553 of the Bankruptcy Code or avoidance or recovery Claims recognized under any applicable state law where such Entity was either an immediate or subsequent transferee).

"***Banyon Litigation Claims***" shall mean the Claims, causes of action, avoidance actions, damages, rights and interests, owned by the Banyon Estates assertable against any Entity that is not a TD Bank Releasee; **provided**, **however**, that all payments and distributions from and in connection with the Gibraltar Settlement Agreement allocable to the Banyon Estates shall not be included within the definition of Banyon Litigation Claims; **provided further that** the Banyon Levin Claims are not Banyon Litigation Claims.

"***Banyon Releasors***" shall mean Banyon 1030-32, LLC, Banyon Income Fund, L.P., the Banyon Estates, and the Banyon Trustee, and each of their subsidiaries and affiliates and the successors and assigns of any of them and any other Entity that claims or might claim through, on behalf of or for the benefit of any of the foregoing.

"***Banyon Unsecured Claim***" shall mean the unsecured Allowed Claim held by the Banyon Estates against the RRA Estate in the amount of $39.7 million ($39,700,000.00).

"***Banyon Unsecured Creditor Fund***" shall mean $39.7 million ($39,700,000.00) in Cash from the TD Bank Contribution held by the Liquidating Trustee to be distributed in accordance with Section 3.6(b) of the RRA Plan.

"***Beneficiary or Beneficiaries***" shall mean the holder(s) of an Allowed Claim against the RRA Estate as may be determined from time to time in accordance with the RRA Plan and the Liquidating Trust Agreement.

"***BIF Petition Date***" shall have the meaning set forth in Recital I.

"***BIF Case***" shall have the meaning set forth in Recital I.

"***Business Day***" shall mean any day other than a Saturday, Sunday or other day on which banks in the State of Florida are required or permitted to close.

"***Cases***" shall have the meaning set forth in Recital I.

"***Cash***" shall mean legal tender accepted in the United States of America for the payment of public and private debts, currently denominated in United States Dollars.

"***Claim***" shall have the meaning ascribed to it in Section 101 of the Bankruptcy Code.

"***Committee***" shall mean the Official Committee of Unsecured Creditors appointed in the RRA Case as of the date the Disclosure Statement Approval Order is entered. As of the date hereof, the Official Committee of Unsecured Creditors appointed in the RRA Case consists of the following members: (i) American Express Travel Related Services Company, Inc., (ii) Ira

6

Sochet, Trustee-Revocable Intervivos Trust of Ira Sochet and (iii) John Mullin, Esq. for Edward J. Morse (or his testamentary estate as his successor).

"*Confirmation Hearing*" shall mean the hearing conducted by the Bankruptcy Court to consider the confirmation of the RRA Plan.

"*Confirmation Order*" shall mean the order or orders of the Bankruptcy Court confirming pursuant to Bankruptcy Code Section 1129 and implementing the terms of the RRA Plan and authorizing and directing the consummation by the RRA Trustee, the RRA Estate, the Liquidating Trust and the Liquidating Trustee of the transactions contemplated herein, which order or orders shall be in form and substance satisfactory to the Parties and the Committee.

"*Coquina Settlement Agreement*" shall mean that certain settlement agreement dated as of October 17, 2011 between the RRA Trustee and Coquina Investments, and approved by the Bankruptcy Court by Final Order in the RRA Case dated October 21, 2011 [RRA ECF No. 2138].

"*Court of Appeals*" shall mean the United States Court of Appeals for the Eleventh Circuit.

"*Disclosure Statement*" shall mean that certain written amended disclosure statement that relates to the RRA Plan as filed in the RRA Case by the Plan Proponents, including the schedules and exhibits attached thereto, as any of them may be amended, modified or supplemented from time to time.

"*Disclosure Statement Approval Order*" shall mean that certain order of the Bankruptcy Court approving, among other things, the notice and balloting procedures for the RRA Plan, and the Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code which order or orders shall be in form and substance satisfactory to the Parties and the Committee.

"*District Court*" shall mean the United States District Court for the Southern District of Florida.

"*Effective Date*" shall mean the first Business Day on which all conditions to effectiveness set forth in Section 6.2 of this Agreement shall have been satisfied or, if waiveable, waived in accordance with Section 6.2 of this Agreement.

"*Emess Litigation*" shall mean the adversary proceeding brought by the RRA Trustee against Emess Capital, L.L.C. that is pending in the Bankruptcy Court as adversary proceeding number 11-02768-RBR.

"*Entity*" shall mean a Person, an estate, a trust, or the United States Trustee as defined in Section 101(15) of the Bankruptcy Code.

"*Final Order*" shall mean an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on its docket, that has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, petition for certiorari or move for reargument,

rehearing or a new trial has expired and no appeal, petition for certiorari or motion for reargument, rehearing or a new trial, respectively, has been timely filed, or (b) any appeal, any petition for certiorari or any motion for reargument, rehearing or a new trial that has been or may be filed has been resolved by the highest court (or any other tribunal having final appellate jurisdiction over the order or judgment) to which the order or judgment was appealed or from which certiorari or reargument, rehearing or a new trial was sought, and the time to take any further appeal, petition for certiorari or move for reargument, rehearing or a new trial shall have expired without such actions having been taken; provided, however, the possibility that a party may file a motion for reconsideration of an order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, Section 502(j) of the Bankruptcy Code, or Bankruptcy Rules 9023 and 9024 shall not preclude an order from being a Final Order.

"*Forfeiture Action*"   shall mean the case styled as *USA v. Scott W. Rothstein*, Case No. 0:09-cr-60331-JIC, pending in the District Court or any subsequent court of appeals with jurisdiction over such case.

"*Full Amount*" shall mean the total amount of a Claim without any interest, costs, fees or charges accruing on such Claim from and after the applicable Petition Date.

"*Funds*" shall mean Centurion Structured Growth LLC, Platinum Partners Credit Opportunities Fund LP, Platinum Partners Value Arbitrage Fund LP and Level 3 Capital Fund LP.

"*Funds' Settlement Agreement*" shall mean that certain settlement agreement dated as of June 14, 2012 among the Trustee, the Funds, Regent Capital Partners, LLC, Mark Nordlicht, Dahlia Kalter, Murray Huberfeld, Laura Huberfeld, David Bodner, Naomi Bodner, and the Bodner Family Foundation, and approved by the Bankruptcy Court by Final Order in the RRA Case dated August 28, 2012 [RRA ECF No. 3352].

"*Funds Senior Subordinated Claim*" shall mean that certain unsecured subordinated Claim of the Funds' in the maximum amount of $26,000,000 which shall be allowed and subordinated to the extent, and as provided, in the Funds' Settlement Agreement.

"*Gibraltar Settlement Agreement*" shall mean that certain settlement agreement between Gibraltar Private Bank & Trust Company, Boston Private Financial Holdings, Inc. and Boston Private Bank and Trust Company and all of such entities' current or former directors, officers, employees, and partners (not including John Harris, Charles Sanders, Steven D. Hayworth, and Lisa Ellis), and any successors and their partners, directors, officers, and employees and the RRA Trustee dated October 9, 2012 and approved by Final Order of the Bankruptcy Court in the RRA Case dated as of October 10, 2012 [RRA ECF No. 3500].

"*Interest*" shall mean the interest of any shareholder or equity holder against the Banyon Funds or RRA, as applicable.

"*IRC*" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"*Levin Claims*" shall mean the Banyon Levin Claims and the RRA Levin Claims.

"***Levy Settlement Agreement***" shall mean that certain settlement agreement dated as of October 31, 2012 by and among the RRA Trustee on the one hand and Shimon Levy, Ovadia Levy, Rachel Levy, Daniel Minkowitz, Mordechai Bar-Adon, Ben-Zion Varon, The 2009 Ovadia Levy Revocable Trust, Renato Watches, Inc. N/K/A DMOL, Inc., Sea Club Ocean Resort Hotel, Inc., JUBOT, LLC on the other, and approved by Final Order of the Bankruptcy Court in the RRA Case dated as of January 23, 2013 [RRA ECF No. 3746].

"***Liquidating Trust***" shall mean the trust created on the Effective Date pursuant to the RRA Plan.

"***Liquidating Trust Agreement***" shall mean the agreement governing the Liquidating Trust and the Liquidating Trustee, which shall be included as an appendix to the RRA Plan, and which shall be in form and substance that is agreeable to the Parties and the Committee.

"***Liquidating Trustee***" shall mean Michael I. Goldberg.

"***Liquidating Trust Oversight Committee***" shall mean the committee of three Persons selected in accordance with Section 2.29 of this Agreement and appointed pursuant to the Confirmation Order, each of whom shall be identified ten (10) Business Days subsequent to entry of the Disclosure Statement Approval Order.

"***October Mediation Expense***" shall mean $67,182.10, which is the Estates' allocable share of the fees and expenses incurred in regard to the October 9-10, 2012 mediation among TD Bank, the RRA Estate and the Banyon Estates, which were previously funded by TD Bank.

"***Person***" shall mean an individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and any spouses, heirs, predecessors, successors, representatives or assignees of any of the foregoing.

"***Petition Dates***" shall have the meaning set forth in Recital I.

"***Plan Proponents***" shall mean the RRA Trustee and the Committee.

"***Pro Rata***" shall mean proportionately so that the ratio of the amount of consideration distributed on account of a particular Allowed Claim to the amount of the Allowed Claim is the same as the ratio of the amount of consideration distributed on account of all Allowed Claims of the class in which the particular Allowed Claim is included to the amount of all Allowed Claims of that Class, but in any event the amount of consideration distributed on account of an Allowed Claim shall not exceed the Full Amount of such Claim.

"***Razorback Plaintiffs***" shall mean, collectively, Razorback Funding, LLC; D3 Capital Club, LLC; BFMC Investment, LLC; Linda Von Allmen, as Trustee of the Von Allmen Dynasty Trust; D&L Partners, LP; David Von Allmen, as Trustee of the David Von Allmen Living Trust; Ann Von Allmen, as Trustee of the Ann Von Allmen Living Trust; Dean Kretschmar; Cooper Management, LLC; Anthony Degennaro, as Trustee of the Extra Inning Dynasty Trust; Adele Mussry; Jack Mussry; Nassim Mussry; Melina El-Ani; Danielle El-Ani; H&N Associates; Aretz

9

Associates; Park National Capital Funding, LLC; Park National Mortgage Servicing; Scott Morgan; Viceroy Global Investments, Inc.; Concord Capital, Inc.; Edward Paley; Florence Paley; the Edward and Florence Paley Foundation; Steven Paley; Laura Paley; Jane Zaretsky, The Jane Zaretsky Dynasty Trust and Lawrence E. Dekelbaum.

"*Razorback Settlement Agreement*" shall mean the Settlement Agreement dated as of August 4, 2012 between the RRA Trustee and the Razorback Plaintiffs and approved by Final Order of the Bankruptcy Court dated October 10, 2012 [RRA ECF No. 3510].

"*Razorback Substantial Contribution Claim*" shall mean the substantial contribution Claim, to the extent filed by the applicable bar date and to the extent such Claim becomes an Allowed Claim, and in the maximum amount of $8 million, asserted by the Razorback Plaintiffs in the RRA Case.

"*Released Claims*" shall have the meaning set forth in Section 3.1.

"*Releasors*" shall have the meaning set forth in Section 3.1.

"*RRA*" shall mean Rothstein Rosenfeldt Adler, P.A.

"*RRA Banyon Senior Subordinated Claim*" shall have the meaning set forth in section 2.13(d) of this Agreement.

"*RRA Case*" shall have the meaning set forth in Recital D.

"*RRA Collateral Source Recoveries*" shall mean in regard to an Allowed Claim against the RRA Estate, the amount calculated in accordance with Section 2.16 of this Agreement and Section 6.13 of the RRA Plan and determined and applied in accordance with Sections 3.4(b), 3.7(b) and 3.8(b) of the RRA Plan.

"*RRA Complaint*" shall have the meaning set forth in Recital H.

"*RRA Levin Claims*" shall mean any and all rights, Claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, rights to payment, reckonings, bonds, bills, specialties, controversies, variances, trespasses, damages, judgments, third-party Claims, counterclaims and cross Claims (including, but not limited to avoidance or recovery actions available through the exercise of the powers granted by Sections 541 – 553 of the Bankruptcy Code or avoidance or recovery Claims recognized under any applicable state law) of the RRA Estate, against Gayla Susan Levin, George Levin or, the bankruptcy estate of George Levin, (including, but not limited to, proofs of Claim number 1-1 and 1-2 asserted against George Levin by the RRA Estate in George Levin's chapter 11 bankruptcy case, case number 10-33696-RBR, currently pending in the Bankruptcy Court) and/or any of their Affiliates (with Gayla Susan Levin and/or George Levin considered the "debtor" for the purposes of the definition of Affiliate) or subsidiaries; provided, that  the RRA Levin Claims do not include any of the foregoing Claims or rights against any Entity that is not Gayla Susan Levin, George Levin, the bankruptcy estate of George Levin and/or any of their Affiliates (with  Gayla Susan Levin and/or George Levin considered the "debtor" for the purposes of the definition of Affiliate) or subsidiaries (including, but not limited to, avoidance or recovery actions through the exercise of

powers granted by Sections 541-553 of the Bankruptcy Code or avoidance or recovery Claims recognized under any applicable state law where such Entity was either an immediate or subsequent transferee); provided further, that the RRA Levin Claims do not include any of the following Claims, rights or actions: (a) of the RRA Estate against the Banyon Estates, and (b) asserted by the Trustee on or before May 29, 2013 through the commencement of an action against any Entity that is an Affiliate or subsidiary of either of Gayla Sue Levin or George Levin (excluding Gayla Susan Levin, George Levin, and the bankruptcy estate of George Levin).
.

"*RRA Litigation Claims*" shall mean the Claims, causes of action, avoidance actions, damages, rights and interests, owned by the RRA Estate assertable against any Entity that is not a TD Bank Releasee; provided that the RRA Levin Claims are not RRA Litigation Claims.

"*RRA Petition Date*" shall have the meaning set forth in Recital D.

"*RRA Plan*" shall mean the plan of liquidation for the RRA Estate, including any exhibits, supplements, and appendices thereto, that, *inter alia*, authorizes and directs the RRA Trustee, the RRA Estate, the Liquidating Trust and the Liquidating Trustee to consummate the compromise and settlement set forth in this Agreement and authorizes and directs the RRA Trustee, the RRA Estate, the Liquidating Trust and the Liquidating Trustee to enter into the transactions contemplated herein, which shall be in the form annexed hereto as Exhibit "A" or in form and substance that is otherwise satisfactory to the Parties and the Committee; provided, however, that any modifications to the form of RRA Plan annexed hereto as Exhibit "A" must be in form and substance satisfactory to the Parties and the Committee.

"*RRA Releasors*" shall mean RRA, the RRA Estate, the RRA Trustee, and the Committee and each of their subsidiaries and affiliates and the successors and assigns of any of them and any other Entity that claims or might claim through, on behalf of or for the benefit of any of the foregoing.

"*TD Bank Banyon Junior Subordinated Claim*" shall have the meaning set forth in Section 2.8 hereof.

"*TD Bank Contribution*" shall mean Cash in the amount of SEVENTY TWO MILLION, THREE HUNDRED AND EIGHTY-TWO THOUSAND, EIGHT HUNDRED AND SEVENTEEN DOLLARS AND NINETY CENTS ($72,382,817.90), which is the difference between SEVENTY TWO MILLION, FOUR HUNDRED AND FIFTY THOUSAND DOLLARS ($72,450,000.00) and the October Mediation Expense ($67,182.10), to be delivered by TD Bank to the RRA Trustee by the third Business Day after the Confirmation Date, subject to and in accordance with Section 6.1.1 of the RRA Plan and the proviso contained in Section 6.2(p) of this Agreement.

"*TD Bank Controlled Claims*" shall have the meaning set forth in Recital P.

"*TD Bank Indemnitee*" shall mean (i) any current or former director, officer, or employee of TD Bank to whom TD Bank has an indemnification obligation (whether in its by-

11

laws, certificates of incorporation, board resolutions, or by agreement), and (ii) Emess Capital, L.L.C.

"**TD Bank Releasees**" shall mean TD Bank, The Toronto-Dominion Bank and each of its current and former affiliates, officers, directors, principals, shareholders, parents, subsidiaries, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, consultants, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives, the TD Bank Indemnitees and the assigns of each of the foregoing.

"**TD Bank RRA Junior Subordinated Claim**" shall have the meaning set forth in Section 2.4 hereof.

"**TD Bank Junior Subordinated Claims**" shall mean the TD Bank RRA Junior Subordinated Claim and the TD Bank Banyon Junior Subordinated Claim.

"**Third Party Claims**" shall have the meaning set forth in Recital O.

"**Trust Assets**" shall have the meaning set forth in the RRA Plan.

"**Unknown Claims**" shall have the meaning set forth in Section 3.2.

"**Verified Banyon Creditor Collateral Source Recovery Disclosure**" shall mean the form disclosure required under Section 2.13 hereof and Section 3.6(b) of the RRA Plan and substantially in the form attached hereto as Exhibit "B", which discloses (a) the holder of a Claim against one of the Banyon Estates' full legal name and complete street address and mailing address, (b) the identity and contact information of any party that is not a Banyon Estate against whom the holder of such Claim has made a demand that has given rise or may give rise to a Banyon Creditor Collateral Source Recovery, (c) the amount of all Banyon Creditor Collateral Source Recoveries actually received directly, indirectly, or for the benefit of the holder of such Claim prior to the date on which such Verified Banyon Creditor Collateral Source Recovery Disclosure is submitted to the Banyon Trustee, (d) the legal basis for all Banyon Creditor Collateral Source Recoveries received by the holder of such Claim, and (e) the existence, without quantification, of any future or anticipated Banyon Creditor Collateral Source Recovery.

"**Verified RRA Collateral Source Recovery Disclosure**" shall mean the form disclosure required under Section 2.16 hereof and Sections 3.3(b), 3.4(b), 3.7(b), and 3.8(b) of the RRA Plan and substantially in the form attached hereto as Exhibit "C", which discloses (a) the full legal name and complete street address and mailing address of the holder of a Class 2, Class 3 and Class 7, as applicable, Claim as classified under the RRA Plan, (b) the identity and contact information of any non-RRA party against whom the holder of such Claim has made a demand that has given rise to an RRA Collateral Source Recovery or may give rise to a RRA Collateral Source Recovery, (c) the amount of all RRA Collateral Source Recoveries actually received directly, indirectly or for the benefit of the holder of such Claim prior to the date on which such Verified RRA Collateral Source Recovery Disclosure is submitted to the Voting Agent, (d) the

12

legal basis for all RRA Collateral Source Recoveries received by the holder of such Claim, and (e) the existence, without quantification, of any future or anticipated Collateral Source Recovery.

"***Voting Agent***" shall mean Trustee Services, Inc., the entity authorized by the Bankruptcy Court to serve as the Claims, noticing, and balloting agent in the RRA Case.

"***Voting Deadline***" shall mean the deadline set forth in the Disclosure Statement Approval Order by which ballots on the RRA Plan must have actually been received by the Voting Agent.

Section 1.3     Other Terms.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "***include***", "***includes***", and "***including***" will be deemed to be followed by "***without limitation***".  Pronouns in masculine, feminine, or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "***this Agreement***", "***herein***", "***hereof***", "***hereby***", "***hereunder***", and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

Section 1.4     Interpretation.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

**ARTICLE II**
**SETTLEMENT TERMS**

Section 2.1     TD Bank Contribution.  Within three Business Days after the Confirmation Date, and subject to and in accordance with Section 6.1.1 of the RRA Plan and the proviso contained in Section 6.2(p) of this Agreement, TD Bank shall deliver the TD Bank Contribution to an account designated by the RRA Trustee.

Section 2.2     Intentionally Omitted.

Section 2.3     Allowance of TD Bank Claims in the RRA Estate.  On the Effective Date, on account of the TD Bank Controlled Claims pertaining to the RRA Estate and on account of the TD Bank Contribution, TD Bank shall have an allowed unsecured Claim against the RRA Estate in the aggregate principal amount of $132.45 million ($132,450,000.00) (the "***Allowed RRA TD Bank Claim***"), albeit subordinated pursuant to Section 2.4 of this Agreement; provided, that no Claims or recoveries assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013 shall be included in the Allowed RRA TD Bank Claim.

Section 2.4     Subordination of Allowed RRA TD Bank Claim Against the RRA Estate. On the Effective Date, the Allowed RRA TD Bank Claim shall be deemed subordinated in

accordance with the terms and provisions of Section 510 of the Bankruptcy Code and the RRA Plan to the payment of the Full Amount of all other Allowed Claims in the RRA Case, after the application of RRA Collateral Source Recoveries as applicable (the "***TD Bank RRA Junior Subordinated Claim***"); <u>provided</u> that the RRA Plan shall not permit the holders of Allowed Claims senior to the TD Bank RRA Junior Subordinated Claim to receive in excess of the Full Amount of their Claims, after the application of RRA Collateral Source Recoveries as applicable; <u>provided further</u> that the Liquidating Trustee shall not, and shall cause the Liquidating Trust to not, permit the payment or distribution of any property of the RRA Estate or the Liquidating Trust (or the proceeds thereof) on account of any Interest against RRA.

