**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov


IN RE:                                                    CASE NO. 09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,          CHAPTER 11

    Debtor.

_____/

### JEFFREY EPSTEIN'S EXPEDITED MOTION TO BE EXCUSED FROM ATTENDING SHOW CAUSE HEARING
**(In order to grant effective relief Expedited Hearing Requested on or before October 24, 2018, so that the Court may rule prior to the October 26, 2018, hearing)**

Jeffrey Epstein ("Epstein") moves the Court, on an expedited basis, to be excused from attending the **October 26, 2018,** show cause hearing, and states:

### INTRODUCTION

On April 20, 2018, this Court entered its Order to Show Cause (the "Show Cause Order") why Fowler White and Epstein should not be held in contempt and scheduled an evidentiary show cause hearing for August 23 and 24, 2018. (D.E. 6366.) The hearing was reset to October 26, 2018, at 10:00 a.m. (D.E. 6431.) In its Show Cause Order, the Court ordered Epstein to sit for a limited deposition and to attend the show cause hearing in person. (D.E. 6366.)

Epstein respectfully requests to be excused from attending the show cause hearing because his deposition was taken on October 13, 2018, for a period of two hours and Epstein has filed a Declaration in support of his position.[1] There is nothing left to add to Epstein's testimony and it would be unnecessary and duplicative to require Epstein, who resides in the U.S. Virgin Islands, to travel to Florida for the hearing.

_____

[1]Epstein's deposition transcript and Declaration are attached as **Exhibits A and B,** respectively.

There are no disputed facts material to this show cause proceeding regarding Epstein.  The Movants in these show cause proceedings (Farmer Jaffe, Bradley J. Edwards and L.M.) have acknowledged that Epstein did not have the disc or even know of the disc's existence before being advised by Link & Rockenbach in February 2018.  Further, Epstein has testified that he only received select documents from the disc in February 2018.  The select documents were provided to Epstein after Link & Rockenbach located the disc in Fowler White's boxes in February 2018.  Because there are no material facts in dispute, live testimony will have no impact on this Court's determination of whether there was a violation by Epstein of the November 2010 Agreed Order.

As this Court will see, there is not a shred of evidence that Epstein knew about the disc before learning about it from Link & Rockenbach in February 2018.  Movants' position is that Epstein violated the November 2010 Agreed Order because Link & Rockenbach – Epstein's "agent" -- found the disc in 2018 and provided select copies of documents from it to Epstein.  This Court has already ruled that everything post Link & Rockenbach is not a violation of the November 2010 Agreed Order but, rather, is a State Court issue, and will not be considered at the Show Cause hearing.  Therefore, there is no further live testimony that can be elicited from Epstein that would benefit the Court in deciding if Epstein violated the November 2010 Agreed Order.  Epstein respectfully requests to be excused from personally attending the Show Cause hearing.  Epstein will be represented at the hearing by his counsel, Chad Pugatch and Scott J. Link.

**ARGUMENT**

A.    **What Happened to the Disc in 2018 is Not a Violation of This Court's November 2010 Agreed Order.**

The Court was clear that issues relating to what happened after Link & Rockenbach found the disc in 2018 are State Court issues and not to be considered in the Show Cause proceedings.

EDWARDS:  … The representation was made on the record by Mr. Link that he provided it within his law firm and his client, that being Mr. Epstein.  When further asked by the court, has Mr. Epstein been provided with copies of the documents, or the contents of these privileged documents?  Mr. Link replied, I just said my client, my law firm and my client, and I can saw legal counsel, Mr. Goldberger.  So, that's it.  So we now know that this information that was improperly obtained was disseminated not only to Mr. Epstein, the adversary who now has this information, it was also ---

COURT:  Take that up in the state court.

(Apr. Tr. 39:15-40:3.) [2]

SCAROLA:  Your Honor has made repeated reference to being permitted to inquire of Mr. Epstein about his possession of the disk.  Your Honor's order related not only to the electronic documents, but related as well to any copies of the documents that were made.  Mr. Link has made it clear in his representations to your Honor today, and he has stated previously that he sent copies of the privileged documents to Mr. Epstein.  Mr. Epstein, we know, retained those documents, and retention of those documents is a clear violation of your Honor's order.  What we would like to be able to inquire about, in addition to whether Mr. Epstein had possession of the disk, is whether Mr. Epstein had possession of copies of any of the information obtained from that disk, including the e-mail ---

COURT:  But the disc wasn't discovered until Link found it in the 36 boxes.

SCAROLA:  Well, yes, sir, that's what has been represented to the Court, but what Mr. Link has said is that he transferred that information to Mr. Epstein.

COURT:  After he found it.

SCAROLA:  Well, he obviously couldn't transfer it before.

COURT:  But that's what you're litigating in state court.

SCAROLA:  No, sir, I'm sorry, that's not what we're litigating in state court.  What we are litigating in state court is the malicious prosecution claim.  What we want to be able to litigate before your Honor is violation of this Court's order, and retention of documents obtained from that disk is a clear violation of your Honor's order.

---

[2]The April 13, 2018, hearing transcript (D.E. 6367) shall be referred to as "Apr. Tr."

3

> COURT: I disagree with you. …. Take that up in your state court litigation.

(Apr. Tr. 43:19-45:6.)

## B. Epstein has Provided Sworn Testimony and His Attendance at the Show Cause Hearing is Not Necessary.

The Court allowed Movants to take Epstein's deposition limited to the issue of his knowledge and possession of the disc. (Apr. Tr. 36:2-9.) The Show Cause Order also provided for the filing of sworn declarations. (D.E. 6366, ¶ 5 i.v.) Specifically, it provides:

> Unless otherwise ordered, the direct testimony of each witness, except adverse, hostile or rebuttal witnesses, shall be presented by sworn declarations consisting of a succinct written statement of the direct testimony which that witness would be prepared to give if questions were propounded in the usual fashion at the Show Cause Hearing. …
>
> ***
>
> Objections to any portions of the statements may be raised at the time the sworn declaration of each respective witness is offered to the Court. The witness shall then be sworn and asked if the statement correctly reflects the testimony that would be given if the witness was asked the appropriate questions. Assuming an affirmative answer, opposing counsel may then cross-examine the witness. At the conclusion of cross-examination, the party whose witness is on the stand may conduct oral redirect examination in the usual manner.

*Id.*

Well before his deposition was taken, Epstein provided a sworn Declaration attesting to these matters. In addition, on October 13, 2018, Epstein sat for more than two hours and answered all questions relating to the alleged federal civil contempt for alleged discovery violations and Movants had an opportunity to cross exam Epstein about the Declaration. There is simply nothing within the scope of this Court's ruling that Epstein has not answered.

At the April 13, 2018, hearing Edwards' counsel informed the Court that:

4

SCAROLA: … and as far as Jeffrey Epstein is concerned, obviously he was personally prohibited by the express language of the Court's order from possessing or accessing any of this information, and he would certainly want to take Mr. Epstein's deposition.

While representations have been made with regard to the extent that Mr. Epstein has been in possession of, or had access to this privileged information, the record is completely devoid of any sworn representation by Mr. Epstein, and clearly that is essential in terms of this Court fashioning, or first of all determining who is responsible for these very serious violations, and in fashioning an appropriate response.

(Apr. Tr. 17:8-19.)

Epstein has now provided not only his direct testimony but two hours of cross examination. In his Declaration, Epstein attested that he had no personal knowledge of how the disc came into Fowler White's possession (Ex. B, ¶ 5) and that he had never seen the disc (Ex. B, ¶ 6). Epstein confirmed this testimony during his deposition:

Q.    How is it that you can tell us under oath today that you had no prior knowledge of Fowler White having come into possession of a disc relating to your litigation?

A.    So, to be clear, to the best of my recollection today, the answer is no. I have no recollection whatsoever.

(Ex. A, 25:4-10.) *Also see* Ex. A, 25:24-26:8.

Q.    Have you ever communication with any agent of Fowler White about the disc that was turned over by them to Link & Rockenbach?

A.    No. Not to the best of my knowledge.

Q.    Have you ever communicated with Tonja or Fred Haddad about the Fowler White disc?

A.    Not to the best of my knowledge.

Q.    Did you ever receive a copy of the disc itself?

A.    No.

5

(Ex. A, 56:4-13.)

Edwards' counsel has admitted that it is not Edwards' contention that Epstein had the disc, but that after the disc was located by Link & Rockenbach, Epstein was provided alleged privileged information contained on the disc. While Edwards asked questions of Epstein about dissemination to others, what he read from the disc and things of that nature, those questions, among many others, exceeded the scope of inquiry allowed by this Court. This Court has already ruled that for purposes of the Show Cause proceedings it was not going to allow Movants to ask question regarding what material Epstein received after Link & Rockenbach discovered the disc. Consequently, any issues that remain unresolved after Epstein's deposition as to those questions is of no moment in these proceedings. The alleged privileged e-mails and all issues related to privilege and waiver are currently pending before the State Court.

## CONCLUSION

As the sole basis for seeking to hold Epstein liable for a violation of the November 2010 Agreed Order, Movants contend that Epstein's receipt from Link & Rockenbach in 2018 of documents from the disc was somehow a violation of the nearly eight-year-old November 2010 Agreed Order. The Court has already flatly rejected that argument and determined that all issues relating to what happened after Link & Rockenbach found the disc in 2018 are matters exclusively for the State Court that will not be considered at the Show Cause proceedings. Rather, the Show Cause proceedings are limited, as to Epstein, regarding whether he was aware of Fowler White's possession of the disc and whether he possessed the disc or any alleged privileged documents at any time before Link & Rockenbach found it. Epstein's two hours of cross examination provides all the testimony necessary to determine if Epstein violated the November 2010 Agreed Order. There is nothing left to cross examine Epstein about within the parameters set by this Court.

Because cross examination would be duplicative of the testimony already given, Epstein's testimony at the Show Cause hearing would provide no further benefit to the Court.

Accordingly, Epstein respectfully requests that he personally be excused from attending the show cause hearing.

### GOOD-FAITH CERTIFICATION

Epstein's counsel certify that on October 18, 2018, they asked Movants' counsel if Movants would oppose the relief sought herein.  Movants oppose the relief sought.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 19, 2018, a true and correct copy of the foregoing was served electronically to all registered users on the CM/ECF system, which includes counsel identified on the service list below.

