UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: CASE NO. 09-34791-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,

Debtor.
_________________________________/

ECF #6440, 6488, 6490
October 26, 2018

The above-entitled cause came on for hearing before the Honorable RAYMOND B. RAY, one of the Judges in the UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd., Fort Lauderdale, Broward County, Florida on October 26, 2018, commencing at or about 10:00 a.m., and the following proceedings were had.

Transcribed from a digital recording by:
Cheryl L. Jenkins, RPR, RMR

APPEARANCES:

SEARCY DENNY SCAROLA BARNHART & SHIPLEY, by
JACK SCAROLA, Esquire
DAVID VITALE, Esquire
On behalf of Bradley J. Edwards

LINK & ROCKENBACH, by
SCOTT LINK, Esquire
and
RICE PUGATCH ROBINSON STORFER & COHEN, by
CHAD P. PUGATCH, Esquire
On behalf of Jeffrey Epstein

CARLTON FIELDS, BY
NIALL McLACHLAN, Esquire
JOSEPH IANNO, Esquire
On behalf of Fowler White Barnett, P.A.

EDWARDS POTTINGER, by
BRITTANY HENDERSON, Esquire
On behalf of Farmer Jaffe Weissing

ALSO PRESENT

Bradley Edwards

James Hurley

ECRO - Electronic Court Reporting Operator

- - - - - - -

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RE-CROSS |
|---|---|---|---|---|
| Bradley Edwards | | | | |
| By Mr. Scarola | 12 | | 22 | |
| By Mr. McLachlan | | 15 | | |
| John Hopkins | | | | |
| By Mr. Vitale | 28 | | 32 | |
| By Mr. McLachlan | | 29 | | |
| James Hurley | | | | |
| By Mr. Scarola | 36 | | | |
| By Mr. Edwards | | 64 | | |
| By Mr. McLachlan | | 79 | | |
| Scott Link | | | | |
| By Mr. Scarola | 84 | | 96 | |
| By Mr. McLachlan | | 95 | | |
| Joseph Ackerman | | | | |
| By Mr. McLachlan | 106 | | | |
| Lillian Sanchez | | | | |
| By Mr. Ianno | 108 | | 133 | |
| By Mr. Edwards | | 109 | | |
| By Mr. Scarola | | 123 | | |

Exhibits

| | Page |
|---|---|
| Exhibits E-L | 100 |
| Exhibit 1-37 | 102 |
| Exhibit B | 109 |

ECRO: All rise.

THE COURT: Court calls the matter of Rothstein Rosenfeldt & Adler.

May I have appearances for the record?

MR. SCAROLA: Good morning, your Honor. My name is Jack Scarola, together with David Vitale. We are from Searcy Denny Scarola Barnhart & Shipley. We have the privilege of representing Mr. Bradley Edwards. Mr. Edwards is present in his capacity as representative of the law firm of Farmer Jaffe Fistos, et al, and Ms. Brittany Henderson is present as counsel on behalf of that law firm.

THE COURT: Is that Henderson or Heckerson?

MR. SCAROLA: Henderson, your Honor, H-e-n-d-e-r-s-o-n.

THE COURT: And she's for Farmer Jaffe.

Other appearances?

MR. SCAROLA: Those are our appearances, your Honor, yes.

MR. McLACHLAN: Good morning, your Honor. Niall McLachlan, M-c-L-a-c-h-l-a-n, from Carlton Fields on behalf of Fowler White Barnett, P.A. I have with me my partner Joseph Ianno, I-a-n-n-o, and the corporate representative of Fowler White, Mr. James Hurley, H-u-r-l-e-y.

MR. PUGATCH: Good morning, your Honor. Chad Pugatch, P-u-g-a-t-c-h, along with my co-counsel, Scott Link, L-i-n-k. We're here as counsel for Jeffrey Epstein.

Judge, there was a notice filed yesterday, which is on the docket, by which the petitioners have voluntarily dismissed Mr. Epstein out of this matter.

Because this was an order to show cause, we felt that rather than simply a notice of dismissal, there ought to be an order discharging your order to show cause as to Mr. Epstein. We prepared such an order. The form was approved by counsel for the petitioners, and we uploaded that order this morning. I don't know if you've seen it yet, but if I may approach, I have a copy of that order in the form that was approved, that simply discharges the order to show cause based upon their voluntary dismissal.

THE COURT: All right. Other appearances for the record.

MR. PUGATCH: May I approach?

THE COURT: Your appearance for the record.

MR. LINK: He made my appearance for me, Judge. Scott Link on behalf of Mr. Epstein, with the law firm of Link & Rockenbach, L-i-n-k.

THE COURT: All right.

MR. LINK: Thank you, your Honor.

THE COURT: I saw the -- yesterday, when preparing for today's hearing, I saw the notice of joint voluntary dismissal, Docket Entry 6495.

So that will result in an order discharging the order to show cause as a result as it reflects to Jeffrey Epstein.

MR. PUGATCH: Yes, sir, Judge, and the order and the form that I've handed to you has been uploaded this morning. So, it's waiting for you.

THE COURT: Then we're going to proceed.

MR. SCAROLA: Your Honor, if I may, I should also announce that Professor Paul Cassell is counsel to the intervenors in this matter, and Professor Cassell has asked me to announce to the Court that he adopts all arguments made on behalf of Mr. Edwards and on behalf of Farmer Jaffe.

THE COURT: Thank you.

MR. SCAROLA: And that's C-a-s-s-e-l-l.

THE COURT: But he's not present.

MR. SCAROLA: He is not present, your Honor, and will not be appearing, but adopts all presentations of argument on behalf of Farmer Jaffe and Mr. Edwards.

THE COURT: All right. Let's do a little housekeeping before we get started.

There were some pending motions, a motion to compel intervenors L.M., E.W. and Jane Doe to appear for depo, Docket Entry 6440. Is that moot?

MR. LINK: It is moot, your Honor. In fact, there was a notice withdrawing it I believe yesterday. That is moot.

THE COURT: All right.

MR. McLACHLAN: Judge, if I may?

THE COURT: Yes

MR. McLACHLAN: Niall McLachlan again for Fowler White.

It's not entirely moot, Judge, because in our motion for bifurcation in connection with that, at the same time we filed it, we joined in the motion to compel depositions, but your Honor put that off for after the hearing if, in fact, your Honor finds contempt of your November ---

MR. LINK: This was L.M.'s motion is compel Epstein ---

MR. McLACHLAN: Oh, I'm sorry, I'm sorry, I got it backwards, Judge. I thought it was Epstein's motion to compel L.M. My apologies.

THE COURT: Now, the motion, Docket Entry 6440, is the motion by Epstein to compel intervenors L.M., E.W. and Jane Doe to appear.

MR. LINK: Yes, your Honor, on behalf of Mr. Epstein we have withdrawn that motion --

THE COURT: All right.

MR. LINK: -- and it's moot from Mr. Epstein's standpoint.

THE COURT: All right. Next go to Docket Entry 6488, motion to compel Jeffrey Epstein to answer deposition questions.

MR. LINK: That motion is moot as well, your Honor.

THE COURT: All right. We'll deny it without prejudice as moot. Mr. Pugatch, see to an order.

MR. PUGATCH: Yes, Judge.

THE COURT: All right. Motion in limine, Docket Entry 6490.

MR. LINK: Your Honor, Mr. Epstein withdrew that motion yesterday, once he was dismissed from the proceeding. So it can be denied without prejudice as moot.

THE COURT: So, then the only pending matter that's before me this morning is the order to show cause addressed to Fowler White arising from the agreed order, Docket Entry 1194 in the Rothstein case?

MR. LINK: Yes, your Honor.

THE COURT: All right. Let me hear from the

parties.

MR. SCAROLA: Your Honor, in light of the fact that this is an order to show cause, we still consider that we have some burden of going forward, and with that understanding we have submitted our opening statement in writing pursuant to your Honor's direction, and we would call as our first witness Mr. Bradley Edwards.

Mr. Edwards has submitted a declaration with supporting exhibits, and is available to be cross-examined, your Honor.

THE COURT: All right. There are four -- I'm sorry, not four. One, two -- two binders submitted by Farmer Jaffe Weissing. Binder one is the exhibit register. Two is the opening statement. C is the sworn declarations of Farmer, Bradley Edwards and John Hopkins, and D is the objection to Fowler White's exhibit register.

Bradley Edwards has two volumes, that appears to duplicate Farmer Jaffe, is that correct?

MR. SCAROLA: Mr. Farmer's declaration and Mr. Edwards' declaration are identical, your Honor.

UNIDENTIFIED: I think he's asking about yours and our firms.

THE COURT: Jeffrey Epstein's exhibit register will not be entertained by the Court because he's

out. Fowler White has an exhibit register.

MR. McLACHLAN: Judge, yes, Niall McLachlan.

We have our declaration in that exhibit binder. You indicated that Mr. Epstein's declaration is out because he's not here. The same should apply to Gary Farmer, who I have been advised will not be appearing today. So his exhibit reg -- his declaration should also be stricken.

THE COURT: All right. We'll deal with that when we get to it.

Let me hear from the movants.

MR. SCAROLA: We would call Mr. Edwards at this time to the witness stand, your Honor, and we would also invoke the rule of sequestration.

MR. LINK: Your Honor, if I may? Scott Link on behalf of Mr. Epstein.

I have been notified that I may be called as a witness by the movant. I don't know if I will be or not, but I'm also here as Mr. Epstein's representative, and would ask that the order of sequestration not apply to me as his lawyer.

THE COURT: Any opposition?

MR. SCAROLA: Your Honor, Mr. Epstein no longer is a party to this proceeding, but as a professional courtesy to Mr. Link, I would agree that he

might remain in the courtroom.

THE COURT: Very well. So ordered.

MR. LINK: Thank you, your Honor. Thank you, Mr. Scarola.

MR. SCAROLA: You're welcome.

THE COURT: All right. Mr. Scarola, proceed.

MR. SCAROLA: Thank you. May Mr. Edwards take the witness stand?

THE COURT: Yes, he may.

MR. EDWARDS: Thank you, your Honor.

MR. SCAROLA: And I assume pursuant to your Honor's procedure that it is not necessary that Mr. Edwards read his declaration into the record, but I defer to the Court's preference in that regard.

ECRO: Swear him in?

THE COURT: Yes, swear him in.

ECRO: Will you raise your right hand?

Do you solemnly swear or affirm that the testimony you're about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth under penalty of perjury?

MR. EDWARDS: I do.

Thereupon,

BRADLEY EDWARDS,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCAROLA:

Q. Mr. Edwards, did you prepare a declaration with regard to your direct testimony?

A. I did.

Q. If you were asked appropriate questions, would all of the information included within that declaration be your responses to those questions?

A. Yes.

Q. And are the exhibits attached to that declaration true and accurate copies of those documents that are referenced in the declaration?

A. Yes.

MR. McLACHLAN: Judge, at this time we need to object to a substantial portion of Mr. Edwards' declaration.

If you look at Paragraph 19 through 26 of the declaration ---

ECRO: Please make sure your microphone is on.

MR. McLACHLAN: Oh, my apologies. That's better.

Judge, Fowler White objects to a substantial

portion of Mr. Edwards' declaration.

Paragraphs 19 through 26 of that document spend a lot of time and effort discussing how the entry of the agreed order was negotiated.

We know a couple of things very clearly. Mr. Edwards filed a motion, which is at Docket Entry 1120, asking for cost shifting. Rather than go to a hearing on that motion, they entered into an agreed order which is the subject of this proceeding.

We don't need to spend a lot of time discussing how the order was negotiated, what Judge Carney said about the order, which is obviously complete hearsay. So it's both irrelevant and contains many hearsay statements that have absolutely no probative value to the only issue before this Court, and that is did Fowler White violate the order, the agreed order, the November 30, 2010 agreed order, and if there is not complete compliance, whether there is substantial good faith compliance with that order. Those are the issues before the Court. Not how the order was negotiated, or why the movants entered into an agreed order that's the subject of this proceeding.

Thank you, Judge.

MR. SCAROLA: Your Honor, the history of the negotiations of this order clearly go to the extent of the

knowledge on the part of the alleged contemnors with respect to the meaning and significance of the restrictive provisions contained within that order.

That history laid out in the paragraphs that are being challenged is based directly upon the exhibits that are attached to this declaration, the authenticity of which has not been challenged, and the content of which is part of the business records of the law firm of both Farmer Jaffe and Fowler White.

I respectfully suggest that it will be of significance to your Honor to understand how this order came into being, and why the restrictive provisions with regard to the imposition of sanctions was so important to a party that was being directed to turn over privileged information not only to an adversary in the pending litigation that Mr. Epstein had against Mr. Edwards, but privileged information with regard to the victims of Mr. Epstein's serial child molestation. That was an extraordinary, an extraordinary circumstance, and it will be of significance to your Honor in determining whether Fowler White ignored substantially significant provisions in the order to understand how those provisions came about.

THE COURT: Well, let's go back in history and get it right. The party being deposed was the trustee

in bankruptcy.

MR. SCAROLA: The subpoena was ---

THE COURT: It was a state court subpoena.

MR. SCAROLA: I'm sorry, your Honor.

THE COURT: It was a state court subpoena addressed to the records being held by the debtor estate.

MR. SCAROLA: Yes, sir, absolutely, that is correct.

THE COURT: So the debtor estate presented the records to the two parties. They had them copied, copies were given to the Special Master, and the trustee got back his copies.

MR. SCAROLA: That's not quite an accurate reflection, your Honor, and the reason why it is not is because we're talking about multiple copies, and I'd be happy to go through the history, but it is laid out in the declaration accurately with respect to both electronic copies, and hard copies that are at issue as well.

THE COURT: All right. Let's proceed.

MR. SCAROLA: Thank you very much.

I assume we're proceeding with cross-examination, your Honor, is that correct?

THE COURT: Correct.

CROSS-EXAMINATION

BY MR. MCLACHLAN:

Q. Mr. Edwards, I'm going to show you what's been marked as Exhibit 7 to your declaration. Do you recognize that document?

A. Yes.

Q. What is it?

A. It's ---

THE COURT: Hold it. Let me find it. It's not sub-marked. What page is it?

MR. McLACHLAN: I'm not sure what page, Judge. It's Docket Number 1120 on your order. It's marked as Exhibit 7 to their declaration.

We had provided Edy with a PDF -- a thumb drive that had all of our exhibits on it per the order to show cause. I'm not sure whether the other counsel have done the same. It might make it easier if they had.

MR. VITALE: Your Honor, we provided a flash drive, but I have an extra copy if your Honor please.

THE COURT: All right. What is -- what exhibit number?

MR. McLACHLAN: It's Exhibit 7 to Mr. Edwards's declaration.

THE COURT: All right. I found Exhibit 7 to Farmer's --

MR. McLACHLAN: Well, it's ---

THE COURT: -- or to Edwards.

MR. McLACHLAN: Well, according to Mr. Edwards and Scarola, they're identical declarations, so the exhibits will also be identical.

THE COURT: All right. Exhibit 7 is the motion for relief from amended order.

MR. McLACHLAN: Yes, Judge.

THE COURT: Docket Entry 1120 in the bankruptcy.

MR. McLACHLAN: That's correct.

THE COURT: All right.

BY MR. MCLACHLAN:

Q. Mr. Edwards?

A. I recognize it.

Q. Okay. What is it?

A. It's the motion for relief from amended order, Docket Entry 1068, and the motion to compel Jeffrey Epstein to pay for the production of all documents in response to his request, which was filed by the Farmer Jaffe firm and the Searcy Denny firm on behalf of L.M., which was a client represented by Farmer Jaffe, and Bradley Edwards, who was represented by Searcy Denny.