Section 2.5    <u>RRA Interim Distribution</u> The Liquidating Trustee shall make an interim distribution of not less than 72.5% of the allowed amount of a Beneficiary's Claim to each such Beneficiary entitled thereto within thirty (30) days after the Effective Date in accordance with Article 6 of the Liquidating Trust Agreement; <u>provided, however</u>, that any such interim distributions by the Liquidating Trustee shall be limited in amounts that, in the Liquidating Trustee's reasonable judgment, are designed to avoid the payment of excess distributions to such Beneficiary; <u>provided, further, however</u>, that the Liquidating Trustee may seek authority from the Bankruptcy Court, after notice and a hearing, to reduce the percentage of the interim distribution required by Section 8.7 of the RRA Plan and this Section 2.5 of this Agreement for good cause shown.  The Liquidating Trustee may rely on the amount of RRA Collateral Source Recoveries disclosed on a Verified RRA Collateral Source Recovery Disclosure as an RRA Collateral Source Recovery that will reduce a creditor's distribution for the purpose of making any reserve or distribution, including any interim distribution.

Section 2.6    <u>Intentionally Omitted.</u>

Section 2.7    <u>Allowance of TD Bank Claims in the Banyon Estates</u>.  On the Effective Date, on account of the TD Bank Controlled Claims pertaining to either of the Banyon Estates and on account of the TD Bank Contribution, TD Bank shall have an allowed unsecured Claim against each of the Banyon Estates in the aggregate principal amount of $97.45 Million ($97,450,000.00) "***Allowed Banyon TD Bank Claim***"), albeit subordinated pursuant to Section 2.8 of this Agreement; <u>provided, that</u> no Claims or recoveries assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013 shall be included in the Allowed Banyon TD Bank Claim.

Section 2.8    <u>Subordination of Allowed Banyon TD Bank Claim Against the Banyon Estates</u>.  On the Effective Date, the Allowed Banyon TD Bank Claim shall be deemed subordinated in accordance with the terms and provisions of Section 510 of the Bankruptcy Code to the payment of the Full Amount of (i) all allowed administrative expenses in each of the Banyon Cases, respectively, (ii) all allowed priority Claims in each of the Banyon Cases, respectively, (iii) all allowed non-subordinated general unsecured Claims in each of the Banyon Cases, after the application of Banyon Creditor Collateral Source Recoveries, as applicable, and (iv) the RRA Banyon Senior Subordinated Claim (the "***TD Bank Banyon Junior Subordinated Claim***"); <u>provided, that</u> the Banyon Trustee shall not permit the holders of Allowed Claims senior to the TD Bank Banyon Junior Subordinated Claim to receive in excess of the Full Amount of their Claims, after the application of Banyon Creditor Collateral Source Recoveries as applicable; <u>provided further</u> that the Banyon Trustee shall not permit the payment or

14

distribution of any property of the Banyon Estates (or the proceeds thereof) on account of any Interest against a Banyon Estate.

Section 2.9      [Intentionally Omitted].

Section 2.10      [Intentionally Omitted].

Section 2.11      Claims Transferred to TD Bank.  Any Claim against any of the Estates, which is assigned, participated or transferred or has had its recovery assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013 shall not be subject to objection, reconsideration, reduction, recharacterization, subordination, impairment, disallowance, offset or reduction in distribution, including an interim distribution, on account of an RRA Collateral Source Recovery or a Banyon Creditor Collateral Source Recovery, as applicable, or otherwise, due to the payments made by TD Bank or because TD Bank has been assigned, participated or transferred, in whole or in part, such Claim or recovery; provided, however, that such Claim shall be subject to objection, reconsideration, reduction, recharacterization, subordination, impairment or disallowance for any other reason, subject to the other provisions of this Agreement and the RRA Plan.

Section 2.12      Banyon Estates Anti-layering Agreement.  The TD Bank Banyon Junior Subordinated Claim shall be junior to all Claims in each Banyon Estate to the extent specified in Section 2.8(i)-(iv) of this Agreement.  The TD Bank Banyon Junior Subordinated Claim shall be senior to all Claims not specified in Section 2.8(i)-(iv) of this Agreement.  The Banyon Trustee shall not, and shall cause the Banyon Estates to not, permit any Claim to be treated on a pari passu basis with the TD Bank Banyon Junior Subordinated Claims in either of the Banyon Estates absent the prior written consent of TD Bank.

Section 2.13      Treatment of the Banyon Unsecured Claim.  In accordance with and subject to Section 3.6(b) of the RRA Plan and this Section, the Banyon Unsecured Claim against the RRA Estate shall be treated in the following manner:

(a)      Allowance of the Banyon Unsecured Claim.  In accordance with and subject to Section 3.6(b) of the RRA Plan, upon the occurrence of the Effective Date, the Banyon Unsecured Claim shall be Allowed in the amount of $39.7 million ($39,700,000.00) against the RRA Estate.

(b)      Establishment of the Banyon Unsecured Creditor Fund.  In accordance with and subject to Section 3.6(b) of the RRA Plan, upon the transfer of the Trust Assets from the RRA Estate to the Liquidating Trustee, the Liquidating Trustee shall establish the Banyon Unsecured Creditor Fund from the TD Bank Contribution and earmark the Banyon Unsecured Creditor Fund for payment of the Banyon Unsecured Claim.  The Banyon Estates shall recover on account of the Banyon Unsecured Claim solely from the Banyon Unsecured Creditor Fund.

(c)      Banyon Distribution.  Within five (5) Business Days after the Effective Date, the Liquidating Trustee shall Distribute the Banyon Unsecured Creditor Fund to the Banyon Trustee for the benefit of the Banyon Estates (the "**Banyon Distribution**") in full

satisfaction, release and discharge of all Claims of the Banyon Estates, directly or indirectly, against the Debtor or the Estate, including, without limitation, the Banyon Unsecured Claim.  The amount of the Banyon Distribution shall be allocated between the Banyon Estates in accordance with the direction of the Banyon Trustee or Final Order of the Bankruptcy Court in the Banyon Cases.

(d)    Allowance of RRA Banyon Senior Subordinated Claim Upon the payment of the Banyon Distribution, the RRA Estate shall have an allowed senior subordinated Claim against each of the Banyon Estates in the amount of $39.7 million ($39,700,000.00) (the "**RRA Banyon Senior Subordinated Claim**"). The RRA Banyon Senior Subordinated Claim shall be subordinated in right to payment to the Full Amount of (i) all allowed administrative expenses in each of the Banyon Cases, respectively, (ii) all allowed priority Claims in each of the Banyon Cases, respectively, and (iii) all allowed non-subordinated general unsecured Claims in each of the Banyon Cases, after the application of Banyon Creditor Collateral Source Recoveries, as applicable; provided, that the Banyon Trustee shall not permit the holders of Allowed Claims senior to the RRA Banyon Senior Subordinated Claim to receive in excess of the Full Amount of their Claims, after the application of Banyon Creditor Collateral Source Recoveries as applicable.  The RRA Banyon Senior Subordinated Claim shall be senior in right of payment to the TD Bank Banyon Junior Subordinated Claim.

(e)    Banyon Creditor Collateral Source Recovery Distribution Reductions.

(1)  (A) Within (5) five Business Days after the Effective Date, the Banyon Trustee shall send to all holders of Claims asserted or assertable against the Banyon Estates a Verified Banyon Creditor Collateral Source Recovery Disclosure with instructions to return such Verified Banyon Creditor Collateral Source Recovery Disclosure to the Banyon Trustee so that (i) it is actually received by the Banyon Trustee on or before the date that is 25 days after the Effective Date and (ii) contains the information required in part (B) hereof.

(B) **Each holder of a Claim asserted or assertable against the Banyon Estates must deliver to the Banyon Trustee a Verified Banyon Creditor Collateral Source Recovery Disclosure by a date that is no later than 25 days after the Effective Date.**  If the holder of a Claim asserted or assertable against the Banyon Estates (i) fails or refuses to timely deliver to the Banyon Trustee a completed and duly executed Verified Banyon Creditor Collateral Source Recovery Disclosure, or (ii) after notice and a hearing, is determined to have knowingly provided false information in a Verified Banyon Creditor Collateral Source Recovery Disclosure, then (a) such holder shall be deemed to irrevocably waive its rights to receive, and shall be forever barred from receiving, a distribution from the Banyon Estates, and (b) such holder's Claim asserted or assertable against the Banyon Estates shall be deemed disallowed without further order of the Bankruptcy Court.  All Entities submitting a Verified Banyon Creditor Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such Verified Banyon

16

Creditor Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has materially changed, including, but not limited to, when such Entity actually receives a previously anticipated Banyon Creditor Collateral Source Recovery. Such obligation to correct and/or update shall terminate on the date on which the Liquidating Trustee makes the final distribution from the Liquidating Trust.

(2)    The Banyon Trustee shall provide the Liquidating Trustee and the Liquidating Trust Oversight Committee copies of each Verified Banyon Creditor Collateral Source Recovery Disclosure submitted to him within five Business Days after the last date on which such Verified Banyon Creditor Collateral Source Recovery Disclosure is required to be submitted to the Banyon Trustee.

(3)    The amount of the distributions, including interim distributions, to be made by the Banyon Estates on account of each Claim asserted or assertable against each Banyon Estate shall, be reduced, on a dollar for dollar basis, by the amount of all Banyon Creditor Collateral Source Recoveries received on account of each such Claim.    The amount of the reduction of the distributions, including interim distributions, on account of each such allowed Claim's Banyon Creditor Collateral Source Recovery shall be calculated in accordance with Section 2.13(5)(e) of this Agreement and established in the following manner: on or before the date that is 45 days after the Effective Date (without prejudice to the Banyon Trustee's right to request an extension of this deadline for cause from the Bankruptcy Court), the Banyon Trustee shall, after consultation with the Liquidating Trustee and the Liquidating Trust Oversight Committee, file and serve upon all affected parties, a motion to make an interim distribution in each of the Banyon Cases which (I) provides a schedule of the aggregate Banyon Creditor Collateral Source Recoveries received by each holder of a Claim asserted or assertable against each applicable Banyon Estate, (II) explicitly identifies the amount by which all distributions, including interim distributions, by the Banyon Trustee on account of each such holder's Claim will be reduced on account of all of such holder's Banyon Creditor Collateral Source Recoveries applicable to each such Claim for all purposes, and (III) seeks authority to make an interim distribution to the creditors in each of the Banyon Estates in accordance with Section 2.13(h) of this Agreement. Such motion to make an interim distribution shall also provide that: (i) the Liquidating Trustee, the Liquidating Trust Oversight Committee and the holder of a Claim against the Banyon Estates whose distribution, including an interim distribution, is sought to be reduced shall have 15 days from the filing of such motion to object to the relief sought in such motion; (ii) all objections to such motion must be filed with the Bankruptcy Court and served upon the Banyon Trustee, the Liquidating Trustee, and the Liquidating Trust Oversight Committee; (iii) if no timely objection to such motion is filed and served, the Banyon Trustee shall use the amount of the applicable Banyon Creditor Collateral Source Recovery indicated in such motion to calculate the reduction to the distributions, including an interim distribution, to each such holder of

17

each such Claim asserted or assertable against each of the Banyon Estates for all purposes; and (iv) if a timely objection to such motion is filed and served, such objection and the amount of the applicable Banyon Creditor Collateral Source Recovery shall be resolved by the Bankruptcy Court in accordance with the provisions of this Section 2.13 and Section 3.6(b) of the RRA Plan after notice and opportunity for a hearing.

     (4)   The holder of a Claim asserted or assertable against the Banyon Estates, once allowed, shall not receive a distribution on account of such a Claim asserted or assertable against the Banyon Estates until the amount of such holder's Banyon Creditor Collateral Source Recoveries are less than or equal to the amount such holder would have received in distributions on account of its Claim asserted against the Banyon Estates if such holder did not have any Banyon Creditor Collateral Source Recoveries.

     (5)  Except to the extent that a settlement agreement approved by Final Order of the Bankruptcy Court between the holder of an allowed Claim against either of the Banyon Estates and such Banyon Estate in either of the Banyon Case provides for differing treatment of Banyon Creditor Collateral Source Recoveries, the amount of a Banyon Creditor Collateral Source Recovery shall be calculated for each applicable allowed Claim against a Banyon Estate as:

I.     The gross amount of Cash and non-Cash assets received by, available to, received for the benefit of or applied to the indebtedness of the holder of an Allowed Claim against the Banyon Estates (whether made directly or indirectly to such holder or any agent, attorney or third party associated with such holder), on account of or in any way related to such holder's loss directly or indirectly relating to Banyon 1030-32, LLC, Banyon Income Fund, LP, or Rothstein from all parties and sources, including, without limitation, any payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action.

II.    The amount calculated pursuant to Section 2.13(e)(5)(I) of this Agreement shall exclude, without duplication:

    (i)     any distributions to be made to the holder of such Claim by either of the Banyon Estates;

    (ii)    any tax benefit from a theft loss deduction taken in accordance with the IRC, or other tax benefits received by a holder of such Claim, in either case as a result of losses in connection with Banyon Estates or the Ponzi scheme orchestrated or operated by Rothstein;

    (iii)   any amounts paid by TD Bank that result in any Claims or recoveries being assigned, participated or transferred, in whole or

in part, to TD Bank on or after May 8, 2013, unless TD Bank consents to these amounts being included in the calculation of a Banyon Creditor Collateral Source Recovery; and

(iv)    any anticipated, but not yet received, Banyon Creditor Collateral Source Recovery.

III.    The amount calculated pursuant to Section 2.13(e)(5)(I) and (II) of this Agreement shall include interest only if and to the extent that such interest would be recoverable or allowable as an Allowed Claim against either Banyon Estate or as part of the Allowed Claim of such holder against either Banyon Estate.

IV.    No deduction or reduction from the amount of a Banyon Creditor Collateral Source Recovery on account of the fees, costs and other expenses incurred or paid in connection with its pursuit of any Banyon Creditor Collateral Source Recoveries, including, without limitation, attorney's fees and costs, is permissible.

(6)    In connection with the calculation of Banyon Creditor Collateral Source Recoveries, to the extent that the holder of a Claim against the Banyon Estates assigned or assigns any Banyon Creditor Collateral Source Recoveries to another holder of a Claim against the Banyon Estates, the assignor may notify the Banyon Trustee of such assignment.  Subject to the Bankruptcy Court's approval, the Banyon Trustee may, in his discretion, seek to reduce the assignee's distribution, including an interim distribution, from the Banyon Estates by the amount of the Banyon Creditor Collateral Source Recovery assigned to such assignee and not reduce the assignor's distribution, including an interim distribution, from the Banyon Estates.

(7)    Without the need of a further order of the Bankruptcy Court and except to the extent that a settlement agreement approved in either of the Banyon Cases by Final Order of the Bankruptcy Court between either of the Banyon Estates and the holder of an Allowed Claim against such Banyon Estate provides for differing treatment of Banyon Creditor Collateral Source Recoveries, the holder of an Allowed Claim against a Banyon Estate shall be required to remit to the Banyon Trustee  an amount of Cash equal to the value of all Banyon Creditor Collateral Source Recoveries it receives that were not disclosed as having been received on such holder's Verified Banyon Creditor Collateral Source Recovery Disclosure or did not then exist, including, without limitation, any applicable payments made to the holder of such Claim by TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action; provided, however that in no event shall the holder of an Allowed Claim against either Banyon Estate be required to remit Cash to the Banyon Trustee in an amount that is greater than the sum of such holder's distribution on account of such Allowed Claim from the

19

applicable Banyon Estate.  The holder of an Allowed Claim against either Banyon Estate that has received or will receive a distribution from the Banyon Trustee shall fully cooperate with the Banyon Trustee and execute any documents reasonably required by the Banyon Trustee to evidence the obligation.

(f)    <u>Banyon Claim Objections</u>.  All objections to Claims in the Banyon Estates shall be filed within 60 days after the Effective Date.

(g)    <u>Banyon Status Reports</u>.  The Banyon Trustee shall provide the Liquidating Trustee and the Liquidating Trust Oversight Committee, periodic reports on (i) the status of the objections to and reconciliation of the Claims asserted in the Banyon Cases, (ii) the status of the objections, if any, asserted to the Banyon Creditor Collateral Source Recoveries asserted in the motion required to be filed in accordance with Section 2.13(e)(3) of this Agreement, and (iii) the estimated administrative expenses that are projected to arise in the subsequent quarter and be allowed in the Banyon Cases, each quarter commencing on the last Business Day of the month in which the 90th day after the Effective Date occurs and concluding on the date in which the Banyon Cases are closed.

(h)    <u>Banyon Estate Interim Distribution.</u>  The Banyon Trustee shall, in the motion to make an interim distribution required by Section 2.13(e)(3) of this Agreement, seek the authority to make an interim distribution of not less than 60% of the allowed amount of each creditor's Claim against a Banyon Estate from such Banyon Estate, and shall use his best efforts to distribute an additional 10% of the allowed amount of each creditor's Claim against a Banyon Estate from such Banyon Estate, subject to Bankruptcy Court approval, within five (5) Business Days after the approval of such motion. <u>provided, however</u>, that any such interim distributions by the Banyon Trustee shall be limited in amounts that, in the Banyon Trustee's reasonable judgment, are designed to avoid the payment of excess distributions to the creditors of the Banyon Estates; <u>provided, further, however</u>, that the Banyon Trustee may seek authority from the Bankruptcy Court, after notice and a hearing, to reduce the percentage of the interim distribution required by this Section 2.13(h) for good cause shown.  The Banyon Trustee may rely on the amount of Banyon Creditor Collateral Source Recoveries disclosed on a Verified Banyon Creditor Collateral Source Recovery Disclosure as a Banyon Creditor Collateral Source Recovery that would reduce a creditor's distribution for the purpose of making any reserve or distribution, including any interim distribution.

(i)    <u>Banyon Unsecured Claim Allocation</u>.  If the Banyon Estates are not substantively consolidated, the Banyon Trustee shall allocate any distribution received on account of the Banyon Unsecured Claim in a manner that shall result in the holders of allowed non-subordinated general unsecured Claims against each of the Banyon Estates receiving the same Pro Rata distribution on account of their allowed Claims after applying the Banyon Creditor Collateral Source Recoveries identified in this Section 2.13 of this Agreement, if any.

(j)    Banyon Distribution Reporting Obligation.  The Banyon Trustee shall file a notice that sets forth each distribution made to a creditor of either of the Banyon Estates (indicating the identity of such creditor, the applicable Banyon Estate against which the creditor has asserted a Claim, the applicable Claim number and the amount of the distributions made to such creditor) within 30 days after the making of any such distribution to unsecured creditors in either of the Banyon Cases.

Section 2.14    Inter-Estate Claims.  Upon the Effective Date, other than the Banyon Unsecured Claim, the RRA Banyon Senior Subordinated Claim, and as otherwise provided in this Agreement, all inter-estate Claims (including, without limitation, administrative expenses, general unsecured Claims, and Claims on behalf of any trustee or his professionals) between the RRA Estate and either of the Banyon Estates shall be waived and released in their entirety and, except as otherwise provided for in this Section, any and all proofs of Claim asserted against an Estate by another Estate shall be expunged.

Section 2.15    Substantial Contribution Claims.  Other than the Razorback Substantial Contribution Claim, the Trustees and the Liquidating Trustee, as applicable, shall not and shall not permit the Estates and the Liquidating Trust to support, and shall cause the Estates and Liquidating Trust to object to (i) any Claims under Sections 503(b)(3)(A) through (E) and 503(b)(4) of the Bankruptcy Code and (ii) any other non-ordinary course administrative expenses asserted against their respective Estates or the Liquidating Trust, as applicable, including any Claim for a fee enhancement, unless TD Bank consents in writing to such Claims; provided, that the Trustees and the Liquidating Trustee may support and shall not be required to object to the fees and expenses sought by the RRA Trustee, the Liquidating Trustee, the Banyon Trustee or their professionals in their applicable cases whose employment was authorized by Final Order of the Bankruptcy Court in such Case or the RRA Plan.

Section 2.16    (A) RRA Collateral Source Recovery Verification.  The Disclosure Statement Approval Order shall provide that as a condition precedent to the receipt of a distribution from the RRA Estate or the Liquidating Trust, each holder of a Class 2, Class 3 or Class 7 Claim against the RRA Estate must deliver to the Voting Agent by the Voting Deadline a Verified RRA Collateral Source Recovery Disclosure.  On or by the Effective Date, the RRA Trustee or the Liquidating Trustee, as applicable, shall provide the Liquidating Trust Oversight Committee with copies of all Verified RRA Collateral Source Recovery Disclosures that are received by the RRA Trustee.

(B)  Disallowance of Claims.  If the holder of a Claim classified in Class 2, Class 3, or Class 7 under the RRA Plan (i) fails or refuses to timely deliver to the Voting Agent a completed and duly executed Verified RRA Collateral Source Recovery Disclosure on or before the Voting Deadline, or (ii) after notice and hearing is determined to have knowingly provided false information in a Verified RRA Collateral Source Recovery Disclosure, then (a) such holder shall be deemed to irrevocably waive its right to receive, and shall be forever barred from receiving, a distribution from the Liquidating Trust on account of such Claim, (b) such Claim shall be deemed disallowed without further order of the Bankruptcy Court, and (c) the Ballot on account of such Claim shall not be counted for purposes of determining whether the applicable Class of Claims has accepted or rejected the RRA Plan. All Entities submitting a Verified RRA Collateral Source Recovery Disclosure shall have an obligation to correct and/or update such

Verified RRA Collateral Source Recovery Disclosure as and when such Entity has knowledge that such disclosure was incorrect or has changed, including, but not limited to, when such Entity actually receives a previously anticipated Verified RRA Collateral Source Recovery. Such obligation to correct and/or update shall terminate on the date that the Liquidating Trust makes its final distribution.