RICE PUGATCH ROBINSON STORFER & COHEN, PLLC
101 N.E. Third Avenue, Suite 1800
Ft. Lauderdale, FL  33301
(954) 462-8000; (954) 462-4300 [fax]


By: /s/ *Chad P. Pugatch*
CHAD P. PUGATCH (FBN 220582)
cpugatch@rprslaw.com

- AND –

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

LINK & ROCKENBACH, PA
1555 Palm Beach Lakes Boulevard, Suite 930
West Palm Beach, FL  33401
(561) 847-4408; (561) 855-2891 [fax]


By: /s/ *Scott J. Link*
    SCOTT J. LINK (FBN 602991)
    scott@linkrocklaw.com

    *Counsel for Jeffrey Epstein*


## SERVICE LIST

| | |
|---|---|
| Jack Scarola<br>Searcy, Denny, Scarola, Barnhart & Shipley, P.A.<br>2139 Palm Beach Lakes Boulevard<br>West Palm Beach, FL  33409<br>mmccann@searcylaw.com<br>jsx@searcylaw.com<br>scarolateam@searcylaw.com<br>*Counsel for Bradley J. Edwards* | Bradley J. Edwards<br>Brittany N. Henderson<br>Edwards Pottinger LLC<br>425 N. Andrews Avenue, Suite 2<br>Fort Lauderdale, FL  33301-3268<br>brad@epllc.com<br>brittany@epllc.com<br>*Counsel for Farmer Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.* |
| Paul G. Cassell<br>S.J. Quinney College of Law at the University of Utah<br>332 S. University St.<br>Salt Lake City, UT  84112-0730<br>cassellp@law.utah.edu<br>*Counsel for L.M., E.W. and Jane Doe* | Peter E. Shapiro<br>Shapiro Law<br>8551 West Sunrise Boulevard, Suite 3000<br>Plantation, FL  33322<br>pshapiro@shapirolawpa.com<br>*Counsel for L.M., E.W. and Jane Doe* |
| Niall T. McLachlan<br>Carlton Fields Jorden Burt, P.A.<br>100 S.E. Second Street, Suite 4200<br>Miami, FL  33131<br>nmclachlan@cfjblaw.com<br>*Counsel for Fowler White Burnett, P.A.* | Isaac M. Marcushamer<br>Berger Singerman LLP<br>1450 Brickell Avenue, Suite 1900<br>Miami, FL  33131<br>imarcushamer@bergersingerman.com<br>*Counsel for Liquidating Trustee* |

2077028

# EXHIBIT A

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH COUNTY, FLORIDA

Case No. 502009CA040800XXXXMB


JEFFREY EPSTEIN,

Plaintiff/Counter-Defendant,

vs.

SCOTT ROTHSTEIN, individually;
BRADLEY EDWARDS, individually,

Defendants/Counter-Plaintiffs.
_____/



VIDEOTAPED DEPOSITION

OF

JEFFREY EPSTEIN




Saturday, October 13th, 2018
9:07 a.m. - 11:00 a.m.
1555 Palm Beach Lakes Boulevard, #930
West Palm Beach, Florida 33401




Examination of the witness taken before

Sonja D. Hall
Palm Beach Reporting Service, Inc.
1665 Palm Beach Lakes Boulevard, Suite 1001
West Palm Beach, FL 33401
(561) 471-2995

2

APPEARANCES:

   For Plaintiff/Counter-Defendant:

      LINK & ROCKENBACH, P.A.
      1555 Palm Beach Lakes Boulevard, Suite 301
      West Palm Beach, FL 33401
      By SCOTT J. LINK, ESQUIRE
      By KARA BERARD ROCKENBACH, ESQUIRE

   For Plaintiff/Counter-Defendant:

      ATTERBURY, GOLDBERGER & WEISS, P.A.
      250 Australian Ave. South, Suite 1400
      West Palm Beach, FL  33401
      By JACK A. GOLDBERGER, ESQUIRE


   For Defendants/Counter-Plaintiffs:

      SEARCY, DENNEY, SCAROLA, BARNHART &
      SHIPLEY, P.A.
      2139 Palm Beach Lakes Boulevard
      West Palm Beach, FL 33409
      By JACK SCAROLA, ESQUIRE

   For Fowler White:

      CARLTON FIELDS, PA
      525 Okeechobee Boulevard, Suite 1200
      West Palm Beach, FL 33401
      By JOSEPH IANNO, JR, ESQUIRE


   For L.M., E.W. and Jane Doe:

      S.J. QUINNEY COLLEGE OF LAW
      at the UNIVERSITY OF UTAH
      332 S. University Street
      Salt Lake City, UT 84112
      By PAUL G. CASSELL, ESQUIRE (Telephonically)

              ALSO PRESENT

      Above & Beyond Reprographics
      2161 Palm Beach Lakes Boulevard, Suite 412
      West Palm Beach, FL 33409
      By Manuel Santiago, Videographer

3

I N D E X

Videotaped Deposition of JEFFREY EPSTEIN          Page No.

Direct Examination by Mr. Scarola                      5

Certificate of Oath                                  83

Certificate of Reporter                              84

Read & Sign Letter to Witness                        85

PLAINTIFF'S EXHIBIT INDEX

(No exhibits were marked.)



DEFENDANTS/COUNTER-PLAINTIFFS' EXHIBIT INDEX

No.     Description                              Page No.

1       Sworn Declaration of Jeffrey Epstein          6

2       Affidavit of Jeffrey Epstein                 40

3       Re-Notice of Taking Deposition               58

4       Re-Notice of Taking Deposition               62

4

THE VIDEOGRAPHER: We are on the video record. This is the 13th day of October 2018. The time is approximately 9:07 a.m.

This is the videotaped deposition of Jeffrey Epstein in the matter of Jeffrey Epstein versus Scott Rothstein, individually; Bradley Edwards, individually; L.M. individually.

This deposition is being held at 1555 Palm Beach Lakes Boulevard, West Palm Beach, Florida 33401.

My name is Manuel Santiago. I am the videographer representing Above & Beyond Reprographics.

Will the attorneys please announce their appearances for the record?

MR. SCAROLA: My name is Jack Scarola. I am counsel on behalf of Bradley Edwards.

MR. LINK: Scott Link and Kara Rockenbach on behalf of Mr. Epstein.

MR. GOLDBERGER: And Jack Goldberger on behalf of Jeffrey Epstein.

MR. SCAROLA: On the phone we have Professor Paul Cassell.

5

MR. CASSELL:  Can I just chime in here? Paul Cassell for L.M., E.W. and Jane Doe, intervenors in the Florida State court action.

THEREUPON,

JEFFREY EPSTEIN,

being a witness in the notice heretofore filed, and being first duly sworn in the above cause, testified on his oath as follows:

THE WITNESS:  Yes.

DIRECT EXAMINATION

BY MR. SCAROLA:

Q    Would you please state your full name?

A    Jeffrey E. Epstein.

Q    Would you list for us, please, each of your residence addresses?

MR. GOLDBERGER:  I think it's beyond the scope.  I'm going to object to Fifth Amendment.

You want him to invoke or you okay with me doing it?

MR. SCAROLA:  We want Mr. Epstein to invoke any privilege that Mr. Epstein considers appropriate to invoke.

THE WITNESS:  The Fifth.

6

BY MR. SCAROLA:

**Q**   I'm sorry?

**A**   The Fifth.

**Q**   You are the same Jeffrey Epstein that is a party in the current state court proceedings in which Bradley Edwards has brought suit against you for malicious prosecution, correct?

**A**   Correct.

**Q**   Mr. Epstein, I'm going to hand you what I have marked as Exhibit Number 1 to this deposition.

Ask you to take a look at that document.

MR. SCAROLA:  Paul, this is Mr. Epstein's sworn declaration of fact that was filed in the bankruptcy court proceeding.

MR. CASSELL:  I am familiar with that. Thank you, Jack.

(Defendants/Counter-Plaintiffs' Exhibit Number 1 was marked for identification.)

BY MR. SCAROLA:

**Q**   Do you recognize the document, Mr. Epstein?

**A**   Yes.

**Q**   Is that, in fact, your signature above the line that says Jeffrey Epstein?

**A**   Yes.

Q   There is a signature to the left of yours at the bottom of the document.  Whose signature is that?

A   I don't know.

Q   Who were the attorneys who were representing you at the time that this declaration was prepared on August 14, 2018?

MR. LINK:  Object to the form.

THE WITNESS:  Could you ask the question again?

BY MR. SCAROLA:

Q   Yes, sir.

Who were the lawyers who were representing you in this matter on August 14, 2018?

THE WITNESS:  Scott Link.

BY MR. SCAROLA:

Q   Anyone else?

A   Jack Goldberg.

Q   Anyone else?

A   Darren Indyke.

Q   Anyone else?

A   Not that I recall.

Q   Who prepared this declaration?

A   I believe the Link firm.

Q   Was it sent to you initially in the form in which it presently appears?

**A**    I don't recall.

**Q**    Do you have any recollection whatsoever of having any input into the content of this declaration?

MR. LINK:  So, Mr. Epstein, I just want to caution you.  I don't want you to share any of our communications or conversations.

Okay.  You can answer the question without disclosing anything we have talked about.

THE WITNESS:  No.

BY MR. SCAROLA:

**Q**    You had no input?

**A**    I don't have anything separate from my attorneys.  Any input I have is with conversations with my attorneys.

**Q**    That's not my question.  I have not asked you whether you received any information from your attorneys.

I asked you whether you had any input into the content of this declaration.

MR. LINK:  Again, I am going to instruct you not to disclose any of our conversations and communications.

You can simply answer yes or no to the question.  If you remember it, then you can.

9

THE WITNESS:  Sorry.  So I'm clear, the conversations I had with you about this --

MR. LINK:  We are not going to talk about.

THE WITNESS:  So is that an answer of yes or no?

MR. LINK:  If the question is, do you recall whether you made any changes to what was sent to you, I think you can answer yes or no.

MR. SCAROLA:  That's not the question.

BY MR. SCAROLA:

Q   I want to know whether you had any input whatsoever into the drafting of this declaration.