Q. Thank you.

So you had that motion filed, do I understand that correctly?

A. The law firm of Farmer Jaffe, as well as

Searcy Denny filed this motion jointly, yes.
Q. On your behalf, and on behalf of L.M.?
A. Correct.
Q. Okay. There was a hearing scheduled on that motion, correct?
A. Yes.
Q. Okay, and your counsel agreed to the entry of the agreed order cancelling that hearing, correct?
A. Eventually there was an agreed order entered on the copying and Bates stamping process, and for sanctions should there be any breach of that process.
Q. I don't think you answered my question.
Did you agree to entry of that order?
A. Did Farmer Jaffe agree? I'm just testifying ---
Q. They filed it on your behalf, correct?
A. Searcy Denny filed it on my behalf.
Q. Did Searcy Denny -- well, I'm not even going to ask you that question.
Did you agree to entry of the order that's at issue today? The November --
THE COURT: The agreed order.
BY MR. MCLACHLAN:
Q. -- 30th, two thousand -- the agreed order.
THE COURT: Docket Entry 1194.

THE WITNESS: The agreed order was an agreed order.

BY MR. MCLACHLAN:

Q. Exactly. Okay.

A. Yes.

Q. Did Special Master Carney, was he going to rule on that order -- on the motion that you're holding in your hand?

A. Special Master Carney was not going to rule on the motion.

Q. Because he wasn't the judge, correct?

A. He was the Special Master appointed by the judge.

Q. Pretty self-evident?

A. Yes.

Q. Okay.

THE COURT: By the state court judge.

THE WITNESS: No, he was appointed by your Honor.

THE COURT: Oh, all right.

MR. McLACHLAN: By your Honor, Judge.

THE WITNESS: Special Master Carney was appointed -- I'm sorry, my answer wasn't clear. Special Master Carney was appointed by Judge Ray to serve over the process of evaluating the emails that were being

delivered, supposed to be delivered to Farmer Jaffe, and the preparation of any privilege log.

MR. McLACHLAN: Thank you.

BY MR. MCLACHLAN:

Q. So, while you may have had reservations about entering into the agreed order, your lawyer entered into that order on your behalf, correct? It's a pretty simple question. It's not really a trick question. It's a yes or no, I believe.

A. Well, my lawyer was Mr. Scarola, and as you can see from the correspondence, the bulk of the interaction occurred between my law firm, Farmer Jaffe, and more particularly Gary Farmer, and the Special Master, as well as a representative from Fowler White, and ultimately those are the core people that arrived at the agreed order to ultimately come up with a process to protect against any feared breach that Farmer Jaffe was stating to the Special Master could happen.

Q. You were a partner at Farmer Jaffe at the time, correct?

A. Yes.

Q. And you worked with Seth Lehrman of Farmer Jaffe on this case, correct?

A. Yes.

Q. Okay. Did Mr. Lehrman indicate in any way

that we were talking about an agreed order on your motion at 1120?

A. I'm sorry, repeat the question.

Q. Were you aware that Mr. Lehrman and Mr. Farmer, your partner, were negotiating an agreed order?

A. I was very aware of the entire process.

Q. Okay. So, you could have gone to the hearing on November 30, 2010, but instead you consented to the entry of an agreed order, which provided that Fowler White would print the documents and send out copies -- I mean, print the documents, and send the printed documents to your law firm, is that correct?

A. We could have gone to a hearing where a Special Master was telling us that he was going to strongly recommend that the in-house printing and Bates stamping offer by ---

MR. McLACHLAN: Judge, I object to the question (sic). That's pure hearsay. Mr. Carney is not here.

BY MR. MCLACHLAN:

Q. It's a very simple question, did you agree to entry of the order rather than show up for a hearing on November 30, 2010?

A. The emails are self-evident as to how this

came about.

Q. Okay.

A. Eventually there was an agreement, it was Docket Entry, I think you told me, 1120.

THE COURT: No, 1194.

BY MR. MCLACHLAN:

Q. That's the order.

A. Okay, the one entered November 30th, 2011 --

Q. That's right.

A. -- or 2010.

Q. That's right.

MR. McLACHLAN: I have no further questions, Judge.

THE COURT: All right. May the witness step down?

MR. SCAROLA: May I redirect, your Honor?

THE COURT: Yes.

MR. SCAROLA: Thank you very much.

REDIRECT EXAMINATION

BY MR. SCAROLA:

Q. There was a reference in your cross-examination, Mr. Edwards, to reservations that you had about entering into the November 30, 2010 agreed order. What were those reservations?

A. As is depicted in email, and was had in

numerous conversations between the Special Master, between a representative of Fowler White, mostly Lillian Sanchez and Gary Farmer, we were on behalf of L.M. and Farmer Jaffe --

MR. McLACHLAN: Judge, if I ---

THE WITNESS: -- objecting ---

MR. McLACHLAN: If I may, Judge? I'm again objecting to the hearsay about the numerous discussions between Farmer Jaffe and Special Master Carney --

THE COURT: Let's get to --

MR. McLACHLAN: -- and everyone else.

THE COURT: -- the order, 1194.

MR. McLACHLAN: Thank you, Judge.

THE COURT: The issue before me, it's a narrow issue.

MR. SCAROLA: Yes, indeed, sir, and on cross-examination Mr. Edwards was asked about the reservations that he had with respect to that specific order.

THE COURT: No, he was asked whether it was an agreed order and he said yes.

MR. SCAROLA: He did say yes, your Honor, but he was specifically asked if he had reservations about entering into that order.

If your Honor does not want me to go into

that area, I will not, but that was specifically asked in cross-examination.

THE COURT: Response. Response.

MR. McLACHLAN: Judge, we just, we believe that the document -- that the testimony is hearsay. It's an agreed order. We shouldn't be spending a lot of time discussing how the agreed order was come to --

THE COURT: I agree.

MR. McLACHLAN: -- especially not including hearsay statements.

THE COURT: Let's go on with the proceeding and deal with the issue.

MR. McLACHLAN: Thank you, Judge.

BY MR. SCAROLA:

Q. Did you ever subsequently waive any of the provisions of that agreed order?

A. No.

MR. SCAROLA: Thank you very much. I don't have any further questions, your Honor.

THE COURT: The witness may step down.

MR. SCAROLA: Our next witness, your Honor, is Mr. John Hopkins.

May I step out to bring him in?

THE COURT: Yes, please.

MR. SCAROLA: Thank you very much.

ECRO: Please raise your right hand. Speak into the mic.

Do you solemnly swear or affirm that the testimony you're about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth under penalty of perjury?

MR. HOPKINS: I do.

Thereupon,

JOHN HOPKINS,

having been first duly sworn, was examined and testified as follows:

MR. SCAROLA: Your Honor, again, Mr. Hopkins has presented a declaration. We adopt that declaration as his direct testimony, and submit him for cross-examination.

THE COURT: All right. Hold on. Wait.

MR. McLACHLAN: Judge, we simply object in its entirety, based on what was just said, to admission of this declaration. There has been no foundation for it.

THE COURT: What exhibit is it?

MR. SCAROLA: It is -- it's the last exhibit to Mr. -- no, I'm sorry, it's the second to last exhibit to Mr. Edwards' ---

MR. VITALE: Exhibit 35.

MR. SCAROLA: 35.

THE COURT: Exhibit 35.

MR. VITALE: Mr. Edwards, your Honor.

MR. SCAROLA: I'm sorry, Judge, to the exhibit register, just to be clear, not to the declaration.

THE COURT: So you're objecting to Mr. Hopkins' testimony?

MR. McLACHLAN: Yes, Judge. There has been no foundation laid for its admission at this point.

THE COURT: All right, and what is his testimony, what exhibit number?

MR. VITALE: Exhibit 35, Mr. Edwards' exhibit register, your Honor.

May I approach? I can hand you a copy.

Your Honor, we have some clarification as to the foundation objection.

THE COURT: Let me read it first.

MR. VITALE: I'm sorry.

THE COURT: All right. What's the purpose of John Hopkins' testimony?

MR. VITALE: Your Honor, Mr. Hopkins' testimony establishes that the disk that has been the subject of this proceeding was created on December 8th, 2010. That date is important, your Honor, because there was correspondence entered as exhibits by Fowler White

that on December 7th a courier picked up two disks from Judge Carney in West Palm Beach. Those disks were then FedExed overnight to Fowler White's Miami office. They arrived on December 8th.

The Bates stamping/copying process was done, and it was completed no later than December 10th, at which point, although hard copies of the disk -- of the documents were sent to Farmer Jaffe, the disk remained in Fowler White's office for 18 days, but Mr. Hopkins establishes that the subject disk that was located in Fowler White's files was created on December 8th, which is the exact date that they received the original disks from Judge Carney.

THE COURT: And the purpose of the testimony of these facts?

MR. VITALE: Yes, sir, your Honor, in Mr. Hurley's deposition, that's the corporate representative of Fowler White, he testified that Fowler White received two disks from Judge Carney -- from Special Master Carney. The copying process was completed by inserting one disk into a computer, the files on that disk were uploaded to a temporary folder. That disk is removed, the second original disk is put in, and those documents are also uploaded to a temporary folder. Then a third disk, a blank disk, was put in and all of the

documents in the temporary folder, which were gathered from the Special Master Carney's disks, are burnt and copied onto that third disk.

We know that the disks arrived in Miami on December 8th. It's our understanding that's when the copying process took place. It's our understanding that is when the third new disk is created.

Mr. Hopkins' testimony goes to establishing the date of the disk that was located in Fowler White's files is also December 8th, 2010.

To the extent there is any challenge that this disk was a product of Docket Entry 1194, that's the purpose of Mr. Hopkins' testimony.

THE COURT: I'll allow the testimony.

MR. VITALE: Thank you, your Honor.

MR. SCAROLA: Thank you, Judge. Establish the predicate.

MR. VITALE: Your Honor, if I may, Mr. McLachlan, very briefly?

DIRECT EXAMINATION

BY MR. VITALE:

Q. Mr. Hopkins, you have submitted a sworn declaration of fact in this proceeding, is that correct?

A. Yes.

Q. And if you were asked the -- does the

testimony in that sworn declaration of fact accurately reflect the answers you would give if you were asked appropriate questions here today?

A. Yes.

Q. And are the exhibits contained in your sworn declaration of fact true and correct copies of those exhibits as they existed at the time of your declaration of fact?

A. Yes.

MR. VITALE: Thank you. No further questions at this time on direct, your Honor.

MR. McLACHLAN: I have a copy of your declaration.

CROSS-EXAMINATION

BY MR. MCLACHLAN:

Q. In your declaration you say you examined a flash drive, which was apparently a copy of the disk that was found by Mr. Link, is that correct?

A. I examined a flash drive, yes.

Q. Okay. You've never examined the disk itself, correct?

A. I did not examine a disk, a CD.

Q. Okay, and is it your understanding that at least two, or possibly three disks were delivered to Fowler White for the printing process and Bates stamping

process?

A. I don't know the details of how many disks were delivered. I understand disks, some disks were delivered to someone.

Q. But more than one?

A. I don't know.

Q. Does "disks" mean one or more than one?

A. Well, everybody else has been talking about disks. So, data was delivered on some media, and I understand it to be a CD, one or more CDs.

Q. Did you hear your counsel just argue that disks were provided to Fowler White on December 7th, delivered to the Miami office on December 8th, and then were used to create this new disk on December 8th?

A. I believe that's what he said, yes.

Q. Okay. Do you have any reason to doubt that that's accurate?

A. No.

Q. Okay. Are you familiar with the process, if you were to get two CDs and someone was to say put Bates numbers on all these documents, would you go through the process of transferring them to a new disk with Bates numbers on them?

A. You mean from a disk.

Q. Yeah, from a copy of different disks.

A. And I'm going to Bates stamp them?

Q. You're going to have to Bates stamp them and turn over the Bates stamped documents.

A. So I would transfer them from a CD to a drive, as opposed to a removable media.

Q. I'm just asking you -- let me ask you, I'll ask it a different way. Let me just ask it a different way.

The original data was on at least one, if not two, disks?

A. Uh-huh.

Q. We believe it's two disks.

In order to put Bates numbers on those documents, and to take the data from the two disks and put it on a new disk with Bates numbers, would that constitute a modification of the data on the original disks?

A. Yes.

MR. McLACHLAN: That's all, Judge. Thank you.

THE COURT: So the original disk was modified to include Bates numbers on the new disk?

THE WITNESS: Well, it wouldn't have been the original disk. The data, the files on that disk would have been modified when they were Bates stamped.

THE COURT: But on the original disk there

would be no Bates stamp. On the new disk there would be Bates stamps?

THE WITNESS: Yes, sir.

MR. SCAROLA: And when did that occur? What's that date?

MR. VITALE: Your Honor, may I conduct some redirect?

THE COURT: Yes.

REDIRECT EXAMINATION

BY MR. VITALE:

Q. Mr. Hopkins, based on your review of the flash drive, what was the date on which those Bates numbers were added to the documents in question?

A. Well, the documents were modified December 8th, Bates stamps put on them or some other function, but they were modified on that date.

THE COURT: September 8th?

THE WITNESS: December 8th, sir.

BY MR. VITALE:

Q. 2010, correct?

A. 2010, yes, sir.

MR. SCAROLA: David, was that the last modification?

BY MR. VITALE:

Q. And was that the last modification?

A. As far as this date is concerned, yes.

MR. VITALE: Thank you. No further questions.

THE COURT: All right. Let me ask the parties this, the disk in question, did it have Bates numbers on it or not?

UNIDENTIFIED: It did, your Honor.

UNIDENTIFIED: Yes, sir.

UNIDENTIFIED: Yes.

THE COURT: So it was a copy of the modified one that went to Judge Carney?

MR. SCAROLA: Your Honor, it may be a copy of the one that went to Judge Carney. It may be the one that went to Judge Carney. That's, at this point, a matter of pure speculation. What we know is that the disk that was delivered in 2017 from Fowler White to Link & Rockenbach was a disk that was last modified on December 8, 2010, and had Bates numbers on more than 27,500 documents.

MR. McLACHLAN: Judge, if I may just clarify. I think what Mr. Scarola said -- what he meant to say was that the disk was in the boxes delivered to Mr. Link in 2018, not 2017, minor technicality, I just want the record to be correct.

MR. SCAROLA: That's correct.

THE COURT: Link didn't discover it until February of 2017, correct?

MR. SCAROLA: 2018.

MR. McLACHLAN: 2018.

THE COURT: I'm sorry.

MR. McLACHLAN: Yes.

MR. SCAROLA: Yes, sir.

MR. VITALE: 2018.

MR. SCAROLA: Yes. Mr. Link -- Link & Rockenbach took on the representation of Mr. Epstein in November of 2017. The delivery, counsel is correct, took place in early 2018.

MR. VITALE: For clarification, your Honor, the first time the disk is located by the Link & Rockenbach firm is January, when they visited Fowler White's Miami office and flagged copies of materials they wanted sent to them in their representation of Mr. Epstein.

Those materials are not then sent to Mr. Link's office until February of 2018.

MR. SCAROLA: And so that your Honor understands the reference to a flash drive, when we requested a copy of what Mr. Link received, what we received was a flash drive represented to be an exact duplicate of the data on the disk that was delivered from

Fowler White to Link & Rockenbach.

MR. VITALE: And that, your Honor, is Exhibit 26 of Mr. Edwards' deposition -- or exhibit registry, is the March 7th correspondence from Mr. Link to our office enclosing the flash drive.