(C)   Prior Settlement Agreements.   Nothing in this Agreement is intended to modify or supersede, and nothing herein shall modify or supersede, any settlement agreements that have been approved in the RRA Case by Final Order of the Bankruptcy Court on or before May 8, 2013, including, without limitation the Coquina Settlement Agreement, Funds' Settlement Agreement, the Gibraltar Settlement Agreement, the Levy Settlement Agreement, and the Razorback Settlement Agreement.   The Liquidating Trustee shall reduce distributions, including interim distributions, pursuant to RRA Collateral Source Recoveries as stated in the RRA Plan, to the extent not inconsistent with any relevant provisions of such settlement agreements.  For the avoidance of any doubt, RRA Collateral Source Recoveries received by the holders of Allowed Claims against the RRA Estate shall be calculated and applied in accordance with the applicable terms of any settlement agreement with the RRA Estate that has been approved in the RRA Case by Final Order on or before May 8, 2013 and is applicable to such Allowed Claim, and such holders shall receive distributions on account of such Allowed Claims as, and to the extent, provided in such settlement agreements and the RRA Plan, to the extent not inconsistent with such settlement agreements.

(D)   RRA Collateral Source Recovery Distribution Reductions.  The amount of the distributions, including interim distributions, to be made on account of each Allowed Class 3 or Class 7 Claim in the RRA Plan shall be reduced, on a dollar for dollar basis, by the amount of all RRA Collateral Source Recoveries received from any source.  The amount of the reduction of the distributions, including interim distributions, on account of each Allowed Class 3 or Class 7 Claim's RRA Collateral Source Recovery shall be established in the following manner: on or before the date that is 60 days after the Effective Date (without prejudice to the Liquidating Trustee's right to request an extension of this deadline for cause from the Bankruptcy Court), the Liquidating Trustee shall, after consultation with the Liquidating Trust Oversight Committee, file and serve a notice on all affected parties which (A) provides a schedule of the aggregate RRA Collateral Source Recoveries received from all sources by each holder of a Claim in Class 3 and Class 7, and (B) explicitly identifies the amount by which distributions, including interim distributions, on account of each such holder's Class 3 or Class 7 Claim, as applicable, will be reduced on account of all of such holder's RRA Collateral Source Recoveries. Such notice shall also provide that: (a) the Liquidating Trust Oversight Committee and the holder of a Class 3 or Class 7 Claim whose distribution, including an interim distribution,  is sought to be reduced shall have 30 days from the filing of such notice to object to the relief sought in such notice; (b) all objections to such notice shall be filed with the Bankruptcy Court and served upon the Liquidating Trustee and the Liquidating Trust Oversight Committee; (c) if no timely objection to such notice is filed and served, the Liquidating Trustee shall use the amount of the applicable RRA Collateral Source Recovery indicated on such notice to calculate the reductions to distributions, including interim distributions, to each such holder of a Class 3 or Class 7 Claim, as applicable; and (d) if a timely objection to such notice is filed and served, such objection and the amount of the applicable RRA Collateral Source Recovery shall be resolved by the

22

Bankruptcy Court in accordance with the provisions of this Section 2.16 and the RRA Plan after notice and opportunity for a hearing.

Section 2.17    Claims Objections in Banyon Cases. Subject to the terms of Section 2.13(f) of this Agreement, the RRA Trustee and the Liquidating Trustee, as applicable, and the Banyon Trustee shall have exclusive standing to object to any and all Claims in the Banyon Estates.

Section 2.18    Banyon Estates' Support of the RRA Plan. The Banyon Trustee shall, and shall cause the Banyon Estates to, support, not object to, and vote in favor of the RRA Plan.

Section 2.19    Agreement on Certain Trustees' Commissions. With respect to the moneys disbursed by the Liquidating Trust to the Banyon Estates on account of the Banyon Unsecured Claim and the corresponding Banyon Unsecured Claim moneys disbursed by the Banyon Trustee to creditors of the Banyon Estates, the RRA Trustee and the Banyon Trustee agree (a) to seek in their respective Bankruptcy Cases an allocable share of compensation attributable to a unitary disbursement of the Banyon Unsecured Claim (and not based upon disbursements of such amounts from both the Liquidating Trust and the Banyon Estates), and (b) to allocate such compensation, 30% to the RRA Trustee (or the Liquidating Trustee, as applicable) and 70% to the Banyon Trustee.

Section 2.20    Selection of Liquidating Trustee. Michael I. Goldberg was selected by the Committee, after consultation with the United States Trustee, to be the Liquidating Trustee. The appointment of the Liquidating Trustee shall be ratified by the Confirmation Order and effective as of the Effective Date.

Section 2.21    Liquidating Trust Consent and Review Rights. Subject at all times to the consent and review rights of the Liquidating Trust Oversight Committee set forth in the RRA Plan and/or the Liquidating Trust Agreement, the Liquidating Trustee shall (A) oversee and direct the Liquidating Trust's operations and activities, in accordance with the Liquidating Trust Agreement, including, but not limited to, the retention of post-confirmation professionals, objecting to Claims, reconciling Claims, resolving Claims, otherwise disposing of Claims, prosecution of RRA Litigation Claims, and the settling of RRA Litigation Claims, and (B) have the authority as set forth in Section 5.12 of the Liquidating Trust Agreement to initiate, prosecute, settle, resolve, dismiss, object to, reconcile or otherwise dispose of any Claim or RRA Litigation Claim, all without the need of Bankruptcy Court approval absent the explicit requirement of such approval set forth in the RRA Plan, this Agreement or the Liquidating Trust Agreement; provided, however, that for the avoidance of any doubt, (i) the Liquidating Trustee shall be bound by all prior settlement agreements that have been approved in the RRA Case by Final Order of the Bankruptcy Court as of May 8, 2013, subject to the RRA Collateral Source Recovery provisions set forth in Section 2.16 of this Agreement and Sections 1.19, 1.36, 1.137 and 1.138, as well as Article 3, of the RRA Plan, except to the extent such RRA Collateral Source Recovery provisions are inconsistent with such prior settlement agreements, and (ii) TD Bank shall not have any right (a) to contest any prior settlements agreements that have been approved by a Final Order of the Bankruptcy Court in the RRA Case as of the Effective Date, or (b) to object to any Claims in the RRA Case.

23

Section 2.22    Hiring of Professionals by the Liquidating Trust.  Subsequent to the Effective Date, the Liquidating Trust Oversight Committee shall have review and consent rights regarding the hiring and retention terms of professionals by the Liquidating Trust; provided that, the hiring of certain professionals by the Liquidating Trust remains subject to the applicable provisions of the Gibraltar Settlement Agreement.

Section 2.23    Intentionally Omitted.

Section 2.24    RRA Banyon Senior Subordinated Claims.  The RRA Banyon Senior Subordinated Claims shall not be subject to further objection, reconsideration, reduction, recharacterization, further subordination, impairment, disallowance or reduction in distribution on account of a Banyon Creditor Collateral Resource Recovery, or otherwise in any manner.

Section 2.25    Emess Litigation Dismissal.  Within three (3) Business Days after the Effective Date, the Liquidating Trustee shall dismiss the Emess Litigation with prejudice.

Section 2.26    Obligations Regarding Appeals.  The Trustees, the Committee and the Liquidating Trustee, as applicable, shall (i) prosecute the RRA Plan and the 9019 Motion until the Confirmation Order and the 9019 Order are Final Orders and (ii) oppose and fully prosecute any appeal of the Confirmation Order or the 9019 Order that seeks relief that is adverse to any of the Parties or the Liquidating Trust.  The Trustees, the Committee and the Liquidating Trustee, as applicable, shall use their respective best efforts to have any such appeal (i) dismissed, (ii) resolved in manner that is in form and in substance acceptable to the Parties, or (iii) fully prosecuted so that the relief requested in such appeal is denied Notwithstanding anything herein to the contrary, the Trustees, the Committee and the Liquidating Trustee, as applicable, shall not oppose an appeal of the Confirmation Order or the 9019 Order filed by the Trustees or TD Bank, so long as the relief sought by such appeal is in accordance with the terms of the RRA Plan and this Agreement.

Section 2.27    TD Bank Standing Regarding Appeals.  TD Bank shall have standing to prosecute or defend any appeal of the Confirmation Order or the 9019 Order.

Section 2.28    TD Bank Junior Subordinated Claims.  The TD Bank Junior Subordinated Claims shall not be subject to further objection, reconsideration, reduction, recharacterization, further subordination, impairment, disallowance or reduction in distribution on account of an RRA Collateral Source Recovery or a Banyon Creditor Collateral Resource Recovery, or otherwise in any manner.

Section 2.29    Selection of Liquidating Trust Oversight Committee.  The Committee shall designate the members of the Liquidating Trust Oversight Committee.  The members of the Liquidating Trust Oversight Committee shall be identified no later than ten (10) Business Days subsequent to entry of the Disclosure Statement Approval Order.  The appointment of the Liquidating Trust Oversight Committee shall be ratified by the Confirmation Order and effective as of the Effective Date.  Any successor members of the Liquidating Trust Oversight Committee shall be appointed in accordance with the RRA Plan.

Section 2.30    <u>TD Bank Litigation Dismissal</u>.  Within three (3) Business Days after the Effective Date, the Liquidating Trustee shall, on behalf of the RRA Trustee, RRA and the RRA Estate, dismiss with prejudice the RRA Complaint in the adversary proceeding brought by the RRA Trustee against TD Bank that is pending in the Bankruptcy Court as adversary proceeding number 11-02368-RBR.

Section 2.31    <u>Temporary Stay</u>.  The RRA Trustee and/or the Banyon Trustee shall, upon the reasonable request of TD Bank, file pleadings in support of and cooperate in obtaining a stay of litigation and discovery against or from any TD Bank Releasee in any litigation brought against such TD Bank Releasee in connection with, pertaining to, arising out of or related to the Cases, Rothstein or the Ponzi scheme orchestrated or operated by Rothstein, while approval of this Agreement and the RRA Plan is sought.

Section 2.32    <u>Approval of Terms of this Agreement</u>.  The Confirmation Order and the 9019 Order shall contain provisions which authorize and direct the implementation of all of the terms and provisions of this Agreement.

Section 2.33    <u>Assignment of Banyon Levin Claims</u>. Upon the occurrence of the Effective Date, without execution of any further documentation, each of the Banyon Estates hereby irrevocably assigns, transfers, and conveys the Banyon Levin Claims and/or any proceeds thereof to TD Bank free and clear of all liens, Claims and encumbrances.  Upon the occurrence of the Effective Date, the Banyon Levin Claims shall unconditionally and irrevocably vest with TD Bank and TD Bank shall have the exclusive right and standing to enforce any and all of the Banyon Levin Claims, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, and shall be entitled to all remedies available to the Banyon Trustee in the Banyon Cases, for the sole benefit of TD Bank.

Section 2.34    <u>Assignment of RRA Levin Claims</u>.  Upon the occurrence of the Effective Date, without execution of any further documentation, the RRA Estate hereby irrevocably assigns, transfers, and conveys the RRA Levin Claims and/or any proceeds thereof to TD Bank free and clear of all liens, Claims and encumbrances.  Upon the occurrence of the Effective Date, the RRA Levin Claims shall unconditionally and irrevocably vest with TD Bank and TD Bank shall have the exclusive right and standing to enforce any and all of the RRA Levin Claims, including, but not limited to, the rights and powers of a trustee and debtor-in-possession, and shall be entitled to all remedies available to the RRA Trustee in the RRA Case, for the sole benefit of TD Bank.

Section 2.35    <u>Levin Claims Cooperation</u>.  The Trustees and the Liquidating Trustee hereby agree that upon the reasonable request of TD Bank, the Trustees shall provide or make available any and all data, records and documents regarding the Levin Claims in their actual possession, to TD Bank, subject to entry into mutually acceptable written agreements in order to preserve any applicable attorney client privileges and protections afforded by the work product protection doctrine.

Section 2.36    <u>Hearings on 9019 Motion and Confirmation Hearing</u>.  The Parties and the Committee intend that the hearing on the approval of the 9019 Motion and the Confirmation Hearing shall be held substantially contemporaneously.

25

Section 2.37    Stay.  The Trustees shall stay any and all litigation and/or discovery brought by any of the Estates against any TD Bank Releasee while approval of this Agreement and the RRA Plan is sought.

## ARTICLE III
## RELEASES AND BAR ORDERS

Section 3.1    Release of TD Bank Releasees.  Upon the occurrence of the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in the RRA Plan or this Agreement, the RRA Releasors and the Banyon Releasors (collectively, the "*Releasors*") shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged the TD Bank Releasees from any and all Claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies and demands, of any and every kind, character or nature whatsoever (including Unknown Claims), whether liquidated or unliquidated, asserted or unasserted, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, at equity or otherwise, which the Releasors, or any of them, or anyone claiming through them, on their behalf or for their benefit may have or claim to have, now or in the future, against any TD Bank Releasee that are based upon, relate to, or arise out of, in connection with or pertain to (a)(i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors; (b) any act, fact, transaction, event, occurrence, statement or omission in connection with (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors; or (c) anything alleged in any complaint asserted by a Releasor against a TD Bank Releasee, including, but not limited to, those alleged in the RRA Complaint, or that could have been alleged in any such complaint, or other similar proceedings, including, without limitation, the Banyon Asserted Claims and Unknown Claims (collectively, the "***Released Claims***"); provided, however, the release in favor of the TD Bank Releasees described herein shall not (A) effect a release of any Claim by the United States Government or any of its agencies or any state and local governmental authority whatsoever against the TD Bank Releasees, or (B) enjoin the United States Government or any of its agencies or any state and local governmental authority whatsoever from bringing any Claim, suit, action or other proceedings against the TD Bank Releasees asserting any other liability, including without limitation any Claim, suit or action arising under the IRC, securities laws, environmental laws or any criminal laws of the United States or any state or local jurisdiction.  Notwithstanding anything contained in this Section 3.1 or elsewhere in this Agreement, or in the RRA Plan to the contrary, the foregoing is not intended to release, nor shall it have the effect of releasing, (x) TD Bank from the performance of its obligations in accordance with the RRA Plan or the Settlement Agreement, including, without limitation, any Claim, demand or cause of action relating to the payment of the TD Bank Contribution; or (y) any Released Claim held by TD Bank or its affiliates, including, but not limited to, the release of any Claim that would otherwise be a Released Claim by TD Bank or its affiliates against another TD Bank Releasee.

26

Section 3.2     Unknown Claims.   An "*Unknown Claim*" is any Released Claim that any Releasor does not know or suspect to exist in his, her or its favor at the time of giving the release required by Section 3.1 of this Agreement and Section 10.6 of the RRA Plan that if known by him, her or it, might have affected his, her or its settlement and release.  With respect to any and all Released Claims, each Releasor shall expressly waive or be deemed to have waived, and by operation of the 9019 Order and the Confirmation Order shall have waived the provisions, rights and benefits of California Civil Code § 1542 (to the extent it applies herein), which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Each Releasor expressly waives, and shall be deemed to have waived, and by operation of the 9019 Order and the Confirmation Order shall have waived, any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, that is similar, comparable or equivalent in effect to California Civil Code § 1542.  The Releasors may hereafter discover facts in addition to or different from those that any of them now knows or believes to be true with respect to the subject matter of the Released Claims, but each Releasor shall expressly have and shall be deemed to have, and by operation of the 9019 Order and the Confirmation Order shall have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or noncontingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery of existence of such different or additional facts.  Each Releasor acknowledges and shall be deemed to have acknowledged, and by operation of the 9019 Order and the Confirmation Order shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

Section 3.3     TD Bank Releasee Injunction and Bar Order.  (A) The effectiveness of the compromise and settlement set forth in this Agreement is conditioned upon, among other things, the Bankruptcy Court entering the 9019 Order and Confirmation Order which, upon the occurrence of the Effective Date, shall act as an injunction against each and every Entity, including, without limitation, the plaintiffs in regard to the lawsuits enumerated on Exhibit "D" hereof, and each and every Entity is hereby permanently enjoined, barred and restrained from instituting, prosecuting, continuing, pursuing or litigating in any manner:

1.  any Released Claim; and

2.  any action, suit or proceeding against any TD Bank Releasee (except as against Emess Capital, L.L.C.), including, without limitation (in each case, whether pre-judgment or post-judgment) enforcing, levying, employing legal process, attaching, garnishing, sequestering, bringing proceedings supplementary to execution, collecting or otherwise recovering by any means or in any manner from any TD

27

Bank Releasee based upon any liability or responsibility, or asserted or potential liability or responsibility, directly or indirectly, of any TD Bank Releasee to or for the benefit of any Entity arising from, in any way related to, based upon, arising in connection with or pertaining to:

(a)(i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors;

(b) the Released Claims; or

(c) any other Claims, acts, facts, transactions, events, occurrences, statements or omissions that are, could have been or may be alleged against the TD Bank Releasees, including, without limitation, those asserted in the RRA Complaint, the Banyon Asserted Claims and the Third Party Claims or in any other complaint, action, suit or proceeding brought or that might be brought by, through, on behalf of, or for the benefit of any Entity (whether arising under federal, state or foreign law and regardless of where asserted), including, without limitation, any Unknown Claims, that is in any way related to: (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors;

(B) Notwithstanding the foregoing subsection (A), Section 3.3:

1.      Shall not enjoin or bar any action or Claim by TD Bank or its affiliates, including, but not limited to, the assertion of any Claim that would otherwise be a Released Claim by TD Bank or its affiliates against another TD Bank Releasee;

2.      Shall not enjoin or bar any action or Claim against TD Bank filed by Coquina Investments in the matter captioned *Coquina Investments v. Rothstein, et al.*, 10-cv-60786 (S.D. Fla.), including, but not limited to, the pending appeal and cross-appeal of the decisions and orders issued in the U.S. District Court for the Southern District of Florida (Miami Division) that is currently pending in the Court of Appeals docketed at case no. 12-11161, including any subsequent related appeal, review or remand;

3.      Shall not (i) enjoin any Claim by the United States Government or any of its agencies or any state and local governmental authority whatsoever against the TD Bank Releasees, or (ii) enjoin the United States Government or any of its agencies or any state and local governmental authority whatsoever from bringing any Claim, suit, action or other proceedings against the TD Bank Releasees asserting any other liability, including without limitation any Claim, suit or action arising under the IRC, securities laws, environmental laws or any criminal laws of the United States or any state or local jurisdiction;

28

4.      Shall not enjoin or bar the prosecution of that certain *Plaintiffs' Amended Motion for Sanctions Against TD Bank, N.A.* dated as of December 10, 2012 currently pending in the Broward County Circuit Court before the Honorable Judge Jeffrey E. Streitfeld in the case captioned *Razorback Funding et al. v. Scott W. Rothstein, et al.,* Case No. 09-062943 (07); and

5.      Shall not bar any claim or action which is not, or was not, within the subject matter jurisdiction of the Bankruptcy Court as determined by Final Order of the Bankruptcy Court or of the District Court (which Final Order may be entered after the Effective Date), including any claim or action that is an independent claim not permitted to be barred under controlling Eleventh Circuit precedent.

Section 3.4      Bar of Equitable Defenses.  The assertion of any and all defenses, equitable or otherwise, against the RRA Estate, the Liquidating Trust or the Banyon Estates in any litigation, including the RRA Litigation Claims and the Banyon Litigation Claims, or the Claims reconciliation and objection process brought by the Trustees, any Liquidating Trust, the Liquidating Trustee or other similar estate representative based in whole or in part on TD Bank's interest in the Liquidating Trust, TD Bank's potential recovery as a beneficiary under the Liquidating Trust, or TD Bank's recovery on account of its Claims against any of the Estates shall be barred.