Was any of the information contained in this declaration -- included in the declaration as a consequence of input that you personally had?  Or was it simply all drafted by somebody else for your signature?

MR. LINK:  So, if you can answer that question without disclosing our communications, you can answer the question. If you can't answer it without disclosing our communication, Mr. Epstein, then you are instructed not to answer it.

BY MR. SCAROLA:

Q    Your answer to the question, sir?

A    I can't disclose anything -- I have only had a conversation with my attorney regarding this.

Q    Yes, sir.

But my question does not ask you about any communication you had with your lawyers.  I am asking you whether you had any input into the language that is included within this declaration.

Is anything here your -- the consequence of your input?

MR. LINK:  So, let me just -- I have two questions for you, Mr. Scarola.  One, I thought we were starting with the state court matter.

MR. SCAROLA:  We are.

MR. LINK:  I may have misunderstood, because this is a bankruptcy declaration. And there isn't anything in Judge Hafele's order that talks about bankruptcy testimony or spoke that you can inquire about.

Obviously, by signing this, he has adopted every statement in there as his own. So I'm not sure what we are doing at the moment.

11

BY MR. SCAROLA:

     Q     Can you answer the question, sir?

     A     I cannot answer the question.

     Q     Why?

     A     Anything I talked about with respect to this document is a conversation with my attorneys.

     Q     And I'm not asking about any communication you had with your lawyer.  I want to know whether anything in this affidavit is as a consequence of your personal input.

          MR. LINK:  So, if there was anything you did separate and apart from our conversations, then you can tell him.  If not --

          THE WITNESS:  No.

BY MR. SCAROLA:

     Q     No what?

     A     No.

     Q     Nothing in this affidavit was as a result of your personal input; is that correct?

          MR. LINK:  What he said was separate and apart.

          My instruction is, you may not disclose any of our communications.  If you can answer the question about something you did

12

separate and apart from my directions to you or our communications, you can answer the question. Other than that, you cannot.

MR. SCAROLA: Mr. Link, communications with counsel are privileged if they are intended to remain confidential.

If Mr. Epstein communicated something to you to include within this affidavit, that, obviously, was not intended to remain confidential. It was intended to be communicated in this particular filing.

MR. LINK: Mr. Scarola, I disagree with you. I'm instructing him not to answer if it's based on our communications period.

BY MR. SCAROLA:

Q    The second paragraph of this affidavit says, "The law firm of Fowler White Burnett, PA, represented me" -- meaning you -- "in the state court proceeding from June 2010 through May 2012."

What were the terms on which you retained the Fowler White Burnett law firm?

MR. LINK: Mr. Scarola, you are exceeding the scope of the deposition in the state court matter.

There are four very specific limited

13

topics, none of which have you asked a single question about.  I'm really trying to understand what --

Do you want to do the bankruptcy first?

MR. SCAROLA:  No.  No, sir.  I want to do the state court proceeding first.  I'm asking questions that relate directly to the topics that are defined within the state court order and I would like an answer to that question.

MR. LINK:  Would you please tell me which topic you are focused on?  There are only four.

MR. SCAROLA:  This relates to all of them.

MR. LINK:  It does not, Mr. Scarola.

MR. SCAROLA:  We have a disagreement about that.  If you are instructing him not to answer, then the court will make a determination as to whether that is or is not an appropriate instruction and whether we will or will not be back here to redepose Mr. Epstein once again.

Are you instructing him to the answer?

MR. LINK:  Your question is what were

14

the terms of his engagement of Fowler White?

MR. SCAROLA:  Yes, that's correct.

MR. LINK:  Then I'm instructing him not to answer.

BY MR. SCAROLA:

Q   Did you engage Fowler White on an hourly basis?

MR. LINK:  I am instructing him not to answer.

BY MR. SCAROLA:

Q   Did Fowler White present invoices to you for services that were rendered on an hourly basis?

MR. LINK:  I am instructing him not to answer.

BY MR. SCAROLA:

Q   Were you ever billed by Fowler White with invoices that included a description of the services that Fowler White rendered on your behalf?

MR. LINK:  I am instructing him not to answer.

BY MR. SCAROLA:

Q   Were you kept informed as to what Fowler White did on your behalf in connection with their representation of you?

MR. LINK:  I'm instructing him not to

15

answer.  It exceeds the scope of the court's order.

BY MR. SCAROLA:

**Q**   Your affidavit -- excuse me.  Your declaration states that as part of Fowler White's representation of you, that they represented you in proceedings in the bankruptcy case concerning a subpoena that your original counsel issued to the bankruptcy trustee.  Is that statement true?

**A**   Yes.

**Q**   Who was your original counsel that issued the subpoena to the bankruptcy trustee?

**A**   I don't recall.

**Q**   What was subpoenaed?

**A**   The question again.

**Q**   What was subpoenaed?

**A**   I don't recall.

**Q**   Were emails subpoenaed?

**A**   I'm not sure what subpoena you are talking about.  Sorry.

**Q**   The one that you declared under penalty of perjury was issued by your original counsel to the bankruptcy trustee.

**A**   I don't recall.

**Q**   Did you ever come to learn that the trustee

16

in the bankruptcy for the law firm Rothstein, Rosenfeldt & Adler had been subpoenaed to produce emails contained on the server of that law firm?

A    I don't recall.

Q    Did it ever come to your attention that emails contained on the server of the law firm Rothstein, Rosenfeldt & Adler had been produced in connection with the state court civil proceedings by the bankruptcy trustee to a special master that had been appointed for purposes of determining what, if any, emails from that production would be turned over in response to the subpoena that was issued?

A    Separate from any conversations with my attorney, I don't recall.

Q    Did you ever learn that privilege was being asserted with respect to the production of any emails that were contained on a Rothstein, Rosenfeldt, Adler server?

A    Separate from a conversation with my attorneys, I don't recall.

Q    Are you aware, as you sit here today, that federal bankruptcy Judge Ray issued an order with respect to procedures to be followed in connection with responding to an email subpoena?

MR. LINK:  Object to the form.

17

MR. SCAROLA:  What's the problem with the form?

MR. LINK:  You didn't give us any time. Is there more than one?

MR. SCAROLA:  No, I did.  I said as you sit here today.

MR. LINK:  No, as to the order.  But --

If you can answer the question, you can answer question.

THE WITNESS:  I'm sorry.  You have to repeat it.

BY MR. SCAROLA:

Q    Yes.  As you sit here today, are you aware that federal bankruptcy Judge Ray issued an order concerning matters relating to the production of Rothstein, Rosenfeldt, Adler emails?

MR. LINK:  Object to the form.

THE WITNESS:  Outside conversations with my attorney, no.

BY MR. SCAROLA:

Q    Have you ever seen an order issued by federal bankruptcy Judge Ray that impose restrictions on the possession of electronic data produced in response to a subpoena for emails from the Rothstein, Rosenfeldt, Adler law firm?

MR. LINK:  Object to the form.

THE WITNESS:  Outside of conversations with my attorney, no.

BY MR. SCAROLA:

Q   Tell me about the conversations that you had with your lawyers relating to the terms of Judge Ray's order.

MR. LINK:  I am going to instruct you not to answer that question.

BY MR. SCAROLA:

Q   Have you ever personally seen any of the language that was included within Judge Ray's order?

A   Outside of the conversations with my attorney, no.

Q   Well, a conversation with your lawyer does not tell me anything in response to a question that asks what you have seen.

Have you ever seen any of the language included within Judge Ray's order that impose restrictions on the possession of electronic data relating to emails of the Rothstein, Rosenfeldt, Adler firm?

MR. LINK:  So let me object to the form.

If you can answer the question

independent of communications with your lawyer -- so if you looked at the order on your own, then you can answer.

THE WITNESS:  I don't recall.

BY MR. SCAROLA:

Q    Are you aware that contempt proceedings are pending in the federal bankruptcy court?

A    Yes.

Q    What is your understanding of what those proceedings are about?

A    It's in regards to the discovery of a disc that was in possession of Fowler White.

Q    What is it in regard to that disc?

A    That's not a very good question.  Sorry.

Q    I'm sorry?

A    Can you ask a question?

Q    The question is, what is it about this disc that is the subject matter of contempt proceedings in the bankruptcy court?

MR. LINK:  So, again, if you can answer the question based on your own personal review of information rather than our communications, you can share that with Mr. Scarola.

THE WITNESS:  Nothing outside my

20

conversations with the attorney.

BY MR. SCAROLA:

**Q**    Did you ever become aware that a subpoena was issued to the bankruptcy trustee to produce emails?

**A**    I don't recall.

**Q**    Did you ever become aware that a claim of privilege was asserted with regard to any of the emails on the Rothstein, Rosenfeldt, Adler server?

**A**    Outside of conversations with my attorney, no.

**Q**    Did your lawyer tell you that a claim of privilege had been made with regard to any of the emails on the RRA server?

MR. LINK:  Mr. Scarola, you know better than to ask that question.

Mr. Epstein, do not answer that question.

MR. SCAROLA:  Mr. Link, those happen to be matters as to which privilege is waived as a consequence of your own disclosures in your own affidavits and your own statements with respect to this case.

MR. LINK:  I disagree with you.

MR. SCAROLA:  That's fine.

MR. LINK:  I'm going to instruct you

not to answer.

MR. SCAROLA:  Just as long as you know that it is our position that there has been a waiver.  You can instruct the witness not to answer and the court will make a determination with regard to that legal issue.

MR. LINK:  There's no question.

And I will say this, for the record.  You haven't asked a single question about the four topics that Judge Hafele specifically delineated for this limited deposition you could take.

But I am instructing you not to answer the question, Mr. Epstein.

BY MR. SCAROLA:

Q    Paragraph four of your declaration, Exhibit Number 1, states, "In February 2018, Scott J. Link of Link & Rockenbach, PA, informed me that he had located a disc in Fowler White's files labeled," quote, Epstein Bate Stamp, unquote.

Did I read that accurately?

A    Correct.

Q    That was a communication from Mr. Link, your lawyer, to you, correct?

22

**A**    Yes.

**Q**    What else did Mr. Link tell you?

MR. LINK:  So, I'm going to instruct you not to disclose any of your conversations that involved legal advice or strategy or protected communication.