THE COURT: All right. Let's proceed.

MR. SCAROLA: Thank you.

MR. VITALE: Thank you, Judge.

MR. SCAROLA: We would call, your Honor, Mr. James Hurley as an adverse witness, and ask that Mr. Hopkins be excused, so as for him to remain in the courtroom.

THE COURT: So ordered.

MR. SCAROLA: Thank you.

MR. McLACHLAN: Judge if I may? I know that the process and these proceedings is for Mr. Hurley to be put on with his declaration and then he's subject to cross-examination.

THE COURT: Well, they're free to call him as an adverse party witness.

MR. McLACHLAN: Okay.

MR. SCAROLA: That's my understanding as well, your Honor, and that's what we're doing at this time, with the Court's permission.

ECRO: Please raise your right hand.

Do you solemnly swear or affirm that the testimony you're about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth under penalty of perjury?

MR. HURLEY: I do.

Thereupon,

JAMES HURLEY,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCAROLA:

Q. Mr. Hurley, would you please state your full name?

A. James Norford Hurley.

Q. And how are you currently employed, sir?

A. I'm employed by the firm of Fowler White Barnett.

Q. And that firm was issued a subpoena to produce a corporate representative for purposes of giving testimony in these proceedings, correct?

A. I believe it was a notice, but it was a notice of deposition that was issued.

Q. All right, and you were selected to -- excuse me -- to speak on behalf of the law firm, correct?

A. Yes, sir.

Q. All right. How long have you been a Fowler White employee?
A. Since 1996.
Q. And how long have you been a member of the bar?
A. Since 1982.
Q. All right, sir, and I think you said that you are presently still a member of the firm, correct?
A. Correct.
Q. Are you a shareholder in the firm?
A. I am.
Q. Thank you, sir.
You became involved with respect to these matters for the first time sometime in 2018, is that right?
A. I first became involved in matters pertaining to Mr. Epstein's file in 2017.
Q. And that was as a consequence of a request that was made by Scott Link to examine files that Fowler White had assembled during the course of its representation of Jeffrey Epstein, correct?
A. That is correct.
Q. And when did that representation begin? When did Fowler White first begin representing Jeffrey Epstein?

A. I don't know the date we began representation.

Q. Do you know the nature of the matter in which the files were generated that Mr. Link was seeking to examine?

A. There was a lawsuit between Mr. Epstein and Mr. Edwards.

Q. And Fowler White was assisting Mr. Epstein in the prosecution of that claim that subsequently became the subject of a malicious prosecution claim back against Mr. Epstein, correct?

A. That is my understanding.

Q. All right. You were the one who, on behalf of Fowler White, assumed the responsibility of gathering the boxes for Mr. Link's examination, correct?

A. That is correct.

Q. And when did that actually take place? That is, when did Mr. Link come to the Miami offices of Fowler White in order to examine their files?

A. The first time was January ---

THE COURT: Well, let's establish where the files were located and the number of them.

MR. SCAROLA: I'm about to do that, your Honor. I mentioned in that question the Miami office of Fowler White, but I'll make sure that's clear.

THE COURT: Okay. Proceed.

THE WITNESS: Mr. Link first came to examine the files in January of 2018.

BY MR. SCAROLA:

Q. And that was in Fowler White's Miami offices, correct?

A. That is correct.

Q. What was necessary in order to gather those files for Mr. Link's examination?

A. I ordered the files to be returned from archives in November of 2017.

Q. And when you say you had to gather them from archives, what does that mean?

A. We have an off-site storage facility we contract with for maintaining our hard files.

Q. Iron Mountain?

A. I believe so.

Q. Okay, and so you needed to contact the storage facility, request the boxes, and have those boxes delivered to the Miami office, correct?

A. That is correct.

Q. And was it your understanding that they had been transferred into storage from the Miami office?

A. That is correct.

Q. And that took place in 2014, correct?

A. 2014 or 2015.
Q. All right. Fowler White's standard operating procedures are before a file is transferred to storage, the file is inventoried, correct?
A. The file folders are inventoried for a closing index.
Q. All right, and that inventory takes the form of some document. Whether in writing or electronically, there is a record kept of what Fowler White sends to storage, some identification of the files that get stored, correct?
A. That is correct.
Q. And in this case you knew that what you were requesting was a file that was comprised of some 36 boxes, is that correct?
A. I believe it was 44 boxes altogether.
Q. All right. A total of 44 boxes, and a determination was made that approximately 36 of those 44 were boxes that Mr. Link wanted to examine, correct?
A. That is correct.
Q. Mr. Link and a paralegal arrived at the Miami offices of Fowler White, and were given access to those boxes, correct?
A. That is correct.
Q. For purposes of marking those portions of

Fowler White's files that they wanted duplicated and delivered to them, correct?

A. That was part of the purpose.

Q. Okay, and how did they go about doing that?

A. Ms. Campbell did the work for the most part, she marked various documents within the file boxes that she wanted copied. She gave instructions as to the media she wanted the copies made in. I believe the documents that she wanted copies made of were taken from the boxes and placed on the top of the boxes, just to be sure what they were, and we followed those instructions.

Q. Did the instructions include a request for the copying of anything other than paper documents?

A. There were disks that were also in the file that were copied.

Q. How many?

A. I don't know.

Q. You do know from review of the inventory that there were some disks that related to deposition testimony, correct?

A. Correct.

Q. You also know that there was ---

THE COURT: You used the word "inventory". Define "inventory".

MR. SCAROLA: Pardon me, your Honor?

THE COURT: You used the word "inventory".

MR. SCAROLA: I did use the word "inventory", correct.

THE COURT: So, there was a written inventory?

MR. SCAROLA: That's what the testimony was, your Honor, that Fowler White, before they sent the documents to storage, inventoried the content of the boxes.

THE WITNESS: Actually I believe the testimony is we indexed the file folders within the box, not necessarily the contents of the folders.

MR. SCAROLA: Yes, sir.

BY MR. SCAROLA:

Q. The inventory, or index did not include a document-by-document identification, but rather a folder-by-folder identification --

A. That is correct.

Q. -- is that fair?

A. Yes, sir.

Q. Okay, and you know from that inventory that there were multiple disks that Mr. Link requested to be copied, and included among those disks was a disk that was on the inventory and referenced Judge Carney, is that correct?

A. That is not correct.

Q. Okay. How was that disk identified?

A. The disk itself was apparently, as I have been advised, in the box. There was no identification of the disk on the inventory. Merely a file folder which referenced Judge Carney's name.

Q. All right. So, there was a disk inside a file folder that referenced Judge Carney's name, and what were the words that were written on the file folder?

A. And, again, the predicate of that question is I do not have knowledge, do not know if there is actually a disk within that folder. The folder said Judge Carney printing issues, I believe.

Q. Okay. Now, as part of the fulfillment of your responsibilities as the designated corporate representative to be deposed with respect to these matters, you familiarized yourself with the manner in which Fowler White had obtained possession of a disk that included emails that had been subpoenaed from the trustee in bankruptcy of the Rothstein Rosenfeldt Adler firm, correct?

A. I'm not sure which disk you're referring to, whether you're referring to the original disk from Judge Carney, or the disk which give rise to today's proceedings.

Q. All right. You reviewed an exchange of email correspondence, and whatever related portions of your file that you had, about a process that was to be followed by Fowler White in accordance with an order that was entered, an agreed order that was entered by Judge Ray, correct?

A. Yes, sir.

Q. All right, and what you know from your review on behalf of Fowler White is that initially Mr. Epstein had agreed to bear the costs of the process of producing hard copies that would be Bates stamped of a very significant number of emails that were produced in response to the subpoena, correct?

A. I am not aware of the full extent of the agreement as to the costs Mr. Epstein agreed to incur.

Q. All right, but you know that there was some discussion of Mr. Epstein, initially agreeing to bear the cost of the copying process, that would be completed by some third party, correct?

A. Some of the costs, yes, sir.

Q. There were then subsequently significant negotiations after Fowler White said that the copying process could be conducted in-house in order to save Mr. Epstein from incurring the cost of copying and Bates stamping the documents, correct?

A. There were discussions, yes, sir.

Q. Okay, and ultimately the agreed order provided for that process to occur, correct?

A. That is correct.

Q. You know, from your review of the documents, that there were very significant reservations and, in fact, objections expressed by Gary Farmer to that process, correct?

MR. McLACHLAN: Judge, if I may, we've objected to the negotiation of the order. Your Honor sustained this objection. We're here about an agreed order --

THE COURT: The order is the order.

MR. McLACHLAN: -- that was entered.

THE COURT: It speaks for itself.

MR. McLACHLAN: Thank you, Judge.

BY MR. SCAROLA:

Q. You do know that there was a great deal of emphasis placed upon that portion of the order that ---

THE COURT: I'll sustain the objection.

MR. McLACHLAN: Thank you, Judge.

BY MR. SCAROLA:

Q. Farmer Jaffe was well aware of all of the provisions of the agreed order -- excuse me. Fowler White was well aware of all of the provisions of the agreed

order, correct?

A. Yes, sir.

Q. Fowler White knew it was absolutely prohibited from retaining any electronic imagines of documents, or any hard copies of the documents that were delivered to Farmer -- excuse me, delivered to Fowler White for the sole purpose of providing the cost-free service of Bates stamping the contents of whatever CDs were delivered to it in response to the subpoena, correct?

A. My understanding of the order is at the time we made the prints and the disk, we were not to retain any copies.

Q. Yes, sir.

THE COURT: Any copies of the documents contained on the disk, provided to it, nor shall any images or copies be retained in the memory of Fowler White's copiers, period.

THE WITNESS: Yes, sir.

BY MR. SCAROLA:

Q. You understood that provision, you understood the significance of that provision, correct?

A. You mean Fowler White, yes, sir.

Q. Yes, sir, Fowler White.

A. Yes, sir.

Q. Okay. Fowler White understood that the

information being delivered to it was alleged to contain both attorney/client and work product privileged information of the Farmer Jaffe law firm in connection with multiple pending claims relating to Jeffrey Epstein, right?

A. We understood that the disk was alleged to contain certain privileged documents, yes, sir.

Q. Both attorney/client and work product privileged documents, correct?

A. Yes, sir.

Q. And Fowler White understood that the purpose of generating hard copies of the documents, a single set of hard copies of the documents, was to allow the Farmer Jaffe law firm, and Bradley Edwards to prepare a privilege log, correct?

A. That's my understanding.

Q. And the reason why Farmer Jaffe and Bradley Edwards would be involved in preparing the privilege log was because neither the trustee nor the Special Master were in a position to be able to assess issues of privilege with regard to pending litigation in which neither the trustee nor the Special Master was involved, correct?

A. That's beyond my knowledge.

Q. Okay. You don't know one way or another?

A. That's correct.
Q. But you do know that that was a task that was to be performed by Farmer Jaffe and Bradley Edwards, and you know that that task was performed, correct? The privilege log was prepared?
A. Yes, sir.
Q. You also know during the time that Fowler White was continuing to represent Jeffrey Epstein prior to the firm's discharge by Jeffrey Epstein, that a challenge was raised with regard to some documents on the privilege log, but ultimately documents were withheld from production that were included on a privilege log that had been prepared by Bradley Edwards and Farmer Jaffe, correct?
A. That's my understanding.
Q. You agree that the disks from which a consolidated disk containing in excess of 27,500 documents, those disks were delivered to Fowler White, correct?
A. Yes, sir.
Q. Fowler White, in fact, followed the process that has been described of transferring information on two compact disks to its computer where Bates stamps were affixed electronically to the documents on those two disks, correct?

A. That's correct.
Q. And those Bates stamps ran from number 1 through number 27,554, if I remember correctly, right?
A. That's what I've been advised.
Q. Pardon me?
A. That's what I've been advised.
Q. Okay. So, a disk was produced by Fowler White on December 8 of 2010 that had 27,554 Bates stamped documents in sequence on that disk, right?
A. I don't know the specific day the disk would have been created. It would have been within a window of the 8th to the 10th of December.
Q. All right. Do you have any reason whatsoever to question the testimony that you heard from Mr. Hopkins, that the date of modification, that is the date on which the Bates stamps were affixed to the documents, was December 8, 2010?
A. I have no basis to comment one way or the other, other than that it was during a window from the 8th to the 10th of December.
Q. Okay. So, Mr. Hopkins' testimony is at least consistent with what you know to be the window, correct?
A. That is correct.
Q. And you know that to be the window because

that is the window from the receipt of the un-Bates stamped documents, to the transmittal of the Bates stamped CD to Judge Carney, correct?

A. On December 10th the Bates Stamped hard copies were Federal Expressed to Farmer Jaffe.

Q. Okay. So we know the process was completed because Bates stamped hard copies were completed as of that time. You don't know what happened to the disk, right?

A. My understanding from my review of the disk was it was returned to Judge Carney.

Q. And what is it that supports that understanding?

A. A Federal Express to Judge Carney later December 2010.

Q. And that Federal Express to Judge Carney references "disks", plural, without any indication as to the number of disks, correct?

A. There is no indication as to the number of disks, but also in my review there was no objection from Judge Carney that he had not received what he expected to receive.

Q. Well ---

THE COURT: When were they delivered to Judge Carney?

THE WITNESS: I believe December 28th, your Honor.

THE COURT: 2010?

THE WITNESS: Yes, sir.

THE COURT: Proceed.

BY MR. SCAROLA:

Q. So we know that the hard copies were printed out no later than December 10, because that's when they were delivered to Farmer Jaffe, correct?

A. That's correct.

Q. And we know that something got sent to Judge Carney 20 days later, right?

A. 18, but, yes, sir, December 10th.

Q. 10th to the 28th?

A. Correct.

Q. 18 days later.

So it's somewhere between 18 days and 20 days, if the copies were made on the same day that the disk was completed on December 8th, fair?

A. Yes, sir.

Q. Okay. What happened to the information that was transferred to both Fowler White's computers, and to that disk with Bates stamped documents on it during that 18 to 20-day period of time?

A. The information that would have been

transferred to the computer for the purposes of making the disk would have been deleted when the temporary file was deleted.

As far as the disk, it would have been retained until it was returned to Judge Carney.

Q. Why? Why did Fowler White retain possession of a disk with sensitive attorney/client privilege and work product information in its possession for at least 18 days?

A. My review of the file, it doesn't indicate that. I presume with the holidays, that could have played a role in it.

Q. You presume with the holidays?

A. Yes, sir.

Q. You mean Christmas, December 25th?

A. Hanukkah, Christmas, whatever holidays, maybe when people are traveling. That's just purely a presumption.

Q. So let's take out the 12 days of Hanukkah, you didn't look to see when they fell in 2010, did you?

A. No.

Q. Pardon me?

A. I did not.

Q. You did not. Okay.

Do you agree that you have no idea why it

took 18 to 20 days for Fowler White to relinquish possession of sensitive data which it was not to retain except for the specific purpose of making copies, a process completed no later than December 10th?

A. My review of the file didn't indicate it.

Q. Did your review of the file indicate that any security measures were taken with regard to protect the sensitive data during that period of time?

A. The disks were not mentioned in any way in my review of the file during that period of time.

Q. So there is no indication that any security measures were taken, correct?

A. My review of the file did not indicate any reference to those disks whatsoever during that period of time.

Q. We know that there was a CD with Bates stamped emails containing some 27,500 plus sequentially Bates stamped emails in Fowler White's files in 2018 when those files were examined by Scott Link, correct?