Section 3.5      TD Bank Release.  Upon the occurrence of the Effective Date, and without the need for the execution and delivery of additional documentation or the entry of any additional orders of the Bankruptcy Court, except as expressly provided in the RRA Plan or this Agreement, TD Bank shall be deemed to have irrevocably and unconditionally, fully, finally and forever waived, released, acquitted and discharged the Estates, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the RRA Case as of the Confirmation Date (only in their capacity as  members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustees and any professionals retained by the Estates in the Cases by Final Order of the Bankruptcy Court on or before May 8, 2013 from any and all Claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies and demands, of any and every kind, character or nature whatsoever, whether liquidated or unliquidated, asserted or unasserted, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, now existing or hereafter arising, in law, at equity or otherwise, which TD Bank, or anyone claiming through it, on its behalf or for its benefit, may have or Claim to have, now or in the future, against the Estates, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the RRA Case as of the Confirmation Date (only in their capacity as  members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustees and any professionals retained by the Estates in the Cases by Final Order of the Bankruptcy Court on or before May 8, 2013 that are based upon, relate to, or arise out of, in connection with or pertain to (a)(i) the Cases, (ii) the Ponzi scheme orchestrated or operated by Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors, or (b) any act, fact, transaction, event, occurrence, statement or omission in connection with (i) the Cases, (ii) the Ponzi scheme orchestrated or operated by

29

Rothstein, (iii) Rothstein and any other co-conspirator or aider and abettor, (iv) the RRA Releasors, (v) the principals of the RRA Releasors, (vi) the Banyon Releasors, or (vii) the principals of the Banyon Releasors, or (c) anything alleged in the RRA Complaint, or that could have been alleged in the RRA Complaint, or other similar proceedings.  Notwithstanding anything contained in this Section 3.5 or elsewhere in this Agreement or the RRA Plan to the contrary, the foregoing is not intended to release, nor shall it have the effect of releasing, (x) the Estates, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the RRA Case as of the Confirmation Date (but only in their capacity as  members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustees and any professionals retained by the Estates, or the Liquidating Trustee from the performance of their respective obligations in accordance with the RRA Plan or this Agreement, or (y) the Estates, the Committee, the members of the Official Committee of Unsecured Creditors appointed in the RRA Case as of the Confirmation Date (but only in their capacity as  members of the Official Committee of Unsecured Creditors and not in their individual capacities (e.g., as a creditor)), the Trustees and any professionals retained by the Estates, or the Liquidating Trustee from making any distribution to TD Bank on account of (A) the TD Bank Junior Subordinated Claims, or (B) on any Claim or recovery assigned, participated or transferred, in whole or in part, to TD Bank on or after May 8, 2013.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representation and Warranties of TD Bank. TD Bank hereby represents and warrants that as of the Effective Date: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 4.2    Representation and Warranties of the Trustees.  Each of the Trustees and the Estates hereby represent and warrant that as of the Effective Date: (a) subject to entry of the 9019 Order and/or the Confirmation Order, it or he is not precluded from executing this Agreement and consummating the transactions contemplated hereby; (b) subject to entry of the 9019 Order and/or the Confirmation Order, it or he has full requisite power and authority to execute and deliver and to perform its or his obligations under this Agreement and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it or him which would adversely affect its or his ability to enter into this Agreement or to perform its or his obligations hereunder; (d) subject to the entry of the 9019 Order and/or the Confirmation Order, it or he has

30

the power and authority to bind the applicable Estate to the terms of this Agreement or otherwise has been duly authorized to execute and deliver this Agreement on its behalf; and (e) each of the Trustees has and will pursue the approval of this Agreement in good faith.

## ARTICLE V
## COVENANTS

Section 5.1    Covenants of TD Bank.  TD Bank hereby covenants and agrees that it shall cause its subsidiaries and affiliates to take all actions reasonably necessary to obtain and shall take no action to impede or preclude the entry of the Confirmation Order, the 9019 Order, the administration of the RRA Case or the Banyon Cases, or the implementation and administration of the RRA Plan subject to the provisions hereof.

Section 5.2    Covenants of the Estates.  Each of the Trustees, for themselves and, as applicable, on behalf of the Estates, hereby covenants and agrees as follows:

(a)    The Estates shall take, and shall cause their subsidiaries and affiliates to take, all actions reasonably necessary to obtain and shall take no action to impede or preclude, the entry of the Confirmation Order or the 9019 Order.

(b)    None of the Trustees of the Estates or the Liquidating Trustee shall: (i) file any additional Claims, commence or prosecute any pending or additional litigation, proceeding, action, or matter or seek to recover damages or to seek equitable relief against any TD Bank Releasee; and (ii) directly or indirectly aid any Entity in taking any act prohibited by clause (i) of this Section 5.2(b).

(c)    On the Effective Date, and without limiting the generality of the foregoing, the Trustees, the Liquidating Trustee, the Estates, and the Liquidating Trust shall be deemed to have covenanted not to sue the TD Bank Releasees and to be permanently barred and enjoined from instituting, prosecuting, pursuing or litigating in any manner against the TD Bank Releasees.

## ARTICLE VI
## EFFECTIVENESS AND TERMINATION OF AGREEMENT

Section 6.1    Closing.  The consummation of the transactions contemplated hereby shall take place at 10:00 a.m., prevailing Eastern time, on the Effective Date at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, or such other date or place as is mutually agreed upon in writing by the Parties hereto.

Section 6.2    Conditions to Effective Date.  The terms and provisions of this Agreement are expressly subject to the occurrence of the following conditions:

(a)    each of the entities identified on the signature pages of this Agreement shall have executed and delivered this Agreement;

(b)    the representations and warranties of each Party contained in Article IV hereof shall be true and correct as of the date hereof, and as of the Effective Date;

31

(c)      the Disclosure Statement for the RRA Plan shall be in form and substance agreeable to TD Bank, the Banyon Trustee, and the Plan Proponents;

(d)      the Disclosure Statement Approval Order shall be in form and substance agreeable to TD Bank, the Banyon Trustee, and the Plan Proponents and the Disclosure Statement Approval Order shall have become a Final Order;

(e)      the RRA Plan shall be in form and substance agreeable to TD Bank, the Banyon Trustee, and the Plan Proponents;

(f)      the 9019 Motion shall be in form and substance satisfactory to TD Bank, the Banyon Trustee, and the Plan Proponents;

(g)      the Bankruptcy Court shall have entered the Confirmation Order which, *inter alia*, confirms the RRA Plan, ratifies the Committee's selection of the Liquidating Trustee and the Liquidating Trust Oversight Committee, and authorizes and directs the RRA Trustee, the Liquidating Trustee and the RRA Estate to perform all of their obligations under this Agreement and is in form and substance satisfactory to TD Bank, the Banyon Trustee, and the Plan Proponents;

(h)      the Confirmation Order shall not have been stayed and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such Confirmation Order;

(i)      this Agreement shall be in form and substance agreeable to TD Bank, the Banyon Trustee, and the Plan Proponents;

(j)      the Bankruptcy Court shall have approved, in all respects, this Agreement;

(k)      the Bankruptcy Court shall have entered the 9019 Order, which, *inter alia*, authorizes and directs the Trustees, the Liquidating Trustee, and the Estates to perform all of their obligations under this Agreement and is in form and substance satisfactory to TD Bank, the Banyon Trustee, and the Plan Proponents;

(l)      the 9019 Order shall not have been stayed and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such 9019 Order;

(m)      the Liquidating Trust Agreement is in form and substance satisfactory to TD Bank and the RRA Trustee;

(n)      the Liquidating Trust Agreement shall have been executed and delivered by the Liquidating Trustee and the RRA Trustee;

(o)      the RRA Trustee on behalf of the RRA Estate has transferred the Assets (as such term is defined in the RRA Plan) to the Liquidating Trust; provided that the RRA Trustee shall not have any obligation to transfer the Assets unless and until all other conditions to effectiveness contained in this Section of the Agreement, except the

32

condition set forth in Section 6.2(p) of this Agreement,  shall have been satisfied or waived in accordance with this Section of the Agreement;

(p)    TD Bank shall have made the TD Bank Contribution; <u>provided that</u> TD Bank shall not have any obligation to make the TD Bank Contribution unless and until all other conditions to effectiveness contained in this Section of the Agreement and the RRA Plan have been satisfied or waived in accordance with this Section of the Agreement;

(q)    all other documents, instruments and agreements, in form and substance satisfactory to TD Bank, the Banyon Trustee, and the Plan Proponents, provided for under this Agreement, the RRA Plan or necessary to implement the RRA Plan, shall have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and

(r)    the RRA Plan shall have become effective by its terms.

<u>Provided that</u> any of the conditions to the Effective Date contained in this Section 6.2 may be waived by written agreement among and signed by all of the Parties.

Section 6.3    <u>Termination of this Agreement</u>.  This Agreement may be terminated by any of the Parties, at each Party's option and discretion, in the event that (i) each of the 9019 Order and the Confirmation Order are not entered by the Bankruptcy Court on or before July 19, 2013; or (ii) the Effective Date of the Agreement has not occurred or the RRA Plan has not become effective by its terms, on or before July 31, 2013.  In addition, TD Bank may terminate this Agreement in the event the RRA Case is converted to a case under Chapter 7 of the Bankruptcy Code.  If this Agreement is terminated pursuant to this Section 6.3, no Party hereto shall have any obligation or liability to any other Party; <u>provided, that</u> nothing herein shall relieve a defaulting or breaching Party from any liability or damages arising out of its breach of any provision of this Agreement.

**ARTICLE VII**
**MISCELLANEOUS**

Section 7.1    <u>Amendments</u>. This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement.

Section 7.2    <u>No Admission of Liability; No Estoppel Effect</u>.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any Claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement, the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any Claim, or any

33

allegation made in the RRA Complaint, the Banyon Asserted Claims, the Third Party Claims or of any wrongdoing or liability of any TD Bank Releasee; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any TD Bank Releasee, in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as admission or evidence against the Estates, the Liquidating Trust, the Liquidating Trustee or a Trustee with respect to the validity of any of the Claims; or (iv) is or may be deemed to be or used as admission or evidence of or have any evidentiary, res judicata, or collateral estoppel effect on the Estates', the Liquidating Trust's, the Trustees', or the Liquidating Trustee's ability to assert RRA Collateral Source Recoveries or Banyon Creditor Collateral Source Recoveries, as applicable, against any party other than a TD Bank Releasee. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement, and except that any TD Bank Releasee may file this Agreement in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of Claim preclusion or issue preclusion or similar defense of counterclaim.

Section 7.3    Good Faith Negotiations. The Parties further recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement. Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly, at arm's length, and in good faith; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts and his or its rights in connection therewith; and that he or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the Claims between the Parties that are settled by the execution of this Agreement.

Section 7.4    Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto, the TD Bank Releasees, and their respective successors and assigns, any right, remedy or Claim under or by reason of this Agreement or any covenant, condition or stipulation thereof, and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto, the TD Bank Releasees and their respective successors and assigns. For the avoidance of doubt, only the signatories hereto and the Liquidating Trustee may seek to enforce this Agreement.

Section 7.5    Governing Law; Retention of Jurisdiction; Service of Process. This Agreement shall be governed by and construed in accordance with the federal law as it pertains to bar orders and the Bankruptcy Code and administration of estates in bankruptcy, as well as the internal laws of the State of Florida, without giving effect to any principles of conflicts of law. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees that any legal action, suit or proceeding between the Parties with respect to any matter under or arising out of or in connection with this Agreement or for recognition or

34

enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each Party hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 7.12 hereof, unless another address had been designated by such Party in a notice given to the other Parties in accordance with Section 7.12 hereof.

Section 7.6    Specific Performance.  Subject to the entry of the 9019 Order and the Confirmation Order by the Bankruptcy Court, and each of them becoming Final Orders, it is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach.

Section 7.7    Fees and Expenses.  If any Party brings an action against any other Party based upon a breach by the other Party of its obligations under this Agreement, the prevailing Party shall be entitled to all reasonable expenses incurred, including reasonable attorneys' fees and expenses.

Section 7.8    Headings.  The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 7.9    Binding Agreement Successors and Assigns; Joint and Several Obligations.  This Agreement shall be binding upon the Estates and TD Bank only upon the occurrence of the Effective Date.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives.  This Agreement shall be binding on the Liquidating Trust and the Liquidating Trustee as the successors to the RRA Estate and the RRA Trustee, respectively.  The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.

Section 7.10    Entire Agreement.  This Agreement constitutes the full and entire agreement among the Parties with regard to the subject hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 7.11    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which,

35

when taken together, shall constitute one and the same Agreement.  Copies of executed
counterparts transmitted by telecopy or other electronic transmission service shall be considered
original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 7.12    Notices.  Any notice required or permitted to be provided under this
Agreement shall be in writing and served by electronic mail and either (a) certified mail, return
receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service,
freight prepaid, to be addressed as follows:

If to the RRA Trustee, to:

Herbert Stettin
4000 Ponce de Leon Boulevard
Suite 570
Coral Gables, FL  33146
Tel: (305) 374-3353
Fax: (305) 374-7632
Email c/o:  singerman@bergersingerman.com

and

Herbert Stettin
5401 Hammock Drive
Coral Gables, FL  33156

with a copy to:

Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Attn: Paul Steven Singerman
Telephone: (305) 714-4343
Facsimile: (305) 714-4340
Email: singerman@bergersingerman.com

and

John H. Genovese

36

Genovese Joblove & Battista, P.A.
100 SE 2nd Street, 44th Floor
Miami, FL 33131
Telephone: (305) 372-2462
Facsimile: (305) 428-8802
Email: jgenovese@gjb-law.com

If to the Banyon Trustee, to:

Robert C. Furr, Trustee
Furr and Cohen, P.A.
2255 Glades Rd. Suite 337w
Boca Raton, FL  33431
Telephone: (561) 395-0500
Facsimile:  561-338-7532
Email: rfurr@furrcohen.com
with copy to:

Russell Blain
Stichter, Riedel, Blain & Prosser, P.A.
110 East Madison Street
Suite 200
Tampa, FL 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Email:  rblain@srbp.com

If to TD Bank, to:

TD Bank, N.A.
Legal Department
1701 Route 70 East
Cherry Hill, NJ 08034
Attn: Craig Baldauf
Telephone: (856) 874-2455
Facsimile:  (856) 874-2423
E-mail: craig.baldauf@td.com

with a copy to:

Dion W. Hayes
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219
Telephone: (804) 775-1144

37

Facsimile:  (804) 698-2078
Email:  dhayes@mcguirewoods.com

If to the Liquidating Trustee, to the address and e-mail address identified on the notice identifying the Liquidating Trustee or his successor, filed with the Bankruptcy Court.

If to the members of the Liquidating Trust Oversight Committee, to the addresses and e-mail addresses identified on the notice identifying the members of the Liquidating Trust Oversight Committee or a member's successor, filed with the Bankruptcy Court.

Section 7.13   Further Assurances.  Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

Section 7.14   Publicity.  In connection with the filing of the 9019 Motion and the RRA Plan with the Bankruptcy Court, neither of the Trustees shall issue any press release or otherwise make any statement to the media regarding this Agreement or the transactions contemplated hereby unless it is mutually acceptable to such Trustee and TD Bank.

38

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the dates set forth above.

DATED:  May 29, 2013


TD BANK, N.A.

By: _____

Name: Craig R. Baldauf

Title:   Global Head of Litigation



_____

HERBERT STETTIN, not individually but
solely as Chapter 11 Trustee of
ROTHSTEIN ROSENFELDT ADLER, P.A.



_____

ROBERT C. FURR, not individually but solely
as Chapter 7 Trustee of
BANYON 1030-32, LLC, and Chapter 7 Trustee of
BANYON INCOME FUND, L.P.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the dates set forth above.

DATED:  May 29, 2013


TD BANK, N.A.


By:_____

Name: _____

Title:_____


_____
HERBERT STETTIN, not individually but
solely as Chapter 11 Trustee of
ROTHSTEIN ROSENFELDT ADLER, P.A.



_____
ROBERT C. FURR, not individually but solely
as Chapter 7 Trustee of
BANYON 1030-32, LLC, and Chapter 7 Trustee of
BANYON INCOME FUND, L.P.


48254260-3

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the dates set forth above.

DATED:  May 29, 2013

TD BANK, N.A.

By:_____

Name:_____

Title:_____


_____
HERBERT STETTIN, not individually but
solely as Chapter 11 Trustee of
ROTHSTEIN ROSENFELDT ADLER, P.A.


_____
ROBERT C. FURR, not individually but solely
as Chapter 7 Trustee of
BANYON 1030-32, LLC, and Chapter 7 Trustee of
BANYON INCOME FUND, L.P.

48254260-3

EXHIBIT A

Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code
Proposed Jointly by the Trustee and the Official Committee of Unsecured Creditors
(as Modified) Dated May 29, 2013 and Filed in the RRA Case

EXHIBIT B

VERIFIED BANYON CREDITOR COLLATERAL SOURCE RECOVERY DISCLOSURE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 7 |
| BANYON 1030-32, LLC,<br>BANYON INCOME FUND, L.P., | Case Nos.    10-33691-RBR<br>11-40929-RBR |
| Debtors. | *Jointly Administered under*<br>*Case No. 10-33691-RBR* |

## VERIFIED BANYON CREDITOR COLLATERAL SOURCE RECOVERY DISCLOSURE

YOU ARE RECEIVING THIS FORM BECAUSE THE BANYON TRUSTEE BELIEVES
YOU MAY HOLD A CLAIM IN EITHER OF THE ABOVE-CAPTIONED JOINTLY
ADMINISTERED CHAPTER 7 BANKRUPTCY CASES.

By Order entered on _____, 2013 (the "Settlement Order"), the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "Bankruptcy Court") approved the *Banyon Trustee's Motion to Approve (1) Agreement with TD Bank, N.A. and Herbert Stettin, as Chapter 11 Trustee of the Rothstein Rosenfeldt Adler, P.A. Bankruptcy Estate, (2) Entry of Bar Order, and (3) Approval of the Banyon Estates' Vote to Accept the RRA Plan* (the Settlement Agreement approved in the Settlement Order is referred to herein as the "Settlement Agreement").[1]

Under the terms of the Settlement Order, in order to receive a distribution from the bankruptcy estates of Banyon 1030-32, LLC or Banyon Income Fund, L.P. (collectively, the "Banyon Estates"), you must deliver this Verified Banyon Creditor Collateral Source Recovery Disclosure to Robert C. Furr, chapter 7 trustee for the Bankruptcy Estates (the "Banyon Trustee"), 2255 Glades Road, Suite 337w, Boca Raton, Florida 33431, so that it is actually received by the Banyon Trustee not later than _____, 2013.

---

[1]  All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

**IF YOU FAIL OR REFUSE TO DELIVER THIS VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE TO THE BANYON TRUSTEE SO THAT IT IS ACTUALLY RECEIVED BY THE BANYON TRUSTEE NOT LATER THAN_____, 2013, OR IF, AFTER NOTICE AND A HEARING, IT IS DETERMINED THAT YOU PROVIDED MATERIALLY FALSE INFORMATION IN THIS VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE, THEN YOUR RIGHT TO RECEIVE ANY DISTRIBUTION FROM THE BANYON ESTATES MAY BE IRREVOCABLY WAIVED, AND YOUR CLAIM AGAINST THE BANYONS ESTATES MAY BE DISALLOWED.**

## DEFINITIONS:

A.    "You" and "Your" refers to the Entity or Person filling out this Verified Collateral Source Recovery Disclosure and all agents, attorneys, third parties or other person or legal entity acting, or purporting to act on your behalf, in concert with you or under your control.

B.    "Collateral Source Recoveries" for the purpose of this Verified Banyon Creditor Collateral Source Recovery Disclosure means the gross amount (before deducting any fees, costs or other expenses incurred or paid in connection with your pursuit of any Collateral Source Recovery) of Cash and non-Cash assets received by you, available to you, received for your benefit, applied to your indebtedness (whether made or to be made directly or indirectly to such holder or any agent, attorney, or other third party associated with the holder), from all parties and sources, including, without limitation, TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action, on account of or in any way related to any loss that you have that is directly or indirectly related to: (i) the Ponzi scheme orchestrated or operated by Scott W. Rothstein; (ii) Scott W. Rothstein and/or his co-conspirators, (iii) Rothstein Rosenfeldt Adler, P.A, and (iv) Banyon 1030-32, LLC and Banyon Income Fund, L.P.; provided however, that for the avoidance of any doubt, Collateral Source Recoveries do not include any tax benefit from a theft loss deduction taken in accordance with the Internal Revenue Code, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein.

Disclosure:

1.  Creditor's Contact Information

    a.  Your full legal name:

    _____

    b.  Your complete street address:

    _____

    c.  Your complete mailing address:

    _____

2

2. Have You:

    a. Filed or otherwise made a claim for restitution or return of forfeited assets with the Federal Bureau of Investigations ("FBI"), the United States Attorney's Office, or any other federal agency in connection with the case of *United States v. Scott W. Rothstein*, 09-60331-JIC (S.D. Fla. 2009).

    ☐ YES. ☐ NO.

    b. Sought compensation, recovery, redress, damages, or any other form of relief against any party other than the Banyon Estates as a result of the alleged actions, inactions or omissions of any or all of: (i) Scott W. Rothstein and/or his co-conspirators, (ii) Rothstein Rosenfeldt Adler, P.A, (iii) Banyon 1030-32, LLC and Banyon Income Fund, L.P., and (iv) TD Bank, N.A. as related to any of (a) Scott W. Rothstein and/or his co-conspirators, (b) Rothstein Rosenfeldt Adler, P.A., and (c) Banyon 1030-32, LLC and Banyon Income Fund, L.P.

    ☐ YES. ☐ NO.

If You answered "YES" to question 2(a) or 2(b) then proceed to question 3.

If You answered "NO" to both question 2(a) and 2(b) then proceed to sign the attestation at the end of this document.

3. The name and address of each party other than the above-captioned debtor against whom You have made a demand that has given rise to a Collateral Source Recovery:

_____

_____

4. As of the date this form is completed, provide the gross recoveries You have received (before deducting any cost or expense, including attorneys' fees and costs paid or incurred by the holder):

    Amount: _____

5. The Collateral Source Recoveries that the undersigned has received, as disclosed in response to question number 4 above, were premised on the following legal claims or theories:

_____

_____

6. The name and address of each party other than the above-captioned debtor against whom You have made a demand that may give rise to a Collateral Source Recovery:

_____

_____

3

7.  Do you anticipate receiving Collateral Source Recoveries from any of the sources disclosed in question number 6?

☐ YES.  ☐ NO.