If you recall that I said anything other than I located a disc specific to that topic, you can answer.

THE WITNESS:  I remember that. Everything else I talked with my attorneys.

BY MR. SCAROLA:

**Q**    Yes, I know you were talking to your lawyer. I want to know everything that your lawyer told you in this conversation that you have partially disclosed.

MR. LINK:  So --

BY MR. SCAROLA:

**Q**    What else did he tell you?

MR. LINK:  So, I'm going to instruct you not to answer based both on attorney-client privilege and exceeds the scope of Judge Hafele's order.

BY MR. SCAROLA:

**Q**    Your response?

MR. LINK:  I have instructed him not to

23

answer.

BY MR. SCAROLA:

**Q**     When in February of 2018 did you have this communication with Mr. Link?

**A**     I don't recall specifically.

**Q**     What was the form of the communication?

**A**     I don't recall specifically.

**Q**     When you tell me you don't recall specifically, that suggest that you may recall generally.  What is your recollection with regard to the form that the communication took?

**A**     It's not specifically -- I believe it was a phone call.  But that's my best recollection.

**Q**     Where were you when you received that phone call?

**A**     No idea.

**Q**     Did Mr. Link tell you why he was calling to tell you that he had located a disc?

        MR. LINK:  Mr. Epstein, I am going to instruct you not to answer the question.

BY MR. SCAROLA:

**Q**     Did Mr. Link tell you what was on the disc?

        MR. LINK:  I'm going to instruct you not to answer.

BY MR. SCAROLA:

Q   Did Mr. Link communicate to you at any time anything regarding the content of a disc that had been located in Fowler White's files?

MR. LINK:  I am going to instruct you not to answer.

MR. SCAROLA:  The basis of that instruction?

MR. LINK:  Attorney-client privilege and exceeds scope of Judge Hafele's order.

BY MR. SCAROLA:

Q   Had you known prior to Mr. Link's communication with you in February of 2018 that Fowler White had come into possession of a disc relating to anything having to do with the litigation in which you were involved?

MR. LINK:  Can you read the first part? Did he say if or did you?  I'm sorry, I missed the first words.

(Thereupon, the requested portion of the record was read back by the reporter as above duly recorded.)

MR. LINK:  I'm going to object to form.

THE WITNESS:  No.

25

BY MR. SCAROLA:

**Q**   How was it that you remember that?

**A**   I'm sorry.  The question again.

**Q**   How is it that you can tell us under oath today that you had no prior knowledge of Fowler White having come into possession of a disc relating to your litigation?

**A**   So, to be clear, to the best of my recollection today, the answer is no.  I have no recollection whatsoever.

**Q**   So the answer is not no.  The answer is I don't remember.  Is that correct?

MR. LINK:  No.  That's not what he said.

BY MR. SCAROLA:

**Q**   Well, I want to know.  Are you telling us, no, you didn't know; or are you telling us, I don't remember whether I knew or not?

**A**   My best recollection is no.  I can't be certain of anything, frankly.  So the answer is -- with respect to most questions, my answer is no.  But I can't be certain that someone hadn't told me something years ago.  I have no recollection.  I would say no.

**Q**   Paragraph five of this declaration says, "I have no personnel knowledge of how the CD came to be in

26

Fowler White's possession."

Do you have any knowledge that, in fact, it did come to be in Fowler White's possession?

MR. LINK: So, you can -- other than our communications, you can answer the question.

THE WITNESS: It's only through communications with my attorney.

BY MR. SCAROLA:

Q So Mr. Link told you that he got the disc from Fowler White; is that correct?

MR. LINK: You can answer that question.

THE WITNESS: Correct.

BY MR. SCAROLA:

Q Did he tell you when he got it from Fowler White?

MR. LINK: If you remember, you can answer that question.

THE WITNESS: Sometime in February.

BY MR. SCAROLA:

Q Are you aware that William Berger was deposed in the state court civil proceeding?

A I don't recall.

Q Do you know who William Berger is?

**A**     No, sir.

**Q**     Do you recall a former Palm Beach County circuit court judge having been involved as co-counsel in the prosecution of molestation claims against you by the Rothstein, Rosenfeldt, Adler firm?

THE WITNESS:  Is this part of today's --

MR. LINK:  If you remember that there was a --

THE WITNESS:  I do not remember.

BY MR. SCAROLA:

**Q**     At the time that you had the communication with Mr. Link sometime in February of 2018, did Mr. Link discuss any of the data that was included on the disc that he was informing you about?

MR. LINK:  Mr. Epstein, I am going to instruct you not to answer.

BY MR. SCAROLA:

**Q**     Have you ever received any documents that were represented to have been included on that disc?

MR. LINK:  Object to the form.

If you can answer that question without disclosing our communications you can answer it.

THE WITNESS:  Anything I received, I

28

received from my attorneys.

BY MR. SCAROLA:

**Q**    Yes.  And I want to know whether you ever received any of -- any documents that were represented to you to have been printed from data on the disc that Mr. Link told you about in February of 2018.

MR. LINK:  So, again, without disclosing our communications, you can simply tell him whether you were provided generally any documents, without disclosing any specific documents or our communications.

THE WITNESS:  I don't believe so.

BY MR. SCAROLA:

**Q**    What specific documents that originated on the disc did you receive?

MR. LINK:  So, I'm going to instruct you not to answer that question based on attorney-client and work product.

BY MR. SCAROLA:

**Q**    How many documents did you receive?

MR. LINK:  That question you can answer, if you remember.

THE WITNESS:  I don't remember.

BY MR. SCAROLA:

Q   Can you characterize in any way the volume of documents that you received that you understood originated on the disc?

A   I don't recall.

Q   Was it more than one?

A   Probably.

Q   Was it more than two?

A   Probably.

Q   Was it more than three?

A   I don't know what you mean by documents.  Are you talking about pages?

Q   Yes.  Let's be very specific.

Did you receive more than three pages that you understood to have been printed out from the disc?

MR. LINK:  Let me think about the question for a minute.

You can answer that question.

THE WITNESS:  Yes.

BY MR. SCAROLA:

Q   Was it more than 10?

A   I would say less than 100, so we don't have to go through numbers.

Q   That does indeed save us some time.

30

Was it more than 50?

A    I don't recall.

Q    Was it probably more than 50?

A    I don't recall.

Q    So the best you are able to tell us is that it was, more likely than not, more than three and less than 100 pages, and you can't narrow it down any further than that; is that correct?

A    Correct.

Q    How did you receive those pages?

A    I don't recall.

Q    Were they electronically transmitted to you?

A    I don't recall.

Q    Do you have any recollection of ever having received hard copies of documents generated from the disc?

MR. LINK:  Object to the form.

You are talking about from me?

MR. SCAROLA:  No, I didn't ask that.

THE WITNESS:  Anything separate my attorneys, nothing.

BY MR. SCAROLA:

Q    Pardon me?

A    Anything separate from the attorneys, nothing.

31

**Q**   Okay.  Well, that's not my question.

**A**   Okay.

**Q**   Did you ever receive from anyone any hard copies of pages that you understood to be generated from the disc?

MR. LINK:  Okay.  So, I am going to object to the form.

There are thousands of pages that have been produced in this case from the disc. So that general generic --

MR. SCAROLA:  Mr. Link, that's not a legal objection.  If you have a legal objection, please state it.  Anything other than that is nothing more than an attempt to coach the witness.

MR. LINK:  It's not.  It's an objection to the form.

MR. SCAROLA:  That's fine.  I understand.

BY MR. SCAROLA:

**Q**   Could you answer the question, please?

**A**   Could you repeat it?

**Q**   Yes, sir.

Did you ever receive any hard copies of documents -- pages that you understood to have been

32

generated from the disc?

**A**   Yes.

**Q**   On how many separate occasions did you receive pages in hard copy form that you understood to have been generated from the disc?

**A**   I would say less than 20.

**Q**   Twenty occasions?

**A**   Less than 20.

**Q**   Let's go through each of those that you can remember and tell me about those occasions on which you recall having received hard copies of pages, which you understood to have been generated from the disc.

**A**   Have you asked a question?

**Q**   Pardon me?

**A**   Have you asked a question?

**Q**   Yes.

**A**   What's the question?

**Q**   I want you to tell me about each of the occasions -- we will start with the first one, chronologically, when you received hard copies of pages that you understood to have been generated from the Fowler White disc that Mr. Link told you about in February of 2018.

MR. LINK:   Okay, you can answer that specific question.  It's a different

33

question.

THE WITNESS:  Sometime in February I was handed, from my attorneys, some documents.  Is what I recall.  Some documents from my attorneys.  I was handed some documents.

BY MR. SCAROLA:

Q    Who specifically handed you those documents?

A    Darren Indyke.

Q    Where were you?

A    I believe in New York.  I can't be certain.

Q    How many pages did Mr. Indyke hand you on that occasion?

A    Less than 100.

Q    Were those pages accompanied by any cover letter?

A    Not that I recall.

Q    Were they accompanied by any summary of the contents?

A    Not that I recall.

Q    Were they accompanied by any index?

A    Not that I recall.

Q    What did Mr. Indyke tell you about the documents when he gave him to you?

MR. LINK:  I'm going to instruct you

34

not to answer that question based on
attorney-client privilege.

BY MR. SCAROLA:

Q    What did you do with the documents when you received them?

A    I read them, to the best of my recollection.

Q    Did you read them in their entirety?

A    I don't recall.

Q    What did the documents say?

Let me withdrew that question.

If you were asked to recount the content of the documents, as you sit here today, would you be able to describe the contents of the documents?

A    Some of them, I think.

Q    Approximately, how many documents are there as to which you have the ability, as you sit here today, to describe the contents?

A    When you say documents, you mean pages?  I'm sorry?

Q    Yes, sir.  Pages.

A    Well, I can remember the emails with respect to Brad Edwards --

Q    Excuse me.  Pardon me.  I'm stopping you, sir.  That's no responsive to my question.  And I don't want you on this record to be disclosing the content of

any privileged documents.

My question is not to ask you to describe the content of those privileged documents, but to tell us how many pages of privileged material you have retained a recollection of that would enable you to describe that content as you sit here today.

So how many pages?

MR. LINK:  You can answer that question.