A. That's what I've been advised.

Q. And we know that that file was inventoried and sent to storage in 2014, correct?

A. Either 2014 or early 2015.

Q. All right. So, sometime in 2014 or early 2015, to the beginning of 2018, at least approximately

three years, Fowler White was in possession of electronic data that it was strictly prohibited from retaining, correct?

A. I don't know that.

Q. Well, do you have any reason to believe that burglars slipped into Iron Mountain and dropped ---

MR. McLACHLAN: Objection, Judge, it's argumentative.

THE COURT: Sustained. Ask a question.

BY MR. SCAROLA:

Q. Do you have any reason to believe that anyone could possibly have added data to Fowler White's files between 2014 and 2018, when Mr. Link was given access to those files?

A. The only thing I know is when Mr. Link reviewed the file in 2018, he says he found a disk in it. I have no clue as to when that disk might have gotten there, up until the point in time Mr. Link saw the file.

Q. Except that you know that Mr. Link has sworn under oath that that disk came from a folder that is included on Fowler White's 2014 inventory, correct?

A. I read that.

Q. And you have no basis to challenge that testimony, do you?

A. No.

Q. So as we sit here today in this contempt proceeding with regard to Fowler White retaining information that it was prohibited from retaining, you have no explanation as to how the disk in Fowler White's files at the time that Mr. Link examined those files got into the files, correct?

A. That is correct.

Q. And you have no information as to how long that disk was in the file prior to 2014, correct?

A. If it was.

Q. Yes, sir, if it was.

A. Right.

Q. Okay. So, as you sit here today, for all you know somebody could have made two, three, four, five CDs or more with 27,500 plus sensitive emails, including privileged information, Bates stamped and left one of those multiple copies in Fowler White's file from December 10th forward, correct, you just don't know?

A. It would all be speculation.

Q. Yes, sir.

Now, you also came to learn that the file that Mr. Link said contained the CD, contained hard copies of other documents, correct? And when I say other documents, that's not properly phrased. The file folder contained documents in addition to a CD, according to

Mr. Link, right?
THE COURT: You're talking about the J. Carney --
MR. SCAROLA: Yes, sir.
THE COURT: -- filed folder?
BY MR. SCAROLA:
Q. The J. Carney file folder contained not only a CD, it contained pages of documents, right?
A. I know at the time it was presented to us for copying, the file folder and hard copies of certain pages of documents were presented to us together for copying.
Q. So after Mr. Link flagged what he wanted copied, what Fowler White was given to copy was a file folder that included a CD and hard copies of documents, correct?
A. I don't know if the folder contained the CD. I don't know if the folder contained the documents. I know the documents were together with the file folder at the time we made the copies.
Q. Okay. So all you can say is that the folder itself, the documents, and the CD were all presented to you together for coping after Mr. Link reviewed Fowler White's files?
A. Again, I have no information regarding the

CD itself other than what I've heard from Mr. Link's office.

Q. And that's what you heard from Mr. Link's office?

A. Correct.

Q. Okay. Now, let's talk about the hard copies. The hard copies were hard copies of documents that were printed from the CD, right?

A. I have no way of knowing that.

Q. Well, actually you do have a way of knowing that, don't you? Because all of the documents that were on the CD were Bates stamped, correct?

A. That is correct.

Q. And the documents presented to you for copying with the file folder and the CD, all of those documents bore sequential Bates stamp, bore Bates stamped numbers, they weren't in sequence, but the bore the same Bates stamp numbers as the Bates stamps of documents on the CD, correct?

A. I have been advised that, yes.

Q. Yes, and you not only know that, you know that included in that group of documents were documents that were on the privilege log that had been prepared by Farmer Jaffe and Brad Edwards, attorney/client privileged and work product documents, right?

A. I have been advised that some of the documents appeared on the privilege log, yes, sir.

Q. And as Fowler White's corporate representative here today, you admit that Fowler White was in possession as of the time that Mr. Link handed these documents over to you, along with the file folder that was on the inventory list, Fowler White was in possession of attorney/client privilege and work product documents included on the privilege log prepared by Farmer Jaffe and Brad Edwards, correct?

A. Again, it was my understanding that we were in possession of documents, some of which appeared on the privilege log.

Q. For which, as you sit here today, as the corporate representative of the alleged contemnor, you have absolutely no explanation, correct?

A. That is correct.

Q. You also know that at least one of those documents has handwritten notations on it, correct?

A. I've been told that. I did not look at the documents.

Q. And the reason why you didn't look at the documents is because as soon as they were presented to you, you recognized this was information that Fowler White ought not to have in its possession, correct?

A. That's not correct.

As soon as I saw them in their proximity to the folder in question I became concerned. So I contacted my lawyers at that point in time.

Q. And you stopped reviewing them, correct?

A. That's correct. I saw two -- the first two pages, I saw they were emails, I saw they had a Bates stamp number. I did not look at any other documents after that.

Q. You do agree that it was a violation of this Court's November 2010 order?

MR. McLACHLAN: Objection, your Honor, it calls for a legal conclusion. That's for your Honor to decide.

THE COURT: That's up to me to decide.

MR. SCAROLA: Pardon me?

MR. McLACHLAN: Thank you, Judge.

THE COURT: That's for me to decide.

MR. SCAROLA: I understand that, your Honor, but I think it's significant to this Court to determine whether the alleged contemnor itself recognizes the fact that its possession was in violation.

If your Honor doesn't chose to have me ask that question I ---

THE COURT: You're talking about in February

when it was brought to their attention?
MR. SCAROLA: Yes, sir.
THE COURT: February of 2010 -- 2018?
MR. SCAROLA: February 2018, yes, that's correct.
THE COURT: All right. You can ask that question.
MR. SCAROLA: Thank you.
BY MR. SCAROLA:
Q. You understand that Fowler White's possessing those documents at any time subsequent to the completion of the process described in the November 2010 order, including up to February of 2018, is in violation of the terms of that order, correct?
MR. McLACHLAN: Judge, the same objection. Our position is that if these documents came back ---
MR. SCAROLA: I'm sorry, your Honor, but that doesn't sound like the beginning of a legal objection to me. It sounds like the beginning of argument.
THE COURT: Let me hear the objection.
MR. McLACHLAN: The objection, Judge, is it's ultimately up to you and you alone to determine whether possession of documents in 2018 constitutes a violation of the November 30, 2010 agreed order. That's not for Mr. Hurley to determine. That's your

determination.

THE COURT: I'll sustain the objection. Go to your next question.

MR. McLACHLAN: Thank you.

BY MR. SCAROLA:

Q. The disks delivered to Mr. Link was also labeled in handwriting, correct?

A. I never saw the disk.

Q. Pardon me?

A. I never saw that disk.

Q. You are aware from the conduct of your investigation that the disk delivered to Mr. -- excuse me, delivered to Mr. Link by Fowler White had the handwritten notation Epstein Bates stamp, correct?

A. No, sir. The first time I became aware of anything about the appearance of that disk was at my deposition when you showed me a photograph, or a photocopy of something.

Q. You requested when these issues initially came to your attention that Mr. Link provide you with a photocopy of the file folder that had been delivered to him, correct?

A. I don't know if I requested it. I know I eventually obtained a copy. As I said at my deposition, I'm not sure if I got it directly from Mr. Link's office

or if it came through my attorneys, but I eventually received a copy of the folder.

Q. And that file folder reads, J. Carney - printing of CD issue, correct?

A. I believe so. I'd have to see a copy to be sure if those are the exact words.

Q. Whatever the exact words were, they were the same exact words that appeared on the 2014 inventory, correct?

A. That is correct.

Q. And if you accept my representation at this time that those words were, J. Carney - printing of CD issue, it was those exact words that appeared on the 2014 inventory, correct?

A. I'd have to say yes.

Q. Suggesting that the file folder, whenever it was created, sat in Fowler White's files from 2014 through 2018, correct?

A. That is correct.

MR. SCAROLA: Your Honor, may I have just a moment, please?

THE COURT: Certainly.

MR. SCAROLA: Thank you very much.

I have no further questions at this time, your Honor.

MR. EDWARDS: Your Honor, Brad Edwards on behalf of Farmer Jaffe. I have a few questions on cross-examination.

THE COURT: All right, and for the record, who is conducting the cross?

MR. EDWARDS: It will be Brad Edwards.

MR. SCAROLA: Judge, if I may, Brad Edwards is not counsel of record for Farmer Jaffe. That would be Ms. Brittany Henderson, is my understanding. Counsel of record for Mr. Edwards is Jack Scarola.

MR. EDWARDS: Your Honor, I believe I filed a notice of appearance in this case.

MS. HENDERSON: Yes, we both are, and it's on the (inaudible).

MR. EDWARDS: May I have just a moment with opposing counsel?

THE COURT: Yes.

(Inaudible conversation.)

MR. SCAROLA: Your Honor, we have an agreement that Mr. Edwards will be permitted to ask the questions.

THE COURT: All right.

MR. EDWARDS: May I proceed?

THE COURT: You may.

MR. EDWARDS: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. EDWARDS:

Q. If I understand your testimony, based on your investigation it revealed that on December 7th two CDs were picked up from Special Master Carney and initially delivered to the Palm Beach office of Fowler White, correct?

A. That is correct.

Q. On December 8th those documents were FedExed from -- sorry, those two disks were FedExed from Palm Beach Fowler White to Miami Fowler White, correct?

A. That's not correct. They were Federal Expressed on the 7th for deliver on the 8th.

Q. Okay. Those two CDs were delivered to Fowler White on the 8th?

A. That is correct.

Q. It is then your understanding, based on your investigation, that each one of those two CDs was uploaded into your IT tech's computer at Fowler White?

MR. McLACHLAN: Judge, objection, asked and answered. Mr. Scarola already covered this territory.

THE COURT: Sustained.

Ask a new question.

BY MR. EDWARDS:

Q. The documents that arrived to Fowler White,

they did not have a Bates stamp number on them, correct?

A. That's my understanding.

Q. The Bates stamp number was put onto the documents using the computer system of Fowler White?

MR. McLACHLAN: Judge, same objection. This ground has already been covered by Mr. Scarola.

THE COURT: What's the purpose of this line of questioning?

MR. EDWARDS: I'm only trying to get the dates of when the new CD was created, which I believe is December 8th, 2010, and whether he has any information about whether that -- what information he has about whether that CD was ever sent back to Judge Carney. That's the only place that this particular line of questioning is going.

MR. McLACHLAN: And this whole area has been covered by Mr. Scarola, your Honor.

THE COURT: Didn't, in fact, Mr. Scarola elicit testimony that the disk to Judge Carney was delivered December 28th, 2010?

MR. EDWARDS: And that's what I want to ask about.

THE COURT: But he already testified to that.

MR. EDWARDS: I believe he testified that

disks were returned to Judge Carney, not necessarily the disk that contains all of the Bates stamped numbers. If you just let me clarify, maybe he's ---

THE COURT: Well, ask that clarification question.

MR. EDWARDS: Okay.

BY MR. EDWARDS:

Q. Do you know, based on your review of the record and your investigation, whether the disk that contained the Bates stamped numbers was one of the disks that was delivered to Judge Carney on December 28th, 2010?

A. It is my belief that it was.

Q. I'm not asking about your belief. Do you know based on some email saying that Bates stamped documents on a disk are being delivered to Judge Carney, or any email correspondence back from Judge Carney, indicating that there was a CD that had Bates stamped numbers on it, that was one of the things delivered back to him on December 28th, 2010?

A. There was no transmittal correspondence to Judge Carney delineating specifically what was returned to him.

Q. It could have been, based on your investigation, that what was returned to him was what was given --

MR. McLACHLAN: Objection, your Honor --
BY MR. EDWARDS:
Q. -- to Fowler White ---
MR. McLACHLAN: -- calls for speculation.
THE COURT: Sustained.
BY MR. EDWARDS:
Q. In 2014, if I understand your testimony, there was a file folder that indicated the words J. Carney - printing of CD issue, correct?
MR. McLACHLAN: Again, Judge, I don't know if we're -- we seem to be going through the entire examination by Mr. Scarola through Mr. Edwards again. It's the same question. It's already been covered.
THE COURT: That question has been asked and answered.
MR. EDWARDS: Okay. I was getting to the documents that are associated with that file and the timing of it.
If your Honor is satisfied with the timing of that, then okay. I'm not looking to rehash anything.
THE COURT: Well, my notes reflect 2014, the written inventory was by index folder, the disk was produced December 8th, 2010, copies were delivered to Farmer Jaffe December 10th, 2010, disks to Judge Carney December 28th, 2010, the boxes were in storage 2014 to

2015.

MR. EDWARDS: Right, and my only -- that was just a set of questions to what documents were in the J. Carney folder in 2014, when the inventory was performed.

MR. McLACHLAN: That issue was also addressed by Mr. Scarola, Judge.

THE COURT: I believe he's testified to his knowledge.

BY MR. EDWARDS:

Q. Okay. To your knowledge, do you know where the file folder or any of the documents that were closed out in 2014 related to the file folder of J. Carney - printing of CD issue came from?

A. I do not know.

MR. EDWARDS: Okay. I have no other questions.

Thank you, your Honor.

THE COURT: All right. Any other questions for the witness?

MR. McLACHLAN: I have a few, Judge.

THE COURT: Wait a second. How long will your cross take?

MR. McLACHLAN: I would say no more than 10 or 15 minutes, Judge. I'd be surprised if it was that

long.

THE COURT: All right. Let's proceed.

CROSS-EXAMINATION

BY MR. MCLACHLAN:

Q. Mr. Harley, just for purposes of clarifying the record, Mr. Scarola at one point referred to 27,544 documents that were on the CD. Is that your understanding, that there were 27,544 documents or pages?

A. My understanding is there was 27,000 plus pages.

Q. Thank you.

Mr. Scarola also said at one point that the CDs were delivered and that Fowler White copied the documents. Is that your understanding?

A. That is not my understanding.

Q. Is it your understanding instead that Fowler White simply printed the documents, and then sent the copies to Farmer Jaffe, according to the records that you've reviewed?

A. Two-step process, we burned the disk and printed copies, or printed from the disk.

Q. You had indicated at one point that in response to a question from Mr. Scarola, that the new disk, the subject disk was created by the documents from the original disks being put into a temporary file

folder --

A. That is correct.

Q. -- in order to add the Bates numbers.

A. Yes, sir.

Q. And that there were 27,544 pages, at least according to what's been represented in the motion for order to show cause, et cetera.

A. That's correct.

Q. Okay. What happened -- what would have happened to the documents put in the temporary file folder in order to create the new CD?

A. He would have utilized an acrobat program we have that creates Bates stamps. The program would have been applied to the documents. Those would have been then burnt onto the new disk.

Q. And what would have happened to the temporary file folder which held the documents?

MR. SCAROLA: Excuse me, your Honor. I'm going to object to the form of the question. I don't know what the witness is being asked when he's asked what would have happened.

I think the appropriate question is what did happen, if the witness knows.

THE COURT: All right. Ask "what did".

BY MR. MCLACHLAN:

Q. Did Fowler White's computers have sufficient data to keep copies, PDF copies of 27,544 documents in temporary directories when you're -- as created by your file clerk?

A. They would not have been maintained, they would have been deleted.

Q. How quickly would they be deleted?

A. Immediately.

Q. Okay. Mr. Scarola asked you about what happened between December 10 and December 28. Your investigation reveal anything to indicate that Fowler White did anything at all with the documents on the disk during that period?

A. No.

Q. Did your investigation reveal anything that indicated that anyone at Fowler White reviewed the contents of the disk?

A. No.

Q. Mr. Scarola at one point asked you a question as to -- that indicated that there were four to five copies of the subject disk in the folder.