8.  If you answered "Yes" to question number 7, from which source(s) do you anticipate receiving Collateral Source Recoveries:

_____
_____


BY EXECUTING THIS DISCLOSURE, I UNDERSTAND THAT I AM REQUIRED TO REMIT TO THE BANYON TRUSTEE:  (I) DISTRIBUTIONS I RECEIVE IN EXCESS OF THE AMOUNT I WAS ENTITLED TO RECEIVE ON ACCOUNT OF MY CLAIM IF ALLOWED; (II) DISTRIBUTIONS I RECEIVED ON ACCOUNT OF MY CLAIM THAT IS DISALLOWED SUBSEQUENT TO A DISTRIBUTION BEING MADE; AND (III) AN AMOUNT OF CASH EQUAL TO THE VALUE OF ALL COLLATERAL SOURCE RECOVERIES I RECEIVE ON ACCOUNT OF MY CLAIM THAT WERE NOT DISCLOSED AS HAVING BEEN RECEIVED AS OF THE DATE OF THIS DISCLOSURE (WHETHER EXISTING AT THE TIME OF THIS DISCLOSURE OR ARISING IN THE FUTURE); PROVIDED, HOWEVER THAT IN NO EVENT SHALL I BE REQUIRED TO REMIT CASH TO THE BANYON TRUSTEE IN AN AMOUNT THAT IS GREATER THAN THE AMOUNT OF MY DISTRIBUTIONS ON SUCH CLAIM.

I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.


Name of Creditor: _____

By:_____
       [Print Name]

Title:_____

Signature:_____

Sign and Return To:

**Robert C. Furr, Trustee**
**Furr and Cohen, P.A.**
**2255 Glades Road, Suite 337w**
**Roca Raton, Florida 33431**

48254260-3

EXHIBIT C

VERIFIED RRA COLLATERAL SOURCE RECOVERY DISCLOSURE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:

ROTHSTEIN ROSENFELDT ADLER, P.A.          Case No. 09-34791-BKC-RBR
                                          Chapter 11

      Debtor.
_____/

**VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE**

On May 29, 2013, Herbert Stettin, as chapter 11 trustee for the above-captioned debtor (the "Trustee") and the Official Committee of Unsecured Creditors for the above-captioned debtor, filed a plan of liquidation (the "Plan")[1] in the above-captioned case.

YOU ARE RECEIVING THIS FORM BECAUSE THE TRUSTEE BELIEVES YOU MAY
HOLD A CLAIM IN CLASS 2, CLASS 3, OR CLASS 7.

**IF YOU FAIL OR REFUSE TO DELIVER THIS VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE TO THE VOTING AGENT SO THAT IT IS ACTUALLY RECEIVED BY THE VOTING AGENT NOT LATER THAN_____, 2013 (THE "VOTING DEADLINE"), OR IF, AFTER NOTICE AND A HEARING, IT IS DETERMINED THAT YOU PROVIDED MATERIALLY FALSE INFORMATION IN THIS VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE, THEN:**
    **1.      YOUR RIGHT TO RECEIVE ANY DISTRIBUTION UNDER THE PLAN MAY BE IRREVOCABLY WAIVED;**
    **2.      YOUR CLAIM MAY BE DISALLOWED; AND**
    **3.      YOUR BALLOT IN REGARD TO THE PLAN MAY NOT BE COUNTED.**

---

[1]      Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

## DEFINITIONS:

C.    "You" and "Your" refers to the Entity or Person filling out this Verified Collateral Source Recovery Disclosure and all agents, attorneys, third parties or other person or legal entity acting, or purporting to act on your behalf, in concert with you or under your control.

D.    "Collateral Source Recoveries" for the purpose of this Verified Collateral Source Recovery Disclosure means the gross amount (before deducting any fees, costs or other expenses incurred or paid in connection with your pursuit of any Collateral Source Recovery) of Cash and non-Cash assets received by you, available to you, received for your benefit, applied to your indebtedness, (whether made or to be made directly or indirectly to such holder or any agent, attorney, or other third party associated with the holder), from all parties and sources, including, without limitation, TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action, on account of or in any way related to any loss that you have that is directly or indirectly related to: (i) the Ponzi scheme orchestrated or operated by Scott W. Rothstein; (ii) Scott W. Rothstein and/or his co-conspirators, (iii) Rothstein Rosenfeldt Adler, P.A, and (iv) Banyon 1030-32, LLC and Banyon Income Fund, L.P.; provided however, that for the avoidance of any doubt, Collateral Source Recoveries do not include any tax benefit from a theft loss deduction taken in accordance with the Internal Revenue Code, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein.

Disclosure:

1. Creditor's Contact Information

   a.   Your full legal name:

   _____

   b.   Your complete street address:

   _____

   c.   Your complete mailing address:
   _____

2. Have You:

   a.   Filed or otherwise made a claim for restitution or return of forfeited assets with the Federal Bureau of Investigations ("FBI"), the United States Attorney's Office, or any other federal agency in connection with the case of *United States v. Scott W. Rothstein*, 09-60331-JIC (S.D. Fla. 2009).

   ☐ YES.  ☐ NO.

2

b.  Sought compensation, recovery, redress, damages, or any other form of relief against any party other than the bankruptcy estate of Rothstein Rosenfeldt Adler, P.A. as a result of the alleged actions, inactions or omissions of any or all of: (i) Scott W. Rothstein and/or his co-conspirators, (ii) Rothstein Rosenfeldt Adler, P.A, (iii) Banyon 1030-32, LLC and Banyon Income Fund, L.P., and (iv) TD Bank, N.A. as related to any of (a) Scott W. Rothstein and/or his co-conspirators, (b) Rothstein Rosenfeldt Adler, P.A., and (c) Banyon 1030-32, LLC and Banyon Income Fund, L.P.

☐ YES.  ☐ NO.

If You answered "YES" to question 2(a) or 2(b) then proceed to question 3.

If You answered "NO" to <u>both</u> question 2(a) and 2(b) then proceed to sign the attestation at the end of this document.

3.  The name and address of each party other than the above-captioned debtor against whom You have made a demand that has given rise to a Collateral Source Recovery:

_____
_____

4.  As of the date this form is completed, provide the gross recoveries You have received (before deducting any cost or expense, including attorneys' fees and costs paid or incurred by the holder):

Amount: _____

5.  The Collateral Source Recoveries that the undersigned has received, as disclosed in response to question number 4 above, were premised on the following legal claims or theories:

_____
_____

6.  The name and address of each party other than the above-captioned debtor against whom You have made a demand that may give rise to a Collateral Source Recovery:

_____
_____

7.  Do you anticipate receiving Collateral Source Recoveries from any of the sources disclosed in question number 6?

☐ YES.  ☐ NO.

8.  If you answered "Yes" to question number 7, from which source(s) do you anticipate receiving Collateral Source Recoveries:

_____

_____

BY EXECUTING THIS DISCLOSURE, I UNDERSTAND THAT I AM REQUIRED TO REMIT TO THE LIQUIDATING TRUST:  (I) DISTRIBUTIONS I RECEIVE IN EXCESS OF THE AMOUNT I WAS ENTITLED TO RECEIVE ON ACCOUNT OF MY CLAIM IF ALLOWED; (II) DISTRIBUTIONS I RECEIVED ON MY CLAIM THAT IS DISALLOWED SUBSEQUENT TO A DISTRIBUTION BEING MADE; AND (III) AN AMOUNT OF CASH EQUAL TO THE VALUE OF ALL COLLATERAL SOURCE RECOVERIES I RECEIVE THAT WERE NOT DISCLOSED AS HAVING BEEN RECEIVED AS OF THE DATE OF THIS DISCLOSURE (WHETHER EXISTING AT THE TIME OF THIS DISCLOSURE OR ARISING IN THE FUTURE); PROVIDED, HOWEVER THAT IN NO EVENT SHALL I BE REQUIRED TO REMIT CASH TO THE LIQUIDATING TRUST IN AN AMOUNT THAT IS GREATER THAN THE SUM OF SUCH HOLDER'S DISTRIBUTIONS.

I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

Name of Creditor: _____

By:_____
        [Print Name]

Title:_____

Signature:_____

Sign and Return To:

**Trustee Services, Inc.**
**1844 N. Nob Hill Road, #613**
**Plantation, FL  33322**

4

EXHIBIT D

PENDING LITIGATION

*Arvidson, et al. v. TD Bank, N.A., et al.*, Case No. 12-30370, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Beverly, et al. v. TD Bank, N.A., et al.*, Case No. 13-60176, United States District Court for the Southern District of Florida (this case was referred to the United States Bankruptcy Court for the Southern District of Florida by order entered January 30, 2013 [ECF Doc. No. 5] as a proceeding related to the Chapter 11 Case, but it has not been docketed as a separate adversary proceeding) and, as remanded, Case No. 12-32710, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Gayla Susan Levin v. TD Bank, et al.* (*In re George Levin*), Case No.  10-33696, AP Case No. 13-01061, United States Bankruptcy Court for the Southern District of Florida, and, as remanded, Case No. 12-35089, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*George G. Levin v. TD Bank, et al.* (*In re George Levin*), Case No. 10-33696, AP Case No. 13-01060, United States Bankruptcy Court for the Southern District of Florida, and, as remanded, Case No. Case No. 12-35407, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Harbeson, et al. v. TD Bank, N.A.*, Case No. _____, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Deborah Marlin as Trustee of the Deborah Marlin Revocable Trust U/A 06/01/98, et al. v. TD Bank, et al.*, Case No. 13-6202, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Platinum Partners Value Arbitrage Fund, LP, et al. v. TD Bank, N.A.*, Case No. 12-023947, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Razorback Funding, LLC, et al. v. Scott W. Rothstein, et al.*, Case No. 09-062943 (07), Circuit Court for the 17th Judicial District in Broward County, Florida., except the *Plaintiffs' Amended Motion for Sanctions Against TD Bank, N.A.* dated as of December 10, 2012;

*RWRK Investments, LLC, et al. v. TD Bank, N.A., et al.*, Case No. 12-15605 (13), Circuit Court for the 17th Judicial District in Broward County, Florida.

*Stettin v. TD Bank, N.A.* (*In re Rothstein Rosenfeldt Adler, P.A.*), Case No. 09-34791, AP Case No. 11-02368, United States Bankruptcy Court for the Southern District of Florida.

4969631-3

Appendix 1.137

Form of Verified Banyon Creditor Collateral Source Recovery Disclosure

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 7 |
| BANYON 1030-32, LLC, | Case Nos.　　10-33691-RBR |
| BANYON INCOME FUND, L.P., | 　　　　　　　11-40929-RBR |
| Debtors. | *Jointly Administered under Case No. 10-33691-RBR* |

### VERIFIED BANYON CREDITOR COLLATERAL SOURCE RECOVERY DISCLOSURE

YOU ARE RECEIVING THIS FORM BECAUSE THE BANYON TRUSTEE BELIEVES YOU MAY HOLD A CLAIM IN EITHER OF THE ABOVE-CAPTIONED JOINTLY ADMINISTERED CHAPTER 7 BANKRUPTCY CASES.

By Order entered on _____, 2013 (the "Settlement Order"), the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "Bankruptcy Court") approved the *Banyon Trustee's Motion to Approve (1) Agreement with TD Bank, N.A. and Herbert Stettin, as Chapter 11 Trustee of the Rothstein Rosenfeldt Adler, P.A. Bankruptcy Estate, (2) Entry of Bar Order, and (3) Approval of the Banyon Estates' Vote to Accept the RRA Plan* (the Settlement Agreement approved in the Settlement Order is referred to herein as the "Settlement Agreement").[1]

Under the terms of the Settlement Order, in order to receive a distribution from the bankruptcy estates of Banyon 1030-32, LLC or Banyon Income Fund, L.P. (collectively, the "Banyon Estates"), you must deliver this Verified Banyon Creditor Collateral Source Recovery Disclosure to Robert C. Furr, chapter 7 trustee for the Bankruptcy Estates (the "Banyon Trustee"), 2255 Glades Road, Suite 337w, Boca Raton, Florida 33431, so that it is actually received by the Banyon Trustee not later than _____, 2013.

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Settlement Agreement.

\48246798.1
4999213-2

> **IF YOU FAIL OR REFUSE TO DELIVER THIS VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE TO THE BANYON TRUSTEE SO THAT IT IS ACTUALLY RECEIVED BY THE BANYON TRUSTEE NOT LATER THAN_____, 2013, OR IF, AFTER NOTICE AND A HEARING, IT IS DETERMINED THAT YOU PROVIDED MATERIALLY FALSE INFORMATION IN THIS VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE, THEN YOUR RIGHT TO RECEIVE ANY DISTRIBUTION FROM THE BANYON ESTATES MAY BE IRREVOCABLY WAIVED, AND YOUR CLAIM AGAINST THE BANYONS ESTATES MAY BE DISALLOWED.**

## <u>DEFINITIONS:</u>

A.    "You" and "Your" refers to the Entity or Person filling out this Verified Collateral Source Recovery Disclosure and all agents, attorneys, third parties or other person or legal entity acting, or purporting to act on your behalf, in concert with you or under your control.

B.    "Collateral Source Recoveries" for the purpose of this Verified Banyon Creditor Collateral Source Recovery Disclosure means the gross amount (before deducting any fees, costs or other expenses incurred or paid in connection with your pursuit of any Collateral Source Recovery) of Cash and non-Cash assets received by you, available to you, received for your benefit, applied to your indebtedness (whether made or to be made directly or indirectly to such holder or any agent, attorney, or other third party associated with the holder), from all parties and sources, including, without limitation, TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action, on account of or in any way related to any loss that you have that is directly or indirectly related to: (i) the Ponzi scheme orchestrated or operated by Scott W. Rothstein; (ii) Scott W. Rothstein and/or his co-conspirators, (iii) Rothstein Rosenfeldt Adler, P.A, and (iv) Banyon 1030-32, LLC and Banyon Income Fund, L.P.; <u>provided however</u>, that for the avoidance of any doubt, Collateral Source Recoveries do not include any tax benefit from a theft loss deduction taken in accordance with the Internal Revenue Code, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein.

Disclosure:

1.  Creditor's Contact Information

    a.  Your full legal name:

    _____

    b.  Your complete street address:

    _____

    c.  Your complete mailing address:

    _____

2. Have You:

    a. Filed or otherwise made a claim for restitution or return of forfeited assets with the Federal Bureau of Investigations ("FBI"), the United States Attorney's Office, or any other federal agency in connection with the case of *United States v. Scott W. Rothstein*, 09-60331-JIC (S.D. Fla. 2009).

    ☐ YES. ☐ NO.

    b. Sought compensation, recovery, redress, damages, or any other form of relief against any party other than the Banyon Estates as a result of the alleged actions, inactions or omissions of any or all of: (i) Scott W. Rothstein and/or his co-conspirators, (ii) Rothstein Rosenfeldt Adler, P.A, (iii) Banyon 1030-32, LLC and Banyon Income Fund, L.P., and (iv) TD Bank, N.A. as related to any of (a) Scott W. Rothstein and/or his co-conspirators, (b) Rothstein Rosenfeldt Adler, P.A., and (c) Banyon 1030-32, LLC and Banyon Income Fund, L.P.

    ☐ YES. ☐ NO.

If You answered "YES" to question 2(a) or 2(b) then proceed to question 3.

If You answered "NO" to <u>both</u> question 2(a) and 2(b) then proceed to sign the attestation at the end of this document.

3. The name and address of each party other than the above-captioned debtor against whom You have made a demand that has given rise to a Collateral Source Recovery:

    _____

    _____

4. As of the date this form is completed, provide the gross recoveries You have received (before deducting any cost or expense, including attorneys' fees and costs paid or incurred by the holder):

    Amount: _____

5. The Collateral Source Recoveries that the undersigned has received, as disclosed in response to question number 4 above, were premised on the following legal claims or theories:

    _____

    _____

6. The name and address of each party other than the above-captioned debtor against whom You have made a demand that may give rise to a Collateral Source Recovery:

    _____

    _____

7. Do you anticipate receiving Collateral Source Recoveries from any of the sources disclosed in question number 6?

☐ YES. ☐ NO.

8. If you answered "Yes" to question number 7, from which source(s) do you anticipate receiving Collateral Source Recoveries:

_____

_____

BY EXECUTING THIS DISCLOSURE, I UNDERSTAND THAT I AM REQUIRED TO REMIT TO THE BANYON TRUSTEE:  (I) DISTRIBUTIONS I RECEIVE IN EXCESS OF THE AMOUNT I WAS ENTITLED TO RECEIVE ON ACCOUNT OF MY CLAIM IF ALLOWED; (II) DISTRIBUTIONS I RECEIVED ON ACCOUNT OF MY CLAIM THAT IS DISALLOWED SUBSEQUENT TO A DISTRIBUTION BEING MADE; AND (III) AN AMOUNT OF CASH EQUAL TO THE VALUE OF ALL COLLATERAL SOURCE RECOVERIES I RECEIVE ON ACCOUNT OF MY CLAIM THAT WERE NOT DISCLOSED AS HAVING BEEN RECEIVED AS OF THE DATE OF THIS DISCLOSURE (WHETHER EXISTING AT THE TIME OF THIS DISCLOSURE OR ARISING IN THE FUTURE); PROVIDED, HOWEVER THAT IN NO EVENT SHALL I BE REQUIRED TO REMIT CASH TO THE BANYON TRUSTEE IN AN AMOUNT THAT IS GREATER THAN THE AMOUNT OF MY DISTRIBUTIONS ON SUCH CLAIM.

I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

Name of Creditor: _____

By:_____
      [Print Name]

Title:_____

Signature:_____

Sign and Return To:

**Robert C. Furr, Trustee**
**Furr and Cohen, P.A.**
**2255 Glades Road, Suite 337w**
**Roca Raton, Florida 33431**

\48246798.1
4999213-2

Appendix 1.138

Form of Verified Collateral Source Recovery Disclosure

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF FLORIDA
# FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

In re:

ROTHSTEIN ROSENFELDT ADLER, P.A.                Case No. 09-34791-BKC-RBR
                                                Chapter 11

       Debtor.

_____/

## VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE

On May 29, 2013, Herbert Stettin, as chapter 11 trustee for the above-captioned debtor (the "Trustee") and the Official Committee of Unsecured Creditors for the above-captioned debtor, filed a plan of liquidation (the "Plan")[1] in the above-captioned case.

YOU ARE RECEIVING THIS FORM BECAUSE THE TRUSTEE BELIEVES YOU MAY HOLD A CLAIM IN CLASS 2, CLASS 3, OR CLASS 7.

---

**IF YOU FAIL OR REFUSE TO DELIVER THIS VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE TO THE VOTING AGENT SO THAT IT IS ACTUALLY RECEIVED BY THE VOTING AGENT NOT LATER THAN JULY 2, 2013 AT 5:00 PM (PREVAILING EASTERN TIME) (THE "VOTING DEADLINE"), OR IF, AFTER NOTICE AND A HEARING, IT IS DETERMINED THAT YOU PROVIDED MATERIALLY FALSE INFORMATION IN THIS VERIFIED COLLATERAL SOURCE RECOVERY DISCLOSURE, THEN:**

     **1.    YOUR RIGHT TO RECEIVE ANY DISTRIBUTION UNDER THE PLAN MAY BE IRREVOCABLY WAIVED;**

     **2.    YOUR CLAIM MAY BE DISALLOWED; AND**

     **3.    YOUR BALLOT IN REGARD TO THE PLAN MAY NOT BE COUNTED.**

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

\48246798.1
4999213-2

## <u>DEFINITIONS:</u>

C.      "You" and "Your" refers to the Entity or Person filling out this Verified Collateral Source Recovery Disclosure and all agents, attorneys, third parties or other person or legal entity acting, or purporting to act on your behalf, in concert with you or under your control.

D.      "Collateral Source Recoveries" for the purpose of this Verified Collateral Source Recovery Disclosure means the gross amount (before deducting any fees, costs or other expenses incurred or paid in connection with your pursuit of any Collateral Source Recovery) of Cash and non-Cash assets received by you, available to you, received for your benefit, applied to your indebtedness, (whether made or to be made directly or indirectly to such holder or any agent, attorney, or other third party associated with the holder), from all parties and sources, including, without limitation, TD Bank, Gibraltar Private Bank & Trust Company, Berenfeld Spritzer Shechter & Sheer, LLP or in the Forfeiture Action, on account of or in any way related to any loss that you have that is directly or indirectly related to: (i) the Ponzi scheme orchestrated or operated by Scott W. Rothstein; (ii) Scott W. Rothstein and/or his co-conspirators, (iii) Rothstein Rosenfeldt Adler, P.A, and (iv) Banyon 1030-32, LLC and Banyon Income Fund, L.P.; <u>provided however</u>, that for the avoidance of any doubt, Collateral Source Recoveries do not include any tax benefit from a theft loss deduction taken in accordance with the Internal Revenue Code, or other tax benefits received by a holder of a Claim, in either case as a result of losses in connection with the Ponzi scheme orchestrated or operated by Rothstein.

Disclosure:

1.  Creditor's Contact Information

    a.  Your full legal name:

    _____

    b.  Your complete street address:

    _____

    c.  Your complete mailing address:

    _____

2.  Have You:

    a.  Filed or otherwise made a claim for restitution or return of forfeited assets with the Federal Bureau of Investigations ("FBI"), the United States Attorney's Office, or any other federal agency in connection with the case of *United States v. Scott W. Rothstein*, 09-60331-JIC (S.D. Fla. 2009).