I want to note for the record that you have made an assertion of privilege.  We have challenged that privilege.  And no court has ever made a determination that they are, in fact, privileged.

With that statement, you can answer the question, if you can.

THE WITNESS:  I'm sorry.  Can you repeat the question?

BY MR. SCAROLA:

**Q**   Yes, sir.

As you sit here today, how many pages of the documents that you received from Mr. Indyke -- something less than 100 documents --

**A**   Yes.

**Q**   -- would you be able to describe the contents

of?

A   Again, I could describe the contents in detail on some that I remember.  I have generalizations on others.

Q   Let's break it down into two categories.  How many pages could you describe the contents of in detail?

A   Less than 10.

Q   And how many pages could you describe the contents of generally?

A   Probably at least another 20.

Q   Are you aware that a claim of privilege has been asserted with regard to any of the documents that you received from Darren Indyke?

MR. LINK:  So, again, if you have independent knowledge, separate and apart from communications with your lawyers, you can answer the question.

THE WITNESS:  I have no independent knowledge.

BY MR. SCAROLA:

Q   Are you aware that a claim of privilege has been asserted with regard to any of the documents or pages that you received from Darren Indyke?

MR. LINK:  Same instruction,

37

Mr. Epstein.

THE WITNESS:  Outside of conversations with my attorney, no.

BY MR. SCAROLA:

Q    Regardless of where you received the information from, are you aware that a claim of privilege has been asserted with regard to any of those documents?

MR. LINK:  So, Mr. Epstein, the source of information is important.  If the sources of information are our communications or communications with your lawyers, I do not want you to disclose that.

If you have independent information -- you have read something, you have seen something outside of our communications -- you answer the question.

THE WITNESS:  I have no independent knowledge.

BY MR. SCAROLA:

Q    Do you have knowledge that you derived from your lawyers?

MR. LINK:  Generally or about the topic?

MR. SCAROLA:  About that specific

38

topic, the assertion of privilege with regard to any documents.

MR. LINK:  We are not going to disclose any topics or anything that we talked about. I am instructing you not to answer.

BY MR. SCAROLA:

Q     Have you ever seen a privilege log that listed any of the documents that you received from Mr. Indyke on that log?

A     I don't recall.

Q     Where did Mr. Indyke get the documents that he delivered to you?

A     I don't know.

Q     How do you know that the documents Darren Indyke delivered to you were documents that originated on the disc?

A     Outside of -- I have no independent knowledge.

Q     So that's information you received from your lawyers?

A     I have no independent knowledge.

Q     That's not my question.

Is that information you received from your lawyers?  So they told you that the documents that you received from Darren Indyke came from the Fowler

39

White disc, correct?

MR. LINK:  I do not want you to disclose your communications with your lawyers.  I am going to instruct you not to disclose any information.

If you can answer any of his questions based on your independent knowledge or reviewed independently from discussion with your lawyers you can answer the question.

THE WITNESS:  I have no independent knowledge.

BY MR. SCAROLA:

**Q**   Have you ever reviewed the transcripts of any hearings that were held either in the circuit court, in the bankruptcy proceeding, or before Special Master Carney with regard the production of emails?

**A**   I don't recall.

**Q**   I am going to hand you what I will mark as Exhibit Number 2 to your deposition.  It is an affidavit that purports to have been signed by you and filed in the circuit court proceedings in Palm Beach County.

I would like you to take a look at that, please.  Tell me if you recognize that document.

(Defendants/Counter-Plaintiffs's Exhibit

40

(Number 2 was marked for identification.)

MR. LINK:  Mr. Scarola, do you have a copy for me?

MR. SCAROLA:  That's the only one I have.

THE WITNESS:  Okay.

BY MR. SCAROLA:

Q    Is that your signature on that affidavit?

A    Yes.

Q    Did you, in fact, swear to the contents of that document?

A    Yes, sir.

Q    You had told us there were something less than 20 occasions in which you received documents that had been originally contained on the Fowler White disc. You told us about one of those occasions when Mr. Indyke handed you documents.

What others do you remember?

MR. LINK:  Object to the form.  That was not his testimony.  That was the second question that you asked.

The first question, I believe, was general, as I made a statement thousands of documents were produced.

MR. SCAROLA:  Is this the legal

41

objection that you are making, Mr. Link?

MR. LINK:  It is, Mr. Scarola.

MR. SCAROLA:  Then please state the legal basis of your objection, and don't attempt to coach the witness.

MR. LINK:  I'm not coaching the witness.  I'm correcting your misstatement.

MR. SCAROLA:  That's fine.  Your objection is there is no proper predicate for the question.

BY MR. SCAROLA:

Q   Can you answer the question please?

MR. LINK:  Mr. Scarola, I am going to finish, please, my objection, although, you did a good job of disrupting my thought, because I was on a roll there.

But in any event, your question -- object to the form.  It mistakes your prior question and the witness's prior testimony.

THE WITNESS:  Sorry.  Could you ask it again?

BY MR. SCAROLA:

Q   How many other times -- or tell us about the other times that you received information generated from the Fowler White disc.

42

A    I don't have any specific recollection today.

Q    Can you give us any better estimate as to the number of times you received information from the Fowler White disc other than that it was less than 20?

A    No.

Q    What did you do with the documents that you received that you understood to have been generated from the Fowler White disc?

MR. LINK:  Object to the form.

THE WITNESS:  I'm sorry.  I don't fully understand the question.

BY MR. SCAROLA:

Q    What did you do with the documents that Mr. Indyke gave you, which you understood to have been generated from the Fowler White disc?

A    I read them.

Q    And what did you do with them after you read them?

A    I left them on my desk.

Q    Which desk?

A    I don't remember exactly.  I believe New York, as I said before.

Q    What happened to those documents after you left them on your desk?

A    After being informed by my counsel, I

Palm Beach Reporting Service, Inc.   561-471-2995

43

destroyed them.

Q    How?

A    In a shredder.

Q    When?

A    The same day.

Q    The same day that you received them from Mr. Indyke?

A    The same day I was informed by Counsel to destroy them.

Q    And when was that?

A    Some time after February.

Q    When in relation to having received them from Mr. Indyke?

A    Sometime -- right after the court -- Indyke was in February.  As soon as the court ordered me to destroy them, I destroyed them.

Q    Did you ever communicate with anyone regarding the contents of those documents?

A    Separate from my attorneys, I don't remember anybody else.

Q    Which lawyers did you communicate with about the content of the documents?

A    Scott Link, Darren, Jack.

Q    Anyone else?

A    Not that I recall.

44

Q      Was there anyone else at all at any time under any circumstance that you discussed the contents of the documents with?

A      I don't recall anybody except my attorneys.

Q      Did you have any communication with Bradley Edwards regarding the content of those documents?

A      I don't recall.

Q      Since receiving those documents, did you have any communication with Bradley Edwards at all about anything?

A      I don't recall.

Q      When you read the documents that you received from Mr. Indyke, did you learn anything that you had not previously known?

A      Yes.

Q      As you sit here today, would you be able to identify those things that you learned for the first time from among the documents that Mr. Indyke delivered to you?

A      I'm sure I can remember some of them.

Q      Was there anything in those documents that you already knew that was not being disclosed to you for the first time upon delivery of those documents to you?

A      I don't recall.

45

Q    We have marked as Exhibit Number 2 an affidavit, which you acknowledged to have been signed by you.  Have you had a chance to read through that?

A    Yes, sir.

Q    You agree that there is nothing in this affidavit that relates to the content of any emails, correct?

A    I'm sorry.  Which emails?

Q    The emails that you received from Darren Indyke.

Let's establish that.  The pages that you received from Darren Indyke were printouts of emails, were they not?

A    I believe some of them were.

Q    What else was in there besides email printouts?

MR. LINK:  You can say generally, if you remember, without describing what was provided to you.

THE WITNESS:  My best recollection is emails.

BY MR. SCAROLA:

Q    So you have no recollection of there being anything other than emails in the documents that you received from Mr. Indyke, correct?

46

**A**    I believe so.

Could you ask that question again?  You asked me a question.  Sorry.

MR. LINK:  I don't think there's any pending --

MR. SCAROLA:  I don't think there's a pending question.  There's about to be.

BY MR. SCAROLA:

**Q**    You understood that the purpose of Exhibit Number 2, your affidavit, was to describe all of the information that you relied upon in deciding to sue Bradley Edwards, correct?

**A**    No, sir.

**Q**    What was the purpose of this affidavit?

**A**    It was a general -- it did not fully encompass everything I might have seen prior to signing it.  It was a general affidavit.

**Q**    I'm sorry.

**A**    It was a general discussion.  It didn't list anything I had actually seen before signing this affidavit.

**Q**    So the affidavit does not include anything that you actually saw before signing the affidavit; is that correct?

**A**    I don't believe with any specificity, sir.

**Q**    What does that answer mean?  I don't understand that.

**A**    I might have seen things that are not in this affidavit.

**Q**    All right.  So what is it that you saw before signing this affidavit that related to your having had a good faith basis for filing the action against Bradley Edwards and Scott Rothstein in December of 2009?

MR. LINK:  Mr. Epstein, I am going to instruct you not to answer the question.  It far exceeds the scope of the deposition that was authorized by Judge Hafele.

This is not a discovery deposition related to the case.  Please do not answer the question.

BY MR. SCAROLA:

**Q**    Was there any information contained within the emails that form part of your alleged good faith basis for suing Bradley Edwards?

MR. LINK:  Object to the form.

You can answer the question.

THE WITNESS:  Reading the emails in the Darren Indyke documents confirmed everything that was in this affidavit.  Yes, sir.

Palm Beach Reporting Service, Inc.   561-471-2995

48

BY MR. SCAROLA:

Q    Was there any information contained within the emails that formed part of your good faith basis for suing Bradley Edwards?

MR. LINK:  Again, I am going to instruct you not answer that question.  It exceeds the scope of the court's order.

BY MR. SCAROLA:

Q    Are you aware of the specific scope of the inquiry that Judge Hafele permitted during the course of this deposition?

Did you ever see his order that outlined what you were allowed to be asked about?

A    Yes.

Q    You are aware that topic number one was whether and to what extent Epstein reviewed any of the alleged privileged materials prior to March of 2018, correct?