When Mr. Link came and asked for copies of disks, is it your understanding that there were also several disks that have been produced by the Razorback plaintiffs?

A. There were disks on the Razorback plaintiff's documents as well.

Q. Okay, and do you recall whether that was four or five disks?

A. I didn't recall the number. It was multiple.

Q. Okay. Is it your understanding that there were four to five copies of the subject disk anywhere in Fowler White's files?

A. No, sir.

Q. Mr. Scarola indicates that there was a -- there were a few documents located in your directory during your investigation, which according to Mr. Scarola remained on the privilege log. Approximately how many pages of documents did you discover during your investigation?

A. I believe, including the copy of the file folder, it was 32, 33.

Q. 32 or 33 pages?

A. Yes, sir.

Q. And is it your understanding from the motion for order to show cause, and your investigation, that there were approximately -- there were more than 6,400 pages of documents which remained on the February 2011 privilege log that was prepared by Farmer Jaffe?

A. That is my understanding.
Q. Mr. Scarola asked you about a file folder label which said J. Carney - printing of CD issue. Do you recall that?
A. Yes, sir.
Q. Is there anything in your investigation that that folder contained a copy of the disk?
A. No.
Q. Did the label indicate that the folder contained a copy of the disk?
A. No.
Q. Do you personally know that the subject disk, with all 27,544 documents, were in one of the boxes that were given to Mr. Link?
A. No.
Q. What is your understanding that such a disk was in the boxes, where does that understanding come from?
A. From Mr. Link.
MR. McLACHLAN: Okay. Thank you.
MR. SCAROLA: Briefly, if I may, your Honor?
THE COURT: All right.

REDIRECT EXAMINATION

BY MR. SCAROLA:
Q. You were asked a number of questions about whether your investigation indicated Fowler White did

anything with the disk or with the copies. Do you remember those questions?

A. Yes, sir.

Q. And your answer was, no, your investigation did not indicate that Fowler White did anything with the disks or with the copies, correct?

MR. McLACHLAN: Excuse me, Judge, we're talking about the printed documents. We're not talking about photocopies, unless we're talking about the 31 pages of documents that were ---

MR. SCAROLA: That's what we're talking about.

BY MR. SCAROLA:

Q. We're talking about the disk that Mr. Link has told you was in the file folder, and the pages of documents that Mr. Link has told you were in the file folder, and you were asked, did your investigation indicate that Fowler White did anything with that disk or those copies. That's what you were asked, correct?

A. I was not asked regarding Mr. Link telling me about documents being in the file folder. He said the disk was in the file folder. Mr. Link has never mentioned documents being in the file folder to me.

Q. He didn't mention them being in the file folder to you?

A. That is correct.
Q. But you heard that testimony, didn't you, from Mr. Link?
A. I'm not aware ---
MR. McLACHLAN: Objection, Judge. There has been no testimony from Mr. Link, and my question to Mr. Hurley was whether there is any indication that any documents or the disk were used between December 10 and December 28th, 2010. That was my question.
MR. SCAROLA: Let's take that question. I'll accept that question.
THE COURT: All right.
BY MR. SCAROLA:
Q. Your answer was no, correct?
A. That is correct.
Q. But there is also no indication in your investigation that Fowler White didn't do anything with that information, correct? You just don't know one way or another how the information got in the files, how long it was in the files, what happened to the information in the files? You just know it was there when it wasn't supposed to be, right?
A. That's a lot of parts to that question. The answer is there is no reference to the disk or any documents from the disk that I saw contained in our file

from the time it was delivered in December to Judge Carney forward at any point in time.

Q. So you don't know one way or another because the file is silent with respect to those matters, correct?

A. There is no reference in the file about that.

MR. SCAROLA: I need just another moment if I could, your Honor.

THE COURT: Counsel, how much longer are you going to be?

MR. SCAROLA: Your Honor, this should only take five minutes, max.

THE COURT: Well, we're going to take a short break.

MR. SCAROLA: Okay.

THE COURT: We'll take a five-minute break.

(Thereupon, a recess was had, after which the following proceedings were had.)

ECRO: All rise.

THE COURT: All right. Please be seated.

MR. SCAROLA: May I proceed, your Honor?

THE COURT: Yes.

BY MR. SCAROLA:

Q. Mr. Hurley, one of the parts of your investigation included a review of the Epstein cost ledger

from Fowler White, correct?
A. That is correct.
Q. And the way in which you determined the dates that you testified to about the receipt and transmission of CDs was to look at this cost ledger, correct?
A. That was part of the way.
Q. Okay, and if we go down to December 7, right here, take us through and tell us what this entry says.
A. It appears to be a line item for a FedEx overnight to Miami, attention Louie Sanchez, from Joe Akerman.
Q. And the FedEx charge for the delivery of these two disks was $14.79, FedEx priority overnight, correct?
A. That's what it says.
Q. Okay. Now, that was a delivery of two disks, as you've previously testified, correct?
A. I believe so, yes.
Q. All right, and then we determined the date of December 28th from this entry, which again is on the first line. Do you see that?
A. Yes, sir.
Q. December 28, 2010, FedEx priority overnight to Robert Carney in West Palm Beach from Lilly Sanchez in

Miami.

So, the disks come from the West Palm Beach office to Miami, and then come from Miami back to West Palm Beach, correct?

A. That is correct.

Q. The original charge for two disks was $14.79, correct?

A. That's what it says.

Q. Do you remember that, $14.79 on December 7th, correct?

A. That is what it says.

Q. And then when materials were returned to Judge Carney, over the same distance, by the same shipper, the same priority overnight, $10.79, correct?

A. That's what is says.

Q. Do you think that it's reasonable to conclude from Fowler White's own documents that less got sent to Judge Carney than was delivered --

MR. McLACHLAN: Objection.

BY MR. SCAROLA:

Q. -- to Judge ---

MR. McLACHLAN: Objection, your Honor, calls for speculation.

MR. SCAROLA: Then -- I'm sorry.

THE COURT: We'll allow the question.

BY MR. MCLACHLAN:

Q. Do you think it's reasonable to conclude that less got sent to Judge Carney than was received by Federal Express overnight from West Palm Beach to Miami on December 7?

A. I do not.

MR. McLACHLAN: Judge, if I may, I have one question for Mr. Hurley.

THE COURT: All right.

CROSS-EXAMINATION

BY MR. MCLACHLAN:

Q. Mr. Hurley, do you know whether FedEx -- Federal Express, how they create their charges?

A. I have no idea.

Q. Do you know if their charges are based on weight?

A. They have a variety of charging, I believe, but I don't know how FedEx charges, whether a point of origin makes a difference, I just don't know.

Q. Okay. So you don't know whether -- why there is a reason -- you don't know an explanation for the difference in cost from the CD going from Palm Beach to Miami versus the disks going back from Miami to Judge Carney in Palm Beach on the 28th?

A. I have no idea.

MR. McLACHLAN: Okay. Thank you.
THE COURT: May the witness step down?
MR. SCAROLA: I have no further questions, your Honor.
THE COURT: All right.
THE WITNESS: Thank you, your Honor.
THE COURT: You may step down.
All right. What is the batting order for the afternoon?
MR. SCAROLA: Pardon me, sir?
THE COURT: What's the batting order for the afternoon?
MR. SCAROLA: Your Honor, we have some documents we want to introduce. We want to provide your Honor with the contents of the folder that has been under discussion for in camera review, since these are documents that obviously are still subject to a claim of privilege.
THE COURT: Well, why do I need to look at them?
MR. SCAROLA: Only to the extent that there is any question about whether these are privileged documents included on Farmer Jaffe/Bradley Edwards' privilege log. If that point is conceded, there is no reason for your Honor to look at the specific documents.

THE COURT: It's not been raised.

MR. SCAROLA: I'm sorry, Judge?

THE COURT: It's not been raised.

MR. SCAROLA: It hasn't been raised, and I don't know that there is any need for this, and also I don't have a way right now to compare what's on this supposed summary with what was in the file. So I don't know how he's going to qualify --

THE COURT: I don't think --

MR. SCAROLA: -- the summary.

THE COURT: -- I need to look at the file.

MR. SCAROLA: Thank you, sir.

MR. McLACHLAN: Thank you, Judge.

THE COURT: All right. What's your batting order this afternoon?

MR. SCAROLA: We reasonably anticipate that we have concluded our case in chief, that's subject, your Honor, to review over the lunch break, if we could.

THE COURT: All right, and what's -- and the response, how long?

MR. McLACHLAN: We're not sure whether we're going to call Mr. Hurley again, and then we have, I believe, two more witnesses, neither of which should take very long.

THE COURT: All right. Well, we'll take a

lunch break. We'll return at 1:30.

Leave your materials here. The courtroom will be locked in your absence.

MR. McLACHLAN: Thank you, your Honor.

MR. SCAROLA: Thank you, your Honor.

MR. VITALE: Thank you, your Honor.

MR. SCAROLA: Thank you, sir.

MR. LINK: Your Honor, before we leave, I heard Mr. Scarola say that they're going to close. Can I be excused from my obligation? I didn't require a subpoena as an officer of the Court, but am I excused as a witness?

THE COURT: You're excused by me.

MR. LINK: Thank you, Judge.

MR. SCAROLA: Your Honor, one of the things that we're considering over lunch is whether we're calling Mr. Link or whether we might need him as a rebuttal witness, depending upon the presentation from Fowler White. So ---

THE COURT: Is he under subpoena to appear as a witness today?

MR. SCAROLA: He has agreed to appear voluntarily, sir.

MR. LINK: Your Honor, as an officer of the Court I told them I did not need to be subpoenaed, that I

would show up, and if I need to be here, I'll be here, sir.

THE COURT: All right. Apparently you do.

MR. LINK: Apparently I do, sir. Thank you.

MR. VITALE: What time?

MR. SCAROLA: 1:30.

(Thereupon, a lunch recess was had, after which the following proceedings were had.)

ECRO: All rise.

THE COURT: Good afternoon. Please be seated.

Court will be in session.

MR. SCAROLA: Thank you, your Honor.

At this time we would call Mr. Scott Link to the witness stand.

ECRO: Do you solemnly swear or affirm that the testimony you're about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth under penalty of perjury?

MR. LINK: I do.

Thereupon,

SCOTT LINK,

having been first duly sworn, was examined and testified as follows:

THE COURT: Proceed.

DIRECT EXAMINATION

BY MR. SCAROLA:

Q. Mr. Link, would you please state your full name?

A. Yes, Scott Jeffrey Link.

Q. And you currently serve as counsel to Jeffrey Epstein in pending litigation adverse to Bradley Edwards, correct?

A. Yes, sir.

Q. Mr. Edwards is suing Jeffrey Epstein for malicious prosecution, correct?

A. He is.

Q. And that's one of multiple matters in which Mr. Epstein's interests are adverse to the interests of Jeffrey Epstein, correct? The other matter being a challenge to the non-prosecution agreement involving Mr. Epstein.

A. The only reason I'm hesitating is because I don't think Mr. Edwards is a party to that action, but ---

Q. He is legal counsel on behalf of the parties to that action, correct?

A. That is correct.

Q. Okay. Thank you, sir.

When did you first begin representing Jeffrey Epstein?

A. November 2017.

Q. And one of the things you did in connection with that representation was to contact Fowler White, who had been predecessor counsel in the same matter in which you are currently representing Mr. Epstein, correct?

A. That's correct.

Q. The question ---

THE COURT: Now let me stop you there and ask you a question.

When you started in November 2017, you were representing him in the ---

MR. SCAROLA: Malicious prosecution claim, your Honor.

THE COURT: Malicious prosecution claim only?

THE WITNESS: That's correct, your Honor.

THE COURT: Okay. Thank you.

BY MR. SCAROLA:

Q. You contacted Fowler White in order to gain access to their litigation files, correct?

A. Correct.

Q. There had actually been multiple interim lawyers representing Mr. Epstein between Fowler White's withdrawal and your appearance, correct?

A. I know of at least one. There may have been

more.

Q. Tanya Hadad Coleman (phonetic)?

A. Correct.

Q. Fred Hadad?

A. I thought they were at the same time.

Q. Well, you know that they were both involved. Whether they appeared simultaneously or not, you don't recall?

A. I don't know.

Q. Okay. You do know that there was interim counsel between you and Fowler White?

A. Yes, sir.

Q. All right, and you are one of multiple lawyers involved in Mr. Epstein's representation, correct?

A. In the malicious prosecution case?

Q. Yes.

A. Yes.

Q. Okay. Fowler White initially resisted turning files over to you, is that accurate?

A. No, no. They -- when I requested files to go down and look at them, they gave me access, but they wanted to keep -- they wanted to keep their boxes. So they let us make, you know, copies of what we wanted.

Q. All right. So you went down with a paralegal?

A. Yes, sir.
Q. You examined a large number of boxes, it turned out to be approximately 36 boxes, correct?
A. That is correct.
Q. And you flagged certain materials that you wanted immediate access to?
A. Correct.
Q. You requested those items that had been flagged be duplicated and sent to you, correct?
A. That's right.
Q. And Fowler White complied with that request?
A. They did.
Q. You marked a file that you now know to have been labeled Judge Carney - printing of CD issue, correct?
A. That's correct.
Q. And in that file was a CD that was labeled Epstein Bates stamp, correct?
A. That is correct?
Q. And also included in that file were 33 pages, if I recall correctly, of hard print documents, correct?
A. I don't know the number, but there were hard print documents.
Q. Approximately 30 pages, fair?
A. That sounds about right, yes.

Q. Okay. You subsequently had occasion to examine those documents and compare them to documents that were listed on a privilege log that had been prepared back in 2011 by Brad Edwards and the law firm by whom he was then employed at the time the privilege log was compiled, correct?

A. I'm not sure which documents you're talking about.

Q. Well, you found out that there were documents in that folder that were Bates stamped documents, that were on Brad Edward's privilege log, correct?

A. In the stack of documents that were in the file when we got the boxes from Fowler White, I know that we looked at them, and some of the pages were listed on the privilege log.

Q. Okay, sir. You then had occasion to contact Mr. Hurley, correct?

A. Yes.

Q. And you had discussions with Mr. Hurley regarding that CD and the pages that were included in the folder labeled Judge Carney - printing of CD issue, correct?

A. My only hesitation is I'm not going to waive Mr. Epstein's work product or attorney/client

communications, and Mr. Hurley was an -- and his law firm were former counsel. So I had a conversation with him, but, your Honor, I don't think I should disclose the contents of the conversation. It would violate work product.

THE COURT: Very well.

BY MR. SCAROLA:

Q. You did request the originals of those 36 boxes, correct?

A. Yes, sir.

Q. And they were, in fact, transported from Fowler White's Miami office to you --

A. Yes, sir.

Q. -- correct?

A. That is correct.

Q. And what you received included the original file folder labeled Judge Carney - printing of CD issue, correct?

A. That is correct.

Q. The CD, Epstein Bates stamp, that contained some 27,554 pages of documents, correct?

A. Generally that's correct. It contained more pages of documents, but that was the number of Bates stamps.

Q. Okay, and you also received the contents of

that file folder, which included the approximately 30 pages of documents that you had originally marked to be copied and sent to you. That all came to you together, correct?

A. So I just need to break that out a little bit.

Q. Sure.

A. I don't know that the documents that were in the file folder that said Judge Carney on it were documents that were in the folder, were the same documents that were in the folder when we put stickies on them.

When I received the box, in the Carney file was the disk and approximately 30 pieces of paper with the disk.

Q. Okay. So, as you received the documents back, the originals back from Fowler White, there was a file folder that contained the CD and hard copies of documents, the approximately 30 pages that we have been talking about?