    ☐ YES.  ☐ NO.

b. Sought compensation, recovery, redress, damages, or any other form of relief against any party other than the bankruptcy estate of Rothstein Rosenfeldt Adler, P.A. as a result of the alleged actions, inactions or omissions of any or all of: (i) Scott W. Rothstein and/or his co-conspirators, (ii) Rothstein Rosenfeldt Adler, P.A., (iii) Banyon 1030-32, LLC and Banyon Income Fund, L.P., and (iv) TD Bank, N.A. as related to any of (a) Scott W. Rothstein and/or his co-conspirators, (b) Rothstein Rosenfeldt Adler, P.A., and (c) Banyon 1030-32, LLC and Banyon Income Fund, L.P.

☐ YES.    ☐ NO.

If You answered "YES" to question 2(a) or 2(b) then proceed to question 3.

If You answered "NO" to both question 2(a) and 2(b) then proceed to sign the attestation at the end of this document.

3. The name and address of each party other than the above-captioned debtor against whom You have made a demand that has given rise to a Collateral Source Recovery:

_____
_____

4. As of the date this form is completed, provide the gross recoveries You have received (before deducting any cost or expense, including attorneys' fees and costs paid or incurred by the holder):

Amount: _____

5. The Collateral Source Recoveries that the undersigned has received, as disclosed in response to question number 4 above, were premised on the following legal claims or theories:

_____
_____

6. The name and address of each party other than the above-captioned debtor against whom You have made a demand that may give rise to a Collateral Source Recovery:

_____
_____

7. Do you anticipate receiving Collateral Source Recoveries from any of the sources disclosed in question number 6?

☐ YES.    ☐ NO.

8. If you answered "Yes" to question number 7, from which source(s) do you anticipate

receiving Collateral Source Recoveries:

_____

_____


BY EXECUTING THIS DISCLOSURE, I UNDERSTAND THAT I AM REQUIRED TO REMIT TO THE LIQUIDATING TRUST:  (I) DISTRIBUTIONS I RECEIVE IN EXCESS OF THE AMOUNT I WAS ENTITLED TO RECEIVE ON ACCOUNT OF MY CLAIM IF ALLOWED; (II) DISTRIBUTIONS I RECEIVED ON MY CLAIM THAT IS DISALLOWED SUBSEQUENT TO A DISTRIBUTION BEING MADE; AND (III) AN AMOUNT OF CASH EQUAL TO THE VALUE OF ALL COLLATERAL SOURCE RECOVERIES I RECEIVE THAT WERE NOT DISCLOSED AS HAVING BEEN RECEIVED AS OF THE DATE OF THIS DISCLOSURE (WHETHER EXISTING AT THE TIME OF THIS DISCLOSURE OR ARISING IN THE FUTURE); PROVIDED, HOWEVER THAT IN NO EVENT SHALL I BE REQUIRED TO REMIT CASH TO THE LIQUIDATING TRUST IN AN AMOUNT THAT IS GREATER THAN THE SUM OF SUCH HOLDER'S DISTRIBUTIONS.

I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.


Name of Creditor: _____

By:_____
        [Print Name]

Title:_____

Signature:_____

Sign and Return To:

**Trustee Services, Inc.**
**1844 N. Nob Hill Road, #613**
**Plantation, FL  33322**

Appendix 10.8

<u>Litigation Pending Against TD Bank Releasees</u>

*Arvidson, et al. v. TD Bank, N.A., et al.*, Case No. 12-30370, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Beverly, et al. v. TD Bank, N.A., et al.*, Case No. 13-60176, United States District Court for the Southern District of Florida (this case was referred to the United States Bankruptcy Court for the Southern District of Florida by order entered January 30, 2013 [ECF Doc. No. 5] as a proceeding related to the Chapter 11 Case, but it has not been docketed as a separate adversary proceeding) and, as remanded, Case No. 12-32710, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Gayla Susan Levin v. TD Bank, et al.* (*In re George Levin*), Case No. 10-33696, AP Case No. 13-01061, United States Bankruptcy Court for the Southern District of Florida, and, as remanded, Case No. 12-35089, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*George G. Levin v. TD Bank, et al.* (*In re George Levin*), Case No. 10-33696, AP Case No. 13-01060, United States Bankruptcy Court for the Southern District of Florida, and, as remanded, Case No. Case No. 12-35407, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Deborah Marlin as Trustee of the Deborah Marlin Revocable Trust U/A 06/01/98, et al. v. TD Bank, et al.*, Case No. 13-6202, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Platinum Partners Value Arbitrage Fund, LP, et al. v. TD Bank, N.A.*, Case No. 12-023947, Circuit Court of the 17th Judicial Circuit in Broward County, Florida.

*Razorback Funding, LLC, et al. v. Scott W. Rothstein, et al.*, Case No. 09-062943 (07), Circuit Court for the 17th Judicial District in Broward County, Florida., except the *Plaintiffs' Amended Motion for Sanctions Against TD Bank, N.A.* dated as of December 10, 2012;

*RWRK Investments, LLC, et al. v. TD Bank, N.A., et al.*, Case No. 12-15605 (13), Circuit Court for the 17th Judicial District in Broward County, Florida.

*Stettin v. TD Bank, N.A.* (*In re Rothstein Rosenfeldt Adler, P.A.*), Case No. 09-34791, AP Case No. 11-02368, United States Bankruptcy Court for the Southern District of Florida.

Appendix 11.1.2

<u>Stipulation and Order Regarding The Policies</u>



**ORDERED in the Southern District of Florida on October 16, 2012.**

Raymond B. Ray, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:                                                    Case No.: 09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,          Chapter 11 Case

      Debtor.

_____/

<u>**ORDER GRANTING MOTION TO APPROVE COMPROMISE**</u>
<u>**AND SETTLEMENT BETWEEN THE CHAPTER 11 TRUSTEE AND THE**</u>
<u>**GIBRALTAR D&O'S, THE RAZORBACK PARTIES AND THE MORSES**</u>
<u>**AND FOR ENTRY OF BAR ORDER**</u>

**THIS CAUSE** came before the Court for hearing on October 2, 2012 at 9:30 a.m., upon

the Trustee's Amended Joint *Motion to Approve (1) Settlement with Gibraltar Private Bank &*

*Trust Company and Certain of Its Officers and Directors Including John Harris, Charles*

*Sanders, Lisa Ellis & Steven D. Hayworth (the "D&O Settlement Agreement"); (2) Entry of Bar*

*Orders; (3) Settlement and Assignment Agreement by and Among the Trustees and the Morses;*

*(the "Trustees/Morses Agreement") and (4) Settlement Agreement by and Among the Trustees*

1

*and the Razorback Parties (the "Trustees/Razorback Agreement")* [ECF No. 3301] (the "**Motion**") filed by the Trustee on August 17, 2012. The Court has reviewed the Motion, and has considered the entire record in this case and the arguments of counsel at the hearing on the Motion and evidence adduced in support of the Motion (including any evidence offered by proffer and accepted by the Court without objection of any party) and having noted the withdrawal of the Objections to the Motion filed by FEP Victims Group [ECF Nos. 3445 and 3470] and RWRK [ECF Nos. 3449 and 3471]. The Court finds that notice of the Motion and the hearing thereon is sufficient [ECF Nos. 3385 and 3392] and that no other or further notice is or shall be required; having noted that no other objection to the Motion was raised by any party in interest, other than an objection filed *pro se* by Miriam Donner [ECF No. 3347], who did not appear at the hearing; having found that the settlement and compromise set forth in the Motion is reasonable and in the best interests of creditors and the estate; and having found that good and sufficient cause has been shown to warrant the entry of this Order. Based on the foregoing, it is

**ORDERED** as follows:

1.　　The Motion is **GRANTED**, and all Objections are moot by virtue of being withdrawn or overruled, including the objection filed *pro se* by Miriam Donner [ECF No. 3347]. The request for a bar order shall be granted by separate order.

2.　　The terms of the D&O Settlement Agreement attached to the Motion as Exhibit "B," the Trustees/Razorback Agreement attached to the Motion as Exhibit "C," and the Trustees/Morses Agreement attached to the Motion as Exhibit "D," are approved and incorporated herein in their entirety. The Trustee is further authorized to take any action necessary to effectuate the D&O Settlement Agreement, the Trustees/Razorback Agreement and the Trustees/Morses Agreement.

3.     The Stipulation Concerning National Union's Motion to Withdraw the Reference, Motion to Stay, Objection, and Request For Judicial Notice in Support of the Objection to the Trustees' Amended Joint Motion to Approve (1) Settlement with Gibraltar Private Bank & Trust Company and Certain of its Officers and Directors Including John Harris, Charles Sanders, Lisa Ellis & Steven D. Hayworth; (2) Entry Of Bar Orders; And (3) Settlement and Assignment Agreement by and Among the Trustee and the Morses; and (4) Settlement Agreement by and among the Trustee and The Razorback Parties previously approved by the Court [ECF No. 3447] (the "National Union Stipulation") is adopted and incorporated herein by reference.

4.     The Court reserves jurisdiction regarding the interpretation, effectuation, and enforcement of the terms of the D&O Settlement Agreement, the Trustees/Razorback Agreement and the Trustees/Morses Agreement, the National Union Stipulation and this Order.

# # #

Submitted By
John H. Genovese, Esq.
Genovese Joblove & Battista, P.A.
Miami Tower
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Telephone: 305-349-2300
Facsimile: 305-349-2310
Email: JGenovese@gjb-law.com

Copies Furnished To:
John H. Genovese, Esq.
[Attorney Genovese is directed to serve a copy of this Order upon all parties in interest].

3



**ORDERED in the Southern District of Florida on September 27, 2012.**

Raymond B. Ray, Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
www.flsb.uscourts.gov

In re                                                       CASE NO. 09-34791-BKC-RBR
                                                            CHAPTER 11
ROTHSTEIN ROSENFELDT
ADLER, P.A.,

      Debtor.
_____/

### ORDER DENYING AS MOOT
### NATIONAL UNION FIRE INSURANCE
### COMPANY OF PITTSBURGH, PA'S OBJECTION TO TRUSTEES' AMENDED
### JOINT MOTION TO APPROVE SETTLEMENT WITH GIBRALTAR PRIVATE
### BANK AND TRUST COMPANY AND RELATED AGREEMENTS [ECF NO. 3359]

**THIS MATTER** came before the Court on <u>September 19, 2012 at 2:30 p.m.</u> upon

National Union Fire Insurance Company of Pittsburgh, PA ("National Union") on behalf of itself

and its affiliates (including American International Specialty Lines Insurance Co.), objection to

the Trustees' Amended Joint Motion to Approve (1) Settlement with Gibraltar Private Bank and

Trust Company and Certain of its Officers and Directors Including John Harris, Charles Sanders,

Lisa Ellis & Steven D. Hayworth; (2) Entry of Bar Orders; (3) Settlement and Assignment

Agreement by and among the Trustees and the Morses; and (4) Settlement Agreement by and

among the Trustees and the Razorback (the "National Union Objection").  The Court, having conducted a hearing, noting the agreement of counsel, being advised that the parties have entered into a Stipulation Concerning National Union's Motion to Withdraw the Reference, Motion to Stay, Objection, and Request For Judicial Notice in Support of the Objection to the Trustees' Amended Joint Motion to Approve (1) Settlement with Gibraltar Private Bank and Trust Company and Certain of its Officers and Directors Including John Harris, Charles Sanders, Lisa Ellis & Steven D. Hayworth; (2) Entry Of Bar Orders; And (3) Settlement and Assignment Agreement by and Among the Trustee and the Morses; and (4) Settlement Agreement by and among the Trustee and The Razorback Parties (the "Stipulation") and being otherwise duly advised in the premises, it is:

**ORDERED:**

1.     The National Union Objection is **DENIED as MOOT.**

2.     The Stipulation annexed hereto as Exhibit "A" is **APPROVED** by Order of this Court *Nunc Pro Tunc* to September 19, 2012.

# # #

Submitted By
John H. Genovese, Esq.
Genovese Joblove & Battista, P.A.
Miami Tower
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Telephone: 305-349-2300
Facsimile: 305-349-2310
Email: jgenovese@gjb-law.com

Copies Furnished To:

John H. Genovese, Esq.
[Attorney Genovese is directed to serve a copy of this Order upon all parties in interest].

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

| | |
|---|---|
| In re: | |
| | |
| ROTHSTEIN ROSENFELDT ADLER P.A., | CASE NO.: 09-34791-RBR |
| | |
| Debtor | CHAPTER 11 |
| | |
| In re: | Case No.: 10-33691-RBR |
| | |
| BANYON 1030-32, LLC, | CHAPTER 7 |
| | |
| Debtor | |
| In re: | Case No. 11-40929-RBR |
| | |
| BANYON INCOME FUND, LP, | CHAPTER 7 |
| | |
| Debtor | |

**STIPULATION CONCERNING NATIONAL UNION'S MOTION TO WITHDRAW THE REFERENCE, MOTION TO STAY, OBJECTION, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF THE OBJECTION TO THE TRUSTEES' AMENDED JOINT MOTION TO APPROVE (1) SETTLEMENT WITH GIBRALTAR PRIVATE BANK AND TRUST COMPANY AND CERTAIN OF ITS OFFICERS AND DIRECTORS INCLUDING JOHN HARRIS, CHARLES SANDERS, LISA ELLIS & STEVEN D. HAYWORTH; (2) ENTRY OF BAR ORDERS; AND (3) SETTLEMENT AND ASSIGNMENT AGREEMENT BY AND AMONG THE TRUSTEE AND THE MORSES; AND (4) SETTLEMENT AGREEMENT BY AND AMONG THE TRUSTEE AND THE RAZORBACK PARTIES**
*(ECF Nos. 3301, 3359, 3360, 3361, and 544, 549, 550 and 551)*

National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") and Twin City Fire Insurance Company (**"Twin City"**) (collectively the **"Insurers"**), on the one hand, and the Chapter 11 Trustee of the estate of Rothstein Rosenfeldt Adler, P.A. (the "**RRA Trustee**") and the Chapter 7 Trustee for the estates of Banyon 1030-32, LLC and Banyon Income Fund, LP (the "**Banyon Trustee**") (collectively the "**Trustees**" and together with the

Insurers, the "**Parties**" and/or "**Party**" if used sigularly), on the other hand, hereby enter into this stipulation (the "**Stipulation**"), subject to the Court's approval, as follows:

1.     The Trustees have filed *Trustee's Amended Joint Motion to Approve (1) Settlement with Gibraltar Private Bank and Trust Company and Certain of its Officers and Directors Including John Harris, Charles Sanders, Lisa Ellis & Steven D. Hayworth; (2) Entry of Bar Orders; (3) Settlement and Assignment Agreement by and among the Trustees and the Morses; and (4) Settlement Agreement by and Among the Trustees and the Razorback Parties* (the "**Bar Order Motion**") [In re Rothstein, Rosenfeldt Adler P.A., Case No. 09-34791-RBR, ECF No. 3301; In re Banyon 1030-32, LLC, Case No. 10-33691-RBR, ECF No. 544] on August 17, 2012.

2.     The settlement sought to be approved in the Bar Order Motion includes an assignment to the Trustees by Gibraltar Private Bank and Trust Company ("**Gibraltar**") and certain of its directors and/or officers of their rights to pursue claims against National Union and Twin City under insurance policies issued to Gibraltar by National Union (Policy No. 01-232-51-05) and Twin City to Gibraltar (Policy No. 00 DA 0259335-09) (the "**Policies**").

3.     National Union, in response to the Bar Order Motion, has filed:

   i.     Objection to the Bar Order Motion [In re Rothstein, Rosenfeldt Adler P.A., Case No. 09-34791-RBR, ECF No. 3359; In re Banyon 1030-32, LLC, Case No. 10-33691-RBR, ECF No. 549] ("**Bar Order Objection**");

   ii.    Request for Judicial Notice in Support of National Union's Objection to the Bar Order Motion [In re Rothstein, Rosenfeldt Adler P.A., Case No. 09-34791-RBR, ECF No. 3360; In re Banyon 1030-32, LLC, Case No. 10-33691-RBR, ECF No. 550] ("**RJN**");

iii.     Motion to Withdraw the Reference for the Bar Order Motion [In re Rothstein, Rosenfeldt Adler P.A., Case No. 09-34791-RBR, ECF No. 3361; In re Banyon 1030-32, LLC, Case No. 10-33691-RBR, ECF No. 551] (**"Motion to Withdraw Reference"**); and

iv.     Motion to Stay Pursuant to Rule 5011 of the Federal Rules of Bankruptcy Procedure the Bar Order Motion [In re Rothstein, Rosenfeldt Adler P.A., Case No. 09-34791-RBR, ECF No. 3364; In re Banyon 1030-32, LLC, Case No. 10-33691-RBR, ECF No. 552] (**"Motion to Stay"**) (i-iv, collectively, "**National Union Filings**").

4.     Twin City intends to join in the National Union Filings and/or submit similar filings of its own.

5.     To resolve the issues raised by the National Union Filings and any filing that could have been filed by Twin City requesting similar relief, the Parties have agreed, subject to the Court's approval, as follows:

i.     Notwithstanding the terms of the Bar Order Motion or any order granting or relating to it, any actions (including defenses or counterclaims) between one or more of the Trustees and one or more of the Insurers arising out of or relating to the Policies, including but not limited to any action to recover under the Policies by the Trustees or any action for declaratory relief or rescission by the Insurers, shall be filed and litigated exclusively in the United States District Court for the Southern District of Florida. The Parties agree that under no circumstances, and for no purposes, shall any such actions be referred to the United States Bankruptcy Court for the

Southern District of Florida as related to the bankruptcy cases, and no Party shall seek or suggest such referral. In the event of such referral for any reason that is not revoked absolutely within 45 days, with the reference being withdrawn in its entirety with no pre-trial or other proceedings of any kind before the Bankruptcy Court, then the Party initiating the action shall immediately dismiss it without prejudice, subject to re-filing in the Southern District of Florida and/or pursuant to the ADR provision in the National Union policy. The Parties further expressly agree that the provisions of this paragraph are not an impairment, waiver or modification of any ADR provision or requirement in the applicable Policies.

ii. Nothing in the Bar Order Motion, or any order granting or relating to it, shall impair, waive or otherwise modify the terms, conditions, limitations and exclusions in the Policies, or any rights, claims, arguments, causes of action, defenses or counterclaims that any party to this Stipulation may have under the Policies, at law or in equity, including but not limited to challenges to the reasonableness of the settlement amount agreed to between the Chapter 11 Trustee of the Estate of Rothstein Rosenfeldt Adler, P.A., the Chapter 7 Trustee for the Estates of Banyon 1030-32, LLC and Banyon Income Fund, LP, the Razorback Plaintiffs, the Estate of Edward J. Morse, Carol A. Morse and Morse Operations, Inc, and certain officers and directors of Gibraltar Private Bank & Trust (Lisa Ellis, John Harris, Steven Hayworth and Charles Sanders). All such rights, claims, arguments, causes of action, defenses and counterclaims (including without

limitation the right of the Insurers to dispute their responsibility under the Policies to pay all or any aspect of the Settlement Amount) may be asserted by or against the Trustees, including the Trustees as assignees of Gibraltar and certain of its directors and officers, in any action relating to the Policies, as if, and to the same extent, that the Insurer could have asserted such rights, arguments, causes of action or defenses against an Insured under one or more of the Policies.

iii.  This Stipulation, and resolution of the National Union Filings, are not, other than as expressly set forth above with respect to the Trustees: (a) an agreement that the Policies are valid and enforceable; (b) an acknowledgement or agreement that Gibraltar, its directors and officers, or the Trustees as assignees, have valid claims under the Policies; (c) a waiver of any rights that any party to this Stipulation maintains to enforce the terms, conditions and exclusions in the Policies, at law or equity; and/or (d) an impairment, waiver or other modification of any rights, claims, arguments, causes of action, defenses or counterclaims arising under or otherwise related to the Policies. Except as stated herein, the Parties agree that no action taken in connection with this Stipulation and the agreements memorialized herein shall be construed as or asserted as a waiver of any of the terms, conditions, limitations or exclusions in the Policies.

iv.  The terms of this Stipulation, once effective, shall be binding on the Parties and their respective successors-in-interest and assigns.

6.  This Stipulation shall only be effective provided that (i) an Order approving

Stipulation and the Order approving this Stipulation.

7.     Upon entry on or before September 19, 2012 of an order by the Court approving this Stipulation, the National Union Filings shall be deemed provisionally resolved and on that basis co-withdrawn, subject to the Stipulation becoming effective as provided in paragraph 6, above.