THE WITNESS:  Is that what it says?

MR. LINK:  That's what it says.

THE WITNESS:  Yes.

BY MR. SCAROLA:

Q    Did you review any of the allegedly privileged materials prior to March 2018?

A    That's a very general category.  Which

49

privilege materials?  It's 27,000 emails, so you are going to have to be specific.

Q    Well, when you were preparing for this deposition, did you find out which of those 27,000 emails were alleged to be privileged?

A    No.

Q    So as you sit here today, you are incapable of telling us whether you reviewed any of the alleged privileged materials prior to March 2018, because you have no idea what materials are alleged to be privileged.  Is that what you're telling us?

MR. LINK:  Object to the form.  That it is not what he said.

THE WITNESS:  I have recollection of reading some of the emails.

BY MR. SCAROLA:

Q    So did you review any of the allegedly privileged materials prior to March 2018?

A    Again, I understand alleged privileged materials encompass 27,000 emails, so I don't understand your question.

Q    I want to know whether you reviewed any of -- any email, which is alleged to have been privileged at any time before March of 2018.

MR. LINK:  Object to the form.

50

THE WITNESS:  Yes.

BY MR. SCAROLA:

Q    How many emails alleged to have been privileged did you review prior to March of 2018?

A    Again, your question.

MR. SCAROLA:  Read it back, please.

(Thereupon, the requested portion of the record was read back by the reporter as above duly recorded.)

THE WITNESS:  Can you tell me how many emails have been alleged to be privileged, so we are talking about something --

BY MR. SCAROLA:

Q    I want to know which emails you reviewed, which you believed to have been alleged to be privileged, prior to March of 2018.

MR. LINK:  That's a different question. You can -- if you understand, the question you can answer that.

THE WITNESS:  I'm sorry.  I didn't -- ask it again, please.

MR. SCAROLA:  Please read it back.

MR. LINK:  Jack, do you mind if we try to clarify this so that we can move forward, because I think I understand what the

51

difficulty is?

MR. SCAROLA:  I would like the question read back to see whether or not Mr. Epstein understands the question.

MR. LINK:  Okay.

(Thereupon, the requested portion of the record was read back by the reporter as above duly recorded.)

THE WITNESS:  I still don't understand the question.

BY MR. SCAROLA:

Q    Pardon me?

A    I don't understand the question.  Sorry.

Q    You are aware that there are emails which Bradley Edwards alleges to be privileged emails, correct?

A    I am aware that there -- I was told 27,000 emails alleged -- in some form to be privileged.

Q    Who told you that Bradley Edwards alleged 27,000 emails were privileged?

MR. LINK:  So, I don't want you to share our conversations or conversations with your lawyers.

If you can answer that question from whatever documents -- independent review

52

          that the order or affidavit -- whatever you

          have seen related to the bankruptcy

          proceeding --

               THE WITNESS:  I don't believe I have

          any independent knowledge.

BY MR. SCAROLA:

     Q    You just said you were told that 27,000

emails were alleged to have been privileged.

     A    Sorry.  That's not that I said.  I said --

               MR. SCAROLA:  Would you read back

          Mr. Epstein's answer, please?

               MR. LINK:  Do you really not want to

          have a conversation to see if we can fix

          this confusion?

               MR. SCAROLA:  I really don't want to.

               (Thereupon, the requested portion of the

               record was read back by the reporter as

               above duly recorded.)

BY MR. SCAROLA:

     Q    Who told you?

     A    My attorneys.

     Q    Which one?

     A    I don't recall.

     Q    When?

     A    I don't recall.

53

**Q** Was it before or after March of 2018?

**A** Before.

**Q** Was it before or after February of 2018?

**A** I don't recall.

**Q** What do you remember about that conversation?

MR. LINK: Again, I don't want you to share the details of the conversation.

MR. SCAROLA: He has already done that. He has already made an assertion of what he was told. That's a waiver of the privilege.

I want to know about the conversation in it's entirety.

MR. LINK: And I don't believe that it was a waiver of the privilege. He gave you non-privileged communication, and he's not going to share with you privileged communications.

As you said earlier, every communication isn't privileged. But the discussion would have been.

I have let you ask questions about dates and things of that nature that are not privileged, but I am going to instruct him not to answer your question.

And again, I offered on the record to

54

discuss with you what I think the impediment is to these general questions, because there were alleged privileged emails that were produced in the litigation -- before my law firm was retained -- voluntarily by Mr. Edwards and his law firm, so that there had been in the record alleged privileged emails for years in this case. And you have not asked specific questions about the emails that were located by my law firm in February as to your questions.

So I think your general questions about alleged privileged emails is not encompassed in what the court has asked or what we are here to talk about. And it's creating confusion, because there were many alleged privileged emails produced years ago.

BY MR. SCAROLA:

Q   Did Mr. Link tell you the things that he just stated on the record at some time prior to today?

MR. LINK:  You are not going to answer that question, Mr. Epstein.

BY MR. SCAROLA:

Q   Were you told at the time that Mr. Indyke gave you the less than 100 pages that he said were

55

contained on the disc, that an allegation was made that any of those pages were privileged?

THE WITNESS:  Can you repeat the question for me, please?

(Thereupon, the requested portion of the record was read back by the reporter as above duly recorded.)

MR. LINK:  So if you can answer that general question because the source of information was from somebody other than Mr. Indyke and or your lawyers, then you can answer it.

THE WITNESS:  I cannot answer it separate from that.

BY MR. SCAROLA:

Q   Did your lawyers, including Mr. Indyke, tell you when they handed over those pages to you that there's an allegation that these pages contain privileged material?

MR. LINK:  I am going to instruct you not to answer it.

Do you mind if we take a break?

THE VIDEOGRAPHER:  Going off the record at 10:15 a.m.

(A recess was had.)

56

THE VIDEOGRAPHER: Going back on the record. The time is 10:26 a.m.

BY MR. SCAROLA:

Q Have you ever communicated with any agent of Fowler White about the disc that was turned over by them to Link & Rockenbach?

A No. Not to the best of my knowledge.

Q Have you ever communicated with Tonja or Fred Haddad about the Fowler White disc?

A Not to the best of my knowledge.

Q Did you ever receive a copy of the disc itself?

A No.

Q Do I understand correctly that you don't recall whether any information contained on disc was transmitted to you electronically? Is that correct?

MR. LINK: Object to the form.

THE WITNESS: We are only talking about recently, I take it, right?

I don't know what information was contained entirely on the disc. I have never seen the disc. I can't give you an answer in terms of what came off the disc in the past 10 years.

Can you ask a better question? I'm

sorry.

BY MR. SCAROLA:

**Q**   The information you received from Mr. Indyke, you were told, was information that originated on the Fowler White disc, correct?

MR. LINK:  I don't want you to disclose any communications with your lawyers, but --

THE WITNESS:  That is my belief.

BY MR. SCAROLA:

**Q**   Do you have a specific recollection that that information was conveyed to you in hard copy as opposed to having been sent to you electronically?

**A**   Correct.

**Q**   Were there any electronic communications that took place at any time that included any information derived from the disc?

MR. LINK:  Object to the form.

THE WITNESS:  It's a bad question.  I don't have a time frame.  I don't know what was -- came off the discs over the past eight years.

BY MR. SCAROLA:

**Q**   At any time since the beginning of February 2017 -- 2018, was any information conveyed to you electronically, which, as you sit here today, you

58

believe to have originated on the Fowler White disc?

A    I don't believe so.

Q    Have you had any electronic communications about the content of the Fowler White disc at any time since 2018?

A    With who?

Q    With anyone.

A    Outside of my attorneys, no.

Q    Have you had communications with your attorneys about information contained on the Fowler White discs since February of 2018?

MR. LINK:  I am going to instruct you not to answer that question.

BY MR. SCAROLA:

Q    This deposition was noticed duces tecum.  You know what that means, correct?

A    No.  Sorry.

Q    You don't know.

I'm going to hand you what we will mark as Exhibit Number 3.

(Defendants/Counter-Plaintiffs' Exhibit Number 3 was marked for identification.)

BY MR. SCAROLA:

Q    Can you take a look at it and tell me whether you have ever seen it before?

MR. SCAROLA:  Paul, this is a copy of the Re-Notice of Taking Video Deposition Duces Tecum.

MR. CASSELL:  Thank you, Jack.

MR. LINK:  Let me know when you are finished.

THE WITNESS:  I'm finished.

MR. LINK:  So, Mr. Epstein, you can answer the question -- I don't want you to disclose our communication.  But if the question that's asked have you seen physically that document, then you can answer that.  But I don't want you to disclose our communications about it and anything we discussed.

THE WITNESS:  I have not seen it before.

BY MR. SCAROLA:

Q    Were you informed that you had an obligation to bring with you at the time of this deposition those items that are described on the second page of Exhibit Number 3, quote, All communications and all records relating to all communications concerning or containing information derived from documents or data over which a claim of privilege was asserted by or on behalf of

60

Rothstein, Rosenfeldt, Adler PA; Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; or Bradley J. Edwards?

MR. LINK:  I think -- which subpoena duces tecum are you looking at, Jack?  Which case?

MR. SCAROLA:  This is the subpoena duces tecum issued in the bankruptcy court proceedings.

MR. LINK:  So in the bankruptcy court proceeding, we filed an objection to the subpoena duces tecum, and you and your law firm never responded, so there are no documents being produced in the bankruptcy matter.

BY MR. SCAROLA:

Q    Do you have any documents that fit within the description that I just read?

MR. LINK:  You are not going to answer that question.

MR. SCAROLA:  And the basis for that?

MR. LINK:  I filed my objection and it has sat there for months and you didn't respond to it or move to compel it.  I am not going to let him answer any questions

61

about it.

BY MR. SCAROLA:

Q    Have you conducted any search of electronically retained data on any communication device or computer that you have used since March of -- excuse me -- since February of 2018 to determine whether there is stored on that device any communication or records relating to communications concerning or containing information derived from documents or data over which a claim of privilege has been asserted in these proceedings?

MR. LINK:  So, Mr. Epstein, I do not -- I am instructing you not to answer the question on the basis of both our assertion of an objection to the duces tecum that went unanswered in the federal court -- bankruptcy court.