A. That is correct.

Q. All right, sir, and just so that we can be clear about this, the CD that you received did have Bates stamps on the documents, correct?

A. That is correct.

Q. Sequentially numbered pages ---

THE COURT: You're talking about the Judge Carney - print CD?

MR. SCAROLA: That is correct, your Honor, the ---

THE COURT: Because ---

MR. SCAROLA: Well, actually it's the Epstein Bates stamp CD. The folder is Judge Carney - printing of CD issue. So the folder label and the CD label are not identical language. The CD label is Epstein Bates stamp. The folder label is Judge Carney - printing of CD issue.

THE COURT: Is that a question?

THE WITNESS: I apologize, if there was a question, I forgot what it was, Judge.

MR. SCAROLA: I was only clarifying that for the Court, that was the prior testimony, your Honor.

THE COURT: Okay. So we're talking about a CD and a file.

MR. SCAROLA: A CD, a file, and ---

THE COURT: 23 pages.

MR. SCAROLA: No, 30, 30 odd pages, sir.

BY MR. SCAROLA:

Q. You also have seen a copy of -- thank you -- the letter from Charles Lichtman of the Berger Singerman firm who was serving as counsel at that time to

the bankruptcy trustee, correct? Do you remember this letter?

A. I did not see that before Mr. Hurley's deposition. That was the first time I saw it.

Q. Yes, sir, but you saw it at that time?

A. I did.

MR. SCAROLA: And for the record, your Honor, this is Exhibit Number 6 to the declaration of Mr. Edwards.

BY MR. SCAROLA:

Q. And in that letter Charles Lichtman tells Gary Farmer that he is enclosing a copy of the CD containing all emails provided to Judge Carney regarding Jeffrey Epstein. Also enclosed is another CD containing the documents loaded onto the Fortis system, which Judge Carney has not yet seen, though we are sending him a copy simultaneously herewith, and I hope that's not just my vision.

All right. Do you know what the Fortis system is?

A. No idea, sir.

Q. Okay. Attached to that letter happened to have been photocopies of the two CDs that are referenced in the letter, and let me zoom out a little bit here. There is one CD that was photocopied with the letter, and

it is labeled Epstein search production, not Epstein Bates stamp, correct? I'm reading that accurately?
A. You're reading that accurately.
Q. Okay, and then the second referenced CD, although it's not entirely legible, would appear, based upon the contents of the letter we just read, to read Epstein Fortis, correct?
A. You're reading it correctly.
Q. All right. Also not Epstein Bates stamp, correct?
A. That is correct.
Q. All right. So, would you agree with me that it is reasonable to conclude from Chuck Lichtman's letter to Gary Farmer that neither of the CDs that Mr. Farmer -- excuse me, that Mr. Lichtman references as sending to both Gary Farmer and Judge Carney are CDs that are labeled Epstein Bates stamp, fair?
A. Well, the two you showed me did not say Epstein Bates stamp on them.
Q. All right. Thank you, sir.
You were subsequently asked to -- by my law firm, to copy the CD, and you copied the CD labeled Epstein Bates stamp onto what device?
A. A flash drive.
Q. Very good, a flash drive, and you ---

A. That's about the extent of my technical expertise, you just got it.

Q. Well, I'm going to test it just a little bit further. Your intention, presumably fulfilled, was to provide an exact copy of the data on the CD transferred to the flash drive --

A. Yes, sir.

Q. -- correct?

A. That's correct.

Q. Okay, and presumably you accomplished that objective and gave us a duplicate of exactly what the CD said, which you have heard from earlier testimony, reflects that it was created in its Bates stamp form on December 8 of 2010, correct?

A. That is all true.

MR. SCAROLA: All right. May I have just one moment, your Honor?

BY MR. SCAROLA:

Q. I think this is probably already clear, Mr. Link, but let's make certain, you, meaning you individually and your law firm, you didn't print out those 33 pages, 30-plus pages, to be included into that file from the Bates stamp CD, did you?

A. No.

Q. Okay. Those Bates stamped pages have Bates

stamps that correspond to those same documents on the CD as you found them both in Fowler White's files, correct?

A. That is correct.

MR. SCAROLA: Thank you very much, sir. That's all I have, your Honor.

THE COURT: Any cross?

MR. McLACHLAN: Yes, Judge. Thank you.

CROSS-EXAMINATION

BY MR. MCLACHLAN:

Q. A couple of questions --

A. Sure.

Q. -- for you, Mr. Link.

Do you recall how many pages you asked Fowler White to copy in January 2018 after your initial review of the documents in Fowler White's offices?

A. I don't remember specifically, but it was a lot of paper.

Q. Certainly more than 32 pages?

A. Oh, a lot more.

Q. Would you say a few hundred, possibly?

A. Could have been thousands.

Q. Okay. Just to be sure, I think I heard you testify that you can't say that the disk and those 32 pages were in the folder marked Judge Carney -- or J. Carney - printing of CD issue when you reviewed the

documents at Fowler White. Did I understand you correctly?

A. That is correct.

Q. You don't know how the disk or those pages got into Fowler White's files, do you? You don't know when they got in, do you?

A. No idea.

Q. Okay. Do you know the source of those 32 pages of materials that you found in Fowler White's files?

A. Yes, the source were Fowler White's files.

Q. But do you know where those pages came from?

A. Where did Fowler White get them?

Q. Yes.

A. No, I have no idea.

MR. McLACHLAN: Okay. Thank you.

MR. SCAROLA: Your Honor, if I may, I did overlook one additional area that I want to cover with Mr. Link.

THE COURT: Go ahead.

MR. SCAROLA: Thank you very much.

REDIRECT EXAMINATION

BY MR. SCAROLA:

Q. There is a second letter that includes photocopies of CDs, and this is a letter of November 9, 2010 from Lewis Torres, litigation paralegal, of the

Berger Singerman firm, going to Farmer Jaffe, and it reads pursuant to Judge Carney's email of even date, enclosed please find two CDs, one for Judge Carney, and one for the Farmer Jaffe firm, which should be considered as a full and complete set of all emails responsive to the search terms agreed to regarding Epstein's subpoena.

Did I read that accurately?

A. Yes, sir.

Q. All right. Attached to that letter, again, are photocopies of two CDs. One, again, that is not particularly legible, but appears at the bottom again to say Epstein Fortis, and a second one, which, thank you, is very clear, Rothstein Rosenfeldt Adler bankruptcy, Scott Rothstein and Bradley Edwards' emails, Epstein updated search results, date ranger April four o one (sic), 2009 to October 31, 2009, disk one of one, April 23, 2010. I read that accurately?

MR. McLACHLAN: Judge, Ray, we object to this. The witness has absolutely no foundation. He has no personal knowledge of this letter.

The first time he saw the letter he testified was at the deposition of Fowler White's representative. He has ---

THE COURT: What's -- why are you asking him these questions?

MR. SCAROLA: Only to establish, your Honor, that these disks, again, don't bear the label of the disks -- the disk that he saw and received. It's the only point of these questions, sir. These are already -- these documents are already in evidence. I'm not attempting to lay a predicate through this witness.

MR. McLACHLAN: Judge, Mr. Scarola is testifying. You can look at the labels, you know what they say. I don't see the point of this line of questioning.

THE COURT: I'll sustain the objection. Go on.

MR. McLACHLAN: Thank you.

BY MR. SCAROLA:

Q. Did you ever see these disks, sir?

A. No, sir, this is the first time.

MR. SCAROLA: Thank you. That's it, your Honor. Thank you very much.

THE COURT: All right. Is the witness excused?

MR. McLACHLAN: Yes, sir. We have no reason for him to remain.

THE COURT: All right. Thank you, Mr. Link. You can proceed if you want.

MR. LINK: Thank you, your Honor. I

appreciate it.

MR. SCAROLA: We have no further witnesses to present at this time, your Honor.

THE COURT: For the record, who has any further witnesses?

MR. SCAROLA: Your Honor, none of the moving parties with respect to this rule to show cause are presenting any further testimony. The presentation that has been made is a consolidated presentation on behalf of Bradley Edwards, Farmer Jaffe and the intervenors.

THE COURT: All right. Thank you.

MR. SCAROLA: Thank you, sir.

MR. McLACHLAN: Thank you, Judge.

Just two things before we get started for Fowler White, your Honor. The movants have withdrawn their objection to all of Fowler White's Exhibits A through L. We'd ask to move those into evidence at this time.

MR. SCAROLA: Your Honor, that is subject to the declarants being called to testify so that they be cross-examined.

THE COURT: All right. Well, then we'll wait until then.

MR. McLACHLAN: Judge, we have exhibits -- I'm sorry, the declarations are A, B and C. So, we'd just

ask that D through L be moved into evidence at this time.

THE COURT: Hold on for a minute.

MR. SCAROLA: Does it include anything other than emails?

MR. McLACHLAN: Let me see.

MR. SCAROLA: Can I have just one moment, your Honor?

Your Honor, we do have no objection to Exhibits E through L. We withdraw those objections.

THE COURT: All right. E through L are admitted.

(Thereupon, Exhibits E - L were admitted into evidence.)

MR. SCAROLA: Just so that the record is clear, your Honor, we have -- we are moving in all of our exhibits as well, and no objections have been raised.

THE COURT: Well, whoa, whoa, whoa, wait, one thing at a time.

MR. SCAROLA: Yes, sir.

THE COURT: I'm dealing with Fowler White's exhibits. So Exhibits E through L are admitted without objection.

MR. SCAROLA: Correct, sir.

THE COURT: Now turning back to ---

MR. SCAROLA: Turning back to the movants

case, if I have not formally moved those exhibits into evidence, we are moving them into evidence, sir.

THE COURT: Exhibits 1 through 33 and 34 through 37?

MR. SCAROLA: That is correct.

THE COURT: Any objection?

MR. McLACHLAN: Judge, only to the extent that those exhibits talk about negotiations of the order, which your Honor has already indicated is irrelevant to the case, but apart from a relevance objection, we don't have any objection.

THE COURT: All right. Sworn declarations are not admitted. They're admitted subject to cross-exam, and Exhibit D is the objection to the registers.

MR. SCAROLA: Exhibit D is a December 7, 2010 email correspondence, which I believe --

MR. McLACHLAN: I'm sorry --

MR. SCAROLA: -- counsel has agreed to.

MR. McLACHLAN: -- I'm a little bit confused about these exhibits.

THE COURT: You have four binders, Binders A, B, C and D.

MR. SCAROLA: Yes, sir.

THE COURT: Binder A is A through -- Binder A is Exhibits 1 through 33. Binder 2 is

Exhibits 34 through 37. They are admitted.

MR. SCAROLA: Thank you, sir.

(Thereupon, Exhibits 1-37 were admitted into evidence.)

THE COURT: Binder 2 is the opening statement of Farmer Jaffe. Binder 2-C is the three sworn declarations. Binder D -- Binder 2-D is the objections.

MR. SCAROLA: Yes, sir. We need not, we need not move into evidence the objections. The declarations are moved in only with respect to those witnesses who have testified, and all of the exhibits are unobjected to, and we do move those in.

THE COURT: So Farmer is not in.

MR. McLACHLAN: Correct, and that would obviously include all of his exhibits, Judge.

MR. SCAROLA: Which are simply duplicates of the exhibits attached to the declaration of Mr. Edwards.

THE COURT: All right.

MR. SCAROLA: Thank you, sir.

MR. McLACHLAN: Judge, at this time we would move for the entry of judgment in Fowler White's favor. The movant's have provided absolutely no evidence that Fowler White retained a copy of the disk or any of the documents at the time they printed the documents in December 2010. There has been not a scintilla of evidence

on that front.

The only thing that's been shown is that at some point thereafter, maybe in 2014 or '15 a disk was in the box, and there was a folder that said J. Carney - printing of CD issue. We respectfully state that the movants have not met their clear and convincing burden of proof necessary to find contempt.

THE COURT: Let me look at the order.

MR. McLACHLAN: And Mr. Scarola even said during his argument that for all he knows that disk came back from Judge Carney, who was on the case until midway through 2012.

THE COURT: This order reads Fowler White will not retain any copies of the documents contained on the disk provided to it. They did.

MR. McLACHLAN: Well, I think maybe the question is what is "retained", because we certainly didn't do it in December 2010.

If someone sent us a disk back four years later, after we no longer represented Mr. Epstein, was someone -- I don't understand whether someone had the obligation to then spend hours looking through the CD to determine what was on it, instead of just dropping it in a box.

I think the purpose of the order was that we

would print out the documents, we would send them to Farmer Jaffe, and we would send the CDs back to Judge Carney. That's the evidence that's been presented, and there is no evidence that's been presented that the documents were retained in 2010.

If they came back to us later from Judge Carney or some other source, I don't know how that could be considered clear and convincing evidence of contempt --

THE COURT: There is no evidence --

MR. McLACHLAN: -- of your Judge's order.

THE COURT: -- to support that.

MR. McLACHLAN: There is no evidence to support the fact that it was in the file in December 2010.

THE COURT: Well, no, it was there.

MR. McLACHLAN: It was there --

THE COURT: How it got there ---

MR. McLACHLAN: -- at some point.

That's right, how it got there, we don't know, but since ---

THE COURT: Response.

MR. SCAROLA: Your Honor, it is not our burden to establish how this respondent violated the order. It is our burden to establish that a violation occurred.

The order clearly and expressly prohibits retention of any of this privileged information, and the un-rebutted, overwhelming, compelling clear and convincing evidence establishes that they did just that in two separate forms, one, on a CD with 27,554 pages of potentially privileged information and, two, in hard copy 33 pages of information, including information that was clearly privileged that originated on the CD with Bates stamps on those pages. There is no reasonable explanation for that except explanations that clearly contravene this Court's order prohibiting that possession.

THE COURT: All right. The motion is denied.

Proceed.

MR. McLACHLAN: Well, Fowler White will call Joseph Akerman, Judge.

THE COURT: Joseph Ackerman.

ECRO: Please raise your right hand.

Do you solemnly swear or affirm this the testimony you're about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth under penalty of perjury?

MR. ACKERMAN: I do.

Thereupon,

JOSEPH ACKERMAN,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MCLACHLAN:

Q. Good afternoon.

A. Good afternoon.

Q. C on our register, do you recognize that document?

A. Yes.

Q. What is it?

A. It's a declaration that I authored and signed in this case with exhibits.

Q. Does that declaration accurately and correctly reflect the testimony you would give if asked the appropriate questions in this proceeding?

A. Yes.

MR. McLACHLAN: Judge, I move the declaration into evidence.

THE COURT: Admitted, subject to cross.

MR. McLACHLAN: Thank you, Judge.

BY MR. MCLACHLAN:

Q. Can you take a look at the first e-mail that's attached to your declaration?

MR. McLACHLAN: Oh, I'm sorry, Judge, that was -- I thought I was in state court.

I tender the witness.

MR. VITALE: Your Honor, we have no questions for this witness.

THE COURT: All right. May the witness be excused?

MR. McLACHLAN: Yes, Judge.

MR. IANNO: Your Honor, our next witness will be Ms. Lillian Sanchez. If I may, I'll go out and get her.

THE COURT: All right.

ECRO: By the microphone, please.

Please raise your right hand.

Do you solemnly swear or affirm that the testimony you're about to give in the case now before the Court will be the truth, the whole truth, and nothing but the truth under penalty of perjury?

MS. SCARLETT: Yes.

Thereupon,

LILLIAN SANCHEZ,

having been first duly sworn, was examined and testified as follows:

MR. IANNO: If I may approach the witness, your Honor?