IT IS SO STIPULATED.

| DATED:<br><br>September 18, 2012 | ALSTON & BIRD LLP<br>333 South Hope Street<br>16th Floor<br>Los Angeles, CA 90071-3004<br><br>By: _____<br>Michael J. Hartley / Brant T. Stein<br>Attorneys for National Union<br>Fire Insurance Company of Pittsburg, Pa. |
|---|---|
| DATED:<br><br>September 19, 2012 | VER PLOEG & LUMPKIN, P.A.<br>100 Southeast 2nd Street<br>30th Floor<br>Miami, Florida 33131<br><br>By: _____<br>Jason S. Mazer<br>Attorneys for RRA Trustee |
| DATED:<br><br>September 18, 2012 | STICHTER RIEDEL BLAIN & PROSSER, P.A.<br>110 East Madison Street<br>Suite 200<br>Tampa, Florida 33602<br><br>By: _____<br>Russell Blain<br>Attorneys for Banyon Trustee |
| DATED:<br><br>September 18, 2012 | KAPLAN ZEENA LLP<br>2 South Biscayne Blvd.<br>Suite 3050<br>Miami, Florida 33131<br><br>By: _____<br>James M. Kaplan<br>Attorneys for Twin City |

**EXHIBIT 2**
**The Liquidation Analysis**

ROTHSTEIN ROSENFELDT ADLER, P.A.

LIQUIDATION ANALYSIS NOTES AND DISCLOSURES

A.      Introduction.[1]

In connection with the *Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code Proposed Jointly by the Trustee and the Official Committee of Unsecured Creditors* filed with the Bankruptcy Court on May 8, 2013 [ECF No. 4392], as may be amended (the "Plan") and the *Disclosure Statement in Connection with the Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code Proposed Jointly By the Trustee and the Official Committee of Unsecured Creditors*, filed concurrently with the Plan [ECF No. 4391], as may be amended (the "Disclosure Statement"), the following analysis (the "Analysis") consists of two parts: (i) the Projected Distributions under Chapter 11 Plan (the "Ch. 11 Analysis") and (ii) the Hypothetical Liquidation Analysis (the "Ch. 7 Analysis"). The Analysis has been prepared by Herbert Stettin, the Chapter 11 Trustee (the "Ch. 11 Trustee") with the assistance of his financial advisors and should be read in conjunction with the Plan, the Disclosure Statement, and these notes accompanying the Analysis (collectively, the "Notes").

The Ch. 7 Analysis has been prepared assuming the Debtor's current Chapter 11 case converts to a case under Chapter 7 of the Bankruptcy Code on or about July 19, 2013 (the "Conversion Date") and any remaining assets of that date are monetized and liquidated. The liquidation is assumed to occur over an eighteen month period (the "Wind-Down Period").

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the "best interests test"), with respect to each impaired class of claims, each holder of a claim must either (a) accept the plan or (b) receive or retain under the plan on account of such allowed claim property of a value, as of the plan's assumed effective date, that is not less than the value such non-accepting holder would receive or retain if the debtor were to be liquidated under Chapter 7 of the Bankruptcy Code. The Ch. 11 Trustee believes that the Plan meets the "best interests test" as set forth in section 1129(a)(7) of the Bankruptcy Code because the holders of Allowed Claims in each Impaired Class of Claims in the Plan will receive at least as much under the Plan as they would if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

---

[1]     Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to it in the Plan.

1

To demonstrate compliance with and satisfaction of the "best interests test," the Ch. 11 Trustee, with the assistance of his financial advisors, has prepared the Analysis. The Analysis relies upon certain assumptions described in the Disclosure Statement and the Notes.  The Analysis is based on unaudited projected financial data as of July 19, 2013, unless otherwise indicated, which is subject to change, and these values, in total, are assumed to be representative of the Debtor's assets as of the Conversion Date.

The Ch. 7 Analysis estimates the assets obtained, and expenses incurred by the Estate if a Chapter 7 Trustee (the "Ch. 7 Trustee") was appointed and charged with monetizing all of the Debtor's non-cash assets and distributing the proceeds in accordance with the statutory scheme of Chapter 7.  If the Debtor were liquidated pursuant to a Chapter 7 case, the Ch. 11 Trustee believes that the value available to creditors would be reduced by the additional costs of the Chapter 7 liquidation, which include the (i) fees and expenses of the Ch. 7 Trustee appointed to manage the liquidation, (ii) fees and expenses of the legal counsel, financial advisors and other professionals retained by the Ch. 7 Trustee to assist with the Chapter 7 liquidation, and (iii) other administrative costs to wind-down the Chapter 7 estate.

## B.    Scope, Intent, and Purpose of the Analysis.

Estimating recoveries in any hypothetical Chapter 7 liquidation is an uncertain process due to the number of unknown variables and is necessarily speculative.  Thus, the Analysis includes and is based upon certain estimates and assumptions. The Trustee's counsel and financial advisors consider such estimates and assumptions to be reasonable, but the Trustee recognizes that the Analysis is subject to significant risks, litigation uncertainties and contingencies beyond his control.  Inevitably, some assumptions in the Analysis may not materialize under either the Ch. 7 Analysis or the Ch. 11 Analysis.

THE CH. 11 TRUSTEE MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THE ANALYSIS.

In preparing the Analysis, the amount of Allowed Claims, and accordingly, the corresponding distributions, have been estimated primarily based upon a review of scheduled Claims and filed proofs of claim associated with pre-petition and post-petition

obligations, and, therefore, such estimate is subject to material variation.[2]  In the event litigation were to become necessary to resolve claims asserted in a Chapter 7 liquidation the Chapter 7 estate would be burdened by additional administrative expenses, thereby increasing the total amount of the claims and delaying potential distributions. The effects of this delay on the value of distributions under the hypothetical liquidation have not been considered.

NOTHING CONTAINED IN THIS ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE CH. 11 TRUSTEE.  THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH IN THE ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY AND SIGNIFICANTLY DIFFER FROM THE AMOUNT OF CLAIMS ESTIMATED IN THE ANALYSIS.   EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT THIS ANALYSIS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE CH. 11 TRUSTEE DOES NOT INTEND AND DOES NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE ANALYSIS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THIS ANALYSIS IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE ANALYSIS.

THIS ANALYSIS WAS DEVELOPED SOLELY TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

C.    **Results of the Analysis.**

---

[2]    The estimation of the General Unsecured Claims in Lines [14], [17] and [35] assumes approval of the settlement (as more particularly described in ECF No. 4407) between the Ch. 11 Trustee and the Sochet Entities (as defined in ECF No. 3738).

The estimated value of a hypothetical Chapter 7 liquidation for all assets of and the estimated amount of claims asserted against the Debtor was calculated based on assumptions provided in the Notes.  As is demonstrated in the Analysis, the holders of Allowed Claims in each Impaired Class of Claims in the Plan will receive at least as much under the Plan as they would if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.   In particular, all holders of non-subordinated, Allowed General Unsecured Claims in the Chapter 11 case (Classes 1-5) and the holders of the Funds' Subordinated Unsecured Claim (Class 6), are expected to receive substantially more under the Plan than under a Chapter 7 liquidation.   Accordingly, the Ch. 11 Trustee believes that the Plan meets the "best interests test" as set forth in section 1129(a)(7) of the Bankruptcy Code.

**D.     Global Notes to the Ch. 7 Analysis.**

   **1.   Conversion Date and Appointment of a Chapter 7 Trustee.**

As stated above, the Liquidation Analysis assumes a Conversion Date of July 19, 2013.  On the Conversion Date, it is assumed that the Bankruptcy Court will appoint a Ch. 7 Trustee to oversee the liquidation of the Estate.

   **2.   Likely Consequences of a Conversion to Chapter 7.**

As a result of conversion, a new claims bar date will be established allowing for additional claims and potentially diluting distributions to current claim holders in the Chapter 11 case.  While it is normally difficult to quantify the claims that might be filed if the bar date was reopened, in this case the Trustee is able to generate an estimate of additional claims based upon the restitution claims filed in the Scott Rothstein criminal case, *United States v. Rothstein*, 09-60331-JIC (S.D. Fla. 2009) (the "Rothstein Criminal Case").

As part of his sentencing Scott Rothstein was ordered to pay restitution of $363,172,140. The government was ordered to prepare a report for the Trustee indicating which restitution claimants were also claimants in the RRA case.   The Trustee, as per that Court order, is not permitted to share that data with the any party. However, further analysis indicates that there is "overlap" between the RRA creditor body and the restitution creditor body of approximately $251,281,460 or approximately 69% of the restitution claims.  Accordingly, there are $111,890,680.10 in claims that have been allowed as restitution in the Rothstein Criminal Case that are not duplicative of the claims filed against the RRA estate (the "Non-Overlap Claims").  The Trustee has not been able to verify the identities of the individual claimants that hold Non-Overlap Claims, because the court overseeing the Rothstein Criminal Case has not permitted the government to turn over the data. Accordingly, the Trustee has conservatively,

4

estimated that at least 10% on the low end and 30% on the high end of the total amount of the Non-Overlap Claims would file claims in the RRA estate in the event the bar date was reopened.  It is likely that the Ch. 7 Trustee and his or her professionals would have to expend significant resources reconciling these additional claims.

Moreover, the Ch. 7 Trustee would be required hire his or her own professionals which will result in (i) the delay of resolving litigation claims, potentially decreasing their value and (ii) the increased expense of the new professionals becoming familiar with the details of all aspects of the current adversary proceedings and other matters.

Finally, the Ch. 7 Analysis assumes that holders of non-subordinated unsecured claims who are also the subject of avoidance action proceedings would assert claims against the Estate under section 502(h) of the Bankruptcy Code because the Allowed Claims of such holders would likely receive a distribution less than 100% of their Allowed Claims from the Estate.

### 3. **Assets to be Liquidated.**

The Debtor was a law firm which, due to the circumstances under which it was placed into an involuntary bankruptcy, ceased operations on or about the Petition Date. At that time, the Ch. 11 Trustee was appointed and began the process of liquidating the Debtor's assets.  As of the filing of the Plan, the Ch. 11 Trustee has converted a majority[3] of the Debtor's assets to cash.  The assets reflected in the Analysis consist of (i) cash on hand, (ii) the value (if any) of uncollected accounts receivable, (iii) the value of funds to be received by the Estate from various settlements already approved by the Bankruptcy Court, and (iv) the estimated value of proceeds to be obtained in various pending and future adversary proceedings (the remaining assets consist of causes of action against various third parties (as defined in the Plan, the Litigation Claims)).

### 4. **Estimated Costs of Liquidation.**

The Ch. 7 Analysis includes expenses expected to be incurred during the Wind-Down Period, including those related to fees for the Ch. 7 Trustee, legal and other professional fees of the Ch. 7 Trustee, and operating/wind-down expenses of the Chapter 7 estate.

### E.    **Notes to the Ch. 7 Analysis.**

---

[3]    The Ch. 11 Trustee maintains a small amount of office furniture and computer equipment/servers in order for its professionals to have access to necessary electronic information.  The value of these assets is *de minimis* and not included in the Liquidation Analysis.

1.  **Cash On Hand** – Line [1]:  Cash On Hand reflects the aggregate balance in the Debtor's combined bank accounts as of May 6, 2013.

2.  **Settlement Funds Receivable** – Line [2]:  Settlement Funds Receivable represents the remaining amounts due to the Ch. 11 Trustee pursuant to settlement agreements that have already been approved by the Bankruptcy Court.  The high value reflects the aggregate remaining payments due to the Ch. 11 Trustee under the various court-approved settlement agreements.  The low value assumes the sum of the following two components: (i) 100% collection of the $26 million remaining settlement payments due to the Ch. 11 Trustee from a settlement entered into between the Ch. 11 Trustee and certain Funds (as defined in the Plan, the Funds) described more fully in the *Motion to Approve Settlement and Compromise with Certain Adversary Defendants*, dated July 12, 2012 [ECF No. 3185] that was approved by Final Order of the Bankruptcy Court on August 28, 2012 [ECF No. 3352]; *plus* (ii) a reduction of 20% of the remaining settlement payments due to the Ch. 11 Trustee from the other court-approved settlements (in order to account for possible defaults or other scenarios under which the Ch. 11 Trustee may not collect the full amount remaining due).

3.  **Cash in Trust** – Line [3]:  Cash in Trust represents the amount currently being held in the trust account of the Ch. 11 Trustee's counsel.  Release/use of these funds is subject to certain key events.  The following represents a break-down of the amount on Line [3]:

    |   |   |   |
    |---|---|---|
    | 1. | Morse | $4,000,000.00 |
    | 2. | Tonnachio | $300,000.00 |
    | 3. | Aran Deve. | $50,000.00 |
    | 4. | JR Dunn | $ 58,333.33 |
    | 5. | Kent | $1,000,000.00 |
    | 6. | Roger Stone | $1,000.00 |
    | 7. | VRLP1 | $549,980.00 |
    | 8. | Other | $308,242.07 |
    | 9. | Brian Levy | $25,000.00 |
    |   | Total | $6,292,555.40 |

4.  **Value of RRA Accounts Receivable** – Line [4]:  The schedules filed in the beginning of the Debtor's involuntary Chapter 11 case reflected accounts receivable valued at approximately $13 million.  Subsequent to the filing of the Debtor's schedules, the Ch. 11 Trustee made significant attempts to

6

verify this amount.  However, as a result of the poor internal operating procedures followed by the Debtor prior to the start of its Chapter 11 case as well the Debtor's poor prepetition billing practices, it is not possible to achieve a completely accurate verification of the outstanding accounts receivable as of the Petition Date.  Therefore, the Ch. 11 Trustee believes the Debtor's accounts receivable were significantly overstated in the Debtor's prepetition books and records.  With the approval of the Bankruptcy Court, the Ch. 11 Trustee also retained special counsel to collect these accounts receivable.

To date, special counsel has collected approximately $1.5 million of these accounts receivable.  Currently, there remain 83 pending, collection proceedings involving an aggregate amount of approximately $1.0 million in potential accounts receivable.  The high value assumes collection of 10% of the potential accounts receivable and the low value assumes collection of 0% of the potential accounts receivable.

5.   **Value of Litigation Claims** – Line [5]:  The Ch. 11 Trustee's counsel has filed numerous adversary proceedings.  While many have settled, many are still pending.   Providing details regarding the value assigned to each individual claim in each adversary proceeding would require the Ch. 11 Trustee to divulge information subject of the work product protection doctrine or the attorney-client privilege.  The high value assumes a litigation recovery of approximately 20%, and the low value assumes a litigation recovery of approximately 10%, of the combined gross amount of the claims asserted in the relevant complaints.  To be clear, these values do not reflect the Ch. 11 Trustee's internal recovery projections for currently pending adversary proceedings.  The Ch. 11 Trustee's collection rate in respect of the claims he has asserted has ranged from 0%-100% of the demand. However, disclosing the actual average rate of collection would severely hamper the Estate's ability to resolve the remaining adversary proceedings on terms most favorable to the Estate as defendants would likely only be willing to settle cases for the average settlement percentage.

Also, the TD Bank adversary has been excluded (as it is a separate line item (see Line [6]).

Additionally, the United States of America ("USA") previously seized and forfeited bank accounts in the name of RRA as well as all business and personal assets in which the RRA Estate has asserted an interest.  An

7

appellate ruling is pending as to the propriety of such action. At this time, no value has been ascribed to these assets as doing so would be purely speculative.

6. **Value of TD Bank Adversary (net of litigation costs)** – Line [6]: The complaint filed in this adversary proceeding ascribes a gross value of approximately $10.2 million for the "Potential Fraudulent Transfers" described therein and identified in the "Composite Exhibit B" attached thereto (Adversary Proceeding 11-02368-RBR [ECF No. 1]). Under the Analysis, no value has been ascribed to the tort claims asserted in this adversary proceeding because these damage claims, which may be significant, are at this time unliquidated. As such, "[t]here is no requirement in case law or statute that a disclosure statement estimate the value of specific unliquidated tort claims." *See In re A.H. Robins Co., Inc.,* 880 F.2d 694,697 (4th Cir. 1989). In addition, the Analysis assumes the adversary proceeding against TD Bank will take two years to resolve. The high value represents the net amount of proceeds adjusted for litigation costs (at approximately 30% contingency). The low value assumes the Ch. 7 Trustee does not prevail and therefore is reflected at zero.

7. **Chapter 7 Trustee Fees & Accumulated & Unpaid Ch. 11 Trustee Fees** – Line [8]: Ch. 7 Trustee fees include those fees associated with compensating the Ch. 7 Trustee in accordance with section 326 of the Bankruptcy Code. Fees have been calculated based upon the following escalating scale provided by the Bankruptcy Code:

> 25.0% of the first $5,000
> 10.0% of the next $45,000
> 5.0% of the next $950,000
> 3.0% in excess of $1,000,000

The high value assumes that a higher amount of assets are collected by the Ch. 7 Trustee, and the low value assumes that a lower amount of assets are collected by the Ch. 7 Trustee.[4]

Additionally, Line [8b] reflects the prorated U.S. Trustee fee that would be due upon conversion, for the distributions made during the time period prior to conversion.

---

[4] Wind-Down Operating Costs – Non-professional costs are approximately $12,000 per month. The resulting costs have not been reflected in the Liquidation Analysis as they are *de minimis* and do not have any material impact on it.

8

4978106-1

8. **Ch. 7 Trustee Professional Fees** – Line [9]: It is assumed that the Ch. 7 Trustee would retain his or her own legal counsel and financial advisors (and potentially other professionals). Professional fees for the Chapter 7 professionals are projected to total $6.6 million, comprised of the sum of the following components: (i) $500,000 per month for the first six months following the Conversion Date; (ii) $350,000 per month thereafter for a period of six months (i.e., months 7 through 12 following the Conversion Date); and (iii) $250,000 per month thereafter for the final six months of the Wind-Down Period (i.e., months 13 through 18 following the Conversion Date). The low value assumes 75% of the high value.

9. **Accumulated & Unpaid Professional Fee Holdbacks Prior to Conversion** – Line [10]: These fees are the same as the fees that are included in the Ch. 11 Analysis Line [30], as the date of conversion is the same as the potential Effective Date. Accordingly, please see Line [30] for further explanation.

10. **Priority Claims** – Line [11]: Priority Claims primarily include the allowed priority unsecured claims of the former employees of the Debtor, up to the statutory cap of $10,950 (as of the Petition Date), pursuant to section 507(a)(4) of the Bankruptcy Code. The difference between the low and high values depends on the resolution of Thirteen Aqua Holdings litigation, wherein the claimant has asserted a priority claim and the Trustee has asserted that it does not have a claim.

11. **Priority Tax Claims** – Line [12]: Priority Tax Claims include the priority unsecured claims of governmental units pursuant to section 507(a)(8) of the Bankruptcy Code.

12. **Ch. 11 Substantial Contribution Claim** – Line [13]: Pursuant to a certain settlement entered into by the Ch. 11 Trustee and various parties described in the Plan as the Razorback Plaintiffs and detailed more fully in the *Motion to Approve Settlement Agreement Between the Trustee and Various Creditor Parties*, dated August 31, 2012 [ECF No. 3362] (and approved by Final Order of the Bankruptcy Court on October 12, 2012 [ECF No. 3510]), the Ch. 11 Trustee agreed to support a substantial contribution claim in the

9

approximate aggregate amount of $8 million[5] to the extent that the Razorback Plaintiffs choose to seek one.   Should any portion of the substantial contribution claim not be allowed by the Bankruptcy Court as an administrative expense priority, the Razorback Plaintiffs are deemed to hold an additional Allowed General Unsecured Claim in the amount of that portion of the substantial contribution claim not granted administrative expense priority.  Accordingly, the "low" value reflects that no amount of the substantial contribution claim (approx. $8 million) is awarded on an administrative expense priority basis and a corresponding adjustment upward has been made to the estimate of General Unsecured Claims (see Line [14]).  On the other hand, the "high" value reflects that the full amount of the substantial contribution claim (approx. $8 million) is awarded on an administrative expense priority basis and a corresponding adjustment downward is made to the estimate of General Unsecured Claims (see Line [14]).

13.  **General Unsecured Claims** – Line [14a]:   The estimated amount of General Unsecured Claims includes amounts owed to (i) trade creditors, (ii) former employees in excess of the then section 507(a)(4) statutory cap of $10,950, (iii) other general unsecured creditors, and (iv) rejection damage claims arising from the rejection of unexpired leases of nonresidential real property.  The Ch. 11 Trustee is continuing to object to, and settle, asserted Claims and therefore, the amounts utilized for the purposes of this Analysis are subject to change.

For purposes of the Ch. 7 Analysis, Lines [14(a) & 17(a)] assumes that 75% of the amounts received on Line [5] would result in Allowed section 502(h) claims.

The Ch. 11 Trustee has provided two alternative analyses of the hypothetical Chapter 7 case.   The first analysis (the "Chapter 7 CSR Analysis") assumes that the reductions in distributions to holders of Allowed Claims due to Collateral Source Recoveries (as such term is defined in the Plan) are applied in the Ch. 7 Analysis. However, only reductions for gross cash received are applied. Accordingly, in the Ch. 7 CSR Analysis, the following reductions are assumed:

---

[5] The $8 million dollar claim has been reduced on account of the Viceroy Global Investments, Inc. settlement with the Trustee [ECF No. 4216], which results in a waiver of all claims against the estate, including Viceroy's share of the $8 million claim.

10

(a) The Morse distribution is reduced from $49 million to $30.5 million.

(b) The Sochet distribution is not reduced at all, because the Sochet settlement is only effective if the Plan is confirmed and the Effective Date thereunder occur. Accordingly, it is projected at $29.5 million.

(c) the distribution on account of the Emess claim is reduced by $33.75 million to zero.