And secondly, it exceeds the scope of the deposition in the bankruptcy court, which was limited to asking you whether you had the disc or were aware of the disc that is subject to the bankruptcy proceeding before it was delivered -- before I located it.  So I'm going to instruct you not to answer.

BY MR. SCAROLA:

Q    I am going to mark as Exhibit Number 4 the Re-Notice of Taking Video Deposition Duces Tecum in the circuit court proceedings.

(Defendants/Counter-Plaintiffs' Exhibit Number 4 was marked for identification.)

BY MR. SCAROLA:

Q    Hand that to you, sir, and ask you whether you have seen that before.

MR. LINK:  Again, you can answer that specific question.  I don't want you to testify or disclose about our communications that relate to that exhibit, but you can answer his very specific question.

THE WITNESS:  No.

BY MR. SCAROLA:

Q    Were you aware that you had an obligation to bring with you at the time of this deposition all documents tending to establish whether and to what extent Epstein reviewed any of the alleged privileged materials prior to March 2018; whether and to what extent Epstein reviewed any of the alleged privileged materials after March 2018; whether Epstein has any knowledge regarding compliance with the court's verbal rulings on the record at the March 8th, 2018 hearing

63

regarding destruction of those documents Edwards has claimed are privileged; whether and to what extent Epstein has shared any of the alleged privileged materials with anyone other than his attorneys, understanding that the documents are described as including, but not limited to all non-identical copies of writings, drawing, drafts, charts, photographs, phono-records, recordings, and/or any other data, compilations from which information can be obtained, translated, if necessary, by the party to whom the request is directed through detection devices into reasonably useable form?

Documents also include all electronic data as well as application metadata and system metadata. All inventories and rosters of information technology systems, for example, hardware, software and data, including but not limited to network drawings, lists of computing devices, servers, PCs, laptops, PDAs, cell phones with data storage and/or transmission features, programs, data maps and security tools and protocols.

MR. LINK:  So, we filed a written response and objection to the request.  We have asserted attorney-client privilege where appropriate.  We identified where no

64

documents existed.  We, in fact, produced the only responsive non-privileged documents.

I will note for the record, Mr. Scarola, that we did all of that in advance of this deposition, even though we weren't required to do so by the Florida Rules of Civil Procedure that gave us 35 days, I believe, to do that with mailing, and that information and objections and documents have been produced.

BY MR. SCAROLA:

Q   Did you search the data storage of any cell phone that you used in order to make a determination as to whether any of those items described in this duces tecum exist?

MR. LINK:  I am going to instruct you not to answer.  We have filed our written response to the subpoena duces tecum.

As I just said, we did it in advance of deposition, even though we weren't required to under the Florida Rules of Civil Procedure, and we have produced all non-privileged documents.

65

BY MR. SCAROLA:

Q    And I am entitled to know whether any search was conducted in connection with this duces tecum. Would you answer that question, please?

MR. LINK:  I am going instruct you not to answer it.

BY MR. SCAROLA:

Q    Did you search any home computer or other device capable of electronically storing data to determine whether any documents exist within the scope of the request that I have just read?

MR. LINK:  I'm going to instruct you not to answer.

Let the record reflect Mr. Epstein testified that he shredded the hard copies that he had.  That's what he remembers receiving.  We will stand by our written objections and production.

BY MR. SCAROLA:

Q    As you sit here today, do you know whether there is any data on any electronic storage device that relates in any way to the content of the Fowler White disc?

MR. LINK:  Mr. Epstein, you can answer that specific question, but you may not

disclose any communications between you and your attorneys.

MR. SCAROLA:  That doesn't ask for any communications between Mr. Epstein and his lawyer.

BY MR. SCAROLA:

Q    I would like to know whether, as you sit here today, you know whether there is any electronic data stored on any device to which you have access that contains any information derived from the Fowler White disc.

A    Since I'm not really sure what total information contained from the Fowler White disc of at least 27,000 emails -- and you referenced something as being derived from it -- I would not be able to have any recollection -- any way possible to search in any way to see if there's anything that's been derived from 27,000 emails.

Q    Do you have files on any electronic storage device that relate to this litigation?

MR. LINK:  Over the last 10 years?

BY MR. SCAROLA:

Q    As you sit here today, do you know whether there is any electronic data on any electronic data storage device that relates to this litigation?

67

MR. LINK:  I am going to object to the form.  It is not limited -- I am going to instruct you not the answer.  It is unrelated to the bankruptcy proceeding and Judge Hafele's topics.

If you want to try to narrow it, Mr. Scarola.  I obviously communicated with Mr. Epstein, to this day, sometimes electronically.

If you want to tie it in to the court's order, then we will see if he can answer it.

MR. SCAROLA:  My question stands.  And he is instructed not to answer that question?

MR. LINK:  Yes, sir.

BY MR. SCAROLA:

Q    Thank you.

Mr. Epstein, have you made any effort to determine whether there is anything on any electronic storage device to which you have access, which information was generated since February of 2018 relating to the contents of the Fowler White disc?

MR. LINK:  I am going to instruct you not to answer.

68

MR. SCAROLA:  And the basis of that instruction?

MR. LINK:  It exceeds the scope of the deposition of bankruptcy proceeding and Judge Hafele's specific order and our objections that we filed in the circuit court and the bankruptcy court.

BY MR. SCAROLA:

**Q**    Are you aware of the entry of an order requiring that all information derived from the Fowler White discs be destroyed or purged?

**A**    You said derived from.  I'm sorry.  That's the problem I am having with your question.

MR. LINK:  Object to the form.  Thank you.

BY MR. SCAROLA:

**Q**    Would you answer the question please?

**A**    I don't know what derived from means.  I'm sorry.

MR. LINK:  As we have discussed, when you say the Fowler White disc, that a -- I'm assuming you mean the one that my law firm discovered.  The disc generated thousands -- tens of thousands of pages that were produced in this litigation.

Palm Beach Reporting Service, Inc.   561-471-2995

These depositions -- this deposition we are here for today is limited by court order to the disc that I -- that my law firm located and received in February.

MR. SCAROLA:  That's the Fowler White disc, isn't it.

MR. LINK:  No.  I don't know that it is.

MR. SCAROLA:  That's the question that I'm asking.  The question I'm asking relates specifically to the Fowler White disc and whether Mr. Epstein is aware of the entry of an order that required the destruction or purging of all information alleged to be privileged derived from the Fowler White disc.

MR. LINK:  By definition we are now limiting that to the disc, which my office started reviewing on February 25th, 2018. If that's your clarification for all the questions, then let me hear the question again.

THE WITNESS:  I don't know what derived from a disc with untold amount of information on it means.  Sorry.

70

BY MR. SCAROLA:

**Q**    I mean came from.

**A**    No.

**Q**    Data that came from the disc, printouts that came from the disc, information that came from the disc that was obtained from Fowler White and acquired, allegedly, sometime in February 2018 from Fowler White to Link & Rockenbach.

Do you now understand the question, sir?

**A**    No.  I don't not.

MR. LINK:  I don't either.

Jack, are you asking him whether he as retained any of the allegedly privilege emails --

MR. SCAROLA:  No.  I was asking him whether he's aware of an order --

MR. LINK:  Can I please finish, please?

Are you asking him -- because the question has changed -- are you asking him has he retained any of the copies or electronic copies of the documents that are the subject of the bankruptcy proceeding that were located by my law firm from a disc that we started reviewing on February 25th, 2018?

I think that's a legitimate question, pursuant to both -- well, pursuant to Judge Hafele's order, not pursuant to the bankruptcy order.

But your question hasn't been tailored that way.

MR. SCAROLA:  And that's because that's not the question I'm asking.

BY MR. SCAROLA:

Q    I want to know whether you are aware of the entry of an order that restricted your possession of any information that was derived from the disc that Link & Rockenbach obtained from Fowler White in February of 2018.

A    The word derived -- any conversation that anybody had in any way attached to that information, I cannot answer that question.

If you are asking me the question specifically -- you have to be more specific. Derived from -- I don't know what derive means.

MR. LINK:  It can encompass our conversations.

THE WITNESS:  It can encompass many conversations, and subjects not related to this hearing (sic).

72

BY MR. SCAROLA:

**Q**   Are you aware of the entry of a court order that prohibited you from obtaining possession of any documents or electronic data that originated on the specific copy of the disc that had been in Fowler White's files and was turned over in copy form to Link & Rockenbach in February of 2018?

MR. LINK:   I object to the form.   I don't think there's an order that says that.

Do you have a court order you are referring to?

THE WITNESS:   May I see a court order?

BY MR. SCAROLA:

**Q**   Are you aware of any court order restricting your possession of that information?

**A**   May I see the court order?

**Q**   No, sir.   I want to know whether you are aware of any court order that restricted your possession of that information.

**A**   I don't know what that information you are referring to is.

**Q**   The information that was contained --

**A**   Are you going to let me finish?

MR. LINK:   Let me -- let's take a pause.   I think the problem we're having is

73

that the court order -- there's no court order that says he has to flush his memory.

THE WITNESS:  Excuse me.  Is there a court order?

MR. LINK:  There is no court order that says what Mr. Scarola says.

Mr. Epstein has already answered your question that he received documents and he shredded them when I instructed him of Judge Hafele's oral ruling on March 8th, 2018.

BY MR. SCAROLA:

Q    What do you know about that March 8th, 2018 order?

MR. LINK:  Mr. Scarola -- Mr. Scarola, this is -- no reason to get aggressive and be upset.  If there's an order that you have -- because what you have recited is not accurate.  If you have an order, please show us.

BY MR. SCAROLA:

Q    Are you aware of an order entered by Judge Hafele in March of 2018 that related to the contents of the disc obtained from Fowler White's files?

MR. LINK:  Mr. Scarola, that is a misrepresentation.  There was no order

74

entered.  There was a verbal ruling, which
we complied with and filed, I believe, at
least two notices of compliance.  So you are
misstating what transpired in March of 2018
to this witness.

BY MR. SCAROLA:

Q   Are you aware of any verbal ruling -- whether
Mr. Link chooses to characterize as an order or
something other than an order -- relating to the
retention of documents or data derived from the Fowler
White disc that Link & Rockenbach obtained from the
files of Fowler White?