THE COURT: Please.

ECRO: Your name, sir?

MR. IANNO: And just for the record, Joseph Ianno on behalf of Fowler White.

THE COURT: Spell it for the court reporter, your last name.

MR. IANNO: I-a-n-n-o.

DIRECT EXAMINATION

BY MR. IANNO:

Q. Ms. Sanchez, do you recognize the document we just handed -- put in front of you as Exhibit B?

A. I do.

Q. What is it?

A. It's the declaration that I signed earlier this week.

Q. Okay. Does the state -- does the declaration correctly reflect the testimony that you would give if you were asked those questions on direct examination?

A. Yes.

MR. IANNO: Your Honor, at this time ---

BY MR. IANNO:

Q. And are there exhibits attached to it?

A. Yes, Exhibits A, B and C.

Q. Are those true and accurate copies of the documents as they exist?

A. Yes.

MR. IANNO: Your Honor, at this time I move Exhibit B, which is the declaration of Ms. Sanchez, into evidence.

THE COURT: Admitted, subject to cross.

(Thereupon, Exhibit B was admitted into evidence.)

MR. IANNO: And offer the witness for cross, your Honor.

MR. EDWARDS: Thank you, your Honor. Brad Edwards on behalf of Farmer Jaffe.

May I proceed?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. EDWARDS:

Q. Good afternoon, Ms. Sanchez.

A. Good afternoon.

Q. Your affidavit, do you have it in front of you?

A. I do.

Q. And at Paragraph 12 it states, I also sent all original disks back to Judge Carney as indicated in Exhibit C. Do you see that?

A. Yes.

Q. If we go to Exhibit C of your affidavit ---

THE COURT: Hold it. Let me get her

affidavit.

All right. I have it, Exhibit C.

MR. EDWARDS: I think I can zoom right here for us.

THE COURT: What exhibit to her affidavit?

MR. EDWARDS: Exhibit C.

BY MR. EDWARDS:

Q. Is that Exhibit C that we pulled up on the screen?

A. Yes.

Q. Okay, and is this the email that you were referring to that you sent December 10th at 3:46 p.m., that starts, Seth, the documents are done and will be FedExed to you tonight for Monday, 10:00 a.m. delivery. The documents that you were talking about were the printed, Bates stamped documents that were then being sent to Farmer Jaffe and Seth, as a representative of Farmer Jaffe, correct?

A. Correct.

Q. And the disks, plural, will be returned to Judge Carney, correct?

A. Correct.

Q. These are the disks that, as you discussed in Paragraph 10 of your affidavit, were collected from Judge Carney on December 7th, 2010, and were delivered to

Fowler White's Miami office on December 8th, 2010 for numbers and Bates -- for numbering and printing, correct?

A. Correct.

Q. Those are the disks that were, as you stated in your email, returned to Judge Carney?

A. Correct.

Q. And the printed documents, as stated in that email, were sent, the hard copy documents were sent to Farmer Jaffe on December 10th, 2010, correct?

A. Correct.

Q. And the disks that were sent originally from Judge Carney to Miami were sent back to Judge Carney on December 28th, 2010, correct?

A. I believe that's correct.

Q. You, personally, did not watch over the entire process of taking in the two disks and ultimately uploading them into a system, Bates numbering them, printing them, and then creating another CD that would have Bates numbered CDs on it, did you?

A. No.

Q. And you have no personal knowledge of the number of CDs that may have been created that would have contained all 27,000 plus documents with Bates numbers on them, correct?

A. No, not personal knowledge of what they

actually did in the copy room.

Q. And you have no personal knowledge of what happened with the disks that were originally sent by Judge Carney to Fowler White for the 18 to 20 days between December 8th, or 10th, whatever the CDs were -- whenever the Bates stamps were put on, through December 28th, when they were returned to Judge Carney, correct?

A. No, I can only assume that they would have been in the custody of my secretary until they were sent to Judge Carney but, no, they weren't in my custody for those days, until Judge Carney requested -- you know, we sent them back to Judge Carney.

Q. So you had no personal knowledge of what happened during that 20 days with the two CDs that were sent by Judge Carney before they were returned to Judge Carney?

A. Right, Judge Carney would have gotten them back, the two CDs that he sent to us, plus a CD that was Bates stamped, with the Bates stamped numbers, and I thought that -- my understanding, from my recollection, is that I believe a CD with the Bates stamped numbers was also provided to Seth, with the seven boxes of documents, so he could have it in a digital electronic format.

Q. The information that we have from your affidavit, as well as the exhibit that we just looked at,

indicates on December 10th, 2010 you sent the email to Seth saying the documents are done and will be FedExed to you tonight for Monday, 10:00 a.m. delivery, correct?

A. Yes.

Q. The evidence that we have is that documents, hard copy documents are sent to Farmer Jaffe, right?

A. Absolutely.

Q. Okay, and that the disks that had arrived at Fowler White were returned to Judge Carney, right?

A. Right, but remember that additional disks were made for the Bates stamped documents.

Q. And that's why -- well, let's go to the order.

A. Okay.

Q. And maybe you can explain to us why an additional CD with Bates stamped numbers was ever made. According to what the agreement was, as this was an agreed order that was entered on November 30th, 2011, right -- or 2010?

A. Correct.

Q. All right, and it starts with, the motion for relief from amended order and to compel Jeffrey Epstein to pay for the production of all documents in response to this request filed by interested party Farmer Jaffe was adequately resolved by agreement of the

parties.

The law firm of Fowler White will print a hard copy of all documents contained on the disks. Do you see that?

A. Yes.

Q. With Bates numbers added, and will provide a set of copied, stamped documents to the Special Master, and a set to Farmer, who will use same to create its privilege log.

Do you see that?

A. I mean, it moved. So, no, but, yes.

Q. Okay. So, based on the agreed order, wouldn't you agree that Fowler White was to print a hard copy of all the documents contained on the disk, right?

MR. IANNO: Objection, your Honor. This is what we covered with Mr. Hurley in Mr. Scarola's examination. Mr. Edwards is asking the witness to interpret a document, an agreed order of this Court. The Court -- that's something for the Court to do.

She can testify as to what she did.

THE COURT: Ask her what she did.

MR. EDWARDS: Well, she just testified about another disk being created, and I'm trying to figure out where in this process that ever could have happened. So ---

THE COURT: Well, ask her what disk was created and by whom.

BY MR. EDWARDS:

Q. Did Fowler White do what the order ---

THE COURT: Ask her the question, was there a third disk created and by whom?

BY MR. EDWARDS:

Q. Was there a third disk created?

A. If I can explain how it worked?

Q. Yes.

A. The way that it worked was we had two -- I don't recall exactly, but I believe it was two disks that we got from Judge Carney, okay? In fact, I think it was originally one disk, and there was some issue about it before it even came to Fowler White. I think it was one disk, and that just -- I think it was Seth who couldn't open it, and then requested it, for the disk to be broken down into two -- the documents to be broken down into two disks, and then those two, I believe it was two disks, it could have been three, but the disks, the original disks, let's call them, came over to Fowler White.

THE COURT: From whom?

THE WITNESS: From -- I believe they came from Seth or from Judge Carney, whoever had them that was sending them over for us to print them pursuant to the

order. I don't remember exactly who sent the disks.

So -- but I'm sure it's in the emails or the documents, I could look.

So, when I received the disks from, I believe, the West Palm Beach office, the two disks are given to the copy room, and they're sup -- they need to be Bates stamped before they're printed out, because there was an agreement to have them numbered.

In order to number them, from my recollection, is that all the documents, okay, are put on another CD that's created, so that digitally the machine can put the Bates stamped numbers on those documents digitally, and then from that CD that's created with the Bates stamp numbers on it, the seven boxes of printed documents are created, with the numbers pursuant to the order.

Judge Carney wanted a disk, is my understanding, with the disk -- the disk with the numbered CD, because he didn't want all the documents, but he needed to have the CDs with the Bates stamped numbers on it so that when the privilege log was created, he can look up the documents on the CD by the Bates stamp number, and then it's my understanding, I thought, I remember -- I thought that Seth Lehrman also wanted a Bates stamped -- the disk with the Bates stamped numbers on it.

MR. SCAROLA: Stop her.

BY MR. EDWARDS:

Q. Based on your personal knowledge of what happened, were you the one that uploaded the CDs onto the computer and created Bates stamps?

A. Absolutely not.

Q. Anywhere in the email communications leading up to the agreed order, is there any communication that you're aware of where it was informed to Farmer Jaffe that an additional disk was going to be created with Bates stamps on it?

A. Okay.

THE COURT: Well, what other alternative would there be?

MR. IANNO: Thank you.

BY MR. EDWARDS:

Q. Well, isn't it -- isn't it possible to take the CDs that arrived to Fowler White that did not have a Bates stamp on it, upload them into a temporary file, use the Acrobat program to place Bates stamps on those documents in that file, and print from that file?

THE COURT: So you're altering the original disk?

MR. EDWARDS: You can't -- those original disks could not be altered. You could only put them into

a temporary file and alter the temporary file.

THE COURT: (Inaudible) -- a new disk with Bates stamp numbers?

MR. IANNO: Your Honor, at this point it's getting to be -- the question is beginning to get argumentative, because the witness testified Judge Carney requested the disk. I don't know what ---

THE COURT: The Bates stamped disk.

MR. IANNO: Correct. So, that's there. Now they want to argue with the witness of why she created it. She testified as to why.

BY MR. EDWARDS:

Q. Well, did you create another disk?

A. My recollection ---

Q. Did you create another disk?

A. I'm not an IT person. I didn't create anything.

My -- what my instructions were, was that here are two original disks, I need a printed set of the documents with Bates stamped numbers. The only way to do that is to -- and, again, I'm not an IT person, is to take those and create -- put them into some temporary file, or to some other CD, put it through some program that gives it numbers, and then print from that numbered CD.

Q. Okay.

A. And then a CD was created for Judge Carney, because Judge Carney did not want printed documents.

Q. Were you a part of that process?

A. No, I was not in the IT room.

Q. Okay. So, going back to the order that simply states, a hard copy of all documents contained on the disk with Bates number added will be provided, copied stamped documents to the Special Master. Was that done, hard copy documents, Bates stamped, presented to Judge Carney? To your personal knowledge, was that done?

A. Okay. A hard copy of the documents was not provided to Special Master Carney. He wanted it just the disk.

Q. Okay. This is a conversation that you had with Special Master Carney after the order was entered that somehow allowed a deviation from the letter of the order, that's what you're recollecting?

A. No.

MR. IANNO: Objection, your Honor, argumentative.

THE WITNESS: Let me, let me --

MR. IANNO: Hang on, Ms. Sanchez.

THE COURT: What's the question?

BY MR. EDWARDS:

Q. Was there a conversation between Ms. Sanchez

and Special Master Carney that gave permission for Fowler White to deviate from the order that directed Fowler White to print a hard copy of the Bates stamped documents, and deliver only that hard copy to the Special Master?

THE COURT: Was there -- that's a compound question.

Ask her, did she have a conversation from Judge Carney and, if so, what did Judge Carney say.

BY MR. EDWARDS:

Q. Did you have a conversation with Judge Carney about the production of these documents to him?

A. I'm sure I did, yes.

Q. Do you remember the conversation?

A. I remember a conversation, maybe numerous conversations during this time. I went through a period -- this went through a period of about several weeks, I think, regarding what was going to be prepared, and there was a lot of back and forth on drafting this order. I wasn't involved in it, but that's my understanding.

But I am clear that Judge Carney wanted a disk with the Bates stamp copies on it, because he did not want seven boxes, or whatever it was going to be, of hard copy documents.

Q. But you agree that's not what the parties

agreed to in the order?

MR. IANNO: Objection, your Honor.

THE COURT: Sustained. The question is stricken.

BY MR. EDWARDS:

Q. Okay. After that sentence that states, will provide a set of copied stamped documents to the Special Master, and an identical set to Farmer, who will use same to creates its privilege log, it states Farmer agrees to prepare that portion of the privilege log relating to emails on or before December 15th, with the remaining portion due 30 days from the date of this order subject to the other court orders. Did I read that correctly?

A. Yes.

Q. Then it states Fowler White will not retain any copies of the documents contained on the disk provided to it, nor shall any images or copies of said documents be retained in the memory of Fowler White's copiers.

Should it be determined that Fowler White or Epstein retain images or copies of the subject documents on its computer or otherwise, the Court retains jurisdiction to award sanctions. Did I read that correctly?

A. Yes.

THE COURT: Did anyone at Fowler White

instruct you to retain a copy of the disk?

THE WITNESS: No.

THE COURT: Do you know of any instructions by anyone at Fowler White that a copy of the disk should be retained?

THE WITNESS: No.

BY MR. EDWARDS:

Q. Based on the order, Fowler White was not to retain any copies of any kind, whether electronic ---

THE COURT: You're repeating yourself. You're repeating yourself.

BY MR. EDWARDS:

Q. Well, my question is, this order did not just apply to 2010. This was, Fowler White was not to retain any copies of these documents at any time unless produced to them --

THE COURT: That's not a question.

BY MR. EDWARDS:

Q. -- correct?

MR. EDWARDS: Okay. Thank you. No further questions.

MR. IANNO: Just briefly, your Honor.

BY MR. IANNO:

Q. Ms. Sanchez, I thought you ---

MR. SCAROLA: Pardon me. Do you want me

to ---

MR. IANNO: Oh, I'm sorry. I thought you were letting Mr. Edwards do your side. Excuse me, Mr. Scarola, I'm sorry.

MR. SCAROLA: That's all right. Thank you.

CROSS-EXAMINATION

BY MR. SCAROLA:

Q. Good afternoon, Ms. Sanchez. My name is Jack Scarola. I don't think that we have he met before, have we?

A. I think we've met several times.

Q. Have we?

A. Yes.

Q. Well, I apologize. I am getting old. That I readily admit.

You were asked where you gave anyone instructions to make and retain any copies. Do you recall that question from the Court?

A. Yes.

Q. And your answer was, no, you did not?

A. Correct.

Q. What effort did you make to inform all of the Fowler White employees that there was a strict prohibition in place against making extra copies, or retaining extra copies in any form whatsoever?

MR. IANNO: Your Honor, I object to Mr. Scarola's characterization of the prohibition. He can ask her whether she made any efforts to inform anyone of the order.

THE COURT: I'll sustain the objection. Restructure the question.

BY MR. SCAROLA:

Q. Did you make any effort to distribute this order to Fowler White personnel involved with these documents so that they would know about the prohibitions contained in the order?

A. I didn't -- I do not recall distributing the actual order to any Fowler White personnel.

Q. Okay. You made the statement, the only way to make the copies was to create a CD with Bates stamped numbered copies on the CD. Do you remember making that statement?

A. Yes, but you -- understand, Mr. Scarola, I'm not an IT person. I spoke to David Tobin, the gentleman that's in charge of IT at Fowler White.

Q. I don't want you to tell us what anybody else said, but I do want to ask you about the statement that you made, the only way to do that, to make the copies, is the "that" that you were referring to, is to create another CD with the Bates stamped documents on

them.

A. I made the statement, but I also caveated by saying I'm not an IT guy, and my understanding is, is that you have to -- you can't put Bates stamped numbers on the --

Q. I'm sorry --

Q. -- original CDs?

A. -- to interrupt you, ma'am, but if you're not an IT person I really ---

THE COURT: Then why did you ask her the question?

MR. SCAROLA: Pardon me?

THE COURT: Then why did you ask her the question?

MR. SCAROLA: Only to ask her the next question as a predicate, your Honor, if I could?