The second analysis (the "Chapter 7 Non-CSR Analysis") does not adjust the distributions of General Unsecured Claims for Collateral Source Recoveries. As shown by the Ch. 7 Analysis, the sole impact reflected by the two alternative analyses occurs in the percentage recovery range for General Unsecured Claims (compare Line [14a] (Chapter 7 CSR Analysis) with Line [17a] (Chapter 7 Non-CSR Analysis)).

Additionally, the Ch. 11 Trustee has assumed an increase for additional claims that are likely to be filed as a result of a new claims bar date being set in the Chapter 7 case. This amount could be substantial.

As discussed above in Section D(2) relating to Lines [14(b) and 17(b)], there are approximately $111.8 million in Non-Overlap Claims in the Rothstein Criminal Case. Accordingly, the Trustee has conservatively, estimated that at least 10% on the low end and 33.33% on the high side of the total amount of the Non-Overlap Claims would file claims in the RRA estate in the event the bar date was reopened. This is not the sole universe of potential claimants; indeed it is likely that individuals who were not granted or failed to file claims in the Rothstein Criminal Case or the RRA case would now file claims upon conversion in light of the substantial cash on hand. Accordingly, these numbers are conservative.

It is likely that the Ch. 7 Trustee and his or her professionals would have to expend significant resources reconciling these additional claims.

Finally, both the Chapter 7 CSR Analysis and the Chapter 7 Non-CSR Analysis include a General Unsecured Claim for the Banyon Bankruptcy Estates. The claim amount has been included at approximately $77 million, representing (i) the gross amount of the claims asserted in the approximate amount of $95 million, and (ii) an offset of approximately $18 million to

11

account for the claim asserted by the RRA Estate against the Banyon Bankruptcy Estates.

14. **Subordinated Unsecured Claims** – Lines [15 and 18]:  Under either Ch. 7 Analysis no proceeds are estimated to be available to pay Subordinated Claims.  Under the Ch. 7 Analysis, the holders of Allowed Subordinated Claims will not receive any distribution.

15.  **Other Subordinated Unsecured Claims** – Lines [16, 19, and 38] these amounts consist of the claims that are subject to consensual subordination pursuant to Court approved settlements.

## F.    Notes to the Ch. 11 Analysis.

All Notes to the Ch. 7 Analysis are incorporated herein by reference and should be presumed to apply unless otherwise noted herein. In particular, lines 20-23 of the Ch. 11 Analysis mirror lines 1-4 of the Ch. 7 Analysis.

1. **Value of Litigation Claims** – Line [24]:  As compared with Lines [5] & [6] of the Ch. 7 Analysis, the Ch. 11 Trustee has excluded from the calculation of the Litigation Claims the gross value of the adversary proceedings involving TD Bank, Emess Capital, L.L.C., and any recovery on account of the David Boden claims, because those claims are part of settlements proposed in the Chapter 11 Case and in the case of David Boden are likely without significant value. The high value assumes a litigation recovery of approximately 20%, and the low value assumes a litigation recovery of approximately 10%, of the combined gross amount of the claims asserted in the relevant complaints.

2. **TD Bank Contribution** – Line [25]:  Under the terms of the proposed settlement, TD Bank will make a contribution to the Estate in an amount of $72.45 million (less the October Mediation Expense of $67,182.10). Moreover, $39.7 million of the TD Bank Contribution will be paid to the Banyon Bankruptcy estates on account of the Banyon Unsecured Claim of $39.7 million.[6]

3. **Chapter 11 Trustee Fees** – Lines [27 & 28]:  The fees payable to the Ch. 11 Trustee shown on Line [27] consist of compensation payable consistent with section 326 of the Bankruptcy Code and are calculated based upon the

---

[6]As part of the settlement with Banyon the RRA estate will receive a senior subordinated claim of $39.7 million. No recovery is currently projected on account of that asset.

amount appearing on Line [26] adjusted downward by the $39.7 million distribution on the Allowed Banyon Unsecured Claim (Class 5). The high value in Line [27] assumes that a higher amount of assets are collected by the Ch. 11 Trustee, and the low value assumes a lower amount of assets are collected by the Ch. 11 Trustee.

With respect to the fees payable to the Ch. 11 Trustee related to the distribution on the Allowed Banyon Unsecured Claim ($39.7 million) shown on Line [28], the Ch. 11 Trustee has agreed to take a reduction in the fee and it will be calculated as 3% of 30% of the Allowed Banyon Unsecured Claim (for a maximum fee of up to $360,000).

4.  **Accumulated & Projected Professional Fees to Effective Date** – Line [30]: These fees reflect actual hold-backs through April, 2013, in the amount of $2,629,725.04, plus two and one half months of fees based on the recent monthly average rate of $1,300,000 per month (for the high amount) and $1,000,000 per month (for the low amount). The Trustee is projecting increased administrative fees in connection with confirmation as a result of litigation brought by a distinct group of movants who are aggressively pressing conversion of the case. This group of movants is seeking to convert the case for reasons, that the Trustee submits, are inconsistent with the economic interests of certain of the clients represented by the attorneys' for the movants and which are certainly contrary to the interests of the estate its creditors.

5.  **Projected Post-Confirmation Liquidating Trustee & Professional Fees** – Line [31]: These fees represent the post-Confirmation Date costs of the Liquidating Trustee and his professionals. The high range is calculated based on $300,000 per month for 18 months. The low value assumes 75% of the high value.

6.  **General Unsecured Claims** – Line [35]: Consistent with the terms of the Plan and subject to the Collateral Source Recovery provisions thereof, the following assumptions have made in connection with line 35[7]:

    1.  approval of the Sochet Settlement as more particularly described in ECF No. 4407, resulting in a $20 million claim;
    2.  no distribution for the Emess Claim of $33.75 million; and

---

[7] These assumptions are made solely for the purpose of this Analysis and are not intended and explicitly do not bind the Liquidating Trustee in respect of the application of the Collateral Source Recovery provisions of the Plan.

3.  a distribution of $21 million for the Morse Entities on account of their $49 million claim, which is a reduction of $28 million.

The low value assumes that the Trustee prevails on all outstanding claim objections and anticipated claim reductions through litigation (approximately $11 million).  The high value assumes the opposite; that is that the Trustee will not prevail on these claim objections and anticipated claim reductions. No anticipated Collateral Source Recovery is included in this analysis, including but not limited to the distributions that may take place in connection with the Rothstein Criminal Case. Indeed, if there is a distribution on account of the restitution claims in the Rothstein Criminal Case, there could be a material increase in respect of Distributions in the RRA case.

7.  **Subordinated Unsecured Claims** – Lines [37, 38 & 39]:  These claims have been segregated into three sets of Classes in the Plan (and line items in the Ch. 11 Analysis), including: (i) Funds' Subordinated Unsecured Claim (Class 6); (ii) Other Subordinated Claims (Class 7); and (iii) TD Bank Junior Subordinated Claim (Class 8).

a.  Funds' Subordinated Unsecured Claim (Line [37]):  It is estimated the potential distribution percentage on the Allowed Funds' Subordinated Unsecured Claim will range from 29.26% to 93.07%, primarily due to the potential range of assets that may be collected by the Liquidating Trustee.

b.  Other Subordinated Claims (Line [38]):  It is estimated these Claims will receive no distribution, under the conservative assumptions made in the Ch. 11 Analysis. If there are additional Collateral Source Recovery credits or if recoveries on remaining unliquidated claims exceed the projected values these claims may ultimately recover something on account of their claims.

c.  TD Bank Junior Subordinated Claim (Line [39]):  It is estimated that TD Bank will receive no recovery, under either the low or high valuation, on its Allowed TD Bank Junior Subordinated Claim. Under the proposed TD Bank Settlement, TD Bank would have a claim up to the amount of $132.38 million which represents the sum of: (a) $ 60 million on account of the $61.75 million of value, (which is comprised of $33.750 million on account of the Emess Claim and $28 million on account of the Morse Claim) subordinated unsecured

14

claim on account of the TD Bank Controlled Claims; *plus* (b) the TD Bank Contribution.

## G.    Conclusion.

As shown herein, the impact of a Chapter 7 liquidation would include (i) a material increase in costs and expenses due to the added burden of fees payable to a Ch. 7 Trustee in bankruptcy and new professional advisors retained by such Ch. 7 Trustee, (ii) a substantial increase in claims which would be satisfied on a priority basis, and (iii) the potential erosion in the value of litigation claims pursued in a Chapter 7 case (e.g., the deterioration in the ability to pursue and collect upon a judgment).

Moreover, the Ch. 11 Trustee believes that the value of any distributions from the liquidation proceeds to each class of allowed claims in a Chapter 7 case would be less than the value of distributions under the Plan because such distributions in a Chapter 7 case may not occur for a substantial period of time.  In this regard, it is possible that distribution of the proceeds of the Chapter 7 liquidation could be delayed for a year or more after the completion of such liquidation at the end of the 18-month Wind-Down Period in order to resolve the claims and prepare for distributions.  In the event litigation were necessary to resolve claims asserted in the Chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

As such, the Ch. 11 Trustee has determined that in a Chapter 7 case the holders of Allowed Claims in (a) Classes 2-5 (General Unsecured Claims) would receive less than the distributions they will receive under the Plan, and (b) Class 6 (Funds' Subordinated Unsecured Claim),[8] Classes 7-8 (Other Subordinated Unsecured Claims) and Class 9 (Allowed Interests in the Debtor) would receive no distribution.

Accordingly, the Ch. 11 Trustee believes that the holders of Allowed Claims in each Impaired Class will receive at least as much (or more) under the Plan as they would if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

---

[8]    Moreover, under the Plan, the holders of the Allowed Funds' Subordinated Unsecured Claims are estimated to receive a distribution on their claim in the range of 29.26% - 93.07%, but are projected to receive no distribution in a Chapter 7 liquidation.

[THE DATA CONTAINED IN THIS LIQUIDATION ANALYSIS HAS NOT BEEN SUBJECTED TO AUDIT AND IS SUBJECT IN ALL RESPECTS TO THE DISCLAIMERS AND QUALIFICATIONS SET FORTH IN THE DISCLOSURE STATEMENT TO WHICH THIS LIQUIDATION ANALYSIS PERTAINS AND THE NOTES AND DISCLOSURES ATTACHED HERETO]

**Rothstein Rosenfeldt Adler, P.A.**
**Hypothetical Liquidation Analysis**
**Projected Liquidation Under Chapter 7**
**As of July 19, 2013**
**(unaudited)**

### Chapter 7 CSR Analysis

| Note Ref. | | Values Low (L) | Values High (H) | Recovery Range Low (L) | Recovery Range High (H) |
|---|---|---|---|---|---|
| | **Assets (A)** | | | | |
| 1 | Cash On Hand as of May 6, 2013 | $ 83,189,549.83 | $ 83,189,549.83 | | |
| 2 | Settlement Funds Receivable | 28,215,397.08 | 28,769,246.35 | | |
| 3 | Cash in Trust as of May 6, 2013 | 6,292,555.40 | 6,292,555.40 | | |
| 4 | Value of RRA Accounts Receivable | - | 100,000.00 | | |
| 5 | Value of Litigation Claims | 5,400,000.00 | 10,900,000.00 | | |
| 6 | Value of TD Bank Adversary, net of litigation costs | - | 7,160,464.00 | | |
| 7 | Gross Liquidation Proceeds Available for Admin and Priority Claims | $ 123,097,502.31 | $ 136,411,815.58 | | |
| | **Administrative Expenses (E)** | | | | |
| 8 | Ch. 7 Trustee Fees and Accumulated & Unpaid Ch. 11 Trustee Fees | (3,692,925.07) | (4,092,354.47) | 100.00% | 100.00% |
| 8b | Prorated U.S. Trustee Fees | (10,000.00) | (10,000.00) | 100.00% | 100.00% |
| 9 | Ch. 7 Professional Fees | (4,950,000.00) | (6,600,000.00) | 100.00% | 100.00% |
| 10 | Accumulated & Unpaid Ch. 11 Professional Fees Prior to Conversion | (5,130,000.00) | (5,880,000.00) | 100.00% | 100.00% |
| | | $ (13,782,925.07) | $ (16,582,354.47) | | |
| | **Claims (C)** | | | | |
| 11 | Priority Claims | (711,036.96) | (836,036.96) | 100.00% | 100.00% |
| 12 | Priority Tax Claims | (3,789.55) | (3,789.55) | 100.00% | 100.00% |
| 13 | Ch. 11 Substantial Contribution Claims | | (7,822,800.00) | 0.00% | 100.00% |
| 14a | General Unsecured Claims | (221,714,570.04) | (228,955,624.04) | 36.90% | 52.17% |
| 14b | New Bar Date General Unsecured Claims | (11,200,000.00) | (37,300,000.00) | 36.90% | 52.17% |
| 15 | Funds' Subordinated Unsecured Claim | (26,000,000.00) | (26,000,000.00) | 0.00% | 0.00% |
| 16 | Other Subordinated Unsecured Claims | (43,218,483.14) | (43,218,483.14) | 0.00% | 0.00% |

### Chapter 7 Non-CSR Analysis

| Note Ref. | | Values Low (L) | Values High (H) | Recovery Range Low (L) | Recovery Range High (H) |
|---|---|---|---|---|---|
| | **Claims (C)** | | | | |
| 17a | General Unsecured Claims | (283,464,570.04) | (290,705,624.04) | 29.95% | 41.24% |
| 17b | New Bar Date General Unsecured Claims | (11,200,000.00) | (37,300,000.00) | 29.95% | 41.24% |
| 18 | Funds' Subordinated Unsecured Claim | (26,000,000.00) | (26,000,000.00) | 0.00% | 0.00% |
| 19 | Other Subordinated Unsecured Claims | (43,218,483.14) | (43,218,483.14) | 0.00% | 0.00% |

**Rothstein Rosenfeldt Adler, P.A.**
**Projected Liquidation Under Chapter 11 Plan**
**As of July 19, 2013**
**(unaudited)**

### Chapter 11

| Note Ref. | | Values Low (L) | Values High (H) | Recovery Range Low (L) | Recovery Range High (H) |
|---|---|---|---|---|---|
| | **Assets (A)** | | | | |
| 20 | Cash On Hand as of May 6, 2013 | $ 83,189,549.83 | $ 83,189,549.83 | | |
| 21 | Settlement Funds Receivable | 28,215,397.08 | 28,769,246.35 | | |
| 22 | Cash in Trust as of May 6, 2013 | 6,292,555.40 | 6,292,555.40 | | |
| 23 | Value of RRA Accounts Receivable | - | 100,000.00 | | |
| 24 | Value of Litigation Claims | 2,700,000.00 | 5,400,000.00 | | |
| 25 | TD Bank Contribution | 72,382,817.90 | 72,382,817.90 | | |
| 26 | Gross Liquidation Proceeds Available for Admin and Priority Claims | $ 192,780,320.21 | $ 196,134,169.48 | | |
| | **Administrative Expenses (E)** | | | | |
| 27 | Trustee Fees (RRA Bankruptcy Estate)** | (4,511,409.61) | (4,531,025.08) | 100.00% | 100.00% |
| 28 | Trustee Fees (on 3% of 30% of $39.7MM to Banyon Bankruptcy Estates) | (357,300.00) | (357,300.00) | 100.00% | 100.00% |
| 29 | U.S. Trustee Fees | (120,000.00) | (120,000.00) | 100.00% | 100.00% |
| 30 | Accumulated & Projected Professional Fees to Effective Date | (5,130,000.00) | (5,880,000.00) | 100.00% | 100.00% |
| 31 | Liquidating Trustee & Professional Fees | (4,050,000.00) | (5,400,000.00) | 100.00% | 100.00% |
| | | $ (14,168,709.61) | $ (16,288,325.08) | | |
| | **Claims (C)** | | | | |
| 32 | Priority Claims | (711,036.96) | (836,036.96) | 100.00% | 100.00% |
| 33 | Priority Tax Claims | (3,789.55) | (3,789.55) | 100.00% | 100.00% |
| 34 | Substantial Contribution Claims | - | (7,822,800.00) | 0.00% | 100.00% |
| 35 | General Unsecured Claims | (117,333,470.14) | (120,541,070.70) | 100.00% | 100.00% |
| 36 | Class 5 - Banyon Unsecured Claims | (39,700,000.00) | (39,700,000.00) | 100.00% | 100.00% |
| 37 | Class 6 - Funds' Subordinated Unsecured Claim | (26,000,000.00) | (26,000,000.00) | 29.26% | 93.07% |
| 38 | Class 7 - Subordinated Unsecured Claims | (43,218,483.14) | (43,218,483.14) | 0.00% | 0.00% |
| 39 | Class 8 - TD Bank Junior Subordinated Unsecured Claim | (132,382,817.90) | (132,382,817.90) | 0.00% | 0.00% |

** - Based on Gross Liquidation Proceeds less the value of litigation claims and $39.7MM of the TD Bank Contribution

<u>**EXHIBIT 3**</u>

List With Respect to Paragraph 3 of the *Order Granting Trustee's Motion for Protective Order [ECF No. 3948] and Granting TD Bank's Motion for Protective Order [ECF No. 3935]*, entered by the Bankruptcy Court on March 18, 2013 [ECF No. 4078]

**A.**     <u>**List of Lawsuits Settled Pursuant to Certain Settlement Agreements Entered Into Between and Among TD Bank and Non-Debtor Plaintiffs**</u>

1.     *Razorback Funding, LLC, et al. v. Scott W. Rothstein, et al.*, Case No. 09-062943 (07) (17th Judicial Cir., Broward County, Fla.)

2.     *Platinum Estates, Inc. and OPMonies 2, LLC v. TD Bank, N.A.*, Case No. 11-CV-60670-KAM (S.D. Fla.)

3.     *VRLP1, LLC v. TD Bank, N.A.*, Case No. 10-14349 (07) (17th Judicial Cir., Broward County, Fla.)

4.     *Emess Capital, LLC v. Scott W. Rothstein and TD Bank, N.A.*, Case No. 10-60882-CIV-Lenard/O'Sullivan (S.D. Fla.)

5.     *Amy Adams, et al. v. Scott W. Rothstein, et al.*, Case No. 12-14959 CACE (07) (17th Jud. Cir., Broward County, Fla.)

6.     *Edward J. Morse, et al. v. Scott W. Rothstein, et al.*, Case No. 10-24110 CACE (07) (17th Jud. Cir., Broward County, Fla.)

**B.**     <u>**List of Settlement Agreements Related to the Lawsuits Listed Above in "A"**</u>

The Trustee directs Creditors and Parties in Interest to the Trustee's 287 page *Chapter 11 Trustee's Notice of Filing*, dated April 2, 2013 [*See* ECF No. 4184]

**C.**     <u>**List of Plaintiffs Named in the Lawsuits Listed Above in "A" Received From TD Bank**</u>

To the best of TD Bank's knowledge, the following list identifies those counterparties to settlement agreements with TD Bank who have filed proofs of claim against the RRA Estate.

1.     *Razorback Funding, LLC, et al. v. Scott W. Rothstein, et al.*, Case No. 09-062943 (07) (17th Judicial Cir., Broward County, Fla.)

Razorback Funding, LLC
D3 Capital Club, LLC

2

4969645-2

BFMC Investment, LLC
Linda Von Allmen, as Trustee of the Von Allmen Dynasty Trust
D&L Partner, LP
David Von Allmen, as Trustee of the David Von Allmen Living Trust
Ann Von Allmen, as Trustee of the Ann Von Allmen Living Trust
Dean Kretschmar
Cooper Management
Anthony Degennaro, as Trustee of the Extra Inning Dynasty Trust
Adele Mussry
Jack Mussry
Nassim Mussry
Melina El-Ani
H&N Associates
Aretz & Associates
Park National Capital Funding, LLC
Park National Mortgage Servicing, LLC
Scott Morgan
Viceroy Global Investments, Inc.
Concorde Capital, Inc.
Ira Sochet as Trustee of the Ira Sochet Revocable Inter Vivos Trust
Investors Risk Advantage LP
Sussco, Inc.
Edward Paley
Florence Paley
The Edward and Florence Paley Foundation
Steven Paley
Laura Paley
Jane Zaretsky
Steven Zaretsky, as Trustee of the Jane Zaretsky Dynasty Trust
Lawrence E. Dekelbaum
Shalom Strictly Kosher Meats, Inc.

2.    *Platinum Estates, Inc. and OPMonies 2, LLC v. TD Bank, N.A.*, Case No. 11-CV-60670-KAM (S.D. Fla.)

No proof of claim has been filed against the RRA Estate by or on behalf of Platinum Estates, Inc. or OPMonies 2, LLC.

3.    *VRLP1, LLC v. TD Bank, N.A.*, Case No. 10-14349 (07) (17th Judicial Cir., Broward  County, Fla.)

VRLP1, LLC

4.    *Emess Capital, LLC v. Scott W. Rothstein and TD Bank, N.A.*, Case No. 10-60882-CIV-Lenard/O'Sullivan (S.D. Fla.)

4969645-2

Emess Capital, LLC

5.      *Amy Adams, et al. v. Scott W. Rothstein, et al.*, Case No. 12-14959 CACE (07) (17th Jud. Cir., Broward County, Fla.)

No proof of claim has been filed against the RRA Estate by or on behalf of any of the *Adams* plaintiffs.

6.      *Edward J. Morse, et al. v. Scott W. Rothstein, et al.*, Case No. 10-24110 CACE (07) (17th Jud. Cir., Broward County, Fla.)

Estate of Edward J. Morse
Carol A. Morse
Morse Operations, Inc.

4