A   I am going to take -- you will have -- again,
if you choose your words more carefully, I would
appreciate it.  I don't know what derived from means.

Q   Is it derived that you don't understand the
meaning of, or from that you don't understand the
meaning of?

A   Derived from.

MR. LINK:  It includes our
conversations, Mr. Scarola.  That's the
issue.

MR. SCAROLA:  Except that the question
relates to documents or data.

BY MR. SCAROLA:

**Q**    Are you aware of the entry of an order or the issuance of a ruling or the pronouncement of any court that restricted retention of documents or electronic data that was obtained from --

**A**    Thank you.

**Q**    -- the disc that Link & Rockenbach got from Fowler White's files?

**A**    Yes.

**Q**    What do you understand that ruling, order or direction to be?

**A**    I was to have destroyed my copies I had of those emails.

**Q**    Did you have any understanding as to whether that order, direction or ruling related to anything other than hard copies that you had?

**A**    Anything -- I believe anything I had.

**Q**    And that would include any electronic data that you had, correct?

**A**    I believe so.

**Q**    Did you make any effort whatsoever to determine whether you had any electronic data that fell within the scope of that ruling?

**A**    Yes.

**Q**    What did you do?

**A**     I don't remember.

**Q**     Is whatever you did an action that you took personally or did it involve anyone else's efforts?

**A**     Separate from my attorneys, I don't believe so.

**Q**     Did you engage your attorneys to attempt to determine whether there was any electronic data that you had that fell within the scope of the court's ruling, direction or order?

MR. LINK:  I'm going to instruct you not -- A, I am going to object to the form. And I don't understand the question.  But I am going to object to you discussing -- answering any question about what we discussed.

MR. SCAROLA:  I haven't asked what you discussed.  I am trying find out whether anything was done to comply with the court's order, which Mr. Epstein has said he understood to include purging electronic data.

MR. LINK:  Then ask him --

MR. SCAROLA:  If he said --

MR. LINK:  Ask him, Did you have any data and you looked and you delete it, and

he will answer that question.  Just like he
said he shredded the hard copies.

BY MR. SCAROLA:

Q    Did you look for any electronic data?

A    I don't believe I had any.

Q    Did you look for any electronic data?

A    I don't believe I had any.

Q    Let me try a third time.

A    Okay.

Q    Did you look for any electronic data or did you assume, because you didn't think you had any, that there was no need to look?

A    I don't recall.

Q    Did you engage the services of anyone else to attempt to determine whether you had any electronic data that you understood you were not supposed to have?

A    Not to the best of my recollection.

Q    What devices do you have upon which electronic data could be stored?

MR. LINK:  I am going to object to the form and instruct you not to answer the question as framed.

MR. SCAROLA:  I have no further questions of Mr. Epstein subject to our ability to re-examine him with regard to all

78

improper objections that have been raised, and with regard to items not produced that fall within the scope of the duces tecum of both notices.

MR. LINK:  So you have completed both the circuit court and the bankruptcy deposition?

MR. SCAROLA:  That is correct.

MR. LINK:  Mr. Cassell, do you have --

MR. SCAROLA:  Actually, it is not correct.  I'm telling you they are not completed --

MR. LINK:  Subject to your reservations.

MR. SCAROLA:  Right.

MR. LINK:  I got that.

Mr. Cassell, do you have questions for L.M. in the bankruptcy proceeding?

MR. CASSELL:  I do.

MR. LINK:  Okay.  So I want the record to be clear, Mr. Cassell, that you do not have permission by the circuit court to ask any questions in the circuit court.

The bankruptcy court has allowed you to ask questions on behalf of L.M., directed

79

only in the bankruptcy proceeding, and the -- my question is do you have questions about the bankruptcy proceeding that have not been asked by Mr. Scarola?

MR. CASSELL:  I do.

MR. LINK:  Okay.

MR. CASSELL:  And for the record, I would like to disagree with your assertion that we have been denied the opportunity to ask questions by the circuit court.

It is our position that, by virtue of having intervened in that matter, and in particular with matters connected to those that are being discussed today, we have the right to ask questions.

MR. LINK:  There's actually a court order, Mr. Cassell, that gives Bradley Edwards permission to ask questions.  There is no court order giving the intervenors the right to ask questions.

So I want to be clear we have closed the circuit court proceeding, because the only party that had permission, pursuant to Judge Hafele's order to ask questions, was Mr. Edwards, and Mr. Scarola -- subject to

80

your reservations, Jack -- has finished his deposition of the circuit court.

So we are now closing that matter and moving forward on the bankruptcy matter for additional questions by Mr. Cassell on behalf of L.M. and by Mr. Ianno on behalf of Fowler White.

MR. SCAROLA:  And it is our position on behalf of Brad Edwards that once an intervention has been granted and permission is given to take discovery in the proceeding to any party, every other party, including intervenors to that proceeding, have a right to participate in the discovery process.

MR. LINK:  We will see what Judge Hafele says.

Mr. Ianno --

MR. IANNO:  Well, I think what we need to do is do the read or waive and then just splice it and start -- not to continue it. We will just close it off entirely and have the videographer start a whole new file and the court reporter start a whole new file.

MR. LINK:  So, yes --

MR. CASSELL:  Before we do that, I just

81

need to ask two small things for the record. It will take about 30 seconds.

First, I join in the statement that Mr. Scarola just made. And second, I would amplify that it was my understanding that Mr. Epstein understood he could have questions asked of him today through his attorneys -- and, of course, there's no court order permitting that -- just as a defendant in an action is allowed to ask questions during a deposition, such as this one, intervenors are allowed to ask questions, particularly where the subject matter at issues goes directly to the interest of the intervenors, which is the privacy of their own confidential information, which was the subject that I intended to ask questions about.

MR. LINK: I understand. So we are going to not waive. We will read, please.

And this closes the circuit court proceeding. We understand your objections, Mr. Cassell, and Mr. Scarola's reservations to go back before Judge Hafele. And if we are instructed to come back, we will come

82

back.

THE VIDEOGRAPHER: Going off the record. The time is 11 a.m. This marks the end of the deposition.

- - -

(The deposition was concluded
at 11:00 a.m.)

83

CERTIFICATE OF OATH

STATE OF FLORIDA     )
                     : SS
COUNTY OF PALM BEACH )

I, the undersigned authority, certify that JEFFREY EPSTEIN personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 19th day of October, 2018.

_____

Sonja D. Hall

Commission No.: GG 168652

Notary Public - State of Florida

My Commission Expires: 2-01-22

84

REPORTER'S DEPOSITION CERTIFICATE

STATE   OF   FLORIDA    )
                        : SS
COUNTY OF PALM BEACH )

I, SONJA D. HALL, certify that I was authorized to and did stenographically report the deposition of JEFFREY EPSTEIN; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that on the 19th day of October, 2018, I notified SCOTT J. LINK, ESQUIRE that the deposition of JEFFREY EPSTEIN was ready for reading and signing by the witness.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of October, 2018.

_____

SONJA D. HALL

85

TO:     JEFFREY EPSTEIN
        c/o SCOTT J. LINK, ESQUIRE
        LINK & ROCKENBACH, P.A.
        1555 Palm Beach Lakes Boulevard, Suite 301
        West Palm Beach, FL 33401


          RE:  JEFFREY EPSTEIN vs. SCOTT ROTHSTEIN,
INDIVIDUALLY; BRADLEY EDWARDS, INDIVIDUALLY


          At the conclusion of your deposition given
in the above-styled cause you indicated you wished to
read and sign the transcript.

          This letter is to advise you that your
deposition is ready, and we ask that you call our
office at (561) 471-2995 at your earliest convenience
for an appointment to come in.

          If you are a party in this action and your
attorney has ordered a copy of this transcript, you
may wish to read his copy and forward to us a
photostatic copy of your signed correction sheet.

          It is necessary that you do this as soon as
possible, since the transcript cannot be held beyond
two weeks from the date of this letter.

          If you have any reason which you would like
for me to place on your deposition as to your failure
to sign the same, please advise.

          Thank you for your prompt attention.

                    Very truly yours,
                    PALM BEACH REPORTING SERVICE, INC.
                    1665 Palm Beach Lakes Blvd.,
                    Suite 1001
                    West Palm Beach, Florida  33401


                    BY:  SONJA D. HALL


Date:  October 19th, 2018

Palm Beach Reporting Service, Inc.   561-471-2995

86

CORRECTION SHEET:

NAME:  JEFFREY EPSTEIN
            RE:  JEFFREY EPSTEIN vs. SCOTT ROTHSTEIN,
INDIVIDUALLY; BRADLEY EDWARDS, INDIVIDUALLY


            The following corrections, additions or
deletions were noted on the transcript of the
testimony which I gave in the above-captioned matter
held on October 13th, 2018:

PAGE(S)      LINE(S)     SHOULD READ

                              SIGNATURE:  _____

                                   DATE:  _____

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

IN RE:                                                    CASE NO. 09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,        CHAPTER 11

      Debtor.

_____/

### JEFFREY EPSTEIN'S SWORN DECLARATION OF FACT

1. My name is Jeffrey Epstein. I am the Plaintiff and Counter-Defendant in the action styled *Epstein v. Rothstein, Edwards, and L.M.*, No. 2009CA040800XXXXMBAG pending before the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "state court proceeding").

2. The law firm of Fowler White Burnett, P.A. ("Fowler White"), represented me in the state court proceeding from June 2010 through May 2012. As part of that representation, Fowler White represented me in proceedings in this case concerning a Subpoena that my original counsel issued to the Bankruptcy Trustee.

3. In November 2017, I retained Link & Rockenbach, PA, to represent me in the state court proceeding.

4. In February 2018, Scott J. Link of Link & Rockenbach, PA informed me that he had located a disc ("CD") in Fowler White's files labeled "Epstein Bate Stamp."

5. I have no personal knowledge of how the CD came to be in Fowler White's possession.

6. I have never seen the CD nor received a copy of it.

Executed in the United States Virgin Islands, August 14, 2018. I declare under penalty of perjury that the foregoing is true and correct.

Jeffrey Epstein

APPROVED AS TO FORM:

_____
ATTORNEY FOR JEFFREY EPSTEIN