THE COURT: Please.

BY MR. SCAROLA:

Q. You don't know whether it's the only way to do it, do you, Ms. Sanchez?

A. No, I don't.

Q. Okay, and, in fact, even just from a standpoint of pure logic, if you've created a temporary folder ---

THE COURT: She's already testified she

doesn't know. You brought that out.

MR. SCAROLA: Yes, sir, I did bring that out.

THE COURT: She's not an expert.

MR. SCAROLA: But she did say the only way to do it, your Honor, and I went to ask her ---

THE COURT: She caveated that.

MR. SCAROLA: Pardon me?

THE COURT: She caveated that, the only way to do it.

BY MR. SCAROLA:

Q. Okay. So we can ignore your statement that that's the only way to do it, is that fair?

MR. IANNO: Objection, your Honor, argumentative.

THE COURT: Sustained.

BY MR. SCAROLA:

Q. Do you withdraw your statement that that's the only way to do it --

MR. IANNO: The same objection.

BY MR. SCAROLA:

Q. -- because you just don't know?

THE COURT: Go ahead and answer the question.

THE WITNESS: Mr. Scarola, what I do know,

okay, and what I was explained at the time from my recollection ---

MR. SCAROLA: I don't want you to tell us what somebody else told you, ma'am.

THE WITNESS: Okay.

MR. SCAROLA: You're here to testify about your personal knowledge.

THE WITNESS: Okay. My personal knowledge is, is that the documents have to be put in another format in order to run them through the program to get numbers on these documents.

MR. SCAROLA: Excuse me, your Honor, I'm sorry to interrupt Ms. Sanchez, but either she's going to be permitted to testify about a process that she's acknowledged ---

THE COURT: Go on to your next question.

MR. SCAROLA: Thank you very much, your Honor. I appreciate that.

BY MR. SCAROLA:

Q. You have a statement in your declaration about not having retained copies of the documents in December 2010, do you recall that?

A. Yes.

Q. In order to know whether there were any documents in Fowler White's file that were retained in

December 2010, you would need to have examined Fowler White's files in December of 2010, correct?

MR. IANNO: Objection, your Honor, calls for speculation.

THE COURT: Read the question again.

BY MR. SCAROLA:

Q. You have told us in your declaration that no copies of the documents were retained in December 2010 --

THE COURT: What paragraph?

BY MR. SCAROLA:

Q. -- by Fowler White, correct?

THE COURT: What paragraph are you talking about?

MR. SCAROLA: I can tell you in just one moment, your Honor. I don't have it directly in front of me, but I will have it in just a second.

It is Paragraph Number 12, which reads: I also sent all original disks back to Judge Carney, original disks back to Judge Carney, as is indicated in Exhibit C. Fowler White did not retain any of the disks, or any copies of the printed materials in December 2010.

THE WITNESS: That's correct.

BY MR. SCAROLA:

Q. And that's what your swore to under oath, correct?

A. That's correct.
Q. You swore under oath that the original disks were returned to Judge Carney, that's what we just read, correct?
A. Yes.
Q. And you testified under oath in your declaration that no copies of the disks or documents from those disks were retained by Fowler White in December of 2010, that's what this says, correct?
MR. IANNO: Objection, your Honor. Mr. Scarola does not need to raise his voice to the witness.
MR. SCAROLA: I apologize if it seems that I'm doing that, your Honor.
THE COURT: You are doing that.
MR. SCAROLA: Then I will certainly make an effort not to do that, and I apologize to you also, Ms. Sanchez.
BY MR. SCAROLA:
Q. In order to know what was in Fowler White's files, it would be necessary for you, if you're testifying from personal knowledge, to have reviewed Fowler White's files in December of 2010, correct?
A. Yes, and in -- okay. In December of 2010 Fowler White, it is my understanding ---

Q. I don't mean to interrupt you, Ms. Sanchez, but --

A. Okay. Let me ---

Q. -- it is not proper for you to be telling you what your understanding is, when what we need to be able to carefully distinguish is what you know --

THE COURT: Well, let --

BY MR. SCAROLA:

Q. -- from personal knowledge.

THE COURT: -- her explain what her understanding came from.

MR. SCAROLA: I'm sorry, your Honor?

THE COURT: Where her understanding came from. Please answer the question as best you can.

THE WITNESS: When I received the disks back from -- and the original disk and the boxes back from our IT, and they were sent to Seth Lehrman and to Judge Carney on December 10th and then thereafter, I did not keep, I did not retain any copies of any printed documents or any CDs.

If there is a distinction you're making between Fowler White and me, that's your distinction, but that's what I -- obviously, what I'm saying is I did not retain anything, and I did not retain any printed documents in my files.

BY MR. SCAROLA:

Q. Okay. Ms. Sanchez, you do understand that there is a distinction between what you personally retained and what Fowler White retained, can we agree to that?

A. Yes.

Q. And the fact of the matter is that what you meant to say in this declaration was that you, Ms. Sanchez, did not retain copies, as opposed to attempting to suggest in this declaration that Fowler White did not retain copies, is that fair?

MR. IANNO: Objection, argumentative, your Honor.

THE COURT: Sustained. Let me ask the question this way, to the best of your knowledge did Fowler White retain any copies of the documents?

THE WITNESS: No, your Honor, I don't have any information that Fowler White retained anything, any of the documents.

BY MR. SCAROLA:

Q. And you also don't have any information that Fowler White did not retain those copies, because you did not review 36 boxes of Fowler White's files in December of 2010, correct?

MR. IANNO: Objection, your Honor, there is

no testimony there were 36 boxes in existence in December 2010. Counsel is misleading the witness.

THE COURT: I thought it was six or seven boxes that went over.

MR. IANNO: No, sir, when the boxes ---

THE COURT: There were a total to 36 that arrived.

MR. IANNO: Pardon me?

THE COURT: There were a total of 36 that arrived, but there were only six or seven that were copied.

MR. IANNO: Well, it's the timing, your Honor. There were 36 boxes that were made available for Mr. Link to review in 2018. There is no testimony that 36 boxes of documents existed in December 2010 because Fowler White continued to represent Mr. Epstein for another year and a half, and there is no ---

MR. SCAROLA: I'll rephrase the question, sir --

MR. IANNO: All right.

MR. SCAROLA: -- to avoid the objection.

THE COURT: All right.

BY MR. SCAROLA:

Q. Ms. Sanchez, you didn't conduct a review of Fowler White's files, whether it was one box, seven boxes,

or 36 boxes, you didn't conduct a review of those boxes in December 2010 in order to determine whether any copy of disks or any copy of documents printed from those Bates stamped data were included in Fowler White's files, correct?

A. In the entire offices in Miami?

Q. Wherever Fowler White was keeping all of its Epstein files. Those were extensive files, weren't they?

A. They were very extensive, that's why I asked the question, and they were in Miami, I think even in Fort Lauderdale and Palm Beach. So, I can only -- I can speak to in Miami, where this was produced for production to Seth Lehrman and to Judge Carney, and where I kept my files, we did not keep anything.

Q. Okay.

A. There was nothing kept there.

Q. Your files didn't include anything. You don't know what was in anyone else's files, fair?

A. That is fair.

MR. SCAROLA: Thank you very much, your Honor. Thank you.

MR. IANNO: Your Honor, if I may, just a couple of questions.

REDIRECT EXAMINATION

BY MR. IANNO:

Q. Ms. Sanchez, in connection with the document printing process, because documents weren't copied, correct, they were printed?

A. Correct.

Q. What offers did you make, if any, to have any of the movants or their counsel present ---

MR. SCAROLA: Excuse me, your Honor, that has to go to negotiations regarding this order, which your Honor has precluded us from getting into. I do object on the basis of relevance.

THE COURT: What's the relevance?

MR. IANNO: The relevance is she made the offer, Judge, and they had the opportunity to be present for this process and how it was done and then chose not to.

THE COURT: They submitted the agreed order.

MR. IANNO: Correct.

THE COURT: Proceed.

BY MR. IANNO:

Q. Ms. Sanchez, turn to Exhibit C of your affidavit. The email -- there is an email from you to Mr. Lehrman saying the documents are done and will be FedExed to you tonight for Monday, 10:00 a.m. delivery and the disks returned to Judge Carney. Do you see that?

A. Yes.

Q. What, if any, objection did you receive from Farmer Jaffe or any of its lawyers to that process?

A. None. I received a thank you.

Q. The documents that were provided to Fowler White, were you responsible for the printing process? The CDs that you received from Judge Carney with the ---

THE COURT: She already answered that she was not.

MR. IANNO: Well, no, she was responsible as the attorney, Judge.

THE COURT: Well, you didn't ask her that.

MR. IANNO: I know she didn't personally participate, I apologize.

BY MR. IANNO:

Q. Were you the person who was the attorney within Fowler White who received the documents -- the disks?

A. Yes.

Q. Were you responsible for those disks?

A. Yes.

Q. So when you say to your knowledge none of the disks or the documents were retained, that's because it was your responsibility?

A. Yes.

Q. Now, the disks were sent to Judge Carney, as you said --

A. Yes.

Q. -- do you remember that?

A. Yes.

Q. What, if any, response did you receive from Judge Carney that he didn't receive the disks he was supposed to receive?

A. None.

Q. And he was copied on your e-mail that's Exhibit C, correct?

A. Yes.

Q. What, if any -- strike that.

MR. IANNO: One moment, your Honor.

BY MR. IANNO:

Q. Did you ever review, copy, use or obtain any of the documents that Fowler White wasn't supposed to have?

A. No.

MR. IANNO: Thank you.

No further questions, your Honor.

THE COURT: May the witness be excused?

MR. SCAROLA: We have no objection, your Honor.

THE COURT: All right. You're excused.

THE WITNESS: Thank you, your Honor.

THE COURT: Mr. McLachlan, your next witness.

MR. McLACHLAN: Judge, we just want to confer for just a minute, if you don't mind.

THE COURT: All right. We'll take a five-minute break.

MR. McLACHLAN: Thank you, Judge.

(Thereupon, a recess was had, after which the following proceedings were had:)

ECRO: All rise.

THE COURT: Please be seated. We'll be back in session.

All right. Mr. McLachlan.

MR. McLACHLAN: Thank you, Judge.

At this time we only have two requests -- well, one request, and that is that the Court take judicial notice of the filing in this case, at DE 1442, which is our Exhibit N -- M, and the ---

THE COURT: What's the docket entry number?

MR. McLACHLAN: It is DE 1442, Doc 1442, and also our Exhibit N, which is a filing dated February 9, 2012 in the state court, and other than that, your Honor, we rest our case.

THE COURT: Any response?

MR. SCAROLA: Yes, your Honor. We object to both Exhibit M and N as being irrelevant.

THE COURT: All right.

MR. SCAROLA: And containing hearsay statements.

THE COURT: Let me see what M is first of all.

MR. McLACHLAN: I can respond to the relevance argument.

THE COURT: It's the motion for sanctions, Docket Entry 1442.

MR. McLACHLAN: Yes, Judge.

THE COURT: That's part of the court record.

MR. McLACHLAN: Correct.

THE COURT: That will be admitted.

MR. SCAROLA: May I point out, your Honor, that it is part of the Court record, being a filing by counsel for Jeffrey Epstein, and it contains hearsay within the hearsay document. That is the basis for our objection, Jeffrey Epstein's statements, or the statements of his counsel are not subject to cross-examination, and on that basis we do object.

THE COURT: Your response, that's well argued. Epstein is not testifying.

MR. McLACHLAN: Well, no, Epstein is not testifying, it's not his clients, and he was excused from this proceeding yesterday pursuant to the agreement of Mr. Scarola and Mr. Link when he was dropped.

Here is what I would say, Judge, as to relevance, there ---

THE COURT: No, he was ordered to appear here by me.

MR. McLACHLAN: Right, and he disobeyed that order.

THE COURT: He didn't agree, and the parties didn't object.

MR. McLACHLAN: I'm sorry?

THE COURT: The parties haven't objected. Now they're objecting?

MR. McLACHLAN: Only to the extent -- I find it hard to believe that Mr. Scarola is objecting to your taking judicial notice, simply of the filing. We don't need you to believe everything in the document. The fact of the matter is, this is why it's highly probative, Judge, on Exhibit M, that was filed February 15, 2011.

THE COURT: And it's filed against the trustee.

MR. McLACHLAN: It's -- no, it's filed

against -- it's filed actually against --

THE COURT: Let me look.

MR. McLACHLAN: -- Farmer Jaffe, Edwards, not until -- Edwards filed a motion to challenge the subpoena in state court. It's simply saying we need documents, and we need an appropriate privilege log.

Wait, I'm sorry. Yes, if you look at the closing, the closing document, the record demonstrates that Epstein incurred unnecessary expenses and delays in attempting to obtain compliance from Edwards of the orders of this Court.

Since August 13, 2010, when the Court first required the privilege log, six months have passed and still no privilege log has been prepared.

THE COURT: I won't allow a motion for sanctions into evidence for this hearing.

MR. McLACHLAN: I'm sorry, you will or you won't, Judge?

THE COURT: Will not.

MR. McLACHLAN: Okay.

THE COURT: Let me mark that.

MR. SCAROLA: We have the same objections with regard to Exhibit N, your Honor, which is also a Jeffrey Epstein filing.

THE COURT: The same ruling.

MR. McLACHLAN: Even though that was a filing made by Fowler White on Mr. Epstein's behalf, your Honor? The last document is, that's February 2012.

THE COURT: Let me look.

MR. McLACHLAN: Both of these documents were filed by Fowler White on behalf of Mr. Epstein, seeking to get the documents that had not been produced, and in February 2012, seeking to have Edwards provide a compliant privilege log.

MR. SCAROLA: They are not relevant, they are self-serving statements.

THE COURT: My ruling remains the same, they're not admitted.

All right. You say the parties rest?

MR. McLACHLAN: Yes, Judge. Thank you.

THE COURT: All right. We'll take the matter under advisement, require proposed orders that address the narrow, narrow issue of whether there was a violation of Docket Entry 1194, the agreed order.

Any case law that supports the position you're taking, cite to it. Cite to any uncontested facts or facts that support your position.

MR. McLACHLAN: Judge, just to be clear, if I might, I just want to be clear on your Honor's ruling

today, you said whether there was a violation, and of course there is the provision in your order to show cause that says even if there is not perfect compliance, substantial good faith compliance would preclude a finding of contempt. We would like to address that issue as well, your Honor.

THE COURT: Address it in -- hang on for a minute. Let me find it, order to show cause is Docket Entry 6366.

MR. McLACHLAN: Yes, Judge.

THE COURT: And take that into account in preparing your proposed orders.

How much time do you all need on the proposed orders?

MR. SCAROLA: We would request 15 days, your Honor.

MR. McLACHLAN: That's fine, Judge.

THE COURT: What date that would be? Give me the following Monday.

UNIDENTIFIED: Monday the 12th, I believe, which is a holiday. So, that would be Tuesday, the 13th.

THE COURT: Tuesday, November 13th.

MR. SCAROLA: Thank you very much, your Honor, and thank you for your time and attention to

this, sir.

MR. McLACHLAN: Thank you, your Honor.

MR. IANNO: Thank you, Judge.

(Thereupon, the hearing was concluded.)

CERTIFICATION

STATE OF FLORIDA :
COUNTY OF MIAMI-DADE :

I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

WITNESS my hand this 31st day of October, 2018.

______________________________

CHERYL L. JENKINS, RPR, RMR
Court Reporter and Notary Public
in and for the State of Florida at Large
Commission #GG 138863
December 27, 2021